# In the United States Court of Appeals for the Eighth Circuit

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, ET AL.

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent*.

On Petitions for Review of an Order of the
Federal Trade Commission

## MOTION FOR STAY PENDING DISPOSITION OF PETITIONS FOR REVIEW

Helgi C. Walker
  *Counsel of Record*
Lucas C. Townsend
Michael P. Corcoran
Lael D. Weinberger
Andrew Ebrahem
Connor P. Mui
GIBSON, DUNN & CRUTCHER LLP
1700 M St. N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

*Additional counsel listed on next page*

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street N.W.
Suite 1000
Washington, DC 20006
(202) 783-8400
edavis@shb.com

*Counsel for Custom Communications, Inc., d/b/a Custom Alarm*

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE LLC
P.O. Box. 8248
Cincinnati, OH 45249
513-201-5775
bflowers@ashbrookbk.com

*Counsel for Michigan Press Association and the National Federation of Independent Business, Inc.*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.
777 Gloucester St.
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for the Chamber of Commerce of the United States of America and the Georgia Chamber of Commerce*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H St., NW
Washington, DC 20062

*Counsel for the Chamber of Commerce of the United States of America*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 8th Cir. R. 26.1A, petitioners Custom Communications, Inc., d/b/a Custom Alarm, Electronic Security Association, Inc., Interactive Advertising Bureau, NCTA – The Internet & Television Association, Michigan Press Association, National Federation of Independent Business, Inc., the Chamber of Commerce of the United States of America, and the Georgia Chamber of Commerce, make the following disclosures:

Custom Communications, Inc., d/b/a Custom Alarm has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Electronic Security Association, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Interactive Advertising Bureau has no parent corporation, and no publicly held company owns 10% or more of its stock.

NCTA – The Internet & Television Association has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Michigan Press Association has no parent corporation, and no publicly held company owns 10% or more of its stock.

i

The National Federation of Independent Business, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Chamber of Commerce of the United States of America has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Georgia Chamber of Commerce has no parent corporation, and no publicly held company owns 10% or more of its stock.

Dated: December 5, 2024        Respectfully submitted,

*/s/ Helgi C. Walker*

Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 887-3599
hwalker@gibsondunn.com

*Counsel for Petitioners*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

BACKGROUND ..............................................................................3

    A.    The Federal Trade Commission Act .....................................3

    B.    Recurring Subscriptions .....................................................6

    C.    The Rule............................................................................7

    D.    Petitioners' Challenges ....................................................10

JURISDICTION............................................................................10

ARGUMENT ................................................................................11

I.    Petitioners Are Likely To Prevail On The Merits. .......................13

    A.    The Commission lacks authority to issue this Rule. ............13

    B.    The Commission violated multiple procedural requirements.........................................................................18

    C.    The Rule is arbitrary and capricious...................................19

    D.    The Rule violates the First Amendment. .............................22

II.    The Balance Of Equities Supports A Stay....................................25

    A.    The Rule causes irreparable harm. .....................................25

    B.    The public interest supports a stay. ....................................28

CONCLUSION.............................................................................30

Appellate Case: 24-3137     Page: 5     Date Filed: 12/05/2024 Entry ID: 5463205

# TABLE OF AUTHORITIES

**Cases**        **Page(s)**

*Am. Fin. Servs. Ass'n v. F.T.C.*,
767 F.2d 957 (D.C. Cir. 1985)................................................................3

*Bond v. United States*,
572 U.S. 844 (2014) ......................................................17

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980) ........................................................22, 24

*In re Electronic Sec. Ass'n*,
No. 24-60570 (5th Cir. Nov. 19, 2024)................................................11

*Elrod v. Burns*,
427 U.S. 347 (1976) .........................................................25

*In re Federal Trade Commission, Negative Option Rule*,
MCP No. 192 (Nov. 21, 2024) ............................................................11

*Harry and Bryant Co. v. FTC*,
726 F.2d 993 (4th Cir. 1984).............................................................18

*Iowa Utilities Bd. v. F.C.C.*,
109 F.3d 418 (8th Cir. 1996)............................................................27

*Missouri v. Biden*,
2024 WL 3462265 (8th Cir. July 18, 2024) ........................................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..........................................................19

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ..........................................................24

*Nebraska v. Biden*,
52 F.4th 1044 (8th Cir. 2022)....................................................12, 29

Appellate Case: 24-3137     Page: 6     Date Filed: 12/05/2024 Entry ID: 5463205

# TABLE OF AUTHORITIES
*(continued)*

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................28

*Paul v. United States*,
140 S. Ct. 342 (2019) ......................................................17

*Rogers Group, Inc. v. City of Fayetteville, Ark.*,
629 F.3d 784 (8th Cir. 2010)............................................25

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022)............................................28

*Va. State Bd. of Pharma. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ..................................................22, 23

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................................17

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
471 U.S. 626 (1985) ........................................................22

## Statutes

5 U.S.C. § 705....................................................................12

15 U.S.C. § 57a.......................................... 1, 5, 10, 13, 14, 18, 19

15 U.S.C. § 57b-3..........................................................5, 18

15 U.S.C. § 1693 ..............................................................7

15 U.S.C. § 1693c .......................................................14, 15

15 U.S.C. § 6101 ..............................................................7

15 U.S.C. § 6102 ............................................................16

Appellate Case: 24-3137     Page: 7     Date Filed: 12/05/2024 Entry ID: 5463205

# TABLE OF AUTHORITIES
*(continued)*

**Page**

15 U.S.C. § 8403.................................................................7, 15, 24

15 U.S.C. § 8404.....................................................................15, 16

28 U.S.C. § 2112......................................................................10, 11

39 U.S.C. § 3009.............................................................................6

47 U.S.C. § 562......................................................................7, 15

Colo. Rev. Stat. § 6-1-732..............................................................7

Pub. L. No. 75-447, 52 Stat. 111 (1938)..........................................3

Pub. L. No. 93-637, 88 Stat. 2183 (1975)........................................4

Pub. L. No. 96-252, 94 Stat. 374 (1980)..........................................4

Pub. L. No. 103-312, 108 Stat. 1691 (1994)....................................4

Pub. L. No. 117-58, 135 Stat. 429 (2021).................................7, 15

## Other Authorities

*Ask the Commissioner: Federal Trade Commissioner
Christine Varney*, 14 No. 2 ACCA Docket 36 (1996)............................6

Beales & Muris, *Back to the Future: How Not To Write a
Regulation*, AEI (June 2022),
https://tinyurl.com/4r9cydm8............................................................4, 5

Dissenting Statement of Commissioner Melissa Holyoak,
*Negative Option Rule*, FTC Matter No. P064202 (Oct. 16,
2024)...........................................................................................4

S. Hrg. 111-647, 111th Cong. 62-63 (2010)....................................5

S. Rep. No. 96-500 (1979)...............................................................4

Appellate Case: 24-3137     Page: 8     Date Filed: 12/05/2024 Entry ID: 5463205

# TABLE OF AUTHORITIES

*(continued)*

**Page**

**Rule**

Fed. R. App. P. 18 ....................................................................12

Appellate Case: 24-3137     Page: 9     Date Filed: 12/05/2024 Entry ID: 5463205

## INTRODUCTION

This is no ordinary administrative challenge. The Federal Trade Commission used a statute that *limits* the agency's rulemaking power to promulgate, by a 3-2 vote, a rule regulating over *a billion* recurring subscription agreements across all sectors of the economy (the "Rule"). These are contracts that more than three-quarters of consumers rely on for everything from newspapers and internet service to lawn care and home security. Their only shared feature? They continue to provide some good or service until the customer cancels, allowing consumers the convenience of uninterrupted service. The Commission calls these subscriptions "negative option" contracts and deems them *categorically* "unfair or deceptive" unless sellers meet a new set of complex requirements.

The Commission lacks authority for this indiscriminate regulation. The agency claims authority in Section 18 of the Federal Trade Commission Act ("FTC Act"), but that law *curtails* the agency's regulatory power. Specifically, Section 18 provides that the Commission may make rules regarding only "specific[]" and "prevalent" "unfair or deceptive acts or practices," 15 U.S.C. § 57a(a)(1)(B), (b)(3), and then only

1

after following rigorous procedural requirements that go above and beyond the Administrative Procedure Act. The Commission exceeded those statutory limits: A Rule governing a billion subscription plans across the economy is hardly "specific," and the Commission did not bother to find that swaths of these plans are rife with unfair or deceptive practices.

Congress knows how to deal with subscription plans when it wants. Congress has enacted no fewer than five statutes regulating such plans in specific contexts. But the Rule would declare *all* subscription plans unfair or deceptive *even when* they comply with these laws. The Commission has no power to override Congress's judgment and regulate the field, much less under a narrow provision like Section 18.

The Rule should be stayed pending judicial review. Unless the Court acts, some of the Rule will take effect on January 14, 2025, and the rest on May 14, 2025. To meet those deadlines, Petitioners must begin incurring significant compliance costs that will be passed on to consumers in the form of higher prices for essential goods and services. Absent a stay, Petitioners will need to redesign sales materials, websites, apps, customer intake and cancellation procedures, and more, losing

2

customer goodwill in the process. The Rule will also burden Petitioners' First Amendment rights by restricting whether and how companies can communicate with their customers—a *per se* irreparable harm. Meanwhile, the Rule will harm consumers by making popular subscriptions more difficult to enter and harder to retain—causing significant problems for vital services like home security, medical monitoring, or internet service where continuity is key.

For all these reasons, Petitioners respectfully request that the Court stay the Rule by January 14, 2025, or as soon thereafter as possible. To maintain the *status quo* pending the resolution of this motion, the Court should enter an administrative stay.

## BACKGROUND

### A. The Federal Trade Commission Act

The FTC Act provides the Commission with authority to "prevent . . . unfair or deceptive acts or practices in commerce." Pub. L. No. 75-447, 52 Stat. 111, 112 (1938) (codified at 15 U.S.C. § 45). For much of the Act's history, the Commission relied exclusively on administrative cease-and-desist orders for enforcement purposes. *See Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 967 (D.C. Cir. 1985). But in the 1970s, the

3

Commission began wielding its powers more aggressively, issuing rules that deemed certain acts "unfair" under dubious assertions of authority. *See* Dissenting Statement of Commissioner Melissa Holyoak, at 3, *Negative Option Rule*, FTC Matter No. P064202 (Oct. 16, 2024). At one point, the Commission even tried to ban all television advertising to children, which earned it the moniker "National Nanny" by the Washington Post. *Id.* Those rules created a congressional backlash against the "breadth" of the Commission's asserted authority. *See* Beales & Muris, *Back to the Future: How Not to Write a Regulation* at 8, AEI (June 2022), https://tinyurl.com/4r9cydm8.

Congress responded with multiple statutes, starting with the Magnuson-Moss Warranty Act in 1975, designed to *curb* the Commission's power. Holyoak Dissent, at 3 (citing Pub. L. No. 93-637, 88 Stat. 2183 (1975); Pub. L. No. 96-252, 94 Stat. 374 (1980)); *see also* Pub. L. No. 103-312, 108 Stat. 1691 (1994); S. Rep. No. 96-500, at 2 (1979) (FTC's rules had gone "beyond the intent of Congress."). Magnuson-Moss codified Section 18 of the FTC Act and clarified that the Commission may promulgate only "rules which define *with specificity* acts or practices which are unfair or deceptive"—and then, only if those unfair or

4

deceptive acts or practices are "*prevalent*." 15 U.S.C. § 57a(a)(1)(B), (b)(3) (emphases added). Further, Congress enacted detailed procedural limitations on that authority. The Commission must:

- publish an "advance notice of proposed rulemaking" *before* issuing a notice of proposed rulemaking, *id.* § 57a(b)(2);

- describe the "alternatives" under consideration, *id.* § 57a(b)(1);

- provide a detailed "preliminary regulatory analysis" for rules that will "have an annual effect on the national economy of $100,000,000 or more," *id.* § 57b-3(a)-(b); and

- provide the opportunity for an "informal hearing," which involves additional submissions, evidence, and cross-examination to resolve disputed issues of material fact, *id.* § 57a(b)(1), (c).

In the years after Magnuson-Moss, the Commission initiated only a handful of rulemakings under Section 18—all concerning narrow subjects or specific trade practices. For example, the Commission initiated rulemakings for "health spas," "eyeglasses," and "funerals." Beales & Muris, *supra*, at 8. To comply with Magnuson-Moss, most of those rulemakings took several years, a few took nearly a decade, and some were abandoned altogether. S. Hrg. 111-647, 111th Cong. 62-63

5

(2010). That scope and pace reflected Congress's plan to effectively "prohibit" the Commission "from proposing or imposing regulatory burdens on industry under its own initiative" and return that authority to Congress. *Ask the Commissioner: Federal Trade Commissioner Christine Varney*, 14 No. 2 ACCA Docket 36 (1996).

### B. Recurring Subscriptions

Subscription plans are a convenient way for Americans to obtain goods or services on a continuous, uninterrupted basis. These goods and services include newspapers, telephone, internet, electricity, home security, lawncare, and more. Automatically renewing subscriptions are a beneficial, common means of meeting that market demand.

Before Congress enacted Magnuson-Moss, the Commission adopted a regulation for a specific type of recurring subscription: "prenotification plans," like book-of-the-month-clubs, where sellers provide notices of offers for goods and then ship and charge for the goods if the consumer does not decline the offer. App.7. A few years earlier, Congress had enacted the Unordered Merchandise Statute, 39 U.S.C. § 3009, which prohibits sending unordered merchandise to consumers. Neither that rule nor that statute regulated any other recurring subscriptions.

6

After Magnuson-Moss, Congress enacted several other statutes regulating recurring subscriptions in specific contexts. The Electronic Fund Transfer Act ("EFTA") regulates unfair or deceptive electronic-fund transfers. 15 U.S.C. § 1693. The Telemarketing and Consumer Fraud and Abuse Prevention Act requires the Commission to promulgate rules regarding unfair or deceptive telemarketing practices. *Id.* § 6101. The Restore Online Shoppers' Confidence Act ("ROSCA") regulates unfair or deceptive recurring subscriptions offered online. *Id.* § 8403. More recently, Congress enacted statutes requiring specific disclosures for subscriptions offered by both cable television providers, 47 U.S.C. § 562, and broadband providers, Pub. L. 117-58, § 60504(a)-(b), 135 Stat. 429, 1244 (2021). States, too, have regulated recurring subscriptions. *E.g.*, Colo. Rev. Stat. § 6-1-732.

### C. The Rule

Not satisfied with Congress's work, the Commission initiated this rulemaking in 2019 by issuing an advanced notice of proposed rulemaking that simply asked whether its prior rule should be amended to address other types of recurring subscriptions. Four years later, the Commission issued a notice of proposed rulemaking ("NPRM") regarding

7

an all-encompassing rule regulating all manner of recurring subscriptions in all industries.

In the NPRM, the Commission implausibly claimed that the proposed rule would not annually affect the economy by $100 million or more, and thus declined to perform the preliminary regulatory analysis required by the FTC Act. App.86. When several commenters requested an informal hearing, the Commission refused to hear multiple disputed issues, including how proposed requirements would affect companies and customers and specific industries, and whether the supposedly unfair or deceptive practices are prevalent in specific industries or media. App.86-87. After a limited informal hearing, an Administrative Law Judge concluded that "[t]he proposed rule . . . *will* have an annual effect on the national economy of $100 million or more." App.88 (emphasis added).

On October 16, 2024, the Commission issued the final Rule. It has four categories of requirements:

- **§ 425.3** prohibits misrepresentations of any "[m]aterial fact," including facts that have nothing to do with the automatic renewal aspect of the transaction.

8

- **§ 425.4** requires companies to "disclose . . . all [m]aterial terms, regardless of whether those terms directly relate to the" subscription plan; it also forbids any statement that could "interfere[] with, detract[] from, contradict[], or otherwise undermine[]" the required disclosures.

- **§ 425.5** requires companies to obtain and document a customer's consent to the recurring subscription feature "separately from any other portion of the transaction."

- **§ 425.6** requires entities to provide a "simple mechanism" to cancel that is "at least as easy to use as the mechanism the consumer used to consent" and meets other requirements. For example, if a customer signed up for a subscription online, the Rule restricts the company from interacting with the customer through live or virtual representatives when the customer cancels.

The ban on misrepresentations and ancillary provisions will take effect on January 14, 2025; the other provisions detailed above will take effect on May 14, 2025.

9

### D. Petitioners' Challenges

Petitioners are or represent sellers from many industries that use recurring subscription plans. They include Custom Communications, Inc., d/b/a Custom Alarm, a family-owned security services company; the Electronic Security Association, Inc., representing home security companies and emergency services; the Interactive Advertising Bureau, representing 700 media companies, brand marketers, and technology companies; NCTA – The Internet & Television Association, representing cable and broadband operators and cable TV programmers; the U.S. Chamber of Commerce, representing more than three million companies that provide a wide range of goods and services; the Michigan Press Association, representing newspapers and magazines in Michigan; and the National Federation of Independent Business, representing hundreds of thousands of small businesses across the country. Custom Alarm and other Petitioners' members (collectively, "Petitioners") will be directly regulated and harmed by the Rule.

## JURISDICTION

The Court has jurisdiction to review the Rule under 15 U.S.C. § 57a(e)(1)(A) and 28 U.S.C. § 2112(a). Petitioners filed their petitions

Appellate Case: 24-3137     Page: 19     Date Filed: 12/05/2024 Entry ID: 5463205

for review on October 22, 2024, six days after the Commission issued and promulgated the Rule on October 16, 2024. After the Fifth Circuit issued a writ of mandamus directing the Commission to comply with the lottery statute, 28 U.S.C. § 2112(a), *see* App.129, Order, *In re Elec. Sec. Ass'n*, No. 24-60570 (5th Cir. Nov. 19, 2024), the Judicial Panel on Multidistrict Litigation designated this Court to consolidate the petitions, Consolidation Order, *In re Federal Trade Commission, Negative Option Rule*, MCP No. 192 (Nov. 21, 2024). All petitions were transferred to and consolidated in this Court by December 4, 2024.

## ARGUMENT

The Rule badly exceeds the strict statutory limits Congress placed on the Commission's authority to regulate trade practices. Congress enacted those substantive and procedural limits to *rein in* the Commission's regulation of the economy and return that power to elected lawmakers. In the decades since, Congress has enacted laws that address specific aspects of recurring subscriptions. But the Rule overrides those laws to saddle American businesses and consumers with a new, complex set of regulations that apply to *all* recurring subscriptions. In one fell swoop, the Rule regulates large and small

11

businesses, goods and services providers, and consumer and business-to-business contracts. And it applies across every industry, profession, and sector in the economy, regardless of whether the company or industry was ever found to have prevalent unfair or deceptive recurring subscriptions. This is the opposite of regulating discrete, "prevalent" practices with "specificity," as Magnuson-Moss requires.

Petitioners are likely to succeed on the merits, and at minimum these challenges "involve substantial questions of law." *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022). Yet if Petitioners are required to implement changes to comply with the Rule, they and their customers will suffer irreparable harm. The equities and the public interest lie in preventing that harm. The Court should stay the Rule's effective dates pending judicial review. 5 U.S.C. § 705.[1]

---

[1] Petitioners asked the Commission for a stay by November 1, 2024, stating that the request would be deemed denied if not acted upon by that date. App.98. It has been over four weeks since that date, yet the Commission has not responded, thus "fail[ing] to afford the relief requested" and making agency-granted relief "impracticable." Fed. R. App. P. 18(a)(2)(A).

## I.    Petitioners Are Likely To Prevail On The Merits.

### A.    The Commission lacks authority to issue this Rule.

The Rule is unlikely to survive judicial review because the Commission lacks authority to issue it, much less to override Congress's judgments about consumer protection. The major questions and nondelegation doctrines also foreclose the Commission's power-grab.

*First*, the Rule is far more expansive than Section 18 permits. Section 18 authorizes the Commission to "define with *specificity*" unfair or deceptive acts or practices, no more. 15 U.S.C. § 57a(a)(1)(B) (emphasis added). But the Rule is far from specific. It wraps together over *one billion* recurring subscriptions—covering everything from security services to meal-prep deliveries—that have nothing in common except that they continue until the customer cancels. *See* App.53. That plenary regulation represents exactly what Congress meant to stop when enacting Magnuson Moss.

Moreover, the Rule is rife with amorphous terms that are hardly specific. For example, the Rule requires disclosures of "Material terms," Rule § 425.4, but that is patently vague—what counts as a "material term" will necessarily vary among subscriptions that range from life-

13

saving security services to routine newspaper transactions. *Compare* App.199-203 (Allstate Security), *with* App.349-53 (Detroit Free Press). And the prohibition on "misrepresentations" of "*any* Material fact" is effectively a ban on "deceptive" acts or practices—a tautological restatement of Section 18 that is not specific. Rule § 425.3 (emphasis added).

*Second*, the Commission can issue specific rules under Section 18 only when it determines that the "unfair or deceptive acts or practices are *prevalent.*" 15 U.S.C. §§ 57a(b)(3), (d)(1) (emphasis added). The Commission has never established that these one-billion-plus recurring subscriptions are so rife with unfair or deceptive acts as to warrant this catch-all Rule. Instead, the Commission has cited a smattering of cases, studies, and comments that at most suggest *some* companies or industries might contain *instances* of unfair or deceptive recurring subscriptions. The Commission concedes it has not established prevalence for *all* the industries that the Rule covers. *See* App.13-14. For example, the Commission cites a single comment regarding an allegedly unfair recurring lawncare service, *id.*, yet the Rule will regulate recurring lawncare subscriptions everywhere.

14

Congress's legislative approach confirms the Rule's lack of specificity and failure to establish prevalence. When Congress has regulated recurring subscriptions, it has done so for specific industries and contexts through laws far more circumscribed than the agency's Rule. For example, ROSCA regulates recurring subscriptions offered *over the internet*. 15 U.S.C. §§ 8403, 8404. The EFTA regulates *electronic fund transfer services*. 15 U.S.C. § 1693c. And more recent enactments require *broadband and cable television providers* to disclose *particular terms* of their recurring subscriptions. *See* Pub. L. No. 117-58, § 60504, 135 Stat. 429; 47 U.S.C. § 562. The Commission's circumscribed authority to regulate "with specificity" cannot be license to issue a broader, more burdensome Rule than the specific laws that Congress itself has enacted.

Worse, the Rule would effectively override all of those statutes. The Rule boldly declares that recurring subscriptions are unfair or deceptive *even when they comply with federal legislation*—while also regulating subscriptions that *Congress never regulated*. For example, while ROSCA requires a "simple" cancellation mechanism only for online subscriptions, 15 U.S.C. § 8403, the Rule requires all cancellation mechanisms to be "as

15

easy to use as" the sign-up mechanism, Rule § 425.6(b). Similarly, while Congress decided that institutions effectuating electronic fund transfers must disclose only certain terms, 15 U.S.C. § 1693c(a), the Rule mandates disclosure of all material terms. How could a practice be "unfair or deceptive" if it meets all the requirements Congress deemed necessary to protect consumers? And though Congress has never directly regulated recurring subscriptions offered by newspapers, security services, or lawn care services, the Rule reaches all those subscriptions and more.

Congress never gave the Commission this plenary power. Quite the contrary, Congress explicitly *repudiated* such power in Magnuson-Moss, and later, through ROSCA and other statutes, conferred upon the agency only *discrete* authority over specific types of recurring subscriptions. *E.g.*, 15 U.S.C. § 8404; *id.* § 6102(a)(1) (rulemaking power over "deceptive *telemarketing* acts or practices" (emphasis added)). Section 18's limited authority to issue "specific[]" trade regulations does not support this sweeping Rule that is broader and more prescriptive than any statute enacted by Congress.

16

Were there any doubt, it would be resolved by the major questions and nondelegation doctrines. The Rule regulates over one billion contracts across the entire economy that millions of consumers and businesses use every day. That is a textbook major question, yet nothing clearly grants the Commission such vast power. Rather, the Commission invoked only its "long-extant" and "vague" Section 18 authority to justify this "transformative" Rule. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). In doing so, the Commission disrupted the "usual constitutional balance of federal and state powers" by federalizing a huge swath of contract law. *Bond v. United States*, 572 U.S. 844, 858 (2014). *None* of that is allowed without a clear statement from Congress.

If Section 18 somehow justified this Rule, that would mean that Section 18's standardless authority violates the nondelegation doctrine. That doctrine prohibits the delegation of major policy questions from Congress to the Executive. *See Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J.). If construed to allow the Commission to regulate subscriptions in every industry—regardless of the good or service, regardless of any evidence of unfair or deceptive practices regarding the subscriptions, and regardless whether Congress

17

has also legislated on the topic—Section 18 would lack any guiding principle and amount to an unconstitutional delegation of legislative power.

## B. The Commission violated multiple procedural requirements.

The Rule is also unlikely to survive because the Commission violated multiple procedural requirements when issuing it. The Commission "failed entirely" to perform a preliminary regulatory analysis, even though the sweeping Rule will plainly affect the national economy by $100 million or more—as the Commission later conceded. *See* 15 U.S.C. §§ 57b-3(c); App.47-49. Regulated companies were entitled to a "public comment period in response to the preliminary regulatory analysis," 15 U.S.C. §§ 57b-3(b)(2)(E), but they never got that chance. Those failures necessitate "set[ting] aside" the Rule. *Id.* § 57b-3(c).

The Commission also refused to hear multiple disputed issues of material fact at the statutorily required informal hearing—which in years past entailed months of evidentiary submissions, hearings, and cross-examination on disputes of fact. 15 U.S.C. §§ 57a(b)(1)(C), (c)(2)(B); *Harry and Bryant Co. v. FTC*, 726 F.2d 993, 996 (4th Cir. 1984). For example, the Commission refused to consider the specific effects of

18

particular Rule provisions and whether unfair or deceptive subscriptions are prevalent in specific industries. App.78-80. That too warrants vacatur. *See* 15 U.S.C. § 57a(e)(3)(B).

### C. The Rule is arbitrary and capricious.

The Rule is arbitrary and capricious for multiple reasons. Critically, the Commission "entirely failed to consider [several] important aspect[s] of the problem" in promulgating this one-size-fits-all Rule. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Indeed, the Commission never explained how the Rule could reasonably cover so many different industries, such as security or lawncare services, or large and small businesses alike, that have nothing in common beyond recurring subscriptions. The Commission also insisted that the Rule must apply to subscription contracts between businesses to protect small businesses, App.14—which completely ignores that many small businesses offer their own subscription services to larger ones. App.144-45, 155-56 (Custom Alarm). Again and again, the Commission failed to grapple with the breadth of its Rule or particular problems its Rule will create for specific subscriptions and industries.

19

For example, the Commission missed several big problems with the Rule's cancellation requirement, including how the Rule will hinder companies from providing customers with important protections and information when they try to cancel. *See* Rule § 425.6. Security, medical monitoring, or communications services in particular must verify that the right person is cancelling, or that customers are prepared for immediate termination, with potentially life-changing consequences. App.208-10 (Allstate Security); App.153-58 (Custom Alarm). Yet the Commission estimates that it should take customers "no more than 30 seconds to one minute" to cancel, App.50, and that any identity verification cannot create "distinctly asymmetrical experiences" between signup and cancellation, App.36, which hardly allows for proper safeguards in critical services. And for customers that have bundled services, the Commission failed to explain how a cancellation process can be as easy to use as a sign-up process if the customer tries to cancel only one of a bundled service and retain the rest. *See* App.302-03 (Cox).

The same is true for the Rule's requirement that companies obtain and document consent to recurring subscription features "separately" from the rest of the transaction. Rule § 425.5. Basic contract law will

require companies to obtain *two* consents to a recurring subscription—one for the recurring subscription feature under the Rule, and one for the rest of the transaction. The Commission conceded that a two-step consent requirement "is unnecessary, potentially confusing, and may be hard to implement," App.32, without acknowledging that its Rule effectively requires two-step consent anyway. Nor did the Commission recognize that such two-step consent will prove practically impossible for small companies that operate informally with their customers. *See* App.405, 415-16 (Herbi-Systems).

Similarly, the Commission failed to grapple with how the Rule's disclosure requirements will vary drastically among companies and industries. Rule § 425.4. The Commission requires disclosures of all "Material terms" that are "likely to affect a person's choice of, or conduct regarding, goods or services," Rule § 425.2, without realizing that people's choices turn on the specific good or service offered and will require guesswork from companies. *E.g.*, App.172-75 (ESA); App.443 (Gannett). Likewise, the Commission justified the ban on material misrepresentations as somehow "specific," even though the Commission admitted that it "cannot predict" what that provision will ban. App.24.

21

Any one of those failures is arbitrary and capricious; together, they confirm that the Commission entirely missed multiple problems in its rush to issue the Rule.

### D. The Rule violates the First Amendment.

The Rule severely burdens companies' speech, which is protected by the First Amendment even when it "does no more than propose a commercial transaction." *Va. State Bd. of Pharma. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). "Commercial speech that is not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985); *see Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980).

The Rule violates the First Amendment by both restraining and compelling speech.

The Rule *restrains* speech by prohibiting any communication that "interferes with, detracts from, contradicts, or otherwise undermines" consumers' ability to "read, hear, see, or otherwise understand" required

22

disclosures, Rule § 425.4(b)(3)—all broadly prescriptive and malleable terms followed by a catch-all designed to cover the maximum amount of speech and preserve the maximum amount of enforcement discretion. *See also* Rule §§ 425.2, 425.5(a)(2) (similar). Even truthful, helpful speech might be swept under this nebulous umbrella. For example, a seller might hesitate before saying that it guarantees customer satisfaction or has a strong Better Business Bureau rating out of fear that the Commission might determine that such statements "detract[]" from the seller's disclosures.

The Rule further restrains speech through its new cancellation requirement, which will sometimes directly prohibit companies from speaking with customers that wish to cancel. Rule § 425.6. In many cases, it will prevent companies from understanding customers' reasons for cancelling and providing useful information or offering better prices or more suitable plans. *See, e.g.*, App.277-78 (NCTA); App.360-61 (Detroit Free Press); App. 176-80 (ESA). Thus, the Rule restricts the "free flow of commercial information" protected by the First Amendment. *Va. State Bd. of Pharma.*, 425 U.S. at 764.

23

Collectively, the Rule's slippery speech prohibitions will "chill" Petitioners' "protected speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018). Particularly given Congress's less restrictive enactments, *e.g.*, 15 U.S.C. § 8403, the Rule's prohibitions are not "narrowly drawn" to "directly advance" any governmental interest. *Cent. Hudson Gas*, 447 U.S. at 564-65 (quotations omitted).

The Rule *compels* speech through commercial disclosure requirements that are overbroad, "unjustified," and "unduly burdensome." *NIFLA*, 585 U.S. at 776. The First Amendment mandates that disclosure requirements be designed to "remedy a harm that is potentially real, not purely hypothetical," and "extend no broader than reasonably necessary." *Id.* (quotations omitted). Yet the Rule requires disclosing an indefinite and non-exhaustive list of "all Material terms"— *anything* "likely to affect a person's choice of . . . goods or services"— "regardless of whether" they relate to the subscription feature that supposedly justifies the Rule in the first place. §§ 425.2, 425.4(a). The alleged harms of negative option features cannot justify a sweeping obligation that goes far beyond those features.

24

## II.    The Balance Of Equities Supports A Stay.

The remaining stay factors support immediate relief.

### A.    The Rule causes irreparable harm.

In the absence of a stay, businesses subject to the Rule face significant and irreparable harms.  Irreparable harm exists where there is "no adequate remedy at law." *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010).  Here, the Rule will cause three types of irreparable harm to Petitioners.

***First Amendment.***    The Rule violates Petitioners' First Amendment rights.  As explained above, the Rule directly restricts companies' speech through provisions that are both broad and vague.  It also compels speech through its overbroad and burdensome disclosure requirements.  *See supra*, I.D.; *see also, e.g.*, App.205-12 (Allstate Security); App.407-14 (Herbi-Systems).  Both forms of speech regulation run afoul of the First Amendment.  And "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and alone justifies a stay.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Appellate Case: 24-3137    Page: 34    Date Filed: 12/05/2024 Entry ID: 5463205

**Customer goodwill.** The Rule will cause harm to Petitioners' customer goodwill. Repeatedly, the Rule makes it harder for customers to enter and retain recurring subscriptions, erecting obstacles that will frustrate, confuse, and annoy customers, who will blame companies, not the Commission for the hassle. For example, customers who wish to enter recurring subscriptions will be inundated with disclosures they do not want or need. Routine transactions for lawn care services will become unnecessarily complicated, and more complex transactions for security services will be bogged down in exhaustive disclosures. *See* App.407-09 (Herbi-Systems); App.199-201 (Allstate Security); App.172-74 (ESA); App.263-66 (NCTA); App.289-94 (Cox).

When customers make it past those disclosures, they will be confused and irritated by the need to consent twice to a single transaction—once for the recurring subscription and once for the rest of it. Some customers may mistakenly consent only to the subscription feature (or miss that step) and not realize that they do not actually have a contract for, *e.g.*, important security or medical monitoring services. *See* App.182-84 (ESA); App.432-33 (U.S. Chamber of Commerce); App.237 (IAB); App.271-73 (NCTA); App.299-300 (Cox); App.449-50

26

(Gannett). Those customers will fault companies for disruptions to their coverage.

The Rule's new cancellation requirement will backfire in many cases. Customers might inadvertently click to cancel their home security, telephone, internet, or other critical services—or third parties, without authorization to cancel, might do so. App.153-58 (Custom Alarm); App.184-89 (ESA); App.275-77 (NCTA); App.301-02 (Cox); App.489-90 (LOUD). Again, these customers will blame companies, not the Commission. And when customers wish to cancel, companies often offer discounts or better plans to retain them—yet the Rule will often prohibit companies from doing so, leading to lost customers for companies and lost savings for consumers. App.279-80 (NCTA); App.453-54 (Gannett); App.394-95 (NFIB); App.338-39 (Michigan Press Association); App.186-89 (ESA). That "loss of consumer goodwill" will be irreparable. *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996).

***Compliance costs.*** The Rule will harm Petitioners by causing them to incur massive "economic losses" that could not be recovered "if the [Commission's] rules are eventually overturned." *Id.* They will need to modify offers, redesign customer enrollment and cancellation

27

processes, change apps, websites, and telephone and in-person procedures, re-train staff, and obtain legal review.  App.414-19 (Herbi-Systems); App.146-50, 158-61 (Custom Alarm); App.485-88, 492-96 (LOUD Security); App.251, 261-263 (NCTA); App.465-66 (Georgia Chamber of Commerce).  Those changes will cost millions of dollars. App.308 (Cox); App.450-51 (Gannett); App.280-84 (NCTA); App.411 (Herbi-Systems); App.88-89.  And because of the Rule's complexity, Petitioners are incurring costs *now* absent a stay from this Court. App.414 (Herbi-Systems); App.201-05 (Allstate Security); App.445-46 (Gannett); App.305 (Cox).  All these costs will be unrecoverable due to the Commission's sovereign immunity.

### B.    The public interest supports a stay.

When "[g]overnment is the opposing party," the balance of the equities and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here the public interest strongly supports a stay.

There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (cleaned up).  Here, the Commission not only lacked authority to

28

promulgate the Rule, but also ignored important requirements deliberately crafted by Congress to limit the Commission's rulemaking activity.

Moreover, the public would not be harmed by a stay because, as the Commission itself recognized, federal and state laws already protect consumers here. App.7-9, 44-45. A stay would preserve the congressionally set status quo while protecting companies and consumers alike from the Rule's burdensome and complicated requirements. *See Nebraska*, 52 F.4th at 1046 (injunction pending appeal "to preserve the status quo"); *Missouri v. Biden*, 2024 WL 3462265, at *1 (8th Cir. July 18, 2024) (granting administrative stay).

Were there any doubt, the Commission's process resolves it. The Commission began this rulemaking five years ago, but then issued the Rule, in rushed fashion and with much fanfare and posturing in the press and on social media, just weeks before the presidential election. The agency could have been focusing on lawfully enforcing the standards that Congress adopted, not stretching its rulemaking authority to displace Congress's judgements. And even after Petitioners challenged the Rule, the Commission stonewalled under the lottery statute, necessitating a

29

writ of mandamus to kick-start this litigation. All this shows that something other than a legitimate need for immediate regulation spurred the Rule.

## CONCLUSION

The Court should stay the Rule pending judicial review and enter an administrative stay pending its ruling on this motion.

Dated:  December 5, 2024

Respectfully submitted,

  */s/ Helgi C. Walker*

Helgi C. Walker
   *Counsel of Record*
Lucas C. Townsend
Michael Corcoran
Lael D. Weinberger
Andrew Ebrahem
Connor P. Mui
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
hwalker@gibsondunn.com

Elliott M. Davis
Shook, Hardy & Bacon L.L.P.
1800 K Street N.W.
Suite 1000
Washington, DC 20006
(202) 783-8400
edavis@shb.com

*Counsel for Petitioners*

*Counsel for Custom Communica-
tions, Inc., d/b/a Custom Alarm*

30

Benjamin M. Flowers
Ashbrook Byrne Kresge LLC
P.O. Box. 8248
Cincinnati, OH 45249
513-201-5775
bflowers@ashbrookbk.com

*Counsel for Michigan Press Association and the National Federation of Independent Business, Inc.*

Mark D. Johnson
Gilbert, Harrell, Sumerford &
Martin, P.C.
777 Gloucester St.
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for the Chamber of Commerce of the United States of America and the Georgia Chamber of Commerce*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H St., NW
Washington, DC 20062

*Counsel for the Chamber of Commerce of the United States of America*

Appellate Case: 24-3137    Page: 40    Date Filed: 12/05/2024 Entry ID: 5463205

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2024, an electronic copy of the foregoing motion was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

*/s/ Helgi C. Walker*

Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts exempted under Federal Rule of Appellate Procedure 27(d)(a)(2)(B), it contains 5,200 words.

I certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook LT.

I further certify that this motion has been scanned for viruses and is virus-free.

Dated:  December 5, 2024

*/s/ Helgi C. Walker*

Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*