# In the United States Court of Appeals for the Eighth Circuit

―――――――――――

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, ET AL.

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

―――――――――――

On Petitions for Review of an Order of the
Federal Trade Commission

## APPENDIX TO MOTION FOR STAY PENDING DISPOSITION OF PETITIONS FOR REVIEW

Helgi C. Walker
  *Counsel of Record*
Lucas C. Townsend
Michael P. Corcoran
Lael D. Weinberger
Andrew Ebrahem
Connor P. Mui
GIBSON, DUNN & CRUTCHER LLP
1700 M St. N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

*Additional counsel listed on next page*

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street N.W.
Suite 1000
Washington, DC 20006
(202) 783-8400
edavis@shb.com

*Counsel for Custom
Communications, Inc., d/b/a
Custom Alarm*

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE LLC
P.O. Box. 8248
Cincinnati, OH 45249
513-201-5775
bflowers@ashbrookbk.com

*Counsel for Michigan Press
Association and the National
Federation for Independent
Business, Inc.*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD &
MARTIN, P.C.
777 Gloucester St.
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for the Chamber of
Commerce of the United States of
America and the Georgia
Chamber of Commerce*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H St., NW
Washington, DC 20062

*Counsel for the Chamber of
Commerce of the United States of
America*

# INDEX OF EXHIBITS

| Doc. # | Document Title | Page |
|---|---|---|
| 1 | Final Negative Option Rule, published at 89 Fed. Reg. 90476 | 5 |
| 2 | Notice Regarding Requests Relating to the Informal Hearing, No. P064202 (Jan. 10, 2024) | 76 |
| 3 | ALJ Recommended Decision, No. P064202 (FTC Apr. 12, 2024) | 82 |
| 4 | Declaration of Helgi C. Walker | 91 |
| 4.A | Letter from Helgi C. Walker to FTC Office of the Secretary, Oct. 25, 2024, and Attached Stay Request | 96 |
| 4.B | Letter from Anisha Dasgupta, FTC General Counsel, to Helgi C. Walker, Oct. 29, 2024 | 117 |
| 4.C | Letter from Helgi C. Walker to Anisha Dasgupta, Oct. 30, 2024 | 120 |
| 4.D | Letter from Anisha Dasgupta to Helgi C. Walker, Nov. 1, 2024 | 124 |
| 4.E | Order Granting Writ of Mandamus, No. 24-60570 (5th Cir. Nov. 19, 2024) | 129 |
| 5 | Declaration of Melissa Brinkman, Custom Communications, Inc., d/b/a Custom Alarm | 137 |
| 6 | Declaration of Merlin Guilbeau, Electronic Security Association, Inc. | 163 |
| 7 | Declaration of Randall Renfroe, Allstate Security Industries, Inc. | 193 |
| 8 | Declaration of Lartease Tiffith, Interactive Advertising Bureau | 216 |
| 9 | Declaration of Joni Lupovitz, NCTA – The Internet & Television Association | 248 |
| 10 | Declaration of Curt Stamp, Cox Communications, Inc. | 285 |
| 11 | Declaration of James Tarrant, Michigan Press Association | 310 |
| 12 | Declaration of Aaron Velthoven, Detroit Free Press | 344 |
| 13 | Declaration of Elizabeth Milito, National Federation of Independent Business, Inc. | 365 |

| | | |
|---|---|---|
| 14 | Declaration of Kenny Crenshaw, Herbi-Systems, Inc. | 401 |
| 15 | Declaration of William Ashley Gum, U.S. Chamber of Commerce | 420 |
| 16 | Declaration of Kristin Roberts, Gannett Co. | 437 |
| 17 | Declaration of Chris Clark, Georgia Chamber of Commerce | 457 |
| 18 | Declaration of John Loud, LOUD Security Systems, Inc. | 474 |

# Doc. 1

Final Negative Option Rule, published at
89 Fed. Reg. 90476

# FEDERAL TRADE COMMISSION

## 16 CFR Part 425

**RIN 3084–AB60**

## Negative Option Rule

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

---

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission") issues final amendments to the Commission's trade regulation "Rule Concerning Use of Prenotification Negative Option Plans," retitled the "Rule Concerning Recurring Subscriptions and Other Negative Option Programs" ("Rule," "final Rule" or "Negative Option Rule"). The final Rule now applies to all negative option programs in any media. This document also contains the text of the final Rule, the Rule's Statement of Basis and Purpose ("SBP"), and a final regulatory analysis.

**DATES:**

*Effective date:* This rule is effective January 14, 2025.

*Compliance date:* Regulated entities have until May 14, 2025 to comply with §§ 425.4 through 425.6.

**ADDRESSES:** Relevant portions of the record of this proceeding, including this document, are available *at https://www.ftc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Katherine Johnson, Attorney, (202) 326–2185, *kjohnson3@ftc.gov,* Division of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Ave. NW, Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

## I. Overview

The Commission commenced this proceeding because it had reason to believe unfair and deceptive negative option practices are widespread in the marketplace. Negative option programs can provide substantial benefits for sellers and consumers. However, consumers cannot realize these benefits when sellers make material misrepresentations to induce consumers to enroll in such programs, fail to provide important information, bill consumers without their consent, or make cancellation difficult or impossible. Unfair and deceptive negative option practices have been a persistent source of consumer harm for decades, saddling shoppers with recurring payments for products and services they never intended to purchase nor wanted to continue buying. In the past, the Commission

sought to address these practices through individual law enforcement actions and a patchwork of laws and regulations. Nevertheless, problems persist, as demonstrated by both a steady stream of State and Federal law enforcement actions and thousands of consumer complaints each year. To address these practices, the Commission proposed amending the current Negative Option Rule to establish clear, enforceable performance-based requirements for all negative option features in all media. The Commission solicited comments first in an advance notice of proposed rulemaking ("ANPR") and then on proposed amendments in a notice of proposed rulemaking ("NPRM"). The Commission designed these amendments to ensure consumers understand what they are purchasing and allow them to cancel their participation without undue burden.

Among other things, this final Rule (1) prohibits misrepresentations of any material fact made while marketing using negative option features; (2) requires sellers to provide important information prior to obtaining consumers' billing information and charging consumers; (3) requires sellers to obtain consumers' unambiguously affirmative consent to the negative option feature prior to charging them; and (4) requires sellers to provide consumers with simple cancellation mechanisms to immediately halt all recurring charges.

The Commission now promulgates a final Rule. Pursuant to 15 U.S.C. 57a(a)(1)(B), the Rule, *inter alia,* defines the following acts and practices as unfair or deceptive within the meaning of section 5 of the FTC Act:

• to misrepresent any material fact made while marketing using a negative option feature (§ 425.3);

• to fail to clearly and conspicuously disclose material terms prior to obtaining a consumer's billing information in connection with a negative option feature (§ 425.4);

• to fail to obtain a consumer's express informed consent to the negative option feature before charging the consumer (§ 425.5); and

• to fail to provide a simple mechanism to cancel the negative option feature and immediately halt charges (§ 425.6).

Further, the Rule, consistent with the final sentence of 15 U.S.C. 57a(a)(1)(B) includes requirements prescribed for the purpose of preventing such acts or practices.

The final Rule differs from the proposed Rule in two significant ways. First, the proposed Rule would have

required sellers to provide annual reminders to consumers of the negative option feature. Second, the proposed Rule would have prohibited sellers from forcing consumers to receive saves [1] without first obtaining consumers' unambiguously affirmative consent. The Commission has considered comments both supporting and opposing these proposed provisions. As explained in the section-by-section analysis, the Commission declines to adopt these provisions of the proposed Rule at this time. Instead, the Commission plans to seek further comment through a supplemental NPRM ("SNPRM"), and therefore, keeps the record open on these issues.[2]

Finally, in response to the comments, the Commission adds two definitions and two provisions to the final Rule for clarity. The final Rule explicitly defines the terms "material" and "interactive electronic medium" consistent with how they were defined and discussed in the NPRM. Additionally, the final Rule includes a severability provision and a provision allowing requests for exemptions from the final Rule consistent with the Commission's Rules of Practice.[3]

## II. Background

### A. Statutory Authority

The Commission promulgates the final Negative Option Rule, 16 CFR part 425 pursuant to section 18 of the FTC Act, 15 U.S.C. 57a, the Administrative Procedure Act ("APA"), 5 U.S.C. 533; and part 1, subpart B of the Commission's Rules of Practice, 16 CFR 1.7–1.20. Section 18 permits the Commission to promulgate, amend, and repeal trade regulation rules that define with specificity acts or practices that are unfair or deceptive within the meaning of section 5(a)(1) of the FTC Act, 15 U.S.C. 45(a)(1); and allows the Commission to prescribe requirements for the purpose of preventing these unfair or deceptive acts and practices.

### B. Negative Option Marketing

#### 1. Negative Option Programs

Negative option programs come in a variety of forms, but all share a central feature: each contain a term or condition that allows a seller to interpret a customer's silence, or failure to take an

---

[1] Save was defined in the proposed Rule to mean an attempt by a seller to present any additional offers, modifications to the existing agreement, reasons to retain the existing offer, or similar information when a consumer attempts to cancel a negative option feature. Proposed Rule § 425.2(f).

[2] *See* 16 CFR 1.11 ("Commission's Rules of Practice" or "Commission Rules"); *cf.* Impersonation Rule, 89 FR 15072 (Feb. 29, 2024).

[3] *See* 16 CFR 1.16.

App.6

affirmative action, as acceptance of an offer.[4] Negative option programs generally fall into four categories: prenotification plans, continuity plans, automatic renewals, and free trial (*i.e.,* free-to-pay or nominal-fee-to-pay) conversion offers.

Prenotification plans are the only negative option practice currently covered by the Commission's current Negative Option Rule, originally promulgated in 1973. Under such plans (*e.g.,* book-of-the-month clubs), sellers provide periodic notices offering goods to participating consumers and then send—and charge for—those goods only if the consumers take no action to decline the offer. The periodic announcements and shipments can continue indefinitely. In continuity plans, consumers agree in advance to receive periodic shipments of goods or provision of services (*e.g.,* bottled water delivery), which they continue to receive until they cancel the agreement. In automatic renewals, sellers (*e.g.,* a magazine publisher, credit monitoring service provider, etc.) automatically renew consumers' subscriptions when they expire, unless consumers affirmatively cancel the subscriptions. Finally, in free-to-pay plans, consumers receive goods or services for free (or at a nominal fee) for a trial period. After the trial period, sellers automatically begin charging a fee (or higher fee) unless consumers affirmatively cancel or return the goods or services.

Some negative option offers include upsell or bundled offers, where sellers use consumers' billing data to sell additional products from the same seller or pass consumers' billing data to a third party for their sales. An upsell occurs, *e.g.,* when a consumer completes a first transaction and then receives a second solicitation for an additional product or service. A bundled offer occurs, *e.g.,* when a seller packages two or more products or services together.

Importantly, negative option programs are distinct from other continuing agreements such as installment contracts. In an installment contract, consumers are obligated for the entire contractual period for the entire contract. A prime example of this type of transaction is a contract for purchasing a vehicle, which outlines terms, such as price, interest rate, and payment schedule. The contract thus allows the consumer to pay the purchase price of the vehicle over time. Consumers' failure to pay amounts due under an installment agreement may bring the total balance due, and may trigger halting performance, or provide the seller with other contractual rights.

A negative option, in contrast, merely determines whether a seller may continue to send, and charge for, goods or provide services without the consumer's further action. Notably, a contract could have both installment and negative option features. Take, for instance, a software license agreement. A consumer may purchase a software license for a year, in which the consumer is obligated for the entire year, payable monthly, to renew automatically at the conclusion of the year unless the consumer cancels the agreement.[5] Canceling the agreement during the first year does not void a consumer's obligation to pay for the whole first year, but it does terminate the consumer's responsibility for the next year.

### 2. Prevalence of Deceptive or Unfair Negative Option Acts and Practices

Negative option programs are widespread in the marketplace and can provide substantial benefits for sellers and consumers. For businesses, the benefits of negative option marketing include "greater revenue predictability, customer base continuity, and the ability to better plan in advance."[6] For consumers, such benefits may include opportunities to explore new products prior to purchase (*e.g.,* free trials),[7] broader selections at lower prices and transaction costs,[8] and the convenience of uninterrupted products or services.[9] However, consumers cannot reap these benefits when marketers misrepresent material facts, fail to make adequate disclosures, bill consumers without their consent, or make cancellation difficult or impossible. Over the years, such problematic practices have remained a persistent source of consumer harm, saddling consumers with recurring payments for products and services they never intended to purchase nor wanted to continue buying.

The Commission tried to address these practices through individual law enforcement cases and a patchwork of regulations (*see* discussion at sections III–IV). Nevertheless, problems persist, as demonstrated in part by the tens of thousands of complaints consumers submit about these practices to the FTC each year. Moreover, the Commission and States continue to regularly bring cases challenging harmful negative option practices, including more than 35 recent FTC cases.[10] These matters involved a range of deceptive or unfair practices, including inadequate disclosures for "free" offers and other products or services, enrollment without consumer consent, and inadequate or overly burdensome cancellation and refund procedures.[11] As discussed further below, the continuing stream of cases; the high volume of ongoing complaints; and comments on the record all demonstrate prevalent unfair and deceptive practices and unabated consumer harm.

### III. The FTC'S Existing Regulatory Scheme

#### A. The FTC's Current Negative Option Rule

The Commission first promulgated the Rule in 1973 pursuant to the FTC Act, 15 U.S.C. 41 *et seq.,* finding some negative option marketers committed

---

[4] The Commission's Telemarking Sales Rule defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 CFR 310.2(w).

[5] *See, e.g., United States* v. *Adobe, Inc.,* No. 5:24–cv–03630 (N.D. Cal. 2024).

[6] News/Media Alliance ("N/MA"), FTC–2023–0033–0873; *see also* Association of National Advertisers ("ANA"), FTC–2023–0033–1001; National Retail Federation ("NRF"), FTC–2023–0033–1005. Citations herein to comments are cited as the name of commenter and unique identifier (*e.g.,* FTC–2023–0033–____). Comments are available online at *regulations.gov,* Negative Option Rule (NPRM), FTC–2023–0033–0001, *https://www.regulations.gov/document/FTC-2023-0033-0001.*

[7] N/MA, FTC–2023–0033–0873; Sirius XM Radio Inc. ("Sirius XM"), FTC–2023–0033–0857; NCTA—The Internet & Television Association ("NCTA"), FTC–2023–0033–0858; Interactive Advertising Bureau ("IAB"), FTC–2023–0033–1000.

[8] *See* IAB, FTC–2023–0033–1000; Sirius XM, FTC–2023–0033–0857; Joint Comment from Entertainment Software Association, Digital Media Association, and Motion Picture Association ("ESA"), FTC–2023–0033–0867.

[9] N/MA, FTC 2023–0033–0873; NRF, FTC–2023–0033–1005; ANA, FTC–2023–0033–1001.

[10] *See, e.g., FTC* v. *FloatMe Corp.,* No. 5:24–cv–00001 (W.D. Tex. 2024); *United States* v. *Adobe, Inc.,* No. 5:24–cv–03630 (N.D. Cal. 2024); *FTC* v. *WealthPress, Inc.,* No. 3:23–cv–00046 (M.D. Fla. 2023); *FTC* v. *Bridge It, Inc.,* No. 1:23–cv–09651 (S.D.N.Y. 2023); *FTC* v. *Amazon.com, Inc.,* No. 2:23–cv–0932 (W.D. Wash. 2023); *see also* n.60.

[11] *E.g., FTC* v. *Triangle Media Corp.,* No. 3:18–cv–01388 (S.D. Cal. 2018); *FTC* v. *Credit Bureau Ctr., LLC,* No. 1:17–cv–00194 (N.D. Ill. 2017); *FTC* v. *JDI Dating, Ltd.,* No. 1:14–cv–08400 (N.D. Ill. 2014); *FTC* v. *One Techs., LP,* No. 3:14–cv–05066 (N.D. Cal. 2014); *FTC* v. *Health Formulas, LLC,* No. 2:14–cv–01649 (D. Nev. 2014); *FTC* v. *NutraClick, LLC,* No. 2:16–cv–06819 (C.D. Cal. 2016); *FTC* v. *XXL Impressions, LLC,* No. 1:17–cv–00067 (D. Me. 2017); *FTC* v. *AAFE Prods. Corp.,* No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC* v. *Pact, Inc.,* No. 2:17–cv–1429 (W.D. Wash. 2017); *FTC* v. *Tarr,* No. 3:17–cv–02024 (S.D. Cal. 2017); *FTC* v. *AdoreMe, Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC* v. *DOTAuthority.com, Inc.,* No. 0:16–cv–62186 (S.D. Fla. 2016); *FTC* v. *BunZai Media Grp., Inc.,* No. 2:15–cv–04527 (C.D. Cal. 2015); *FTC* v. *RevMountain, LLC,* No. 2:17–cv–02000 (D. Nev. 2017).

unfair and deceptive practices that violated section 5 of the Act, 15 U.S.C. 45. Based on practices at the time, however, the Rule only applied to prenotification plans for the sale of goods, and therefore, does not reach the vast majority of modern negative option programs.[12]

Specifically, the Rule required prenotification plan sellers to disclose their plans' material terms clearly and conspicuously before consumers subscribe. To do so, it required sellers to disclose seven material terms: (1) how subscribers must notify the seller if they do not wish to purchase the selection; (2) any minimum purchase obligations; (3) the subscribers' right to cancel; (4) whether billing charges include postage and handling; (5) that subscribers have at least ten days to reject a selection; (6) that if any subscriber is not given ten days to reject a selection, the seller will credit the return of the selection and postage to return the selection, along with shipping and handling; and (7) the frequency with which announcements and forms will be sent.[13] In addition, sellers had to disclose the specific periods during which they would send introductory merchandise, give consumers a specified period to respond to announcements, provide instructions for rejecting merchandise in announcements, and promptly honor written cancellation requests.[14]

## B. Other Current Regulatory Requirements

Several other statutes and regulations also address harmful negative option practices. First, section 5 of the FTC Act has served as the Commission's primary mechanism for addressing deceptive negative option claims. Additionally, the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. 8401–8405, the Telemarketing Sales Rule ("TSR"), 16 CFR part 310, the Postal Reorganization Act (*i.e.*, the Unordered Merchandise Statute), 39 U.S.C. 3009, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. 1693–1693r, all address various aspects of negative option marketing. ROSCA, however, is the only law primarily designed to do so, but only for online transactions.

### 1. Section 5 of the FTC Act

Section 5(a) of the FTC Act, 15 U.S.C. 45(a), is the core consumer protection statute enforced by the Commission. That statute broadly prohibits "unfair or deceptive acts or practices" but does not specifically address negative option marketing.[15] Therefore, in guidance and cases, the FTC has highlighted six basic requirements negative option marketing must follow to avoid deceptive and unfair practices.[16] First, marketers must disclose the material terms of a negative option offer including, at a minimum: the existence of the negative option offer; the offer's total cost; the transfer of a consumer's billing information to a third party, if applicable; and how to cancel the offer. Second, section 5 requires these disclosures to be clear and conspicuous. Third, sellers must disclose the material terms of the negative option offer before consumers agree to the purchase. Fourth, marketers must obtain consumers' consent to such offers. Fifth, marketers must not impede the effective operation of promised cancellation procedures and must honor cancellation requests that comply with those procedures. Finally, marketers cannot make any material

misrepresentation regarding any portion of the transaction.

In addition to these deception-based requirements, the Commission has repeatedly stated billing consumers without consumers' express informed consent is an unfair act under the FTC Act.[17]

### 2. ROSCA

Enacted by Congress in 2010 to address, in part, ongoing problems with online negative option marketing, ROSCA contains general provisions related to disclosures, consent, and cancellation.[18] Specifically, ROSCA prohibits charging or attempting to charge consumers for goods or services sold on the internet through any negative option feature unless the marketer: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, regardless of whether a material term directly relates to the terms of the negative option offer; [19] (2) obtains a consumer's express informed consent before charging the consumer's account; and (3) provides simple mechanisms for the consumer to stop recurring charges.[20] ROSCA, however, does not prescribe specific steps marketers must follow to comply with these provisions and is limited to online transactions.

Furthermore, pursuant to the statute, a violation of ROSCA is treated as a violation of a Commission trade regulation rule under section 18 of the FTC Act.[21] Thus, the Commission may seek a variety of remedies for violations of ROSCA, including civil penalties under section 5(m)(1)(A) of the FTC Act; [22] injunctive relief under section 13(b) of the FTC Act; [23] and consumer redress, damages, and other relief under section 19 of the FTC Act.[24]

### 3. Telemarketing Sales Rule

The TSR prohibits deceptive telemarketing acts or practices,

---

[12] The Rule defines "negative option plan" narrowly to apply only to prenotification plans. 16 CFR 425.1(c)(1). In 1998, the Commission clarified the Rule's application to such plans in all media, stating that it "covers all promotional materials that contain a means for consumers to subscribe to prenotification negative option plans, including those that are disseminated through newer technologies." 63 FR 44555, 44561 (Aug. 20, 1998).

[13] 16 CFR 425.1(a)(1)(i)–(vii).

[14] 16 CFR 425.1(a)(2) and (3); *id.* 425.1(b).

[15] Under the FTC Act, "unfair or deceptive acts or practices" include acts or practices involving foreign commerce that cause or are likely to cause reasonably foreseeable injury within the United States or involve material conduct occurring within the United States. 15 U.S.C. 45(a)(4)(A). Section 5(n) of the FTC Act provides that "unfair" practices are those that cause or are likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. 45(n).

[16] *See Negative Options: A Report by the Staff of the FTC's Division of Enforcement*, 26–29 (Jan. 2009) ("Staff Report"), *https://www.ftc.gov/reports/ negative-options-federal-trade-commission- workshop-analyzing-negative-option-marketing- report-staff*. In discussing the principal Section 5 requirements related to negative options, the report cites the following pre-ROSCA cases, *FTC* v. *JAB Ventures, LLC*, No. 2:08–cv–04648 (C.D. Cal. 2008); *FTC* v. *Complete Weightloss Ctr.*, No. 1:08–cv– 00053 (D.N.D. 2008); *FTC* v. *Berkeley Premium Nutraceuticals*, No. 1:06–cv–00051 (S.D. Ohio 2006); *FTC* v. *Think All Publ'g, LLC*, No. 4:07–cv– 00011 (E.D. Tex. 2006); *FTC* v. *HispaNexo, Inc.*, No. 1:06–cv–424 (E.D. Va. 2006); *FTC* v. *Consumerinfo.com*, No. 8:05–cv–00801 (C.D. Cal. 2005); *FTC* v. *Conversion Mktg.*, No. 8:04–cv–01264 (C.D. Cal. 2004); *United States* v. *Mantra Films, Inc.*, No. 2:03–cv–9184 (C.D. Cal. 2003); *FTC* v. *Preferred Alliance, Inc.*, No. 1:03–cv–0405 (N.D. Ga. 2003); *United States* v. *Prochnow*, No. 1:02–cv–917 (N.D. Ga. 2002); *FTC* v. *Ultralife Fitness, Inc.*, No. 2:08– cv–07655 (C.D. Cal. 2008); *In re America Iraku Motors*, FTC Docket No. C–3712 (1996); *FTC* v. *Universal Premium Servs.*, No. 2:06–cv–00849 (C.D. Cal. 2006); *FTC* v. *Remote Response Corp.*, No. 1:06–cv–20168 (S.D. Fla. 2006). The report also cited the FTC's previously issued guidance, *Dot Com Disclosures* (2002), archived at *https:// www.ftc.gov/sites/default/files/attachments/press- releases/ftc-staff-issues-guidelines-internet- advertising/0005dotcomstaffreport.pdf. See also* nn.245–252.

[17] Courts have found unauthorized billing to be unfair under the FTC Act. *See, e.g., FTC.* v. *Neovi, Inc.*, 604 F.3d 1150, 1157–59 (9th Cir. 2010), *amended by* 2010 WL 2365956 (9th Cir. June 15, 2010); *FTC* v. *Amazon.com, Inc.*, No. 2:14–cv–1038, 2016 WL 10654030, at *8 (W.D. Wash. Apr. 26, 2016); *FTC* v. *Ideal Fin. Sols., Inc.*, No. 2:13–cv– 00143, 2015 WL 4032103, at *8 (D. Nev. June 30, 2015).

[18] 15 U.S.C. 8401–8405.

[19] ROSCA, 15 U.S.C. 8403(1); *see also In re MoviePass, Inc.*, FTC Docket No. C–4751 (2021).

[20] 15 U.S.C. 8403. ROSCA incorporates the definition of "negative option feature" from the TSR, 16 CFR 310.2(w).

[21] 15 U.S.C. 8404 (citing section 18 of the FTC Act, 15 U.S.C. 57a).

[22] 15 U.S.C. 45(m)(1)(A).

[23] 15 U.S.C. 53(b).

[24] 15 U.S.C. 57b(a)(1), (b).

including those involving negative option offers, and certain types of payment methods common in deceptive negative option marketing. Specifically, the TSR requires telemarketers to disclose all material terms and conditions of the negative option feature, including the need for affirmative consumer action to avoid the charges, the date (or dates) the charges will be submitted for payment, and the specific steps the customer must take to avoid the charges. It also prohibits telemarketers from misrepresenting such information and contains specific requirements related to payment authorization.[25] The TSR, however, only applies to negative option offers made over the telephone.

### 4. Other Relevant Requirements

EFTA [26] and the Unordered Merchandise Statute [27] also contain provisions relevant to unfair and deceptive negative option marketing. EFTA prohibits sellers from imposing recurring charges on a consumer's debit cards or bank accounts without written authorization.[28] The Unordered Merchandise Statute provides that mailing unordered merchandise, or a bill for such merchandise, constitutes an unfair method of competition and an unfair trade practice in violation of section 5 of the FTC Act.[29]

### IV. Limitations of Existing Regulatory Requirements

The existing patchwork of laws and regulations does not provide industry and consumers with a consistent legal framework across media and offers. For instance, as discussed above, the current Rule does not cover common practices such as continuity plans, automatic renewals, and free-to-pay conversions.[30] In addition, ROSCA and the TSR do not

address negative option programs in all media. Yet, harmful negative option practices that fall outside of ROSCA and the TSR's coverage still occur.[31]

Additionally, ROSCA lacks specificity about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. Instead, the statute requires marketers to provide "simple mechanisms" for the consumer to stop recurring charges without guidance about what is simple. While the statute provides more than adequate specificity to avoid blatant violations, it makes law enforcement actions much more difficult for closer calls, even when these practices cause significant harm.

### V. Negative Option Rulemaking and Enforcement Efforts

The Commission initiated its last regulatory review of the Negative Option Rule in 2009,[32] following a 2007 FTC workshop and subsequent Staff Report.[33] The Commission completed the review in 2014.[34] At the time, the Commission found the comments supporting the Rule's expansion "argue convincingly that unfair, deceptive, and otherwise problematic negative option marketing practices continue to cause substantial consumer injury, despite determined enforcement efforts by the Commission and other law enforcement agencies." [35] It also noted practices not covered by the Rule (e.g., trial conversions and continuity plans) accounted for most of the Commission's enforcement activity in this area. Nevertheless, the Commission declined

to expand or modify the Rule because the enforcement tools provided by the TSR and, especially, ROSCA, which had only recently become effective, might prove adequate to address the extant problems. The Commission emphasized, however, if ROSCA and its other enforcement tools failed to protect consumers, the Commission would consider whether and how to amend the Rule.[36] Since that review, the problems with negative options have persisted.[37]

### VI. Rule Review and Request for Comment

#### A. 2019 Advance Notice of Proposed Rulemaking

Given the persistence of unfair and deceptive practices despite significant law enforcement attention at both the Federal and State level, the Commission published its 2019 advance notice of proposed rulemaking ("ANPR") seeking comments on the current Rule, as well as possible new measures to reduce consumer harm created by deceptive or unfair negative option marketing.[38] Specifically, the Commission sought comment on various alternatives, including amendments to existing rules to further address disclosures, consumer consent, and cancellation. The Commission also requested input on whether and how it should use its authority under section 18 of the FTC Act to expand the Negative Option Rule to address prevalent unfair or deceptive practices involving negative options.[39] In response, the Commission received 17 comments.[40]

#### B. 2021 Enforcement Policy Statement

On November 4, 2021, the Commission published an "Enforcement Policy Statement Regarding Negative Option Marketing" ("2021 Enforcement Policy Statement" or "EPS") to provide guidance regarding its enforcement of

---

[25] 16 CFR 310.3(a).

[26] 15 U.S.C. 1693–1693r.

[27] 39 U.S.C. 3009.

[28] EFTA provides that the Commission shall enforce its requirements, except to the extent that enforcement is specifically committed to some other Federal government agency, and that a violation of any of its requirements shall be deemed a violation of the FTC Act. Accordingly, the Commission has authority to seek injunctive relief for EFTA violations, just as it can seek injunctive relief for other section 5 violations.

[29] The Commission has authority to seek the same remedies for violations of the Unordered Merchandise Statute that it can seek for other section 5 violations. The Commission can seek civil penalties pursuant to section 5(m)(1)(B) of the FTC Act from violators who have actual knowledge that the Commission has found mailing unordered merchandise unfair. 15 U.S.C. 45(m)(1)(B).

[30] Indeed, the prenotification plans covered by the Rule represent only a small fraction of negative option marketing. In 2017, for instance, the Commission estimated that fewer than 100 sellers ("clubs") were subject to the current Rule's requirements. 82 FR 38907, 38908 (Aug. 16, 2017).

[31] See, e.g., In re Dun & Bradstreet, Inc., FTC Docket No. C–4761 (2022); FTC v. Nobetes Corp., No. 2:18–cv–10068 (C.D. Cal. 2018); FTC v. Dill, No. 2:16–cv–00023 (D. Me. 2016); FTC v. Shopper Sys., LLC, No. 1:12–cv–23919 (S.D. Fla. 2012); FTC v. XXL Impressions, LLC, No. 1:17–cv–00067 (D. Me. 2017); FTC v. Health Rsch. Labs., LLC, No. 2:17–cv–00467 (D. Me. 2017); FTC v. Mktg. Architects, No. 2:18–cv–00050 (D. Me. 2018); see also Individual commenter, FTC–2023–0033–0007 (discussing deceptive and unfair negative option practices for in-person enrollment); Individual commenter, FTC–2023–0033–0129 (gym membership in-person enrollment); Individual commenter, FTC–2023–0033–0299 (same).

[32] 74 FR 22720 (May 14, 2009).

[33] See Staff Report, n.16.

[34] 79 FR 44271 (July 31, 2014).

[35] 79 FR 44275. The Commission cited a number of its law enforcement actions challenging negative option marketing practices, including, for example, FTC v. Process Am., Inc., No. 2:14–cv–00386 (C.D. Cal. 2014) (processing of unauthorized charges relating to negative option marketing); FTC v. Willms, No. 2:11–cv–00828 (W.D. Wash. 2011) (internet free trials and continuity plans); FTC v. Moneymaker, No. 2:11–cv–00461 (D. Nev. 2011) (internet trial offers and continuity programs); FTC v. Johnson, No. 2:10–cv–02203 (D. Nev. 2010) (internet trial offers); and FTC v. John Beck Amazing Profits, LLC, No. 2:09–cv–04719 (C.D. Cal. 2009) (infomercial and telemarketing trial offers and continuity programs).

[36] 79 FR 44275–76.

[37] See sections VI–VII of this SBP.

[38] ANPR, 84 FR 52393 (Oct. 2, 2019).

[39] Section 18 of the FTC Act authorizes the Commission to promulgate rules that define with specificity acts or practices in or affecting commerce which are unfair or deceptive. 15 U.S.C. 57a(a)(1)(B). The Commission may issue regulations "where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." 15 U.S.C. 57a(b)(3). The Commission may make such a prevalence finding if it has issued cease and desist orders regarding such acts or practices, or any other available information indicates a widespread pattern of unfair or deceptive acts or practices. Rules under section 18 "may include requirements prescribed for the purpose of preventing such acts or practices."

[40] The comments are available online. See Regulations.gov, Negative Option Rule (ANPR), FTC–2019–0082, https://www.regulations.gov/docket/FTC-2019-0082.

various statutes and FTC regulations.[41] The 2021 Enforcement Policy Statement enunciated various principles rooted in FTC case law and restated previous guidance related to the provision of information to consumers, consent, and cancellations. Among these principles, the Statement emphasized ROSCA's requirement that sellers disclose all material terms related to the underlying product or service that are necessary to prevent deception, regardless of whether that term relates directly to the terms of the negative option offer.[42] In addition, consistent with ROSCA, judicial decisions applying section 5, and cases brought by the Commission, the 2021 Enforcement Policy Statement reiterated sellers should obtain consumers' acceptance of the negative option feature separately from any other portion of the transaction. Finally, the Statement explained sellers should provide cancellation mechanisms at least as easy to use as the method the consumer employed to initiate the negative option feature.

### C. 2023 Notice of Proposed Rulemaking

After reviewing the comments received in response to the ANPR and issuing the 2021 Enforcement Policy Statement, the Commission issued a notice of proposed rulemaking ("NPRM") on April 23, 2023 (88 FR 24716). In the NPRM, the Commission proposed amending the existing Rule to prohibit material misrepresentations and to require sellers to provide important information to consumers, obtain consumers' express informed consent, and ensure consumers can easily cancel negative option programs if they choose. All these proposed changes would be applicable to all forms of negative option marketing across all media (*e.g.,* telephone, internet, traditional print media, and in-person transactions).[43]

The Commission designed the proposed amendments to curb deceptive or unfair practices occurring in negative option marketing. The Commission sought public comment on "all aspects" of the proposal, "including the likely effectiveness of the proposed Rule in helping the Commission combat unfair or deceptive practices in negative option marketing." [44] The Commission further identified specific questions and areas where it solicited available data and evidence, including data and evidence supporting alternatives to the proposed regulations.[45] The Commission did not identify any disputed issues of material fact that needed to be resolved at an informal hearing.[46] The comment period closed on June 23, 2023.

In response, the Commission received more than 16,000 comments and published the 1,162 unique comments from stakeholders representing a wide range of viewpoints.[47] Although some commenters raised concerns and recommended specific modifications or additions to the proposed Rule (some of which the Commission adopts as

discussed herein), the majority generally supported the Rule. The Commission discusses these comments in section VII below.

### D. Informal Hearing and Recommended Decision

Section 18 of the Federal Trade Commission Act, 15 U.S.C. 57a, and the Commission's Rules of Practice, 16 CFR 1.11(e),[48] provide interested persons the opportunity to make an oral statement at an informal hearing upon request.[49] The Commission received six [50] such requests. Additionally, although the Commission did not designate any disputed issues of material fact in the NPRM, two interested commenters, IAB and NCTA, proposed the Commission consider several potential disputed issues of material fact.[51]

On December 8, 2023, the Commission published an Initial Notice of Informal Hearing (88 FR 85525, "Hearing Notice"). The Hearing Notice designated the Honorable Carol Fox Foelak, Administrative Law Judge for the Securities Exchange Commission, to serve as the presiding officer of the informal hearing and scheduled the informal hearing for January 16, 2024. In the Hearing Notice, the Commission again did not designate any disputed issues of material fact, finding the issues raised by IAB and NCTA did not need to be resolved at the informal hearing through cross-examination.[52]

On January 16, 2024, Judge Foelak commenced the informal hearing, at which IAB, NCTA, Performance Driven Marketing Institute ("PDMI"), TechFreedom, and the International Franchise Association ("IFA") appeared and made oral submissions subject to cross-examination.[53] Included in their oral and written submissions, IAB and

---

[41] EPS, 86 FR 60822 (Nov. 4, 2021).

[42] The Commission recently alleged a negative option seller's failure to disclose it was impeding access to its movie subscription service violates ROSCA. *In re MoviePass, Inc.,* FTC Docket No. C–4751 (2021).

[43] The Commission proposed to issue such amendments pursuant to section 18 of the FTC Act, which authorizes it to promulgate rules specifying acts or practices in or affecting commerce which are unfair or deceptive. 15 U.S.C. 57a(a)(1)(B). Several commenters raised concerns the Commission failed to follow section 18's procedures for two reasons. First, commenters argued the Commission's proposed Rule went beyond the scope of the ANPR. *See, e.g.,* ESA, FTC–2023–0033–0867; USTelecom-The Broadband Association ("USTelecom"), FTC–2023–0033–0876; Retail Industry Leaders Association ("RILA"), FTC–2023–0033–0883; U.S. Chamber of Commerce ("Chamber"), FTC–2023–0033–0885; The Computer & Communications Industry Association ("CCIA"), FTC–2023–0033–0984; IAB, FTC–2023–0033–1000; National Retail

Federation ("NRF"), FTC–2023–0033–1005). Second, they argued the Commission's proposed Rule did not satisfy the specificity and prevalence requirements of section 18. The Commission addresses these comments in section VII.A.

[44] NPRM, 88 FR 24730.

[45] *See* NPRM, 88 FR 24728 (inviting comments on free trials); *id.* at 24729 (requesting comments on proposed annual reminder provision); *id.* at 24730 (inviting comments on conflicts with existing state requirements; *id.* (seeking comments on proposed material changes provision and exempted activities or entities); *id.* (inviting submissions of "data, views, and arguments on the proposed amendments"); *id.* at 24732–33 (inviting comments on the impacts on small businesses, including any modifications to reduce costs or burdens for small entities); *id.* at 24734 (inviting comments on the Paperwork Reduction Act analysis). *See also id.* at 24730 (NPRM section XIII, Request for Comments).

[46] *See* 16 CFR 1.11(e).

[47] Unique public comments to the NPRM are available online. *See regulations.gov,* Negative Option Rule (NPRM), FTC–2023–0033–0001, *https://www.regulations.gov/document/FTC-2023-0033-0001.* The Commission published 1,162 unique comments. As explained at *regulations.gov,* agencies may withhold duplicate/near duplicate examples of a mass-mail campaign. *See* Gen. Servs. Admin., *Regulations.gov* Frequently Asked Questions, Find Dockets, Documents, and Comments FAQs, "How are comments counted and posted to Regulations.gov?," *https://www.regulations.gov/faq.* The Commission cannot quantify the number of individuals or entities represented by the comments. The number of comments undercounts the number of individuals or entities represented by the comments because many comments, including those from different types of organizations, jointly represent the opinions or interests of many. Overall, the Commission received 16,612 comments. Of those, 15,449 were not posted online for various reasons (*i.e.,* 14 unrelated, 23 duplicates, and 15,412 that appear to be non-unique responses to mass media campaigns) and one comment was withdrawn. The Commission has considered all timely and responsive public comments it received in response to its NPRM.

[48] The FTC Act provides that "an interested person is entitled to present his position orally or by documentary submission (or both)." 15 U.S.C. 57a(c)(2)(A).

[49] 16 CFR 1.11(e).

[50] The six requesters were (1) International Franchise Association; (2) TechFreedom; (3) Performance Driven Marketing Institute; (4) NCTA—The Internet & Television Association; (5) Frontdoor; and (6) Interactive Advertising Bureau. All but one—TechFreedom—identified their interest in the proceeding either as industry groups or private companies.

[51] *See* Notice of Informal Hearing ("Hearing Notice"), 88 FR 85525, 85526 (Dec. 8, 2023).

[52] 88 FR 85526–27.

[53] The Hearing Notice also allowed interested persons to make additional written submissions. The following interested parties timely filed additional written submissions on December 22, 2023: (1) BSA—The Software Alliance; (2) PDMI; (3) U.S. Chamber of Commerce; (4) IAB; (5) NCTA; and two individuals. All filings related to the Hearing Notice are available online at *regulations.gov* at *https://www.regulations.gov/document/FTC-2023-0073-0001.*

NCTA renewed their requests to have the presiding officer designate disputed issues of material fact.[54] Following the hearing, Judge Foelak designated two disputed issues: (1) will the proposed rule have an annual effect on the national economy of $100 million or more?; and (2) what will the recordkeeping and disclosure costs associated with the proposed rule be? Judge Foelak held subsequent hearings on January 31, 2024, and February 14, 2024. She allowed post-hearing briefs filed by February 22, and February 28, 2024, respectively, and issued her recommended decision on April 12, 2024. Based on the evidence, the presiding officer found: (1) the proposed Rule will have an annual effect on the national economy of $100 million or more; and (2) there is insufficient evidence to make a finding regarding the size of the recordkeeping and disclosure costs associated with the proposed Rule.[55]

## VII. Discussion of Final Rule

### A. Legal Standard for Promulgating the Final Rule

As explained above in section II, the Commission promulgates the final Rule, 16 CFR part 425, pursuant to section 18 of the FTC Act, also known as Magnuson-Moss rulemaking ("Magnuson-Moss"). Under section 18 and the Commission Rules,[56] to promulgate a rule the Commission must: (1) issue a SBP with statements detailing: (a) the prevalence of the acts or practices treated by the rule; (b) the manner and context in which such acts or practices are unfair or deceptive; and (c) the economic effect of the rule, taking into account the effect on small business and consumers; and (2) "define with specificity acts or practices which are unfair or deceptive." The Commission addresses these requirements in part A.1–2. In part A.3, the Commission addresses additional legal issues, including the ANPR's scope and the "major questions" doctrine.

#### 1. Statements Required Under Section 18(d) of the FTC Act

(a) Statement Regarding Prevalence of the Acts and Practices Treated by the Rule

Under the Magnuson-Moss statute, the Commission may promulgate rules if

it "has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." [57] An act or practice is "prevalent" if the FTC has previously issued cease and desist orders regarding the act or practice, or if "any other information available to the Commission indicates a widespread pattern of unfair or deceptive acts or practices." [58] Based on the rulemaking record, the Commission has more than sufficient reason to believe unfair or deceptive acts and practices in the negative option marketplace are prevalent. These practices include: (1) material misrepresentations made while marketing using negative option features to induce consumers to enter into negative option programs; (2) failure to provide important information about material terms prior to billing consumers; (3) lack of informed consumer consent; and (4) failure to provide consumers with a simple cancellation method, including failure to honor cancellation requests, refusal to provide refunds to consumers who unknowingly enrolled in programs, denying them refunds, forcing them to pay to return the unordered goods, requiring consumers to cancel using a more difficult method than the one used to sign up for the program, and forcing consumers to contend with multiple upsells before allowing cancellation.[59] These practices cause consumer harm by luring consumers into purchasing goods and services they do not want, or ensnaring consumers into unwanted recurring payments that are difficult or impossible to cancel.

The Commission relies on substantial evidence in the record showing a widespread pattern of unfair or deceptive conduct in the negative option marketplace. This evidence generally falls into three categories: State, private, and Federal actions (including administrative and Federal court FTC law enforcement actions); consumer complaints and comments; and studies. The Commission discusses each in turn below.

*Federal, State, and Private Actions.* As discussed in the ANPR and NPRM, the volume of enforcement efforts in recent years seeking to stem illegal negative option marketing is significant. These matters involve a range of deceptive and unfair practices, including: failure to adequately disclose the existence of negative options,

including after the expiration of free trials; enrollment without consumer consent; and inadequate or unnecessarily burdensome cancellation and refund procedures. The FTC itself has brought at least 35 such cases in the years since ROSCA was enacted.[60] The Consumer Financial Protection Bureau ("CFPB") also has brought many of its own negative option cases.[61] Truth in Advertising, Inc. ("TINA"),[62] a consumer advocacy organization, stated in 2019 that more than 100 Federal class actions involving various negative option terms and conditions have been filed since 2014. Notwithstanding these actions, according to TINA, "the incidence of deceptive negative option

---

[54] Subsequently, IFA also asserted there were disputed issues of material fact regarding the impact to both small businesses and their consumers. IFA, FTC–2024–0001–0009.

[55] Recommended Decision by Presiding Officer, *https://www.regulations.gov/comment/FTC-2024-0001-0042.*

[56] 15 U.S.C. 57a and 16 CFR 1.14(a)(1).

[57] 15 U.S.C. 57a(b)(3).

[58] 15 U.S.C. 57a(b)(3)(A)–(B); *see also Compassion Over Killing v. FDA,* 849 F.3d 849, 855 (9th Cir. 2017).

[59] NPRM, 88 FR 24725.

[60] In the NPRM, the Commission cited a number of its law enforcement actions challenging negative option marketing practices, including, for example, *FTC v. Process Am., Inc.,* No. 1:14–cv–00386 (C.D. Cal. 2014) (processing of unauthorized charges relating to negative option marketing); *FTC v. Willms,* No. 2:11–cv–00828 (W.D. Wash. 2011) (internet free trials and continuity plans); *FTC v. Moneymaker,* No. 2:11–cv–00461 (D. Nev. 2011) (internet trial offers and continuity programs); *FTC v. Johnson,* No. 2:10–cv–02203 (D. Nev. 2010) (internet trial offers); and *FTC v. John Beck Amazing Profits, LLC,* No. 2:09–cv–04719 (C.D. Cal. 2009) (infomercial and telemarketing trial offers and continuity programs). Further examples of these matters include: *FTC v. Triangle Media Corp.,* No. 3:18–cv–01380 (S.D. Cal. 2018); *FTC v. Credit Bureau Ctr., LLC,* No. 1:17–cv–00194 (N.D. Ill. 2017); *FTC v. JDI Dating, Ltd.,* No. 1:14–cv–08400 (N.D. Ill. 2014); *FTC v. One Techs., LP,* No. 3:14–cv–05066 (N.D. Cal. 2014); *FTC v. Health Formulas, LLC,* No. 2:14–cv–01649 (D. Nev. 2014); *FTC v. NutraClick, LLC,* No. 2:16–cv–06819 (C.D. Cal. 2016); *FTC v. XXL Impressions, LLC,* No. 1:17–cv–00067 (D. Me. 2017); *FTC v. AAFE Prods. Corp.,* No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC v. Pact, Inc.,* No. 2:17–cv–1429 (W.D. Wash. 2017); *FTC v. Tarr,* No. 3:17–cv–02024 (S.D. Cal. 2017); *FTC v. AdoreMe, Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC v. DOTAuthority.com, Inc.,* No. 0:16–cv–62186 (S.D. Fla. 2016); *FTC v. BunZai Media Grp., Inc.,* No. 2:15–cv–04527 (C.D. Cal. 2015); and *FTC v. RevMountain, LLC,* No. 2:17–cv–02000 (D. Nev. 2017); *see also FTC v. WealthPress, Inc.,* No. 3:23–cv–00346 (M.D. Fla. 2023); *FTC v. Bridge It, Inc.,* No. 1:23–cv–09651 (S.D.N.Y. 2023); *FTC v. Amazon.com, Inc.,* No. 2:23–cv–0932 (W.D. Wash. 2023); *FTC v. FloatMe Corp.,* No. 5:24–cv–00001 (W.D. Tex. 2024); *United States v. Adobe, Inc.,* No. 5:24–cv–03630 (N.D. Cal. 2024).

[61] *See, e.g., CFPB v. Transunion,* No. 1:22–cv–01880 (N.D. Ill. 2022); *CFPB v. ACTIVE Network, LLC,* No. 4:22–cv–00898 (E.D. Tex. 2022); *CFPB v. Sterling Jewelers, Inc.,* No. 1:19–cv–00448 (S.D.N.Y. 2019); *In re Equifax Inc., et al.,* CFPB No. 2017–CFPB–0001, 2017 WL 1036710 (Jan. 3, 2017) (consent order); *CFPB v. Prime Mktg. Holdings, LLC,* No. 2:16–cv–07111 (C.D. Cal. 2016); *In re Transunion Interactive, Inc., et al.,* CFPB No. 2017–CFPB–0002, 2017 WL 1036711 (Jan. 3, 2017) (consent order); *CFPB v. Student Financial Aid Servs., Inc.,* No. 2:15–cv–00821 (E.D. Cal. 2015); *CFPB v. Affinion Group Holdings, Inc.,* No. 5:15–cv–01005 (D. Conn. 2015); *CFPB v. Intersections Inc.,* No. 1:15–cv–835 (E.D. Va. 2015). Notably, the CFPB has independent authority to enforce FTC rules, and both agencies share some overlapping jurisdiction. *See* 12 U.S.C. 5581(b)(5)(B)(ii).

[62] TINA, FTC–2019–0082–0014 (cmt. to ANPR, *https://www.regulations.gov/comment/FTC-2019-0082-0014*) and FTC–2023–0033–1139 (cmt. to NPRM).

offers continues to rise.''[63] TINA also reports that deceptive negative options ''have only continued to grow'' since its 2019 comment.[64]

Several state Attorneys General[65] also referenced dozens of enforcement actions taken in recent years to address the proliferation of deceptive negative option practices they regularly encounter, including the ''lack of informed consumer consent, lack of clear and conspicuous disclosures, failure to honor cancellation requests and/or refusal to provide refunds to consumers who unknowingly enrolled in plans.''[66] These agencies explained their actions ''demonstrate that problems persist in this area and that additional regulatory action is needed.''[67] For example, over the last decade, New York alone has reached 23 negative option settlements involving a variety of products and services such as membership programs, credit monitoring, dietary supplements, and apparel.[68] They also described several multi- and individual state law enforcement actions involving negative option offers for products and services such as satellite radio, social networking services, language learning programs, security monitoring, and dietary supplements. They further recounted numerous, illustrative complaints from consumers who ordered what they thought were free, no-obligation samples but then found themselves enrolled in costly continuity programs.[69]

Additionally, the State AGs outlined several ongoing investigations into deceptive or unfair negative option programs since 2019. These investigations include allegations of misrepresenting offers as free when they were not; and failure to clearly and conspicuously disclose negative option features.[70]

Additionally, consumer advocacy organizations and others explained that the widespread prevalence of deceptive acts and practices underscores the ''ongoing need for [S]tate engagement to limit negative option abuses.''[71] Several commenters observed that more than half of States specifically regulate some aspect of negative option marketing.[72] A group of law professors explain this ''ongoing engagement just shows that unscrupulous negative-option business models remain such a problem that [S]tates *increasingly* find themselves needing to step in.''[73]

*Consumer Complaints and Comments.* The FTC receives tens of thousands of complaints about negative options each year through its Sentinel complaint database, and marketers receive many more as demonstrated by evidence in FTC cases.[74] Additionally, TINA explained that negative options are one of its top complaint categories. These complaints usually involve consumers who unwittingly enroll in programs and then find it difficult or impossible to cancel.[75]

Moreover, hundreds of consumer comments detailed specific practices (discussed more thoroughly in connection with the section-by-section analysis below) demonstrating the prevalence of unfair or deceptive negative option practices. Likewise, comments from public interest and consumer advocacy groups further describe existing deceptive or unfair practices prevalent in the negative option marketplace. For example, a Berkeley Consumer Law Center explained businesses regularly use dark patterns[76] to facilitate enrollment in subscription-based products and inhibit cancellation, and provided numerous examples of these activities.[77] A group of law professors referenced the burgeoning industry offering to help consumers identify and cancel their unwanted subscriptions. As they explained: ''One might expect that, if consumers experienced the marketplace as one in which they are adequately informed of recurring payments and readily able to cancel them, there would not be an emerging industry to help them do just that.''[78]

Members of Congress also detailed ongoing problems in this area. Citing the increase in consumer complaints and consumer harm in recent years, Representative Takano stated, ''deceptive online marketing and unclear recurring payment plans are leaving too many consumers on the hook for products they may not want or even know they purchased.''[79] Representatives Schiff and Norton noted their constituents' desire for greater protections in the negative option marketplace, stating the ''proposed updates will help put the consumers

---

[63] NPRM, 88 FR 24720.

[64] TINA, FTC–2023–0033–1139.

[65] Several State Attorneys General offered comments to the ANPR (FTC–2019–0082–0012 (State Attorneys General cmt. to ANPR, *https://www.regulations.gov/comment/FTC-2019-0082-0012*)), and additionally 26 Attorneys General for the States of Alabama, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Vermont, Washington, and Wisconsin (''State AGs'') filed comments in response to the NPRM. *See* State AGs, FTC–2023–0033–0886 (cmt. to NPRM).

[66] NPRM, 88 FR 24720; State Attorneys General (ANPR), FTC–2019–0082–0012. They further explained the nature of the underlying products often fails to alert consumers of their enrollment in a negative option program. For instance, many offers involve credit monitoring or anti-virus computer programs costing less than $20 a month and have no tangible presence for consumers. The State AGs explained consumers are often unaware of having ordered these products, never use them, and never notice them on their bills. The State AGs further explained these transactions often pull consumers into a stream of recurring payments by obtaining credit card information to ostensibly pay for a small shipping charge. Consequently, they commented many consumers have been billed for such services for years before discovering the unauthorized charges. *Id.*

[67] NPRM, 88 FR 24721.

[68] State Attorneys General (ANPR), FTC–2019–0082–0012.

[69] *Id.*

[70] State AGs, FTC–2023–0033–0886.

[71] *See, e.g.,* Joint comment from Professor Kaitlin Caruso (U. of Maine School of Law), Professor Jeff Sovern (St. John's U. School of Law), Professor Dee Pridgen (U. of Wyoming College of Law), Professor Chrystin Ondersma (Rutgers Law School), Professor Vijay Raghavan (Brooklyn Law School), Professor David Vladeck (Georgetown U. Law Center), Professor Edward Janger (Brooklyn Law School), and Professor Susan Block-Lieb (Fordham U. School of Law) (collectively, ''Law Professors''), FTC–2023–0033–0861.

[72] *See, e.g.,* PDMI, FTC–2023–0033–0864 (stating over 27 states regulate negative option marketing); N/MA, FTC–2023–0033–0873 (stating 35 states and the District of Columbia now have automatic renewal laws, and at least 20 address all forms of automatic renewals); Service Contract Industry Council (''SCIC''), FTC–2023–0033–0879 (noting about half of U.S. states enacted auto-renewal laws); NRF, FTC–2023–0033–1005 (stating at least half of all states have statutes governing free-trial, negative-option, and/or automatic-renewal programs); *see also* Law Professors, FTC–2323–0033–0861 (stating the ''number of states that have recently adopted specific laws targeting negative option marketing, on top of their general prohibitions on unfair and deceptive practices and ability to enforce ROSCA, is particularly noteworthy.''); IHRSA, The Global Health & Fitness Association (''IHRSA''), FTC–2023–0033–0863 (noting many states have laws on negative options). *But see* The Center for Consumer Law and Economic Justice at UC Berkeley School of Law (''Berkeley Consumer Law Center''), FTC–2023–0033–0855 (stating that ''fewer than half the states have a law specifically addressing negative option marketing'').

[73] Law Professors, FTC–2023–0033–0861. This group also points out that private industry, too, has felt the need for more action in this area, noting that VISA and Mastercard have their own requirements for businesses that bill using a negative option model.

[74] *See, e.g., United States* v. *Adobe, Inc.,* No. 5:24–cv–03630 (N.D. Cal. 2024) (ECF No. 40, Amd. Compl.); *FTC* v. *Amazon.com, Inc.,* No. 2:23–cv–0932 (W.D. Wash. 2023) (ECF No. 67, Amd. Compl.).

[75] TINA, FTC–2023–0033–1139.

[76] The term ''dark patterns'' has been used to describe design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm *See Bringing Dark Patterns to Light,* FTC Staff Report (Sept. 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.*

[77] Berkeley Consumer Law Center, FTC–2023–0033–0855.

[78] Law Professors, FTC–2023–0033–0861.

[79] NPRM, 88 FR 24720–21.

back in control of their purchases and subscriptions.''[80]

*Studies.* Finally, ''studies cited by commenters confirm a pattern of consumer ensnarement in unwanted recurring payments.''[81] A Better Business Bureau study of FTC data, titled ''Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements,'' demonstrated complaints about free trials doubled between 2015 and 2017, with complaints during the period reaching nearly 37,000.[82] The BBB study shows consumer losses in FTC ''free trial offer'' cases exceeded $1.3 billion (over the ten years covered by the study).[83] A group of consumer and public interest advocacy organizations, including the National Consumers League [84] stated that, according to the BBB, the average consumer loss for a free trial is $186.[85]

Referring to another survey conducted in 2016, TINA noted unwanted fees associated with trial offers and automatically renewing subscriptions ranked as ''the biggest financial complaint of consumers.''[86] Similarly, TINA noted the FBI's internet Crime Complaint Center recorded a rise in complaints about free trial offers, growing from 1,738 in 2015 to 2,486 in 2017.[87] A 2019 *Bankrate.com* survey cited by NCL found that 59% of

consumers have been signed up ''against their will'' for ''free trials'' that automatically converted into a recurring payment.[88]

NCL and others also cited a 2017 national telephone survey commissioned by *CreditCards.com* finding 35% of U.S. consumers have enrolled in at least one automatically renewing contract without realizing it.[89] In response to the NPRM, the Public Interest Groups cited more recent studies confirming the continued prevalence of harms from deceptive and unfair negative option practices. For instance, consumer groups referenced a 2022 study, which concluded ''on average, consumers pay two-and-a-half times what they originally estimated on monthly subscriptions, likely due to the lack of adequate notice from sellers.''[90] They also noted burdensome cancellation procedures remain rampant. ''One survey found that more than half of respondents reported it took an average of three months to cancel unwanted recurring payments.''[91] That same study reported 71% of individuals lost more than $50 a month in unwanted subscriptions. Another study concluded consumers underestimate how much they pay to maintain their subscriptions by an average of $133/month (or $1,596 per year), and 42% of the consumers had forgotten about a subscription for which they continued to pay.[92]

Finally, TINA also noted a consumer survey by the Washington Attorney General's office finding ''59% of Washingtonians (3.5 million residents) may have been unintentionally enrolled in a subscription plan or service when they thought they were making a one-time purchase.''[93] TINA contended this is ''consistent with'' the 2022 Bankrate

survey finding more than half of U.S. adults experience unwanted charges from a subscription or membership.[94] These findings are further supported by a Chase Bank study in 2021 finding nearly three-quarters of Americans waste more than $50 a month on unwanted subscription fees.[95]

Despite the robust evidence that unfair or deceptive practices are exceedingly prevalent, several trade organizations challenged the Commission's proposed prevalence determination. However, their arguments, as discussed below, are not persuasive.

First, they argued the Commission must show prevalence in a specific industry in order to regulate negative option practices in that industry, but the Commission failed to do so. For instance, NCTA asserted there is no evidence of widespread deceptive negative option practices in the broadband, cable, or voice industries warranting regulation.[96] Other commenters argued the Commission must identify the prevalence of a specific deceptive or unfair act to warrant regulating that specific act or practice under Section 18. For instance, IAB, NCTA, TechNet, and TechFreedom argued the Commission failed to show prevalence of misrepresentations about the underlying product or service in connection with negative option contracts. Similarly, three commenters argued the Commission should limit the scope of the Rule to business-to-consumer transactions and exclude business-to-business (''B2B'') transactions, in part, because the Commission failed to show ''the prevalence of harms created by automatically-renewing subscriptions entered into in the business-to-business context.''[97]

As demonstrated above, however, there is ample evidence in the record demonstrating the prevalence of the specific unfair and deceptive practices across numerous sectors of the economy, which the Commission now addresses in an industry-neutral fashion.[98] Moreover, nothing in Section 18 requires the Commission to find prevalence regarding a specific industry or group.[99] The Commission need only

---

[80] Schiff and Norton, FTC–2023–0033–0868.

[81] NPRM, 88 FR 24725.

[82] Steve Baker, *Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements,* Better Business Bureau (Dec. 2018), *https://www.bbb.org/article/investigations/18929-subscription-traps-and-deceptive-free-trials-scammillions-with-misleading-ads-and-fake-celebrity-endorsements.*

[83] *Id.; see also* Better Business Bureau, BBB Investigation Update: Free Trial Offer Scams (Apr. 2020), *https://www.bbb.org/article/news-releases/22040-bbb-update-free-trial-offerscams* (reporting the total has risen to nearly $1.4 billion since the 2018 BBB study); *id.* (observing that while celebrities, credit card companies and government agencies have increased their efforts to fight deceptive free trial offer scams, victims continue to lose millions of dollars to fraudsters after the release of a December 2018 BBB study about the shady practices).

[84] The six public interest and consumer advocacy groups are: Consumer Action, Consumer Federation of America, Demand Progress Education Fund, National Association of Consumer Advocates, Nation Consumer Law Center (on behalf of its low income clients,) and National Consumers League (''NCL'') (collectively, the ''Public Interest Groups'').

[85] Steve Baker, *Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements,* Better Business Bureau (Dec. 2018).

[86] NPRM, 88 FR 24720 (citing Rebecca Lake, ''Report: Hidden Fees are #1 Consumer Complaint,'' *mybanktracker.com* (updated Oct. 16, 2018), *https://www.mybanktracker.com/money-tips/money/hidden-fees-consumercomplaint-253387.*)

[87] NPRM, 88 FR 24721.

[88] Bankrate, ''Despite safety concerns, 64% of U.S. debit or credit cardholders save their information online'' (Oct. 24, 2019), at *https://www.bankrate.com/pdfs/pr/20191024-online-shopping-survey.pdf* (as cited by Civil Society Organizations, FTC–2023–0033–0870).

[89] NPRM, 88 FR 24720.

[90] Public Interest Groups, FTC–2023–0033–0880 (citing ''Subscription Service Statistics and Costs,'' C+R Research Blog (May 18, 2022)).

[91] Public Interest Groups, FTC–2023–0033–0880 (citing Chase, ''Survey from Chase Reveals That Two-Thirds of Consumers Have Forgotten About At Least One Recurring Payment In The Last Year'' (Apr. 1, 2021), *https://media.chase.com/news/survey-from-chase-reveals.*)

[92] State AGs, FTC–2023–0033–00866 (citing Sarah Brady and Korrena Bailie, ''5 Tools To Help You Cancel Unwanted Subscriptions,'' Forbes (July 13, 2022), *https://www.forbes.com/advisor/personal-finance/manage-subscriptions*). *See also* Einav, Liran, et al., ''Selling Subscriptions'' (Dec. 1, 2023), *https://nmahoney.people.stanford.edu/sites/g/files/sbiybj23976/files/media/file/mahoney_subscriptions.pdf.*

[93] TINA, FTC–2023–0033–1139.

[94] *Id.*

[95] *See* n.91.

[96] NCTA, FTC–2023–0033–0858; *see also* SCIC, FTC–2023–0033–0879.

[97] BSA, FTC–2023–0033–1015; *see also* Anonymous commenter, FTC–2023–0033–1007; NCTA, FTC–2023–0033–0858.

[98] *See* sections VII.A.1.a–b and section II.A.1.b of this SBP.

[99] *See generally* 15 U.S.C. 57a.

find "some basis or evidence" demonstrating the practice the Commission seeks to regulate "does indeed occur."[100] Such evidence exists here in abundance. As NCTA itself pointed out, individual consumers complained of deceptive and unfair practices in its members' industries.[101] Further, "consumer subscription models are rapidly growing in popularity,"[102] and there is evidence of the proliferation of negative option features in virtually every industry.[103] The

harms outlined here resulted from the negative option transaction itself, and many businesses, regardless of industry, are incentivized to continue to leverage negative options to the possible detriment of consumers.[104] The Commission also declines to limit the scope of the final Rule by excluding business-to-business transactions. As explained in Section VII.B.1, the Commission has a long history of protecting businesses, particularly small business, in their role as consumers; the practices and harms described here impact these consumers, as well.

(b) The Manner and Context in Which the Acts or Practices Are Unfair or Deceptive

Pursuant to Section 18 and the Commission's Rules, the Commission must also state the manner and context in which the prevalent acts or practices are unfair or deceptive. The record demonstrates consumers are often lured into enrolling in negative option programs through seller misrepresentations about material facts—for instance, when a seller offers a product for "free" when it is not.[105] Additionally, sellers misrepresent other aspects of the deal, such as product features, processing or shipping fees, billing information use, deadlines, consumer authorization, refunds, cancellations, among other facts.[106]

Sellers also often fail to disclose important information about the offer prior to billing the consumer. As detailed in the comments from, *inter alia,* State AGs and TINA, sellers fail to

disclose in a clear and conspicuous manner the existence of the negative option feature, refund and cancellation deadlines, or other material terms of the agreement, resulting in consumers purchasing goods or services they do not want.[107] All of these unfair or deceptive acts are further supported in dozens of FTC, State AG, and class action cases.[108]

The record also demonstrates sellers fail to obtain consumers' express informed consent to the negative option feature before charging them. For instance, as detailed in representative consumer complaints from State AGs and several FTC cases, consumers are often unwittingly enrolled into recurring subscriptions with promises of no- or low-cost or discounted rates (not knowing that agreeing will result in subscription to a costly membership), with consumers not realizing the deceptive and unfair enrollment until they see unexpected charges, often after several billing cycles.[109]

Finally, substantial record evidence shows sellers often fail to provide a simple cancellation method. If consumers cannot easily leave a negative option program when they wish, the negative option feature is merely a means of charging consumers for goods or services they no longer want. Commission cases, the Sentinel complaint database, and State Attorneys General's complaints all show sellers often use difficult and cumbersome cancellation mechanisms to prevent or curtail cancellations.[110] This fact is further corroborated by studies discussed above.[111]

---

[100] *Pennsylvania Funeral Dirs. Ass'n, Inc.* v. *FTC,* 41 F.3d 81, 87–88 (3d Cir. 1994) (holding the FTC did not need "substantial, rigorous, quantitative studies" or to show the practice occurs in a certain percentage of transactions through the country to find prevalence). "Further, even where there is a limited record as to the prevalence of a practice on a nationwide basis or where the data reviewed only relates to a few states, the practice can be found to be prevalent enough to warrant a regulation." *Id.* at 87.

[101] NCTA, FTC–2023–0073–0008.

[102] CTA, FTC–2023–0033–0997. CTA reports that a 2022 study found the global subscription e-commerce market is expected to reach $904.2 billion by 2026, and between 2021 and 2022, existing subscription brands grew their customer bases by 31 percent.

[103] According to a 2018 McKinsey & Company study, the subscription e-commerce market increased more than 100% over a five-year period prior to the study's publication. Tony Chen, Ken Fenyo, Sylvia Yang, and Jessica Zhang, "Thinking Inside the Subscription Box: New Research on E-Commerce Consumers," McKinsey & Company (February 2018) (as cited by, *e.g.,* TechNet, FTC–2023–0033–0869 and Individual commenter, FTC–2023–0033–0800). PDMI also observed that negative options are offered in a wide array of product and services from major brands including media services, meal preparation kits, shaving and beauty products, beer and wine, contacts and ordinary household consumables. FTC–2023–0033–0864. Digital Content Next ("DCN"), FTC–2023–0033–0983, reports the United States had more than one billion paid subscriptions in Q1 2023 across the digital media landscape, indicating almost all online U.S. households subscribe to one or more digital media subscription services. *See also, e.g.,* Individual commenter, FTC–2023–0033–0137 (detailing difficulty cancelling recurring subscriptions for newspaper, mobile, and other businesses); Individual commenter, FTC–2023–0033–0217 (reported spending hours on the phone and online to cancel mobile account); Individual commenter, FTC–2023–0033–0465 (reported difficulty cancelling rewards program subscription); Individual commenter, FTC–2023–0033–0674 (complaint reporting difficulty canceling mobile device protection subscription); Individual commenter, FTC–2023–0033–0965 (trying to cancel mobile phone service because they bill for different amount every month); Individual commenter, FTC–2023–0033–0003 (difficulty cancelling "home warranty" subscription); Individual commenter, FTC–2023–0033–0004 (full cost and refund policy for gym contract not clearly disclosed); Individual commenter, FTC–2023–0033–0006 ("2 attempts and far too much time" to cancel radio subscription); Individual commenter, FTC–2023–0033–0008 (discussing how "subscription services in particular pervade the market. Even long-standing 'buy-it-once' products such as certain software suits have moved to subscription models"); Anonymous commenter, FTC–2023–0033–0013 (difficulty canceling home security monitoring contract, including hearing unwanted upsells); Anonymous commenter, FTC–2023–0033–0023 (webhosting

service); Anonymous commenter, FTC–2023–0033–0024 (cable service); Individual commenter, FTC–2023–0033–0039 (language learning app); Anonymous commenter, FTC–2023–0033–0046 (software); Individual commenter, FTC–2023–0033–0049 (cannot cancel streaming service); Individual commenter, FTC–2023–0033–0050 (virus protection software and charity); Individual commenter, FTC–2023–0033–0052 (e-news service subscription); Individual commenter, FTC–2023–0033–0057 (magazine subscription service); Individual commenter, FTC–2023–0033–0061 (newspaper); Individual commenter, FTC–2023–0033–0063 (big box retailer membership); Individual commenter, FTC–2023–0033–0064 (cosmetics); Anonymous commenter, FTC–2023–0033–0066 (home warranty service); Individual commenter, FTC–2023–0033–0071 (lawncare service).

[104] *See* Prof. Chris Jay Hoofnagle, UC Berkeley ("Hoofnagle"), FTC–2023–0033–1137 (discussing the subscription economy). See also nn.245–252, collecting cases showing deceptive and unfair negative option practices occur across a wide range of industries and involve a variety of claims.

[105] State AGs, FTC–2023–0033–0886 (consumer paid for shipping on "free" gift only to have it converted to a paid item because she retained the item); *id.* (Money Map Press), *FTC* v. *Triangle Media Corp.,* No. 3:18–cv–01388 (S.D. Cal. 2018) (consumers who clicked on ads for risk free trials, paid for shipping and handling fees unwittingly enrolled in negative option programs).

[106] *See* nn.245–252 (collecting cases).

[107] *See* State Attorneys General (ANPR), FTC–2019–0082–0012 and State AGs, FTC–2023–0033–0886; TINA, FTC–2019–0082–0014 and FTC–2023–0033–1139.

[108] *See, e.g., id.; see also FTC* v. *Pact, Inc.,* No. 2:17–cv–1429 (W.D. Wash. 2017); *United States* v. *MyLife.com, Inc.,* No. 2:20–cv–6692 (C.D. Cal. 2020); *FTC* v. *NutraClick, LLC,* No. 2:20–cv–08612 (C.D. Cal. 2020); *In re Dun & Bradstreet, Inc.,* FTC Docket No. C–4761 (2022). *See generally* Staff Report, n.16.

[109] *See, e.g.,* State Attorneys General (ANPR), FTC–2019–0082–0012 and State AGs, FTC–2023–0033–0886; *FTC* v. *FloatMe Corp.,* No. 5:24–cv–00001 (W.D. Tex. 2024); *United States* v. *Cerebral, Inc.,* No. 1:24–cv–21376 (S.D. Fla. 2024); *FTC* v. *Bridge It, Inc.,* No. 1:23–cv–09651 (S.D.N.Y. 2023); *FTC* v. *Benefytt Techs., Inc.,* No. 8:22–cv–01794 (M.D. Fla. 2022); *FTC* v. *First Am. Payment Sys.,* No. 4:22–cv–00654 (E.D. Tex. 2022); *FTC* v. *NutraClick, LLC,* No. 2:20–cv–08612 (C.D. Cal. 2020); *FTC* v. *F9 Advert., LLC,* No. 3:19–cv–01174 (D.P.R. 2019); *FTC* v. *Age of Learning, Inc.,* No. 2:20–cv–07996 (C.D. Cal. 2020); *FTC* v. *NutraClick, LLC,* No. 2:16–cv–06819 (C.D. Cal. 2016); *FTC* v. *AH Media Grp., LLC,* No. 3:19–cv–04022 (N.D. Cal. 2019); *In re Urthbox, Inc.,* FTC Docket No. C–4676 (2019); *FTC* v. *Health Rsch. Labs., LLC,* No. 2:17–cv–00467 (D. Me. 2017); *FTC v HispaNexo, Inc.,* No. 1:06–cv–424 (E.D. Va. 2006).

[110] *See* section VII.B.6.

[111] Section VII.A.1.a.

(c) Statement as to the Economic Effect of the Rule

Finally, pursuant to section 18 and the Commission's Rules, the SBP must include a statement regarding the economic effect of the Rule. As part of these rulemaking proceedings, the Commission solicited and received comments on the economic impact of the proposed Rule. In issuing the final Rule, the Commission has carefully considered the comments and other information received as well as the costs and benefits of each provision, as discussed in more detail in section X, Final Regulatory Analysis. That analysis demonstrates the benefits of the Rule far exceed the costs. Benefits were evaluated on a per-cancellation basis; that is, the analysis assumes the primary consumer benefit of the Rule will come in the form of faster cancellations. Costs were evaluated primarily to reflect resources spent by businesses to review and come into compliance with the Rule. The overall net benefit of the Rule is estimated to exceed $5.3B (and could be as much as $49.2B) over the first 10 years (in 2023 dollars).

2. Magnuson-Moss Specificity Requirement

Pursuant to Magnuson-Moss, the Commission must also define with specificity acts or practices which are unfair or deceptive and either prohibit those activities or establish rules to prevent them. The Commission has done just that, despite some commenters' arguments to the contrary. Specifically, IAB and others [112] argue the provision prohibiting material misrepresentations fails to define claims that fall within its scope, and therefore, "fails to identify covered acts with the requisite level of specificity." [113]

First, section 18 does not require the Commission to define claims with specificity, only acts or practices. The practice of misrepresenting the material facts of a transaction, for instance, is a deceptive practice, but could vary depending on the transaction's terms. Requiring the Commission to identify particular claims would make its rules no better than a leaky sieve, unable to effectively address consumer harm.

Second, the NPRM and the final Rule do define with the requisite specificity the unfair or deceptive negative option acts and practices covered by the Rule.[114] While those critical of the proposed Rule cite to *Katharine Gibbs School* v. *FTC,* 612 F.2d 658 (2d Cir. 1979), this case is inapposite. In *Katharine Gibbs School,* the Second Circuit held the Commission failed to connect elements of its trade regulation rule to specifically defined unfair or deceptive acts or practices. The opinion held the Commission may not merely set requirements and then define failure to meet those requirements as unfair or deceptive acts or practices. The Commission must instead identify some underlying deceptive or unfair conduct and connect the rule requirements to that conduct.

In contrast here, the Commission specifically identified misrepresentation of material facts as a deceptive practice, and defined the term "material" with the same meaning it has under Section 5 of the FTC Act.[115] Moreover, the misrepresentations provision goes further, providing categories of potentially material facts to assist the marketplace in understanding the provision and supporting those examples with cases.[116] Thus, the final Rule's prohibition against material misrepresentations is not only connected to underlying deceptive or unfair conduct, but in fact prohibits that very conduct.

3. Other Legal Issues

Several commenters raised additional challenges to the Commission's ability to promulgate the Rule. These challenges fall into two categories. First, some commenters argued the Commission failed to give adequate notice of the scope of the proposed amendments to the Rule in the ANPR in accordance with Section 57a(b)(2)(A) of the FTC Act. Second, four commenters argued the Commission exceeded its grant of Congressional authority under the "major questions" doctrine. The Commission addresses each argument below.

(a) ANPR

Several commenters asserted the ANPR, issued in 2019, failed to provide adequate notice of the acts and practices to be covered by the proposed Rule. Specifically, ESA, USTelecom, RILA, a coalition of trade associations, Chamber, CCIA, IAB, and NRF argued the ANPR failed to provide notice the proposed Rule would cover misrepresentations of all material facts; would require express informed consent to opt-in to receive a save;[117] and would require an annual reminder.[118] Thus, according to these commenters, including these provisions in the final Rule would violate Section 18(b)(2)(A). They further argued the lack of these topics' inclusion in the ANPR meant that affected entities had inadequate opportunity to provide input, leading to an inadequate rulemaking record.[119]

These arguments, however, are unpersuasive. Section 18 imposes no requirement the ANPR have the level of specificity the commenters demand. In fact, the statute only says the ANPR must include "a brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission." [120] The Commission included a discussion of each of these topics in the ANPR.[121] Moreover, the affected entities have had the chance to raise concerns with the Rule in their comments to the NPRM, which the Commission has considered and responded to in this Statement of Basis and Purpose.

(b) Major Questions Doctrine

Four commenters asserted the Rule implicates the "major questions" doctrine.[122] According to the Supreme Court, the major questions doctrine is implicated in "extraordinary cases . . . in which the history and the breadth of the authority that the agency has

---

[112] IAB, FTC–2023–0033–1000; Coalition Comments from CCIA, Direct Selling Association, Information Technology Industry Council, IAB, Software & Information Industry Association, and Chamber ("Coalition"), FTC–2023–0033–0884; PDMI, FTC–2023–033–0864; TechNet, FTC–2023–0033–0869; TechFreedom, FTC–2023–0033–0872; ACT-The App Association ("ACT App Association"), FTC–2023–0033–0874; USTelecom, FTC–2023–0033–0876.

[113] IAB, FTC–2023–0033–1000.

[114] *See* Section I; Section VII.A, defining the acts and practices covered in §§ 425.3 through 425.6 as unfair or deceptive and a violation of the Rule. As acknowledged by USTelecom, the "contours of the 'specificity' requirement have not been precisely defined." FTC–2023–0033–0876.

[115] *See* SBP Section VII.B.3 discussing § 425.3.

[116] *Id.* As explained in the *Katharine Gibbs School* dissent, "Congress required specific definitions of such practices so that a rule would 'reasonably and fairly inform those within its ambit of the obligation to be met and the activity to be avoided.' " 612 F.2d 658, 672 (*quoting* H.R. Rep. No.93–1107, 93d Cong., 2d Sess. 46 (1974), *reprinted in* (1974) U.S.C.C.A.N., pp. 7702, 7727).

[117] As discussed in Section VII.B.6, the Commission removes the proposed save provision from the final Rule.

[118] As discussed in Section VII.B.7, the Commission removes the proposed annual reminder provision from the final Rule.

[119] *E.g.,* IAB, FTC–2023–0033–1000.

[120] 15 U.S.C. 57a(b)(2)(A). "The Advance Notice [of Proposed Rulemaking] is a formal invitation to participate in shaping the proposed rule and starts the notice-and-comment process in motion." Office of the Federal Register, "A Guide to the Rulemaking Process," *https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.*

[121] ANPR, 84 FR 52393; *see also* id. 52396–8 (Request for Comments); Section VII.B.3.b.1 (discussing ANPR in context of § 425.3).

[122] PDMI, FTC–2023–0033–0864; ACT App Association, FTC–2023–0033–0874; Coalition, FTC–2023–0033–0884; Chamber, FTC–2023–0033–0885.

Appellate Case: 24-3137     Page: 15     Date Filed: 12/05/2024 Entry ID: 5463205

asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority.'' [123] Citing this authority, the commenters argue Congress only granted the FTC ''limited and tailored authorities to regulate certain mediums and types of negative option marketing, but not all mediums and types as the NPRM encompasses.'' [124] Further, they assert Congress never intended for the Commission to create a comprehensive regulatory scheme for negative option marketing that encompasses the variety of requirements proposed in the NPRM. Because negative option programs play an ever-increasing role in the economy, these commenters claim the proposed Rule would ''dramatically alter'' how companies structure their subscription services.[125] More specifically, they assert the prohibition against misrepresentations, together with the ability to seek civil penalties in Federal court, would expand the FTC's authority beyond that envisioned by Congress.

However, far from exceeding Congressional intent, the Rule merely effectuates that intent in a way wholly consistent with the specific requirements set forth in Section 18 of the FTC Act. Specifically, Congress explicitly authorized the Commission to prescribe ''rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of such section 5(a)(1)),'' which ''may include requirements prescribed for the purpose of preventing such acts or practices.'' [126] As demonstrated below, each of the Rule's provisions identifies specific deceptive or unfair acts or practices that are prevalent throughout the marketplace and ties each Rule provision tightly to those findings.

As the Supreme Court explained, courts use the ''major questions doctrine'' when examining ''extraordinary cases'' where agency action would ''make a radical or fundamental change'' to a statutory scheme and assert ''extravagant'' authority over the national economy through ''ambiguous statutory text,'' citing ''modest words,'' ''vague terms,'' ''subtle device[s],'' or ''oblique or elliptical language.'' [127] Here, no such

extraordinary circumstance exists. The prohibitions and disclosures in the Rule do not effect a major change in the economy. In fact, all the substantive requirements in the Rule are already extant under section 5 of the FTC Act, ROSCA, or the TSR. Moreover, the Rules' terms, as explained below, are neither vague, oblique, or elliptical—in fact, if anything, they are clearer than the legal authority just cited.

*B. Discussion of Specific Rule Provisions, Section-by-Section Analysis*

Below, for each provision of the proposed Rule, the Commission reviews the provision, summarizes comments received in response, and sets forth the final Rule with an analysis of the comments and other record evidence.

1. Proposed § 425.1 Scope

The Commission proposed eliminating the old Rule's prescriptive requirements applicable to prenotification plans and replacing them with flexible, but enforceable, standards. The proposed requirements would apply to all forms of negative option marketing, including prenotification and continuity plans, automatic renewals, and free trial offers.[128] The expanded coverage would establish a common set of requirements applicable to all types of negative option marketing. The proposed Rule would cover offers made in all media, including internet, telephone, in-person, and printed material, and would apply to all ''negative option sellers.'' With certain exceptions, not applicable here, the FTC Act provides the agency with jurisdiction over nearly every economic sector.[129]

(a) Negative Option Seller

(1) Comments

The scope of the proposed Rule covered ''negative option seller,'' defined to mean ''the person selling, offering, promoting, charging for, or otherwise marketing goods or services with a negative option feature.'' Several

commenters raised concerns regarding the scope of this definition.

The Chamber, for example, suggested the Commission delete the term ''promoting'' from the definition.[130] It cited a wide variety of actors who could be swept in by the term, including ''advertising companies, web designers, [and] entities in the supply chain,'' who ''may not actually play an active role in determining'' what consumers see and hear about negative option programs.[131] An individual business commenter also criticized the term, saying to include ''promoting'' ''would potentially burden our technicians and our business when we provide service for equipment manufacturers that have their own service contract programs.'' [132]

ETA, representing the payments industry, addressed the words ''charging for'' in the definition.[133] ETA interpreted those words not to cover ''intermediaries, such as payment processors, that merely effect the transfer of funds from the consumer buyer to the merchant seller resulting from a negative option feature.'' [134] ETA noted that payment intermediaries typically ''do not control the terms of the negative option feature and do not control the interface with the consumer buyer.'' [135] ETA therefore suggested the final Rule ''include an express exemption for payment processors and other intermediaries.'' [136]

Other commenters, while not specifically criticizing the definition of negative option seller, raised concerns about the scope of the proposed Rule where third parties are involved in marketing and cancellation. For example, several suggested the Rule exempt a seller who contracts with a third party for subscription enrollment, management, or cancellation services.[137] PDMI argued, ''it is

---

[123] *West Virginia* v. *EPA,* 597 U.S. 697, 721 (2022) (internal quotations cleaned up). *Accord Biden* v. *Nebraska,* 143 S. Ct. 2355, 2372 (2023).

[124] Coalition, FTC–2023–0033–0884.

[125] *See, e.g.,* PDMI, FTC–2023–0033–0864.

[126] 15 U.S.C. 57a(a)(1)(B).

[127] *West Virginia* v. *EPA,* 597 U.S. at 723 (cleaned up).

[128] The proposed Rule stated it applied to any form of negative option plan. Because ''negative option plan'' was a defined term in the old Rule specifically referring to prenotification plans, the Commission modifies the scope to apply to any form of ''negative option program.''

[129] Certain entities or activities are wholly or partially exempt from FTC jurisdiction under the FTC Act, including most depository institutions, charities, transportation and communications common carriers, and the business of insurance. Under Sections 4 and 5 of the FTC Act, however, the Commission's jurisdiction extends to companies organized to carry on business for their own profit or that of their members, even if those companies are organized under state law as a not-for-profit entity. *See California Dental Ass'n* v. *FTC,* 526 U.S. 756 (1999). *But see* n.151.

[130] Chamber, FTC–2023–0033–0885.

[131] *Id.*

[132] Individual commenter, FTC–2023–0033–1136.

[133] Electronic Transactions Association (''ETA''), FTC–2023–0033–1004.

[134] *Id.*

[135] *Id.*

[136] *Id.* IHRSA noted health and fitness membership charges are typically processed on a monthly basis from the time of agreement, and in many cases by a third-party service provider. IHRSA, FTC–2023–0033–0863.

[137] NCTA asserted, ''The proposed rule also fails to account for third-party sign-up arrangements. For example, programmers have arrangements with Roku, Amazon, Apple, and others that allow consumers to sign up through these third parties for their streaming services.'' NCTA, FTC–2023–0033–0858. N/MA suggested the Commission ''should make clear that when a sale with a negative option feature is made through a third party that controls the process of purchasing and/or cancelling a subscription with a negative option feature, any new requirements would apply to the third party only, and not to the company that fulfills the

imperative that the Proposed Rule exempt sellers from compliance with those provisions that are not under their direct control . . . [and] should also exempt the seller from any misrepresentations made by a third-party platform."[138] NRF expressed concern a careful retailer could still "face steep financial penalties for negligent misrepresentations (concerning, *e.g.,* product efficacy) based on information provided by third-party vendors."[139]

(2) Analysis

Based on the record, the Commission revises the definition of "negative option seller" to remove the word "promoting," but declines to create status-based exemptions.[140] Moreover, the Commission clarifies it will enforce the final Rule in accordance with established section 5 principles regarding parties' responsibilities for, and involvement in, relevant activity. This approach should fully address commenters' concerns while maintaining the Rule's consumer protections.

As several commenters observed, a wide variety of actors may have secondary or tertiary roles in promoting products or services with a negative option feature. Further, as the Chamber noted, "many of those participants . . . may not actually play an active role in determining how the negative option is presented to the consumer."[141] Similarly, participants in the promotion process may have no role in cancellation. Deleting the word "promoting" from the definition of negative option seller addresses this issue by ensuring those who have no active participation in the negative option feature are outside the Rule's coverage. However, this amendment

does not mean all actors involved in promotion are exempt from the Rule. A participant who promotes and takes on a further role "selling, offering, charging for, or otherwise marketing goods or services with a negative option feature" remains subject to the final Rule, including the provisions covering "promoting" such goods or services for those who meet the negative option seller definition.[142]

The Commission declines to adopt a status-based exemption for payment intermediaries. Such exemptions are overbroad, excluding actors engaged in the practices condemned by the Rule. For example, a payment processor selling its own services on a negative option basis, as opposed to just providing payment services for another negative option seller, is no different than any other business covered by the Rule. Additionally, as ETA correctly noted, the words "charging for" as used in the Rule do not cover intermediaries merely effecting the transfer of funds from the consumer buyer to the merchant seller. This is consistent with the Commission's interpretation of ROSCA's coverage of persons who "charge or attempt to charge any consumer."[143] Based on longstanding section 5 principles, the Commission has not enforced ROSCA against payment intermediaries solely for their conduct in effecting funds transfers.[144] The Commission will apply the same principles to the Rule.[145]

Similarly, the Commission will not grant blanket exemptions to sellers who contract with third parties while offering subscription services. The Commission expects negative option sellers to evaluate their commercial relationships with the Rule's provisions in mind. Even where a seller does not directly manage its negative option

feature disclosures, consent, or cancellation, it can satisfy its obligations under the Rule by choosing to contract with third parties who act in accordance with the Rule and monitoring those parties' performance. An exemption for all sellers who contract with third parties to manage aspects of their negative option programs would effectively nullify the Rule by incentivizing less than legitimate sellers to contract with actors engaged in deceptive practices to maximize negative option enrollments and frustrate cancellation with impunity. A seller cannot evade its responsibility to deal honestly with consumers by contracting with a third party who does not.[146]

(b) Insurance

(1) Comments

Several commenters asked the Commission to expressly exclude insurance and State-regulated service contracts from the Rule.[147] They argued Congress prohibited the FTC from regulating the "business of insurance" in section 2 of the McCarran-Ferguson Act and the FTC exempted insurance sales in its Cooling-Off Rule.[148] They also asserted, "State regulations in every jurisdiction require an insurer to give notice of a policy renewal," and State rules prohibit negative options.[149] Other commenters argued the Commission should exempt all service contract providers from the Rule due to existing State laws and regulations,[150] regardless

---

[138] PDMI, FTC–2023–003–0864.

[139] NRF, FTC–2023–0033–1005.

[140] *See also* Section VII.B.1; Section VIII.A.1.

[141] Chamber, FTC–2023–0033–0885.

subscription." N/MA, FTC–2023–0033–0873. Marketplace Industry Association ("MIA") requested "the Commission clarify that where there are third-party payment platforms managing Subscriptions on behalf of businesses . . . (collectively, "Third Party Subscription Managers"), that such Third Party Subscription Managers be legally responsible and legally liable for compliance with the proposed Rule. As is the case with Third Party Subscription Managers, businesses that offer Subscriptions have zero control over such Subscriptions, including the initiation of Subscriptions or the cancellation of Subscriptions. Said another way, it is impossible for businesses to comply with the proposed Rule where there are Third Party Subscription Managers. As such, the Association requests that the Commission make clear that Third Party Subscription Managers be responsible for compliance with the proposed Rule, including any penalties for noncompliance." MIA, FTC–2023–0033–1008.

[142] *See, e.g., FTC* v. *LeadClick Media, LLC,* 838 F.3d 158, 172 (2d Cir. 2016) (operator of affiliate marketing network liable where it did not create ads but "directly participat[ed] in the deceptive scheme by recruiting, managing, and paying a network of affiliates to generate consumer traffic through the use of deceptive advertising and allowing the use of deceptive advertising where it had the authority to control the affiliates participating in its network.").

[143] 15 U.S.C. 8403.

[144] *See FTC* v. *Apex Capital Grp., LLC,* No. 2:18–cv–09573 (C.D. Cal. 2018). In this ROSCA matter, the Commission amended its complaint to add payment intermediary defendants for their unlawful conduct in connection with the scheme. However, the Commission did not assert ROSCA claims against the payment intermediary defendants, instead asserting counts for credit card laundering and manipulation of chargeback levels as Section 5 violations.

[145] *Id.; see FTC* v. *First Am. Payment Sys.,* No. 4:22–cv–00654 (E.D. Tex. 2022) (ROSCA case against payment processor for its unlawful acts and practices against its merchant customers).

[146] *E.g., FTC* v. *LeadClick Media, LLC,* 838 F.3d 158, 170 (2d Cir. 2016) ("A defendant may be held liable for its own acts of deception under the FTC Act, whether by directly participating in deception or by allowing deceptive acts or practices to occur that are within its control."); *see also FTC* v. *Inc21.com Corp.,* 688 F. Supp. 2d 927, 939 (N.D. Cal. 2010) ("Even if Inc21 did not approve of the fraud (and it seems likely that it *did* approve), the fact remains that Inc21 is responsible for organizing this engine of fraud and reaping its profits. As such, Inc21 may *certainly* be held accountable[.]") (emphasis in original).

[147] Asurion, FTC–2023–0033–0878; Florida Service Agreement Association, FTC–2023–0033–0882; American Property Casualty Insurance Association ("APCIA"), FTC–2023–0033–0996; National Association of Mutual Insurance Companies ("NAMIC"), FTC–2023–0033–1143.

[148] *See* 15 U.S.C. 1012; 16 CFR 429(a)(6).

[149] NAMIC, FTC–2023–0033–1143.

[150] SCIC, FTC–2023–0033–0879 (noting SCIC's comment to the ANPR stated most states have substantial regulatory frameworks for service contracts and that industry operates nationwide consistent with the intent of the proposed Rule); CTIA, FTC–2023–0033–0866 (noting service contracts are typically regulated by state departments of insurance and most states with autorenewal laws, including California, New York, and Oregon, provide an exemption for entities regulated by the state department of insurance); Frontdoor, Inc. ("Frontdoor"), FTC–2023–0033–0862 (noting majority of states have rigorous laws

Continued

App. 17

of whether they are engaged in the "business of insurance" within the meaning of the McCarran-Ferguson Act.

(2) Analysis

The Commission declines to exempt insurance or service contracts from the Rule. The final Rule can be enforced by the Commission only against covered persons and activities within the Commission's jurisdiction.[151] Restating or further specifying each jurisdictional limit in the final Rule's text, therefore, is not necessary.

Additionally, the requested industry-wide exemption is considerably broader than the FTC's jurisdictional limitations. The McCarran-Ferguson Act does not exempt entities engaged in the business of insurance from the Commission's jurisdiction unless such entities are subject to State regulation.[152] Moreover, activities of entities within the insurance industry that are beyond the scope of the "business of insurance" are subject to the Commission's jurisdiction.[153] No commenter provided any compelling reason to exempt these otherwise covered activities from the Rule.

Finally, commenters' citations to existing State laws and regulations governing service contract sellers indicate these sellers already provide disclosures and protections consistent with the Rule. As a practical matter, sellers who already provide consumers the Rule's protections should not be burdened by its application.[154]

(c) Business-to-Business

(1) Comments

Nine commenters noted the NPRM did not expressly address whether the proposed Rule would apply to business-to-business ("B2B") transactions. Seven, including five industry associations,[155] said it should not apply.[156] Two individuals disagreed.[157]

Commenters advocating against including B2B sales in the Rule asserted the Commission should presume businesses are more sophisticated than individual consumers,[158] and contended B2B contracts typically are individually negotiated.[159] For example, ZoomInfo maintained business consumers are generally "more sophisticated than individual consumers," explaining B2B contracts "are assumed to result from arm's-length negotiation and often benefit from professional legal counsel."[160] Similarly, NCTA, an organization representing the internet and television industry, characterized business consumers as "typically sophisticated," and said the Commission should not intervene in transactions based on "[n]on-form contracts that are the subject of extensive bargaining between sophisticated companies."[161]

Seller and consumer commenters differed on whether the harmful negative option practices discussed in the NPRM are extant for B2B consumers. In support of excluding B2B transactions, two commenters asserted there is insufficient evidence of harm in the B2B context to support a prevalence finding.[162] A B2B consumer, however, noted individuals and small businesses both suffer from the harms of deceptive and unfair negative option practices. "As a small business owner," the individual wrote, "as well as a consumer, I am especially aware of how purposely difficult many companies make it to cancel their services. From telephone companies to travel channel companies . . . to email targeting campaigns . . . the cancelling process is ridiculously complex and at times hidden, if it exists at all on their websites."[163]

Seller and consumer commenters also differed on the significance of existing State law B2B exclusions. Three B2B sellers recommended the Commission follow those States that exclude B2B transactions.[164] A consumer, however, asserted such exclusions are why this Rule is necessary.[165] Specifically, the commenter explained: "negative option marketing also greatly affect[s] many individual sellers and small businesses," but due to B2B exclusions, "some larger corporations or companies are able to take advantage of that loophole and use predatory negative option practices against individual sellers and small businesses."[166]

Some sellers also referred to other Federal regulations to support excluding businesses from the scope of the Rule. For instance, ETA and NCTA each noted the Commission excluded most B2B transactions in the TSR. ETA made the same observation about the Cooling Off Rule.[167] Both CTIA and USTelecom approvingly cited the FCC's approach. USTelecom explained, "the FCC has limited certain consumer protection rules to 'mass-market retail services'" that are "'marketed and sold on a standardized basis to residential customers, small businesses, and other end-user customers such as schools and libraries.'"[168] USTelecom further explained, "Mass-market retail services stand in contrast to 'customized or individually negotiated arrangements' that are typically offered to larger organizations."[169]

ETA questioned whether the Commission has authority to address B2B transactions. ETA argued the proposed Rule would let the Commission "interpose regulatory influence and law enforcement authority in contractual arrangements between businesses in a way that has not been authorized by Congress or

---

[151] Nothing in this Rule, however, shall limit another agency's ability to enforce this Rule within its own statutory authority, even if that authority is different than the FTC's authority. *See, e.g.,* 12 U.S.C. 5581(b)(5)(B)(ii).

[152] *FTC* v. *IAB Mktg. Assocs. LP,* 746 F.3d 1228, 1235 (11th Cir. 2014) ("[T]he FTC Act applies to the business of insurance only to the extent that such business is not regulated by state law.").

[153] The Supreme Court has explained that, under the McCarran-Ferguson Act, a three-part factual inquiry is necessary to evaluate whether any particular activity constitutes the business of insurance. *See Union Labor Life Ins. Co.* v. *Pireno,* 458 U.S. 119, 129 (1982). First, does the activity have the effect of transferring or spreading a policyholder's risk; second, is the activity an integral part of the policy relationship between the insurer and the insured; and third, is the practice limited to entities within the insurance industry. *Id.* This inquiry requires a factual analysis of the activities in question.

[154] Moreover, service contract sellers, like other interested persons, may seek full or partial exemption from the final Rule. *See* Section VIII.A.1 (discussing new § 425.8, Exemptions provision).

for the offering, sale, and renewal of home service contracts, including the use of automatic renewals and applicable cancellation rights).

[155] BSA, FTC–2023–0033–1015 (B2B software sellers); CTIA, FTC–2023–0033–0866 (wireless communication industry); ETA, FTC–2023–0033–1004 (payments industry); NCTA, FTC–2023–0033–0858 (internet and television); USTelecom, FTC–2023–0033–0876 (broadband). A sixth association, the U.S. Chamber of Commerce, asked the Commission to ensure that the scope of its cost-benefit analysis includes business-to-business transactions. FTC–2023–0033–0885.

[156] Anonymous commenter, FTC–2023–0033–1007; BSA, FTC–2023–0033–1015; CTIA, FTC–2023–0033–0866; ETA, FTC–2023–0033–1004; NCTA, FTC–2023–0033–0858; USTelecom, FTC–2023–0033–0876; ZoomInfo, FTC–2023–0033–0865.

[157] Individual commenter, FTC–2023–0033–0755; Individual commenter, FTC–2023–0033–0042.

[158] Anonymous commenter, FTC–2023–0033–1007; CTIA, FTC–2023–0033–0866; NCTA, FTC–2023–0033–0858; ZoomInfo, FTC–2023–0033–0865.

[159] CTIA, FTC–2023–0033–0866; NCTA, FTC–2023–0033–0858; USTelecom, FTC–2023–0033–0876; ZoomInfo, FTC–2023–0033–0865.

[160] ZoomInfo, FTC–2023–0033–0865.

[161] NCTA, FTC–2023–0033–0858. NCTA requested any final rule exclude individually negotiated business-to-business contracts. FTC–2023–0033–0858.

[162] BSA, FTC–2023–0033–1015; NCTA, FTC–2023–0033–0858. The Commission discusses the subject of prevalence more broadly at Section VII.A.

[163] Individual commenter, FTC–2023–0033–0755.

[164] Anonymous commenter, FTC–2023–0033–1007 (California); BSA, FTC–2023–0033–1015 (California, Colorado, Delaware); ZoomInfo, FTC–2023–0033–0865 (California, Colorado, Connecticut, Delaware, Hawaii, New York, Virginia).

[165] Individual commenter, FTC–2023–0033–0042.

[166] *Id.*

[167] 16 CFR 429.0–429.3.

[168] USTelecom, FTC–2023–0033–0876.

[169] *Id.*

justified by the Commission's own rationale for the Proposed Rule.'' [170] ETA cited the Commission's use of ROSCA in the *First American Payment Systems* case to illustrate its view the Rule's application in the B2B context would be impermissible regulation of ''an automatic renewal clause in an arm's length commercial agreement.'' [171]

Finally, ETA and ZoomInfo argued various provisions of the Rule, such as the disclosure and notice requirements, could present unusual implementation problems in B2B transactions. For instance, ETA asserted disclosure requirements could result in operational uncertainty because the Commission did not consider all the typical terms included in B2B agreements. Similarly, ZoomInfo explained ''B2B agreements are often complex, involving multiple decision-makers and points of contact, who might rotate or leave their roles over the course of a contract.'' [172]

### (2) Analysis

The final Rule, like the proposed Rule, covers B2B transactions. It has been the Commission's longstanding view that section 5 of the FTC Act [173] protects business consumers as well as individual consumers. Moreover, commenters' arguments that, under section 5, all business consumers must be held to a heightened standard of sophistication are inconsistent with settled law.

The Commission has long enforced the FTC Act against those who deceive and act unfairly to businesses and other organizations. [174] As the Supreme Court explained in *FTC* v. *Standard Educ. Soc.,* 302 U.S. 112, 116 (1937), ''Laws are made to protect the trusting as well as the suspicious.'' This principle applies no less to the business consumer than to the individual. [175] The Commission maintains a decades-long list of business protection cases on its website and dedicates significant effort

to educate and protect small businesses. [176] Indeed, the Commission has made protecting small businesses a priority. [177]

Moreover, the TSR never exempted B2B transactions entirely. Importantly, the Commission recently amended the TSR to cover a broader scope of B2B activity. Specifically, in 2024, the Commission expanded the TSR to prohibit material misrepresentations and false or misleading statements in B2B calls due to the ongoing harm to small businesses from such practices. [178]

Additionally, recent Commission actions to protect small businesses underscore the fact deceptive practices pertaining to negative option features occur in B2B transactions just as they do with individual consumers. None of these cases present the arms-length negotiation of contracts by sophisticated parties that commenters claim to be universal. For example, in its 2022 action against *First American Payment Systems,* [179] the Commission alleged the defendants violated section 5 and ROSCA by making false claims about fees and cost savings to persuade merchants in small- and medium-sized businesses, many of whom had limited English proficiency, to enter into payment processing agreements. [180] Once enrolled, the defendants allegedly withdrew funds from merchants' accounts without consent, and made it difficult and expensive to cancel the service. Under a stipulated court order, the defendants must (among other things) make it easier for merchants to cancel their services.

In the Commission's 2022 *Dun & Bradstreet* [181] matter, the complaint

alleged multiple deceptive practices pertaining to products the defendant marketed to small- and medium-sized businesses, in violation of section 5. The resulting consent order includes substantial provisions pertaining to negative option features.

The Commission's 2022 action against *Vonage* [182] also illustrates this point. The complaint detailed the defendants' deceptive and unfair practices targeting both business and residential customers and alleged those practices violated section 5 and ROSCA. [183] The stipulated court order includes multiple provisions relating to consent, cancellation, and disclosures pertaining to both individual and business consumers.

Nonetheless, two arguments for excluding B2B transactions warrant additional discussion. *First,* several commenters elide the distinction between B2B agreements generally and individually negotiated B2B agreements. It is neither the purpose nor the effect of the final Rule to prevent businesses from entering into agreements with individually negotiated negative option terms. By requiring the cancellation mechanism to be ''at least as easy to use'' as the consent mechanism, the final Rule incorporates a symmetrical standard that accounts for individually negotiated B2B agreements. A B2B consumer who consents to a negative option feature through an individually negotiated term of an agreement can also individually negotiate the cancellation mechanism. Moreover, as the Commission noted above, it will enforce this Rule in the same manner in which it enforces section 5 of the FTC Act. [184] The Commission has not used its consumer protection authority in the type of large individually negotiated B2B transactions commenters are worried about. [185] Unsurprisingly, no commenter cited any historical instance to the contrary. Thus, the Rule preserves the ability of sophisticated business consumers to individually negotiate B2B agreement terms. [186]

---

[170] ETA, FTC–2023–0033–1004.

[171] *Id.* (citing *FTC* v. *First Am. Payment Sys.,* No. 4:22–cv–00654 (E.D. Tex. 2022)).

[172] ZoomInfo, FTC–2023–0033–0865. ETA also raised a concern about the definition of negative option seller, addressed in Section VII.B.1.a.

[173] 15 U.S.C. 45(a).

[174] *See, e.g., Indep. Directory Corp.* v. *FTC,* 188 F.2d 468 (2d Cir. 1951) (deceptive practices in selling directory ads to businesses).

[175] *Indep. Directory Corp.,* 188 F.2d at 470 (applying *Standard Educ. Soc.*); *see also, e.g., FTC* v. *LoanPointe, LLC,* 525 F. App'x 696, 701 (10th Cir. 2017) (FTC need only prove ''the likelihood that a consumer (here, employers)'' would be deceived); *FTC* v. *Crittenden,* 19 F.3d 26 (9th Cir. 1994) (Table) (noting stipulated judgment with B2B office supplier); *FTC* v. *Inc21.com Corp.,* 688 F. Supp. 2d 927 (N.D. Cal. 2010) (preliminary injunction against deceptive and unfair B2B billing scheme); *FTC* v. *IFC Credit Corp.,* 543 F. Supp. 2d 925, 934 (N.D. Ill. 2008) (FTC Act applies to B2B sales).

[176] *See* Fed. Trade Comm'n, ''Protecting Small Businesses: Cases,'' *https://www.ftc.gov/business-guidance/small-businesses/protecting-small-businesses-cases* (last visited October 23, 2024); Fed. Trade Comm'n, ''Protecting Small Businesses,'' *https://www.ftc.gov/business-guidance/small-businesses* (last visited October 23, 2024); Fed. Trade Comm'n, ''Scams and Your Small Business: A Guide For Business,'' *https://www.ftc.gov/business-guidance/resources/scams-your-small-business-guide-business* (last visited October 23, 2024).

[177] *See* Press Release, Fed. Trade Comm'n, ''FTC, BBB, and Law Enforcement Partners Announce Results of Operation Main Street: Stopping Small Business Scams Law Enforcement and Education Initiative'' (June 18, 2018), *https://www.ftc.gov/news-events/press-releases/2018/06/ftc-bbb-law-enforcement-partners-announce-results-operation-main* (last visited October 23, 2024).

[178] TSR, 89 FR 26760 (April 16, 2024).

[179] *FTC* v. *First Am. Payment Sys.,* No. 4:22–cv–00654 (E.D. Tex. 2022).

[180] In describing the basis for the misrepresentations provision of the proposed Rule, the NPRM cited (among other cases) *First Am. Payment Sys.* NPRM, 88 FR 24726 n.65. *See also* ETA, FTC–2023–0033–1004.

[181] *In re Dun & Bradstreet, Inc.,* FTC Docket No. C–4761 (2022).

[182] *FTC* v. *Vonage Holdings Corp.,* No. 3:22–cv–06435 (D.N.J. 2022).

[183] The *Adobe* matter provides another recent example of a matter alleging unlawful negative option practices targeting both individual and business consumers. *United States* v. *Adobe, Inc.,* No. 5:24–cv–03630 (N.D. Cal. 2024).

[184] *See* section VII.B.1.a.

[185] *See* 16 CFR 2.3.

[186] The *Vonage* order expressly exempts negative option feature provisions in B2B contracts where the defendants ''possess evidence that consumers negotiated significant terms of the negative option feature that are only negotiable with business consumers.'' *FTC* v. *Vonage Holdings Corp.,* No. 3:22–cv–06435 (D.N.J. 2022). The final Rule is less prescriptive and more flexible than that order,
Continued

*Second,* it appears several commenters mistakenly thought the required simple cancellation mechanism would necessarily terminate all aspects of any broader contract or agreement. In fact, this provision only pertains to cancellation of the negative option feature. Complex commercial agreements, such as those described by ETA, will have numerous provisions unrelated to negative option features. Nothing in this Rule prohibits these provisions from being subject to separate cancellation and termination terms.

## 2. Proposed § 425.2 Definitions

In the NPRM, the proposed Rule set forth several definitions. For example, the proposed Rule defined "negative option feature" as a contract provision under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel an agreement is interpreted as acceptance or continuing acceptance of an offer. This definition is consistent with the TSR and ROSCA (which references the TSR's definition). The proposed term includes, but is not limited to, automatic renewals, continuity plans, free-to-pay conversion or fee-to-pay conversions, and pre-notification negative option plans.[187]

Additionally, the proposed Rule defined "clear and conspicuous," "negative option seller," and "save." To define "clear and conspicuous," the FTC imported its definition developed through years of enforcement experience. As explained in the NPRM, the proposed definition substantially overlaps with the concepts provided in California and District of Columbia negative option laws,[188] with one exception. Specifically, the District of Columbia definition requires disclosures to be visually proximate to any request for consumer consent. The final Rule incorporates this requirement in a separate consent section.

### (a) Summary of Comments

The Commission did not receive any comments specifically supporting any proposed definition, though several commenters generally supported the concepts incorporated in the definitions, such as "clear and conspicuous disclosures." Several commenters critiqued the Commission's omission of certain definitions, such as

"material" in connection with § 425.3 and § 425.4,[189] "simple cancellation mechanism,"[190] "practical," and "normal business hours,"[191] because these terms are used throughout the Rule. Other commenters asked the Commission to add a definition for "consumer" that excludes businesses,[192] while another asked the Commission to include small businesses in that definition.[193] Similarly, other commenters asked the Commission to "exempt" certain industries from, or otherwise alter the scope of, the definition of "negative option seller."[194]

Several commenters critiqued the proposed definitions. For example, ESA stated "the definition of 'save'[195] is overly broad and would prohibit the presentation of useful, consumer-friendly details about a consumer's subscription before they cancel it."[196] Other commenters questioned why the "clear and conspicuous" definitions says a disclosure is not clear and

conspicuous, if a consumer must click on a hyperlink to see it.[197]

Additionally, several commenters requested the Commission revise certain of its proposed definitions for clarity. For instance, the National Federation of Independent Businesses ("NFIB") asked the Commission to revise the definitions for "clear and conspicuous" and "negative option feature" to "make their meanings clearer"[198] by, for example, using simpler words in the clear and conspicuous definition ("words and grammar" versus "diction and syntax") or by providing detailed examples of each type of program covered in the definition of negative option feature. NFIB further explained "Those regulated by and served by subsection 425.2(d) most likely would understand the meaning of an automatic renewal, but perhaps not the meaning of the other examples."[199]

### (b) Analysis

Based on the record, the Commission makes several changes to the proposed definitions. First, as explained in sections VII.B.1.3 (material) and VII.B.6.c.2.b.ii (interactive electronic medium), it adds definitions of material and interactive electronic medium for clarity. Further, as discussed in section VII.B.4, the Commission modifies the definition of clear and conspicuous.

Second, the Commission removes the definition of save. As discussed in section VII.B.6.c the proposed saves provision did not achieve the right balance between protecting consumers from unfair tactics and allowing sellers to provide necessary and valuable information about cancellation. Therefore, the Commission declines to include the NPRM's proposed limitation on saves, and instead will consider issuing an SNPRM in the future for

---

thereby promoting more flexibility in the marketplace.

[187] Section II of this Notice contains descriptions of these various plans.

[188] Cal. Bus. & Prof. Code section 17601 and DC Code section 28A–202.

[189] *See, e.g.,* BSA, FTC–2023–0033–1015 (material is not defined); Chamber, FTC–2023–0033–0885 (same).

[190] Center for Data Innovation ("CDI"), FTC–2023–0033–0887; *see also* Act App Association, FTC–2023–0033–0874; NRF, FTC–2023–0033–1005 (failed to defined "as simple as").

[191] International Carwash Association, FTC–2023–0033–1142.

[192] *See, e.g.,* Anonymous commenter, FTC–2023–0033–1007; Zoominfo, FTC–2023–0033–0865; CTIA, FTC–2023–0033–0866; BSA, FTC–2023–0033–1015.

[193] Individual commenter, FTC–2023–0033–0042.

[194] *See, e.g.,* Asurion, FTC–2023–0033–0878 (exempt service contracts); Chamber, FTC–2023–0033–0885 (exclude promoting); ETA, FTC–2023–0033–1004 (exclude "charging for"). These requests are more appropriately addressed in the scope and requested exemptions, and the Commission does not consider them here.

[195] Save was defined in the proposed Rule as an attempt by a seller to present any additional offers, modifications to the existing agreement, reasons to retain the existing offer, or similar information when a consumer attempts to cancel a negative option feature.

[196] ESA, FTC–2023–0033–0867. PDMI argued similarly as to the definition of save. FTC–2023–0033–0864 (arguing sellers should be able to be able to immediately pause, skip or modification options without having to ask for permission, particularly because it is impossible to know which customers prefer to cancel as opposed to merely modify their current plan). *Accord* USTelecom, FTC–2023–0033–0876 (definition of Save overly broad); RILA, FTC–2023–0033–0883 (modify definition of save to allow short clarification and confirmation of intent follow-up communications); Chamber, FTC–2023–0033–0885; CDI, FTC–2023–0033–0887 ("Commission should exclude information about permanent, irreparable harms that may result from cancellation, and is relevant to the current subscription or product plan."); CCIA, FTC–2023–0033–0984; IAB, FTC–2023–0033–1000 (definition of save overly broad and "would prohibit the presentation of useful, consumer-friendly details about a consumer's subscription before they cancel it.").

[197] *See, e.g.,* NCTA, FTC–2023–0033–0858 (definition does not take into account small screens); Chamber, FTC–2023–0033–0885 ("The requirements that disclosure on the internet or mobile applications be 'unavoidable' and 'immediately adjacent' raise practical concerns."); CCIA, FTC–2023–0033–0984 (definition should "hew closely to the Commission's guidance in its *.com Disclosures* policy to ensure regulatory consistency.").

[198] NFIB, FTC–2023–0033–0789. *Accord* Kuehn, FTC–2023–0033–0871 (proposed revised definition of negative option feature); Chamber, FTC–2023–0033–0885 (requests the definition of negative option feature to be revised to exclude monthly subscription services). *See* section VII.B.4 for further discussion of proposed modifications. *See also* ETA, FTC–2023–0033–1004 (clarify and narrow "automatic renewal in the definition).

[199] NFIB, FTC–2023–0033–0789 (requesting specific examples of each type of program be included in the definition of negative option feature); *see also* IHRSA, FTC–2023–0033–0863 (observes the Commission does not define what "automatic renewal, continuity plan" and other examples of negative option features mean).

further comment. Accordingly, without the saves provision, the Commission determines there is no need for a defined term at this time.

Although several commenters critiqued the lack of definitions for such terms as ''simple cancellation mechanism,'' ''practical,'' or ''normal business hours,'' the Commission addresses these concerns with further clarification, rather than with formal definitions, in the section-by-section analysis below. As to commenter requests for a definition of ''consumer'' expressly excluding (or including) business-to-business transactions, the Commission similarly addresses these requests in the sections regarding scope and requested exemptions, above.

Finally, NFIB asked the Commission to add specific examples of each type of negative option program to the text of the Rule, stating those served by the Rule would likely not understand these ''terms of art.''[200] The Commission discusses examples of each type of negative option program in more detail as part of the SBP at section II. Further, the Commission typically engages in robust consumer and business education campaigns when promulgating and issuing final rules and will do so here. The Commission therefore disagrees the Rule must incorporate these examples into the text.[201]

### 3. Proposed § 425.3 Misrepresentations

Section 425.3 of the proposed Rule prohibited sellers from misrepresenting ''any material fact related to the transaction, such as the negative option feature, or any material fact related to the underlying good or service.''[202] As explained in the NPRM, ''misrepresentations in negative option marketing cases often involve deceptive representations not only related to the negative option feature but to the underlying product (or service) or other aspects of the transaction as well.''[203] These include ''misrepresentations related to costs, product efficacy, free trial claims, processing or shipping fees, billing information use, deadlines, consumer authorization, refunds, [and] cancellation.''[204]

The FTC Act provides the legal basis for the Commission to prevent and remedy misrepresentations in the negative option context. Specifically, section 5(a)(1) of the FTC Act declares unfair or deceptive acts or practices in or affecting commerce to be unlawful. Negative option sellers making material misrepresentations are engaged in deceptive practices. Addressing these practices through the Rule prevents deception by giving the Commission the ability to seek civil penalties (where appropriate under 5(m)(1)(a)), where they are not already provided, thus deterring misrepresentations, protecting consumers, and leveling the playing field for ''honest sellers who must compete with those who engage in deception.''[205]

#### (a) Summary of Comments

The State AGs strongly supported this provision, stating, for example, it would ''combat[ ] seller misrepresentations, by providing the FTC with authority to seek civil penalties and consumer redress for material misrepresentations in all types of media.''[206] Echoing the NPRM, they explained, ''[l]ike the FTC, we have found that negative option marketing cases 'often involve deceptive representations not only related to the negative option feature but to the underlying product (or service) or other aspects of the transaction as well.' ''[207] Law Professors further supported prohibiting ''material misrepresentations . . . whether or not the false claim is exclusively about the negative option feature.''[208] They, too, offered evidence of the prevalence of misconduct, stating ''entities like the Better Business Bureau have long reported, based on FTC and other data, the prevalence of misrepresentation in certain negative option arrangements, and non-FTC enforcement efforts confirm the problem.''[209] Citing

multiple sources, they argued the ''Commission thus has more than ample 'reason to believe that' co-occurring negative option violations and other misrepresentations 'are prevalent.' ''[210]

These commenters further argued the Commission should not adopt a narrower provision limited strictly to the elements of a negative option feature because, in their view, it would be difficult ''to fully separate misrepresentations regarding the negative option feature from all other material misrepresentations.''[211]

Several commenters, largely trade groups and sellers, criticized the proposed provision. As discussed in section V.A, several questioned the prevalence of misrepresentations[212] and asserted the provision was not within the scope of the ANPR.[213] Additionally, several commenters argued the provision is overbroad, and suggested it is unnecessary in light of existing law. Finally, they proposed ways to narrow the proposed provision.

Several commenters objected to the scope of the proposed provision. Citing Commissioner Wilson's dissent to the NPRM, TechNet noted the proposed Rule ''would capture alleged misrepresentations regarding the underlying product or service 'wholly unrelated' to the negative option feature.''[214] Three commenters asserted no current trade regulation rule

---

[200] NFIB, FTC–2023–0033–0789.

[201] Further, as explained in n.307, the Commission also declines to revise the definition of ''clear and conspicuous'' to replace the words ''diction and syntax'' with ''words and grammar.''

[202] NPRM, 88 FR 24734.

[203] NPRM, 88 FR 24726.

[204] *Id.* (citing *e.g., FTC* v. *Tarr,* No. 3:17–cv–02024 (S.D. Cal. 2017); *FTC* v. *First Am. Payment Sys., Inc.,* No. 4:22–cv–00654 (E.D. Tex. 2022); *FTC* v. *XXL Impressions, LLC,* No. 1:17–cv–00067 (D. Me. 2017); *United States* v. *MyLife.com, Inc.,* No. 2:20–cv–6692 (C.D. Cal. 2020); *FTC* v. *Health Rsch. Labs., LLC,*

No. 2:17–cv–00467 (D. Me. 2017); *FTC* v. *Leanspa, LLC,* No. 3:11–cv–01715 (D. Conn. 2011); *FTC* v. *WealthPress, Inc.,* No. 3:23–cv–00046 (M.D. Fla. 2023); *FTC* v. *BunZai Media Grp., Inc.,* No. 2:15–cv–04527 (C.D. Cal. 2015); *FTC* v. *Willms,* No. 2:11–cv–00828 (W.D. Wash. 2011); *FTC* v. *Universal Premium Servs.,* No. 2:06–cv–00849 (C.D. Cal. 2006); *FTC* v. *Remote Response Corp.,* No. 1:06–cv–20168 (S.D. Fla. 2006); and *FTC* v. *Johnson,* No. 2:10–cv–02203 (D. Nev. 2016).

[205] NPRM, 88 FR 24726.

[206] State AGs, FTC–2023–0033–0886.

[207] *Id.*

[208] Law Professors, FTC–2023–0033–0861.

[209] *Id.,* citing Better Business Bureau, ''BBB Investigation Update: Free Trial Offer Scams'' (Apr. 2020), *https://www.bbb.org/article/news-releases/22040-bbb-update-free-trial-offerscams;* C. Steven Baker & Better Business Bureau, ''Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements'' (Dec. 2018), *https://www.bbb.org/article/investigations/18929-subscription-traps-and-*

*deceptive-free-trialsscam-millions-with-misleading-ads-and-fake-celebrity-endorsements.* The Law professors further pointed to evidence found by searching BBB's ScamTracker for terms like ''subscription.'' *See, e.g.,* Better Business Bureau, ScamTracker, ID #720953, *https://www.bbb.org/scamtracker/lookupscam/720953.* They additionally cited Consumer Financial Protection Bureau, ''CFPB Charges TransUnion and Senior Executive John Danaher with Violating Law Enforcement Order'' (Apr. 2022), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-charges-transunion-and-seniorexecutive-john-danaher-with-violating-law-enforcement-order/;* David Pierson, 'Santa Monica fitness brand Beachbody is fined $3.6 million over automatic renewals,' L.A. Times (Aug. 29, 2017), *https://www.latimes.com/business/la-fi-beachbody-20170829-story.html;* Bruce A. Craig, Negative-Option Billing—Understanding the Stealth Scams of the '90s, 7 Loy. Consumer L. Rev. 5 (1994).

[210] Law Professors, FTC–2023–0033–0861.

[211] Law Professors, FTC–2023–0033–0861.

[212] CTA, FTC–2023–0033–0997; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000; N/MA, FTC–2023–0033–0873; RILA, FTC–2023–0033–0883; TechFreedom, FTC–2023–0033–0872. *See* section VII.A for a discussion of prevalence addressing these comments.

[213] ANA, FTC–2023–0033–1001; CCIA, FTC–2023–0033–0984; Coalition, FTC–2023–0033–0884; ESA, FTC–2023–0033–0867; Frontdoor, FTC–2023–0033–0862; IAB, FTC–2023–0033–1000; NRF, FTC–2023–0033–1005; RILA, FTC–2023–0033–0883. *See* section VII.A for a discussion addressing these comments.

[214] TechNet, FTC–2023–0033–0869.

Appellate Case: 24-3137      Page: 21      Date Filed: 12/05/2024 Entry ID: 5463205

prohibits misrepresentations so broadly.[215]

Similarly on scope, some commenters also argued the proposed language lacked the specificity necessary to give sellers notice of what conduct would violate the Rule.[216] For example, ACT App Association asserted, "Notwithstanding best efforts, tech startups' ability to flawlessly adhere to the vague and broad language used in this rule is unrealistic." [217]

A few commenters provided hypotheticals or asked rhetorical questions to illustrate concerns about the proposal's breadth. MIA, for example, stated, "if a streaming service advertises, 'movies that you will love,' but you do not 'love' them, is that a violation of this rule subject to penalties? If a housekeeping service claims, 'great cleaning every time,' but the resulting cleanliness is not up to the consumer's 'standards,' will that trigger this provision and any resulting penalties?" [218] The Chamber asked, "[c]ould a privacy policy, for example, be considered a material representation covered under this requirement?" [219]

Many of these commenters argued the reach of the proposed Rule would negatively impact consumers by discouraging negative option offerings. TechNet said, "[f]or a variety of subscription services, the main drivers of consumer engagement are the subscription services' ability to provide financial savings, convenience, and access to premium services. . . . Unfortunately, the NPRM ignores these benefits and would discourage the offering of subscription services altogether." [220] ESA feared "this section will discourage industry members from developing and offering innovative

negative option plans that consumers will enjoy." [221]

Several commenters asserted existing laws and regulations make the proposed provision unnecessary. Some argued section 5's prohibition against deceptive practices already provides the Commission sufficient authority on this issue.[222] Others asserted State laws and regulations prohibiting misrepresentations are sufficient to protect the public.[223]

Commenters were divided on ROSCA's coverage. NRF, for example, said "[i]n light of the Commission's decision that ROSCA already prohibits deceptive statements made in connection with a subscription, even if not directly related to subscription terms, many of the proposed amendments are unnecessary." [224] In contrast, PDMI said while *MoviePass* "perhaps reflects a colorable approach," the application of ROSCA there "exceeded Congress' intent." [225] Similarly, IAB asserted the proposed Rule would break new ground by "grant[ing] the Commission authority to seek monetary remedies against a first-time offender for misrepresentations that would not give rise to monetary relief if made outside the context of an autorenewal agreement." [226]

Several commenters recommended changes if the proposed provision remains in the Rule. BSA, for example, suggested the Commission should define the term "material," citing the TSR and the FTC Policy Statement on Deception as examples.[227] Separately, RILA urged the Commission "to include clear language stating a 'reasonable person standard' will apply to determinations of 'material facts' related to products." [228]

Several commenters suggested the Commission limit the misrepresentation

provision to the terms of the negative option feature. For instance, BSA advocated for limiting the provision "to facts relating to the transaction and not every material fact relating to the underlying good or service." [229] CCIA and CDI agreed, stating the final phrase should instead cover only those material facts related to the underlying negative option feature and exclude "any material fact related to the underlying good or service." [230]

(b) Analysis

Based on the record, the Commission adopts a clarified version of the material misrepresentation section and adds a definition for further clarification. Specifically, the final Rule omits the proposed language referring to "any material fact related to the transaction, such as the negative option feature, or any material fact related to the underlying good or service" and instead prohibits misrepresentation of "any material fact," and defines "material" consistent with the TSR and section 5 of the FTC Act. Further, to enhance clarity and specificity, the text lists several examples of potentially material fact categories, taken from Commission precedent.

As further explained below: (1) despite commenters' concerns to the contrary, this provision is consistent with the ANPR and prevalence requirements of section 18 of the FTC Act; (2) consistent with ROSCA, the final provision is not limited to material misrepresentations about the negative option feature itself; (3) the Commission declines to exclude any subset of material misrepresentations from the scope of the Rule; and (4) for clarity, the Commission adds a definition of "material" consistent with established law of section 5 and other Commission Rules.

(1) *Adoption of a prohibition against misrepresentations is consistent with the ANPR and is appropriate to address prevalent unfair or deceptive acts or practices.*

Prior to the publication of any notice of proposed rulemaking promulgated under the Magnuson Moss Act, the Commission must publish an advance notice of proposed rulemaking (ANPR).[231] That notice must contain a "brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives

---

[215] NCTA, FTC–2023–0033–0858; PDMI, FTC–2023–0033–0864; TechFreedom, FTC–2023–0033–0872.

[216] For example, the Coalition and IAB both said, "The NPRM fails, however, to identify which claims would constitute a material fact, and thus fails to identify covered acts with the requisite level of specificity." Coalition, FTC–2023–0033–0884; IAB, FTC–2023–0033–1000. PDMI similarly claimed the proposed provision's lack of specificity "renders [the proposed Rule] overly vague and unlawful." FTC–2023–0033–0885. *See also* ESA, FTC–2023–0033–0867; TechFreedom, FTC–2023–0033–0872; USTelecom, FTC–2023–0033–0876 (citing *Katharine Gibbs School* v. *FTC,* 612 F.2d 658 (2d Cir. 1979)).

[217] ACT App Association, FTC–2023–0033–0874.

[218] MIA, FTC–2023–0033–1008.

[219] Chamber, FTC–2023–0033–0885. *See also* CDI, FTC–2023–0033–0887 ("consumers could argue that the dish detergent they received through a subscription service did not clean dishes as advertised.").

[220] TechNet, FTC–2023–0033–0869.

[221] ESA, FTC–2023–0033–0867; *see also* IAB, FTC–2023–0033–1000 (predicting "autorenewing (sic) subscriptions will become less common and significantly more costly because of the regulatory risks" and "businesses and consumers will be harmed by the loss of convenience and savings offered by autorenewal arrangements."); Chamber, FTC–2023–0033–0885 (contending "many entities may forgo negative options altogether. This decreases consumer choice in the marketplace given the clear popularity and use of negative option features across the economy.").

[222] ANA, FTC–2023–0033–1001; Consumer Technology Association ("CTA"), FTC–2023–0033–0997; N/MA, FTC–2023–0033–0873.

[223] NRF, FTC–2023–0033–1005; RILA, FTC–2023–0033–0883; SFE Energy, Inc. ("SFE"), FTC–2023–0033–1151.

[224] NRF, FTC–2023–0033–1005.

[225] PDMI, FTC–2023–003–0864.

[226] IAB, FTC–2023–0033–1000.

[227] BSA, FTC–2023–0033–1015; *see also* Chamber, FTC–2023–0033–0885 (noting "materiality" not defined in NPRM).

[228] RILA, FTC–2023–0033–0883.

[229] BSA, FTC–2023–0033–1015.

[230] CCIA, FTC–2023–0033–0984; CDI, FTC–2023–0033–0887; *see also* TechFreedom, FTC–2023–0033–0872.

[231] 15 U.S.C. 57a(b)(2).

App.22

under consideration by the Commission.''[232] The ANPR in this case meets this standard. Specifically, in the ANPR, the Commission stated the objective of the Rule was to prevent deceptive or unfair practices in the marketing of products and services with negative option features. Several industry associations submitted comments in response to the ANPR, illustrating the effectiveness of the ANPR in soliciting views of the interested public and affected industry before issuing the NPRM.[233] Moreover, as detailed herein, the Commission has reviewed and carefully considered the views of the public and industry as expressed in response to both the ANPR and NPRM.

The record demonstrates misrepresentations made to induce consumers to enter into negative option programs are prevalent. Specifically, the Commission's enforcement experience (including consumer complaints, matters cited in the NPRM, and matters cited in this Statement of Basis and Purpose) as well as the experiences of the State AGs, the information cited by the Law Professors, and comments by consumer commenters all support this conclusion.[234]

As several commenters critical of the proposed provision correctly note, misrepresentations to induce consumers to join negative option programs are already unlawful under section 5, as well as under other State and Federal laws and regulations, depending on (among other things) media used and jurisdiction. This fact, however, does not undermine the need for the Rule provision. By definition, a section 18 trade regulation rule addresses conduct that is already prohibited under section 5. With such prohibited conduct defined, the trade regulation rule may also more broadly ''include requirements prescribed for the purpose of preventing such acts or practices,'' but the core of a trade regulation rule is the description of acts or practices already violative of section 5.[235] The misrepresentations section of the Rule is narrower than the full scope of tools available under section 18. It simply

prohibits conduct that is already deceptive. Such a provision promotes clarity and confidence in the marketplace and provides for more effective remedies (*i.e.,* civil penalties, where appropriate) against wrongdoers.

Moreover, the fact that ROSCA's disclosure requirement[236] already essentially prohibits material misrepresentations about online negative option transactions, means much of the rhetoric predicting the downfall of negative option marketing simply is ill-founded. Indeed, the Chamber pointed to the ''clear popularity and use of negative option features across the economy'' even as ROSCA has been law for over a decade.[237] Far from undermining legitimate business, the Rule's express prohibition on misrepresenting material facts in connection with promoting or offering for sale a negative option feature should increase consumer confidence in negative option marketing, thus making it easier for legitimate businesses to market their products.

*(2) Prohibiting misrepresentation of any material facts, not just those pertaining to the negative option feature, promotes clarity consistent with ROSCA and Commission precedent.*

The final Rule prohibits misrepresentation of ''any material fact.'' In doing so, it provides a non-exhaustive list of categories of potentially material facts (including transaction terms) and adds a definition of ''material,'' consistent with section 5 and the TSR. Specifically, consistent with section 5, ''material'' means ''likely to affect a person's choice of, or conduct regarding, goods or services.''[238] This approach both clarifies the terms most at issue and ensures the Rule accords with longstanding section 5 precedent.

The Commission declines to limit the misrepresentations prohibition solely to elements of the negative option feature.[239] First, the Commission finds imposing such a narrow restriction would be inconsistent with existing protections. Pursuant to ROSCA section 8403, sellers must ''clearly and conspicuously disclose all material

terms of the transaction before obtaining the consumer's billing information.'' As Congress has explained, a healthy marketplace ''must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business.''[240] Limiting a misrepresentations prohibition solely to misrepresentations about the negative option feature itself would fall well short of the scope of ROSCA and the Commission's responsibility to protect the public.

Moreover, seller commenters themselves highlighted transaction elements other than negative option terms as critical to inducing consumers to choose negative option features. IAB, for example, pointed to the promise of ''broader selection and lower prices'' or ''convenience and savings.''[241] Similarly, TechNet identified the ''ability to provide financial savings, convenience, and access to premium services'' as ''the main drivers'' of varied subscriptions.[242]

Furthermore, such a distinction may invite dishonest actors to misrepresent material facts about a transaction so long as they felt they could evade monetary liability for such misrepresentations. Moreover, simply refraining from making material misrepresentations is hardly a significant burden given the fact that such misrepresentations are already illegal under section 5 of the FTC Act, and subject to civil penalties when made on the internet and over the telephone pursuant to ROSCA and the TSR, respectively.

*(3) The Commission declines to exclude any material facts from the scope of the provision.*

To further promote clarity, the Commission includes a list of non-exclusive examples in the text of § 425.3. In addition to the negative option feature itself, the examples include certain characteristics the Commission has identified as presumptively material for more than 40 years[243] and which have in fact appeared as the subject of material misrepresentations in Commission negative option cases—cost,[244] purpose

---

[232] 15 U.S.C. (b)(2)(A)(i).

[233] Section 425.3 is the only remaining section as to which commenters made this ANPR argument.

[234] *See* section VII.1.a. In the cited Commission law enforcement matters, the Commission has applied its established materiality standard, limiting its actions to misrepresentations that are likely to affect consumers' choice of, or conduct regarding, goods or services. *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984). That is to say, in the cited matters the Commission alleged defendants made misrepresentations to induce consumers to enter into negative option programs.

[235] 15 U.S.C. 57a(a)(1)(B).

[236] 15 U.S.C. 8403(1).

[237] Chamber, FTC–2023–0033–0885.

[238] 16 CFR 310.2(t) (TSR); 16 CFR 461.1 (Impersonation Rule); Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984)). *See also* BSA, FTC–2023–0033–1015 (requesting definition of material consistent with TSR and Policy Statement); Chamber, FTC–2023–0033–0885 (criticizing the proposed Rule for not defining materiality).

[239] *E.g.,* ESA, FTC–2023–0033–0867; NFIB, FTC–2023–0033–0789; TechFreedom, FTC–2023–0033–0872.

[240] 15 U.S.C. 8401(2).

[241] IAB, FTC–2023–0033–1000.

[242] TechNet, FTC–2023–0033–0869.

[243] Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984)) (describing and citing materiality of purpose, safety, efficacy, and cost); *In re Thompson Medical Co., Inc.,* 104 F.T.C. 648, 816–17 (1984) (listing cost, purpose, efficacy, and safety as presumptively material characteristics).

[244] In the negative option context, material cost misrepresentations may include any cost (and total
Continued

Appellate Case: 24-3137     Page: 23     Date Filed: 12/05/2024 Entry ID: 5463205

or efficacy,[245] and health or safety.[246] The record demonstrates the list must be non-exclusive because the Commission has observed the use of material misrepresentations other than those enumerated to induce consumers to enter into transactions with negative option features, including, for example, characteristics of the seller,[247] the format of the ad or other sales communication,[248] consumer

Some commenters asserted section 18 does not authorize the Commission to prohibit material misrepresentations in a given area of commerce. Section 18, however, permits the FTC to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of [section 5(a)(1)]) . . . [and] may include requirements prescribed for the purpose of preventing such acts or practices." [252] It places no additional restrictions on the scope of this rulemaking.

Several commenters appear to think section 18 requires the Commission to define specific claims as deceptive; for example, two commenters cited the Business Opportunity Rule's treatment of misrepresentations.[253] While the cited Rules show one way to meet the statute's specificity requirements, the statute does not require the Commission to define *claims* with specificity, but instead *acts or practices*.[254] For example, in the Business Opportunity Rule, the practice of misrepresenting "any material aspect of any assistance offered to a prospective purchaser" in a business opportunity transaction is a specific type of deceptive practice in or affecting commerce.[255] By the same token, the practice of misrepresenting

authorization,[249] consumer privacy or data security,[250] and endorsements or testimonials.[251] The Commission cannot predict what other material misrepresentations dishonest actors may employ in the future.

material facts to induce consumers to consent to negative option features constitutes a specific type of deceptive practice.

The record, including the submissions of many industry commenters, shows negative option features are found across industries, but are consistently distinguishable as a subset of general commercial practices. As commenters point out, negative option features offer many distinct benefits to consumers and sellers. These benefits do not lose their distinct character merely because they occur across different kinds of goods and services sold across different channels. While the record shows this practice offers distinct benefits, it also shows the practice is plagued by distinct abuse. This is not a hypothetical statement; the Commission is not promulgating the final Rule because negative option features may engender deception, whether relating to the feature itself or to other material facts, but rather because the record shows they have.[256] Just as with the benefits of

---

costs) from inception through the course of the commercial relationship, including misrepresentations as to recurring costs and refunds or guarantees. *See, e.g., FTC* v. *FloatMe Corp.*, No. 5:24–cv–00001 (W.D. Tex. 2024); *United States* v. *Cerebral, Inc.*, No. 1:24–cv–21376 (S.D. Fla. 2024); *FTC* v. *Bridge It, Inc.*, No. 1:23–cv–09651 (S.D.N.Y. 2023); *FTC* v. *Benefytt Techs., Inc.*, No. 8:22–cv–01794 (M.D. Fla. 2022); *FTC* v. *First Am. Payment Sys.*, No. 4:22–cv–00654 (E.D. Tex. 2022); *FTC* v. *XXL Impressions, LLC*, No. 1:17–cv–00067 (D. Me. 2017); *FTC* v. *Cardiff*, No. 5:18–cv–02104 (C.D. Cal. 2018); *FTC* v. *Health Rsch. Labs., LLC*, No. 2:17–cv–00467 (D. Me. 2017); *FTC* v. *Tarr*, No. 3:17–cv–02024 (S.D. Cal. 2017); *FTC* v. *AdoreMe, Inc.*, No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC* v. *Pact, Inc.*, No. 2:17–cv–1429 (W.D. Wash. 2017); *FTC* v. *Leanspa, LLC*, No. 3:11–cv–01715 (D. Conn. 2011); *FTC* v. *Willms*, No. 2:11–cv–00828 (W.D. Wash. 2011); *FTC* v. *Universal Premium Servs.*, No. 2:06–cv–00849 (C.D. Cal. 2006).

[245] *See, e.g., FTC* v. *FloatMe Corp.*, No. 5:24–cv–00001 (W.D. Tex. 2024); *United States* v. *Cerebral, Inc.*, No. 1:24–cv–21376 (S.D. Fla. 2024); *FTC* v. *NGL Labs, LLC*, No. 2:24–cv–05753 (C.D. Cal. 2024); *FTC* v. *Bridge It, Inc.*, No. 1:23–cv–09651 (S.D.N.Y. 2023); *FTC* v. *WealthPress, Inc.*, No. 3:23–cv–00046 (M.D. Fla. 2023); *In re Dun & Bradstreet, Inc.*, FTC Docket No. C–4761 (2022); *FTC* v. *First Am. Payment Sys.*, No. 4:22–cv–00654 (E.D. Tex. 2022); *In re MoviePass, Inc.*, FTC Docket No. C–4751 (2021); *United States* v. *MyLife.com, Inc.*, No. 2:20–cv–6692 (C.D. Cal. 2020); *FTC* v. *RagingBull.com, LLC*, No. 1:20–cv–03538 (D. Md. 2020); *FTC* v. *Match Grp., Inc.*, No. 3:19–cv–02281 (N.D. Tex. 2019); *FTC* v. *XXL Impressions, LLC*, No. 1:17–cv–00067 (D. Me. 2017); *FTC* v. *Cardiff*, No. 5:18–cv–02104 (C.D. Cal. 2018); *FTC* v. *JDI Dating, Ltd.*, No. 1:14–cv–08400 (N.D. Ill. 2014); *FTC* v. *Credit Bureau Ctr., LLC*, No. 1:17–cv–00194 (N.D. Ill. 2017); *FTC* v. *Health Rsch. Labs., LLC*, No. 2:17–cv–00467 (D. Me. 2017); *FTC* v. *Health Formulas, LLC*, No. 2:14–cv–01649 (D. Nev. 2014); *FTC* v. *Leanspa, LLC*, No. 3:11–cv–01715 (D. Conn. 2011); *FTC* v. *Willms*, No. 2:11–cv–00828 (W.D. Wash. 2011); *FTC* v. *Johnson*, No. 2:10–cv–02203 (D. Nev. 2010); *FTC* v. *Remote Response Corp.*, No. 1:06–cv–20168 (S.D. Fla. 2006).

[246] *See, e.g., FTC* v. *XXL Impressions, LLC*, No. 1:17–cv–00067 (D. Me. 2017); *FTC* v. *Cardiff*, No. 5:18–cv–02104 (C.D. Cal. 2018); *FTC* v. *Health Rsch. Labs., LLC*, No. 2:17–cv–00467 (D. Me. 2017); *FTC* v. *Health Formulas, LLC*, No. 2:14–cv–01649 (D. Nev. 2014); *FTC* v. *Leanspa, LLC*, No. 3:11–cv–01715 (D. Conn. 2011); *FTC* v. *Willms*, No. 2:11–cv–00828 (W.D. Wash. 2011).

[247] *E.g., FTC* v. *Elite IT Partners, Inc.*, No. 2:19–cv–00125 (D. Utah 2019) (affiliation with well-known companies); *In re Urthbox, Inc.*, FTC Docket No. C–4676 (2019) (independence of reviews); *FTC* v. *BunZai Media Grp., Inc.*, No. 2:15–cv–04527 (C.D. Cal. 2015) (BBB accreditation and ratings); *FTC* v. *DOTAuthority.com, Inc.*, No. 0:16–cv–62186 (S.D. Fla. 2016) (ratings); *FTC* v. *FTN Promotions, Inc.*, No. 8:07–cv–1279 (M.D. Fla. 2007) (affiliation with consumer's bank).

[248] *E.g., FTC* v. *XXL Impressions, LLC*, No. 1:17–cv–00067 (D. Me. 2017) (radio news show); *FTC* v. *Leanspa, LLC*, No. 3:11–cv–01715 (D. Conn. 2011) (news reports).

[249] *E.g., In re Dun & Bradstreet, Inc.*, FTC Docket No. C–4761 (2022) (charging for same product consumer previously purchased); *FTC* v. *Benefytt Techs., Inc.*, No. 8:22–cv–01794 (M.D. Fla. 2022) (charging for authorized products); *FTC* v. *Triangle Media Corp.*, No. 3:18–cv–01388 (S.D. Cal. 2018) (completeness of order); *FTC* v. *Apex Capital Grp., LLC*, No. 2:18–cv–09573 (C.D. Cal. 2018) (completeness of order); *FTC* v. *Moneymaker*, No. 2:11–cv–00461 (D. Nev. 2011) (purpose of authorization).

[250] *E.g., United States* v. *Cerebral, Inc.*, No. 1:24–cv–21376 (S.D. Fla. 2024) (data security and privacy); *In re MoviePass, Inc.*, FTC Docket No. C–4751 (2021) (data security).

[251] *E.g., FTC* v. *XXL Impressions, LLC*, No. 1:17–cv–00067 (D. Me. 2017); *FTC* v. *Cardiff*, No. 5:18–cv–02104 (C.D. Cal. 2018); *FTC* v. *Willms*, No. 2:11–cv–00828 (W.D. Wash. 2011).

[252] 15 U.S.C. 57a(a)(1)(B).

[253] PDMI, FTC–2023–003–0864 (contrasting the proposed Rule language with Business Opportunity Rule language, saying "The Business Opportunity Rule does not prohibit any misrepresentation in connection with business opportunities. It prohibits specific misrepresentations about earnings claims."); TechFreedom, FTC–2023–0033–0872 ("For example, the Business Opportunity Rule prohibits no fewer than 21 different kinds of misrepresentation regarding business opportunities. This specificity is typical of trade regulation rules.") (footnotes omitted).

[254] 15 U.S.C. 57a(a)(1)(B).

[255] 16 CFR 437.6(i).

[256] *See, e.g., FTC* v. *FloatMe Corp.*, No. 5:24–cv–00001 (W.D. Tex. 2024); *United States* v. *Cerebral, Inc.*, No. 1:24–cv–21376 (S.D. Fla. 2024); *FTC* v. *NGL Labs, LLC*, No. 2:24–cv–05753 (C.D. Cal. 2024); *FTC* v. *Bridge It, Inc.*, No. 1:23–cv–09651 (S.D.N.Y. 2023); *FTC* v. *WealthPress, Inc.*, No. 3:23–cv–00046 (M.D. Fla. 2023); *FTC* v. *Benefytt Techs., Inc.*, No. 8:22–cv–01794 (M.D. Fla. 2022); *In re Dun & Bradstreet, Inc.*, FTC Docket No. C–4761 (2022); *FTC* v. *First Am. Payment Sys.*, No. 4:22–cv–00654 (E.D. Tex. 2022); *In re MoviePass, Inc.*, FTC Docket No. C–4751 (2021); *United States* v. *MyLife.com, Inc.*, No. 2:20–cv–6692 (C.D. Cal. 2020); *FTC* v. *RagingBull.com, LLC*, No. 1:20–cv–03538 (D. Md. 2020); *FTC* v. *Match Grp., Inc.*, No. 3:19–cv–02281 (N.D. Tex. 2019); *FTC* v. *Elite IT Partners, Inc.*, No. 2:19–cv–00125 (D. Utah 2019); *In re Urthbox, Inc.*, FTC Docket No. C–4676 (2019); *FTC* v. *Triangle Media Corp.*, No. 3:18–cv–01388 (S.D. Cal. 2018); *FTC* v. *Apex Capital Grp., LLC*, No. 2:18–cv–09573 (C.D. Cal. 2018); *FTC* v. *XXL Impressions, LLC*, No. 1:17–cv–00067 (D. Me. 2017); *FTC* v. *Cardiff*, No. 5:18–cv–02104 (C.D. Cal. 2018); *FTC* v. *JDI Dating, Ltd.*, No. 1:14–cv–08400 (N.D. Ill. 2014); *FTC* v. *Credit Bureau Ctr., LLC*, No. 1:17–cv–00194 (N.D. Ill. 2017); *FTC* v. *BunZai Media Grp., Inc.*, No. 2:15–cv–04527 (C.D. Cal. 2015); *FTC* v. *DOTAuthority.com, Inc.*, No. 0:16–cv–62186 (S.D. Fla. 2016); *FTC* v. *Health Rsch. Labs., LLC*, No. 2:17–cv–00467 (D. Me. 2017); *FTC* v. *Tarr*, No. 3:17–cv–02024 (S.D. Cal. 2017); *FTC* v. *AdoreMe, Inc.*, No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC* v. *Pact, Inc.*, No. 2:17–cv–1429 (W.D. Wash. 2017); *FTC* v. *RevMountain, LLC*, No. 2:17–cv–02000 (D. Nev. 2017); *FTC* v. *AAFE Prods. Corp.*, No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC* v. *Health Formulas, LLC*, No. 2:14–cv–01649 (D. Nev. 2014); *FTC* v. *Dill*, No. 2:16–cv–00023 (D. Me. 2016); *FTC* v. *Leanspa, LLC*, No. 3:11–cv–01715 (D. Conn. 2011); *FTC* v. *Willms*, No. 2:11–cv–00828 (W.D. Wash. 2011); *FTC* v. *Moneymaker*, No. 2:11–cv–00461 (D. Nev. 2011); *FTC* v. *Johnson*, No. 2:10–cv–02203 (D. Nev. 2010); *FTC* v. *Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010); *FTC* v. *JAB Ventures, LLC*, No. 2:08–cv–04648 (C.D. Cal. 2008); *FTC* v. *Ultralife Fitness, Inc.*, No. 2:08–cv–07655 (C.D. Cal. 2008); *FTC* v. *FTN Promotions, Inc.*, No. 8:07–cv–1279 (M.D. Fla. 2007); *FTC* v. *Think All Publ'g, LLC*, No. 4:07–cv–00011 (E.D. Tex. 2007); *FTC* v. *HispaNexo, Inc.*, No. 1:06–cv–424 (E.D. Va. 2006); *FTC* v. *Universal Premium Servs.*, No. 2:06–cv–00849 (C.D. Cal.

negative option marketing, these problems do not lose their distinct character, in other words they are distinct practices, even though they appear in a variety of contexts.

In addressing this deceptive practice, the Commission remains guided by core principles articulated in its 1983 Deception Policy Statement. As the Commission explained, in considering whether to act against a deceptive practice, the Commission will observe the extent to which consumers themselves have been able to police and generate consequences for seller deception.

Finally, as a matter of policy, when consumers can easily evaluate the product or service, it is inexpensive, and it is frequently purchased, the Commission will examine the practice closely before issuing a complaint based on deception. There is little incentive for sellers to misrepresent (either by an explicit false statement or a deliberate false implied statement) in these circumstances since they normally would seek to encourage repeat purchases. Where, as here, market incentives place strong constraints on the likelihood of deception, the Commission will examine a practice closely before proceeding.[257]

The record shows the practice of misrepresenting material facts to induce consent to negative option features has created distinct issues consumers have not been able to address themselves, enabling sellers to collect numerous recurring payments before consumers detect the misrepresentation and act to stop the charges. This problem is not confined to a particular subset of industries or misrepresentations but instead is a too-frequent practice throughout negative option marketing.[258] Specifically, when a consumer makes a series of purchases from the same seller in ordinary circumstances (rather than through a negative option), each purchase requires the consumer to actively, even if only briefly, re-evaluate the transaction and affirmatively consent. Dishonest negative option sellers too easily bypass these typical guardrails of "repeat purchases." Thus, up-front misrepresentations can induce consumers into recurring transactions lacking ordinary sales' built-in interruptions for re-evaluation and renewed consent. As with other areas where consumers have limited opportunities for critical up-front evaluation (for example, consumers

cannot easily evaluate medical claims about dietary supplements), so too, here, the Commission finds additional protection warranted.

The Commission has considered commenters' section 18 specificity concerns pertaining to material misrepresentations and finds them unsupported by the record. These commenters suggest a hypothetical world where negative option features provide distinguishable commercial benefits without presenting distinguishable material misrepresentation challenges. The reality is otherwise. Thus, the final Rule prohibits the specific practice of sellers misrepresenting material terms or facts in connection with negative option sales.

*(4) For clarity, the final Rule adds a definition of "material" consistent with precedent.*

As noted above, and as suggested by commenters, the Commission defines "material" in the final Rule. This definition adds clarity and addresses the rhetorical questions raised by commenters regarding scope. Specifically, consistent with section 5, the TSR, and longstanding Commission policy and case law, the final Rule defines the term to mean likely to affect a person's choice of, or conduct regarding, goods or services.[259] Thus, mere puffery is not material.[260]

The hypotheticals posed by MIA—"movies that you will love" or "great cleaning every time"—are classic examples of puffery, and thus, are not within the scope of materiality.[261] The response to the question posed by the Chamber—whether misrepresentation of a privacy policy would be covered—depends, as it always has, on whether the seller misrepresents its privacy policy in a way likely to affect consumer choice or conduct.

### 4. Proposed § 425.4 Important Information

Section 425.4 of the proposed Rule prohibited sellers from failing to disclose "any material conditions related to the underlying product or service that is necessary to prevent

deception, regardless of whether that term directly relates to the terms of the negative option offer." [262] As explained in the NPRM, the Commission drafted this provision because "many sellers fail to provide adequate disclosures, thereby luring consumers into purchasing goods or services they do not want." [263] To address this issue, the proposed Rule required sellers to provide the following important information prior to obtaining a consumer's billing information: "(1) that consumers' payments will be recurring, if applicable; (2) the deadline by which consumers must act to stop charges; (3) the amount or ranges of costs consumers may incur; (4) the date the charge will be submitted for payment; and (5) information about the mechanism consumers may use to cancel the recurring payments." [264]

The Commission also proposed requirements regarding the form and location of this important information, as its "law enforcement experience and consumer complaints are replete with examples of hidden disclosures, including those in fine print, buried in paragraphs of legalese and sales pitches, and accessible only through hyperlinks." [265] Thus, under the proposed Rule, information "directly related to the negative option feature . . . must appear immediately adjacent to the means of recording the consumer's consent for the negative option feature." Information "not directly related to the negative option feature . . . must appear before consumers make a decision to buy (*e.g.,* before they 'add to shopping cart')."

Further, the proposal stated all disclosures must be clear and conspicuous as defined in § 425.2(c). Among other elements of the clear and conspicuous definition, the proposed Rule specified that in any communication using an interactive electronic medium, such as the internet, mobile application, or software, the disclosure must be unavoidable. The proposed Rule also specified that a disclosure is not clear and conspicuous if a consumer "must take any action, such as clicking on a hyperlink or hovering over an icon, to see it."

Finally, the proposed Rule prohibited sellers from including any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the required disclosures. The final clause of this prohibition "includ[ed] any

---

2006); *FTC* v. *Remote Response Corp.,* No. 1:06–cv–20168 (S.D. Fla. 2006).

[257] Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984)).

[258] *See* n.257.

[259] 16 CFR 310.2(t); *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984).

[260] *See FTC* v. *Direct Mktg. Concepts, Inc.,* 624 F.3d 1, 11 (1st Cir. 2010) ("Where a claim is merely 'exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely,' it may be un-actionable puffery.").

[261] The Commission declines to add language defining a "reasonable person standard" as suggested by RILA, and refers instead to the discussion of reasonableness set forth in the Commission's Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984)).

[262] NPRM, 88 FR 24727.
[263] NPRM, 88 FR 24726–27.
[264] NPRM, 88 FR 24726.
[265] NPRM, 88 FR 24727.

Appellate Case: 24-3137     Page: 25     Date Filed: 12/05/2024 Entry ID: 5463205

information not directly related to the material terms and conditions of any negative option feature.''

Through these provisions, the Commission sought to prevent deception by businesses taking advantage of the gray areas in current law, to deter fraudulent actors through the possibility of monetary relief, and to ''level the playing field for legitimate businesses, freeing them from having to compete against those employing deception.'' [266]

(a) Summary of Comments

Thousands of commenters supported the important information requirement, stating it is ''critically important that companies make it explicitly clear what consumers are signing up for.'' [267] Consumers identified problematic practices the provision would address, including insufficient and unclear disclosures in small print or those appearing too late in the transaction. For example, an individual commenter said, ''[t]oo many [sellers] hide these details in extra fine print, and increasingly text is in a very light gray color, making it even harder to read.'' [268] Another individual commenter noted, ''I ordered skin care from a tv infomercial only to find out it was a subscription thing though none of this was disclosed by famous actresses on the promotion. . . . I went back to my receipt of what I originally ordered and in fine print saw that I had been duped!'' [269]

Several individual commenters indicated clear upfront disclosures would help them make informed choices and improve their willingness to try negative option offerings, particularly if the disclosure provided an easy cancellation mechanism. As one put it, ''I am much more like[ly] to try—and buy—a new service if I know there

is an easy way to cancel online.'' [270] Another said, ''I actually subscribe to far fewer services than I would if I knew that I could easily cancel once I had tried a sample.'' [271]

Public advocacy commenters also supported the provision. The Berkeley Consumer Law Center said, ''the requirement of 'clear and conspicuous' disclosures of 'any material term related to the underlying goods or services that is necessary to prevent deception' will help prevent cancellation terms from being shrouded in mystery through complicated terms and conditions, while also blocking the practice of hiding subscription services that are needed to fully use a product.'' [272] Similarly, a coalition of consumer and public interest advocacy organizations asserted the proposed disclosure requirement ''will clearly inform consumers of the terms of the contract and how they may terminate the agreement.'' [273]

Law enforcement commenters likewise supported the important information requirements. The State AGs said they would ''repel the abusive practices of hidden disclosures, 'including those in fine print, buried in paragraphs of legalese and sales pitches, and accessible only through hyperlinks.' '' [274] They particularly emphasized their support for ''the required disclosure of 'the information necessary for the consumer to cancel the negative option feature.' '' [275] The California Auto-Renew Task Force (''CART''), a group of Southern California prosecutors, supported

disclosures appearing ''immediately adjacent to the means of recording the consumer's consent for the negative option feature.'' [276] CART asserted this provision, together with others, ''will greatly minimize consumer deception and ensure that consumers fully understand—and agree to—the nature of the transaction under consideration.'' [277]

Other commenters, mostly industry groups,[278] expressed several concerns with the proposed requirements, specifically with the definition of ''clear and conspicuous,'' the scope and timing of the material terms to be disclosed, specific disclosure requirements, placement, and treatment of other information.[279]

Multiple commenters claimed the requirement that disclosures using an interactive electronic medium must be ''unavoidable'' would be unworkable given the additional provision that a ''disclosure is not clear and conspicuous if a consumer must take any action, such as clicking on a hyperlink or hovering over an icon, to see it.'' [280] Commenters noted it would be difficult or impossible to implement this requirement on small screens (such as mobile phones), and it may reduce rather than improve clarity.

Several commenters also objected to the requirement sellers disclose material terms other than those pertaining exclusively to the negative option feature, asserting this would be overbroad.[281] Additionally, commenters questioned how the Commission would enforce a requirement to disclose material terms before obtaining a

---

[266] NPRM, 88 FR 24727.

[267] Thousands of consumers submitted the following identical comment in their own names: ''It's critically important that companies make it explicitly clear what consumers are signing up for and to make canceling fast and easy. If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. Implementing this consumer protection rule has the potential to save American consumers millions of dollars and I hope it is implemented as soon as possible.'' While apparently a response to a mass solicitation, many consumers further personalized their submission by adding their unique experiences and desire for the Rule. *See, e.g.,* Individual commenter, FTC–2023–0033–0161; –0163; –0164; 0198; –0204; –0545; 0658.

[268] Individual commenter, FTC–2023–0033–0268. Similarly, another individual commenter said, ''Businesses should not present agreements in tiny print on an agent's tablet for the customer to sign. I can't read the print.'' Individual commenter, FTC–2023–0033–0349.

[269] Individual commenter, FTC–2023–0033–0345.

[270] Individual commenter, FTC–2023–0033–0781.

[271] Individual commenter, FTC–2023–0033–0031. *Accord* Individual commenter, 0196 (''I have had to get to the point of not subscribing to any online offers, as far too many times I have found it nearly impossible to unsubscribe''); Individual commenter, FTC–2023–0033–0306 (''you could win over more subscribers to your services if you took away the fear and doubts of the public that they will probably be hooked into something that would be more troublesome to get out of . . . I can tell you that I have passed over many opportunities that I was interested in for this very reason.''); Individual commenter, FTC–2023–0033–0333 (''I've had some difficulty in the past cancelling enrollments or subscriptions, so that now I've become very wary of products or services I would otherwise appreciate having. Implementing this consumer protection rule would help me feel more confident again.'').

[272] Berkeley Consumer Law Center, FTC–2023–0033–0855. Similarly, for the same reasons they provided in connection with the misrepresentations provision, the Law Professors encouraged the Commission to maintain the proposed disclosure provision's coverage of material terms necessary to prevent deception, regardless of whether such terms are exclusively about the negative option feature. Law Professors, FTC–2023–0033–0861.

[273] Public Interest Groups, FTC–2023–0033–0880.

[274] State AGs, FTC–2023–0033–0886.

[275] *Id.*

[276] CART, FTC–2023–0033–0698.

[277] *Id.*

[278] Not all industry groups criticized the provision. Specifically, MIA wrote, ''The Association agrees with the important information requirement under the proposed Rule.'' MIA, FTC–2023–0033–1008.

[279] In addition, some commenters cited industry-specific laws and regulations pertaining to disclosures as rendering the proposed provision unnecessary or counterproductive. ACA Connects-America's Communications Association (''ACA''), FTC–2023–0033–0881; NCTA, FTC–2023–0033–0858; SFE, FTC–2023–0033–1151; USTelecom, FTC–2023–0033–0876.

[280] ANA, FTC–2023–0033–1001; CCIA, FTC–2023–0033–0984; Coalition, FTC–2023–0033–0884; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000; NCTA, FTC–2023–0033–0858; Chamber, FTC–2023–0033–0885. NFIB suggested the Commission strike the provision ''The disclosure must use diction and syntax understandable to ordinary consumers'' and replace it with ''The disclosure must use words and grammar that ordinary consumers would likely understand.' '' FTC–2023–0033–0789.

[281] ACT App Association, FTC–2023–0033–0874; ANA, FTC–2023–0033–1001; BSA, FTC–2023–0033–1015; CCIA, FTC–2023–0033–0984; NCTA, FTC–2023–0033–0858; NFIB, FTC–2023–0033–0789; NRF, FTC–2023–0033–1005; PDMI, FTC–2023–003–0864; Sirius XM, FTC–2023–0033–0857; Chamber, FTC–2023–0033–0885.

App.26

consumer's billing information, especially where a consumer previously elected to save billing information with the seller.[282] Commenters also found the requirement that material terms "not directly related to the negative option feature . . . must appear before consumers make a decision to buy" to be vague.[283]

Several commenters took issue with the five specific disclosures in the proposed Rule. For example, the requirement to disclose "the date (or dates) each charge will be submitted for payment" drew substantial criticism, with several commenters asserting appropriate disclosures regarding frequency should suffice.[284] Commenters also criticized the requirements to disclose deadlines to act and the amount or range of costs.[285] A group of direct marketers asserted, for example, "the Proposed Rule goes too far in appearing to require a specific date by which consumers must act to stop charges when certain negative option plans are inherently more flexible and allow consumers to cancel anytime." [286] Commenters also found the requirement to disclose "the information necessary for the consumer to cancel the negative option feature" was vague and impractical. They contended the requirement would result in unnecessary details crowding out other disclosures.[287] IAB contended "[a] more effective strategy [regarding cancellation disclosures] would be to make clear but concise disclosures of where that information can be found." [288]

Additionally, multiple commenters criticized the provision requiring the placement of material terms "directly related to the negative option feature"

. . . "immediately adjacent" to recording the consumer's consent.[289] Commenters asserted having numerous disclosures in a constrained space would impair consumers' ability to make informed choices. As an individual commenter explained, "this important information may still become overwhelming to a user, or challenge the integrity of other disclosures if it must compete for space (especially because this disclosure must be placed immediately adjacent to where a user will consent to the negative option feature)." [290] NRF found unclear the distinction between which terms are or are not "directly related to the negative option feature." [291] Other commenters noted the "immediately adjacent" requirement may not be appropriate for voice transactions.[292]

Finally, one commenter expressed uncertainty about the meaning of the "other information" provision. NRF said it "asks companies to walk a tight rope between ensuring they contain all material terms, while risking liability if they include '*any* information not directly related to the material terms.'" [293]

The State AGs also recommended three amendments to this proposal. First, they recommended requiring sellers to "disclose all material policies concerning cancellation." Second, they recommended "sellers be required to disclose 'all the information necessary for the consumer to effectively cancel the negative option feature.'" (Emphasis in comment.) They explained, "[d]isclosures in the form of 'click-here-to-cancel' icons, which lead to terms and conditions pages, confusing cancellation flows, or do not otherwise explain how to cancel online, should not be permitted." Third, they recommended "the FTC amend this provision to require that the important information identified by this proposed Rule be provided to the consumer in a

manner that is capable of being retained by the consumer." [294]

(b) Analysis

Based on the record, the Commission retains proposed § 425.4 with several clarifications. First, as explained in section VII.B.3 of this SBP, the Commission adds a definition of "material" at § 425.2(e). Second, in § 425.4(a), the Commission clarifies three of the listed types of important information sellers must provide and omits one to address commenters' concerns. Third, as explained in section VII.B.4.b.2 of this SBP, the Commission revises the definition of "clear and conspicuous" in § 425.2(c). Fourth, in § 425.4(b)(2) the Commission clarifies language regarding "placement" of disclosures. Finally, the Commission clarifies the language prohibiting sellers from including "any other information" that "interferes with, detracts from, contradicts, or otherwise undermines" consumers' abilities to read, hear, see, or understand the required disclosures.

*(1) The Commission declines to limit the required important information under § 425.4(a).*

The Commission declines to limit the scope of the required information under this provision to only information related to the negative option feature. Section 425.4(a)'s requirement that sellers disclose "all material terms" prior to obtaining the consumer's billing information is consistent with ROSCA and section 5 of the FTC Act. Moreover, in the Commission's law enforcement experience such a provision is necessary to prevent deception.[295] Therefore, extending this requirement is well within the Commission's rulemaking authority.[296]

To address commenters' concerns about clarity, however, § 425.2(e) adds a definition of "material;" specifically, material means "likely to affect a person's choice of, or conduct regarding, goods or services." [297] This definition is consistent with longstanding section 5 case law and other Commission rules defining "material." [298]

[282] CTA, FTC–2023–0033–0997; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000; NRF, FTC–2023–0033–1005; RILA, FTC–2023–0033–0883. Sirius XM asserted this requirement could be interpreted to mean every advertisement must contain disclosure of all material terms. FTC–2023–0033–0857.

[283] Rebecca Kuehn ("Kuehn"), FTC–2023–0033–0871; NRF, FTC–2023–0033–1005.

[284] CCIA, FTC–2023–0033–0984; CTA, FTC–2023–0033–0997; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000; NRF, FTC–2023–0033–1005; RILA, FTC–2023–0033–0883; Sirius XM, FTC–2023–0033–0857.

[285] IAB, FTC–2023–0033–1000 (deadlines); Comment from Kelley Drye & Warren LLP on behalf of certain direct marketing companies ("Direct Marketing Companies"), FTC–2023–0033–1016 (deadlines); NRF, FTC–2023–0033–1005 (amount or range of costs); Sirius XM, FTC–2023–0033–0857 (amount or range of costs).

[286] Direct Marketing Companies, FTC–2023–0033–1016.

[287] CCIA, FTC–2023–0033–0984; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000; NRF, FTC–2023–0033–1005.

[288] IAB, FTC–2023–0033–1000.

[289] ANA, FTC–2023–0033–1001; CCIA, FTC–2023–0033–0984; Coalition, FTC–2023–0033–0884; CTA, FTC–2023–0033–0997; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000; Direct Marketing Companies, FTC–2023–0033–1016; NRF, FTC–2023–0033–1005; SFE, FTC–2023–0033–1151; Sirius XM, FTC–2023–0033–0857; Chamber, FTC–2023–0033–0885.

[290] Individual commenter, FTC–2023–0033–0552.

[291] NRF, FTC–2023–0033–1005.

[292] Coalition, FTC–2023–0033–0884; Chamber, FTC–2023–0033–0885.

[293] NRF, FTC–2023–0033–1005 (emphasis in comment); *see also* Chamber, FTC–2023–0033–0885 ("[T]he [disclosure] requirement is also ambiguous considering it does not clearly outline the specific material terms that need to be disclosed, which is particularly important considering the requirement applies not just to the negative option feature, but all terms in the transaction.").

[294] State AGs, FTC–2023–0033–0886.

[295] *See., e.g., In re MoviePass, Inc.,* FTC Docket No. C–4751 (2021).

[296] 15 U.S.C. 57a(a)(1)(B).

[297] Additionally, the Commission changes "any" to "all" material terms, and deletes the phrase "related to the underlying good or service that is necessary to prevent deception" for clarity. Specifically, the Commission makes clear that sellers are required to disclose all material terms, consistent with the requirements of ROSCA.

[298] *See In re Cliffdale Associates, Inc.,* 103 F.T.C. 110, 165 (1984) (misleading impression created by a solicitation is material if it "involves information that is important to consumers and, hence, likely
Continued

Additionally, the Commission modifies the proposed list of important information.[299] The Commission retains the first proposed requirement that sellers must disclose "[t]hat consumers will be Charged for the good or service, or that those Charges will increase after any applicable trial period ends, and, if applicable, that the Charges will be on a recurring basis, unless the consumer timely takes steps to prevent or stop such Charges." [300] The Commission continues to find this requirement appropriate to combat deception.

The Commission revises the second proposed disclosure, that sellers provide "*the deadline* (by date or frequency) by which the consumer must act in order to stop *all* charges." As revised, this provision requires sellers to disclose "*each deadline* (by date or frequency) by which the consumer must act to prevent or stop *the* Charges." This change clarifies there may not be a single "deadline" by which a consumer must act to "stop all charges." A single seller, for example, may offer a single consumer multiple goods or services, and the consumer may wish to stop some charges without terminating the entire relationship. The Commission also clarifies that "frequency" as used in the final Rule includes a description of an irregular frequency (*e.g.*, within a certain period after the seller notifies the consumer a new item in a series has become available) as well as a regular one (*e.g.*, the 15th of each month).

The Commission also clarifies the third proposed disclosure. The proposed Rule required sellers to disclose "[t]he amount (or range of costs) the consumer will be charged, and, if applicable, the frequency of such charges a consumer will incur unless the consumer takes timely steps to prevent or stop those charges".[301] The record suggests, however, that in some circumstances, the amounts to be charged may be inexact before the seller

obtains the consumer's billing information. For example, taxes or delivery fees may depend in part on the billing information the consumer provides. Thus, the Commission clarifies under the final Rule as adopted, the "amount (or range of costs)" need not be exact if an exact figure is impossible, but the seller must give a reasonable approximation. For example, it is within the meaning of "amount (or range of costs)" for a seller to disclose an amount "plus tax" where the seller requires billing information to determine the actual amount of tax. However, a "plus shipping" disclosure may not be sufficient if the amount of shipping is beyond what a consumer would reasonably expect or is greater than the amount a seller would reasonably incur for shipping. In such a circumstance, the seller would need to provide an estimate of shipping costs. These clarifications should address commenters' concerns about having to disclose an exact cost when doing so is not possible.

The final Rule omits the proposed fourth disclosure: the date (or dates) each charge will be submitted for payment. The Commission is persuaded by commenters' concern that a specific date or dates may be cumbersome or impossible to calculate. For example, if the seller will submit a charge when it ships a new item in a series, the seller may not be able to predict the specific dates it will submit the charge in the future. In addition, in light of the change to the placement requirements of § 425.4(b)(2)(i), discussed below, including these dates could reduce the clarity and conspicuousness of higher priority adjacent disclosures (especially cancellation deadlines, which will often occur before dates of charges). If, however, disclosure of the date (or dates) each charge will be submitted for payment is necessary to prevent deception in individual cases, such disclosure is required under § 425.4(a). However, its placement is governed by revised § 425.4(b)(2)(ii) rather than § 425.4(b)(2)(i).

Finally, the Commission clarifies the fifth proposed mandatory disclosure (the fourth in the final Rule). The proposed Rule required sellers to disclose "[t]he information necessary for the consumer to cancel the negative option feature". In contrast, the final Rule requires sellers to disclose "The information necessary for the consumer to find the simple cancellation mechanism required pursuant to § 425.6". This change addresses commenters' concern the language of the proposed Rule, combined with the placement requirements of

§ 425.4(b)(2)(i), would result in detailed cancellation disclosures crowding out other important required disclosures.[302] This new language should provide consumers with concise critical upfront information about how to cancel, while offering sellers flexibility to avoid obscuring other important information.[303]

Some sellers expressed concern regarding the timing of disclosures where a consumer previously elected to save billing information with the seller. To address this concern the Commission now clarifies that, where a consumer has previously provided account information to the seller and expressly allowed the seller to store that information,[304] the seller must make the required disclosures prior to obtaining the consumer's consent to use saved account information.[305]

*(2) The Commission modifies the requirements of § 425.4(b) to promote clarity.*

Section 425.4(b)(1) provides, "[e]ach disclosure required by paragraph (a) of this section must be clear and conspicuous." The Commission retains this requirement but revises the definition of clear and conspicuous at § 425.2(c) to address commenters' concerns regarding space-constrained

---

to affect their choice of, or conduct regarding, a product."); *see also FTC* v. *Cyberspace.com, LLC,* 453 F.3d 1196, 1201 (9th Cir. 2006); 16 CFR 310.2(t) (TSR); 16 CFR 461.1 (Impersonation Rule); Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 174 (1984)).

[299] In the misrepresentations provision (§ 425.3), the final Rule uses the term "including" to provide examples of categories of potentially material facts. In the disclosures provision, the final Rule retains the proposed Rule's use of "and including" (rather than just "including") to establish all of the specifically listed disclosures as being always material.

[300] NPRM, 88 FR 24735 (proposed 425.4).

[301] The final Rule requires sellers to disclose "The amount (or range of costs) the consumer will be Charged and, if applicable, the frequency of the Charges a consumer will incur unless the consumer takes timely steps to prevent or stop those Charges."

[302] For example, IAB suggested the Commission should require sellers "to make clear but concise disclosures of where [cancellation] information can be found, so consumers can find that information if and when it is relevant to them." IAB, FTC–2023–0033–1000.

[303] The Commission declines to adopt the State AGs three suggestions to supplement this section. The Commission expects the final Rule will address two of those suggestions (disclosure of "all material policies concerning cancellation" and of "all the information necessary for the consumer to effectively cancel the negative option feature") through the requirement that sellers disclose all material terms (§ 425.4), the prohibition of misrepresentations of material facts or terms including those pertaining to cancellation (§ 425.3), and the requirement of a simple cancellation mechanism (§ 425.6). The Commission expects to address the concerns underlying their third suggestion ("to require that the important information identified by this proposed Rule be provided to the consumer in a manner that is capable of being retained by the consumer"), through its further development of the reminders requirement. In the interim, the Commission expects the Rule provisions as adopted will encourage sellers to make important information easy to find and easy to retain.

[304] It is a violation of section 5 for a seller to retain and use a consumer's payment information without the consumer's consent. *E.g., FTC* v. *Classic Closeouts LLC,* No. 2:09–cv–2692 (E.D.N.Y. 2009).

[305] *See FTC* v. *Amazon.com, Inc.,* No. 2:23–cv–00932, 2024 WL 2723812, at *11 (W.D. Wash. May 28, 2024) ("Nothing in ROSCA says that companies . . . may not give consumers the option to autofill the billing information already on file or simply to provide billing information after the disclosures, but ROSCA requires that consumers be given that choice *after* the disclosures.") (emphasis in original).

disclosures.[306] Specifically, the Commission deletes the sentence, "A disclosure is not Clear and Conspicuous if a consumer must take any action, such as clicking on a hyperlink or hovering over an icon, to see it." This prohibition would have made effective space-constrained disclosures of the terms required by the final Rule difficult if not impossible. However, a clear and conspicuous disclosure still must be "unavoidable." By this requirement, consumers are protected from buried or inconspicuous disclosures. Sellers, on the other hand, can make disclosures "unavoidable" even if the consumer must take some action to see it. Specifically, the seller could make it impossible for the consumer to consent to a transaction or feature unless and until the consumer has seen the disclosure. For example, a seller dealing with space constraints on a mobile device might not display a consent button until after the consumer has scrolled down to a clear disclosure and then clicked a button indicating they have seen the disclosure.

Section 425.4(b)(2) ("Placement") retains the proposed Rule's structure requiring a subset of disclosures to "appear immediately adjacent to the means of recording the consumer's consent for the negative option feature," while setting a more general timing requirement regarding other disclosures. However, the Commission has revised some terms to promote clarity.

Specifically, final § 425.4(b)(2)(i) requires only the four specific mandatory disclosures listed in § 425.4(a) to appear "immediately adjacent to the means of recording the consumer's consent." The Commission is persuaded by commenters' concerns that requiring market participants to determine which required disclosures are "directly related to the negative option feature," and which are not, is too great a burden and could lead to consumer confusion.[307] Thus, rather than define "directly related to the negative option feature," the Commission removes this phrasing and confines the "immediately adjacent" requirement to a specific, narrow list of disclosures. This change provides clarity and improves predictability for

consumers, and should prevent disclosure overload.

Several commenters requested clarification of the "immediately adjacent" requirement in the context of voice transactions.[308] In response, the Commission clarifies to comply with this requirement, a voice transaction seller must make the required disclosures immediately before requesting and recording the consumer's consent to the negative option feature.

Two commenters expressed concern that requiring sellers to make disclosures "before consumers make a decision to buy" creates uncertainty because it is unclear when that triggering event occurs.[309] The Commission agrees. Therefore, it revises § 425.4(b)(2)(ii) to provide generally for all required disclosures to appear before the seller obtains consumer consent to the transaction pursuant to § 425.5. This amended language provides a triggering event based on a clear point in the process. Additionally, the Commission revises § 425.4(b)(2)(ii) to remove the phrase "not directly related to the negative option feature," doing so for the same clarity reasons described above for removing the phrase "directly related to the negative option feature" from § 425.4(b)(2)(i).

Finally, the Commission adopts a clarified version of § 425.4(b)(3) ("Other information"). The Commission retains the proposed Rule's requirement that sellers not employ "other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures." However, the Commission finds the final clause in the proposed Rule ("including any information not directly related to the material terms and conditions of any negative option feature") could be read to contradict other requirements of the Rule. Specifically, there may be necessary material disclosures not directly related to the terms and conditions of a negative option feature, and it is illogical to simultaneously require these disclosures (through §§ 425.4(a) and (b)(2)) and prohibit them (through § 425.4(b)(3)). The Commission therefore omits the clause from the final Rule. This revision does not alter the requirement of § 425.4(b)(2)(i) that certain specific disclosures be made clearly and conspicuously immediately adjacent to the means of recording the consumer's consent. A seller who makes

additional disclosures immediately adjacent to the means of recording the consumer's consent in a manner undermining the clarity and conspicuousness of the required § 425.4(b)(2)(i) disclosures violates § 425.4(b)(2)(i) and § 425.4(b)(3).

### 5. Proposed § 425.5 Consent

Section 425.5(a) of the proposed Rule prohibited sellers from charging consumers before obtaining their express informed consent to the negative option feature. This provision mirrors 15 U.S.C. 8403(2) (ROSCA), but provided specificity for sellers covered by the Rule and to prevent unfair and deceptive practices. Specifically, the provision addressed one of the most pervasive problems of negative option marketing: sellers employing inadequate consent procedures to increase enrollment. Even for marketers trying to comply with the law, negative option programs present unique challenges. Specifically, consumers often focus on the aspects of an offer that mirror the offers they regularly encounter (*e.g.,* the quality, functionality, and one-time price of the item) and think they are consenting to these core attributes while missing the negative option feature.

To address this problem, § 425.5(a)(1) of the proposed Rule required sellers to obtain a consumer's unambiguously affirmative consent to the feature separately from any other portion of the transaction. Section 425.5(a)(2) of the proposed Rule further required the seller to exclude any information that "interferes with, detracts from, contradicts, or otherwise undermines" the consumer's ability to provide express informed consent to the negative option feature. This prohibition is consistent with longstanding Commission precedent that consent can be subverted, including by so-called "dark patterns," sophisticated design practices used to manipulate users into making choices they would not otherwise have made.[310]

Additionally, under § 425.5(a)(3) of the proposed Rule, sellers had to obtain consumers' unambiguously affirmative consent to the rest of the transaction to ensure consumers agreed to all elements of the agreement, even those not specifically related to the negative option feature. Further, § 425.5(a)(4) of the proposed Rule required sellers to obtain and maintain (for three years or a year after cancellation, whichever is

---

[306] The Commission declines to adopt NFIB's suggested change to strike the provision "The disclosure must use diction and syntax understandable to ordinary consumers" and replace it with "'The disclosure must use words and grammar that ordinary consumers would likely understand.'" Particularly in the context of audio disclosures, the terms "diction and syntax" provide clearer requirements than the terms "words and grammar." NFIB, FTC–2023–0033–0789.

[307] NRF, FTC–2023–0033–1005; Law Professors, FTC–2023–0033–0861.

[308] Coalition, FTC–2023–0033–0884; Chamber, FTC–2023–0033–0885.

[309] Kuehn, FTC–2023–0033–0871; NRF, FTC–2023–0033–1005.

[310] *See, e.g., FTC* v. *RevMountain, LLC,* No. 2:17–cv–02000 (D. Nev. 2017); *FTC* v. *Cyberspace.com, LLC,* 453 F.3d 1196 (9th Cir. 2006); *United States* v. *Mantra Films, Inc.,* No. 2:03–cv–9184 (C.D. Cal. 2003); *FTC* v. *Crescent Publ'g Grp., Inc.,* 129 F. Supp. 2d 311 (S.D.N.Y. 2001).

Appellate Case: 24-3137     Page: 29     Date Filed: 12/05/2024 Entry ID: 5463205

longer) verification of the consumer's consent. The Commission specifically sought comment on the appropriate recordkeeping period.[311]

To maintain consistency with the TSR, § 425.5(b) contained a cross-reference to 16 CFR part 310 so sellers subject to the TSR know they must comply with all applicable provisions of that Rule, including those related to pre-acquired account information and free-to-pay conversions.

Proposed § 425.5(c) provided an exemplar consent mechanism for those making written offers (including those on the internet) to illustrate how sellers could obtain consumers' unambiguously affirmative consent to the negative option feature. Specifically, this provision stated for all written offers, sellers may obtain such consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the negative option feature. This consent had to be independent from any other portion of the offer.[312]

Finally, the Commission invited comments on whether sellers offering free trials should be required to obtain an additional round of consent before charging a consumer at the end of a free trial.[313]

(a) Summary of Comments

Consistent with the Commission's and States' enforcement experience,[314] individual consumers' comments confirm the need for clear, unambiguous, affirmative consent to a negative option feature. These comments identify numerous examples of consumers' unwitting enrollment in negative option programs.[315]

Sellers and trade groups also supported the requirement,[316] as did consumer groups.[317] However, sellers and trade groups expressed concern about the requirement that sellers obtain separate, unambiguously affirmative consent to the "rest of the transaction," as opposed to the "negative option feature" itself. Specifically, these commenters asserted consumers may be confused where the product or service itself is only offered as a negative option, such as with streaming services or periodicals.[318] As explained by one

commenter, in these situations a second consent is likely unanticipated, and thus, could be confusing.[319]

Other groups asserted if consumers are confused, they may not affirmatively consent to the rest of the transaction, which could cause uncertainty about the existence of the contract.[320] Commenters also noted too many required actions during the purchasing process may lead to "fatigue" and "cognitive overload," causing consumers to abandon transactions they may have otherwise wanted.[321] Finally, several commenters complained the separate consent requirements would be difficult (and costly) to implement, but without any benefit to consumers.[322]

[311] NPRM, FR 88 24727 n.70; *see also id.* at 24734.

[312] To avoid potential conflict with EFTA, this proposed provision does not apply to transactions covered by the preauthorized transfer provision of that Act, 15 U.S.C. 1693e, and Regulation E, 12 CFR 1005.10. Those EFTA provisions, which apply to a range of preauthorized transfers include some used for negative options, contain various prescriptive requirements (*e.g.*, written consumer signatures that comply with E-Sign, 15 U.S.C. 7001–7006, evidence of consumer identity and assent, the inclusion of terms in the consumer authorization, and the provision of a copy of the authorization to the consumer) beyond the measures identified in the proposed Rule. Consequently, compliance with the proposed Rule would not necessarily ensure compliance with Regulation E. For example, use of a check box for consent without additional measures may not comply with Regulation E's more specific authorization requirements.

[313] NPRM, 88 FR 24728.

[314] *See, e.g.,* State Attorneys General (ANPR), FTC–2019–0082–0012; State AGs, FTC–2023–0033–0886 (citing cases); *FTC* v. *Amazon.com, Inc.,* No. 2:23–cv–0932 (W.D. Wash. 2023); *see also* n.109.

[315] *See, e.g.,* Anonymous commenter, FTC–2023–0033–0799 (automatically enrolled in program

without consent); Individual commenter, FTC–2023–0033–0039 (free-trial conversion to one year plan without consent); Individual commenter-FTC–2023–0033–0052 (discount to full-price conversion without consent); Individual commenter, FTC–2023–0033–1119 (cancelled, then automatically re-enrolled without consent); Individual commenter, FTC–2023–0033–0079 (automatically re-enrolled without consent); Individual commenter, FTC–2023–0033–0083 (no disclosure account would be automatically renewed); FTC–2023–0033–0138 (charged after cancellation); Individual commenter, FTC–2023–0033–0275 (no affirmative consent to monthly charge).

[316] Sirius XM, FTC–2023–0033–0857 (businesses should be required to obtain express informed consent to the negative option feature at the point of sale); PDMI, FTC–2023–0033–0864 (no objection to the general requirement that sellers obtain a consumer's consent to a transaction containing a negative option feature); MIA, FTC–2023–0033–1008 (agreeing with the consent requirement under the proposed Rule).

[317] Berkely Consumer Law Center, FTC–2023–0033–0855; State AGs, FTC–2023–0033–0886 (noting State Attorneys General support the FTC's proposed consent requirements and agree this provision is necessary given how easily marketers can enroll consumers in negative option programs without actual consent). One individual consumer generally supported the separate consent requirements of the proposed Rule, but asked that the regulation prevent businesses from only offering goods and services through auto-renewal and subscription programs, *i.e.,* consumers should have the option to purchase a good or service a la carte and not only on a recurring basis. Individual commenter, FTC–2023–0033–0026.

[318] Sirius XM, FTC–2023–0033–0857 (requiring an additional consent will only result in consumer confusion); NCTA, FTC–2023–0033–0858 ("requiring two consents could lead to consumer confusion (to say nothing of their exasperation at being forced to read and provide consent to a plethora of successive and largely duplicative documents). They may wonder why they are being asked to consent twice to a single transaction. And might worry that they have somehow misunderstood one or both of the consent notices"); PDMI, FTC–2023–003–0864 (anecdotal evidence received from several PDMI members demonstrates that any time an additional choice or check box is offered to a consumer during a single transaction, such extra steps are likely to cause consumer confusion); N/MA, FTC–2023–0033–0873 ("Requiring sellers to separate a single unified offer into separate components is not only unnecessary, it risks creating consumer confusion and fatigue" and consumers may "simply abandon the transaction"); RILA, FTC–2023–0033–0883 ("requirement for two distinct consents . . . may be confusing and not helpful to consumers."); DCN, FTC–2023–0033–0983 ("We are concerned that requiring a separate consent would be confusing for the consumer who may not have the details of the entire contract readily available in the mandated

separate context. For example, most consumers would likely want to review all of the benefits they would receive as part of a subscription including any discounts when deciding on whether to choose the option of automatic renewal."); APCIA, FTC–2023–0033–0996 ("Requiring a separate consent for a feature that is inherent in service contracts—continuous coverage—seems unnecessary and detrimental to consumers.").

[319] IAB, FTC–2023–0033–1000 ("Furthermore, consumers are familiar with subscription sign-up experiences and do not expect to have to consent a second time once they choose to purchase an autorenewal plan."). One individual consumer confirmed the comment. Individual commenter, FTC–2023–0033–0552 ("The rule specifically prescribes that users must affirmatively assent specifically to the negative option feature, but in cases where a user is only purchasing a negative option product, how should other disclosures be presented?")

[320] NCTA, FTC–2023–0033–0858; Sonsini Alarm Clients, FTC–2023–0033–0860 ("could lead to consumers inadvertently failing to consent to auto-renewal (because they did not notice the second check box) and having an unintended lapse in home security system coverage."); Asurion, FTC–2023–0033–0878 ("many consumers who want and could benefit from auto-renewal protection provisions will neglect to make the requisite two separate affirmative consents and suffer real consequences when they find themselves with a broken device during a gap in coverage"); APCIA, FTC–2023–0033–0996 ("A consumer who wants a service contract but then inadvertently fails to check a box indicating separate consent for the negative option feature could find that they no longer have coverage at the time they most need it.").

[321] *See, e.g.,* DCN, FTC–2023–0033–0983 (could lead to over-notification); CCIA, FTC–2023–0033–0984 ("Adding too much additional information or too many required actions in a purchase cart has diminishing returns for consumer comprehension and attention, and can increase the cognitive load for consumers to the point that they simply stop reading or give up on the purchase."); ANA, FTC–2023–0033–1001.

[322] NCTA, FTC–2023–0033–0858 ("would require companies to change their current customer sign-up flows, at significant cost, without providing consumers with any additional benefits"); PDMI, FTC–2023–003–0864 ("requiring merchants to implement a double opt-in would impose an extraordinary financial and resource burden on sellers."); *id.* (double opt-in requirements "makes absolutely no sense, where, as is often the case, there is no transaction separate from the negative option transaction"); SCIC, FTC–2023–0033–0879; Chamber, FTC–2023–0033–0885 (little to no evidence that double opt-in will create any

Thus, these commenters asked the Commission to exclude transactions where the negative option feature is not independent of the good or service being sold, *i.e.,* where the good or service is itself only offered as a negative option,[323] or to delete the requirement that sellers obtain separate, unambiguous, affirmative consent "to the rest of the transaction." [324]

Two commenters asked the Commission to modify the proposed provision by merging consent to the transaction and the negative option feature. These commenters suggested a separate consent should only be necessary where there are two independent portions of the transaction: one related to the negative option feature and a second for the sale of a separate good or service (including a free trial).[325] Without this change, commenter Kuehn suggested "the proposed Rule could have the unintended result of diminishing the efficacy of other important terms of the contract." Accordingly, Kuehn suggested the Commission revise the definition of negative option feature to encompass the entire contract (rather than a provision of the contract).[326] This alteration, along with changing "rest of the transaction" to "the sale of another good or service," would make it clear separate consent is only required where the seller has both an auto renewal agreement and the sale of another good or service.

IAB, DCN, CTA, and several direct marketing companies asserted the Commission could achieve the same outcome—informed consent—through less restrictive means, *e.g.,* by requiring a clearer disclosure of the negative option feature.[327] For example, CTA

posited: "[a]lternatively, to advance the same goal, and because the Proposed Rule already requires clear and conspicuous disclosure of material terms, the FTC could instead require subscription service providers to prominently disclose subscription terms in a manner that differentiates them from other disclosures, such as in bolded or underlined font, in the course of obtaining consumer consent to the transaction." [328] Additionally, several commenters questioned "why a seller should be precluded from including other material terms of the transaction in obtaining a single consent." [329]

Some commenters raised additional concerns. For instance, several commenters challenged the Commission's statement that a separate check box or similar method could be used to record a consumer's unambiguously affirmative consent. Specifically, PDMI contended the check box, signature, or "substantially similar" method of consent could quickly become obsolete and "replaced by far more effective and consumer friendly mechanisms." [330] Another, NRF, argued courts routinely hold a separate check box is not required for consumers to manifest asset to terms and conditions of the agreement, so long as the terms are reasonably conspicuous.[331] Finally, a group of direct marketing companies, argued standalone consent is not necessary or reasonable, and other methods could suffice. They suggested the Commission include language that it "shall be a question of fact" whether the seller obtained consent through another means.[332]

Additionally, several trade groups and sellers expressed concern about the NPRM's proposed recordkeeping requirements. For instance, one trade group explained the proposed requirements "would require sellers to

maintain records of consumer consent for at least three years, even for consumers who signed up for a free trial and cancelled it before being charged. As drafted, the proposed amendments would also require sellers to maintain records of consumer consent for eleven years for individuals who continuously subscribe to negative option features for at least ten years." [333]

Numerous commenters asserted these recordkeeping requirements would increase costs, which could ultimately be passed onto consumers,[334] or small businesses, especially with respect to in-person and telephone transactions.[335] Others raised concern the proposed recordkeeping requirement could conflict with best privacy practices. For example, commenters noted the retention period is at odds with the need to minimize the amount of consumer data that businesses hold and to enable customers to request deletion of their data.[336] Commenters also suggested the Commission reduce the length of the recordkeeping requirement, *e.g.,* to six months,[337] or revise the proposal to eliminate the requirement for those who do not allow customers to purchase without

consumer benefit; instead will increase consumer fatigue); *see also* IAB, FTC–2023–0033–1000 (double opt-in could be especially burdensome for bundled services, requiring consumers to check an additional box for each service, without added benefit to clarity or disclosure); ICA, 2023–0033–1142 ("requiring recording keeping of 'express informed consent' potentially expressed through verbal, digital, or written records for multiple years will be an onerous and expensive requirement for small business owners to fulfill.").

[323] Chamber, FTC–2023–0033–0885 ("unless there is a negative promotional option, service providers should not be required to have a separate consent for monthly billing and the underlying transaction when the underlying transaction is for a monthly service."); *see also* MIA, FTC–2023–0033–1008 ("an additional consent to initiate a Subscription is unnecessary and superfluous").

[324] *See, e.g.,* Direct Marketing Companies, FTC–2023–0033–1016.

[325] Kuehn, FTC–2023–0033–0871; RILA, FTC–2023–0033–0883.

[326] Kuehn, FTC–2023–0033–0871.

[327] Direct Marketing Companies, FTC–2023–0033–1016 ("the Commission provides no evidence or rationale that a robust, clear and conspicuous

disclosure proximate to the consumer's consent would be insufficient to prevent deception and remedy allegedly prevalent unfair or deceptive acts and practices").

[328] CTA, FTC–2023–0033–0997.

[329] PDMI, FTC–2023–0033–0864; Sirius XM, FTC–2023–0033–0857 ("Businesses should be able to obtain such consent in conjunction with the other terms of an offer,[] as long as they clearly and conspicuously disclose the negative option features and the other material terms of the offer and refrain from "includ[ing] any information that 'interferes with, detracts from, contradicts, or otherwise undermines'' the negative option terms.'').

[330] PDMI, FTC–2023–003–0864.

[331] NRF, FTC–2023–0033–1005 (citing *Meyer* v. *Uber Techs., Inc.,* 868 F.3d 66, 79 (2d Cir. 2017)). It is unclear from NRF's comment whether it questioned separate consent generally, or the guidance on a check box.

[332] Direct Marketing Companies, FTC–2023–0033–1016.

[333] ANA, FTC–2023–0033–1001; *see also* BSA, FTC–2023–0033–1015 ("the current language could be read to require a company to retain for three years the records of a customer who signed up for a free trial but cancelled before the trial ended—and was therefore never a paying customer.").

[334] APCIA, FTC–2023–0033–0996; IAB, FTC–2023–0033–1000 ("this requirement will be significantly costly, as subscription businesses will need to overhaul their sign-up processes to comply with this requirement. Businesses seeking to offset this increased cost will be forced to pass this cost to consumers or avoid offering subscriptions at all").

[335] NCTA, FTC–2023–0033–0858 ("The proposal fails to account for the immense burden the proposal would impose on companies using alternative means to sell their products and services by requiring them to create and implement ways to capture and store duplicative layers of consumer consent.").

[336] CCIA, FTC–2023–0033–0984 ("This record retention rule also seems to be at odds with key principles of consumer privacy, namely the need to minimize the amount of consumer data that businesses hold and to enable customers to request deletion of any data in possession of a third party. A shorter mandatory retention period is more appropriate for both businesses and consumers."); NCTA, FTC–2023–0033–0858 ("Not only is it expensive to maintain these records, it does not comport with privacy best practices.").

[337] ICA, 2023–0033–1142 ("Decrease the duration of the record-keeping requirement to six months after the business and the consumer enters into the agreement."); *see also* Direct Marketing Companies, FTC–2023–0033–1016 (change recordkeeping requirement to keep or maintain records "for at least one year if the consumer is charged at least twice within six months after the initial charge; or for at least three years if the consumer is not charged at least twice within six months after the initial charge.").

accepting the terms of the negative option feature.[338]

Two consumer groups supported the consent provision but asked the Commission to add clarifying language. Specifically, Berkeley Consumer Law Center asked the Commission to state the Rule strictly prohibits the use of dark patterns to obtain consent and that consent cannot be given through silence. A group of professors asked the Commission to clarify that disclosures "appear in each language in which the representation that requires the disclosure appears."[339]

Finally, commenters split on whether the Rule should require separate affirmative consent for free-trial offers. Several consumers supported requiring separate consent at the conclusion of a free-trial period,[340] with one consumer suggesting the Commission ban free-trial offers that require the prepurchase of the good or service.[341] Other consumer interest and public advocacy groups reiterated consumers often forget, or are unaware they have signed up for, a negative option feature in connection with a free trial offer.[342] Sellers and

trade groups disagreed, specifically noting the Commission's own analysis indicating a separate consent may not be necessary given the other requirements of the Rule[343] and existing State laws.[344]

(b) Analysis

Based on the record, the Commission removes the proposed requirement that sellers obtain separate consent to "the rest of the transaction" under § 425.5(a)(3). Further, the Commission modifies the recordkeeping requirement to require sellers to maintain records only for three years from the date of consent. Alternatively, if sellers can show by a preponderance of the evidence they use processes that make it technologically impossible for a consumer to purchase the good or service without consent, sellers need not retain such records.[345] Finally, the Commission declines to modify the consent provisions to require separate consent for free-trial offers. However, should the Commission seek additional comments about a provision to require annual reminders,[346] it will consider addressing such offers at that time.

Prior to addressing each of the issues listed above, it is important to clarify one point. A negative option feature is not itself a product or service—it is simply a mechanism for repeatedly consenting to the extension of a contract through silence. Thus, there are not situations in which the negative option feature is the product, as some commenters suggested. In the example provided above, a subscription to a streaming entertainment service can be offered with (*e.g.,* the offer renews each month until cancellation) or without (*e.g.,* the subscription lasts one year and then must be affirmatively renewed, or it cancels) a negative option feature. There are situations in which sellers only offer products or services on a

negative option basis; however, doing so does not lessen the need to ensure consumers consent to the negative option mechanism within the agreement. Therefore, the analysis below does not separately address this issue.

*(1) The Commission does not adopt a requirement for separate consent to "the rest of the transaction" because it is unnecessary, confusing, and hard to implement.*

Based on the comments, the Commission finds requiring consumer consent to "the rest of the transaction" apart from the negative option feature is unnecessary, potentially confusing, and may be hard to implement. First, even without the separate consent requirement, the proposed Rule contained several elements that work together to ensure consumers know they are agreeing to a negative option feature. Specifically, the proposed Rule required sellers to obtain the consumer's unambiguously affirmative consent to the negative option feature separately from any other portion of the transaction[347] through, for example, a separately presented check box.[348] It also required sellers to clearly and conspicuously provide important information immediately adjacent to the request for consumer consent, including that the charge will be recurring, the deadline to act to stop charges, the amount of the charges, and information necessary to cancel.[349] Further, the proposed Rule stated the seller cannot include any information or employ any techniques that interfere with the consumer's ability to understand these important disclosures and provide unambiguously affirmative consent to the negative option feature.

Given these protections, a separate consent requirement is not necessary.[350] Second, the Commission agrees the separate consent requirement could cause consumer confusion. Moreover, compliance with the Rule's required disclosure and consent provisions should address the concerns commenters raised regarding deception. Finally, several sellers suggested, and there is no evidence to the contrary, that seeking consent to both the negative

---

[338] PDMI, FTC–2023–003–0864; Chamber, FTC–2023–0033–0885.

[339] Law Professors, FTC–2023–0033–0861.

[340] Individual commenter, FTC–2023–0033–0843 ("In addition to making it easy to cancel an online subscription, it should be illegal for companies offering a 'free trial' to bill for any term of subscription without an opt-in step. If they really believe trying their product will prompt me to keep using it, then it needs to be a 2-step process in which at the end of the trial period they must ask for and receive an opt in before they place a charge on my card."); Individual commenter, FTC–2023–0033–0615 ("Rather than automatic renewals, I think subscriptions should only be renewed following consumer approval. For example, after a 14-day trial of an app, consumers should be asked if they approve a purchase to continue. If approval isn't given, the default should be that the subscription expired and the consumer isn't charged."); Individual commenter, FTC–2023–0033–0993 ("If it's a trial subscription the company should notify you that your trial is over and affirm your desire to continue.").

[341] Individual commenter, FTC–2023–0033–0026; *see also* Individual commenter, FTC–2023–0033–0583 ("Require that any entity not require a credit card on file for a trial, or any free period."); Individual commenter, FTC–2023–0033–0641 ("Consumers shouldn't have to be required to submit credit/debit card information for a trial usage. And, consumers shouldn't be automatically charged the day after the trial expires."); Individual commenter, FTC–2023–0033–1069 ("A free trial should not create an automatic subscription!"); Individual commenter, FTC–2023–0033–0607 ("A 'trial offer' should be just that—a ONE-TIME purchase.").

[342] State AGs, FTC–2023–0033–0886 ("the State Attorneys General again respectfully encourage the FTC to require sellers offering free trials to obtain an additional round of consent before charging a consumer at the completion of the free trial."); Law Professors, FTC–2023–0033–0861 ("we ask that the Commission require additional consent from the consumer before a business may convert a free (or nominal-fee) trial into an expensive subscription. Indeed, it seems that Congress, in adopting ROSCA,

validated consumer expectations that they would "have an opportunity to accept or reject [a] membership club offer at the end of [a] trial period."); TINA, FTC–2023–0033–1139 ("Such consumer complaints are consistent with survey data showing that 42 percent of consumers forget they are still paying for a subscription they no longer use.[ ] Many of those happen after you get enticed by a free trial for an online streaming service or a monthly subscription service for clothes or personal items, and then you forget to cancel it after that trial is over.'").

[343] Sirius XM, FTC–2023–0033–0857 ("As long as consumers are clearly informed about the terms of a free trial offer and evince affirmative consent, no further consumer consent should be required when the free trial period expires.").

[344] CCIA, FTC–2023–0033–0984; Chamber, FTC–2023–0033–0885.

[345] This change will not affect a seller's obligation to maintain appropriate records under other regulations, *e.g.,* the TSR.

[346] *See* section VII.B.7.

[347] Section 425.5(a)(1).

[348] Section 425.5(c) allows sellers to comply with the requirement to obtain unambiguously affirmative consent to the negative option feature through a check box, signature, or other substantially similar method.

[349] *See* Rule § 425.4(a)(1)–(4).

[350] The Commission further notes because the seller is obtaining express informed consent to the negative option feature separately from the rest of the transaction, consumers are, in effect, agreeing to both the negative option feature and the sale of the good or service separately.

option feature and the rest of the transaction could be hard to implement for many sellers. Thus, the final Rule does not contain the separate consent requirement.[351]

*(2) The Commission modifies the recordkeeping requirements to address legitimate privacy concerns and reduce undue burden on small businesses.*

Section 425.5(a)(4) of the proposed Rule required sellers to obtain and maintain (for three years or a year after cancellation, whichever was longer) verification of the consumer's consent to the negative option feature. Implementation of this requirement would undoubtably enhance the FTC's ability to enforce the Rule. However, the Commission agrees the proposal creates privacy concerns. The Commission has long recommended companies employ data retention policies that ''dispose of data once it has outlived the legitimate purpose for which it was collected.''[352] Therefore, the Rule's data retention requirement, could, in some instances, be at odds with this guidance. Further, several commenters asserted a longer recordkeeping requirement will be burdensome, particularly for small businesses.

Balancing the Commission's interest in robust Rule enforcement against privacy and burden concerns, the Commission modifies the proposed Rule. Specifically, § 425.5(a)(3) of the final Rule requires sellers to keep or maintain verification of the consumer's consent for a period of three years from the date of consent (rather than three years or a year after cancellation, whichever is longer). Removing the requirement that sellers keep records until one year after cancellation prevents the retention of records for very long periods of time while the contract is still in force. Moreover, as some commenters stated,[353] sellers can employ technological processes for online consent that could alter the balance of concerns. Specifically, it is technologically feasible to make it impossible for customers to enroll without providing unambiguously affirmative consent. The Commission therefore further modifies the recordkeeping requirement to eliminate the requirement entirely if a seller can

demonstrate it meets this threshold. The final provision will allow sellers to destroy consumer records more quickly, while accomplishing the same goal.[354] Finally, the Commission clarifies maintaining copies of advertisements or telephone scripts documenting the disclosures provided in general does not meet this requirement. Such information is easily manipulated by deceptive sellers and cannot show any particular consumer received the disclosures prior to giving consent. Therefore, sellers must either maintain records of each consumer's unambiguously affirmative consent or demonstrate they satisfy the technological exemption provision.

*(3) Other concerns raised by commenters do not warrant modifications to the rule.*

As noted above, a few commenters questioned the Commission's proposed exemplar consent mechanism under § 425.5(c). This proposed provision states for written offers, a check box, signature, or ''substantially similar'' method can be used to obtain a consumer's unambiguously affirmative consent. The Commission notes the mechanism applies to the negative option feature only, and thus corrects the cross-reference contained in this provision from (a)(3) to (a)(1).

The Commission further notes this provision does not require a check box or signature. The Commission offered these methods only as examples a seller can use to obtain unambiguously affirmative consent, not the only ways to do so. Thus, the exemplar does not conflict with caselaw holding that a check box is not required to manifest consent. The Commission also declines to include language in the final Rule, as one commenter suggested,[355] stating whether a seller has complied with this provision is a question of fact. This is unnecessary because the Commission always evaluates sellers' practices on a case-by-case basis to determine whether they comply with the law.

The Commission further declines to remove this provision's reference to ''substantially similar'' methods as some commenters requested. The language is intended to cover any method that affords consumers all the same protections as a check box or signature. The phrase ''substantially similar'' performs this function while allowing for technological advancement, innovation, and adaption without tying

sellers to specific mechanism that may become obsolete.

Further, the Commission declines to modify the final Rule to allow sellers to obtain express informed consent by merely ''disclosing'' the negative option more clearly through, *e.g.,* bolded or underlined font, rather than obtaining expressed informed consent separately for the negative option feature. Although this change would be ''less restrictive,'' it would not adequately protect consumers from unknowingly enrolling in negative option programs. In the NPRM, the Commission balanced the need for clear, unavoidable disclosure of, *inter alia,* the negative option feature with the need for flexibility to allow sellers to best communicate their entire message to consumers. The proposed Rule strikes the right balance. As discussed above, proposed § 425.4 (Important Information), required sellers to clearly and conspicuously disclose important information about the negative option feature, immediately adjacent to the means of recording consent to the feature, and, under § 425.5 (Consent), separately from any other portion of the transaction. The Commission did not specify exact placement, language, or font size because doing so would have diminished flexibility without a sufficient corresponding benefit.

While this balance is appropriate, the required disclosure of important information under § 425.4 does not replace the requirement that sellers obtain consumers' express informed consent. To avoid harm from unfair and deceptive practices, it is imperative consumers unequivocally understand they are agreeing to enrollment in a negative option program and demonstrate their agreement.

The Commission also declines to add language stating (1) the Rule strictly prohibits the use of dark patterns to obtain consent and (2) consent cannot be given through silence. The Rule already addresses both concerns. First, the Rule bars any information that ''interferes with, detracts from, contradicts, or otherwise undermines'' the consumer's ability to provide express informed consent. To the extent dark patterns run afoul of any of these requirements, they are prohibited. To the extent they do not, consumers' express informed consent as required by the Rule is not implicated. Second, under § 425.5, consumers already must give affirmative consent.

Finally, the Commission does not need to clarify, as some commenters suggested, that required consents ''appear in each language in which the

---

[351] *See* § 425.5(a)(3).

[352] NCTA, FTC–2023–0033–0858 (citing FTC, ''Protecting Consumer Privacy in an Era of Rapid Change'' (2012) at 28, *www.ftc.gov/reports/ protecting-consumer-privacy-era-rapid-change-recommnedations-businessespolicymakers*).

[353] ANA, FTC–2023–0033–1001; ESA, FTC–2023–0033–0867 (for purchases that cannot be completed without a consumer's consent, a business will be deemed compliant with any recordkeeping requirement and is not required to maintain an individual record of consent).

[354] Importantly, if the seller does not maintain records and cannot satisfy the technological exemption, the seller has violated the Rule.

[355] Direct Marketing Companies, FTC–2023–0033–1016.

Appellate Case: 24-3137      Page: 33      Date Filed: 12/05/2024 Entry ID: 5463205

representation . . . appears.''[356] To obtain a consumer's express informed consent, each disclosure must be clear and conspicuous and immediately adject to the means of recording the consumer's consent. To meet the clear and conspicuous standard as defined in the Rule, the disclosure must, among other things, ''appear in each language in which the representation that requires the disclosure appears.''[357]

*(4) The Commission does not modify the Rule to require separate consent for free trial offers.*

In the NPRM, the Commission invited comments on whether the Rule should require an additional (or alternative) round of consent after the end of a free trial offer. As explained in the NPRM, if the seller follows the proposed Rule's disclosure and consent requirements, consumers will understand they are enrolled in, and will be charged for, the negative option feature once the free trial ends. As discussed above, however, several commenters explained with enough time between initial enrollment and charge after conversion, consumers are primed to forget the negative option feature.[358] The Commission agrees this an important issue; however, clear upfront disclosures lessen the chance a negative option feature may be unfair or deceptive. Specifically, clear, accurate upfront disclosures reduce the risk of deception, and the potential harms caused are more likely to be reasonably avoidable (*i.e.,* the consumer can simply refuse to enter into the contract). That said, taking advantage of consumers' ''forgetfulness'' is extremely troubling and thus ripe to be addressed by other means.

6. Proposed § 425.6 Simple Cancellation (''Click to Cancel'')

Section 425.6 of the proposed Rule contains several requirements to ensure consumers can easily cancel negative option features. As explained in the NPRM, ''easy cancellation is an essential feature of a fair and non-deceptive negative option program,'' but one that has become ''far too often illusory.''[359] ''If consumers cannot easily leave a negative option program, the negative option feature is little more

than a means of charging consumers for goods and services they no longer want.''[360]

To prevent unfairly trapping consumers in a transaction they do not want, the proposed Rule directed sellers to provide a cancellation mechanism that (1) immediately halts recurring charges; (2) is as simple to use as the mechanism the consumer used to consent to the negative option feature; and (3) is readily accessible through the same medium the consumer used to provide that consent. The Commission intended these requirements to erect clear guardrails, while providing sellers with the flexibility to innovate. Therefore, rather than propose specific prohibitions, which may lose utility over time, or inadvertently provide a roadmap for deception, the proposed Rule outlined a performance-based standard mapping the contours of what constitutes a simple mechanism, without overly prescriptive requirements.

(a) § 425.6(a) and (b) Simple Mechanism Required for Cancellation; and Simple Mechanism at Least as Simple as Initiation

(1) Summary of Comments

Proposed § 425.5(a) and (b) required a fast and easy cancellation mechanism that, at minimum, allows the consumer to cancel as easily as they enrolled in the program. The Commission received thousands of comments in support of this provision, with individual consumers uniformly expressing their desire for a simple easy to use cancellation mechanism.[361] Such comments included: ''If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel;''[362] ''I

would like the option to cancel my subscriptions, [and] offers online just as easily as it was to sign up;''[363] ''As more and more services enter online use, it is ridiculous that consumers have to jump through so many hoops to cancel services when it is so easy to sign up for them;''[364] and ''Consumers need the one-click option.''[365]

Some commenters suggested unsubscribing should be easier than enrolling,[366] and others, ''very easy.''[367] Indeed, several advocated for an ''Unsubscribe link,''[368] similar to those available under the CAN–SPAM Act.[369] Numerous commenters complained they

---

[356] Law Professors, FTC–2023–0033–0861.

[357] Rule § 425.2(c)(6).

[358] Deceptive sellers also commonly delay shipment of goods or services until close to the end of the trial period, giving consumers little time to stop the charge or cancel the negative option. *See, e.g.,* Individual commenter, FTC–2023–0033–0085.

[359] NPRM, 88 FR 24729; *see* ANPR, 84 FR 52395 (discussing general requirements for nondeceptive negative options); *id.* at 52396 (discussing the ongoing problems in the marketplace including inadequate or overly burdensome cancellation procedures).

[360] NPRM, 88 FR 24729.

[361] Individual commenter FTC–2023–0033–0029 (''Please implement this necessary rule to protect consumers and save us hours on the phone cancelling services we signed up for with one click online.''); Individual commenter, FTC–2023–0033–0072 (''I have had issues with some online subscriptions which were entered into purely online, but to cancel I had to call a phone number open only during certain business hours. I would like a rule that requires all subscriptions to be available to cancel through the same means as they were initiated, whether that is online, in person, phone, mail, or chat. I believe that would be fair to people of all technological levels while allowing businesses to conduct business how they feel comfortable without allowing them to create unnecessary hurdles for customers looking to end their service.'').

[362] Individual commenter, FTC–2023–0033–0111. Thousands of individual commenters repeated this phrase through a mass media campaign. *See, e.g.,* Anonymous commenter, FTC–2023–0033–0013; Individual commenter, FTC–2023–0033–0016 (''If I can subscribe in one click, I should be able to unsubscribe in one click.''); Individual commenter,

FTC–2023–0033–0017 (''It should be as easy as one click to cancel an online account.''); Individual commenter, FTC–2023–0033–0068 (''Being able to go online and with a simple click be able to cancel a subscription would be a dream.''); *see also* Individual commenter, FTC–2023–0033–0015 (''Ending a subscription should be as easy as it was to sign up. it makes no sense how hard it is to close out an account with some places.''); Individual commenter, FTC–2023–0033–0020 (''The time has come to make it as easy for consumers to cancel subscriptions as it has been to start them.''); Individual commenter, FTC–2023–0033–0087 (''I think any offer you can buy with a click should also be an offer to unsubscribe with a click.'').

[363] Individual commenter, FTC–2023–0033–0003; *see also* Individual commenter, FTC–2023–0033–0010 (''I for one would be for the Easing of subscription cancellation. Having it be much harder to cancel a subscription than start it simply shouldn't be.''); Anonymous commenter, FTC–2023–0033–0024 (''It should be no harder for consumers to stop giving a company their money than it is for them to start giving it to them.''); Individual commenter, FTC–2023–0033–0025 (''In fact, it should be as easy to cancel as it is to sign up.'').

[364] Individual commenter, FTC–2023–0033–0231; Individual commenter, FTC–2023–0033–0109.

[365] Individual commenter, FTC–2023–0033–0403.

[366] ''Unsubscribing should be easier than subscribing.'' Individual commenter, FTC–2023–0033–0005. *Accord* Individual commenter, FTC–2023–0033–0021 (same); Anonymous commenter, FTC–2023–0033–0040 (''I am in favor of making it easier to discontinue services.''); Individual commenter, FTC–2023–0033–0107 (''Canceling a subscription should be easier that setting up the subscription.'').

[367] Individual commenter, FTC–2023–0033–0011 (''It should be very easy to cancel a subscription, artificially creating difficulty or hurdles only serves to hurt the consumer of a service as well as a company's image and deplete trust in a brand or service.''); Individual commenter, FTC–2023–0033–0036 (''It should be very easy to cancel a subscription!!!!!'').

[368] Individual commenter, FTC–2023–0033–0030; Individual commenter, FTC–2023–0033–0035; *see also* Individual commenter, FTC–2023–0033–0188 (''If you sign up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. Kind of like 'unsubscribing' from an email newsletter you don't want to get anymore.''); Individual commenter, FTC–2023–0033–0236 (''When I get an email from a politician I'm not interested in there is always an unsubscribe button. Why can't paid subscriptions be the same?'').

[369] Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (''CAN–SPAM Act''), 15 U.S.C. 7701–7713; 16 CFR part 316.

often have to resort to disputing the charge with credit card companies (or cancelling the card altogether) because cancellation is so difficult or impossible.[370] Additionally, commenters described the simple cancellation mechanism requirements as a "no brainer," "common sense," and "only fair" to consumers.[371] These and others commenters complained of the hundreds of dollars [372] and hours [373]

wasted on unused and unwanted products and services they were not effectively able to cancel due to byzantine cancellation procedures.[374]

As summarized by the Berkeley Consumer Law Center, "requiring the mechanism of cancellation be as simple as enrollment" will minimize "overly complex cancellation processes with multiple steps," and prevent sellers "from trapping consumers in automatically renewing subscriptions through obstacles created by tedious processes or confusion." [375]

Sellers and trade organizations argued the proposed requirements were "too vague." [376] For instance, PDMI asserted the requirement that the simple cancellation mechanism be as easy to use as the one used to initiate the transaction provides no clear guidance on when a transaction is "initiated." Several industry and trade groups echoed this comment, contending "as easy as" is a difficult, and often subjective, standard.[377] Other businesses complained the proposed Rule fails to define "simple mechanism" [378] and making cancellation as easy as enrollment was not possible because they serve different purposes.[379] IAB asserted the proposed requirements were overbroad in relation

to the prevalent acts or practices the Commission identified.[380]

### (2) Analysis

Considering the overwhelming support for a simple cancellation [381] mechanism that immediately halts charges,[382] and given substantial evidence supporting the need for such mechanism to prevent unfair and deceptive acts and practices, the Commission retains proposed § 425.6(a) and (b).[383] The Commission disagrees with commenters' argument that the "as easy as" standard is vague. The Commission has provided considerable guidance on what constitutes a simple or "easy" cancellation mechanism through numerous cases and its 2021 Enforcement Policy Statement.[384]

---

[370] *See, e.g.,* Individual commenter, FTC–2023–0033–0068; Individual commenter, FTC–2023–0033–0086; Individual commenter, FTC–2023–0033–0203 ("Recently, I had to start a dispute case with my credit card company because I had subscribed to a service and there was no way to cancel that service."); Individual commenter, FTC 2023–0033–0211; Individual commenter, FTC–2023–0033–0225 (had new card issued); Individual commenter, FTC–2023–0033–0275 (disputed the charge and cancelled card); Individual commenter, FTC–2023–0033–0311 (cancelled credit card); Individual commenter, FTC–2023–0033–0320 (disputed charge); Individual commenter, FTC–2023–0033–0501 (terminated credit card); Individual commenter, FTC–2023–0033–1134 (cancelled credit card).

[371] *See, e.g.,* Individual commenter, FTC–2023–0033–0256; Individual commenter, FTC–2023–0033–0408 ("common sense"); Individual commenter, FTC–2023–0033–0431 ("no brainer"); Individual commenter, FTC–2023–0033–0586 ("no brainer").

[372] Individual commenter, FTC–2023–0033–0232; Individual commenter, FTC–2023–0033–0459 ("I once lost hundreds of dollars because I could not find how to cancel."); Individual commenter, FTC–2023–0033–0509; Individual commenter, FTC–2023–0033–0232 ("I'm currently trapped in at least three subscriptions that are nearly impossible to cancel, costing me hundreds of dollars per year."); Individual commenter, FTC–2023–0033–0509; Individual commenter, FTC–2023–0033–0825 ("I have wasted hundreds of dollars for things that automatically renewed as a result of not being able to figure out easily how to cancel."); Individual commenter, FTC–2023–0033–0572; Individual commenter, FTC–2023–0033–0697 ("I have been caught up in just this very unfair practice where I've been lured in and can't get out—to the tune of hundreds of dollars that I don't have."); *see also* Public Interest Groups, FTC–2023–0033–0880.

[373] *See, e.g.,* Individual commenter, FTC–2023–0033–029 ("Please implement this necessary rule to protect consumers and save us hours on the phone cancelling services we signed up for with one click online."); Anonymous commenter, FTC–2023–0033–0040 ("My negative experience was that it was a simple 'click' on-line to sign up for a service but to cancel same service it took three phone calls and hours of my time.); Individual commenter, FTC–2023–0033–0084 ("I spent over two hours of my time trying to cancel the subscription."); Individual commenter, FTC–2023–0033–0106 ("I've definitely lost at least 30 hours of my life dealing with insufferable 'retention specialists,' all of whom should be ashamed of what they do."); Individual commenter, FTC–2023–0033–0431; Individual commenter, FTC–2023–0033–0385 ("This is not a bot generating a letter; it's an actual person, and I want to register strong support for the one Click rule you are considering. I have wasted hours trying to deal with customer service, whose only goal is to keep me on board."); Individual commenter, FTC–2023–0033–0672 ("It's about time! Trying to unsubscribe can waste many hours, induce stress, result in unwanted subscriptions or cancellation fees, and leave personal data subject to abuse."); Individual commenter, FTC–2023–0033–0642 ("There needs to be a substantial penalty when a

service is requested to be cancelled, but the charges continue. I dropped my TV service from Comcast 3 months ago and they continue to charge me. Every time I need to re-contact them I waste an hour.").

[374] Individual commenter, FTC–2023–0033–0422 ("Implementing this consumer-protection rule has the potential to save American consumers millions of dollars, and prevent unscrupulous companies from using byzantine cancellation procedures to squeeze unwarranted funds out of their customers."); Individual commenter, FTC–2023–0033–0233 ("I had to navigate an endless labyrinth of dark-patterned links in order to cancel an Amazon Prime subscription that took me one click to sign up for."); Individual commenter, FTC–2023–0033–0482 ("They make it a labyrinth of obscure phrases and if you don't know to click on just the right one, you'll never be able to cancel.").

[375] Law Professors, FTC–2023–0033–0861; *see also* State AGs, FTC–2023–0033–0886 ("state attorneys general strongly endorse the FTC's efforts to ensure that consumers enrolled in subscription services or other negative option plans are continuing to pay for those plans because they want to maintain their subscriptions, and not because it is too much trouble to cancel.").

[376] PDMI, FTC–2023–0033–0864; ACT App Association, FTC–2023–0033–0874 (elusive language); IAB, FTC–2023–0033–1000 (unclear how to measure simplicity).

[377] Chamber, FTC–2023–0033–0885 ("ambiguous and hard to implement requirement); NRF, FTC–2023–0033–1005 (as simple as not defined and no examples).

[378] ACT App Association, FTC–2023–0033–0874. The Commission does indeed define "simple mechanism" through the requirements of § 425.6, as well as through existing caselaw and the 2021 Enforcement Policy Statement. *See* n.385.

[379] ESA, FTC–2023–0033–0867; IHRSA, FTC–2023–0033–0863; Chamber, FTC–2023–0033–0885; BSA, FTC–2023–0033–1015.

[380] IAB, FTC–2023–0033–1000. The Commission addresses IAB's prevalence assertions elsewhere. *See* section VII.A.

[381] Beyond the near universal support by consumers and consumer advocacy groups, some trade groups also supported the goal of ensuring consumers have a quick and easy mechanism to cancel. RILA, FTC–2023–0033–0883; *see also* Sirius XM, FTC–2023–0033–0857 ("All parties want an easy-to-use and an accessible method of cancellation"); ZoomInfo, FTC–2023–0033–0865 ("We concur with the FTC's recognition that negative option terms, often concealed in 'fine print', can be difficult for consumers to negotiate or even to comprehend fully, and that canceling these contracts can be unfairly burdensome.").

[382] Some commenters asked for clarification regarding whether the requirement under § 425.6(a) would also immediately cancel the entire contract. *See, e.g.,* N/MA ("The FTC should also clarify that the "Click to Cancel" proposal applies only to the negative option portion of a subscription and not to the entire subscription."). The language of the Rule is clear—cancellation under the Rule applies only to the negative option portion of the contract, and not the entire contract. Section 425.6 ("it is violation of this Rule . . . for the negative option seller to fail to provide a simple mechanism for a consumer to cancel the negative option feature"). Thus, when a consumer cancels, all terms and conditions continue until the expiration of the contract or agreement.

[383] BSA specifically requested the Commission revise subsection (a) to the following: "We suggest revising this language to clarify the intended result by stating the obligation is 'to cancel the negative option feature and immediately stop any recurring charges for the good or service.'" BSA, FTC–2023–0033–1015. However, this change could create ambiguity regarding application of the subsection to the initiation of charges under free- and fee-to-paid conversions. Accordingly, the Commission will not incorporate the suggested change.

[384] *See, e.g.,* EPS, 86 FR 60822; *FTC v. FloatMe Corp.,* No. 5:24–cv–00001 (W.D. Tex. 2024); *United States v. Cerebral, Inc.,* No. 1:24–cv–21376 (S.D. Fla. 2024); *FTC v. Bridge It, Inc.,* No. 1:23–cv–09651 (S.D.N.Y. 2023); *FTC v. Vonage Holdings Corp.,* No. 3:22–cv–08435 (D.N.J. 2022); *FTC v. Benefytt Techs., Inc.,* No. 8:22–cv–01794 (M.D. Fla. 2022); *FTC v. First Am. Payment Sys.,* No. 4:22–cv–00654 (E.D. Tex. 2022); *United States v. MyLife.com, Inc.,* No. 2:20–cv–6692 (C.D. Cal. 2020); *FTC v. RagingBull.com, LLC,* No. 1:20–cv–03538 (D. Md. 2020); *FTC v. Age of Learning, Inc.,* No. 2:20–cv–07996 (C.D. Cal 2020); *FTC v. Match Grp., Inc.,* No. 3:19–cv–02281 (N.D. Tex. 2019); *FTC v. Cardiff,* No. 5:18–cv–02104 (C.D. Cal. 2018); *FTC v. AdoreMe,*
Continued

Moreover, the "as easy as" standard is even clearer in context, *i.e.,* a flexible measure that ensures consumers have similar cancellation and consent experiences in terms of time, burden, expense, and ease of use, among other things.[385] The Commission is aware these experiences may not always be perfectly symmetrical. Consumers may have to verify or authenticate their identity, for instance,[386] or they may be asked to confirm their intent to cancel.[387] However, reasonable verification, authentication, or confirmation procedures should not create distinctly asymmetrical experiences, particularly if the cancellation mechanism is located within account or user settings secured by authentication requirements for access. Any authentication, verification, or confirmation procedure that creates unreasonable asymmetry runs afoul of section 5 of the FTC Act and the Rule. Moreover, given the extensive record and the Commission's experience with sellers using verification and authentication tools to thwart or delay cancellation,[388] the Commission declines to create a safe harbor for these activities as some States have[389] and as some commenters requested.[390]

Nevertheless, as some commenters point out, the proposed initiation or purchase date trigger may provide

insufficient clarity.[391] Not all negative option features begin with a purchase (*e.g.,* free trials), and when a transaction is initiated is subject to interpretation or possible manipulation. Given this ambiguity, businesses attempting to comply with the proposed Rule may have difficulty, and those attempting to evade the proposed Rule may find loopholes with the proposed initiation or purchase date trigger. Thus, the Commission revises § 425.6(b)[392] to require the simple cancellation mechanism be "as easy as" the mechanism the consumer used "to consent" to the negative option feature, rather than "initiate" or "purchase" the feature. The moment of consent avoids the lack of clarity the terms "purchase" and "initiate" introduce and clarifies the action to which the cancellation must be compared.

(b) Proposed § 425.6(c) Minimum Requirements for Simple Mechanisms

(1) Summary of Comments

The proposed Rule required sellers to provide a simple cancellation mechanism through the same medium (internet, phone, in-person) the consumer used to consent to the negative option feature. Almost uniformly, consumers supported this requirement.[393] However, a number of a trade groups disagreed, arguing, as explained below, the requirement is too prescriptive, or could lead to accidental or inadvertent cancellation.[394] Instead, these commenters suggested the Commission allow consumers to choose their cancellation medium (*e.g.,* based

on "consumer expectations," convenience, or common use by the seller).[395]

Consumer groups and law enforcement asked the Commission to add minimum requirements to the simple cancellation mechanism. For instance, the State AGs asked the Commission to include the various requirements stated in the 2021 Enforcement Policy Statement, *e.g.,* require negative option sellers "not [to] erect unreasonable barriers to cancellation or impede the effective operation of promised cancellation procedures, and must honor cancellation requests that comply with such procedures."[396] They also urged the Commission to adopt language from New York's statute, which provides simple cancellation mechanisms must be "cost effective, timely, and easy to use."[397] Additionally, the Center for Data Innovation asked the Commission to create a working group to define simple mechanism further, including best practices for businesses.[398]

Finally, some commenters suggested the record lacks evidence that it would be unfair or harmful to consumers to have a cancellation process different from the sign-up process.[399] Accordingly, they argued promulgating a trade regulation rule requiring such symmetry is beyond the Commission's authority. Further, IAB argued the Commission cannot create new requirements defining simple cancellation methods beyond ROSCA's simplicity standard, *i.e.,* that sellers provide simple mechanisms to stop recurring charges, because Congress already decided the appropriate standard.[400]

(a) Proposed § 425.6(c)(1): Online Cancellation

Section 425.6(c)(1) of the proposed Rule specifically addressed online cancellation, requiring sellers to provide a cancellation mechanism over the same website or web-based application the consumer used to consent. Thousands of commenters repeated the mantra: "If you signed up online, you should be able to cancel online," noting they often face hurdles finding a cancellation mechanism, and then must call and

---

*Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC* v. *AAFE Prods. Corp.,* No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC* v. *JDI Dating, Ltd.,* No. 1:14–cv–00400 (N.D. Ill. 2014).

[385] Some commenters raised the concern that sellers might create complicated signup procedures to justify complex cancellation mechanisms. ESA, FTC–2023–0033–0867; State AGs, FTC–2023–0033–0886; IAB, FTC–2023–0033–1000. As pointed out by the State AGs sellers must comply with all requirements of a simple cancellation mechanism, including that consumers can promptly effectuate cancellation through an accessible means.

[386] Commenters insisted that reasonable authentication and verification procedures be allowed prior to cancellation to ensure that only authorized persons are making changes to an account. NFIB, FTC–2023–0033–0789; IHRSA, FTC–2023–0033–0863; ESA, FTC–2023–0033–0867; N/MA, FTC–20230033–0873; RILA, FTC–2023–0033–0883; ANA, FTC–2023–0033–1001.

[387] *See, e.g.,* MIA, FTC–2023–0033–1008.

[388] Berkeley Consumer Law Center, FTC–2023–0033–0855; RocketMoney, FTC–2023–0033–0998; Anonymous commenter, FTC–2023–0033–0024; Individual commenter, FTC–2023–0033–0411; Individual commenter, FTC–2023–0033–0850; Individual commenter, FTC–2023–0033–0861; Individual commenter, FTC–2023–0033–0888; Anonymous commenter; FTC–2023–0033–0134; Individual commenter, FTC–2023–0033–0326; Individual commenter, FTC–2023–0033–0778.

[389] *See, e.g.,* Cal. Bus. & Prof. Code § 17602(d)(3); Colo. Rev. Stat. § 6–1–732(2)(d)(I)(B).

[390] USTelecom, FTC–2023–0033–0876 ("expressly allow" business to engage in privacy and data security measures prior to cancellation); ANA, FTC–2023–0033–1001.

[391] For online cancellation, § 425.6(c)(1) of the proposed Rule required sellers to provide a simple cancellation mechanism through the same medium consumers used "to purchase the negative option feature."

[392] The Commission also will make a conforming change to add "consent" in section 425.6(c)(1).

[393] *See, e.g.,* Individual commenter, FTC–2023–0033–0072 ("I would like a rule that requires all subscriptions to be available to cancel through the same means as they were initiated, whether that is online, in person, phone, mail, or chat."); Individual commenter, FTC–2023–0033–0252 ("the method provided for signing up for a service must also be provided for cancelling the same service, be just as easy to find, and require no more steps than it took to sign up.").

[394] *See, e.g.,* NCTA, FTC–2023–0033–0858; PDMI, FTC–2023–0033–0864; CTA, FTC–2023–0033–0997; ANA, FTC–2023–0033–1001. *See also* Wilson Sonsini Goodrich & Rosati on behalf of certain of its alarm company clients ("Sonsini Alarm Clients"), FTC–2023–0033–0860 (alarm companies should be able to speak to the customers to verify identity and confirm cancellation intent); N/MA– FTC–2023–0033–0873 (A "one click" cancellation requirement for an entire subscription, especially absent some form of authentication, could also lead to accidental and/or malicious cancellations.); NRF, FTC–2023–0033–1005 (data suggests that one-click-cancellation functions frequently cause accidental cancellations).

[395] *See, e.g.,* Sirius XM, FTC–2023–0033–0857; N/ MA, FTC–2023–0033–0873; State AGs, FTC–2023–0033–0886.

[396] State AGs, FTC–2023–0033–0886.

[397] *Id.*

[398] CDI, FTC–2023–0033–0887.

[399] CTA, FTC–2023–0033–0997; IAB, FTC–2023–0033–1000.

[400] IAB, FTC–2023–0033–1000.

spend significant time on the telephone to cancel their subscriptions.[401]

In contrast, RILA suggested consumers would not always expect to find a cancellation function through the same online medium the consumer used to enroll. "For example, contracts are . . . increasingly concluded online through third parties or via social media apps. Regardless of how a customer initially signs up, once she/he establishes a purchasing arrangement with a seller, the customer will logically look to the seller to cancel." [402] Several commenters agreed, stating where a consumer enrolls through a third party, or through an IoT device, the consumer may naturally look to the seller with whom the consumer has the agreement.[403]

Similarly, trade groups, such as NCTA and PDMI, argued mandating consumer cancellation through the same website or web-based application the consumer used to initiate the transaction is too prescriptive.[404] Several of these commenters asserted the proposed requirement is unnecessary and contrary to consumer expectations.[405] They further contended when consumers enroll online, any online cancellation mechanism should be adequate.[406] Further, these commenters suggested it may not be possible to offer the same website or web-based application due to contractual obligations and limitations imposed by third parties.[407]

Additionally, broadband, wireless, and streaming groups, such as NCTA and USTelecom, suggested the same-medium requirement is particularly troublesome for their industries because consumers often subscribe to multiple, or bundled, services, rendering cancellation online through a single click difficult or impossible. These

industries posited consumers often do not, in fact, want to cancel, but rather seek to downgrade or modify services. Therefore, requiring a consumer to speak to a live agent best accomplishes this goal, regardless of how the consumer enrolled.[408]

Alarm companies raised a similar concern, *i.e.,* there are no safeguards to ensure the consumer intended to cancel (rather than, *e.g.,* unsubscribe from marketing emails) when cancelling online. They also emphasized the importance of verifying a consumer's identity prior to cancellation. As explained by a commenter representing various alarm company clients, alarm companies' "cancellation procedures are designed to prevent inadvertent or malicious disabling of alarm monitoring services, often by directing consumers to call trained customer support representatives who can verify the consumer's identity via their secure passcode and ensure any changes made to the account are intentional and fully informed." [409]

(b) Proposed § 425.6(c)(2): Telephone Cancellation

Proposed § 425.6(c)(2) addressed situations in which sellers obtain consumer consent by telephone. In these situations, the proposed Rule required sellers to provide a telephone number to consumers and "assure" all calls are answered promptly during "normal business hours" and are no more costly than the call to enroll.

Several commenters asked the Commission to modify this section. Specifically, N/MA asked that sellers be allowed to confirm telephone cancellations through email verification.[410] A group of law professors asked the Commission to require sellers to answer cancellation

calls in "comparable timeframe to sign-up calls." [411] They also suggested telephone answering systems should not be limited to normal business hours if they are entirely automated. The State AGs further asked the Commission to incorporate the guidance for telephone cancellation from the 2021 Enforcement Policy statement, for example, ensuring "the calls are not lengthier or otherwise more burdensome than the telephone call the consumer used to consent to the negative option feature," and prohibiting sellers from "hang[ing] up on consumers who call to cancel; plac[ing] them on hold for an unreasonably long time; provid[ing] false information about how to cancel; or misrepresent[ing] the reasons for delays in processing consumers' cancellation requests." [412]

(c) Proposed § 425.6(c)(3): In-person Cancellation

For in-person sales, proposed § 425.6(c)(3) required sellers to offer online or telephone call cancellation mechanisms in addition to the same in-person mechanism, where practical. The proposed Rule further required sellers not make telephone cancellation more costly than the method used to consent to the negative option feature.

Individual consumers identified the many ways in which demanding in-person cancellation is unfair. For instance, they observed it may not always be possible to cancel in person, as was true during the COVID pandemic,[413] after a consumer moves from the area,[414] or for people with young children or who have difficulty leaving their home.[415] Others

---

[401] Individual commenter, FTC–2023–0033–0215 ("If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel."); Individual commenter, FTC–2023–0033–0847; Anonymous commenter, FTC–2023–0033–0040 ("My negative experience was that it was a simple 'click' on-line to sign up for a service but to cancel same service it took three phone calls and hours of my time. If I can sign up with a 'click' then I SHOULD be able to cancel with a 'click.' ").

[402] RILA, FTC–2023–0033–0883.

[403] ESA, FTC–2023–0033–0867; ANA, FTC–2023–0033–1001.

[404] NCTA, FTC–2023–0033–0858; PDMI, FTC–2023–0033–0864; CTA, FTC–2023–0033–0997; ANA, FTC–2023–0033–1001.

[405] *See, e.g.,* ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000.

[406] *See, e.g.,* IAB, FTC–2023–0033–1000; MIA, FTC–2023–0033–1008; *see also* RILA, FTC–2023–0033–0883 (enrollment online, *e.g.,* internet-based mobile applications, should be allowed through seller's website).

[407] *See, e.g.,* ESA, FTC–2023–0033–0867.

[408] USTelecom, FTC–2023–0033–0876; CTIA, FTC–2023–0033–0866 ("imperative that businesses are able to have a live representative speak with a customer seeking to cancel, regardless of the medium used to sign up"); NCTA, FTC–2023–0033–0858; ("Whatever these consumers' reasons for seeking to cancel or modify services, in most instances they are best served by speaking with a live agent, even if they enrolled online."); *see also* Chamber, FTC–2023–0033–0885 (subscriptions to multiple products or services "require[ ] more time and personal assistance to address when a consumer seeks to cancel only one of such related products or services").

[409] Sonsini Alarm Clients, FTC–2023–0033–0860; *see also* Joint Alarm Industry Comments—ESA, TMA, SIA and AICC, FTC–2023–0033–1014 (asking for clarification that alarm companies can require written or verbal confirmation of online cancellation requests). The concerns raised by these industries are likely an artifact of the Saves provision, which, as proposed, could be interpreted to prevent verification procedures and cancellation intent. The Commission addresses these concerns in section VII.B.6.c.

[410] N/MA, FTC–2023–0033–0873.

[411] Law Professors, FTC–2023–0033–0861.

[412] State AGs, FTC–2023–0033–0886.

[413] Individual commenter, FTC–2023–0033–0399 ("Even if I didn't sign up online, terminating a membership in person isn't always possible. Lock down during Covid being a prime example.").

[414] Individual commenter, FTC–2023–0033–0677 ("Companies are absolutely being deceptive about their practices when it comes to canceling a service, including their initial pitch to 'Cancel anytime!' only for you to find out that canceling requires you to go in person to a business in a place you might not even live anymore").

[415] Individual commenter, FTC–2023–0033–0741 ("[m]any places . . . require you to go in person to cancel—they won't even let you do it over the phone! This harms anyone that may have trouble leaving the house regularly, including disabled folks and parents of small children and those caring for older or ailing family members."). *See also* TechFreedom, FTC–2023–0033–0872 ("Returning to the in-person venue where the initial sale occurred may be inconvenient, or even impossible, for the consumer."); Individual commenter, FTC–202–0033–1141 ("Sometimes an unexpected move or unforeseen circumstances make it impossible to cancel in person. I would like to see an option to be able to cancel remotely, even if the subscription was purchased on site.").

complained they showed up numerous times in person, only to be told they could not cancel because the manager was not available.[416] One commenter complained sellers demanded consumers cancel by certified mail if they originally consented in person.[417]

In contrast, two trade associations requested the Commission allow sellers to require consumers to cancel in person if they signed up in person. These commenters argued such a limitation is appropriate due to the unique challenges of their industries. For example, IHRSA, which represents the health and fitness industry, stated, "it is appropriate for a brick-and-mortar business" to require customers to cancel in person "to verify their identity." The International Carwash Association ("ICA") stated some of its members sell products and services exclusively in person; therefore, it asked the Commission to not "force" these small business owners "to set up an online marketplace" to process cancellations if the seller does not already have an online presence.[418]

(2) Analysis

*(a) The Commission retains the general "same medium" requirements of § 425.6(c).*

Based on the record, the final Rule retains the general requirements proposed in § 425.6(c); specifically, the negative option seller must provide a simple cancellation mechanism through the same medium (such as internet, telephone, mail, or in-person) the consumer used to consent to the negative option feature. Further, the final Rule retains § 425.6(a) that requires sellers to provide consumers with a simple mechanism to immediately stop charges that is cost-effective, timely, and easy to use. Such a mechanism cannot include "unreasonable barriers to cancellation or impede the effective operation of promised cancellation procedures."[419] This provision makes

adding language from the 2021 Enforcement Policy Statement or the New York statute unnecessary because the simple mechanism provision already includes it. Further, several commenters asked the Commission to allow consumers to choose additional, alternate means of cancellation.[420] This modification, however, is also unnecessary. The "same medium" requirement presents a floor, not a ceiling. That is, it only requires businesses to offer consumers the ability to cancel in the manner they were able to sign up. Sellers are free to provide additional cancellation mechanisms, giving consumers choices.

Moreover, despite some commenters' assertions to the contrary, the Commission has clear authority to issue a rule requiring sellers to offer cancellation through the same medium as enrollment. As detailed in section VII.A, there is a substantial record demonstrating the negative option practices covered by this Rule are unfair or deceptive, prevalent, and have caused significant consumer harm.[421] Moreover, Magnuson-Moss empowers the Commission to promulgate requirements designed to prevent any unfair or deceptive practice it identifies with specificity.[422] By promulgating a rule that prevents sellers from making cancellation unreasonably difficult, the Commission has done so here. Further, while ROSCA does not provide for APA rulemaking, it does not limit the Commission's authority to issue a trade regulation rule.[423] In fact, the

Commission's Negative Option Rule predates ROSCA, and the statute does not rescind that Rule.

*(b) The Commission modifies the requirements of § 425.6(c)(1): Online Cancellation.*

In response to comments, the Commission makes several changes to clarify the online cancellation mechanism requirements. First, it removes the requirement that, for website or web-based applications, cancellation must be afforded through the same precise means as consent. Instead, the final Rule provides the simple cancellation must be easy to find. Second, the revised provision incorporates a definition of "interactive electronic medium" in place of "internet." Third, the Commission excludes cancellation mechanisms requiring interaction with a live or virtual agent, unless the consumer consented to the negative option feature through such mechanism. Each modification is discussed below.

*(i) The simple cancellation mechanism must be easy to find.*

Consumers uniformly opposed having to engage with a representative to cancel when they could simply click a button to enroll.[424] They also expressed deep

---

[416] *See, e.g.,* Individual commenter, FTC–2023–0033–0510 ("I had to go in person 3 different times because the manager wasn't there so to cancel it").

[417] Individual commenter, FTC–2023–0033–0007 ("I work dispute resolutions for a bank. I see so many cases where someone is trying to cancel something like a gym membership and, while they can sign up in person, they for some reason have to mail a certified letter to the [company's] home office. That has always seemed unreasonable and deliberately contrived.").

[418] ICA, FTC–2023–0033–1142. ICA's comment seems to suggest a misunderstanding that the Rule would require both telephone and online cancellation for in-person consent. It does not. A business may elect either online (or telephone (or both), but there must be at least one mechanism in addition to in-person cancellation.

[419] EPS, 86 FR 60823; *see also* NPRM, 88 FR 24728 (explaining the simple cancellation

mechanism proposed in the Rule should remove barriers, such as unreasonable hold times or verification requirements).

[420] *See, e.g.,* N/MA, FTC–2023–0033–0873 (subscribers should be allowed to choose method most convenient; subscribers who sign up by mail may prefer to cancel online or by telephone, and consumers who subscribed by telephone may prefer to cancel online); Sirius XM, FTC–2023–0033–0857 ("For example, requiring a customer to use direct mail to cancel if the customer used direct mail to accept a subscription offer would be inconvenient for the customer and not the customer's expected or desired means for cancellation. Instead, the cancellation method should be an easy-to-use mechanism for a consumer to stop recurring charge which would closely track consumer expectations and allow for changes in technology."); State AGs, FTC–2023–0033–0886 ("We respectfully suggest requiring sellers to allow *all* consumers to cancel through *any* medium that the seller uses to sell subscriptions or memberships, regardless of the medium through which that particular consumer signed up.").

[421] *See generally* section VII.A.

[422] 15 U.S.C. 57a(a)(1)(B).

[423] NPRM, 88 FR 24716 n.9. Although, as stated in the NPRM, Congress did not direct the FTC to promulgate implementing regulations, it certainly did not preclude them, and the language contained in ROSCA confirms the FTC's authority to do so. 15 U.S.C. 8404(a) ("Violation of this chapter or any regulation prescribed under this chapter shall be treated as a violation of a rule. . . ."); *see also id.*

8404(b) ("Any person who violates this chapter or any regulation prescribed under this chapter" shall be subject to penalties); *id.* 8404(c) ("Nothing in this section shall be construed to limit the authority of the Commission under any other provision of law.").

[424] Individual commenter, FTC–2023–0033–0003 ("When signing up, I didnt talk to a single individual. So its fair that when cancelling, I should not have to talk to a single individual."); Individual commenter, FTC–2023–0033–0006 (was forced to call "and speak with several agents" because unable to cancel online); Anonymous commenter, FTC–2023–0033–0044 (shouldn't be forced to make a phone call and sit on hold for hours if signed up online); Individual commenter, FTC–2023–0033–0072 (fair to consumers to allow consumers to cancel through same means as they were initiated); Individual commenter, FTC–2023–0033–0087 ("I think any offer you can buy with a click should also be an offer to unsubscribe with a click"; having to call instead is a scam); Anonymous commenter, FTC–2023–0033–0095 ("I would like to specify that [company] did not allow to terminate the account online. They specifically requested a phone call, which they then ignored for as long as possible. This practice is unfair and deceptive and needs to be outlawed."); Anonymous commenter, FTC–2023–0033–0097 (FTC should ban practice of companies only offering cancellation via phone call, despite not requiring a phone call for signup); Individual commenter, FTC–2023–0033–0274 ("having to call the company to cancel when the party clicked on the website is forced verbal speech"); Individual commenter, FTC–2023–0033–0356 ("If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. I am tired [sic] of calling some call center, waiting on hold, and then having someone go through a long script about why I should not cancel. Generally make it as easy to cancel as to sign up."); Individual commenter, FTC–2023–0033–0379 ("I have now been charged for a full month because I have to call and speak

frustration over having to hunt to find cancellation mechanisms, usually buried deep within a website or in fine print on a bill or other correspondence.[425] The Commission has brought numerous cases alleging these practices are unfair or deceptive.[426] The proposed Rule sought to prevent these unfair and deceptive practices by requiring sellers to provide an easily accessible online cancellation mechanism to consumers who enrolled

online.[427] As several commenters rightly noted, however, consumers may not always expect (and it may not always be possible) to use the same precise means for both enrollment and cancellation.[428]

Accordingly, to clarify the intent of the original language and to better match consumer expectation with actual cancellation procedures, the Commission now clarifies that where a consumer enrolls online, whether through a website, a mobile application, chat, email, or messaging, consumers must be afforded an equally simple online cancellation experience, *i.e.,* one that allows them easily to find and use the cancellation mechanism.[429]

Many commenters agreed consumers would consider a link or button located on a website or within a user's account or device settings to be "easy to find."[430] Providing a clearly-labeled

cancellation button in a consumer's account or user settings is, thus, one example of a simple online cancellation mechanism.[431] The Commission cautions, however, while such a mechanism need not be exactly the same as the consent mechanism, the seller cannot make it more difficult to use or find than the consent mechanism. For example, the seller cannot prominently label the mechanism within the account settings but make it difficult for consumers to find the account settings in the first instance.

Further, the Commission emphasizes that the cancellation mechanism must be easy to find at the time the consumer decides to cancel. Providing an easy-to-find mechanism at consent does not mean the mechanism will be easy to find later when the consumer wants to cancel, and therefore will not prevent unreasonable barriers to cancellation. Thus, providing the information necessary to find the cancellation mechanism at enrollment (as required under § 425.4) does not discharge the seller's obligation to ensure cancellation is easy to find when most relevant to the consumer.[432]

*(ii) "Interactive electronic medium" is broadly defined to include all methods of electronic communication.*

The State AGs asked the Commission specifically to address the requirements for cancellation by chat, text messaging, and email. The State AGs explained that although chat and text are increasingly common cancellation mechanisms, they share some of the same qualities and potential problems as telephone cancellation because they require interaction with a live or virtual customer representative.[433] Further, the State AGs suggested email should not be an acceptable cancellation medium for online consent.[434]

To address these concerns, the Commission revises the proposed provision to refer to "interactive electronic medium" rather than "internet." This change clearly includes text, chat, and email within the scope of online cancellation mechanisms.

---

to a representative instead of clicking to cancel."); Individual commenter, FTC–2023–0033–0443 ("If the public is allowed to set up an account online we should be allowed to cancel online without ever making a phone call. The consumer should have more rights than corporations."); Individual commenter, FTC–2023–0033–0617 ("It is truly obnoxious to be able to click to join but have to research to find the way to cancel, often involving making a phone call and being left on hold."); Individual commenter, FTC–2023–0033–0716 ("We shouldn't have to call the company to cancel!"); Individual commenter, FTC–2023–0033–0788 (requiring a call when enrolled online is "coercive and unfair"); Individual commenter, FTC–2023–0033–0822 ("I am sick of having to call a phone number to cancel something I signed up for on line, and often speaking to someone who is snide, sarcastic, or downright rude!").

[425] Individual commenter, FTC–2023–0033–0065 ("Often a company makes it significantly more difficult to even find out where or how to cancel a subscription."); Individual commenter, FTC–2023–0033–0024 ("It took a Google search to find the right Customer Service number because it was hidden or unavailable on the website."); Individual commenter, FTC–2023–0033–0084 (finally found corporate number to cancel trampoline park after scouring website for a membership enrolled online); *see also* Individual commenter, FTC–2023–0033–0067 ("why are they allowed to sign you up for automatic renewal with no way to cancel nothing on their web page in order to cancel a subscription"); Individual commenter, FTC–2023–0033–0071 (biggest annoyance is that subscriptions can be signed up for so easily with a few buttons on the remote but nearly impossible to cancel); Anonymous commenter, FTC–2023–0033–0108 ("I certainly hope this goes through. These companies make it incredibly difficult to even find the cancel or opt out option."); Anonymous commenter, FTC–2023–0033–0123 ("Straight forward plain language cancelation instructions that are easy to locate should be required."); Individual commenter, FTC–2023–0033–0124 ("Clearly there should be an easy way to unsubscribe that is easy to find."); Individual commenter, FTC–2023–0033–0560 (cancellation page should be easy to find); Individual commenter, FTC–2023–0033–0642 ("If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. I have had trouble finding where to cancel on multiple subscription services. Often, they are confusing on purpose to keep customers like me trapped in the payment cycle. Some require an email or phone call to a separate customer service representative. Cancelling should not be harder than signing up for their service."); Individual commenter, FTC–2023–0033–0685 ("I am tired of having to screen grab the fine print to figure out my options for cancelling subscriptions-it just shouldn't be this hard!?!"); Ashley Sheil on behalf of Maynooth University and in collaboration with Radboud University, FTC–2023–0033–1006 (observing that companies may take advantage of the "as easy as" requirement, and recommending any termination button should be highlighted and in an obvious location).

[426] *See* n.385 (citing simple cancellation cases).

[427] NPRM, 88 FR 24728 ("On the internet, this 'Click to Cancel' provision requires sellers, at a minimum, to provide an accessible cancellation mechanism on the same website or web-based application used for sign-up.").

[428] *See, e.g.,* ESA, FTC–2023–0033–0867 ("Such a requirement would not be helpful for players seeking to cancel a subscription, as in-game is not the place that most players would expect to find a cancellation ingress."); RILA, FTC–2023–0033–0883 ("The method that a consumer uses for initial sign-up may not be the place where that consumer would expect to find a simple cancellation function. For example, contracts are also increasingly concluded online through third parties or via social media apps. Regardless of how a customer initially signs up, once she/he establishes a purchasing arrangement with a seller, the customer will logically look to the seller to cancel the arrangement.").

[429] The Chamber asked the Commission to clarify that web-based chat is an appropriate cancellation where a consumer signs up online. As is clear from the record, unless the seller required the consumer to engage with an agent through a web-based chat to enroll, the Rule will preclude requiring the consumer to do so to cancel. There is substantial evidence this asymmetrical practice of requiring consumers to engage with agents (live or virtual) for cancellation but not enrollment is one of the principal methods sellers use to create unfair and deceptive cancellation procedures. Accordingly, it is appropriate to include limitations within the Rule to prevent unscrupulous sellers from using such practices.

[430] Individual commenter, FTC–2023–0033–0124 ("Clearly there should be an easy way to unsubscribe that is easy to find."); Individual commenter, FTC–2023–0033–0252 ("I had been thinking of contacting my Governor to suggest just such a rule that the method provided for signing up for a service must also be provided for cancelling the same service, be just as easy to find, and require no more steps than it took to sign up."); Individual commenter, FTC–2023–0033–0560 ("And ensure the bill is explicit with requirement to make it EASY TO FIND HOW TO REACH the company or cancellation page."); Individual commenter, FTC–2023–0033–0640 ("The Federal Trade Commission needs to make it mandatory for companies to have an easy to find button to cancel a subscriptions -online-."); Individual commenter, FTC–2023–0033–0784 ("And the cancel button should be easy to find and as attractively marketed as an opportunity to extend a subscription (font size,

colors, etc.)."); Individual commenter, FTC–2023–0033–1006 (cancellation should be highlighted and in an obvious location).

[431] *See, e.g.,* Cal. Bus. & Prof. Code § 1702(d)(1)(A); Conn. Gen. Stat. Ann. § 42–158ff (d)(1)(A); N.J. Stat. Ann. § 56:8–42.1.a.

[432] *See, e.g.,* Individual commenter, FTC–2023–0033–0022 ("Note that subscriptions are by their very nature long lasting in time, therefor requirements should not just emphasize some fine print disclosure at the time of sign up but also it should be easy to check back with the company or their many layers of subcontractors to cancel at anytime in the future.").

[433] State AGs, FTC–2023–0033–0886.

[434] *Id.*

**App.39**

Specifically, the phrase "interactive electronic medium" used in the "clear and conspicuous" definition includes all media that involve electronic communications (except telephone calls), whether or not they strictly use the internet (and thus would otherwise be "online"). Consumers may not know whether a text or chat is MMS (online) or SMS (offline), for example. This broader definition should provide flexibility to sellers while continuing to require parallel cancellation and sign-up procedures to meet consumers expectations.

Although the State AGs suggested prohibiting the use of email as a cancellation mechanism, the record provides no basis for doing so. Further, consistent with the Commission's definition of interactive electronic medium, several States specifically allow sellers to use email as an online cancellation method.[435] Thus, the final Rule does not bar the use of email to effectuate online cancellation.

*(iii) No interaction with representatives for online cancellation.*

The State AGs noted, and consumer comments further support, the fact that sellers have often used chat, text, and messaging to perpetrate the same abuses documented for telephone cancellation. The Commission, therefore, reiterates all cancellation mechanisms, including chat, text, messaging, and email, are subject to the same "simple" requirements, *i.e.,* sellers may not erect unreasonable barriers or prevent consumers from immediately halting charges. Cancellation mechanisms must be as easy to use as the mechanism the consumer used to sign up, in terms of time, expense, burden, and ease of use; and the mechanism must be as readily accessible as the means the consumer used to consent in the first place.

Consumer comments, as well as the Commission's and State AGs' enforcement experience demonstrate asymmetrical enrollment and cancellation experiences, such as requiring telephone cancellation when consumers can easily sign up online

without speaking with an agent, are unfair. Specifically, this asymmetry creates unreasonable barriers to cancellation, such as unreasonable hold times, unreasonable verification requirements, and aggressive save tactics. Moreover, comments and the Commission's enforcement experience indicate consumers likely understand a simple online enrollment experience as an implied claim that the cancellation experience also will be simple.[436] As consumers themselves explain, they do not anticipate engaging with a customer service representative (whether by phone, or through a web-based chat or messaging) if they did not do so to sign up for the negative option feature.[437] Thus, the Commission further clarifies, for online consent, the seller cannot require the consumer to engage with an agent or customer service representative to cancel unless the consumer did so at enrollment.[438]

Finally, the Commission declines to exclude industries providing bundled services from the same medium requirement. NCTA and other industries with such services insisted their customers are better served by speaking with a live representative, even when they enroll online.[439] They expressed concern these sellers cannot confirm a consumer's cancellation intent (consumers may want to modify or renegotiate services) or apprise consumers of any negative consequences of cancellation (loss of

access to emergency services, for example) without a live discussion.[440] They further assert providing this information online could be complicated and expensive for the seller and not what the consumer would prefer.[441] NCTA noted only 30% of its members' customers sign up online, with the remaining 70% enrolling in person or over the phone.[442]

NCTA's comment seems to suggest the simple cancellation mechanism requirement demands a certain asymmetry—specifically, no matter how complex online enrollment is, the proposed Rule would require a simple "one click" cancellation mechanism, which could preclude the seller from confirming cancellation intent or apprising consumers of negative consequences of cancellation. The Commission reiterates the simple cancellation requirement requires symmetry in terms of, *inter alia,* time, burden, expense, and ease of use. It does not require use of the exact same mechanism.

Further, existing verification procedures, such as two-factor authentication, are routinely used to ensure a consumer's identity in highly sensitive situations. Thus, they are more than sufficient to ensure the correct person is cancelling and do not require the use of a cancellation mechanism different than enrollment. Moreover, at this juncture, the Commission has removed the proposed "saves" provision from the final Rule, making communication regarding material consequences of cancelling easier to convey (so long as communicating through the same medium).

*(c) The Commission adopts § 425.6(c)(2): Telephone Cancellation as proposed, with one exception.*

The Commission adopts the telephone cancellation provision as proposed, except the final Rule removes the requirement sellers must assure all calls are answered during normal business hours. Instead, the final Rule requires sellers to promptly effectuate cancellation requests by consumers via a telephone number that is answered or records messages during normal business hours.

Several commenters suggested specific changes were necessary to enhance the proposed telephone medium requirements. For instance, the State AGs asked the Commission to include the various requirements detailed in the 2021 Enforcement Policy Statement, *e.g.,* require negative option

---

[435] *See, e.g.,* Cal. Bus. & Prof. Code § 17602 ("The business shall provide a method of termination that is online in the form of either of the following: By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information."); Conn. Gen. Stat. Ann. § 42–158ff (an electronic mail message from the business to the consumer, which is immediately accessible by the consumer and to which the consumer may reply without obtaining any additional information); N.J. Stat. Ann. § 56:8–42.1 (a termination email formatted and provided by the subscription service provider that a consumer can email to the subscription service provider without being required to provide any additional information).

[436] *See* nn.362–369; *see also* vlogbrothers, Why isn't this Illegal?, *https://www.youtube.com/watch?v=FjAw1LMShIA&pp=ygUMdmxvZ2Jyb3RoZXJz* (last visited Aug. 25, 2024).

[437] *See, e.g.,* Anonymous commenter, FTC–2023–0033–0024 (could not cancel online even though consumer could upgrade online and via TV); Individual commenter, FTC–2023–0033–0137 ("3 months to cancel, 3 minutes to sign-up. Seriously?"); Individual commenter, FTC–2023–0033–0252 (detailing three instances where consumer signed up online with a few clicks but was required to call to cancel, concluding "the method provided for signing up for a service must also be provided for cancelling the same service, be just as easy to find, and require no more steps than it took to sign up."); Individual commenter, FTC–2023–0033–0457 ("If I enrolled in a subscription online, there are no good reasons why I can't disenroll that way as well. Forcing me to call a number to unsubscribe, when it's only staffed during 'normal business hours,' unnecessarily complicates the process"); Anonymous commenter, FTC–2023–0033–0802 (this practice of making someone call or chat to someone to cancel a membership is predatory).

[438] The Chamber asked the Commission to "make clear that a web-based chat qualifies as an appropriate cancellation mechanism where a customer signed up for a service online." FTC–2023–0033–0885. The Commission reiterates that a web-based chat cancellation mechanism may be appropriate, but only if the consumer enrolled through a virtual or live agent.

[439] NCTA, FTC–2023–0033–0858; CTIA, FTC–2023–0033–0866.

[440] *Id.*

[441] *Id.*

[442] NCTA, FTC–2023–0073–0008.

sellers "not [to] erect unreasonable barriers to cancellation or impede the effective operation of promised cancellation procedures, and . . . honor cancellation requests that comply with such procedures." However, the proposed provisions already include these requirements.[443]

Nonetheless, several commenters correctly pointed out requiring sellers to answer cancellation calls during normal business hours could create considerable costs for small businesses while not directly addressing the core problem identified by the Commission—the unreasonable delay of cancellation requests. To address these concerns, the Commission first clarifies normal business hours are those hours in which the business would normally engage with its customers. A seller, however, cannot make telephone cancellation available only at times that are so inconvenient they erect a barrier to cancellation. For instance, it would be improper to limit cancellation calls to only between midnight and 3 a.m., regardless of whether these are the seller's normal business hours. Importantly, however, the final Rule does not require a seller to physically answer the telephone call (a task that could be difficult for, e.g, a sole proprietorship). An answering machine that clearly provides for cancellation (e.g., a message stating: if you want to cancel your subscription please identify that subscription, and leave identifying information) would comply with this provision of the Rule. To effectuate the provision's intent, the final Rule states sellers, whether answering the cancellation call in person or not, must effectuate that cancellation promptly. Thus, a seller could not, for example, have an answering machine it does not regularly monitor or for which it does not promptly effectuate cancellation requests.

Notably, the final Rule retains the requirement that, for the mechanism to be at least as simple as the one used to initiate the recurring charge, any cancellation call cannot be more expensive than the call used to enroll (e.g., if the sign-up call is toll free, the cancellation call must also be toll free). Consumers would not expect such fees, rendering them unfair or deceptive.[444]

*(d) The Commission adopts § 425.6(c)(3): In-Person Cancellation as proposed.*

Based on the Commission's experience and that of other States, as well as many comments in the record, requiring in-person cancellation presents significant opportunities for unfair and deceptive practices. To prevent such practices, the final Rule adopts provision 425.6(c)(3) essentially as proposed. Thus, the provision continues to require in-person sellers to provide alternatives to in-person cancellation, either online or by phone, at the seller's choice. The Commission, however, corrects the requirement that if the alternative is a telephone call, the call cannot be more costly than the in-person consent. That proposal connected two unrelated costs and thus did not make logical sense. To effectuate the purpose of this provision, however, the Commission adds language stating the call cannot impose any cost that creates an unreasonable barrier to cancellation, including by making the call unreasonably expensive.[445]

To address ICA's concerns, the Commission clarifies the Rule does not require sellers who sell in-person to maintain an alternative online presence to process cancellations. Sellers who have no such presence can allow cancellations by phone if they comply with the simple telephone cancellation requirements detailed above.

(c) § 425.6(d) Saves

(1) Summary of Comments

Proposed § 425.6(d) would have required sellers to immediately effectuate cancellation unless they obtained the consumer's unambiguously affirmative consent to receive a save prior to cancellation. The Commission explained the record shows many businesses have created unnecessary and burdensome obstacles to cancellation, including forcing uninterested consumers to sit through multiple upsells before allowing them to cancel.[446] Individual consumer commenters corroborated the pervasive use of such unfair tactics to thwart cancellation.[447]

---

[443] *E.g.,* the requirements that all cancellation mechanisms be simple and easy to use (§ 425.6), and the seller disclose where to find the cancellation mechanism prior to the sale (§ 425.4).

[444] *Cf. United States* v. *Adobe, Inc.,* No. 5:24–cv–03630 (N.D. Cal. 2024) (cancellation fees plead as a failure to disclose and failure to obtain consent to charge in violation of ROSCA); *FTC* v. *FloatMe Corp.,* No. 5:24–cv–00001 (W.D. Tex. 2024) (extra cost in relation to timing of receipt of product

deceptive in violation of section 5); *United States* v. *Cerebral, Inc.,* No. 1:24–cv–21376 (S.D. Fla. 2024) (delays in cancellation deceptive and injured consumers in violation of section 5); *FTC* v. *Bridge It, Inc.,* No. 1:23–cv–09651 (S.D.N.Y. 2023) (claims to cancel at any time without paying any fees, interest, or other charges deceptive); *FTC* v. *Vonage Holdings Corp.,* No. 3:22–cv–06435 (D.N.J. 2022) (requiring phone cancellation with roadblocks including long hold times, frequent disconnects, endless loops, and early termination fee unfair under section 5); *FTC* v. *Benefytt Techs., Inc.,* No. 8:22–cv–01794 (M.D. Fla. 2022) (unexpected cost for additional product is deceptive and unfair); *In re Dun & Bradstreet, Inc.,* FTC Docket No. C–4761 (2022) (renewal practices, including at end of designated time periods, deceptive); *FTC* v. *First Am. Payment Sys.,* No. 4:22–cv–00654 (E.D. Tex. 2022) (misrepresentations in cancellation and unfair debiting); *United States* v. *MyLife.com, Inc.,* No. 2:20–cv–6692 (C.D. Cal. 2020) (cancellation by phone discouraged or prevented by unavailable or uncooperative agents specified as a violation of ROSCA); *FTC* v. *Match Grp., Inc.,* No. 3:19–cv–02281 (N.D. Tex. 2019) (pleading cancellation difficulties in violation of ROSCA); *In re Urthbox, Inc.,* FTC Docket No. C–4676 (2019) (unexpected charges, including for a full 6 months following the first month of free trial, are a failure to disclose in violation of section 5); *FTC* v. *Cardiff,* No. 5:18–cv–02104 (C.D. Cal. 2018) (unexpected charges a section 5 misrepresentation and unfair charging); *FTC* v. *BunZai Media Grp., Inc.,* No. 2:15–cv–04527 (C.D. Cal. 2015) (failure to disclose charge as deceptive and unfair); *FTC* v. *Tarr,* No. 3:17–cv–02004 (S.D. Cal. 2017) (failure to disclose material terms deceptive and unfair); *FTC* v. *AdoreMe, Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017) (cancelling made difficult by phone, contributing to misrepresentations regarding store credit); *FTC* v. *RevMountain, LLC,* No. 2:17–cv–02000 (D. Nev. 2017) (unexpected product deceptive); *FTC* v. *AAFE Prods. Corp.,* No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC* v. *Health Formulas, LLC,* No. 2:14–cv–01649 (D. Nev. 2014) (deceptive costs).

[445] N/MA suggested there may be instances where the original method of consent is no longer available. FTC–2023–0033–0873. For example, if the person signed up a trade show in person,

returning to the in-person venue may be impossible. The Commission notes the in-person method only must be made available, "where practical."

[446] NPRM, 88 FR 24729.

[447] *See, e.g.,* Individual commenter, FTC–2023–0033–0006 ("Last year I had the pleasure of trying to cancel a radio subscription which took 2 attempts and far too much time to accomplish. Unable to cancel online, I was forced to call and speak with several agents trying to convince me to keep their service. After nearly a half hour of insisting I wanted to cancel, they simply hung up on me which forced me to start the cancellation process all over again from the beginning."); Anonymous commenter, FTC–2023–0033–0024 (able to cancel only after listening to a "long sale pitch about why he shouldn't"); Anonymous commenter, FTC–2023–0033–0066 (when you request a cancellation, will pass your call on to a more "experienced representative" in an attempt to convince you to keep your service. They do not listen to your concerns, instead make you jump through hoops for a cancellation which makes me not want to be one of their customers even more); Individual commenter, FTC–2023–0033–0071 (call to cancel and they repeatedly said "well let's just see how we can save you money" instead of canceling); Individual commenter, FTC–2023–0033–0082 ("You have to call them and endure a high pressure pitch to renew . . . . It wastes time and minutes on your phone bill"); Anonymous commenter, FTC–2023–0033–0097 (the only way to cancel a service is to call them on the phone, intended to allow for sales reps to make a pitch); Individual commenter, FTC–2023–0033–0120 ("However, when you attempt to cancel a continuous subscription you are told you cannot do that and you must call the provided phone number. You are connected to a sales person who then will negotiate with you to continue at a lower rate."); Individual commenter, FTC–2023–0033–0125 ("The only way for me to cancel this service was to CALL THEM DIRECTLY, whereupon they spent nearly half an hour trying to upsell me into a two year subscription."); Individual commenter, FTC–2023–0033–0130 ("It should not be required to call (and sit on hold forever), only to have to sit through a diatribe of hard-sell techniques to try to convince

Continued

one not to cancel.''); Individual commenter, FTC–2023–0033–0233 (''I had to wait on hold and then get sales pitch after sales pitch after sales pitch to cancel a digital-only [newspaper] subscription that I signed up for online.''); Individual commenter, FTC–2023–0033–0228 (had difficulty canceling a newspaper subscription of all things as it required consumer to call an 800 number during the day and then had to listen to multiple sales pitches and saying ''No! What part of 'no' don't you understand'' to cancel); Individual commenter, FTC–2023–0033–0312 (''I and members of my family have had to use valuable time to call corporations to cancel subscriptions, each time getting a long pitch to keep the subscription. If I wanted to keep it, I would not be calling to cancel it.''); Individual commenter, FTC–2023–0033–0356 (''If it took one click to join, it should take one click to cancel. I am tired of calling some call center, waiting on hold, and then having someone go through a long script about why I should not cancel.''); Individual commenter, FTC–2023–0033–0457 (Forcing me to call a number to unsubscribe, which is only stable during ''normal business hours,'' unnecessarily complicates the process for the provider's benefit: I don't need to give opportunity to upsell or persuade me to continue at a reduced price.); Individual commenter, FTC–2023–0033–0491 (''Some have even required me to make a phone call and listen to a hard sell before they will cancel the service.''); Individual commenter, FTC–2023–0033–0597 (have to sit and turn down multiple offers to cancel); FTC–2023–0033–0677 (sit and ''suffer through a long sales pitch'' to cancel); Individual commenter, FTC–2023–0033–0784 (''I suggest limiting the seller's efforts to pitch additional offers & modifications when trying to cancel . . . . no one wants to wade through too many of screens until the cancel 'finally' appears.''); Anonymous commenter, FTC–2023–0033–0785 (person being ''penalized by losing time waiting to speak to a customer service rep, having to decline further sales, or being stuck with recurring charges they don't want''); Individual commenter, FTC–2023–0033–0798 (difficult to cancel subscriptions, including by repeatedly forcing the customer to turn down ''special offers'' to entice the customer not to cancel); Individual commenter, FTC–2023–0033–0815 (No reason to have to call customer service reps who will keep trying to prevent me from canceling); Individual commenter, FTC–2023–0033–0835; Individual commenter, FTC–2023–0033–0850 (Have to make a long awkward phone call and wait on hold or long repetitive live chat); Individual commenter, FTC–2023–0033–0913 (''I've experienced having to call to cancel a subscription only to be forced to listen to a sales spiel in order to do so.''); Individual commenter, FTC–2023–0033–0967 (''Some have even required me to make a phone call and listen to a hard sell before they will cancel the service.''); Individual commenter, FTC–2023–0033–0999 (Consumers should have an on-line option to cancel. A national media company ONLY provides a cancel option with a call to customer service. When doing so, you are met with a CS rep that will not accept your request to cancel, talks over you, continued harassment, making offer after offer. We must stop this deceptive practice.); Individual commenter, FTC–2023–0033–1063 (''Now I'm about to cancel my [company name] account. If it's anything like the last time when I moved, I expect to spend several hours dealing with multiple levels of salespeople, trying to convince me to stay.''); Individual commenter, FTC–2023–0033–1099 (Once customer service is contacted, it should not take more than about 90 seconds to cancel a subscription instead of the endless questions of why you want to cancel. Then try to keep you by offering a discounted rate on yet another year of useless service. Please make this end.); Individual commenter, FTC–2023–0033–1138 (The agent, made multiple attempts to sell me the service, disregarding my many direct statements

However, other commenters explained some of the ''barriers'' consumers complained about are necessary to prevent harm, at least in certain situations. Specifically, commenters noted consumers might not understand the negative consequences of cancellation,[448] and the provision might prevent consumers from taking advantage of money-saving offers prior to cancellation.[449] Some commenters also expressed confusion regarding whether verification or authentication procedures, or discussion of consumers' attempts to pause or modify their existing offers, would violate the Rule.[450] Finally, commenters noted the proposed provision requiring consumers to opt-in to saves could interfere with the simplicity of a cancellation mechanism.[451]

*(2) Analysis*

Based on the record, the Commission determines revisions to this proposed provision are necessary, for which the Commission would need to seek additional comment. Therefore, the Commission does not adopt this provision in the final Rule at this time. On one hand, the record demonstrates saves are often used simply as a barrier to prevent cancellations.[452] On the other, the proposed opt-in save provision could have unintended consequences.[453] Specifically, the provision may thwart attempts to confirm consumers' intent or apprise consumers of any negative consequences of cancellation (*e.g.,* losing data). Moreover, the opt-in save provision may prevent consumers from obtaining valuable concessions (*e.g.,* lower prices), which they would otherwise want.

Consequently, the proposed saves provision did not achieve the right balance between protecting consumers

from unfair tactics and allowing sellers to provide necessary and valuable information about cancellation. Therefore, the Commission will consider issuing an SNPRM in the future seeking a better solution to this difficult problem.

However, the Commission notes the removal of the saves proposal is not a license to erect unreasonable and unnecessary barriers to cancellation. The final Rule requires sellers to provide a simple, easy to use cancellation mechanism. Save attempts that interfere with this mandate by requiring consumers to navigate through upsells, jump through unreasonable hoops, or wait unreasonable amounts of time to cancel are neither simple nor easy.[454]

*7. Proposed § 425.7 Annual Reminders*

In the NPRM, the Commission proposed requiring sellers to provide an annual reminder to consumers for non-physical goods with a negative option feature. Under this proposal, reminders would have needed to identify the product or service, the frequency and amount of charges, and the means to cancel. Additionally, the proposal required Negative Option Sellers to provide the reminders through the same medium the consumer used to consent to the negative option feature. The Commission opined the delivery of physical goods may remind consumers they enrolled in a negative option feature. Therefore, these consumers effectively already receive reminders and can reasonably avoid further payments by canceling their subscription. For services lacking a regular, tangible presence (*e.g.,* data security monitoring or subscriptions for online services), however, many consumers may reasonably forget they enrolled and, consequently, incur charges for services they do not want or use. Thus, the Commission concluded, the failure to provide reminders for such contracts would meet all elements of unfairness.[455] The Commission sought

---

that I just wanted to cancel.); Individual commenter, FTC–2023–0033–1150 (They make you call their company so that sales retention can try to talk you into staying with freebies etc.); Individual commenter, FTC–2023–0033–1153 (There is no reason a person should be subjected to 20 minutes or repeated drilling if they say upfront that they want to cancel service.).

[448] NCTA, FTC–2023–0033–0858; PDMI, FTC–2023–0033–0864; Chamber, FTC–2023–0033–0885.

[449] *Id.*

[450] *See, e.g.,* PDMI, FTC–2023–0033–0864; ANA, FTC–2023–0033–1001; CTIA, FTC–2023–0033–0866.

[451] *See, e.g.,* CCIA, FTC–2023–0033–0984. Some commenters also argued the saves provision violates the First Amendment. *E.g.,* PDMI, FTC–2023–0033–0864; Chamber, FTC–2023–0033–0885; ACT App Association, FTC–2023–0033–0874. The Commission rejects this proposition. *See Mainstream Mktg. Servs., Inc.* v. *FTC,* 358 F.3d 1228 (10th Cir. 2004).

[452] *See* nn.447–448.

[453] *See* nn.449–452.

---

[454] *See, e.g., United States* v. *Adobe, Inc.,* No. 5:24–cv–03630 (N.D. Cal. 2024); *FTC* v. *Amazon.com, Inc.,* No. 2:23–cv–0932 (W.D. Wash. 2023).

[455] NPRM, 88 FR 24729, citing FTC Policy Statement on Unfairness, appended to *In re International Harvester Co.,* 104 F.T.C. 949 (1984). ''To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.'' *Id.; see also* 15 U.S.C. 45(n) (Commission has no authority to declare a practice unfair ''unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not

comment on this proposal, including whether it should narrow the coverage of the proposed language, for example, by types of covered services or the duration between reminders.[456]

(a) Summary of Comments

The Commission received 32 comments in response.[457] Consumers, public interest and consumer advocacy groups, and academics, among others, generally supported the reminder requirement, observing, for example, that "subscription-based products and services have become so widespread that consumers are having difficulty keeping track of them all."[458] The commenters asserted the proposed "annual notice will clearly inform consumers of the terms of the contract and how they may terminate the agreement."[459] Despite this support, virtually every group of commenters—individuals, consumer advocates, trade organizations, and industry groups—suggested the Commission modify or clarify its proposal.

Only three commenters specifically requested the Commission jettison a reminder provision altogether. Specifically, ESA argued the requirement (1) would impose a significant burden on businesses because several State laws already require reminders or notices; (2) would be improper because the Commission did not raise reminders in the ANPR; and (3) would increase the overall number of notices consumers receive, which could result in consumers ignoring reminders, thus benefiting bad actors. NCTA suggested the Commission should instead "allow businesses flexibility to determine whether to provide reminders."[460] IAB also "recommend[ed] that the Commission remove this requirement for several reasons."[461] Both ESA and NCTA conceded, however, the Commission could adopt the provision with additional modifications, such as making the reminders optional (NCTA)

or offering consumers the ability to opt-out of subscription reminders (ESA).[462] Other commenters agreed, asking for "less prescriptive" requirements that would allow businesses more flexibility.[463]

Several commenters, while not urging the Commission to reject the reminder requirement, suggested the NPRM proposal did not satisfy the unfairness test. For instance, CTA, a technology trade association, questioned whether there was sufficient basis to find a lack of annual reminder is an unfair practice or causes consumer harm.[464] Similarly, two other commenters from the communications industry questioned whether a lack of annual reminder would be unfair in the specific context of services that are "always on," such as cable or wireless services.[465]

A few commenters asked to be exempted from the reminder requirement based on the nature of their industries or the frequency of existing notices.[466] For instance, cable/broadband/wireless/streaming industry groups suggested they should be exempt for the same reasons they argued the unfairness test did not render the lack of reminders illegal in their industries. Similarly, these and other sellers, such as service contract providers, suggested consumers who receive monthly bills are already effectively receiving reminders, and, therefore, these transactions should be exempt.[467]

Several commenters questioned the proposed requirement that sellers provide the annual reminder through the same medium the consumer used to consent to the negative option feature.[468] For example, several

commenters observed that requiring reminders through a telephone call could violate the TCPA, the TSR, or at minimum, be a nuisance, and thus ignored by consumers.[469] Many of these commenters advocated for letting consumers choose how they want to receive annual reminders,[470] or allowing sellers to provide reminders through any medium they typically use to communicate with consumers.[471]

Additionally, several commenters disagreed with the Commission's observation that agreements involving delivery of physical goods inherently create a "regular, tangible presence" that serves as a reminder of the contract.[472] For example, they noted some companies charge a monthly fee, but only deliver physical goods at the consumer's request.

Some commenters stated that, without Federal preemption, the annual reminder requirement would create another layer of regulatory complexity because several State laws already require reminders or notices.[473] In contrast, Professor Hoofnagle stated many "credit card processing service" providers likely afford a simple and inexpensive means for sellers to comply with State and Federal mandates "because policy changes can be made programmatically in dashboards."[474]

Several commenters suggested the Commission amend the proposal. For instance, TINA and several individual consumers recommended the Commission require reminders at the end of a free trial period.[475] Others suggested the Commission require more frequent reminders, such as every six

[456] NPRM, 88 FR 24729; *see also id.* at section XIII, Request for Comments ("The Commission seeks any suggestions or alternative methods for improving current requirements.").

[457] The Commission received comments from, *inter alia,* individual consumers; cable/broadband/communications industry groups; public interest and consumer advocacy groups; various trade associations representing traditional and digital marketing, technology, news and magazine media, gaming and entertainment, and retail industries; academic and public policy groups; and service contract and alarm company industries.

[458] State AGs, FTC–2023–0033–0886.

[459] Public Interest Groups, FTC–2023–0033–0858.

[460] NCTA, FTC–2023–0033–0858.

[461] IAB, FTC–2023–0033–1000.

[462] ESA, FTC–2023–0033–0867; NCTA, FTC–2023–0033–0858.

[463] *See, e.g.,* Sirius XM, FTC–2023–0033–0857 (asking Commission not to mandate exactly how renewal notices must be sent); N/MA, FTC–2023–0033–0873 (allow sellers to obtain consent to provide notice through alternate means); Chamber, FTC–2023–0033–0885 (proposed revisions); DCN, FTC–2023–0033–0983 (make annual notice an option company could comply with to provide adequate notice of obligations); ACT App Association, FTC–2023–0033–0874 (adopt a less prescriptive approach so same medium can be used to comply with State and Federal requirements).

[464] CTA, FTC–2023–0033–0997 (no basis to conclude different medium is unfair, or that lack of reminders is unfair).

[465] NCTA, FTC–2023–0033–0858 (lack of notice for "always on" services not unfair, injury reasonably avoidable); USTelecom, FTC–2023–0033–0876 (same).

[466] *See, e.g.,* CTIA, FTC–2023–0033–0866 (exempt mobile services offered on a month-to-month basis); USTelecom, FTC–2023–0033–0876 (exempt broadband and communication services). The Commission addresses exemptions in the SBP at sections VII.B.1 and VIII.

[467] *See, e.g.,* Chamber, FTC–2023–0033–0885.

[468] Sirius XM, FTC–2023–0033–0857; Kuehn, FTC–2023–0033–0871; N/MA, FTC–2023–0033–

0873; Act App Association, FTC–2023–0033–0874; CTA, FTC–2023–0033–0997; Chamber, FTC–2023–0033–0885; ANA, FTC–2023–0033–1001.

[469] Sirius XM, FTC–2023–0033–0857; Kuehn, FTC–2023–0033–0871; N/MA, FTC–2023–0033–0873; Chamber, FTC–2023–0033–0885; SCIC, FTC–2023–0033–0879.

[470] Sirius XM, FTC–2023–0033–0857; Kuehn, FTC–2023–0033–0871; Chamber, FTC–2023–0033–0885; Public Interest Groups, FTC–2023–0033–0880.

[471] State AGs, FTC–2023–0033–0886.

[472] Individual commenter, FTC–2023–0033–0026; TINA, FTC–2023–0033–1139.

[473] NCTA, FTC–2023–0033–0858; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000; ACT App Association, FTC–2023–0033–0874.

[474] Hoofnagle, FTC–2023–0033–1137.

[475] Individual commenter, FTC–2023–0033–0039 (not intended "that the free trial was up"); Individual commenter, FTC–2023–0033–0045 ("consumer should get an email reminder their free period is about to end"); Individual commenter, FTC–2023–0033–0050 (businesses should "be required to provide advance notice that the free trial is about to expire."); TINA, FTC–2023–0033–1139; ACT App Association, FTC–2023–0033–0874 (provide less prescriptive process).

outweighed by countervailing benefits to consumers or to competition").

months, or before each charge.[476] They noted that under an annual notice requirement, a consumer could be charged up to 12 times before discovering a negative option feature.[477] One commenter asked the Commission to require a reminder for so-called "zombie" agreements, ones that have long periods, *e.g.,* 24 months, of inactivity.[478]

In contrast, other commenters noted consumers may suffer from "notice fatigue" given the increasing popularity of subscription services.[479] Some argued there is no evidence of tangible consumer benefit from additional notices, and consumers should be given a choice whether to opt-in to receive annual reminders (or more frequent reminders), or to opt-out.[480] Three commenters suggested sending annual reminder notices could increase opportunities for phishing and other deceptive practices.[481]

Finally, several commenters asked the Commission to clarify certain aspects of the reminder requirement. For instance, ANA asked the Commission to explain what constitutes the "same medium," and a group of law professors asked for more detail about what constitutes an adequate telephone reminder.[482] Additionally, some commenters asked the Commission to clarify that sellers can rely on contact information provided by the consumer at the time of consent,[483] or to provide that abiding by State reminder requirements satisfies a seller's obligations under this provision.[484]

**(b) Analysis**

After reviewing these comments, the Commission determines it needs additional information on the scope and particularities of the proposed annual reminder requirement. The record suggests, given the proliferation of subscription and auto-renewal services, consumers have difficulty tracking all the negative option services and products in which they may be enrolled—so much so that there are now companies claiming to help consumers keep track of these services for a fee. As one commenter noted, consumers should not have to sign up for yet another service to manage all their subscriptions.[485] Thus, limiting the reminder provision to just non-physical goods, and only annually, may not adequately mitigate the harm caused by negative option practices in the marketplace.

Additionally, the Commission shares some commenters' concerns that consumers may ignore these reminder calls. Further, as some commenters noted, the proposed provision does not specify the timing for these reminders (*e.g.,* should sellers issue reminders annually from the date of initial purchase and a specific number of days before the charge?). Accordingly, the Commission will consider issuing a SNPRM seeking additional comment on these issues at a later date.

**8. Proposed § 425.8 Relation to State Laws**

In its NPRM, the Commission proposed that amendments to the Rule would not affect State laws, regulations, orders, or interpretations relating to negative options, except to the extent they are inconsistent with the final Rule, and then only to the extent of the inconsistency. A State provision would not be "inconsistent" with the proposed Rule if it affords any consumer greater protection than the Rule.[486]

The Commission received a range of comments in response. On one end, a commenter opined the "FTC cannot preempt existing [State] laws," so it should instead strive for "harmonization and consistency with existing laws."[487] At the other end, multiple industry groups said the

Commission should completely preempt State laws in this area.[488] These commenters argued having both State and Federal standards may confuse consumers and create financial and operational burdens for sellers, thus raising consumer prices. For example, NCTA asserted that, without preemption, the proposed Rule "would encourage the enactment of new [S]tate laws with differing standards."[489] Another industry commenter suggested the Commission should work with lawmakers on one national standard.[490]

Other industry groups and individual businesses supported preemption in various ways. For example, CTA argued the Rule should "preempt [S]tate laws with differing requirements."[491] Two additional commenters, including a mixed group of industry associations, asserted the Rule should set the ceiling and preempt any State provision that is more stringent.[492]

NRF said the Rule should "preempt any [S]tate law requirements that contradict or are inconsistent with the Rule . . . to the extent of the inconsistency."[493] To effectuate this change, NRF suggested the Commission adopt language from California's Automatic Renewal Law, which it said other States have copied. NRF proposed State laws be deemed inconsistent if they require disclosures or actions "that contradict . . . the [final rule]," and requirements be deemed contradictory if they use the same terms differently from the final rule or require "using a term different from the one required in the [final rule] to describe the same item."[494]

Several industry groups expressed concern regarding potential confusion about preemption. For example, ACA Connects asserted it "may be unclear whether and to what extent [a particular State law offers] 'greater' or 'lesser' protection than [the proposed Rule]" and asked for more guidance generally or for a process that lets interested parties ask the Commission if a

---

[476] Public Interest Groups, FTC–2023–0033–0880 ("consumers deserve to know when they are about to be charged automatically, with a chance to opt out"); State AGs, FTC–2023–0033–0886; MIA, FTC–2023–0033–1008; Individual commenter, FTC–2023–0033–0026 (notification within one month of renewal, stating specific renewal date); Individual commenter, FTC–2023–0033–0708 (commenting that companies do not provide reminders before being charged, possibly overdrawing an account).

[477] *See, e.g.,* Public Interest Groups, FTC–2023–0033–0880.

[478] Law Professors, FTC–2023–0033–0861.

[479] NCTA, FTC–2023–0033–0858; USTelecom, FTC–2023–0033–0876; CCIA, FTC–2023–0033–0985 (recommending a biannual reminder for longer subscriptions); and Coalition, FTC–2023–0033–0884; *see also* DCN, FTC–2023–0033–0983 (incorrectly states the current proposed rule would require monthly notice for month-to-month renewals).

[480] NCTA, FTC–2023–0033–0858 (opt in); ESA, FTC–2023–0033–0867 (opt out); Chamber, FTC–2023–0033–0885 (opt in); DCN, FTC–2023–0033–0983 (opt out); Public Interest Groups, FTC–2023–0033–0880 (opt out).

[481] NCTA, FTC–2023–0033–0858; ESA, FTC–2023–0033–0867; DCN, FTC–2023–0033–0983.

[482] ANA, FTC–2023–0033–1001 (same medium); Law Professors, FTC–2023–0033–0861 (adequate phone reminder).

[483] Sirius XM, FTC–2023–0033–0857; NFIB, FTC–2023–0033–0789.

[484] ACT App Association, FTC–2023–0033–0874.

[485] State AGs, FTC–2023–0033–0886 ("Subscription management has become an entire industry; consumers can choose from a variety of companies that offer to monitor their recurring subscriptions. We believe that consumers should not have to sign up for yet another service—one that comes with privacy and security risks, as subscription monitoring services require sharing financial account and other sensitive information—in order to effectively manage their subscriptions.").

[486] *See* proposed § 425.8.

[487] ANA, FTC–2023–0033–1001.

[488] NCTA, FTC–2023–0033–0858; PDMI, FTC–2023–0033–0864; CCIA, FTC–2023–0033–0984; ESA, FTC–2023–0033–0867; IAB, FTC–2023–0033–1000.

[489] NCTA, FTC–2023–0033–0858; *see also* Chamber, FTC–2023–0033–0885 ("A floor just creates an increased [F]ederal burden without actually ensuring consistency of overall regulation on entities in the different [S]tates.").

[490] IHRSA, FTC–2023–0033–0863 (national standard).

[491] CTA, FTC–2023–0033–0997; *see also* Sirius XM, FTC–2023–0033–0857; DCN, FTC–2023–0033–0983.

[492] Coalition, FTC–2023–0033–0884; CCIA, FTC–2023–0033–0984.

[493] NRF, FTC–2023–0033–1005.

[494] *Id.*

App.44

particular State law is inconsistent.[495] NRF noted such a system has worked well with gift card laws, explaining the CARD Act (Pub. L. 111–24, 124 Stat. 2385) preempts less restrictive State laws.[496]

Finally, a group of law professors supported the Commission's proposed Rule. They noted "more than half of [S]tates . . . regulate some negative option marketing practices," and said the Commission "does not occupy the field or displace non-conflicting [S]tate [laws]." [497] The professors added States "can often move more nimbly to address problematic elements and evolving business models" and should retain the ability to do so.[498]

Having considered the foregoing comments, the Commission will streamline the text of the final Rule for clarity and efficiency, while maintaining the substance of the proposed Rule's proposed preemption language (renumbered in the final Rule as § 425.7). The FTC Act does not expressly preempt State law, and the legislative history of the FTC Act indicates Congress did not intend the FTC to occupy the consumer protection regulation field.[499] Therefore, any preemptive effect of the Rule must be limited to instances where it is not possible to comply with both State law and the Rule, or where application of State law would frustrate the purposes of the Rule.[500] This approach preserves States' ability to continue to act as laboratories to handle new and changing business models. This approach is consistent with other Commission Rules.[501]

Therefore, § 425.7 of the final Rule specifies the Rule does not supersede, alter, or affect State statutes, regulations, orders, or interpretations relating to negative option marketing, except to the extent a State statute, regulation, order, or interpretation is inconsistent with the

Rule. The final language also continues to make clear State requirements are not inconsistent with the Rule to the extent they afford greater protection to any consumer. The manners in which a State law may provide greater protection are many. For example, a State law that requires sellers to remind consumers at the end of a free trial that they are about to be billed would provide greater protection to consumers and not be inconsistent with the Rule.

**VIII. Modifications, Alternatives Considered**

*A. New Provisions in Final Rule for Clarification*

1. New § 425.8 Exemptions

The NPRM sought comment on whether the Rule should exempt any entities or activities that are otherwise subject to the Commission's authority under the FTC Act.[502] Several commenters requested Rule exemption for their business or industry.[503] These commenters made various arguments based on the law and facts in their particular circumstances. For example, some argued existing State licensing and other requirements that already apply to their activities adequately address the problems identified in the NPRM and additional rules would only interfere with the existing regulatory structure. Because such decisions are highly fact dependent, the Commission must consider exemptions, even of larger groups, on an individualized basis pursuant to the FTC's Rules of Practice.[504] Pursuant to these rules, interested persons may file petitions for exemption with relevant evidence and data. If the Commission deems the petition sufficient to warrant further consideration, it will follow the procedures outlined in § 1.31 of its rules.

The Commission adopts a new section, § 425.8. Pursuant to this provision, and consistent with the Commission's Rules of Practice, sellers

and other covered persons may seek full or partial exemptions if they can demonstrate application of the Rule's requirements to a particular product or service, or class of product or service, is not necessary to prevent the acts or practices to which the Rule relates.

2. New § 425.9 Severability

One commenter, NFIB, asked the Commission to address severability in the Rule.[505] Specifically, NFIB proposed a provision stating if a court finds any part of the Rule to be invalid, then the remainder of the Rule remains in force. The Commission agrees with this proposal. It is the Commission's intent that the provisions of the final Rule are separate and severable from one another; therefore, if any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect. Thus, the final Rule includes this language in a new section, § 425.9.[506]

*B. Notice of Material Changes*

In the NPRM, the Commission sought comment on whether and how sellers should notify consumers when they make material changes to contracts with a negative option.[507] As discussed in the NPRM, several commenters responding to the ANPR recommended the Commission require sellers to send consumers notices of such changes. TINA, for example, asserted the Commission should require such notice and provide consumers an opportunity to cancel before the terms become effective.[508] Several States require similar notices.[509] The Commission, however, did not require notice of material changes in the proposed Rule. As it explained at the time, whether a seller's failure to provide such notice is unfair or deceptive is a highly fact-specific inquiry that must be determined on a case-by-case basis. Given the importance of the issue, however, the Commission requested further comment.

1. Summary of Comments

Five commenters responded.[510] TINA reiterated sellers should provide

---

[495] ACA, FTC–2023–0033–0881 (greater or lesser); NRF, FTC–2023–0033–1005 (more guidance); DCN, FTC–2023–0033–0983 (more guidance).

[496] NRF, FTC–2023–0033–1005.

[497] Law Professors, FTC–2023–0033–0861.

[498] *Id.*

[499] *See, e.g., Am. Fin. Servs. Ass'n* v. *FTC,* 767 F.2d 957, 989 (D.C. Cir. 1985).

[500] Preemption would occur where there is an actual conflict between the two schemes of regulation such that both cannot stand in the same area. *Fla. Lime & Avocado Growers, Inc.* v. *Paul,* 373 U.S. 132, 141 (1963); *see also Am. Fin. Servs. Ass'n* v. *FTC,* 767 F.2d 957 (D.C. Cir. 1985) (Credit Practices Rule); *Harry & Bryant Co.* v. *FTC,* 726 F.2d 993 (4th Cir. 1984) (Funeral Rule); *Am. Optometric Ass'n* v. *FTC,* 626 F.2d 896 (D.C. Cir. 1980) (Ophthalmic Practices Rule).

[501] *See, e.g.,* 16 CFR 437.9(b) (Business Opportunity Rule); *id.* 435.3(b) (Merchandise Rule); *id.* 436.10 (Franchise Rule); *id.* 429.2 (Cooling-Off Rule).

[502] *See, e.g.,* NPRM, 88 FR 24730.

[503] Categories of products and services for which commenters sought exemptions include: alarm companies (FTC–2023–0033–0860; FTC–2023–0033–1001); wireless carriers (FTC–2023–0033–0866); telecommunication providers (FTC–2023–0033–0876; FTC–2023–0033–0881); service contracts (FTC–2023–0033–0877; FTC–2023–0033–0879; FTC–2023–0033–0882; FTC–2023–0033–0996; FTC–2023–0033–1136; FTC–2023–0033–1143); insurance agreements, service contracts on consumer goods, and cancellable month-to-month agreements (FTC–2023–0033–0878); and retail energy service (FTC–2023–0033–1151). Some of these and others sought to exclude B2B agreements. *See* section VII.B.1.c.

[504] *See* 16 CFR 1.25, 1.31; *see also* 86 FR 59851 (Oct. 29, 2021) (amending Commission procedures and rules on the petition exemption process).

[505] NFIB, FTC–2023–0033–0789.

[506] This provision is comparable to the severability provision in other Commission Rules. *See* 16 CFR 437.10 (Business Opportunity Rule); 16 CFR 455.7 (Used Motor Vehicle Rule); 16 CFR 436.11 (Franchising Rule); 16 CFR 453.8 (Funeral Industry Rule); 16 CFR 310.9 (TSR).

[507] NPRM, 88 FR 24730.

[508] NPRM, 88 FR 24724.

[509] Those States include Virginia, California, and Oregon. NPRM, 88 FR 24724.

[510] ESA, FTC–2023–0033–0867; USTelecom, FTC–2023–0033–0876; ACA, FTC–2023–0033–0881; IAB, FTC–2023–0033–1000; and TINA, FTC–2023–0033–1139.

consumers with notice of material changes to subscription terms.[511] Further, it asserted the Commission's reasoning is at odds with State laws and the Commission's longstanding position on material terms, *i.e.*, that they be "clearly and conspicuously disclosed when relevant to the marketing being presented." [512] TINA further argued allowing businesses to "hide" material changes to these contracts is likely to cause injury because consumers "do not read these contracts (let alone monitor them for changes) and a significant minority of consumers are not even aware they are bound by these subscription contracts." [513]

In contrast, ESA, USTelecom, ACA, and IAB supported the Commission's proposal. IAB and ESA said it is "industry practice for subscription-based services and products to have regular price increases over time," and consumers expect it.[514] USTelecom agreed with the Commission's rationale that "whether such a practice is unfair or deceptive depends heavily on the facts presented in each case." [515] ACA, a telecommunications trade association, noted the FCC and States already have notice requirements for contract term changes.[516]

### 2. Analysis

Based on the record, the Commission does not require notice of material changes to contract conditions in the final Rule. The final Rule requires the seller disclose important information prior to charging the consumer. Such information includes all material terms, including, *e.g.*, the range of costs the consumer will be charged and the frequency of charges that will incur unless the consumer takes timely steps to prevent or stop them. The seller's failure to disclose such information upfront, clearly and conspicuously, violates the Rule.

Moreover, State laws have different predicate requirements (*e.g.*, less robust initial disclosures) and, importantly, are often based on different legal authority. Additionally, the Commission's final Rule does not conflict with its longstanding advice on clear upfront disclosure. The final Rule requires just such disclosure, § 425.4; and the Commission has never required after sale disclosure based on its section 5 authority.

Finally, as the Commission explained in the NPRM, whether a seller's failure to notify a consumer of material changes is unfair or deceptive could be heavily dependent on the particular facts and circumstances, such as the seller's upfront marketing claims. For example, based on a clear upfront agreement to allow periodic price increases, consumers may understand that firms can make small price increases over long periods of time. On the other hand, significant unilateral changes to the terms of the agreement, such as huge prices increases over short periods of time would probably be inconsistent with reasonable consumer expectation, and therefore, deceptive or unfair. Because the determination of whether a practice runs afoul of section 5 in this context is highly fact dependent, the Commission declines to address it at this time. Nevertheless, the Commission will continue to monitor the need for such a requirement and will continue to bring enforcement actions when appropriate.

### C. Consumer Education

The Commission solicited comments on alternative approaches such as additional consumer and business education, and received two comments in response.[517] The Commission plans to continue its efforts to provide information to help consumers with their purchasing decisions and avoid ensnarement in unwanted recurring payment programs. However, consumer education is not a substitute for improving existing regulatory provisions. Consumer education is likely to have a limited benefit where sellers lure consumers into an agreement without consumers' knowledge, particularly with the use of dark patterns.

### D. Implementation Date

Several industry groups and one individual commenter asked the Commission to delay the final Rule's effective date. Three commenters sought a delay of at least 12 months or up to 18 months, citing generalized concerns that changes can take time "given the complexities" of the proposed Rule.[518] The Chamber asked for a two-year period "depending on the scope and specific requirements of the final

rule." [519] By contrast, consumers generally encouraged the Commission to enact the Rule without delay.[520]

None of the commenters identified a precise period it would take to comply with a specific provision or otherwise detailed what would necessitate a particular length of time.[521] They did, however, detail the general actions they would need to take. For example, NCTA explained, "this proposal would require companies to change and update their customer processes and user interfaces to provide the mandated notices, obtain additional consent, and implement cancellation mechanisms," as well as troubleshoot those changes in a careful way to avoid "glitches and issues that would affect service and frustrate and harm consumers." [522]

The Commission recognizes changes to processes and disclosures typically require some time to address and has regularly provided a grace period for implementation of its rules.[523] Small businesses in particular may require time to ensure their modified processes conform to the Rule. To address these concerns, the final Rule provides 180 days from the date the final Rule is published to come into full compliance. However, sellers must comply with § 425.3 60 days after publication of the Rule, consistent with 5 U.S.C. 801(a)(3). This section prohibits misrepresentations in connection with a negative option feature. Existing law already requires sellers not to make misrepresentations. Therefore, this provision should not impose an added time or cost burden on businesses operating lawfully.[524]

The Commission recognizes the remainder of the final Rule may require some businesses to implement or modify systems, software, or procedures. As detailed in the NPRM, however, the existing legal landscape already includes a patchwork of relevant Federal laws and regulations in

---

[511] TINA, FTC–2023–0033–1139.

[512] *Id.*

[513] *Id.*

[514] IAB, FTC–2023–0033–1000; ESA, FTC–2023–0033–0867.

[515] USTelecom, FTC–2023–0033–0876.

[516] ACA, FTC–2023–0033–0881.

[517] *See* NPRM. 88 FR 24730; NFIB, FTC–2023–0033–0789 (requesting a business education enforcement provision); Hoofnagle, FTC–2023–0033–1137 (consumer and business education probably uneconomical intervention).

[518] IAB, FTC–2023–0033–1000 (at least 12 months); ESA, FTC–2023–0033–0867 (12–18 months); Kuehn, FTC–2023–0033–0871 (12–18 months).

[519] Chamber, FTC–2023–0033–0885.

[520] Individual commenter, FTC–2023–0033–0257; Individual commenter, FTC–2023–0033–0685.

[521] ACA, FTC–2023–0033–0881; SCIC, FTC–2023–0033–0879 (noting many States require service contract forms be filed with State regulators for approval); ANA, FTC–2023–0033–1001; NCTA, FTC–2023–0033–0858.

[522] NCTA, FTC–2023–0033–0858.

[523] *E.g.,* 38 FR 33766 (Dec. 7, 1973) (original Negative Option Rule, 6-month grace period); 60 FR 43842 (Aug. 23, 1995) (TSR. 4-month grace period); 89 FR 26767 (Apr. 16, 2024) (TSR amendment, 180-day grace period); 79 FR 55615 (Sept. 17, 2014) (Merchandise Rule amendments, 3-month grace period).

[524] Similarly, the various procedural sections of the Rule, *e.g.,* § 425.1 (Scope), § 425.2 (Definitions); § 425.7 (Relation to State Laws), § 425.8 (Exemptions), and § 425.9 (Severability) are also operative 60 days after publication.

Appellate Case: 24-3137      Page: 46      Date Filed: 12/05/2024 Entry ID: 5463205

addition to State laws to address sellers' negative option practices.[525] The Commission has also issued guidance to businesses on the basic requirements that negative option marketers must follow to avoid deception.[526] Compliance with these statutes and regulations should mean sellers have a significant head start on their compliance efforts.

Moreover, the Commission has streamlined the final Rule, significantly reducing the compliance burdens. Specifically, for reasons detailed in section VII, above, the final Rule omits or modifies proposed requirements that gave some commenters particular concern. Most notably, the Commission omitted the entire annual reminder and saves requirements. As commenters pointed out, these two sections imposed the greatest compliance burdens on sellers.[527] Their removal, therefore, should substantially reduce the time and expense needed to ensure processes comply.

Similarly, other modifications should clarify and streamline requirements, making compliance easier. For example, the final Rule eliminates certain recordkeeping requirements.[528] Additionally, the final Rule narrows the required disclosures.[529] These changes combined with existing law obviate the need for a lengthy grace period.

### E. Anti-Abuse Provision

The Law Professors suggested the Commission include an "anti-abuse" provision to provide a mechanism for enforcement against sellers' attempts to evade the Rule.[530] Such a provision would make it an "unfair or deceptive act or practice" for a seller to, for example, set up a facially complicated sign-up process to allow for a similarly complicated cancellation process, but in practice to simplify the sign-up process to maximize enrollment.[531] As the Law Professors acknowledge, such attempts to evade the Rule already violate the Rule, and the record does not suggest a need for such an additional anti-abuse provision.

### IX. Congressional Review Act

Pursuant to the Congressional Review Act, 5 U.S.C. 801 *et seq.,* we anticipate the Office of Information and Regulatory Affairs will designate the final Rule as a "major rule," as defined by 5 U.S.C. 804(2).

### X. Final Regulatory Analysis

Under section 22(a) of the FTC Act, 15 U.S.C. 57b–3(a), the Commission must issue a preliminary regulatory analysis for a proceeding to amend a rule if the Commission: (1) estimates that the amendment will have an annual effect on the national economy of $100 million or more; (2) estimates that the amendment will cause a substantial change in the cost or price of certain categories of goods or services; or (3) otherwise determines that the amendment will have a significant effect upon covered entities or upon consumers. Although the Commission preliminarily determined the proposed amendments to the Rule would not have such effects on the national economy; on the cost of goods and services offered for sale by mail, telephone, or over the internet; or on covered parties or consumers, several commenters raised concerns with the Commission's preliminary determination. Ultimately, the presiding officer determined, after receiving additional comments from interested stakeholders, the proposed amendments would have such effect.[532] In accordance with section 22, the Commission therefore issues its final regulatory analysis below.

### A. Introduction

Under section 22 of the FTC Act, 15 U.S.C. 57b–3, the final regulatory analysis must contain (1) a concise statement of the need for, and objectives of, the final rule; (2) a description of any alternatives to the final rule which were considered by the Commission; (3) an analysis of the projected benefits, any adverse economic effects, and any other effects of the final rule; (4) an explanation of the reasons for the determination of the Commission that the final rule will attain its objectives in a manner consistent with applicable law and the reasons the particular alternative was chosen; and (5) a summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

The Commission received comments from trade associations regarding the preliminary regulatory analysis in the NPRM, and three presented testimony and expert reports at the informal hearing. Comments and testimony, including reports submitted by experts, were largely conclusory in nature.[533] The general theme of the comments and testimony, however, was that the compliance costs would be higher than those estimated in the NPRM's preliminary analysis, and the Commission herewith presents revised estimates of those compliance costs.

### B. Regulatory Analysis

*1. Concise statement of the need for, and the objectives of, the final Rule.*

As discussed previously, the objective of the proposed amendments is to curb deceptive or unfair negative option practices . The legal basis for the proposed amendments is section 18(a)(1)(B) of the FTC Act, which provides the Commission with authority to issue "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." [534]

As described in this SBP, the amendments address unfair or deceptive negative option practices. The FTC, other Federal agencies, and State attorneys general have brought multiple administrative and judicial actions to stop and remedy harmful negative option practices. The record demonstrates, however, that existing legal authorities fall short because they leave consumers unprotected from certain practices and constrain the relief the Commission may obtain for law violations to redress consumers and deter future unlawful activity. In the ANPR and NPRM, the Commission explained it receives thousands of consumer complaints a year related to negative option marketing.

As discussed above in sections III–VII, the final Rule clarifies existing requirements regarding negative option marketing currently dispersed in other rules and statutes administered by the FTC and provides a consistent legal framework across media and offers. It also consolidates all requirements, such as those in the TSR and ROSCA, specifically applicable to negative

---

[525] NPRM, 88 FR 24716–18.

[526] *See* EPS, 86 FR 60822; Staff Report, *https://www.ftc.gov/sites/default/files/documents/reports/negative-options-federal-tradecommission-workshop-analyzing-negative-optionmarketing-report-staff/p064202negativeoptionreport.pdf* (last visited on Aug. 26, 2024).

[527] *See* sections VII.B.6 (saves) and VII.B.7 (reminders).

[528] *See* § 425.5(a)(4).

[529] *See* § 425.4.

[530] Law Professors, FTC–2023–0033–0861.

[531] *Id.*

[532] Recommended Decision by Presiding Officer, *https://www.regulations.gov/comment/FTC-2024-0001-0042.*

[533] Where specific components of the Rule, as anticipated when the NPRM was published, were discussed, commenters combined them, such that the concerns expressed cannot readily be separated to reflect what remains in the final Rule. For example, NCTA claims that "(t)he rigid 'Click-to-Cancel' requirements and limits on 'saves' will harm consumers," but addresses these harms only in combined and qualitative ways. FTC–2023–0073–0008.

[534] 15 U.S.C. 57a(a)(1)(B).

Appellate Case: 24-3137     Page: 47     Date Filed: 12/05/2024 Entry ID: 5463205

option marketing. The final Rule also provides clarity about how to avoid deceptive negative option disclosures and procedures. For example, ROSCA lacks specificity about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. The final Rule now provides clear standards for sellers about, *inter alia,* the content and timing of important information disclosures and what constitute "simple mechanisms" for the consumer to stop recurring charges. Further, the Rule allows the Commission to seek civil penalties and consumer redress under section 19(a)(1) of the FTC Act in contexts where such remedies are currently unavailable, such as deceptive or unfair practices involving negative options in print materials and face-to-face transactions (*i.e.,* in media not covered by ROSCA or the TSR).

*2. A description of any alternatives to the final Rule which the Commission considered.*

In formulating the final Rule, the Commission makes every effort to avoid imposing unduly burdensome requirements on sellers. To that end, the Commission avoids, where possible, proposing specific, prescriptive requirements that could stifle marketing innovation or otherwise limit seller options in using new technologies. In the NPRM, the Commission sought comments on several alternatives, including provisions related to consent requirements (additional consent for free trials) and reminder requirements (narrowing the scope of product types requiring reminders). The Commission also sought comments on how it could modify the proposed amendments to reduce costs or burdens for small entities. In response to the comments, and as discussed in the section-by-section analysis, the Commission determines not to finalize the proposed Rule in its entirety. Instead, the Commission finalizes a Rule that limits the material terms to be disclosed immediately adjacent to consent for the negative option feature; removes the limitation on saves and the accompanying recordkeeping requirement; removes the annual reminder provision; and modifies the length of the recordkeeping requirement for verification of consent to three years and provides an alternative method of compliance.

One alternative to the final Rule would be to terminate the rulemaking and rely instead on the existing legal framework to combat unfair or deceptive negative option practices. Another alternative would be to limit the scope of the final Rule to just those

negative option plans that are marketed in person or through the mail and therefore, currently, are covered only by section 5 of the FTC Act and not by ROSCA or the TSR. However, failing to proceed in accordance with the final Rule would substantially reduce or eliminate the benefits of the Rule, including clarifying the requirements currently spread throughout statutes and regulations and covering negative options in media not subject to the TSR or ROSCA.

Given that the Commission expects the unquantified benefits and unquantified costs of the final Rule to be small, and that there is considerable scope for the net benefits to remain positive and large even if compliance costs have been substantially underestimated, this regulatory analysis indicates that adoption of the Rule will result in benefits to the public that outweigh the costs.

*3. An analysis of the projected benefits and any adverse economic effects and any other effects of the final Rule.*

(a) Summary of Benefits and Costs

The primary consumer benefits of the final Rule, relative to the existing regulatory baseline,[535] come in the form of faster cancellations when consumers wish to cancel subscriptions.[536]

---

[535] As explained in section III of the SBP, several other statutes and regulations address harmful negative option practices. Section 5 of the FTC Act, which prohibits unfair or deceptive acts or practices, has traditionally served as the Commission's primary mechanism for addressing deceptive negative option claims. ROSCA, the TSR, 1the Unordered Merchandise Statute, and EFTA all address various aspects of negative option marketing.

[536] The final Rule also requires that specific disclosures relating to negative option features be provided separately to consumers before consent is obtained, whereas the existing regulatory framework requires that all material terms of a negative option contract be disclosed in a clear and conspicuous manner. The new disclosure requirements will aid consumers in understanding both that they are entering a negative option contract and the terms and conditions of that contract, especially how they can cancel the contract and when such cancellation must occur to avoid future charges. No consumer testing of the final Rule's disclosure requirements, relative to a "control" of "clear and conspicuous" disclosure requirements under the existing regulatory baseline, has been done. Accordingly, it is not possible to quantify any incremental consumer comprehension of a negative option plan at the time a consumer provides consent to that plan that may result from the final Rule's disclosure requirements. Moreover, some academic studies claim that "[n]ot only do consumers have a tendency to forget, but also a tendency to forget that they forget," suggesting that any gain in comprehension of the negative option features of an agreement that might be measured under consumer testing might not be durable. *See* Sophia Wang, "One Size Does Not Fit All: The Shortcomings of Current Negative Option Legislation," 26 Cornell J. of L. & Pub. Policy, 197, 212 n.135 (2016) citing Keith M. Marzilli Ericson,

The final Rule requires negative option sellers to provide cancellation mechanisms that are at least as easy to use as the mechanisms by which consumers consent to negative option plans. For negative option sales made online or over the telephone, "at least as easy to use" requires that the cancellation mechanism operate in the same medium and take no more time or effort than the consumer used when enrolling in the negative option plan. For negative option sales that are made in-person or through the mail, the final Rule requires that, in addition to offering cancellation through the specific method used for enrollment, the seller must also offer at least one alternate cancellation mechanism that can be used remotely, *e.g.,* cancellation via a website, email, or a toll-free telephone number and, again, that the consumer can cancel the negative option contract at least as quickly as he or she completed enrollment in the negative option plan.

In the following analysis, the Commission describes the anticipated effects of the final Rule. Where possible, it quantifies the benefits and costs. If a benefit or cost is quantified, it indicates the sources of the data relied upon. If an assumption is needed, the text makes clear which quantities are being assumed. The Commission measures the benefits and costs of the Rule against the existing regulatory baseline that consists primarily of ROSCA, the TSR, and section 5 enforcement.[537]

---

"Forgetting We Forget: Overconfidence and Memory," 9 J. Eur. Econ. Assoc. 43 (2011). Additionally, if the disclosures required by the final Rule come to be viewed as "boilerplate" language that consumers rush through, or consumers consider those disclosures to be less salient than other aspects of the transaction, such as acquiring a free trial of a product or service, the final Rule's disclosures may not offer any incremental benefit over existing "clear and conspicuous" because "people have limited attentional resources and will overlook non-salient features of any transaction." *See* Tess Wilkinson-Ryan, "A Psychological Account of Consent to Fine Print," 99 Iowa L. Rev. 1745 (2014). Concerns such as these are consistent with some consumer advocacy groups seeking amendments that would require a second round of consent to be obtained at the end of a free trial and before any recurring charges could be initiated in addition to routine reminders of recurring charges. *See, e.g.,* TINA, FTC–2019–0082–0014 (seeking amendments to require notice and re-affirmance of consumer consent, prior to being charged because consumers may forget about the trial and incur unwanted charges or enrollments at the end of the offer, particularly with long trial periods).

[537] The Unordered Merchandise Statute and EFTA also address various aspects of negative option marketing, but violations of those laws in relation to negative option marketing are typically pleaded in conjunction with violations of other laws; without loss of generality, the regulatory analysis expressly considers only ROSCA, the TSR, and section 5 as the regulatory baseline against which incremental benefits and costs from the final Rule are measured.

**App.48**

First, the likely per-cancellation benefits of the final Rule in relation to four scenarios under the existing regulatory baseline are considered. Next, the number of transactions relevant to each scenario are estimated. The product of average benefits-per-cancellation in each scenario multiplied by the likely number of consumer cancellation transactions for each scenario, summed across all scenarios, provides an estimate of the aggregate, quantifiable, consumer benefits produced by marketers' compliance with the final Rule's cancellation requirements. Quantifiable costs primarily reflect the resources spent by businesses to review the Rule and to take any preemptive or remedial steps to comply with its provisions, including, when and as needed, making changes to the manner they receive and process cancellation requests from consumers.

The Commission estimates the present discounted value of quantified benefits over ten years, using a 2 percent discount rate, will range between $6.1 and $49.3 billion. Annualized over 10 years, the Commission estimates the quantified benefits will range between $682.8 million and $5.5 billion per year. The Commission estimates the present discounted value of quantified costs over ten years, using a 2 percent discount rate, will range between $100.9 and $826.2 million. Annualized over ten years, the Commission estimates the quantified costs will range between $11.2 and $92.0 million per year. These estimates are presented in Table 1 below.

TABLE 1—SUMMARY OF TOTAL QUANTIFIED BENEFITS AND COSTS

[In millions, 2023 dollars]

| | Low | High |
|---|---|---|
| **Present Discounted Value over 10 years, 2% discount rate** | | |
| Benefits | $6,133.57 | $49,315.39 |
| Costs | 100.89 | 826.15 |
| *Net Benefits* | *5,307.43* | *49,214.50* |
| **Annualized over 10 years, 2% discount rate** | | |
| Benefits | 682.83 | 5,490.11 |
| Costs | 11.23 | 91.97 |
| *Net Benefits* | *590.86* | *5,478.88* |

**(b) Benefits of the Final Rule**

This section describes the beneficial impacts of the Rule, provides quantitative estimates where possible, and describes benefits that are only assessed qualitatively.

The quantifiable estimates reflect benefits stemming from the decreased amount of time and effort consumers will need to expend cancelling subscriptions, and in contexts where data are available, welfare gains from avoided expenditure for unwanted subscriptions, under the final Rule relative to marketers' compliance with the existing regulatory baseline. This section first estimates per-consumer savings from cancellation mechanisms that would become at least as easy to use as the mechanisms through which consent to the negative option transactions was given and then estimates the number of cancellation transactions to which those benefits apply.

In addition to these quantified benefits, there are several benefits we do not quantify. First, marketers' compliance with the final Rule is likely to improve consumer confidence in using subscriptions [538] and increase the number of consumers who are willing to subscribe and obtain the convenience, and often cost savings, that subscriptions can provide. Second, research in economics and psychology finds the perceived monetary and psychological costs from switching products or services can lead consumers to make sub-optimal decisions. The final Rule, by reducing these costs through simpler cancellation methods, may improve consumer decision-making by reducing enrollments in subscriptions that consumers do not value and increasing enrollments in subscriptions that they do value.[539]

Marketers' compliance with the final Rule, and the consumer confidence that compliance inspires, may also "exert additional competitive pressures on businesses who offer subscription contracts (and) could increase productivity in the sector." [540]

Compliance with the final Rule may also result in some allocative effects when consumers can cancel online instead of by telephone. In such cases, consumers will be able to cancel subscriptions at times of the day that may be more convenient to them than the hours that subscription sellers staff their telephone lines and from devices that they find more convenient to use than telephones.[541]

---

[538] One survey found that consumers without subscriptions were much more pessimistic about the ability to cancel subscriptions than were consumers who had subscriptions. *See* Jabil, "Connected Packaging Perceptions and Attitudes: A Consumer Insights Survey" (July 2021), *https://www.jabil.com/dam/jcr:ecdb74e6-c34f-4c30-aa34-c10269617db6/2021-connected-packaging-survey.pdf#page=3*. Another recent study finds that consumers are aware that they may be inattentive in future and not cancel subscriptions that they no longer desire, and so are less likely to sign up for negative-option subscriptions. *See* Klaus Miller, *et al.*, "Sophisticated Consumers with Inertia: Long-Term Implications from a Large-Scale Field Experiment" (2023), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4065098*.

[539] A large literature in economics has documented that consumers face switching costs and/or psychological biases towards inertia. *See, e.g.*, Brigitte Madrian & Dennis Shea, "The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior," 116 Quarterly J. of Econ. 1149 (2001); William Samuelson and Richard Zeckhauser, "Status Quo Bias in Decision Making,"

[1] J. of Risk & Uncertainty 7 (1988). Research has found that many consumers do not cancel subscriptions due to such inertia effects. *See, e.g.*, Miller, *et al.* (2023); Liran Einav, *et al.*, "Selling Subscriptions" (2023), *https://harris.uchicago.edu/sites/default/files/mahoney_ppe_seminar_paper_9-26-23_0.pdf*.

[540] *See* U.K. Department for Business and Trade, "Impact Assessment—Digital Markets, Competition and Consumers Bill: Subscription Measures," at 3 (Apr. 20, 2023), *https://publications.parliament.uk/pa/bills/cbill/58-03/0294/ImpactAssessmentAnnex2.pdf*.

[541] In some instances, an individual cancellation completed at, say, 11:59 p.m., compared to a counterfactual in which a call center closed at, say, 8 p.m., could result in sparing a consumer from a recurring charge that would take effect the next day, and such instances would result in actual monetary
Continued

Appellate Case: 24-3137     Page: 49     Date Filed: 12/05/2024 Entry ID: 5463205

Finally, the Commission's estimates of quantified benefits are based on reductions in time and effort from cancelling subscriptions to non-business consumers. The Commission expects small businesses may also benefit in similar ways from less costly cancellations, but it does not quantify such benefits due to lack of data on business cancellation transactions.

The following subsections then estimate the quantified benefits from reductions in time and effort from cancelling subscriptions. First, in subsection (1), the Commission estimates the per-cancellation benefit relative to the regulatory baseline for (i) online cancellation when only ROSCA-compliant telephonic cancellation was available, (ii) simpler online cancellation when only ROSCA-compliant online cancellation was available, (iii) simpler telephone cancellation when only TSR-compliant cancellation was available, and (iv) online or telephone cancellation when only in-person or mail cancellation was available. The Commission then estimates the number of cancellation transactions in subsection (2), and finally calculates benefits as the per-cancellation benefit in each scenario multiplied by the number of affected transactions in subsection (3).

(1) Estimating Per-Cancellation Benefits

For each of the four scenarios below, the Commission estimates a range of benefits that a consumer will gain each time they cancel a negative option subscription. In these scenarios, the Commission assumes a final Rule-compliant online cancellation should take no more than 30 seconds to one minute, based on the Commission's experience that the average time for consumers to read required disclosures and provide consent to a negative option plan online is 30 seconds to one minute. For telephone cancellations under the final Rule, the Commission assumes that a rule-compliant cancellation should take no more than one to two minutes, based on the assumption it takes a telemarketer twice as long to read required disclosures to a consumer as it would take a consumer to read such disclosures to his or herself online.

(a) Estimated Per-Cancellation Benefit Relative to ROSCA-Compliant Telephonic Cancellation

For consumers enrolling in negative option plans online, the existing

regulatory baseline, ROSCA, requires marketers to provide "simple" cancellation mechanisms. A facially ROSCA-compliant, "simple" telephonic cancellation may, nonetheless, require more time and effort from consumers than was expended when enrolling in the negative option plan. Online subscription sellers' compliance with the final Rule will save consumers that extra measure of time and effort.

To estimate the average time savings to consumers of a final Rule-compliant "click-to-cancel" mechanism compared to a ROSCA-compliant simple telephonic cancellation, this analysis first assumes that ROSCA-compliant simple telephonic cancellations take no more time than the "average handle time" for all customer service requests made to call centers, which an industry source indicates is six minutes and three seconds.[542] As discussed at the beginning of this subsection, the Commission assumes a final Rule-compliant cancellation should take no more than 30 seconds to one minute, saving consumers between five minutes and three seconds and five minutes and 33 seconds per cancellation relative to a simple telephonic cancellation.

The Commission then assumes consumers, on average, value their non-work time at 82% of the mean hourly wage of $31.48, or $25.81 (i.e., .82 × $31.48) per hour.[543] Accordingly, the Commission estimates the faster online cancellations the final Rule will provide, relative to ROSCA-compliant telephonic cancellations, will be valued at between $2.17 (i.e., 5:03 minutes × $25.81/hour) and $2.39 (i.e., 5:33 minutes × $25.81/hour).

---

[542] See Michelle Hawley and Shane O'Neill, "21 Important Call Center Statistics to Know About," (Apr. 3, 2024), *https://www.cmswire.com/contact-center/16-important-call-center-statistics-to-know-about*. We use this proxy for the time a ROSCA-compliant telephonic cancellation takes only for the express purpose of estimating the incremental benefits to consumers of a final Rule-compliant telephonic cancellation replacing a ROSCA-compliant telephonic cancellation. "Average handle time" has not been used as a standard for ROSCA enforcement and is not intended to set a standard here.

[543] The Commission uses a mean hourly wage rate of $31.48; see Bureau of Labor Statistics, "May 2023 National Occupational and Wage Estimates, Unites States," *https://www.bls.gov/oes/current/oes_nat.htm*. A meta-analysis of studies on how consumers value time used in traveling (an area in which "a huge literature has arisen") has determined that consumers value time used in that matter at 82% of their wage rate. See Daniel S. Hamermesh, "What's to Know About Time Use?," 30 J. Econ. Surv. 1, 198–203 (2015). The Commission assumes for the purpose of the final Rule consumers value transaction costs savings in the same way that they value travel time.

(b) Estimated Per-Cancellation Benefit Relative to ROSCA-Compliant Online Cancellation

For online cancellations of online-entered subscriptions, the Commission lacks a source of average cancellation times presumed to be ROSCA-compliant that is as comprehensive as that used for the average handle times of call centers. The Commission relies, instead, on an experiment that involved signing up for 16 online subscriptions between August 2 to October 4, 2022, then canceling each one, and recording the time it took to cancel, as well as the variety of other obstacles faced in canceling.[544] To estimate the average time for online cancellations, the Commission subtracts the time incurred in canceling the three subscriptions that required telephonic cancellation from the aggregate time reported to cancel all 16 subscriptions. This yields an average of two minutes and 4 seconds per online cancellation.[545]

Based on the Commission staff's experience, the average time needed to read the required disclosures and provide consent to a negative option feature is 30 seconds to one minute. An online cancellation that took no longer than the provision of online consent would therefore save the consumer between one minute and four seconds and one minute and 34 seconds. Valuing consumers' time at $25.81 per

---

[544] See Caroline Sinders, "How Companies Make It Difficult to Unsubscribe," *https://pudding.cool/2023/05/dark-patterns*. Among the obstacles noted for otherwise seemingly simple online cancellations were that some websites did not use straight forward terms, such as "unsubscribe" or "cancel," and instead put the cancellation path under titles such as "auto-renew" or "edit plan."

[545] The researcher reported the aggregate time expended to cancel all 16 subscriptions was 57 minutes and 31 seconds. Of the three subscriptions that required telephonic cancellations, one call took 17 minutes and 36 seconds, one took seven minutes, and the time to cancel the third one was not reported (apart from explaining that it was necessary to call three times due to the seller's "technical difficulties"). The Commission replaces this missing value with the average handle time found by Hawley/O'Neill (2024) of six minutes and three seconds. The Commission therefore subtracted 30 minutes and 39 seconds from the aggregate cancellation time of 57 minutes and 31 seconds; measured in seconds, this becomes 3,451 − 1,839 = 1,612. Dividing this result by 13 equals 124 seconds, or two minutes and 4 seconds. The Commission notes this average cancellation time, though relevant for this regulatory analysis, has not been used as a standard for ROSCA enforcement and is not intended to set a standard here. Moreover, while we have calculated this average, the study notes cancellation took under one minute for three large sellers of digital entertainment subscriptions. Last, the Commission notes one commenter opined, "[f]or the most part," companies offer convenient, no-hassle, cancellation options that probably take about five clicks on average, though the commenter did not indicate a time duration. See Individual commenter, FTC–2023–0033–0780.

savings to consumers, but we are unable to estimate the frequency of such occurrences or the monetary savings they would engender.

hour, as assumed above, the final Rule would therefore save consumers who enroll online and cancel online time that they value at between $0.46 (*i.e.,* 1:04 seconds × $25.81/hour) and $0.67 (*i.e.,* 1:34 minutes × $25.81/hour).

### (c) Average Per-Cancellation Benefit Relative to TSR-Compliant Cancellation

For consumers enrolling in negative option plans via telemarketing, the existing regulatory baseline is the TSR. The TSR does not specify a performance standard specific to negative option cancellations. Although egregious cancellation delays can be pleaded against telemarketers under § 310.3(a)(1)(vii) (requiring disclosure of all material terms and conditions of the negative option feature) or § 310.3(a)(2)(ix) (prohibiting misrepresentation directly or by implication of any material aspect of a negative option feature), the final Rule's requirement that the cancellation mechanism be at least as easy to use as the consent mechanism provides cancellation-specificity to negative options sold through telemarketing that is lacking under the existing regulatory baseline. Because telemarketers have substantial discretion in designing and implementing consent processes specific to their programs, telemarketers will have a clear benchmark for the speed with which they must complete a final Rule-compliant cancellation.

As described at the beginning of this subsection, the Commission assumes it takes telemarketers between one and two minutes to read the required disclosures to consumers and receive their consent for enrollment in a negative option plan. Using the same average handle time measure of six minutes and three seconds used a previous scenario to proxy for baseline time spent for a telephonic cancellation, the Commission assumes the final Rule will save consumers who consent to a negative option sale via telemarketing, and cancel in the same manner, between four minutes and three seconds and five minutes and three seconds. Evaluating that time saving in the same manner as above, compliance with the final Rule results in a per-cancellation time saving that is worth between $1.74 (*i.e.,* 4:03 minutes × $25.81/hour) and $2.17 (*i.e.,* 5:03 minutes × $25.81/hour).

### (d) Estimated Per-Cancellation Benefit Related to In-Person Enrollments

Some sellers market negative option plans in ways that are not covered by ROSCA or the TSR. Those that involve in-person enrollment and only offer in-person or mail cancellation, in particular, may be highly burdensome to consumers. The final Rule requires sellers who offer in-person enrollment to offer at least one alternate cancellation method that consumers may use remotely, *e.g.,* online [546] or via telephone.

Providing consumers with an alternative to in-person cancellations will give consumers a faster route to cancel a subscription and may also spare some consumers from incurring additional recurring charges which might accrue during the pendency of a slow cancellation mechanism, enabling consumers to reallocate their spending power in directions of greater utility, resulting in allocative efficiencies.

Unlike negative option transactions entered into online (ROSCA) or by telephone (TSR), the Commission lacks comprehensive experience with negative option plans that require cancellation in person or through the mail. However, because many gym/fitness center/health studio memberships (hereafter, "gym memberships") are sold via negative options [547] and may require cancellation via certified mail or in person (sometimes even when consumers can enroll online [548]), the Commission proxies the per-cancellation benefits of an additional, remote, method of cancellation by looking at those benefits in the context of gym memberships.[549]

---

[546] At the seller's choice, an online cancellation method may be through a website or via email.

[547] IHRSA, The Global Health & Fitness Association, commenting on behalf of itself and the industry (*see* FTC–2023–0033–0863) claimed there were clear distinctions between in-person, brick and-mortar health and fitness businesses and online subscription services, explaining a month-to-month contract is a very different risk to consumers than a long-term contract that begins after a free trial or auto-renews without notice. IHRSA further claims short-term (*e.g.,* month-to-month) continuous service agreements should be distinguished from purely online subscription services targeted by the rule. IHRSA further (mis-) characterizes the Rule as appearing to be concerned with paid contracts that initiate automatically after a free trial period or auto-renew without notice after a long, pre-paid initial term. IHRSA notes consumers with membership agreements with firms in its industry are on notice of the recurring cost because of the monthly charge and have the option to cancel each month under the terms of their contract. The Commission disagrees with IHRSA's characterization of the Rule; the Rule is not intended to exclusively, or even primarily, address online subscription services or long-term contracts that begin after a free trial or auto-renew without notice, but to address all recurring charge plans where the consumer's silence or failure to cancel is interpreted as consent to recurring charges. Accordingly, consumer memberships with firms in IHRSA's industry where consumers have the option to cancel each month squarely fit within the Rule's coverage of negative option plans.

[548] Individual commenter, FTC–2023–0033–0233.

[549] The International Carwash Association ("ICA"), however, commented many of its 60,000 U.S. members offer carwash subscriptions that offer a reduced price for carwashes to subscribers and

---

As noted in the comment submitted by comment filed by IHRSA,[550] The Global Health & Fitness Association, "many (fitness club) operations allow several options for agreement termination through simple online solutions including online account management, email cancellation requests, and specific online cancellation buttons or forms" and "[m]any of these options are currently available for members who have purchased their membership either online or in person." IHRSA did not quantify the share of their member organizations that provide such cancellation opportunities or the number or share of consumer cancellation transactions in which online cancellation is available. Accordingly, the Commission assumes the low-end of the range of quantifiable benefits to consumers who purchased negative option plans in person, but could currently cancel online is the same as the same the low-end of the range for consumers who purchased negative option plans online and had access to online cancellations: $0.46 per cancellation.

Notwithstanding IHRSA's assertion that many fitness clubs offer online cancellation, at least 25 individual consumers submitted comments attesting to the difficulties of canceling gym memberships. Some wrote in general terms of the difficulties consumers experience in canceling such memberships as something that contributed to their support for the Rule.

---

strengthen the relationship with customers and reduce dependence on cash transactions for these businesses. *See* FTC–2023–0033–1142. These subscriptions may be purchased in person, on the world wide web, via a mobile app, or at an automated teller, which indicates at least some of those subscriptions are covered by ROSCA. ICA asserts cancellation through a means other than in person may be burdensome to the generally small businesses that operate carwashes. *Id.* Although commenter Rocket Money, FTC–2023–0033–0998, mentioned "car wash chains that require consumers to visit a specific location to cancel their membership as an example of draconian cancellation requirements they experienced working with consumers, no individual consumer commenter mentioned difficulties with carwash subscriptions. Because no consumer commenter provided any other indication of the number of carwash subscriptions purchased or the costs of cancelling such subscriptions, even anecdotally, they are excluded from the analysis. The estimate of the consumer benefits that would flow from the final Rule's provision that an extra, remote, cancellation mechanism be required of marketers who currently offer only in person or mail cancellation mechanisms may therefore be an under-estimate of such benefits.

[550] FTC–2023–0033–0863.

• "What seems more troublesome tend to be stuff like gym memberships." [551]

• "I work dispute resolutions for a bank. I see so many cases where someone is trying to cancel something like a gym membership and, while they can sign up in person, they for some reason have to mail a certified letter to the companies (sic) home office." [552]

• "I have experienced so much frustration ending memberships with gyms, online subscriptions, etc. over many years and welcome help in this matter. So many friends I speak to share similar stories of how they were roped into paying for longer memberships and subscriptions that they no longer wanted." [553]

• "Many places, like [specific fitness center chain], require you to go in person to cancel—they won't even let you do it over the phone! This harms anyone that may have trouble leaving the house regularly, including disabled folks and parents of small children and those caring for older or ailing family members, not to mention being horribly inconvenient for everyone else." [554]

Many others conveyed personal experiences with burdensome gym membership cancellation. The Commission relies upon these comments to estimate the high-end of the range of quantifiable benefits that the final Rule will provide to consumers who purchase negative option plans in-person. Examples of these include:

• "I had to write a letter and physically mail it to cancel a gym membership I singed [sic] up for on an iPad." [555]

• "Recently it took me three days and several hours to cancel a gym membership (that) had taken less than 20 minutes to join, on line [sic]." [556]

• "I had to go in person 3 different times because the manager wasn't there so [sic] to cancel it." This consumer attached a screen shot of the gym's cancellation policy, which read, in part, "There is no contract and you are free to cancel your Direct Debit at any time. If you do decide to cancel your membership, you must allow at least 7 days before the fifth of the month to ensure your payment is cancelled and advise Reception of the cancellation." Both "(a)t *least* 7 days before the fifth of the month," and the failure to specify whether "7 days" is seven business days or seven calendar days introduce

considerable uncertainty as to when, precisely, the consumer must tender a cancellation to avoid the next recurring payment. [557]

• "Years ago, I had signed up for a gym membership, and after a change in job situation, was no longer able to make use of it. Repeated attempts to reach the gym membership department and cancel my membership went unheeded—a [sic] got a classic runaround, and as often forwarded to unattended phone numbers—and I kept racking up monthly bills for a membership I didn't want . . . . It was only through a personal relationship with someone who worked in the corporate office that I was finally able to get past their automatic renewals and effect a cancellation." [558]

• "We wanted to cancel the [gym] membership, but when we called and emailed, we were told we couldn't cancel that way. We had to send a certified letter or go in person. We have gone in person twice to try to cancel or [sic] membership and it it has been a nightmare." [559]

• "Personally, I have been impacted by my local gym's undisclosed policies and shady cancelation policies that have costed me hundreds of dollars." [560]

• "They bill you monthly for your gym membership but when you want to cancel your membership that's when the problems arise. You cannot do it over phone or on their website. You have to go into the gym personally to cancel said membership. Not only that I was told that I'd have to go to the gym [home gym] where I signed up in order to cancel membership. I could only imagine what this would be like had I moved out of the state. Please help us stop these practices." [561]

• "I am currently trying to cancel a gym membership and have been overwhelmed by how difficult it has been . . . I just called my gym . . . and the pre-recorded automated answering message literally says there is no direct line to the gym! That's outrageous!!!" [562]

• "My personal experience is with my gym membership . . . . Getting out of it was terrible, and I hate to see it happen to anyone else." [563]

Based on these comments, the Commission makes the simplifying assumption that the worst gym membership cancellation experiences

involve three failed attempts at cancellation, each costing one hour of time, and that, because of those cancellation failures, three unwanted monthly charges were processed. The Commission assumes a fourth cancellation attempt, also costing one hour of time, succeeds in halting the recurring payments.

As above, the Commission values consumers' time at $25.81/hour. The typical gym membership costs between $40 and $70 a month. [564] The Commission therefore assumes, at the high-end, consumers incur gym membership cancellation costs of $313.25 (*i.e.*, (4 × $25.81) + (3 × $70)) in the absence of this Rule. [565] As stated previously, the Commission assumes a final Rule-compliant cancellation should take no more one minute at the high end, which has a value of consumers' non-market time of $0.43. Then, to estimate the high-end avoided burden that such consumers would experience under the final Rule, the Commission takes the difference between the high-end cancellation costs in the absence of this Rule ($313.25) and the high-end final Rule-compliant cancellation costs ($0.43), which equates to $312.82. Accordingly, the low-to-high range of benefits provided by the final Rule to consumers who purchase negative option plans in person or through the mail ranges from $0.46 to $312.78. [566]

(e) Summary of Per-Cancellation Benefits

Table 2 presents a summary of the per-cancellation benefit the Commission estimates would result from this final Rule. For subscriptions that are currently cancelled over the phone but would be cancelled online under this final Rule, the Commission estimates

[551] Individual commenter, FTC–2023–0033–0780.
[552] Individual commenter, FTC–2023–0033–0007.
[553] Individual commenter, FTC–2023–0033–1046.
[554] Individual commenter, FTC–2023–0033–0741.
[555] Individual commenter, FTC–2023–0033–0233.
[556] Individual commenter, FTC–2023–0033–1076.

[557] Individual commenter, FTC–2023–0033–0510.
[558] Individual commenter, FTC–2023–0033–0968.
[559] Individual commenter, FTC–2023–0033–0387.
[560] Individual commenter, FTC–2023–0033–0572.
[561] Individual commenter, FTC–2023–0033–0299.
[562] Individual commenter, FTC–2023–0033–1163.
[563] Individual commenter, FTC–2023–0033–0545.

[564] *See* Dana George, "This Is How Much the Average American Really Spends on Gym Memberships," Jan. 7, 2024, *https://www.fool.com/the-ascent/personal-finance/articles/this-is-how-much-the-average-american-really-spends-on-gym-memberships*. Because this report is from January 2024, the Commission assumes it measured gym membership costs in 2023 dollars.

[565] Note the avoided recurring payments associated with delayed cancellations may overstate the amount of consumer surplus gained attributable to the final Rule if consumers continue to use their gym membership during that period of delayed cancellation. However, it is difficult to estimate the extent to which that occurs due to lack of data. A part of those gains may also be transfers of producer surplus from firms to consumers.

[566] Other cancellation methods gyms may currently offer, such as in-person visits that succeed in cancellation and cancellation via certified mail, would fall in between those low/high endpoints, as would the benefits to consumers if those methods were augmented under the final Rule not with online cancellations but with telephonic cancellations.

App.52

consumers would experience a benefit of between $2.17 and $2.39 per cancellation. For subscriptions that are currently cancelled online and would move to a simpler online cancellation under this Rule, the Commission estimates consumers would experience

a benefit of between $0.46 and $0.67 per cancellation. For subscriptions that are currently cancelled over the phone and would move to a simpler telephone cancellation under this Rule, the Commission estimates consumers would experience a benefit of between

$1.74 and $2.17 per cancellation. For subscriptions enrolled in person that would be required to provide online or telephone cancellation under this Rule, the Commission estimates consumers would experience a benefit of between $0.46 and $312.82 per cancellation.

### TABLE 2—ESTIMATES OF BENEFIT PER CANCELLATION

[In 2023 dollars]

| | Low | High |
|---|---|---|
| Phone to Online Cancellation | $2.17 | $2.39 |
| Online to Simpler Online Cancellation | 0.46 | 0.67 |
| Phone to Simpler Phone Cancellation | 1.74 | 2.17 |
| In-Person to Online or Phone Cancellation | 0.46 | 312.82 |

(2) Estimating the Number of Consumer Cancellation Transactions

(a) Baseline Number of Subscriptions

The Commission regards "consumers" for the purposes of this analysis as the U.S. population over the age of 18;[567] this is estimated to be 269 million in 2025,[568] the first year in the ten-year period over which the Commission estimates the benefits and costs of the final Rule ("Year 1").

Because negative option sales are a form of marketing of goods and services, and not an industry or type of output, and because no occupational category is uniquely associated with negative option marketing, no publicly produced data source, such as the Economic Census, tracks the use of negative option marketing in the United States. Accordingly, the Commission must look to other data sources, to estimate the number of subscription cancellations and the channels through which consumer consent was obtained and cancellation mechanisms provided.

To estimate the aggregate number of consumer cancellation transactions, the Commission relies upon a credible source that found that, as of mid-2023, 83% of American consumers had at least one subscription.[569] The

Commission assumes, for the purposes of this analysis, that the percentage of American consumers with at least one subscription remains constant over ten years. Accordingly, in Year 1 the Commission assumes 223.27 million consumers (i.e., .83 × 269 million) have at least one subscription.

To estimate the total number of subscriptions held by U.S. consumers the Commission looks to data on the average number of subscriptions per subscriber. One source, relying upon a large sample of U.S. consumers conducted in late 2023 and early 2024, reported, "[t]he average subscriber now has 4.5 subscriptions."[570] The Commission therefore applies a multiplier of 4.5 to the number of consumers estimated to have at least one subscription to estimate the aggregate number of subscriptions held by consumers in each year. Continuing with the Year 1 example from above, the Commission assumes the 223.27 million U.S. consumers who have subscriptions collectively hold 1,004,715 subscriptions (i.e., 223.27 million × 4.5). The Commission acknowledges some uncertainty in these estimates which could lead to overestimation since subscriptions may be held by households of multiple individual consumers or underestimation due to potential growth in subscription-based goods and services.

(b) Baseline Number of Cancellations

The Commission next considers how many subscriptions consumers may want to cancel. To do so, we look to subscription "churn," or cancellation,

rate data. Churn rates can reflect intentional cancellations as when a consumer completes a merchant's cancellation process, but can also reflect involuntary or passive cancellations, which occur when the payment mechanism the consumer has on file with the merchant is unable to be processed by the merchant.[571] Churn rates may be calculated on a monthly, quarterly, or annual basis,[572] and some rates do not disclose a time dimension; mischaracterizing a monthly churn rate as an annual churn rate could vastly underestimate the volume of annual cancellations.

One source reports an aggregate measure of voluntary[573] churn of 3% per month.[574] The Commission assumes

---

[567] Although this final Rule also benefits small businesses that purchase negative option plans, the Commission does not have sufficient data to quantify those effects in this analysis.

[568] See U.S. Census, "Demographic Turning Points for the United States: Population Projections for 2020 to 2060: Population Estimates and Projections," Feb. 2020, *https://www.census.gov/library/publications/2020/demo/p25-1144.html*. The Commission linearly extrapolated between the report's figures for the population over the age of 18 in 2020 and its estimates of the same population in 2030 to estimate the number of consumers in years 2025 through 2029. Similarly, the Commission linearly extrapolated between the report's estimates of the over age 18 population in 2030 and 2040 to estimate the over age 18 population in the years 2031 through 2034.

[569] See Julia Stoll, "SVOD service user shares in the U.S. 2015–2023" (Sept. 7, 2023) (noting 83

percent of U.S. consumers used a subscription video-on-demand service in 2023), *https://www.statista.com/statistics/318778/subscription-based-video-streaming-services-usage-usa*.

[570] Bango, "Subscription Wars: Super Bundling Awakens," at 4 (2024) (based on data from 5,000 U.S. subscribers), *https://bango.com/resources/subscription-wars-super-bundling-awakens*.

[571] See Stripe, "Subscription churn 101: A complete guide for businesses" (Jan. 23, 2024), *https://stripe.com/resources/more/subscription-churn-101*.

[572] Id. (noting the choice often depends on your business cycle and how often you want to assess your performance).

[573] Some consumers may welcome an "involuntary" cancellation of a subscription, and other cancellations that payment processors perceive as "involuntary" may reflect consumers' deliberate cancellation of a credit card as a means of escaping a subscription that was difficult to cancel. The Commission's analysis nonetheless uses only the reported "voluntary" churn rate to avoid the possibility of over-estimating the consumer benefits of the final Rule.

[574] Recurly, a subscription management platform used across multiple industries, reports an overall churn rate of 4.1% per month and parses this rate into that arising from voluntary cancellations, 3%, and involuntary cancellations, 1%, with, presumably, 0.1% lost to rounding. Recurly explains its methodology in producing these estimates is based on a sample of over 1,200 subscription sites on the Recurly platform over 12 months (January to December 2023); its churn rates are monthly, calculated by dividing the number of subscribers who churn during the month by the total number of subscribers and uses median, 25th, and 75th percentile values to eliminate outliers and provide a more accurate representation of the data in its view. See Recurly, "What is a good churn rate?," *https://recurly.com/research/churn-rate-benchmarks*. Other payment processors report similar churn rates but provide fewer details on the Continued

this rate is constant from month to month and from year to year and therefore assume that the average annual churn rate across all subscriptions is 36%.[575] This churn rate, multiplied by the number of subscriptions held by consumers each year, provides the yearly estimate of how many subscriptions are cancelled by consumers.[576] Continuing with the Year 1 example from above, the Commission therefore estimates 361.70 million cancellations (*i.e.*,.36 × 1,004.72 million) will occur in Year 1 of the analysis and that this number will increase to 384.82 million by Year 10. Table 3 presents the number of subscriptions and total number of cancellations expected in each year.

TABLE 3—NUMBER OF SUBSCRIPTIONS AND TOTAL CANCELLATIONS PER YEAR

[In millions]

| Year | Subscriptions | Cancellations |
|------|--------------|--------------|
| 1 ................ | 1,004.72 | 361.70 |
| 2 ................ | 1,012.48 | 364.49 |
| 3 ................ | 1,020.25 | 367.29 |
| 4 ................ | 1,028.02 | 370.09 |
| 5 ................ | 1,035.79 | 372.88 |
| 6 ................ | 1,043.56 | 375.68 |
| 7 ................ | 1,049.91 | 377.97 |
| 8 ................ | 1,056.26 | 380.25 |
| 9 ................ | 1,062.61 | 382.54 |
| 10 ............... | 1,068.96 | 384.82 |

data underlying their churn rate estimates or do not distinguish voluntary churn rates.

[575] Because consumers may cancel a subscription and then enroll in a different subscription (or even re-enroll in a recently canceled subscription), the Commission assumes average, aggregate, monthly voluntary churn rates are additive across months and that the number of consumers with subscriptions do not "decay" at a rate of 3% per month. Indeed, another report found one-quarter of U.S. consumers cancelled a streaming video service in the past 12 months and resubscribed to the same service, with younger generations significantly more likely to return. *See* Deloitte, Digital Media Trends Survey: 16th Edition (2022), *https://www2.deloitte.com/us/en/insights/industry/technology/digital-media-trends-consumption-habits-survey/summary.html*. The Deloitte report also notes the average churn cancellation rate has remained consistent since 2020 at about 37% across all paid streaming video on demand services. Similarly, a comment from NCTA, FTC–2023–0073–0008, quotes Congressional testimony from Consumer Reports that 36% of consumers who subscribed to streaming services, switched and resubscribed multiple times over a period of 12 months.

[576] The Commission is aware a recent survey of U.S. subscribers found 75% identified one subscription as one they will never cancel or even pause. *See* Bango (2024) at 8. The Commission assumes no adjustment is needed to the reported "churn" rate in light of this finding as subscriptions with such loyalty are already reflected in the denominator of the reported churn rate.

(c) Number of Cancellations by Enrollment and Baseline Cancellation Method

As discussed in the estimates of per-cancellation benefits, the estimated per-cancellation benefits stemming from the final Rule depend on the regulatory baseline cancellation methods relative to those that would be made available under the final Rule. To determine the number of cancellations for which the four categories of per-cancellation benefits estimates would apply, the Commission uses data on its enforcement experience to determine the share of cancellations likely to occur through online and telephone methods. For cancellations of subscriptions that are enrolled in person, the Commission uses data on gym membership cancellations as a proxy.

(i) In-Person Subscriptions

As a proxy for the number of subscriptions entered into in person, the Commission uses a report from Renew Bariatrics that claims 19 percent of the U.S. population are members of gyms or health clubs.[577] The Commission assumes gym members are uniformly distributed by age and multiplies the U.S. adult population by 19 percent to estimate that 51.11 million adults will have active gym membership subscriptions when this final Rule goes into effect. An IHRSA article from 2019 stated the average health club has an annual attrition rate of 28.6 percent.[578] Interpreting this to mean 28.6 percent of all adult gym members cancel their memberships each year, the Commission estimates 14.62 million gym membership subscriptions will be cancelled in the first year of this Rule. In Year 10, the Commission estimates 15.55 million gym membership subscriptions will be cancelled. The Commission uses these estimates as a proxy for the total number of subscriptions that are entered into in person and cancelled each year.

The Commission acknowledges several limitations with this proxy. To begin, there are likely many other types of businesses, such as car washes, lawn care, pest control, and personal care and grooming establishments, that may offer

[577] *See* "28 Gym Membership Statistics: Average Cost of Memberships," Renew Bariatrics (Jan. 4, 2024), *https://renewbariatrics.com/gym-membership-statistics/*.

[578] *See* "Why Health Club Retention Requires a Technology Solution," IHRSA (May 20, 2019), *https://www.healthandfitness.org/improve-your-club/why-health-club-retention-requires-a-technology-solution/#:~:text=Acquiring%20a%20new%20customer%20is%20often%20times,rates%20by%205%20increases%20profits%20from%2025%%2D95%*.

in-person subscription enrollment. To the extent these subscriptions are not included in the count, the estimates may be understated. Further, the source that states 19 percent of the population are members of gyms does not specify the age distribution of the gym members. The Commission has assumed children and adults are distributed uniformly across that 19 percent; however, if adults are more likely to have gym memberships than children, the estimates of gym memberships and cancellations among adults will be understated. On the other hand, gym memberships are not always individual memberships; multiple family members may share a single-family membership. In estimating the number of gym memberships and cancellations, the Commission has assumed each adult gym member has their own subscription, which may overestimate the number of subscriptions and cancellations.

(ii) Online and Telephone Subscriptions

The Commission assumes all subscriptions that are not entered into in person are instead entered into either online or over the phone. Subtracting the in-person subscription, as proxied by gym membership cancellations, from the total number of cancellations, the Commission estimates 347.08 million subscriptions entered into either online or over the phone will be canceled in the first year of this Rule. This number would increase to 369.27 million cancellations in Year 10.

To estimate the distribution of cancellation methods for these subscriptions that are entered into online and over the phone, the Commission reviewed matters it has brought and resolved[579] in which complaints specifically alleged negative option cancellation mechanisms that violated ROSCA, the TSR, or section 5.[580] The Commission found 54 matters met these criteria.

Online[581] enrollment was possible in 42 of 54 matters that met the review

[579] This tally does not include ongoing matters or matters that obtained "fencing-in" relief encompassing the sale of negative options without expressly pleading complaint counts related to cancellation mechanisms.

[580] In many instances, ROSCA and TSR counts were cross-pled as section 5 counts; in parsing cancellation transactions by their enrollment methods, we use "section 5" to refer to instances in which neither ROSCA nor TSR violations were pled.

[581] For ease, the Commission includes in this tally two negative option plans that enrolled consumers via phone apps. Similarly, the Commission regards matters involving online marketing of negative options that were resolved before the passage of ROSCA (and some others that were resolved after the passage of ROSCA, but addressed online

criteria. In the remaining 12 matters, enrollment occurred over the phone. Among the 42 matters in which online enrollment was possible, only six firms offered online [582] cancellation,[583] and the remaining 36 firms offered only telephonic cancellation.[584] Among the 12 matters in which enrollment occurred over the telephone; none of the firms offered online cancellation, therefore, the Commission treats these 12 matters as if only telephone cancellation was available.[585] To summarize, the Commission finds that, among subscriptions that are entered into online and over the phone, 66.7 percent (*i.e.*, 36/54) offered online enrollment and only telephone cancellation, 11.1 percent (*i.e.*, 6/54) offered online enrollment and online cancellation, and 22.2 percent (*i.e.*, 12/54) offered telephone enrollment and

telephone cancellation. Extrapolating the baseline cancellation methods from enforcement matters may weight the online enrollment/telephone cancellation subscriptions and the telephone enrollment/telephone cancellation subscriptions more heavily than is currently experienced in the market. It also assumes that there are no subscriptions offered in the baseline with cancellation methods that are already compliant with the provisions of this Rule. The Commission explores the impacts of these limitations in a sensitivity analysis in section (d).

Multiplying the distribution of cancellation methods for subscriptions entered into online and over the phone by the total number of cancellations of online and telephone subscriptions, the Commission estimates the annual number of cancellations that fall into each of these categories. In Year 1, the

Commission estimates that, in the absence of this final Rule, there would be 231.39 million cancellations by telephone of subscriptions entered into online, 38.56 million online cancellations of subscriptions entered into online, and 77.13 million telephone cancellations of subscriptions entered into over the phone.

(iii) Summary of Subscription Cancellations by Enrollment and Baseline Cancellation Method

Table 4 provides the number of subscription cancellations each year distributed across the four matched enrollment and regulatory baseline cancellation method categories: online enrollment and telephone cancellation; online enrollment and online cancellation; telephone enrollment and telephone cancellation; and in-person enrollment.

TABLE 4—CANCELLATIONS BY ENROLLMENT AND BASELINE CANCELLATION METHOD

[In millions]

| Year | Online enrollment, telephone cancellation | Online enrollment, online cancellation | Telephone enrollment, telephone cancellation | In-person enrollment |
|---|---|---|---|---|
| 1 | 231.39 | 38.56 | 77.13 | 14.62 |
| 2 | 233.18 | 38.86 | 77.73 | 14.73 |
| 3 | 234.96 | 39.16 | 78.32 | 14.84 |
| 4 | 236.75 | 39.46 | 78.92 | 14.96 |
| 5 | 238.54 | 39.76 | 79.51 | 15.07 |
| 6 | 240.33 | 40.06 | 80.11 | 15.18 |
| 7 | 241.79 | 40.30 | 80.60 | 15.27 |
| 8 | 243.26 | 40.54 | 81.09 | 15.37 |
| 9 | 244.72 | 40.79 | 81.57 | 15.46 |
| 10 | 246.18 | 41.03 | 82.06 | 15.55 |

(3) Total Quantified Benefits

To estimate total benefits from this final Rule, the Commission first matches the enrollment and baseline cancellation method categories from the previous section to the four scenarios used to estimate the per-cancellation benefit. The Commission assumes that, under this final Rule, subscriptions enrolled online and cancelled over the

phone in the baseline would move to online cancellations; subscriptions enrolled online and cancelled online would move to simpler online cancellation; subscriptions enrolled over the phone and cancelled over the phone would move to simpler telephone cancellation; and subscriptions enrolled in person would allow online or phone cancellation.

Next, the Commission multiplies the number of cancellations in each baseline category by the matched per-cancellation benefit on the low- and the high-end and then sums across all four categories to obtain total benefits each year. Those totals are presented in Table 5. In the first year following implementation of the final Rule, the Commission estimates the benefits will

---

marketers' conduct that occurred prior to the passage of ROSCA), as ROSCA matters for the purposes of assessing the incremental benefits of the final Rule relative a regulatory baseline of ROSCA's simple cancellation mechanism.

[582] In a few of these matters, online cancellation was offered in addition to telephonic cancellation, and to simplify the analysis, the Commission attributed half to the measure of telephonic cancellations and half to the measure of online cancellations. In a few other instances the Commission's designation of "online" cancellation includes cancellation by email or within the marketer's app.

[583] In contrast, other evidence indicated that 81.25% of U.S. online marketers offered online cancellation. *See, e.g.,* Sinders (2023). Different research looked at nine U.S. news media publishers

that sold subscriptions online. When two "personas" created by the researchers subscribed to each of the nine publications, and then attempted to cancel, 17 of the 18 subscriptions could be canceled online; one publication permitted only the California resident persona to cancel online and offered only telephonic cancellation to the persona posing as a Texas resident. *See* Ashley Sheil, *et al.,* "Staying at the Roach Motel: Cross-Country Analysis of Manipulative Subscription and Cancellation Flows," in Mueller, F.F. (ed.), CHI '24: Proceedings of the CHI Conference on Human Factors in Computing Systems (May 11–16, 2024), *https://repository.ubn.ru.nl/handle/2066/30690.*

[584] In some of the 36 matters, no cancellation method was disclosed by the seller, and in a few other matters consumers were required to return merchandise through the mail to prevent a free trial

from rolling over into a subscription or to obtain a refund for merchandise that was shipped to a consumer, and for which the consumer was charged. Such instances generally occurred before the passage of ROSCA, and it is highly unlikely that an online marketer who offered only a mailed-in cancellation could be in compliance with ROSCA's requirement that cancellation mechanisms be "simple." Without loss of generality, the Commission therefore treats instances in which online cancellation was not offered as instances in which only telephonic cancellation was offered to consumers.

[585] Some required the return of merchandise through the mail if consumers wanted refunds. In two matters, no cancellation mechanism was revealed. Without loss of generality, we assume that cancellation could take place telephonically.

Appellate Case: 24-3137     Page: 55     Date Filed: 12/05/2024 Entry ID: 5463205

range between $661.52 million and $5.32 billion. In Year 10, the Commission estimates the benefits will range between $703.82 million and $5.66 billion. Using a 2 percent discount rate, the Commission estimates the present discounted value of benefits over 10 years to range between $6.13 and $49.32 billion. Annualized over 10 years using a 2 percent discount rate, the Commission estimates the benefits to range between $682.83 million and $5.49 billion per year.

TABLE 5—TOTAL QUANTIFIED BENEFITS

[In millions, 2023 dollars]

| Year | Low | High |
|---|---|---|
| 1 | $661.52 | $5,318.76 |
| 2 | 666.63 | 5,359.88 |
| 3 | 671.75 | 5,401.01 |
| 4 | 676.86 | 5,442.14 |
| 5 | 681.98 | 5,483.26 |
| 6 | 687.09 | 5,524.39 |
| 7 | 691.27 | 5,558.00 |
| 8 | 695.45 | 5,591.62 |
| 9 | 699.63 | 5,625.23 |
| 10 | 703.82 | 5,658.84 |
| Present Discounted Value of Benefits over 10 years, 2% discount rate | 6,133.57 | 49,315.39 |
| Annualized Benefits over 10 years, 2% discount rate | 682.83 | 5,490.11 |

**(c) Estimated Costs of the Final Rule**

This section describes the costs associated with firms coming into compliance with the final Rule, provides quantitative estimates where possible, and describes costs that are only assessed qualitatively. Whereas benefits were estimated based on cancellation transactions, compliance costs are estimated on the basis of firms covered by the final Rule. The Commission first examines the comment record on compliance costs and then estimates the compliance costs for the initial year and subsequent nine years following implementation of the final Rule.

**(1) The Comment Record**

The comment record has not provided specific data useful to the estimation of the costs of compliance with the disclosure, cancellation, and recordkeeping requirements of the final Rule.

Some industry commenters addressed compliance costs by providing broad, aggregate, conclusory cost estimates; because those costs were not itemized by specific features of the Rule as proposed in the NPRM, the Commission is unable to use those comments to estimate compliance costs relevant to the substantially narrowed scope of the final Rule in comparison to the Rule proposed in the NPRM.[586] The same is

Additionally, estimates of the annual costs of maintaining systems may be blanket costs that include a host of programming maintenance features that are unrelated to the specific disclosures and "click to cancel" features of the final Rule. Moreover, NCTA's comment indicated customers of top cable operators enrolled over the phone (43%), online (30%), and in person (24%) and calls to customer service are answered within 30 seconds and lines are available 24 hours a day, 7 days a week. Accordingly, no extra compliance steps may be necessary with respect to offering final Rule-compliant cancellations for enrollments made by telephone, and compliance with the final Rule's requirement that firms offer an extra cancellation mechanism for in-person enrollments likely could be met through reliance on these firms' existing telephonic cancellation capabilities. Accordingly, the provision of an online cancellation mechanism will be required only for the 43% of their consumers who presently enroll online, and NCTA has not provided estimates of compliance costs that are specifically tailored to that segment of their consumer base. Because NCTA members who enroll consumers online already, clearly, have websites, the Commission rejects the notion that adding "click to cancel" functionality to websites that already include an order path for enrolling, and likely also include functionality for registering a payment mechanism for automated billing, would cost $12–$25 million, particularly in light of NCTA's discussion of compliance with the 2019 Television Viewer Protection Act ("TVPA") which, NCTA claims, already regulates *the very same practices* the FTC is attempting to regulate here. NCTA further claims major cable operators estimate that it cost approximately $2.5 to 4 million per company and took about one year for TVPA compliance. However, having *already* incurred the costs to comply with "the very same practices" the final Rule addresses in the course of complying with the TVPA, there would appear to be no incremental costs to comply with the final Rule. Therefore, because the final Rule is narrower in scope than as proposed in the NPRM and because it offers firms the opportunity to apply to be excluded, the Commission rejects NCTA's claim compliance with the Rule would be multiples of TVPA compliance costs and require building online cancellation systems virtually from the ground up and expensive ongoing recordkeeping requirements across all services. Accordingly, the Commission does not include in the estimates of compliance

generally true of testimony and expert reports submitted in conjunction with the informal hearing. Those materials did not focus on providing specific, relevant, data that would permit estimating compliance costs of the final Rule.[587]

costs the aggregate, non-specific, and possibly idiosyncratic compliance costs NCTA cites. Similarly, an expert's survey submitted by IAB (attachment B to FTC–2024–0001–0010) found only six respondents (out of more than 100,000 companies subject to the proposed Rule) indicated the annual cost of compliance would be a total of $50 million, but provided no itemization of these costs, such that they cannot be disaggregated to comport with the narrower scope of the final Rule.

[587] For example, an expert report (Christopher Carrigan and Scott Walster, FTC–2024–0001–0026) filed by IAB concluded the effects of the proposed Rule, if finalized, on the U.S. economy would surpass $100 million annually. The Commission agrees with this conclusion. The Commission disagrees, however, with both the initial and ongoing compliance costs used by Carrigan-Walster; both were likely based on replicating assumptions made in the preliminary regulatory analysis in the NPRM. Their assumptions are inappropriate to this cost analysis because they fail to account for the fact firms subject to the final Rule, unlike firms subject to the proposed Unfair or Deceptive Fees Rule, are already required to provide clear and conspicuous disclosures of all material facts relating to the sale of negative option contracts under the totality of ROSCA, the TSR, and section 5 of the FTC Act, and to provide simple cancellation mechanisms under ROSCA for those firms covered by ROSCA. In addition, firms subject to the final Rule are also required to comply with a variety of other laws relating to negative option sales, including the current Prenotification Rule, EFTA, the Unordered Merchandise Statute, numerous State laws, various laws and regulations that effect specific industries, such as the Television Viewer Protection Act of 2019 (TVPA), other FCC regulations, and, for multi-national entities, various foreign laws. Accordingly, the units of specialized labor, *e.g.*, lawyer, web developer, and business analyst time, that Carrigan-Walster adopt from the Unfair or Deceptive Fees NPRM are not valid representations of the usage of such inputs that are *incremental* to compliance

[586] For example, NCTA, FTC–2023–0073–0008, indicated some major cable operators estimate it could cost $12–$25 million per company and take 2–3 years to rebuild their systems and *one* of its members thought annual costs could be 15–20% of the implementation costs (an industry rule of thumb). This comment does not itemize costs across different elements of the specific rules adopted.

Another commenter addressed the Paperwork Reduction Act cost estimate in the NPRM in a way that conflated it with the totality of compliance costs. IFA, which represents firms, including small firms, in the fitness, preventative healthcare, personal wellness or children's extracurricular activities industries, commented, "the FTC's estimate (in the NPRM) that it will cost companies merely three hours annually at $22.15/hr to comply is grossly understated for IFA's members." [588] The Commission agrees the final Rule's compliance costs will exceed the Paperwork Reduction Act costs discussed in the NPRM because the Paperwork Reduction Act costs only include burden associated with information collection requirements, such as recordkeeping and disclosure costs, while the total compliance costs include those costs as well as costs of familiarization with the Rule and costs to bring cancellation mechanisms into compliance. IFA did not, however, provide a sufficiently detailed alternative estimate of annual or ongoing general compliance or recordkeeping costs for its members. [589] Similarly, IFA provided no information on the enrollment mechanisms used by its members nor an estimate of what share of its members offer negative option plans. [590]

IFA did, however, comment that many of its members already offer consumers the ability to pause or "freeze" memberships, noting, "consumers take advantage of alternatives to membership cancellation at rates of 10% to 40%, with many consumers electing to reactivate their memberships, saving thousands of dollars annually in increased membership rates and additional initiation fees." While pause/freeze capabilities are indeed beneficial to consumers, they do not relieve a firm from an obligation to offer a cancellation mechanism. IFA did not provide similar data on what percentage of its member firms' consumers are dissatisfied with pause/freeze opportunities and seek authentic cancellations or what cancellation mechanisms its member firms make available to consumers.

The technological capability to pause or freeze subscriptions suggests the presence of software architecture "scaffolding" upon which a cancellation mechanism could be built at a modest incremental cost. Alternatively, the offering of subscription pauses or freezes by some IFA members may suggest those members use the services of third-party e-commerce hosting platforms or payment processors who routinely provide consumer subscription account management tools relied on by businesses, including small businesses. As discussed, below, existing software scaffolding and the utilization of third-party consumer subscription management tools can facilitate low- (and even no-) cost compliance with some of the final Rule's requirements.

(2) Initial Compliance Costs

The Commission has previously estimated that 106,000 firms offer negative option plans. [591] The

Commission assumes that to come into compliance with the final Rule, all 106,000 firms selling negative option plans will need to expend some resources to familiarize themselves with the final Rule and some firms will incur costs related to improvements in their pre-consent disclosures and cancellation mechanisms.

*Familiarization costs:* No commenters presented estimates expressly related to the costs of legal and managerial review of the final Rule and front-line staff training needed to come into compliance. The U.K. "Impact Assessment," using surveys and interviews with managers of firms that sold goods and services via negative options, found that firms would need between four and 16 hours of "senior staff" time, depending upon the size of the firm, to gain familiarization with their proposed rule, and between zero and 80 hours of "service staff" time, again depending upon the size of the firm. [592] The Commission assumes that similarities between American and British firms are such that the same units of time are relevant for American firms to gain familiarity with the final Rule. In the American context, the Commission assumes "senior staff time" is proxied by "attorney time," and uses the mean hourly wage for attorneys, $84.84 per hour, to estimate those costs. [593] Similarly, the Commission assumes "service staff time" is proxied by the average of mean wages for salespersons and clerical workers, which is $23.27. [594] Accordingly, the

---

with the final Rule relative to its existing regulatory baseline.

[588] *See* IFA, FTC–2024–0001–0001.

[589] IFA provided an extreme example relevant to what it identified as a preventative healthcare franchise system without disclosing how many individual firms belonged to that system. In the context of that system, IFA stated it would take thousands of hours to access if modifications are necessary to existing contracts, marketing, and operational processes and implement any requirements, costing hundreds of thousands of dollars. IFA did not, however, provide detailed, itemized, estimates of compliance costs that relate to the specific features of the final Rule, which has been substantially streamlined relative to what was proposed in the NPRM, making IFA's highly aggregated notion of compliance costs for one particular group system' inapplicable to the current cost analysis. The same lack of specificity is present in IFA's discussion of "Fitness franchise systems." With somewhat greater specificity, IFA estimates costs to comply with disclosure and recordkeeping requirements are 24 hours annually, but IFA did not disclose what type of labor inputs are involved in those tasks nor the number of fitness facilities that will incur these costs. Moreover, IFA reveals its members estimate the impact to member lifetime value will exceed $100,000 per fitness center and lost revenue is expected to be nearly $40,000 annually per fitness center, but these figures cannot properly be considered compliance costs as they may, in fact, represent benefits consumers receive from speedier exits from fitness club memberships that are no longer wanted by consumers.

[590] Some of its members may offer yearly contracts that do not auto-renew, but that apportion payments over 12 months for the convenience of consumers. Such contracts are installment plans, and not negative option plans. Others may conduct business on a pay-as-you-go basis.

[591] As explained in the NPRM, this estimate is based primarily on data from the U.S. Census North American Industry Classification System (NAICS) for firms and establishments in industry categories wherein some sellers offer free trials, automatic renewal, prenotification plans, and continuity plans. Based on NAICS information as well as Commission staff's own research and industry knowledge, the Commission identified an estimated total of 530,000 firms involved in such industries. However, the Commission estimates only a fraction of the total firms in these industry categories offer negative option features to consumers. For example, few grocery stores and clothing retailers, which account for approximately a third of the of the total estimate from all industry categories, are likely to regularly offer negative option features. In addition, some entities included in the total may be exempt from the Commission's authority. Accordingly, the Commission estimates approximately 106,000 business entities (20%) offer negative option features to consumers. *See* 88 FR 24733. Although no commenter proposed a different number, ETA, FTC–2023–0033–1004, challenged the

Commission's estimated number of firms selling negative option plans on the basis that it did not account for "the many providers of goods and services to business where automatic renewal clauses are used."

[592] *See* U.K. "Impact Assessment" (2023) at 26. While the U.K.'s rule may not be directly analogous to the final Rule, it addresses similar problems associated with consent and cancellation associated with negative option practices. Therefore, the burden the U.K.'s rule places upon subscription sellers, in terms of executive and staff resources to read and understand the rule and assess whether existing procedures are in compliance or need to be revised, may be highly similar to the familiarization steps that U.S. businesses will need to undertake.

[593] The mean hourly wage for lawyers in 2023 was $84.84; *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 23–1011 Lawyers," *https://www.bls.gov/oes/current/oes231011.htm*.

[594] The Commission uses a mean hourly wage for sales personnel of $25.62; *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 41–0000 Sales and Related Occupations (Major Group)," *https://www.bls.gov/oes/currenT/oes410000.htm*. The Commission uses a mean hourly wage for clerical workers of $20.94, *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 43–9061 Office Clerks, General," *https://www.bls.gov/oes/currenT/oes439061.htm*. The average of these two mean wage rates is $23.27.

Commission estimates the aggregate initial year familiarization costs as ranging between $35.97 million and $341.22 million.

*Disclosures:* Clear and conspicuous disclosures are already required by the existing regulatory baseline; § 425.4(a)(1)–(4) of the final Rule adds specificity to those disclosures, albeit in a flexible way.[595] As estimated below, the Commission assumes some marketers are already in compliance with the disclosure requirements of the final Rule; for these marketers, there are no incremental costs of compliance with the disclosure requirements of the final Rule.

For online marketers, the current regulatory baseline is ROSCA, which requires marketers to clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information. To the extent ROSCA-covered marketers' current disclosures lack the specificity required by the final Rule, the Commission estimates changes will be needed only to textual elements of such marketers' websites and that no changes to the underlying website architecture will be needed. The Commission further assumes any such changes, if needed, will be made by website developers, whose mean hourly wage is $45.95.[596] Similarly, some telemarketers and in-person negative option marketers may need to modify their sales agents' scripts to incorporate the disclosures required by the final Rule. Without loss of generality, the Commission assumes the mean wage rates of marketers' staff who will make such script changes is proxied by the mean wage rates of web developers.[597] Although in the Commission's experience these changes should take very little time, perhaps as little as one hour, the Commission adopts a range of one to 10 hours to complete this task.[598]

Accordingly, the Commission estimates that for those marketers whose disclosures are not already in compliance with the requirements of the final Rule, disclosure compliance costs will range between $45.95 and $459.50.

*Cancellation mechanisms:* Section 425.6 of the final Rule requires negative option marketers to provide a simple cancellation mechanism that is in the same medium, and at least as simple for the consumer to use, as the mechanism by which the consumer provided consent to the negative option plan. Additional requirements are medium-specific. For example, when consent is provided through an interactive electronic medium, the cancellation mechanism (also provided through an interactive electronic medium) must be easy for the consumer to find when the consumer seeks cancellation information (for example, on a website, the cancellation mechanism cannot be hidden in "terms and conditions" or otherwise difficult to find) and cannot require interactions with live or virtual representatives (such as chatbots) if no such interactions were required when the consumer consented.

When consent is provided over the telephone, the final Rule requires that telephonic cancellation must be available during normal business hours and not be more costly for the consumer to use than the telephone call the consumer used to consent to the negative option feature.

When consumer consent to a negative option plan is provided via an in-person method, the marketer must offer cancellation opportunities, where practical, in a like manner. In addition, the marketer must offer an alternative simple cancellation mechanism through an interactive electronic medium or by providing a telephone number that satisfies all final Rule requirements related to use of those cancellation media.

The costs negative option sellers will incur in the initial year following implementation of the final Rule to bring their cancellation mechanisms into compliance with the final Rule will depend upon their pre-existing cancellation mechanisms. No commenter provided research or data on the frequency of use of different cancellation mechanisms across negative option marketers or on the incremental costs to make the existing cancellation mechanism compliant with the requirements of the final Rule.[599]

Because the comment record has not provided sufficient data to estimate the costs of compliance with the final Rule's cancellation requirements, the Commission turns to data from the U.K.'s "Impact Assessment" on regulating subscriptions there. Based on these sources, the Commission finds some sellers of negative option plans are already in compliance with the cancellation requirements of the final Rule, and many others will incur only minimal costs to make their cancellation flows compliant with the final Rule.

The relevant experimental research looked at the cancellation practices of 16 online subscription sellers, many of them large and well-known firms, and noted the cancellation mechanisms made available to consumers and how easy those mechanisms were for consumers to locate and use.[600] Although the number of firms sampled in this research was small, publicly available data on total enrollments, located for just seven of the 16 firms, collectively numbered over 350 million,[601] which may lend significance

---

[595] The final Rule requires disclosure of: the fact consumers will be charged; the amount(s) they will be charged; when the consumer must act (by deadline or frequency) to prevent or stop charges; and the information needed for the consumer to find the simple cancellation mechanism.

[596] *See* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 15–1254 Web Developers," *https://www.bls.gov/oes/2023/may/oes151254.htm.*

[597] This is consistent with the approach taken in the expert report submitted by IAB. *See* Carrigan-Walster, FTC–2024–0001–0026 (noting many firms using negative option marketing present offers through the internet and, for presenting offers through other means, web developer time is used as a proxy for worker time to create the presentation of the offers).

[598] The assumed range of one to 10 hours is consistent with the time estimate used for compliance checks and minor modifications of websites in the Unfair or Deceptive Fees NPRM. *See* 88 FR 77420 (Nov. 9, 2023).

[599] Trade association commenters who addressed cancellation mechanisms used by their members, and whether those mechanisms were or were not symmetric with enrollment mechanism or as easy

to use as enrollment mechanisms did so only in a very general manner. For example, NCTA (FTC–2024–0001–0011) commented that, in 2021 and 2022, customers of top cable operators enrolled over the phone (43%), online (30%), and in person (24%)" but provided no information on available cancellation mechanisms. Additionally, NCTA stated its analysis shows complaints received about cancellation are very limited (approximately 0.017% of cancellations) out of the approximately 14 million customers who cancelled some or all of their services from NCTA's largest cable operator members in 2022. Anecdotes such as these, about "top" or "largest" companies do not provide sufficiently reliable data for the instant analysis. Similarly, IHRSA's comment about "many" fitness club operations allowing options to cancel by simple online solutions is not specific enough to be helpful (*see* FTC–2024–0033–0863).

[600] *See* Sinders (2023).

[601] The Commission located subscriber estimates for seven (Amazon, Ancestry, Hulu, Netflix, Paramount+, The Boston Globe, and The New York Times) of the 16 firms included in the research. The number of U.S. subscribers to Amazon Prime is estimated to reach 171.8 million in 2024. *See https://www.yaguara.co/amazon-prime-statistics.* At year-end 2023, Ancestry.com had over 3 million subscribers. *See https://www.ancestry.com/corporate/newsroom/press-releases/ancestry-releases-2023-annual-impact-report-underscoring-corpor.* As of the second quarter of 2024, Hulu had 50.2 million paid U.S. subscribers. *See https://www.statista.com/statistics/258014/number-of-hulus-paying-subscribers).* Also as of the second quarter of 2024, Netflix had 84.11 million subscribers in the U.S. and Canada. *See https://www.statista.com/statistics/483112/netflix-subscribers.* Even if the Commission makes the extreme assumption that every Canadian held a Netflix subscription, that would still leave approximately 50 million U.S. subscribers. Paramount+ had over 71 million subscribers as of the first quarter of 2024. *See https://www.theverge.com/2024/4/29/24144766/paramount-plus-now-has-over-71-million-subscribers).* The Boston Globe had 260,000 (mostly digital) subscribers in 2023. *See https://pressgazette.co.uk/north-america/us-local-news-*

to this research beyond what might otherwise be associated with a sample size of 16 firms. Moreover, the methodology of the study suggests that the researcher's experiences with enrollment and cancellation likely would be typical of any consumer undertaking the same enrollment and cancellation tasks with those firms.

The experimental research found that 18.75% (*i.e.,* 100 × 3/16) of the online marketers studied offered online cancellations in a straightforward, easy to use manner such that it took the researcher less than one minute to complete a subscription cancellation. The Commission therefore assumes that 18.75% of online sellers of negative option plans will not need to change their websites to come into compliance with the cancellation requirements of the final Rule. Although this research did not specifically measure the adequacy of pre-consent disclosures, the Commission assumes that companies who make cancellation so easy for consumers perform equally well in making disclosures. Accordingly, the Commission assumes that the 18.75% of online firms selling negative options that will not incur incremental costs to comply with the final Rule's cancellation requirements also will not incur any incremental costs to comply with the final Rule's disclosure requirements. The Commission assumes that the remaining 81.25% of online negative option sellers that lacked such easy-to-use cancellation mechanisms also performed less well in making the disclosures required by the final Rule, such that they would incur initial year compliance costs of improving their disclosures as indicated by the range estimated above.

The same research found that 62.5% (*i.e.,* 100 × 10/16) of sampled online negative option sellers had cancellation paths that took longer for consumers to complete as a result of nomenclature, not website architecture. These sites, rather than using straightforward terms such as "unsubscribe" or "cancel," put the cancellation path under titles such as "auto-renew" or "edit plan,"[602] and locating the cancellation mechanism delayed the researcher in completing the cancellation task because of the non-

intuitive labeling of the entry point into the cancellation mechanism. In such instances, more intuitive, consumer-friendly labeling of the existing cancellation architecture is assumed to be what is needed for these sites to come into compliance with the cancellation requirements of the final Rule. The Commission assumes such relabeling will not require any additional programming or changes to the underlying website architecture. In the Commission's experience, such "cosmetic" changes can be made quickly and inexpensively, possibly in as little as one hour of a website developer's time. The Commission notes, however, that the U.K. "Impact Assessment," in considering "general updates to websites such as reflecting the clearer communication on contract conditions and updating cancellation options," estimated that such changes would "require eight hours' work from an IT professional and that these costs are uncorrelated with the size of the business."[603] The website changes contemplated in that assessment likely exceed those required to merely relabel consumer-facing elements of an existing cancellation architecture. Out of an abundance of caution, however, the Commission uses the U.K.'s estimate of eight hours as an upper bound on the time required to make the needed changes and further assumes that the relevant "IT professionals" are website developers, which, as noted previously, have a mean wage rate of $45.95. Accordingly, the Commission assumes each firm that needs to relabel existing cancellation mechanisms to make those mechanisms easy for consumers to locate and use will spend between $45.95 (*i.e.,* 1 × $45.95) and $367.60 (*i.e.,* 8 × $45.95) to come into compliance with the final Rule's cancellation requirements.

Lastly, the aforementioned research found that 18.75% (*i.e.,* 100 × 3/16) of online negative option sellers offered only telephonic cancellation. Such firms, because they were online sellers, clearly had online ordering and payment website architecture in place, and so had "scaffolding" upon which online cancellation architecture could be built. No commenter provided relevant data on the costs of building-out a "click-to-cancel" mechanism in such instances, and the U.K "Impact Assessment" indicated it "lacked high quality evidence on the costs businesses would incur" to integrate "easy exiting mechanisms into websites." As a result, the "Impact Assessment" turned to "external estimates" from "[t]he U.S.

eCommerce agency OuterBox [which] indicates a possible range of costs. It suggests that integrating simple tools into an existing eCommerce platform would cost most businesses approximately $500" in 2022.[604] In 2023 dollars, that amount is $532.05.[605] The Commission notes, however, that many payment processors and website hosting platforms used by many businesses, particularly small and medium-sized businesses, provide marketers with consumer subscription account management tools that provide consumers with "click-to-cancel" functionality at no direct[606] incremental cost to marketers.[607] As no commenter

---

*subscribers-ranking.* As of mid-year 2024, the New York Times had 10.8 million subscribers. *See https://www.nytimes.com/2024/08/07/business/ media/new-york-times-earnings.html.* The Commission was unable to locate subscriber data for some of the other firms sampled (*e.g.,* Savage Fenty, Daily Harvest, Deliveroo) and in some other instances found subscriber data reported only on a global basis (*e.g.,* Google One, Adobe).

[602] In the researcher's view, this kind of naming is confusing and adds unnecessary friction to the cancellation process. *See* Sinders (2023).

[603] U.K. "Impact Assessment" (2023) at 26.

---

[604] U.K. "Impact Assessment" (2023) at 27 (citing a report from 2022).

[605] *See* Bureau of Labor Statistics, "CPI Inflation Calculator," *https://www.bls.gov/data/inflation_ calculator.htm.* We note that this amount is equal to 10.25 hours of computer programmer time valued at a mean hourly wage rate of $51.90; *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 15–1251 Computer Programmers," *https://www.bls.gov/current/ oes151251.htm.* As such, this is consistent with the outcome of the approach used by Carrigan-Walster, FTC–2024–0001–0026, in proxying the first-year costs of compliance costs with each of the six provisions of the Rule proposed in the NPRM (which differed, substantially, from the narrowed final Rule, although not with respect to "click to cancel" provisions). That approach made the ad hoc assumption that technological changes required by the Rule would require the same labor inputs as similar requirements in the NPRM for the FTC's Rule on Unfair or Deceptive Fees, notwithstanding the two rules differ substantially in their regulatory baselines. *See* 88 FR 77420.

[606] To the extent that a marketer uses the easy subscription account management and cancellation tools offered by hosting platforms or payment processors and the presence of such tools reduces consumers' perception of the risks of entering into a subscription agreement with the marketer, the marketer's sales may increase along with any payments to the platform or processor that are based on the number of transactions or aggregate sales.

[607] *See,* for example, Shopify's help page at *https://help.shopify.com/en/manual/products/ purchase-options/shopify-subscriptions/customer-experience#subscription-management-for-customers,* "Shopify Subscriptions displays subscription information to customers in the checkout. For example, when buying a subscription product, the order frequency and discount amount for the subscription is displayed in the order summary . . . . During checkout, your customer needs to agree to the cancellation policy terms to confirm that they understand they're purchasing a subscription. They can't complete their purchase without agreeing to this policy . . . . Customers can log in to their customer account to view and manage their subscription orders. Customers can resume, skip, and cancel their subscriptions, and manage their payment methods and shipping address." Moreover, Shopify offers a variety of consumer subscription management tools to merchants that use Shopify for payment processing ("checkout") or website hosting at no incremental cost to merchants *See https://apps.shopify.com/ categories/selling-products-purchase-options-subscriptions.* The fees Shopify charges merchants varies with a number of merchant-specific features, including website design elements, whether merchants want "Shopify checkout" to work on

Continued

provided information on (1) how many negative option sellers comply with ROSCA by offering only telephonic cancellation, (2) what specific costs they would face to provide an online cancellation mechanism, or (3) whether they would build such functionality themselves or use a third-party payment processor or hosting platform to provide it for them, we estimate such costs to range between $0 and $532.05 per firm.

Accordingly, the Commission assumes that most online marketers of negative option plans will face minimal IT costs of coming into compliance with the cancellation requirements of the final Rule.[608]

As noted previously, telemarketers have substantial control over both how long the consent process takes and how long it takes a consumer to complete a cancellation over the telephone. If compliance with the final Rule expedites the cancellation process over the phone, telemarketers may experience cost-savings associated with such resources. Furthermore, no telemarketers or call centers that provide services to telemarketers submitted comments relating to what costs telemarketers would incur to bring cancellation mechanisms into compliance with the final Rule. Because of this, and because the Commission has previously found that only 2,000[609] of 106,000 firms selling negative options were telemarketers (and no commenter has disputed this finding), the Commission proceeds as if telemarketers face no incremental costs in complying with the final Rule's cancellation requirements. However, to reduce any potential downward bias[610] this might introduce into the

compliance cost estimate, the Commission does not subtract the estimated number of telemarketers (2,000) from the total estimated number of online negative option marketers in its calculations of costs. Similarly, the Commission lacks data on how many of the 106,000 firms selling negative option plans currently offer only in-person or by-mail cancellations.[611] The final Rule requires such firms to add a cancellation mechanism that consumers can easily use in a remote manner, *e.g.,* through interactive electronic media or by telephone.

Lastly, the Commission considers the initial year recordkeeping costs required by the Rule, which are estimated in section XIII by and large when aggregated across all 106,000 firms.

Because of the aforementioned data limitations emerging from the comment record, the Commission applies the findings of the experimental research above, which looked only at online sellers, to the full number of firms,

106,000, that it has previously estimated to be marketers of negative option plans. This approach comports with a general proposition made by the report submitted by IAB.[612]

Accordingly, the Commission makes the following estimates of initial year compliance costs.

*Familiarization costs:* All 106,000 firms selling negative options will collectively incur initial Rule familiarization costs of between $35.97 million and $341.22 million.

*Disclosure costs:* 19,875 firms (*i.e.,* .1875 × 106,000) will incur no costs in bringing their disclosures into compliance with the requirements of the final Rule because their disclosures are already compliant. The remaining 86,125 firms will collectively incur costs of between $3.96 million (*i.e.,* $45.95 × 86,125) and $39.58 million (*i.e.,* $459.50 × 86,125) to make their disclosures compliant with the final Rule.

*Cancellation costs:* 19,875 firms (*i.e.,* .1875 × 106,000) will incur no costs in bringing their cancellation mechanisms into compliance with the final Rule. 66,250 firms (*i.e.,* .625 × 106,000) collectively will incur costs of between $3.04 million (*i.e.,* 1 × $45.95 × 66,250) and $24.35 million (*i.e.,* 8 × $45.95 × 66,250) to bring their online cancellation mechanisms into compliance with the final Rule by relabeling consumer-facing elements of their existing cancellation architecture. 19,875 firms (*i.e.,* .1875 × 106,000) collectively will incur costs of between $0 and $10.57 million (*i.e.,* 19,875 × $532.05) to bring their telephonic cancellation mechanisms into compliance with the final Rule.

The Commission notes that this analysis does not quantify costs for the firms selling negative option plans that offer only in-person or by-mail cancellation. The Commission assumes that, in complying with this final Rule, these firms will choose to provide the alternative cancellation method (by phone, online, or both) that makes the most economic sense. The Commission also assumes that the cost of processing a cancellation over the phone should be similar to or less than the cost of processing a cancellation in person or by-mail for these firms. Therefore, the Commission assumes that these firms will not incur significant compliance

---

[608] No commenter to the ANPR or NPRM, and no comment, expert report, or testimony in relation to the informal hearing provided estimates of compliance costs firms would incur that were specific to the features of the Rule as then-proposed that remain in the final Rule.

[609] *See* NPRM, 88 FR 24733.

[610] Because telemarketing firms are such a small share of all firms that will be covered by the final Rule, the Commission does not expect this treatment of telemarketers (or, indeed, even a total exclusion of telemarketers from the analysis) to impart a significant bias.

social media platforms in addition to the merchant's own website, how many of the merchant's employees will have the ability to log-in to the merchant's Shopify account, etc. (*see https://aureatelabs.com/blog/shopify-website-development-cost*). So, although what merchants pay to use Shopify may vary across firms, the incremental cost of using Shopify for consumer subscription account management is assumed to be zero. *See also* Hoofnagle, FTC–2023–0033–1137 ("There are scores of companies like Chargebee that help companies manage subscriptions . . . . Compliance with new rules is inexpensive because policy changes can be made programmatically in dashboards" provided by entities such as Chargebee.").

[611] Three trade associations, who have some members who either sell or offer cancellation mechanisms in-person, submitted comments that were not sufficiently detailed to permit Commission staff to estimate the number of firms that both sell and cancel in-person or through the mail. For example, IHRSA (FTC–2023–0033–0863) commented many of its members allow several options for agreement termination through simple online solutions including online account management, email cancellation requests, and specific online cancellation buttons or forms, adding many of these options are currently available for members who have purchased their membership either online or in person. The International Carwash Association ("ICA"), FTC–2023–0033–1142, commented on subscription-related revenues of member firms (noting more than half, and sometimes more than 80%, of store revenues can be attributable to subscription sales), but not on the number of firms that sell subscriptions or how many subscriptions they sell. Similarly, although it commented subscriptions could be purchased in person, on the world wide web, via a mobile app, or at an automated teller, it provided no data on the relative shares of subscription purchases through these channels or the cancellation mechanisms made available to consumers. The objections ICA raised to a Rule requiring its members to offer cancellation by any method other than in-person strongly suggests that most member firms currently only offer cancellation that way, suggesting that those who sell on the internet, via a mobile app and (possibly) at an automated teller may already be in violation of ROSCA if in-person cancellations are a violation of ROSCA's "simple cancellation mechanism" requirement. IFA (FTC–2023–0033–0856) provided data from its database on the number of franchisees operating fitness establishments, spa/massage studios, entertainment facilities, and preventative healthcare facilities in the U.S., but provided no information on what share of firms sold subscriptions or the media through which consent was obtained or cancellation mechanisms were offered. In a later comment (FTC–2024–0001–0009), IFA noted consumers of member firms used the alternative of "freezing" their memberships at rates of 10%–40% but did not provide information on what the "freezing" mechanism was or what cancellation mechanisms were available to consumers.

[612] *See* Carrigan-Walster, FTC–2024–0001–0026 (employing a similar assumption: "Many firms using negative option marketing present their offers through the web. For those firms that present offers through other means, web developer time is used as a proxy for worker time to create the presentation of the offers.").

costs to provide an alternative cancellation method.

*Recordkeeping costs:* Collectively, firms will incur recordkeeping costs of $6.54 million annually.

*Total Initial Year Costs:* Summing costs enumerated above, the Commission estimates the costs of the Rule in the first year will range between $49.52 and $422.26 million. These costs

are presented in Table 6. The Commission assumes that these costs will be incurred by the end of the initial year following the Rule's implementation.

TABLE 6—TOTAL INITIAL YEAR COMPLIANCE COSTS

[In millions, 2023 dollars]

|  | Low | High |
|---|---|---|
| Familiarization Costs | $35.97 | $341.22 |
| Disclosure Costs | 3.96 | 39.57 |
| Cancellation Mechanisms Costs | 3.04 | 34.93 |
| Recordkeeping Costs | 6.54 | 6.54 |
| Total Initial Year Costs | 49.52 | 422.26 |

(3) Ongoing Compliance Costs, Years 2 Through 10

Compliant disclosures, cancellation paths, and consumer-facing information about cancellation mechanisms will form a ''template'' that can be used without any incremental compliance costs as new subscription products are added to a marketer's retinue of products offered for sale via a negative option plan. The information relevant to the sale of a new product may be ''dropped'' into the template in a fill-in-the-blank way. The Commission assumes marketers, in the ordinary course of business, know what is required for the disclosures (*e.g.,* the amounts consumers will be charged, when, by date or frequency, such charges will occur, when consumers must act to stop recurring charges, etc.) and consider the costs of entering this information into established disclosure templates to be a routine cost of doing business, not an incremental cost required by compliance with the final Rule. The same will also be true for negative option plans that are telemarketed or sold in person; once a telemarketing script or an in-person sales disclosure form is developed in the initial year of compliance, it becomes a template that readily can be used as new subscription products are offered over time. Accordingly, once a marketer comes into compliance with the final Rule there should be no incremental costs of ongoing compliance with respect to disclosures and cancellation mechanisms, and the costs of adding, changing, or deleting products the marketer offers for sale via negative option will be no different from what they would have been absent the final Rule.

The Commission can seek redress or civil penalties for violations of the final Rule. Absent the final Rule, enforcement actions against unfair or deceptive negative option practices would be

brought under section 5 where civil penalties are not available and where, post-*AMG,* it is difficult to obtain redress. Accordingly, some negative option marketers may pay closer attention to underlying claims made for products marketed using negative option sales because of the monetary relief available for violations of the final Rule relative to a section 5 enforcement action. This, however, is no different than what any firm should do to assure that it is not in violation of section 5, and the Commission considers the costs of attentiveness to section 5 compliance as part of the existing regulatory baseline, not as costs that are incremental to complying with the final Rule.

The U.K.'s ''Impact Assessment'' of its regulatory treatment of subscription plans did not estimate ongoing compliance costs because ''the size of these costs . . . are likely small in comparison to the one-off cost and benefits.'' [613] In further support of this, the ''Impact Assessment'' cited a report that found that on-going costs were meaningful only in relation to sending reminders to consumers about their subscriptions, and only for firms that used postal mail delivery and not electronically delivered reminders.[614] The final Rule does not contain a ''reminder'' requirement, and so the ongoing costs of sending reminders to consumers, small though they may be, are not ongoing costs of compliance with the final Rule.

The experts' report submitted by IAB estimated 10 hours of attorney time for annual compliance checks for the Rule proposed in the NPRM. Because the final Rule has removed the most complex (and, therefore, costly) features of the proposed Rule (*e.g.,* double consent, the treatment of ''saves'' in cancellation flows, and the issuance of annual ''reminders'' for some subscriptions), the Commission assumes half of the annual compliance check hours assumed in IAB's experts' report, five hours, is an upper bound on attorney hours needed for annual compliance checks. Moreover, the Commission assumes that some firms will incur no incremental annual compliance check costs, either because their pre-existing business practices followed what the final Rule requires or because the platforms or payment processors they use provide compliant disclosures and cancellation flows.[615]

Accordingly, the Commission estimates the aggregate annual costs of compliance checks to range between $0 and $44.97 million (*i.e.,* 106,000 × 5 hours × $84.84/hour). Inclusive of recordkeeping costs, total ongoing costs range between $6.54 million (*i.e.,* $0 + $6.54 million) and $51.51 million (*i.e.,* $44.97 million + $6.54 million).

(4) Summary of Total Costs

Table 7 presents the initial and recurring costs of this Rule in each year, as well as the present discounted value and annualized costs over 10 years using a 2 percent discount rate. The Commission estimates that in Year 1, the initial costs will range between $49.52 and $422.26 million. In each of the following years, the Commission estimates that the recurring costs will range between $6.54 and $51.51 million. The Commission estimates that the

---

[613] U.K. ''Impact Assessment'' (2023) at 30.

[614] ''We note for example, that Ofcom assessed . . . the business costs of providing customers with notifications at the end of their contracts. These involved possible ongoing costs related to identifying customers that needed notifications on an ongoing basis and providing them with the notification. After consultation with stakeholders, Ofcom only estimated the costs of providing consumers with letters, on the basis that only this medium had significant ongoing costs.'' *Id.*

[615] See discussion in section VII.B.1.a.2 of this SBP and n.146.

present discounted value of costs over ten years, using a 2 percent discount rate, will range between $100.89 and $826.15 million. The Commission estimates that these costs, annualized over ten years using a 2 percent discount rate, would range between $11.23 and $91.97 million per year.

### TABLE 7—TOTAL QUANTIFIED COSTS
[In millions, 2023 dollars]

| Year | Low | High |
|------|-----|------|
| 1 | $49.52 | $422.26 |
| 2 | 6.54 | 51.51 |
| 3 | 6.54 | 51.51 |
| 4 | 6.54 | 51.51 |
| 5 | 6.54 | 51.51 |
| 6 | 6.54 | 51.51 |
| 7 | 6.54 | 51.51 |
| 8 | 6.54 | 51.51 |
| 9 | 6.54 | 51.51 |
| 10 | 6.54 | 51.51 |
| Present Discounted Value of Costs over 10 years, 2% discount rate | 100.89 | 826.15 |
| Annualized Costs over 10 years, 2% discount rate | 11.23 | 91.97 |

(d) Sensitivity Analysis

As a sensitivity analysis, the Commission considers an alternative method that does not rely on data from historical enforcement matters for distributing subscription cancellations across the baseline subscription cancellation methods used to estimate quantified benefits. This alternative method assumes the majority of subscriptions are enrolled online and can be cancelled online in the baseline; whereas, in the main analysis, the majority of subscriptions are enrolled online and can only be cancelled by phone in the baseline. Compared with the main analysis, this alternative method produces lower total quantified benefits by $419.77 to $449.53 million annualized per year, yet the estimated range of quantified benefits still exceeds the estimated range of quantified costs.

(1) Number of Cancellations by Enrollment and Baseline Cancellation Method

Under this sensitivity analysis, the Commission assumes that the baseline number of subscriptions and cancellations is the same as in the main analysis. The Commission also assumes the number of in-person subscriptions, as proxied for by gym memberships, is the same as in the main analysis. What differs here is the approach for determining the share of cancellations likely to occur through online and telephone methods.

The main analysis uses enforcement data to determine the share of cancellations likely to occur through online and telephone methods. This data may suffer from selection bias if, among other factors, only the more egregious violations are pursued through enforcement methods. This approach also assumes no marketers of negative option plans comply with this Rule in the baseline. Further, because the data only include resolved cases and resolved cases tend to be older, they are less likely to reflect the current state of the market.

In this alternative analysis, the Commission uses statistics discussed in the NPRM—that 106,000 firms offer negative option plans and 2,000 of those firms are telemarketers.[616] Based on that, the Commission assumes 1.9 percent (*i.e.,* 2,000/106,000) of subscriptions and cancellations are enrolled and cancelled over the phone in the baseline. The Commission then assumes the remaining cancellations of subscriptions that were not enrolled over the phone or in person were instead enrolled online.[617]

To estimate the distribution of baseline cancellation methods of subscriptions enrolled online, the Commission uses the results from an experiment in which a researcher

consented to 16 online subscriptions between August 2 to October 4, 2022 and then canceled each one, recording the time it took to cancel along with a variety of other obstacles faced in cancelling.[618] Of the 16 online subscriptions, three were found to be easy to cancel online, indicating they are likely in compliance with this Rule; three required phone calls to cancel; and the remaining 10 had a non-straightforward online cancellation method. Based on these results, the Commission assumes 18.75 percent (*i.e.,* 3/16) of online subscriptions have Rule-compliant cancellation methods in the baseline; 18.75 percent (*i.e.,* 3/16) of online subscriptions require telephone cancellation in the baseline; and 62.5 percent (*i.e.,* 10/16) of online subscription offer non-Rule-compliant online cancellations in the baseline.

Table 8 provides the number of subscription cancellations each year distributed across the enrollment and regulatory baseline cancellation methods: online enrollment and telephone cancellation; online enrollment and non-Rule-compliant online cancellation; online enrollment and Rule-compliant online cancellation; telephone enrollment and telephone cancellation; and in-person enrollment.

---

[616] *See* NPRM, 88 FR 24733.

[617] The Commission acknowledges this excludes subscriptions that are enrolled by mail, likely resulting in an overestimate of the number of subscriptions enrolled online.

[618] *See* Sinders (2023). Among the obstacles noted for otherwise seemingly simple online cancellations were that some websites did not use straight forward terms, such as "unsubscribe" or "cancel," and instead put the cancellation path under titles such as "auto-renew" or "edit plan."

Appellate Case: 24-3137     Page: 62     Date Filed: 12/05/2024 Entry ID: 5463205

Table 8—Sensitivity Analysis: Cancellations by Enrollment and Baseline Cancellation Method

[In millions]

| Year | Online enrollment, telephone cancellation | Online enrollment, non-compliant online cancellation | Online enrollment, compliant online cancellation | Telephone enrollment, telephone cancellation | In-person enrollment |
|---|---|---|---|---|---|
| 1 | 63.79 | 212.63 | 63.79 | 6.87 | 14.62 |
| 2 | 64.28 | 214.27 | 64.28 | 6.93 | 14.73 |
| 3 | 64.78 | 215.92 | 64.78 | 6.98 | 14.84 |
| 4 | 65.27 | 217.56 | 65.27 | 7.03 | 14.96 |
| 5 | 65.76 | 219.21 | 65.76 | 7.08 | 15.07 |
| 6 | 66.26 | 220.85 | 66.26 | 7.14 | 15.18 |
| 7 | 66.66 | 222.19 | 66.66 | 7.18 | 15.27 |
| 8 | 67.06 | 223.54 | 67.06 | 7.22 | 15.37 |
| 9 | 67.46 | 224.88 | 67.46 | 7.27 | 15.46 |
| 10 | 67.87 | 226.23 | 67.87 | 7.31 | 15.55 |

(2) Estimating Total Benefits

To estimate total quantified benefits under this sensitivity analysis, the Commission uses the same matching of enrollment and baseline cancellation methods to per-cancellation benefit estimates as in the main analysis. The only difference here is that the Commission assumes consumers who experience Rule-compliant online cancellations in the baseline will not see any additional benefit as a result of this final Rule.

As in the main analysis, the Commission multiplies the number of cancellations in each category by the matched per-cancellation benefit on the low- and the high-end and then sums across all five categories to obtain total quantified benefits each year. Those totals are presented in Table 9 below. In the first year following implementation of the final Rule, the Commission estimates the benefits under this sensitivity analysis will range between $254.85 million and $4.88 billion. In Year 10, the Commission estimates the

benefits will range between $271.15 million and $5.20 billion. Using a 2 percent discount rate, the Commission estimates the present discounted value of benefits over 10 years to range between $2.36 and $45.28 billion. Annualized over 10 years using a 2 percent discount rate, the Commission estimates the benefits to range between $263.06 million and $5.04 billion per year. These annualized benefits estimates are between $419.77 and $449.53 million less per year than the estimates from the main analysis.

Table 9—Sensitivity Analysis: Estimates of Benefits

[In millions, 2023 dollars]

| Year | Low | High |
|---|---|---|
| 1 | $254.85 | $4,883.26 |
| 2 | 256.82 | 4,921.01 |
| 3 | 258.79 | 4,958.77 |
| 4 | 260.76 | 4,996.53 |
| 5 | 262.73 | 5,034.29 |
| 6 | 264.70 | 5,072.05 |
| 7 | 266.31 | 5,102.91 |
| 8 | 267.92 | 5,133.77 |
| 9 | 269.54 | 5,164.63 |
| 10 | 271.15 | 5,195.49 |
| Present Discounted Value of Benefits over 10 years, 2% discount rate | 2,362.97 | 45,277.43 |
| Annualized Benefits over 10 years, 2% discount rate | 263.06 | 5,040.58 |
| Difference in Annualized Benefits from Main Analysis | −419.77 | −449.53 |

4. *An explanation of the reasons for the determination of the Commission that the final Rule will attain its objectives in a manner consistent with applicable law and the reasons the particular alternative was chosen.*

As discussed above in sections I, II, and VII.A, the Commission determines the following deceptive or unfair practices are widespread in the negative option marketplace and cause consumer harm: (1) material misrepresentations made while marketing goods or services with negative option features; (2) failure

to provide important information about material terms prior to obtaining consumers' billing information and charging consumers; (3) lack of informed consumer consent; and (4) failure to provide consumers with a simple cancellation method, including failure to honor cancellation requests, refusal to provide refunds to consumers who unknowingly enrolled in programs, denying consumers refunds and forcing them to pay to return the unordered goods, and requiring consumers to

cancel using a different method than the one used to sign up for the program.

The final Rule amendments prohibit sellers from misrepresenting material facts in connection with promoting or offering for sale a good or service with a negative option feature, require negative option sellers to disclose certain important information about negative option features, obtain a consumer's express informed consent and maintain records of consumer consent for three years after the initial transaction (unless the seller satisfies

App.63

the technological exemption), and provide consumers a simple mechanism for cancellation. In promulgating the final Rule, the Commission sought to enhance consumer protections while avoiding detailed, prescriptive requirements that would impede innovation.

5. *A summary of any significant issues raised during the comments submitted during the public comment period in response to the preliminary regulatory analysis and a summary of the assessment by the Commission of such issues.*

Several commenters (*e.g.,* NCTA, IAB) raised concerns over the Commission's conclusions regarding the economic effect of the proposed Rule. NCTA asserted the NPRM lacked any meaningful cost-benefit analysis, suggesting compliance with the proposed Rule would result in significant costs to its members.[619] Among other things, NCTA said its members would be required to implement changes to their existing customer processes, review and revise existing disclosures, and revamp recordkeeping systems. During the informal hearing process, NCTA further argued it could cost major cable operator members between $12–25 million to comply with the proposed Rule.[620] Additional commenters also suggested compliance with the proposed Rule would cost more than what the Commission estimated. None of them, however, offered any empirical analysis of the issue. In response to these comments, and following the presiding officer's recommended decision, the Commission provides the detailed cost-benefit analysis above in Section X.B.3.

## XI. Final Regulatory Flexibility Act Analysis

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. 601–612, requires the Commission to conduct an Initial Regulatory Flexibility Analysis ("IRFA") with a proposed rule and a Final Regulatory Flexibility Analysis ("FRFA"), if any, with a final rule,

unless the Commission certifies the rule will not have a significant economic impact on a substantial number of small entities.[621] The Regulatory Flexibility Act further states the required elements of the FRFA may be performed in conjunction with or as part of any other agenda or analysis required by any other law if such other analysis satisfies the provisions of the FRFA.[622]

In the NPRM, the Commission provided an IRFA, stating its belief that the proposal will not have a significant economic impact on small entities, and solicited comments on the burden on any small entities that would be covered. Specifically, the Commission acknowledged it did not have sufficient empirical data to determine whether the proposed amendments may affect a substantial number of small entities; therefore, the Commission sought comment on the percentage of affected companies that qualify as small businesses.

The Commission reviewed and considered the comments in response to the NPRM and determined, as an alternative to finalizing the proposed Rule in its entirety, to modify the Rule. In particular, the Commission decided to limit the material terms to be disclosed immediately adjacent to consent for the negative option feature; remove the limitation on saves and the accompanying recordkeeping requirement; remove the annual reminder provision; and modify the length of the recordkeeping requirement for verification of consent by fixing it to three years and provide an alternative method of compliance. After careful consideration of the comments and following the Commission's determination not to finalize the proposed Rule in its entirety, the Commission certifies that the final Rule will not have a significant economic impact on a substantial number of small entities. Nevertheless, because the Commission included an IFRA in the NPRM, the Commission has also performed an FRFA below, and comments to the IFRA are discussed below.

*A. A statement of the need for, and objectives of, the Rule.*

The Commission describes the need for and the objectives of the final Rule in section X.B.1 to the Final Regulatory Analysis.

*B. A statement of the significant issues raised by the public comments in response to the Initial Regulatory Flexibility Analysis, a statement of the assessment of the agency of such issues,*

*and a statement of any changes made in the proposed Rule as a result of such comments.*

Several commenters raised issues about the proposed Rule's economic impact on small businesses. For instance, NFIB asked the Commission to adopt a special provision that would limit enforcement of the Rule against small businesses (fewer than 50 employees) to instances of willful or repeated violations, and set up a program for education on compliance.[623] IFA and IHRSA encouraged the Commission to conduct a "Small Business Regulatory Impact Analysis" to determine how the proposal will impact small businesses.[624] IHRSA stated that small businesses in the health and fitness industry operate at "much different capacity" than larger industries, noting 44% of U.S. small businesses have less than three months of cash reserves, making them more vulnerable to disruptions.[625] Similarly, ACT App Association noted that roughly 20% of small business startups fail in the first year due to scarcity in financial resources.[626]

Other commenters, including PDMI, ESA, Joint Small Business Digital Economy Innovators, and ICA, generally stated the proposed Rule would impose unnecessary and undue burdens on small businesses, but did not offer any detailed empirical data for the Commission to consider.[627]

In response, the Commission first notes its sensitivity to small businesses' concerns. It provides numerous free resources through the Bureau of Consumer Protection Business Center web page[628] to assist businesses of all sizes in complying with the law and will engage in consumer and business education campaigns about this Rule. Second, in consideration of comments regarding regulatory burden, the Commission clarifies or modifies the Rule in several significant ways: (1) it defines "material" and provides several concrete categories of material facts to ensure businesses have a clear understanding of how it will interpret materiality under the Rule; (2) it limits the number of terms that must mandatorily appear "immediately adjacent" to the request for consent to

[619] NCTA, FTC–2023–0033–0858; IAB, FTC–2023–0033–1000. *See also* IFA, FTC–2023–0033–0856; USTelecom, FTC–2023–0033–0876; RILA, FTC–2023–0033–0883; Coalition, FTC–2023–0033–0884; Chamber, FTC–2023–0033–0885 (urging the Commission to refine its cost benefit analysis).

[620] FTC–2024–0001–0011; *see also* Asurion, FTC–2023–0033–0878 (stating the Commission's estimated annual labor costs are understated, and projecting the costs to Asurion and its clients would be millions of dollars); SCIC, FTC–2023–0033–0879 (cost of compliance for the service contract industry would be substantially higher than cost of compliance for unregulated entities, and disproportionately borne by small businesses; APCIA, FTC–2023–0033–0996 (same).

[621] *See* 5 U.S.C. 603–605.

[622] 5 U.S.C. 605.

[623] NFIB, FTC–2023–0033–0789.

[624] IFA, FTC–2023–0033–0856; IHRSA, FTC–2023–0033–0863.

[625] IHRSA, FTC–2023–0033–0863.

[626] ACT App Association, FTC–2023–0033–0874.

[627] PDMI, FTC–2023–0033–0864; ESA, FTC–2023–0033–0867; Joint Small Business Digital Economy Innovators, FTC–2023–0033–0875; ICA, FTC–2023–0033–1142.

[628] *https://www.ftc.gov/business-guidance.*

Appellate Case: 24-3137    Page: 64    Date Filed: 12/05/2024 Entry ID: 5463205

the negative option feature; (3) it removes the requirement to obtain separate affirmative consent to ''the rest of the transaction'' and modifies the recordkeeping requirement; (4) it removes the saves and annual reminder requirements, which also should reduce recordkeeping and compliance burdens. Additionally, the Commission delays the effective date of the final Rule for 180 days to allow time for implementation (except for the provisions related to misrepresentations and other procedural requirements, which should not be an added burden for businesses already complying with the law and which take effect 60 days after publication of the final Rule).

*C. The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed Rule, and a detailed statement of any change made to the proposed rule in the final Rule as a result of the comments.*

The Small Business Administration did not file comments in response to the proposed Rule.

*D. A description of and an estimate of the number of small entities to which the Rule will apply or an explanation of why no such estimate is available.*

The final Rule affects sellers, regardless of industry, engaged in making negative option offers, defined by the final Rule to mean any person ''selling, offering, charging for, or otherwise marketing goods or services with a Negative Option Feature.''[629] Small entities in potentially any industry could incorporate a negative option feature into a sales transaction.[630] The Commission is unaware, however, of any source of data identifying across every industry the number of small entities that routinely utilize negative option features. Although the NPRM requested comments on the percentage of affected companies that qualify as small businesses, and some trade association commenters indicated that some of their members were small businesses, these comments did not identify either the number or share of their small business members that sold negative option contracts.

*E. A description of the projected reporting, recordkeeping, and other compliance requirements of the Rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.*

The estimates of the recordkeeping requirements under the final Rule are set out within the Paperwork Reduction Act analysis in section XII below. As mentioned above, the Commission preliminarily determined the impact of the proposed requirements on small entities is most likely not significant. The small entities potentially covered by these amendments will include all such entities subject to the Rule (*e.g.,* all entities selling goods or services through negative option programs). The professional skills necessary for compliance with the proposed amendments would include sales and clerical personnel. The Commission requested comment on these issues.

In the NPRM, The FTC estimated the majority of firms subject to the recordkeeping requirements already retained these types of records in the normal course of business. The FTC anticipated many transactions subject to the final Rule would be conducted via the internet, minimizing burdens associated with compliance. Additionally, most entities subject to the final Rule were likely to store data though automated means, which reduces compliance burdens associated with record retention. Furthermore, regarding the disclosure requirements, the Commission stated it was likely the substantial majority of sellers routinely provide these disclosures in the ordinary course as a matter of good business practice. Moreover, many State laws already require the same or similar disclosures as the Rule would mandate. Finally, some negative option sellers are already covered by ROSCA and the TSR and thus subject to similar disclosure requirements.

Commenters provided additional comments, suggesting small businesses will be significantly impacted, and the Commission underestimated the burdens. Recordkeeping and disclosure costs associated with the Rule became one of the issues designated for the informal hearing, after which the presiding officer determined ''the issue is not genuinely disputed,'' noting the failure of interested parties to ''provide any evidence to establish what the costs *would be,*'' as opposed to generalized complaints ''costs will be *higher* than the NPRM's estimates.''[631] As explained in the Paperwork Reduction Act estimates below and elsewhere in this SBP, the Commission made changes to the Rule based on the record. Specifically, the Commission determined to specify and thereby limit

the types of disclosures required, narrow the scope of entities covered (by excluding those solely involved in ''promoting'' negative option plans), curtail the length of time for retaining records (to only three years), and establish an option for sellers to eliminate having to keep records of consent if they have the requisite processes in place. Because neither the Commission nor the presiding officer at the informal hearing received evidence to dispute the recordkeeping and disclosure costs figures in the NPRM, the Commission adopts the NPRM's analysis. Given the narrower scope of the final Rule, that analysis should be more conservative and tend to overstate the burden.

*F. A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final Rule and why each one of the other significant alternatives to the Rule considered by the agency which affect the impact on small entities was rejected.*

In formulating the proposed amendments, the Commission made every effort to avoid imposing unduly burdensome requirements on sellers. To that end, the Commission avoided, where possible, proposing specific, prescriptive requirements that could stifle marketing innovation or otherwise limit seller options in using new technologies.

As explained above, in response to comments regarding regulatory burden, the Commission clarifies or modifies the Rule in several significant ways: (1) it defines ''material'' and provides several concrete categories of material facts to ensure businesses have a clear understanding of how it will interpret materiality under the Rule; (2) it limits the number of terms that must mandatorily appear ''immediately adjacent'' to the request for consent to the negative option feature; (3) it removes the requirement to obtain separate affirmative consent to ''the rest of the transaction'' and modifies the recordkeeping requirement; (4) it removes the saves and annual reminder requirements, which also should reduce recordkeeping and compliance burdens. Additionally, the Commission delays the effective date of the final Rule for 180 days to allow time for implementation (except for the provisions related to misrepresentations and other procedural requirements, which should not be an added burden

---

[629] Rule § 425.2(g).

[631] Recommended Decision by Presiding Officer, *https://www.regulations.gov/comment/FTC-2024-0001-0042* (emphasis in original).

Appellate Case: 24-3137     Page: 65     Date Filed: 12/05/2024 Entry ID: 5463205

for businesses already complying with the law and which take effect 60 days after publication of the final Rule).

## XII. Paperwork Reduction Act

The Paperwork Reduction Act ("PRA"), 44 U.S.C. 3501 *et seq.,* requires Federal agencies to obtain Office of Management and Budget ("OMB") approval before collecting information directed to ten or more persons. The current Rule contains various provisions that constitute information collection as defined by 5 CFR 1320.3(c), the OMB regulations implementing the PRA. In January 2024, OMB approved continuation of the Rule's existing information collection (OMB Control No. 3084–0104). The final Rule makes changes in the Rule's recordkeeping and disclosure requirements that will increase the PRA burden as detailed below. Accordingly, the Commission is submitting the final Rule and a Supplemental Supporting Statement to OMB for review under the PRA.[632] The associated burden analysis follows.

### A. The Proposed Rule

In the NPRM, the Commission provided time and cost estimates for the proposed Rule's recordkeeping and disclosure requirements, and solicited comments about their associated costs, including on: (1) whether the disclosure, recordkeeping, and reporting requirements are necessary, including whether the resulting information will be practically useful; (2) the accuracy of our burden estimates, including whether the methodology and assumptions used are valid; (3) how to improve the quality, utility, and clarity of the disclosure requirements; and (4) how to minimize the burden of providing the required information to consumers.[633]

The NPRM also included staff's estimate that the burden for recordkeeping compliance would be 53,000 hours and the estimated burden for disclosures would be 212,000 hours, for a total of 265,000 hours. These estimates are explained below.

*Number of Respondents.* FTC staff estimated there are 106,000 entities offering negative option features to consumers. This estimate is based primarily on data from the U.S. Census North American Industry Classification System (NAICS) for firms and establishments in industry categories wherein some sellers offer free trials, automatic renewal, pretotification

plans, and continuity plans. Based on NAICS information as well as its own research and industry knowledge, FTC staff identified an estimated total of 530,000 firms involved in such industries.[634] However, FTC staff estimated that only a fraction of the total firms in these industry categories offer negative option features to consumers. For example, few grocery stores and clothing retailers, which account for approximately a third of the of the total estimate from all industry categories, are likely to regularly offer negative option features. In addition, some entities included in the total may qualify as common carriers, exempt from the Commission's authority under the FTC Act. Accordingly, the Commission estimated approximately 106,000 business entities (20%) offer negative option features to consumers.

*Recordkeeping Hours.* FTC staff estimated the majority of firms subject to the Rule already retain the types of records in the normal course of business that would be required by the proposed Rule. Under such conditions, the time and financial resources needed to comply with disclosure requirements do not constitute "burden" under the PRA.[635] Moreover, staff anticipated that many transactions subject to the Rule are conducted via the internet and most entities subject to the Rule are likely to store data though automated means, which reduces compliance burdens associated with record retention. Accordingly, staff estimated that 53,000 entities subject to the Rule will require approximately one hour per year to comply with the Rule's recordkeeping requirements, for an annual total of 53,000 burden hours.

*Disclosure Hours.* Staff anticipated that the substantial majority of sellers already routinely provide the disclosures that would be required by the proposed Rule. For these sellers, the time and financial resources associated

with making these disclosures do not constitute a "burden" under the PRA because they are a usual and customary part of regular business practice. 5 CFR 1320.3(b)(2). Moreover, many State laws require the same or similar disclosures as the Rule mandates. In addition, approximately 2,000 negative option sellers are already covered by the TSR and subject to its disclosure requirements. Accordingly, FTC estimated the disclosure burden required by the Rule will be, on average, two hours each year for each seller subject estimated to be subject the Rule, for a total estimated annual burden of 212,000 hours.

*Estimated Annual Labor Cost.* To estimate labor costs for recordkeeping requirements, staff multiplied the 53,000 hours to comply with the proposed Rule's recordkeeping provisions by a clerical wage rate of $18.75/hour.[636] The result is an annual cost of approximately $993,750.

To estimate annual labor costs for disclosures for all entities, staff multiplied the 212,000 hours to comply with the proposed Rule's disclosure provisions by a sales personnel wage rate of $22.15/hour.[637] The result is an annual cost of approximately $4,695,800.

Thus, the estimated annual labor costs were $5,689,550 [($993,750 recordkeeping) + ($4,695,800 disclosure)].

*Estimated Annual Non-Labor Cost.* The NPRM stated capital and start-up costs associated with the Rule's recordkeeping provisions are *de minimis.* Any disclosure or recordkeeping capital costs involved with the Rule, such as equipment and office supplies, would be costs borne by sellers in the normal course of business.

### B. Comments Received and Informal Hearing

The NPRM sought comments on the PRA analysis and stated, "comments should provide any available evidence and data that supports their position, such as empirical data."[638] The Commission did not receive such evidence. A few commenters from businesses and industry groups, however, raised generalized concerns

---

[632] The PRA analysis for this rulemaking focuses strictly on the information collection requirements created by and/or otherwise affected by the amendments.

[633] 88 FR 24734.

[634] Examples of these industries include sellers of software, streaming media, social media services, financial monitoring, computer security, fitness services, groceries and meal kits, dietary supplements, sporting goods, home service contracts, home security systems, office supplies, pet food, computer supplies, cleaning supplies, home/lawn maintenance services, personal care products, clothing sales, energy providers, newspapers, magazines, and books. The NAICS does not provide estimates for all of these categories. Where such data is unavailable, the staff has used its own estimates based on its knowledge of these industry categories.

[635] Under the PRA, the time, effort, and financial resources necessary to comply with the collection of information that would be incurred by persons in the normal course of their activities (*e.g.,* in compiling and maintaining business records) does not constitute a burden under the Rule where the associated recordkeeping is a usual and customary part of business activities. 5 CFR 1320.3(b)(2).

[636] This figure is derived from the mean hourly wage shown for Information and Record Clerks. *See* Bureau of Labor Statistics, "Occupational Employment and Wages—May 2021," at Table 1 (Mar. 31, 2022) (National employment and wage data from the Occupational Employment Statistics survey by occupation, May 2021), *https://www.bls.gov/news.release/pdf/ocwage.pdf.*

[637] This figure is derived from the mean hourly wage shown for Sales and related occupations. *See id.*

[638] 88 FR 24730.

App.66

that the NPRM underestimated PRA-related costs.[639]

As noted earlier, the Commission set an informal hearing, at the request of interested parties, and appointed Administrative Law Judge Carol Fox Foelak as the presiding officer.[640] Based on submissions by interested parties, and other information in the record, the presiding officer designated two disputed issues of material fact, including, "What will the recordkeeping and disclosure costs associated with the proposed rule be?"[641]

Based on the record, the presiding officer concluded, "There is insufficient evidence to make a finding concerning the . . . recordkeeping and disclosure costs associated with the proposed rule," and "in the absence of evidence, the issue is not genuinely disputed."[642] The presiding officer further explained: "IAB made a well-reasoned argument that the costs will be *higher* than the NPRM's estimates, generalizing from limited estimates that it, IFA, and NCTA provided. However, it did not provide any evidence to establish what the costs *would be.*"[643]

*C. Final PRA Analysis*

As previously discussed, the Commission made changes to the Rule based on the record. Some of these changes, in turn, affect the PRA analysis. Specifically, the Commission determined to specify and thereby limit the types of disclosures required, narrow the scope of entities covered (by excluding those solely involved in "promoting" negative option plans), curtail the length of time for retaining records (to only three years), and establish an option for sellers to eliminate having to keep records of consent if they have the requisite processes in place. Neither the Commission nor the presiding officer at the informal hearing received evidence to dispute the specific PRA-related figures in the NPRM. For the final Rule, the Commission adopts the following PRA analysis.

*Number of Respondents.* The Commission received no evidence to dispute the NPRM's statements on the number of entities offering negative option features to consumers, so the Commission adopts the NPRM estimate that there are 106,000 such entities. Although the final Rule is narrower in that it excludes the term "promote" from its scope, the Commission retains the estimate of 106,000 entities for the purposes of this analysis, which would be more conservative and tend to overstate the burden.

*Recordkeeping Hours.* The Commission received no evidence to dispute the NPRM's statements on recordkeeping under the PRA. As the final Rule is narrower, the time and financial resources needed to comply with disclosure requirements still do not constitute "burden" under the PRA.[644] Accordingly, the Commission adopts the NPRM estimate that 53,000 entities subject to the Rule will require approximately one hour per year to comply with the Rule's recordkeeping requirements, for an annual total of 53,000 burden hours.

*Disclosure Hours.* Similarly, the Commission received no evidence to dispute the NPRM's statements on disclosure hours under the PRA. As the final Rule narrowed and delineated the types of disclosures required, the time and financial resources associated with making these disclosures is even less than under the proposed Rule, which also did not constitute a "burden" under the PRA because they are a usual and customary part of regular business practice. 5 CFR 1320.3(b)(2). Accordingly, the Commission adopts the NPRM estimate that the disclosure burden required by the Rule will be, on average, two hours each year for each seller subject estimated to be subject the Rule, for a total estimated annual burden of 212,000 hours.

*Estimated Annual Labor Cost.* The Commission received no evidence to dispute the NPRM's statements on labor costs under the PRA. For the final Rule, the Commission updates its labor cost estimates by using more recent wage data. For recordkeeping, staff multiplied the 53,000 estimated hours to comply with the Rule's recordkeeping provisions by a clerical wage rate of $20.94/hour,[645] to yield an annual cost of approximately $1,109,820. For disclosure compliance, staff multiplied the 212,000 estimated hours by an hourly wage rate for sales personnel of $25.62,[646] to yield an annual cost of $5,431,440. Thus, the estimated total annual labor costs are $6,541,260 [($1,109,820 recordkeeping) + ($5,431,440 disclosure)].

*Estimated Annual Non-Labor Cost.* The Commission received no evidence to dispute the NPRM's statements that capital and start-up costs associated with the Rule's recordkeeping provisions are *de minimis* under the PRA. The Commission adopts those findings.

## List of Subjects in 16 CFR Part 425

Advertising, Consumer protection, Trade practices.

■ For the reasons stated in the preamble, the Federal Trade Commission revises 16 CFR part 425 to read as follows:

## PART 425—RULE CONCERNING RECURRING SUBSCRIPTIONS AND OTHER NEGATIVE OPTION PROGRAMS

Sec.
425.1 Scope.
425.2 Definitions.
425.3 Misrepresentations.
425.4 Important information.
425.5 Consent.
425.6 Simple cancellation ("Click to Cancel").
425.7 Relation to State laws.
425.8 Exemptions.
425.9 Severability.

**Authority:** 15 U.S.C. 41 through 58.

### § 425.1 Scope.

This Rule contains requirements related to any form of negative option program in any media, including, but not limited to, Interactive Electronic Media, telephone, print, and in-person transactions.

### § 425.2 Definitions.

*Billing Information* means any data that enables any person to access a consumer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

---

[639] Sirius XM, FTC–2023–0033–0857; SCIC, FTC–2023–0033–0879; Coalition, FTC–2023–0033–0884; ETA, FTC–2023–0033–1004; Direct Marketing Companies, FTC–2023–0033–1016. In addition, one commenter seemingly confused PRA-related costs with full implementation of the Rule, but still offered only generalized points. *See* Asurion, FTC–2023–0033–0878. Another commenter queried whether the Commission's estimate of the number of firms offering negative option features include B2B sales with automatic renewal clauses. ETA, FTC–2023–0033–1004. The staff estimate did not seek to exclude such sellers.

[640] Hr'g Notice, 88 FR 85525.

[641] Recommended Decision by Presiding Officer, *https://www.regulations.gov/comment/FTC-2024-0001-0042.*

[642] Recommended Decision by Presiding Officer, *https://www.regulations.gov/comment/FTC-2024-0001-0042.*

[643] Recommended Decision by Presiding Officer, *https://www.regulations.gov/comment/FTC-2024-0001-0042.*

[644] Under the PRA, the time, effort, and financial resources necessary to comply with the collection of information that would be incurred by persons in the normal course of their activities (*e.g.,* in compiling and maintaining business records) does not constitute a burden under the Rule where the associated recordkeeping is a usual and customary part of business activities. 5 CFR 1320.3(b)(2).

[645] This figure is derived from the mean hourly wage shown for Information and Record Clerks. *See* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 43–9061 Office Clerks, General," *https://www.bls.gov/oes/current/oes439061.htm.*

[646] This figure is derived from the mean hourly wage shown for Sales and related occupations. *See id.*

*Charge, Charged,* or *Charging* means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

*Clear and Conspicuous* means that a required disclosure is easily noticeable (*i.e.,* difficult to miss) and easily understandable by ordinary consumers, including in all of the following ways:

(1) In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

(2) A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

(3) An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

(4) In any communication using an Interactive Electronic Medium, such as the internet, mobile application, or software, the disclosure must be unavoidable.

(5) The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

(6) The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

(7) The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

(8) When the representation or sales practice targets a specific audience, such as children, older adults, or the terminally ill, ''ordinary consumers'' includes members of that group.

*Interactive Electronic Medium* is any electronic means of communicating (except via telephone calls), including internet, mobile application, text, chat, instant message, email, software, or any online service.

*Material* means likely to affect a person's choice of, or conduct regarding, goods or services.

*Negative Option Feature* is a provision of a contract under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer, including, but not limited to:

(1) An automatic renewal;
(2) A continuity plan;
(3) A free-to-pay conversion or fee-to-pay conversion; or
(4) A pre-notification negative option plan.

*Negative Option Seller* means the person selling, offering, charging for, or otherwise marketing a good or service with a Negative Option Feature.

### § 425.3 Misrepresentations.

In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the Federal Trade Commission Act (''FTC Act'') for any Negative Option Seller to misrepresent, expressly or by implication, any Material fact, including any of the following:

(a) The Negative Option Feature or any term of the Negative Option Feature, including consumer consent, any deadline to prevent or stop a Charge, or the cancellation of the Negative Option Feature;
(b) Cost;
(c) Purpose or efficacy of the underlying good or service;
(d) Health or safety; or
(e) Any other Material fact.

### § 425.4 Important information.

(a) *Disclosures.* In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the FTC Act for a Negative Option Seller to fail to disclose to a consumer, prior to obtaining the consumer's Billing Information, all Material terms, regardless of whether those terms directly relate to the Negative Option Feature, and including but not limited to:

(1) That consumers will be Charged for the good or service, or that those Charges will increase after any applicable trial period ends, and, if applicable, that the Charges will be on a recurring basis, unless the consumer timely takes steps to prevent or stop such Charges;

(2) Each deadline (by date or frequency) by which the consumer must act to prevent or stop the Charges;

(3) The amount (or range of costs) the consumer will be Charged and, if applicable, the frequency of the Charges a consumer will incur unless the consumer takes timely steps to prevent or stop those Charges; and

(4) The information necessary for the consumer to find the simple cancellation mechanism required pursuant to § 425.6.

(b) *Form and content of required information.* (1) Clear and Conspicuous: Each disclosure required by paragraph (a) of this section must be Clear and Conspicuous.

(2) Placement:
(i) The disclosures required by paragraphs (a)(1) through (4) of this section must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature; and

(ii) The disclosures required by paragraph (a) of this section (including, but not limited to, the disclosures required by paragraphs (a)(1) through (4) of this section) must appear before obtaining the consent required pursuant to § 425.5.

(3) Other Information: All communications, regardless of media, must not contain any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures required by paragraph (a) of this section.

### § 425.5 Consent.

(a) *Express informed consent.* In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the FTC Act for a Negative Option Seller to fail to obtain the consumer's express informed consent before Charging the consumer. In obtaining such expressed informed consent, the Negative Option Seller must:

(1) Obtain the consumer's unambiguously affirmative consent to the Negative Option Feature offer separately from any other portion of the transaction;

(2) Not include any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature; and

(3) Keep or maintain verification of the consumer's consent for at least three years. However, if the seller can

App.68

demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent, such seller does not have to maintain these records for such transactions.

(b) *Requirements for Negative Option Features covered in the Telemarketing Sales Rule.* Negative Option Sellers covered by the Telemarketing Sales Rule must comply with all applicable requirements provided in 16 CFR part 310, including, for transactions involving preacquired account information and a free-to-pay– conversion feature, obtaining from the customer, at a minimum, the last four (4) digits of the account number to be charged and making and maintaining an audio recording of the entire telemarketing transaction as required by 16 CFR part 310.

(c) *Documentation of unambiguously affirmative consent for written offers.* Except for transactions covered by the preauthorized transfer provisions of the Electronic Fund Transfer Act (15 U.S.C. 1693e) and Regulation E (12 CFR 1005.10), a Negative Option Seller will be deemed in compliance with the requirements of paragraph (a)(1) of this section for all written offers (including over the internet or phone applications), if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction. The consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature.

### § 425.6 Simple cancellation ("Click to Cancel").

(a) *Simple mechanism required for cancellation.* In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of section 5 of the FTC Act for the Negative Option Seller to fail to provide a simple mechanism for a consumer to cancel the Negative Option Feature; avoid being Charged, or Charged an increased amount, for the good or service; and immediately stop any recurring Charges.

(b) *Simple mechanism at least as simple as consent.* The simple mechanism required by paragraph (a) of this section must be at least as easy to use as the mechanism the consumer

used to consent to the Negative Option Feature.

(c) *Minimum requirements for simple mechanism.* At a minimum, the Negative Option Seller must provide the simple mechanism required by paragraphs (a) and (b) of this section through the same medium the consumer used to consent to the Negative Option Feature, and:

(1) For cancellation by Interactive Electronic Medium, the simple cancellation mechanism must be easy to find when the consumer seeks to cancel. Compliance with the disclosure required under § 425.4(a)(4) does not discharge this obligation. In no event shall a consumer be required to interact with a live or virtual representative (such as a chatbot) to cancel if the consumer did not do so to consent to the Negative Option Feature.

(2) For cancellation by telephone call, the Negative Option Seller must promptly effectuate cancellations requested by the consumer via a telephone number that is answered or records messages, made available during normal business hours, and not more costly to use than the telephone call the consumer used to consent to the Negative Option Feature.

(3) For cancellation of consent obtained in person, in addition to offering cancellation, where practical, via an in-person method similar to that the consumer used to consent to the Negative Option Feature, the Negative Option Seller must offer the simple mechanism through an Interactive Electronic Medium or by providing a telephone number. The alternate simple mechanism required by this paragraph must satisfy all requirements of paragraphs (c)(1) and (2) of this section, as applicable. If the Negative Option Seller offers the alternate mechanism by providing a telephone number, the seller shall not erect a cost-barrier to cancellation by imposing any unnecessary or unreasonable cost for the cancellation call.

### § 425.7 Relation to State laws.

(a) *In general.* This part shall not be construed as superseding, altering, or affecting any State statute, regulation, order, or interpretation relating to negative option requirements, except to the extent it is inconsistent with the provisions of this part, and then only to the extent of the inconsistency.

(b) *Greater protection under State law.* For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this part if it affords any consumer greater protection than provided under this part.

### § 425.8 Exemptions.

Any person to whom this part applies may petition the Commission for a partial or full exemption. The Commission may, in response to petitions or on its own authority, issue partial or full exemptions from this part if the Commission finds application of this part's requirements is not necessary to prevent the acts or practices to which this part relates. The Commission shall resolve petitions using the procedures provided in 16 CFR 1.31. If appropriate, the Commission may condition such exemptions on compliance with alternative standards or requirements to be prescribed by the Commission.

### § 425.9 Severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

By direction of the Commission, Commissioners Holyoak and Ferguson dissenting.

**April J. Tabor,**
*Secretary.*

**Note:** The following statements will not appear in the Code of Federal Regulations.

## Statement of Commissioner Rebecca Kelly Slaughter

As is common in rulemaking proceedings, this Final Rule that the Commission promulgates is somewhat different from what it originally proposed—clarified, narrowed, and ultimately improved by the process of grappling with the substantial record of comments submitted by the public. I extend my heartfelt thanks to everyone who submitted comments; to the talented staff in our Division of Enforcement and the East Central Regional Office who diligently shepherded this proceeding, thoroughly considered all those comments, and recommended thoughtful revisions; and to my colleagues for their deep engagement with this issue of great importance, including former Chairman Joe Simons, under whose leadership the Commission initiated this rulemaking proceeding.

I write separately to draw attention to the comment record about a provision that the Commission proposed but ultimately does not finalize, proposed § 425.7, which would have required annual reminders of subscriptions that do not involve the delivery of physical goods.[1] Americans understand the importance and value of such a requirement; many have discovered that they or their parents had been paying for years or even decades for a service wholly unused, such as a dial-up internet service from the

---

[1] *See* Negative Option Rule, 88 FR 24716, 24736 (proposed Apr. 24, 2023) ("Annual reminders for negative option features not involving physical goods.") (to be codified at 16 CFR 425.7), *https:// www.federalregister.gov/documents/2023/04/24/ 2023-07035/negative-option-rule.*

1990s.[2] The reason that the Commission declines to finalize this proposal is not that it lacks policy merit but that the record in total does not support its inclusion in the Final Rule as proposed.[3] Of course, we are always mindful that our authority under the FTC Act to issue rules under section 18 has limits; sometimes, as here, those limits prevent us from codifying in a rule practices that we might, as a matter of policy, prefer to require explicitly.

Congress and State legislatures, by contrast, have plenary authority to require such a reminder. This spring, for example, in a show of bipartisanship, Virginia Governor Glenn Youngkin signed into law legislation sponsored by Delegate Michelle Lopes Maldonado, H.B. 744, which requires that subscriptions that renew annually provide to the consumer a notice of the upcoming renewal and the opportunity to cancel via between 30 and 60 days before the consumer is charged for the renewal.[4] The comment record compiled in this rulemaking proceeding strongly supports the wisdom of Federal and State legislators' carefully considering adopting such a law, and the Final Rule's omission of such a provision should be understood only as a reflection of the Commission's cautious approach to its jurisdictional limits and not as related to the merits of a policy that requires annual reminders for subscription services.

## Dissenting Statement of Commissioner Melissa Holyoak

"Article I of the Constitution vests 'all legislative Powers herein granted' in Congress. 'By vesting the lawmaking power in the people's elected representatives, the Constitution sought to ensure not only that all power would be derived from the people, but also that those entrusted with it should be kept in dependence on the people.' " [1] Whenever we engage in rulemaking, the Commission should recall that Article I of the Constitution vests legislative powers in Congress, not with agencies. Because of that, it is elected officials that delineate the boundaries, and set the requirements, that we as Commissioners must adhere to. I believe the Commission exceeds those boundaries and requirements in amendments to the Negative Option Rule, 16 CFR part 425, ("Rule") it finalizes today. Instead of pursuing targeted enforcement efforts or finalizing a rule consistent with the Commission's authority under section 18 of the FTC Act,[2] the Commission has used its limited resources to promulgate a broader regulation that may not survive legal challenge.[3]

The likely unlawful character of the rule is compounded by the Majority's race to cross the finish line. Why the rush? There is a simple explanation. Less than a month from election day, the Chair is hurrying to finish a rule that follows through on a campaign pledge made by the Chair's favored presidential candidate.[4]

The Majority votes today to approve a final trade regulation rule amendment to the existing negative option rule. This amendment greatly expands the prior rule, which had covered now-rare prenotification plans (*e.g.*, book-of-the-month clubs)—and goes well beyond what existing laws, such as the Restore Online Shoppers' Confidence Act ("ROSCA"),[5] Telemarketing Sales Rule

("TSR"),[6] or Regulation E,[7] require. The now-capacious Rule creates potential civil penalty liability for: any misrepresentation of material fact made in connection with the marketing of a product or service that has a negative option feature (§ 425.3); failure to disclose all material terms before obtaining billing information in connection with a negative option (§ 425.4); failure to obtain express informed consent before charging in connection with a negative option (§ 425.5); and failure to provide a simple mechanism for cancelling a negative option (§ 425.6). The Rule also preempts inconsistent State laws (§ 425.7).

I respectfully dissent for three reasons. First, this rulemaking did not follow the FTC Act's section 18 requirements for rulemaking because: (1) the Rule is much broader than the "area of inquiry" proposed by the advance notice of proposed rulemaking ("ANPR"); (2) the Rule fails to define with specificity acts or practices that are unfair or deceptive, improperly generalizing from narrow industry-specific complaints and evidence to the entire American economy; and (3) the Rule fails to demonstrate that the unfair or deceptive acts or practices related to negative option billing are "prevalent." [8] Second, the Rule's breadth incentivizes companies to avoid negative option features that honest businesses and consumers find valuable. Third, the Rule represents a missed opportunity to make useful amendments to the preexisting negative option rule within the scope of the Commission's authority.

Such amendments could have provided greater clarity to businesses about the patchwork of Federal laws pertaining to negative options and lawfully used our section 18 rulemaking authority to fill potential gaps including, for example, cancellation requirements. Indeed, I am very concerned that consumers are sometimes misled by companies using deceptive negative option features. The Rule represents a missed opportunity to devote scarce staff resources to bringing enforcement actions related to negative option features using the clear tools that Congress gave us, rather than conducting an overbroad rulemaking that cost years of staff time to propose and finalize, but will likely not survive legal challenge.

Today's rulemaking did not need to end this way. Had political leadership at the Commission taken more time to engage with other Commissioners to refine and improve the Rule, my vote and statement would look very different. Instead, less than a month from November 5, the Chair has put political expediency over getting things right. Unfortunately, pushing politically motivated rulemakings has not been the exception with the Majority.[9] Today, I believe we are seeing another low in our abuse and misuse of the tools Congress has given us. Rather than engage in blatant electioneering to advance political ends, the Commission should have

---

[2] *See, e.g.,* Cmt. of the Attorneys General of New York, Pennsylvania, Alabama, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, North Carolina, North Dakota, Oklahoma, Oregon, Vermont, Washington, and Wisconsin (June 23, 2023), at 15 ("Subscription management has become an entire industry; consumers can choose from a variety of companies that offer to monitor their recurring subscriptions. We believe that consumers should not have to sign up for yet another service—one that comes with privacy and security risks, as subscription monitoring services require sharing financial account and other sensitive information—in order to effectively manage their subscriptions."), *https://www.regulations.gov/comment/FTC-2023-0033-0886;* Cmt. of Consumer Action, Consumer Federation of America, Demand Progress Education Fund, National Association of Consumer Advocates, National Consumer Law Center (on behalf of its low-income clients), and National Consumer League (June 23, 2023), at 7 ("Consumers deserve to know when they are about to be charged automatically, with a chance to opt out."), *https://www.regulations.gov/comment/FTC-2023-0033-0880;* Cmt. of Profs. Caruso, Raghavan, Sovern, Vladeck, Pridgen, Janger, Ondersma, and Block-Lieb (June 23, 2023), at 7–8 (encouraging the Commission to adopt the reminder requirement without narrowing it), *https://www.regulations.gov/comment/FTC-2023-0033-0861.*

[3] *See* Fed. Trade Comm'n, Negative Option Rule, Final Rule Statement of Basis and Purpose (Oct. 16, 2024) (draft as submitted to the Office of the Federal Register), at 138–44.

[4] *See* 2024 Va. Acts, H. 744, Apr. 4, 2024 (to be codified at section 59.1–207.46(E)), *https://legacylis.virginia.gov/cgi-bin/legp604.exe?241+ful+CHAP0452+pdf.*

[1] Dissenting Statement of Comm'r Melissa Holyoak, Joined by Comm'r Andrew N. Ferguson, *In the Matter of the Non-Compete Clause Rule,* FTC Matter No. P201200, at 1 (June 28, 2024) (quoting U.S. Const. Art. I and *W. Virginia* v. *EPA,* 597 U.S. 697, 737–38 (2022) (Gorsuch, J., concurring)) (cleaned up), *https://www.ftc.gov/system/files/ftc_gov/pdf/2024-6-28-commissioner-holyoak-nc.pdf.*

[2] 15 U.S.C. 57a.

[3] *Cf.* Dissenting Statement of Comm'r Melissa Holyoak, Joined by Comm'r Andrew N. Ferguson, *supra* note 1, at 2 ("My dissent should not, however, be interpreted to mean that I endorse all non-compete agreements. To the contrary, I would support the Commission's prosecution of anti-competitive non-compete agreements, where the facts and law support such enforcement. That is why I am particularly disappointed that the Commission dedicated the Commission's limited resources to a broad rulemaking that exceeds congressional authorization and will likely not survive legal challenge.") (citation omitted).

[4] *See, e.g., A New Way Forward for the Middle Class: A Plan to Lower Costs and Create an Opportunity Economy, KamalaHarris.com,* at 33 (Sept. 2024) ("Under her leadership as Vice President, the Administration has launched a historic effort to crack down on junk fees and save consumers time and money. This includes [a rule] to . . . make it as easy to cancel a subscription as it is to subscribe. . . . A Harris-Walz Administration will . . . continue to take on the everyday hassles that waste Americans' time and money, [including] subscriptions. . . .") (citing FTC press release), *https://kamalaharris.com/wp-content/uploads/2024/09/Policy-Book-Economic-Opportunity.pdf.*

[5] 15 U.S.C. 8401–8405.

[6] 16 CFR part 310.

[7] 12 CFR 1005.10.

[8] 15 U.S.C. 57a.

[9] *See generally* Dissenting Statement of Comm'r Melissa Holyoak, Joined by Comm'r Andrew N. Ferguson, *supra* note 1.

**App.70**

instead focused on stewarding its resources effectively and in ways that restore our institutional legitimacy, not further undermine it.

I. The historical context surrounding Congress's enactment of rulemaking requirements in section 18 of the FTC Act is important. Congress passed the Magnuson-Moss Warranty Act in 1975, which imposed exacting requirements and limitations on rulemaking regarding unfair or deceptive acts or practices.[10] In the 1970s, the Commission tried to use its rulemaking and unfairness authority aggressively—for example, "to ban all advertising directed to children on the grounds that it was 'immoral, unscrupulous, and unethical' and based on generalized public policies to protect children." [11] In response, Congress refused to fund the Commission, shutting it down for several days.[12] Even this harsh rebuff did not completely cool Congressional ire with the "National Nanny" (as the Washington Post— no bastion of conservative thought— facetiously dubbed the Commission).[13] A 1979 Senate Report found that the agency's rulemaking efforts were filled with "excessive ambiguity, confusion, and uncertainty." [14] In 1980, Congress legislated to limit the Commission's authority, by imposing additional procedural obligations on section 18 rulemaking.[15] Among other things, Congress created additional procedural rights, well beyond the Administrative Procedure Act's baseline procedural requirements, such as requiring the FTC to issue an ANPR with numerous specific requirements, which the Commission must submit to Congress, for each rulemaking.[16]

Congress' harsh reaction to the FTC's overreach only makes sense if we understand that section 18 was created and then expanded not to give the Commission free-ranging rulemaking authority, but to curb it. We should be exacting in following the requirements of section 18, lest we risk repeating history—drawing Congressional ire that that could further limit our authority and budget. Indeed, section 18's rulemaking requirements, while demanding, are the means of assuring that we act within the parameters established by Congress.

As an initial matter, this Rule's procedural irregularities begin with how the Rule was finalized in a compressed time frame. Given the rigorous demands of section 18 rulemaking, historically, it has taken the Commission, on average, 5.57 years to issue a rule after the Magnuson-Moss procedures were enacted.[17] That, apparently, was too much time and procedure for the Majority. In 2021, during the pendency of this rulemaking, the Commission made changes to its rules of practice,[18] over objections from the Commissioners in the Minority, to limit the efficacy of section 18's procedural safeguards and compress rulemaking timeframes.[19] Among other things, the Commission revised the Rules of Practice so as to remove selection of the Presiding Officer from an independent judge and assign that role to the Chair; strip the Presiding Officer of significant control over the hearing process; and narrow opportunities for the public to help determine which factual issues are in dispute.[20] Then-Commissioners Phillips and Wilson dissented, noting: "What the[se] changes—adopted without public input—in fact do is fast-track regulation at the expense of public input, objectivity, and a full evidentiary record." [21]

Apparently not content with even these procedural shortcuts and compressed timeframe, political leadership now speeds to the finish line with minimal opportunity for Commissioner engagement on the final Rule. There should be ample opportunity for robust consideration and dialogue leading up to a Commission vote on any regulation, and especially for a highly consequential rule. Such opportunity for dialogue may assuage concerns, produce constructive changes, and ultimately lead to a better result. Indeed, in the past where political leadership has been willing to engage and make needed modifications preceding votes, that consideration and engagement have been very valuable and led to bipartisan support for Commission actions.

Here, however, the time period for me to review this economy-wide Rule was a matter of weeks. Those weeks were also packed with dozens of cases, one other rulemaking, and other policy matters. (Remarkably, the Chair had this draft final Rule for some time before it was circulated to the other Commissioners.) Reviewing the NPRM was no substitute for robust discussion and

negotiation related to the final Rule's language and statement of basis and purpose, as the final Rule differs in important ways from the rule as proposed. The push to finalize is inexcusable, particularly because it is a discretionary rulemaking with no due date (imposed by Congress or otherwise). For those tracking the Rule and national politics closely, this rush to the finish line (and less than a month from a Presidential election) is no surprise. This Rule is connected to the current administration's efforts relating to so-called junk fees (which are beginning to make a regular appearance before elections [22]), and it has been in the spotlight for some time, including at the White House [23] and now on the campaign trail.[24]

But elevating political goals comes at a high price, harms policy efforts that might otherwise benefit consumers, and undermines the Commission's legitimacy. Publicly appearing to refuse to keep an open mind on a final rule or to prejudge complex policy questions, along with an apparent unwillingness to reconsider various aspects of a rulemaking may create PR buzz for the campaign trail and score political points. But that posture creates real legal risk for the Rule. Statements from the White House [25]

[10] Magnuson-Moss Warranty Act of 1975, Public Law 93–637, 88 Stat. 2183.

[11] *See* J. Howard Beales III, *The Fed. Trade Comm'n's Use of Unfairness Authority: Its Rise, Fall, and Resurrection*, 22 J. of Pub. Pol'y & Mktg. 192, 193 (2003) (citing FTC Staff Report on Television Advertising to Children (Feb. 1978); Notice of Proposed Rulemaking on Television Advertising to Children, 43 FR 17967 (Apr. 27, 1978)). In the 1970s, the Commission aggressively used its rulemaking authority—so aggressively that it has been called the "second most powerful legislature in America." Timothy J. Muris, *The Consumer Protection Mission: Guiding Principles and Future Direction*, 51 Antitrust L.J. 625, 625 (1982). The approach of today's Majority threatens to turn back the clock to this earlier, ill-advised approach.

[12] *Id.* at 193.

[13] *Id.*

[14] S. Rep. No. 96–500, at 3 (1979).

[15] Federal Trade Commission Improvements Act of 1980, Public Law 96–252, 94 Stat. 374.

[16] *Id.*

[17] Jeffrey S. Lubbers, *It's Time To Remove the "Mossified" Procedures for Removing FTC Rulemaking*, 83 Geo. Wash. L. Rev. 1979, 1997 (2015).

[18] Press Release, Fed. Trade Comm'n, *FTC Votes to Update Rulemaking Procedures, Sets Stage for Stronger Deterrence of Corporate Misconduct* (July 1, 2021), *https://www.ftc.gov/news-events/news/ press-releases/2021/07/ftc-votes-update- rulemaking-procedures-sets-stage-stronger- deterrence-corporate-misconduct.*

[19] *See* Dissenting Statement of Comm'rs Christine S. Wilson and Noah Joshua Phillips, *Regarding the Comm'n Statement On the Adoption of Revised Section 18 Rulemaking Procedures* (July 9, 2021), *https://www.ftc.gov/system/files/documents/ public_statements/1591702/p210100_ wilsonphillips_joint_statement_-_rules_of_ practice.pdf.*

[20] *Id.* at 3–5.

[21] *Id.* at 3.

[22] *See generally* Betsy Klein et al., *Biden Cracks Down on "Junk Fees" in New Economic Focus Ahead of Midterms,* CNN (Oct. 26, 2022), *https:// www.cnn.com/2022/10/26/politics/biden-bank-fees- speech/index.html.*

[23] *See, e.g., Biden-Harris Administration Announces Broad New Actions to Protect Consumers from Billions in Junk Fees,* The White House (Oct. 11, 2023) ("The FTC proposed a 'click to cancel' rule in March of 2023, that, if finalized as proposed, would require sellers to make it as easy for consumers to cancel their enrollment as it was to sign up. This rule would rescue consumers from seemingly never-ending struggles to cancel unwanted subscription payment plans for everything from cosmetics to gym memberships."), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/10/11/biden-harris- administration-announces-broad-new-actions-to- protect-consumers-from-billions-in-junk-fees/.*

[24] *See, e.g., A New Way Forward, KamalaHarris.com, supra* note 4.

[25] *See, e.g.,* President Biden (@POTUS), *X.com* (Aug. 12, 2024) ("We're making it easier to cancel subscriptions and memberships. You shouldn't have to navigate a maze just to cancel unwanted subscriptions and recurring payments. The FTC is hard at work finalizing its 'Click to Cancel' rule that it proposed to make this process a requirement."), *https://x.com/POTUS/status/ 1823037212885441407; see also FACT SHEET: Biden-Harris Administration Launches New Effort to Crack Down on Everyday Headaches and Hassles That Waste Americans' Time and Money,* The White House (Aug. 12, 2024) ("Today, President Biden and Vice President Harris are launching 'Time Is Money,' a new governmentwide effort to crack down on all the ways that corporations . . . add unnecessary headaches and hassles to people's days and degrade their quality of life. . . . The Federal Trade Commission (FTC) has proposed a rule that, if finalized as proposed, would require companies to make it as easy to cancel a subscription or service as it was to sign up for one. The agency is currently reviewing public comments about its proposal."), *https://www.whitehouse.gov/ briefing-room/statements-releases/2024/08/12/fact- sheet-biden-harris-administration-launches-new- effort-to-crack-down-on-everyday-headaches-and- hassles-that-waste-americans-time-and-money/.*

and related statements from the Chair [26] concerning this rule—and other matters related to her tenure or connected to her party's campaign efforts [27]—raise the

possibility that foreordained outcomes and political goals curtailed considering the rulemaking record with an open mind and without prejudgment, as law requires. [28] Today's sprint to the finish line has shortchanged the kind of deliberation and thoughtful engagement Congress deemed appropriate when it established rulemaking requirements under the Magnuson-Moss Act.

In addition to my concern about these irregularities, I am convinced that this rulemaking has failed to satisfy section 18's requirements for rulemaking in three ways. First, the Commission is issuing a broad final rule even though the ANPR was far narrower. This mismatch means that the Commission failed to provide in its ANPR the "brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission" that section 18 requires. [29] The mismatch is the result of leadership changes and priorities. The ANPR was voted out in 2019 by a bipartisan Commission under then-Chair Joseph J. Simons. [30] It sought public comments about centralizing existing legal requirements regarding negative options and filling gaps via section 18 rulemaking related to disclosures, consent, and cancellation. [31]

current Majority took the bipartisan ANPR and politically supercharged it.

Importantly, the ANPR did not contemplate broader regulation prohibiting all misrepresentations of material fact related to products that have negative option features. The ANPR tailored its inquiry by ". . . highlighting five basic section 5 requirements that negative option marketing must follow to avoid deception": (1) disclosure of material terms of a negative option offer; (2) clear and conspicuous disclosures; (3) pre-purchase disclosures; (4) consent; (5) cancellation. [32] Absent from this list is anything about prohibiting all misrepresentations of material fact related to any product that happens to have a negative option feature. Similarly, when the ANPR stated that the Commission was seeking comment "to reduce consumer harm created by deceptive or unfair negative option marketing," it specified the Commission's interest pertained to "disclosures, consumer consent, and cancellation." [33] Again, absent from that list was anything about prohibiting all misrepresentations of material fact related to marketing of any product that has a negative option feature.

When Commission leadership changed in 2021, the "area of inquiry" changed as well. Almost immediately, the Commission under Chair Khan disrupted this particular rulemaking process to issue an Enforcement Policy Statement Regarding Negative Option Marketing [34]—sub-regulatory guidance on the very same topic as the rulemaking itself. The Commission then issued a Notice of Proposed Rulemaking ("NPRM") in 2023 that introduced into the rulemaking—for the first time—the notion of prohibiting misrepresentations related to marketing of products with negative option features. [35] Former Commissioner Christine S. Wilson dissented from the issuance of the NPRM for this (among other) reasons. In her dissenting statement, Commissioner Wilson explained: "Importantly, we did not seek comment in the ANPR about whether an expanded negative option rule should address general misrepresentations; no comments are cited in the NPRM to support the inclusion of these provisions." [36]

---

[26] *See, e.g.,* Lina Khan (@linakhanFTC), *X.com* (Aug. 12, 2024) ("As @POTUS notes, @FTC's proposal would require that firms make it as easy to cancel a subscription as it is to sign up. Too often people have to jump through endless hoops—or end up stuck paying for services they don't want. Our rule would end this tax on your time & money."), *https://x.com/linakhanFTC/status/1823094653962289640.* That Tweet came in response to the President unequivocally saying, "[w]e're making it easier to cancel subscriptions and memberships," and signaling the proposal would be finalized consistent with the NPRM. *See* President Biden (@POTUS), *supra* note 25. Other statements are similarly probative of apparent conclusions being reached about the contours of the final rule. *See, e.g.,* Chair Lina M. Khan, Remarks at Center for American Progress, at 3–4 (Sept. 25, 2024) ("We've also unfortunately seen a rise in subscription traps. We've all been there. Every month, you're paying for that gym membership you don't really use, or streaming services you never signed up for in the first place. But it's absurdly difficult to actually cancel these services. You have to call customer service and spend an hour on the phone with a bot before you finally get through to a human being. Customer Service then transfers you to Memberships. They transfer you to Cancellations. And then suddenly the call drops and you have to do it all over again. It can feel like you're stuck in some type of endless doom loop. And many people understandably just give up—and pay dozens if not hundreds of dollars for subscriptions they don't want or need. And of course, that's kind of the point: to wear you down and keep taking your money, month after month. I'm excited that the Commission will be considering finalization of a 'click to cancel' rule that would require companies to make it just as easy to cancel a subscription as it is to sign up for one."), *https://www.ftc.gov/system/files/ftc_gov/pdf/20240925-remarks-chair-khan-center-for-american-progress.pdf; see also* Chair Lina M. Khan, Remarks at Strike Force on Unfair and Illegal Pricing Public Convening, at 2 (Aug. 1, 2024) ("We're currently working toward finalizing our 'click to cancel' rule. Too often, businesses require people to jump through endless hoops just to cancel a subscription. Customers end up paying dozens if not hundreds of dollars a month in subscriptions they want to escape. Our proposed rule would require that companies make it as easy to cancel a subscription as it is to sign up for one—ending this tax on people's time and money."), *https://www.ftc.gov/system/files/ftc_gov/pdf/2024.08.01-remarks-chair-khan-strike-force-public-convening.pdf.* In light of such statements unambiguously reflecting a firm belief in the need for regulatory action—and all but committing to the proposed solution—it is risible to suggest this rule was not effectively baked well before the Commission's vote.

[27] *See, e.g.,* Talmon Joseph Smith, *Lina Khan Ends FTC Term. What's Next for Her?,* Seattle Times (Oct. 1, 2024) ("Q: You've not gotten any whispers, any word that you will not be wanted in a Harris administration? A. No, I think to the contrary."), *https://www.seattletimes.com/business/lina-khan-ends-ftc-term-whats-next-for-her/; see generally* Ben Brody, *Lina Khan Hits the Road with Democrats Ahead of Election,* Punchbowl News (Oct. 2, 2024), *https://punchbowl.news/article/campaigns/ftc-lina-khan-campaigns-with-democrats/; cf.* Letter from James Comer, Chair, Committee on Oversight and Accountability to Lina Khan, Chair, Fed. Trade Comm'n, at 1 (Oct. 8, 2024) ("During this election season, you have engaged in partisan political activities with numerous Democrat congressional candidates, undermining the FTC's independence and its mission to protect American consumers regardless of partisan

affiliation"), *https://oversight.house.gov/wp-content/uploads/2024/10/FTC-re-Chair-Khan-Campaign-Season-Events_10.8.202423.pdf.*

[28] *See generally* 15 U.S.C. 57a(b)(1); 5 U.S.C. 553(c); *cf. Air Transport Ass'n of Am. Inc.* v. *Nat' Mediation Bd.,* 663 F.3d 476 (D.C. Cir. 2011); *Int'l Snowmobile Mfrs. Ass'n* v. *Norton,* 340 F. Supp. 2d 1249 (D. Wyo. 2004); *Nehemiah Corp. of Am.* v. *Jackson,* 546 F. Supp. 2d 830 (E.D. Cal. 2008). The Chair's approach is highly unusual, given this legal risk and the Commission's responsibility to keep an open mind—which is why, typically, Commissioners do not comment on *pending* rulemakings.

[29] 15 U.S.C. 57a(b)(2)(A).

[30] Fed. Trade Comm'n, Press Release, *FTC Seeks Public Comment on Ways to Improve Current Requirements for Negative Option Marketing* (Sept. 25, 2019), *https://www.ftc.gov/news-events/news/press-releases/2019/09/ftc-seeks-public-comment-ways-improve-current-requirements-negative-option-marketing.*

[31] 84 FR 52393, 52394 (Oct. 2, 2019) ("The Commission seeks comments on ways to improve its existing regulations for negative option marketing, a common form of marketing where the absence of affirmative consumer action constitutes assent to be charged for goods or services. Negative option offers are widespread in the marketplace and can provide substantial benefits for sellers and consumers. However, consumers cannot reap such benefits when marketers fail to make adequate disclosures, bill consumers without their consent, or make cancellation difficult or impossible. Over the years, such problematic negative option practices have remained a persistent source of consumer harm, often saddling consumers with recurring payments for products and programs they did not intend to purchase or did not want. In the past, the Commission has sought to address such practices through individual law enforcement cases and a patchwork of regulations. Nevertheless, problems persist, and consumers continue to submit thousands of complaints to the FTC each year about negative option marketing. To address these concerns, the Commission seeks comments on ways to improve existing regulatory requirements, including whether it should use its rulemaking authority under the FTC Act to expand the scope

and coverage of the existing Negative Option Rule.").

[32] *Id.* at 52395.

[33] *Id.* at 52396.

[34] Fed. Trade Comm'n, Press Release, *FTC To Ramp Up Enforcement Against Illegal Dark Patterns that Trick or Trap Consumers Into Subscriptions* (Oct. 28, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-ramp-enforcement-against-illegal-dark-patterns-trick-or-trap-consumers-subscriptions.*

[35] Fed. Trade Comm'n, Press Release, *Federal Trade Comm'n Proposes Rule Provision Making It Easier for Consumers to "Click to Cancel" Recurring Subscriptions and Memberships* (Mar. 23, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/03/federal-trade-commission-proposes-rule-provision-making-it-easier-consumers-click-cancel-recurring.*

[36] Dissenting Statement of Comm'r Christine S. Wilson, *Notice of Proposed Rulemaking, Negative Option Rule,* at 3 (Mar. 23, 2023), *https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_commissioner_wilson_dissent_negative_option_rule_finalrevd_0.pdf.*

The Statement of Basis and Purpose ("SBP") accompanying the final Rule cursorily dismisses concerns about the ANPR's adequacy, dubiously arguing that section 18 requires no such "specificity" in describing the area of inquiry.[37] But the whole purpose of section 18's requirement of a description of what the Commission aims to do is to elicit public comment to inform the Commission about its choices. Indeed, section 18 requires an ANPR to invite interested parties to provide "suggestions or alternative methods for achieving such objectives."[38] Parties cannot possibly include alternative methods if the ANPR wholly fails to identify the objective, *i.e.,* regulating misrepresentations in marketing of products with negative option features.

It is telling that the ANPR here only elicited 17 comments,[39] while the NPRM (which made clear that the Commission was significantly expanding its focus) elicited 16,000 comments.[40] The narrowness of the ANPR meant the Commission could not, consistent with section 18, proceed to a much broader NPRM.[41] In choosing to interpret the ANPR (and the 17 comments it elicited) as sufficient predicate for the much-expanded NPRM, the Commission cut itself off from valuable public comments at important early stages (especially as to regulatory alternatives) and ignored the rulemaking guardrails that Congress carefully established to forestall nondelegation concerns that might otherwise exist.[42]

The second procedural failing lies in the Commission's failure to "prescribe . . . rules which define with specificity acts or practices which are unfair or deceptive acts or practices" as Section 18 requires.[43] "Because the prohibitions of section 5 of the Act are quite broad, trade regulation rules are needed to define with specificity conduct that violates the statute and to establish requirements to prevent unlawful conduct."[44] And Section 425.3 of the Rule fails Section 18's specificity requirements. Section 425.3 prohibits any misrepresentation of material fact made in connection with the sale or promotion of a product that has a negative option feature.

Unfairness explicitly requires a cost-benefit analysis relating to the practices at issue.[45] Meanwhile, deception is a subset of the broader unfairness authority. With its focus on reasonableness and materiality, no cost-benefit analysis is required because the Commission has historically argued that deceptive practices are always harmful. So far, so good. But both unfairness, and particularly deception, require the Commission to provide sufficient evidence for a reviewing court to evaluate whether the Commission has met the legal predicate for either theory (particularly as it relates to reasonableness and materiality). While the Rule provides examples of material misrepresentations, those are merely examples. Indeed, the Commission ignores the specificity requirement by generalizing from poorly sampled past agency cases. Whatever the merits of the past cases, the Majority does not remotely come close to explaining how the evidence in those limited cases is similar to the myriad contexts an economy-wide rule would inevitably apply to.

Indeed, the Rule is not limited to misrepresentations relating to deceptive terms of negative option features (or some other specific, deceptive conduct), but instead, applies broadly to any material fact. Nor does the Rule require that the consumer actually use the negative option feature; the mere presence of a negative option feature would render any misrepresentation of material fact subject to the Rule. Taken together, the Rule is nothing more than a back-door effort at obtaining civil penalties in any industry where negative option is a method to secure payment. The Rule's application to any misrepresentation therefore fails to meet Section 18's "specificity" requirement,[46] and will no doubt invite serious legal challenge on this basis.[47]

The Supreme Court's decision in *AMG,* which held the language of Section 13(b) does not authorize the Commission to obtain equitable monetary relief,[48] limited the Commission's ability to seek money for first-time violations of the FTC Act. The Commission is still able, however, to seek monetary remedies for violation of rules issued under Section 18.[49] Here, the Final Rule effectively transforms Section 5's broad prohibition on unfair or deceptive practices into a Section 18 rule, allowing the Commission to expand its ability to seek money. Indeed, because negative option features are widely used in a variety of industries, the Rule greatly expands that ability. While I generally support *legislation*

that would grant the FTC authority under Section 13(b) to obtain court orders for redress or disgorgement (with whatever guardrails Congress deems fit), the Commission should not circumvent legislative prerogative via improper Section 18 rulemaking.

The third significant procedural flaw in this rulemaking is that the Commission failed to appropriately establish the "prevalence" of unfair and deceptive practices related to all negative option features for all products in all markets and all media (*i.e.,* with respect to the scope of this rule). According to Section 18, the Commission may issue an NPRM "only where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent."[50] Section 18 further provides:

> The Commission shall make a determination that unfair or deceptive acts or practices are prevalent under this paragraph only if—
>
> (A) it has issued cease and desist orders regarding such acts or practices, or
>
> (B) any other information available to the Commission indicates a widespread pattern of unfair or deceptive acts or practices.[51]

In the SBP, the Commission argues that it has satisfied this standard for its economy-wide rulemaking because it has issued more than 35 cases "challenging harmful negative option practices" and has received "tens of thousands of consumers complaints."[52] This evidence may well suggest that *some* unfair and deceptive acts related to negative option offers are indeed prevalent. But these statistics do not establish prevalence of misrepresentations of material fact related to products with negative option features, any more than the number of FTC cases and consumer complaints involving the internet means that the entire internet should be the subject of a Section 18 rulemaking prohibiting misrepresentations.

If similarity among complaints and cases only at the highest level of generality constitutes the "prevalence" sufficient to ground an economy-wide rulemaking, then a "prevalence" determination is in fact no meaningful guardrail on the Commission's conduct at all, creating precisely the type of non-delegation concerns that Section 18's guardrails were meant to prevent. Canons of "avoidance" warn us to avoid adopting interpretations that would render statutes unconstitutional.[53] To avoid precisely that fate, "prevalence" must require more than what the Commission has shown here.

A final concern here. The Rule's failure to define with specificity the acts or practices which are unfair or deceptive, combined with the rule's preemption of inconsistent

---

[37] SBP at 37–38.

[38] 15 U.S.C. 57a(b)(2)(A)(ii).

[39] *See Regulations.gov,* Negative Option Rule (ANPR), FTC–2019–0082, *https://www.regulations.gov/docket/FTC-2019-0082.*

[40] The Commission published 1,162 unique comments. SBP at 18. *See Regulations.gov,* Negative Option Rule (NPRM), FTC–2023–0033–0001, *https://www.regulations.gov/document/FTC-2023-0033-0001.*

[41] 15 U.S.C. 57a(b)(2)(A) ("Prior to the publication of any notice of proposed rulemaking pursuant to paragraph (1)(A), the Commission shall publish an advance notice of proposed rulemaking in the **Federal Register**.").

[42] *Cf.* Dissenting Statement of Comm'r Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak, *In re Non-Compete Clause Rule,* FTC Matter No. P201200, at 20–22 (June 28, 2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-noncompete-dissent.pdf* (describing nondelegation doctrine).

[43] 15 U.S.C. 57a(a)(1)(B).

[44] S. Rep. No. 93–1408 at 7702, 7755, 7763 (1974) (Conf. Rep.).

[45] 15 U.S.C. 45(n).

[46] *Cf. Katharine Gibbs School (Inc.)* v. *FTC,* 612 F.2d 658, 661–62 (2d Cir. 1979) (setting aside FTC rule under section 18 that did not, among other things, define unfair practices with sufficient specificity).

[47] *See, e.g., id.* at 663 ("When Congress provided that the Commission's rules must define unfair and deceptive acts with specificity, it clearly intended that the Commission's definition would be subject to judicial review.").

[48] *AMG Capital Mgmt., LLC* v. *FTC,* 593 U.S. 67, 70 (2021).

[49] 15 U.S.C. 57b(a)(1).

[50] *Id.* 57a(b)(3).

[51] *Id.*

[52] SBP at 8.

[53] *See Clark* v. *Martinez,* 543 U.S. 371, 381 (2005) (describing the canon of constitutional avoidance as "resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts"); *see also* Adrian Vermeule, *Saving Constructions,* 85 Geo. L. J. 1945, 1949 (1997) (providing examples of cases in which the Supreme Court construed a statute so as to avoid a constitutional question).

State laws,[54] seems likely to create confusion and, ultimately, may harm consumers. The Second Circuit rebuked the Commission for a similar approach in a prior rulemaking after the Commission had ''fail[ed] . . . to define with specificity the acts or practices which are unfair or deceptive.''[55] Absent ''a specification of the acts or practices which the Commission deems deceptive,'' the Court explained that ''the breadth of the preemption provision is such that it places in issue an indefinite variety of [S]tate laws and regulations'' that were relevant to the underlying contractual relationships. Similarly, here, State laws govern the types of conduct today's Rule attempts to regulate.[56] One risk of misguided Federal regulation is that it can confuse or jeopardize State laws and enforcement. Given the Rule's lack of specificity, it raises that concern.

II. The Rule is troubling not only procedurally but also substantively. By singling out representations made in connection with negative option billing models and subjecting these representations to civil penalties or other monetary relief, it tilts the playing field in ways that are likely to pervert business incentives. For example, businesses may avoid using negative option billing models, even when businesses and consumers could derive significant value from them.

One might argue that no shift in incentives will happen for honest businesses because the Rule only addresses misrepresentations of material fact. In other words, all an honest business needs to do to avoid civil penalties is to tell the truth about products and services that involve negative option billing. But what constitutes a misrepresentation can sometimes be in the eye of the beholder (that is, a Commissioner).[57] Even honest businesses will have reason to reconsider the use of negative option billing now that it means subjecting themselves to potential civil penalties for misreading Commission tea leaves.[58] And businesses will also need to factor in the compliance costs associated with implementing this Rule's disclosure, consent, and cancellation requirements— prescriptive requirements that are absent for

other billing models or less prescriptive under existing law, such as ROSCA.

These shifting incentives matter to consumers because the reason that honest businesses adopt negative option billing is to lower transaction costs between consumers and firms. For example, say I want to watch a particular streaming service at my convenience. I don't want to be bothered with signing up and paying a fee each month that I log on; I want negative option billing— a subscription—to reduce the friction in my streaming experience. Raising the transaction costs will reduce a business's sales and the utility consumers derive from these services. In other words, in our good intentions, we may harm the consumers and competition we are supposed to protect.[59]

The Rule purports to address any overbreadth by including, consistent with the Commission's Rules of Practice, an ''Exemptions'' provision, which provides: ''Any person to whom this Rule applies may petition the Commission for a partial or full exemption.''[61] In response to such petition, ''[t]he Commission may . . . issue partial or full exemptions from this part if the Commission finds application of the Rule's requirements is not necessary to prevent the acts or practices to which the Rule relates.''[62]

But the ''Exemptions'' provision does nothing to reduce the burden on firms from the overbreadth of the Rule's coverage of all misrepresentations of material fact. Rather, taken together, they effectively shift the burden of crafting a tailored rule to regulated entities. And, once again, it appears that the Commission is tilting the playing field in a manner that is likely to harm both consumers and competition. Small businesses and new market entrants are less likely to be able to afford the potentially costly legal fees needed to petition the Commission to obtain an exemption. Even for businesses that can afford to use the exemption process, this process will impose costs on businesses, who will pass on those costs to consumers.

Raising potential costs for consumers through an improperly promulgated rule is not a desirable outcome at any time, but especially not in an inflationary economy. Businesses and consumers will not be alone in bearing increased costs. Conducting the exemption process will continue to drain FTC staff resources—reducing the time that our talented staff could devote to enforcing the clear authorities Congress has given us, such as ROSCA.[63]

A final point here. I also have concerns about the Commission's economic analysis of the quantifiable benefits that may result from the Rule's substantive requirements. For example, the Commission's estimate related to the upper bound of the Rule's benefits for consumers who cancel subscriptions with in-person enrollment is based in part on the complaints of 25 individual consumers in a single industry,[64] and a number of other simplifying assumptions.[65] But this self-selected group of 25 consumers does not comprise a random sample, even among people who were not able to cancel subscriptions with in-person enrollment on their first attempt.[66] It is at least possible that other individuals who cancelled subscriptions in person had different experiences or expectations than these particular consumers—and therefore did not voice any complaint. Indeed, given that consumer experiences and expectations may vary significantly across industries and products, there is no reason to believe that balancing of harms and benefits of these consumers can be appropriately extrapolated to the entire economy. Thus, the Commission's estimated benefits are not based on what could be characterized as a representative sample. Without knowing the frequency of consumers having significant difficulty cancelling in-person subscriptions, it is not possible to assess how much weight to place on the estimate of the high end of the range of benefits from the proposed rule. Most of the difference between the low-end and high-end estimates of benefits is driven by the estimate of the high end of the benefits for in-person subscriptions.

III. This Rule is particularly disappointing because it represents two missed opportunities. In 2019, a bipartisan Commission unanimously voted in favor of

---

[54] 16 CFR 425.7(a) (''Relation to State Laws'') (''*In General.* This part shall not be construed as superseding, altering, or affecting any State statute, regulation, order, or interpretation relating to negative option requirements, except to the extent it is inconsistent with the provisions of this part, and then only to the extent of the inconsistency.'').

[55] *See Katharine Gibbs School,* 612 F.2d at 667.

[56] *See, e.g.,* SBP at 145–46, 214.

[57] *Cf.* Statement of Comm'r Christine S. Wilson Concurring In Part and Dissenting In Part, *FTC v. Neurometrix, Inc.,* FTC Matter No. 1723130 (Feb. 28, 2020), (disagreeing with the majority of the Commission on claim interpretation and substantiation for certain claims), *https:// www.ftc.gov/system/files/ftc_gov/pdf/2024.08.01-remarks-chair-khan-strike-force-public-convening.pdf.*

[58] Some businesses were already subject to disclosure requirements under existing laws such as ROSCA and the TSR. But those laws are more limited. For example, ROSCA section 8403 states that for goods or services sold through a negative option feature, the seller must ''clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information.'' 15 U.S.C. 8403.

[59] Concurring and Dissenting Statement of Comm'r Melissa Holyoak, *Social Media and Video Streaming Services Staff Report,* FTC Matter No. P205402, at 18–19 (Sept. 19, 2024) (''The core of this agency's mission is to protect consumers. Unfortunately, recent years have seen some Commissioners take a narrow view of that mission and where harms emanate from . . . . [W]e should also protect the American people from harms that follow when we fail to robustly and comprehensively scrutinize our own policy efforts and advocacy, including for economic effects, and to anticipate potential unintended consequence.''), *https://www.ftc.gov/system/files/ftc_gov/pdf/ commissioner-holyoak-statement-social-media-6b.pdf; cf.* Dissenting Statement of Comm'r Melissa Holyoak, Joined by Comm'r Andrew N. Ferguson, *In re Rytr, LLC,* FTC Matter No. 2323052, at 5 (Sept. 25, 2024) (''We must protect consumers through robust enforcement. Indeed, the Commission is at its best when it does so. But we must also think carefully about the potential harms to consumers and innovation that attend misguided enforcement. Today's misguided complaint and its erroneous application of section 5 will likely undermine innovation in the AI space. I therefore respectfully dissent.''), *https://www.ftc.gov/system/files/ftc_gov/ pdf/holyoak-rytr-statement.pdf.*

[60] 16 CFR 1.25, 1.31.

[61] 16 CFR 425.8.

[62] *Id.*

[63] To be clear, my concern is not with the exemption process itself (or its inclusion in the Rule), but with the enormous work it must do to compensate for the overbreadth of the provision regarding misrepresentations.

[64] *See, e.g.,* SBP at 171 (''Notwithstanding IHRSA's assertion that many fitness clubs offer online cancellation, at least 25 individual consumers submitted comments attesting to the difficulties of canceling gym memberships.'').

[65] *Id.* at 173 (''Based on these comments, the Commission makes the simplifying assumption that the worst gym membership cancellation experiences involve three failed attempts at cancellation, each costing one hour of time, and that, because of those cancellation failures, three unwanted monthly charges were processed.''); *see id.* at 169–70 (explaining how, in its economic analysis for the Rule, ''the Commission proxies the per-cancellation benefits of an additional, remote, method of cancellation by looking at those benefits in the context of gym memberships'').

[66] *See id.* at 171.

Appellate Case: 24-3137      Page: 74      Date Filed: 12/05/2024 Entry ID: 5463205

issuing the ANPR, which was intended to (1) consolidate the requirements from various laws the FTC enforces, providing businesses who have to navigate this patchwork with greater clarity, thereby benefiting both consumers and businesses; and (2) explore whether a Section 18 rule should fill any gaps "when marketers fail to make adequate disclosures, bill consumers without their consent, or make cancellation difficult or impossible." [67] Today's final Rule could have stayed that prudent course rather than expanding in scope and complexity as it has under this Commission.

The second missed opportunity has taken place every day since the Commission expanded the scope of the rulemaking. This Commission chose to devote scarce staff resources to this overbroad rulemaking—one that seems likely to be challenged in court, which will lead to even more taxpayer-funded expenses—rather than direct our talented staff to draft a rule within the scope of our authority or bring enforcement actions

using clear legal authorities like ROSCA and TSR. In my time at the Commission, I have voted in support of numerous ROSCA cases, including *NGL*,[68] *Care.com*,[69] and *Legion Media*,[70] and numerous TSR cases, including *Career Step*,[71] *Carshield*,[72] and *Panda Benefit Services*.[73] As I have said elsewhere, I believe

the Commission is at its best when it focuses on enforcing the law, not writing it.[74] But I am not reflexively opposed to rulemaking where Congress has delegated the Commission relevant authority and we act consistent with that authority.[75] Unfortunately, that is not what today's Rule is. Instead, we have an ill-disguised political maneuver from the Majority in the form of a rule, one rushed to publication to advance the prospects of the Chair's preferred presidential candidate.

I dissent.

[FR Doc. 2024–25534 Filed 11–14–24; 8:45 am]

**BILLING CODE 6750–01–P**

---

[67] 84 FR 52393, 52394.

[68] *FTC* v. *NGL Labs, LLC*, No. 2:24–cv–5753 (C.D. Cal.), *https://www.ftc.gov/legal-library/browse/cases-proceedings/ngl.*

[69] *FTC* v. *Care.com, Inc.*, No. 1:24–cv–987 (W.D. Tex.), *https://www.ftc.gov/legal-library/browse/cases-proceedings/carecom-inc-ftc-v.*

[70] *FTC* v. *Legion Media LLC*, FTC Matter No. 2423034, *https://www.ftc.gov/legal-library/browse/cases-proceedings/242-3034-legion-media-llc-et-al-ftc-v.*

[71] *FTC* v. *Career Step, LLC*, FTC Matter No. 2323019, *https://www.ftc.gov/legal-library/browse/cases-proceedings/232-3019-career-step-llc-ftc-v.*

[72] *FTC* v. *NRRM, LLC*, FTC Matter No. 2223031, *https://www.ftc.gov/legal-library/browse/cases-proceedings/2223031-carshield.*

[73] *FTC* v. *Panda Benefit Servs., LLC*, FTC Matter No. 2423041, *https://www.ftc.gov/legal-library/browse/cases-proceedings/2423041-panda-benefit-services-llc-ftc-v.*

[74] Prepared Statement of Comm'r Melissa Holyoak, Fed. Trade Comm'n, Before the Subcomm. on Innovation, Data, and Commerce of the Energy and Commerce Comm., U.S. House of Representatives, Concerning "The Fiscal Year 2025 Federal Trade Commission Budget," at 2–4 (July 9, 2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/commissioner-holyoak-testimony-7-5-24.pdf.*

[75] *Id.*

Appellate Case: 24-3137     Page: 75     Date Filed: 12/05/2024 Entry ID: 5463205

# Doc. 2

Notice Regarding Requests Relating to
the Informal Hearing, No. P064202 (Jan.
10, 2024)

Procedures," prior to any FAA final regulatory action.

### List of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

### The Proposed Amendment

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

### PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### §71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order JO 7400.11H, Airspace Designations and Reporting Points, dated August 11, 2023, and effective September 15, 2023, is amended as follows:

*Paragraph 6005 Class E Airspace Areas Extending Upward From 700 Feet or More Above the Surface of the Earth.*

\*    \*    \*    \*    \*

### ANM UT E5 Green River, UT [New]

Green River Municipal Airport, UT
(Lat. 38°57′42″ N, long. 110°13′38″ W)

That airspace extending upward from 700 feet above the surface within a 5.5-mile radius of the airport, from the 145° bearing clockwise to the 278° bearing within 6.8 miles southwest of the airport, and from the 278° bearing clockwise to the 337° bearing within 8.5 miles northwest of the airport.

\*    \*    \*    \*    \*

Issued in Des Moines, Washington, on November 30, 2023.

**B.G. Chew,**

*Group Manager, Operations Support Group, Western Service Center.*

[FR Doc. 2023–26798 Filed 12–7–23; 8:45 am]

**BILLING CODE 4910–13–P**

---

### FEDERAL TRADE COMMISSION

### 16 CFR Part 425

### RIN 3084–AB60

### Negative Option Rule

**AGENCY:** Federal Trade Commission.

**ACTION:** Initial notice of informal hearing; final notice of informal hearing; list of Hearing Participants; requests for submissions from Hearing Participants.

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission") has proposed amendments to the "Rule Concerning the Use of Prenotification Negative Option Plans," to be retitled the "Rule Concerning Subscriptions and Other Negative Option Plans" ("Negative Option Rule" or "Rule"). The proposed changes are calculated to combat unfair or deceptive business practices, including recurring charges for products or services consumers do not want and cannot cancel without undue difficulty. In response to the notice of proposed rulemaking, several commenters requested an informal hearing. The informal hearing will be conducted virtually on January 16, 2024, at 10 a.m. Eastern, and the Commission's Chief Presiding Officer, the Chair, has appointed Administrative Law Judge for the Securities and Exchange Commission, the Honorable Carol Fox Foelak, to serve as the presiding officer of the informal hearing.

**DATES:** The informal hearing will be conducted virtually starting at 10 a.m. Eastern on January 16, 2024.

**ADDRESSES:** Hearing participants may submit their oral presentations in writing or file supplementary documentary submissions online or on paper by following the instructions in Part IV of the **SUPPLEMENTARY INFORMATION** section below. Write "Negative Option Rule (16 CFR part 425) (Project No. P064202)" on your request or documentary submission, and file it online through *https:// www.regulations.gov.* If you prefer to file your request or documentary submission on paper, please send it via overnight service to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC– 5610 (Annex N), Washington, DC 20580.

**FOR FURTHER INFORMATION CONTACT:** Katherine Johnson, Attorney, Division of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580 (*phone:* 202– 326–2185).

**SUPPLEMENTARY INFORMATION:**

### I. Background

Following public comment on an advance notice of proposed rulemaking (ANPR), 84 FR 52393 (Oct. 2, 2019), the FTC proposed amending the Negative Option Rule as described in a notice of proposed rulemaking (NPRM), 88 FR 24716 (Apr. 24, 2023). The Commission

posted 1,163 public comments in response to the NPRM.[1]

### II. The Requests for an Informal Hearing; Presentation of Oral Submissions

Section 18 of the Federal Trade Commission Act, 15 U.S.C. 57a, and the Commission's Rules of Practice, 16 CFR 1.11(e), provide interested persons the opportunity to make an oral statement at an informal hearing upon request.[2] To make such a request, a commenter must submit, no later than the close of the comment period for the NPRM, (1) a request to make an oral submission, if desired; (2) a statement identifying the interested person's interests in the proceeding; and (3) any proposal to add disputed issues of material fact to be addressed at the hearing.[3]

The Commission received six[4] such requests in response to the NPRM from:

1. International Franchise Association (IFA)[5]
2. TechFreedom[6]
3. Performance Driven Marketing Institute (PDMI)[7]
4. NCTA—The Internet & Television Association (NCTA)[8]

---

[1] *See* FTC, Negative Option Rule, *https:// www.regulations.gov/document/FTC-2023-0033- 0001/comment.*

[2] The FTC Act provides that "an interested person is entitled to present his position orally or by documentary submission (or both)." 15 U.S.C. 57a(c)(2)(A).

[3] 16 CFR 1.11(e)(1)–(3).

[4] All but one—TechFreedom—identified their interest in the proceeding either as industry groups or as private companies with vested interests in the outcome of this rulemaking. *See* TechFreedom comment (June 23, 2023), *https:// www.regulations.gov/comment/FTC-2023-0033- 0872.*

[5] IFA identified itself as "the world's oldest and largest organization representing franchising" whose members include "franchise companies, individual franchises, and companies that support franchise companies," explaining that "IFA is particularly concerned on [sic] the potential adverse effects of the proposed amendments to the Rule on franchised small businesses." IFA comment at 1 (June 23, 2023), *https://www.regulations.gov/ comment/FTC-2023-0033-0856.*

[6] Although TechFreedom failed to identify its interests in the rulemaking proceeding, according to a recent internet search, "TechFreedom is a non- profit, non-partisan technology think tank launched in 2011, . . . [f]ocusing on issues of internet freedom and technological progress." *See* TechFreedom, *About, https://techfreedom.org/ about/* (last visited Nov. 30, 2023).

[7] PDMI explained that its more than 130 member companies, doing business in performance and direct-to-consumer marketing, "market their goods or services using the types and styles of marketing covered by the FTC's proposed Rule changes." PDMI comment at 1 (June 23, 2023), *https:// www.regulations.gov/comment/FTC-2023-0033- 0864.*

[8] NCTA stated that its members provide consumers with "cable, broadband, voice, video streaming, and other services" and "is the principal trade association for the U.S. cable industry," and

Continued

Appellate Case: 24-3137    Page: 77    Date Filed: 12/05/2024 Entry ID: 5463205

5. FrontDoor [9]
6. Interactive Advertising Bureau (IAB) [10]

The Commission finds that these requests were adequate and therefore will hold an informal hearing. These commenters constitute the Commission's list of interested persons, pursuant to Commission Rule 1.12(a)(4), who will make oral presentations or additional submissions (or both) during the hearing.[11] The Commission has not determined whether there are any groups of interested persons with the same or similar interests in the proceeding, so it does not include any such list in this Notice.[12]

## III. Disputed Issues of Material Fact; Final Notice

In the NPRM, the Commission did not identify any disputed issues of material fact that need to be resolved at an informal hearing. The Commission may still do so, however, after the NPRM, either on its own initiative or in response to a persuasive showing from a commenter.[13] Two interested persons, NCTA and IAB, proposed that the Commission consider several potential disputed issues of material fact.[14] Specifically, NCTA proposed the following (reprinted verbatim): [15]

expressed concern the "proposed rule will have unintended consequences that would burden, confuse, and harm consumers, and would prohibit Members from providing consumers with key information that could inform their decisions about whether to modify or cancel their services." NCTA comment at 1–2 (June 23, 2023), *https:// www.regulations.gov/comment/FTC-2023-0033-0858.*

[9] FrontDoor stated that it and its subsidiaries "have served millions of customers for over fifty years by offering comprehensive home repair and maintenance services through an extensive network of pre-qualified professional contractors" and that many of the contracts it offers come with an automatic renewal option. FrontDoor comment at 1 (June 23, 2023), *https://www.regulations.gov/ comment/FTC-2023-0033-0862.*

[10] IAB represents "over 700 leading media companies, brand marketers, agencies, and technology companies" responsible for "selling, delivering, and optimizing digital advertising and marketing campaigns," and whose members "account for 86 percent of online advertising expenditures" in the United States. IAB comment at 1 (June 23, 2023), *https://www.regulations.gov/ comment/FTC-2023-0033-1000.*

[11] *See infra* Part IV. These interested persons are referred to herein as the "Hearing Participants."

[12] Commission Rule 1.12(a)(5) requires the initial notice of informal hearing to include a "list of the groups of interested persons determined by the Commission to have the same or similar interests in the proceeding." 16 CFR 1.12(a)(5).

[13] 88 FR 24716, 24730 (Apr. 24, 2023).

[14] FrontDoor requested that the Commission "hold an informal hearing to engage in further factfinding on the disputed issues of material fact that have been raised in comments" but FrontDoor failed to identify any specific disputed issues of material fact as required by Commission Rule 1.11(e)(3). FrontDoor comment at 3.

[15] NCTA comment at 35–37.

• Is there substantial evidence that (1) broadband, cable, voice (including both VoIP and mobile wireless services), and video streaming service providers have failed to provide consumers with material information relating to their services and any negative option features and (2) such practices are prevalent?

• Is there substantial evidence that (1) broadband, cable, voice (including both VoIP and mobile wireless services), and video streaming service providers have imposed unwanted services on consumers through deceptive statements made during enrollment and (2) such practices are prevalent?

• Is there substantial evidence that (1) broadband, cable, voice (including both VoIP and mobile wireless services), and video streaming service providers have imposed unwanted services on consumers through deceptive communications when consumers seek to cancel one or more of their services and (2) such practices are prevalent?

• Is there substantial evidence that (1) broadband, cable, voice (including both VoIP and mobile wireless services), and video streaming service providers have misrepresented their billing practices relating to automatic renewal and (2) such practices are prevalent?

• Is there substantial evidence that (1) broadband, cable, voice (including both VoIP and mobile wireless services), and video streaming service providers have failed to obtain consent from consumers before enrolling them for automatically renewing services and (2) such practices are prevalent?

• Is there substantial evidence that (1) consumers have difficulty cancelling their broadband, cable, voice, or video streaming services and (2) such difficulty is due to practices and processes of providers that are prevalent?

• Is there substantial evidence that (1) a click-to-cancel approach for multi-faceted, complex, and often bundled broadband, cable, voice, and video streaming services benefits consumers and (2) such benefits outweigh the downsides and consumer harms?

• Is there substantial evidence that (1) consumers often forget they have purchased broadband, cable, voice, or video streaming services, warranting an annual notice to remind them they are not incurring charges for services they do not want to use and (2) such practices are prevalent?

• Is there substantial evidence that broadband, cable, voice, or video streaming service transactions have distinctive characteristics which place consumers in a disadvantaged bargaining position and leave them

especially vulnerable to prevalent unfair and deceptive practices?

• Is there substantial evidence that (1) consumers are burdened by listening to "saves" or "upsells" and (2) burdensome "saves" or "upsells" are prevalent?

• Do consumers who hear a "save" often decide to retain or modify service?

• If the proposed Rule is adopted, will (1) the "click to cancel" mechanism as required by proposed section 425.6(c) impose significant costs on businesses that must change systems and user interfaces and (2) these costs on businesses result in higher costs for consumers?

• If the proposed Rule is adopted, will (1) a prohibition on "saves" as required by proposed section 425.6(d) impose significant costs on businesses and (2) these costs on businesses result in higher costs or less access to discounts for consumers?

IAB,[16] for its part, indicated that it "intended to raise several disputed issues of material fact," first with respect to the compliance costs and the accuracy of the Commission's estimates as follows (reprinted verbatim):

• Whether the costs associated with implementing these new requirements will be significantly higher than the FTC estimates; and

• Whether the NPRM makes compliance easier for businesses, in light of the lack of preemption of state law.

And, as "to each of the major substantive sections in the NPRM":

• Whether the disclosure requirements proposed by the NPRM improve customer understanding of the terms of an automatic renewal across devices and contexts;

• Whether the double opt-in consent requirement improves consumer understanding, even if sellers disclose the autorenewal feature per the proposed disclosure requirements;

• Whether a cancellation flow that complies with the Commission's requirements (*i.e.,* that asks the consumer for consent to receive a save) is easier for a consumer to navigate and understand than a cancellation flow that simply provides the offer or discount;

• Whether consumers are actually confused or burdened by a reasonable number of "saves"; and

• Whether the deceptive practices identified in the rulemaking record are limited to certain media (*e.g.,* phone or in-person).

To be appropriate for cross-examination or rebuttal, a disputed issue of material fact must raise

[16] IAB comment at 20–21.

App. 78

"specific facts" and not "legislative facts" [17] and must be not only "material" but also "necessary to be resolved." [18] The relevant legislative history explains "disputed issues of material fact necessary to be resolved" should be interpreted narrowly.[19] As explained below, the Commission has reviewed the two interested persons' proposed disputed issues of material fact and has determined that they are not "disputed," "material," or "specific facts" "necessary to be resolved."

In this context, "disputed" and "material" are given the same meaning as in the standard for summary judgment.[20] As in summary judgment,

the challenging party must do more than simply assert there is a dispute regarding the Commission's findings. If those findings are otherwise adequately supported by record evidence, they must come forward with sufficient evidence to show there is a genuine, bona fide dispute over material facts that will affect the outcome of the proceeding.[21] As discussed below, NCTA and IAB proposed disputed issues of material fact challenging the Commission's findings as to (1) the prevalence of unfair or deceptive acts or practices in negative option marketing; (2) the sufficiency of the evidence supporting the various Rule provisions and the Commission's statements on the proposed Rule's economic impact. However, these findings are supported by ample evidence in the record, and neither interested person identified any evidence challenging the FTC's conclusions.

As to prevalence, the Commission must make two findings on prevalence if it promulgates a rule under Section 18. First, it must explain its "reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent" when, after an ANPR, it issues an NPRM.[22] The Commission did that.[23] The second is that, in the statement of

basis and purpose to accompany any final rule, the Commission must include "a statement as to the prevalence of the acts or practices treated by the rule." [24] The Commission's prevalence findings need only have "some basis or evidence" to show "the practice the FTC rule seeks to regulate does indeed occur." [25] The Commission based its first prevalence finding on its extensive record of law enforcement cases challenging deceptive or unfair negative option practices. The robust rulemaking record also included comments from State Attorneys General, who also have vast experience in this area, as well as comments from consumer advocates and individual consumers. There is no genuine dispute as to the fact that, if the Commission decides, after the informal hearing, to promulgate a final rule, it will be able to include a statement as to the prevalence of the negative-option practices treated by the rule with far more than some basis or evidence that they do indeed occur.

As to evidentiary sufficiency, the Commission's factual findings are supported by substantial evidence if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [26] Again, based on evidence cited in the NPRM and from FTC cases, State Attorneys General, and commenters, the Commission has more than adequate evidence from which one could find unfair or deceptive practices in negative option marketing. No interested person identified any evidence showing otherwise. For instance, both NCTA and IAB suggested there is insufficient evidence to support the Commission's initial finding that costs imposed by implementing the Rule's disclosure and other requirements are not significant. However, this statement, without more, does not rise to the level of a bona fide dispute, and no reasonable factfinder could conclude the Commission has failed to meet the applicable standard given its vast experience in this area and the extensive rulemaking record.

Further, NCTA's and IAB's proposed disputed issues of material fact challenge the Commission's findings as to quintessentially "legislative facts"— "facts which help the tribunal determine the content of law and of

---

[17] Commission Rule 1.12(b)(1) ("An issue for cross-examination or the presentation of rebuttal submissions, is an issue of specific fact in contrast to legislative fact."). This Commission Rule follows directly from the legislative history of the adoption of Section 18 of the FTC Act: "The only disputed issues of material fact to be determined for resolution by the Commission are those issues characterized as issues of specific fact in contrast to legislative fact. It was the judgment of the conferees that more effective, workable and meaningful rules will be promulgated if persons affected by such rules have the opportunity afforded by the bill, by cross-examination and rebuttal evidence or other submissions, to challenge the factual assumptions on which the Commission is proceeding and to show in what respect such assumptions are erroneous." H.R. Rep. No. 93–1606, at 34 (Dec. 16, 1974) (Conf. Rep.). As further explained in *Association of National Advertisers, Inc.* v. *FTC*, 627 F.2d 1151 (D.C. Cir. 1979), the distinction between "specific fact" and "legislative fact" grew out of a recommendation from the Administrative Conference of the United States (ACUS):

Conference Recommendation 72–5 is addressed exclusively to agency rulemaking of general applicability. In such a proceeding, almost by definition, adjudicative facts are not at issue, and the agency should ordinarily be free to, and ordinarily would, proceed by the route of written comments, supplemented, perhaps, by a legislative-type hearing. Yet there may arise occasionally in such rulemaking proceedings factual issues which, though not adjudicative, nevertheless justify exploration in a trial-type format because they are sufficiently narrow in focus and sufficiently material to the outcome of the proceeding to make it reasonable and useful for the agency to resort to trial-type procedure to resolve them. These are what the Recommendation refers to as issues of specific fact. *Id.* at 1164.

[18] 16 CFR 1.13(b) (addressing issues that "must" be considered for cross-examination or rebuttal are only those disputed issues of fact the Commission determines "material" and "necessary to be resolved"). See *also* 15 U.S.C. 57a(c)(2)(B) (providing that cross-examination and rebuttal are available only "if the Commission determines that there are disputed issues of material fact it is necessary to resolve").

[19] *See, e.g.,* H.R. Rep. No. 93–1107, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.C.C.A.N. 7702, 7728; *Ass'n of Nat'l Advertisers, Inc.* v. *FTC*, 627 F.2d 1151, 1163 (D.C. Cir. 1979) (quoting H.R. Rep. No. 93–1606, at 33 (1974) (Conf. Report)).

[20] As explained in the legislative history:

The words 'disputed issues of material fact' are intended to describe and limit the scope of cross-examination in a rulemaking proceeding. Thus, the right of participants in the proceeding to cross-examine Commission witnesses does not include

cross-examination on issues as to which there is not a bona fide dispute. In this connection, the Committee considers the rules of summary judgment applied by the courts analogous. Where the weight of the evidence is such that there can be no bona fide dispute over the facts, summary judgment is proper. Similarly, in such a situation cross-examination would not be permitted; neither is a participant entitled to cross-examination where the disputed issues do not involve material facts. This language in the bill is used to distinguish facts which might be relevant to the proceeding but not of significant enough import to rise to the level of materiality. The word material is used here with the same meaning it is given under the common law rules of evidence. Also of importance is the word 'fact.' Cross-examination is not required regarding issues in rulemaking proceedings which are not issues of fact. Examples of such issues are matters of law or policy or matters whose determination has been primarily vested by Congress in the Federal Trade Commission. Thus, unless the subject matter with regard as to which cross-examination is sought relates to disputed issues, which are material to the proposed rule and which are fact issues, there is no right to cross-examination on the part of any party to the proceeding. H.R. REP. No. 93–1107, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. CODE CONG. & AD. NEWS 7702, 7728.

[21] *Id. See also Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (explaining the standard as "[o]nly disputes over facts that might affect the outcome"); *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

[22] 15 U.S.C. 57a(b)(3).

[23] 88 FR 24716, 24725 & n.60 (collecting cases). *See also* ANPR, 84 FR 52393, 52396 (noting that "recent cases and the high volume of ongoing complaints suggests there is prevalent, unabated consumer harm in the marketplace" and soliciting comment on prevalence).

[24] 15 U.S.C. 57a(d)(1). "The contents and adequacy of any statement required" in the statement of basis and purpose, such as the statement as to prevalence, "shall not be subject to judicial review in any respect." *Id.* 57a(e)(5)(C).

[25] *Pa. Funeral Dirs.* v. *FTC*, 41 F.3d 81, 87 (3d Cir. 1994).

[26] *Id.,* 41 F.3d at 85 (citing cases).

policy." [27] Because such facts "combine empirical observation with application of administrative expertise to reach generalized conclusions, they need not be developed through evidentiary hearings." [28] Thus, because these do not raise questions of "specific fact," they do not warrant cross-examination and rebuttal submissions.[29]

Accordingly, the Commission finds that the issues raised by NCTA and IAB are not genuinely disputed or material within the narrow meaning set forth in the case law and legislative history and that they do not require a "trial-type" proceeding for their proper determination because they are not issues of "specific fact." Therefore, the Commission finds that there are no "disputed issues of material fact" to resolve at the informal hearing [30] and no need for cross-examination or rebuttal submissions.[31]

This initial notice of informal hearing also serves as the "final notice of informal hearing." [32] A final notice of informal hearing is limited in its substance to matters that arise only when the Commission designates disputed issues of material fact: who will conduct cross-examination; whether any interested persons with similar interests will be grouped together for such purposes; and who will make rebuttal submissions.[33] Because cross-examination and submission of rebuttal evidence are not anticipated to occur in this informal hearing, no separate final notice of informal hearing is necessary.

## IV. List of Hearing Participants; Making an Oral Statement; Requests for Documentary Submissions

Pursuant to Commission Rule 1.12(a)(4), 16 CFR 1.12(a)(4), the following is the list of interested persons ("Hearing Participants") who will have the opportunity to make oral presentations at the informal hearing:

1. International Franchise Association (IFA)
2. TechFreedom
3. Performance Driven Marketing Institute (PDMI)
4. NCTA—The Internet & Television Association (NCTA)

5. FrontDoor
6. Interactive Advertising Bureau (IAB)

Oral statements will be limited to 10 minutes, although they may be supplemented by documentary submissions as described below, and the presiding officer may grant an extension of time for good cause shown. Transcripts of the oral statements will be placed in the rulemaking record. Hearing Participants will be provided with instructions as to how to participate in the virtual hearing.

If you are a Hearing Participant and would like to submit your oral presentation in writing or file a supplementary documentary submission, you can do so by submitting a comment on this rulemaking docket. You must do so on or before December 22, 2023. Write "Negative Option Rule (16 CFR part 425) (Project No. P064202)" on your submission. If you file a documentary submission under this Section, your documentary submission—including your name and your state—will be placed on the public record of this proceeding, including on the website *https://www.regulations.gov.* To ensure the Commission considers your online documentary submission, please follow the instructions on the web-based form.

Because your documentary submission will be placed on the public record, you are solely responsible for making sure that it does not include any sensitive or confidential information. In particular, your documentary submission should not contain sensitive personal information, such as your or anyone else's Social Security number; date of birth; driver's license number or other state identification number or foreign country equivalent; passport number; financial account number; or credit or debit card number. You are also solely responsible for making sure your documentary submission does not include any sensitive health information, such as medical records or other individually identifiable health information. In addition, your documentary submission should not include any "[t]rade secret or any commercial or financial information which . . . is privileged or confidential"—as provided in Section 6(f) of the FTC Act, 15 U.S.C. 46(f), and Commission Rule 4.10(a)(2), 16 CFR 4.10(a)(2)—including, in particular, competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

Documentary submissions containing material for which confidential

treatment is requested must be filed in paper form, must be clearly labeled "Confidential," and must comply with Commission Rule 4.9(c), 16 CFR 4.9(c). In particular, the written request for confidential treatment that accompanies the documentary submission must include the factual and legal basis for the request and must identify the specific portions to be withheld from the public record. *See* Commission Rule 4.9(c). Your documentary submission will be kept confidential only if the General Counsel grants your request in accordance with the law and the public interest. Once your documentary submission has been posted publicly at *https://www.regulations.gov*—as legally required by Commission Rule 4.9(b), 16 CFR 4.9(b)—we cannot redact or remove it, unless you submit a confidentiality request that meets the requirements for such treatment under Commission Rule 4.9(c), and the General Counsel grants that request.

Visit the FTC website to read this document and the news release describing it. The FTC Act and other laws that the Commission administers permit the collection of documentary submissions to consider and use in this proceeding as appropriate. The Commission will consider all timely and responsive documentary submissions it receives on or before December 22, 2023. For information on the Commission's privacy policy, including routine uses permitted by the Privacy Act, see *https://www.ftc.gov/site information/privacypolicy.*

Hearing Participants who need assistance should indicate as much in their comment, and the Commission will endeavor to provide accommodations. Hearing Participants without the computer technology necessary to participate in video conferencing will be able to participate in the informal hearing by telephone; they should indicate as much in their comments.

## V. Conduct of the Informal Hearing; Role of Presiding Officer

The Commission's Chief Presiding Officer, the Chair, has appointed and designates Administrative Law Judge for the Securities and Exchange Commission, the Honorable Carol Fox Foelak, to serve as the presiding officer of the informal hearing. Judge Foelak will conduct the informal hearing virtually using video conferencing starting at 10:00 a.m. Eastern on January 16, 2024. The informal hearing will be available for the public to watch live from the Commission's website, *https://www.ftc.gov,* and a recording or

---

[27] *Ass'n of Nat'l Advertisers,* 627 F.2d at 1161–62 (D.C. Cir. 1979) (internal citation omitted).

[28] *Id.* at 1162.

[29] *See generally supra* nn.18–22.

[30] If any interested person seeks to have disputed issues of material fact designated by the presiding officer, the interested person may make such request pursuant to Commission Rule 1.13(b)(1)(ii), 16 CFR 1.13(b)(1)(ii).

[31] 16 CFR 1.12(b).

[32] 16 CFR 1.12(c).

[33] *Id.*

Appellate Case: 24-3137     Page: 80     Date Filed: 12/05/2024 Entry ID: 5463205

transcript of the informal hearing will be placed in the rulemaking record.

Because there are no "disputed issues of material fact" to resolve at the informal hearing, the presiding officer is not anticipated to make a recommended decision.[34] The role of the presiding officer therefore will be to preside over and to ensure the orderly conduct of the informal hearing, including selecting the sequence in which oral statements will be heard, and to place the transcript and any additional written submissions received into the rulemaking record. The presiding officer may prescribe additional procedures or issue rulings in accordance with Commission Rule 1.13, 16 CFR 1.13. In execution of the presiding officer's obligations and responsibilities under the Commission Rules, the presiding officer may issue additional public notices.

## VI. Communications by Outside Parties to the Commissioners or Their Advisors

Pursuant to Commission Rule 1.18(c)(1), 16 CFR 1.18(c)(1), the Commission has determined that communications with respect to the merits of this proceeding from any outside party to any Commissioner or Commissioner advisor shall be subject to the following treatment. Written communications and summaries or transcripts of oral communications shall be placed on the rulemaking record if the communication is received before the end of the comment period. They shall be placed on the public record if the communication is received later. Unless the outside party making an oral communication is a member of Congress, such communications are permitted only if advance notice is published in the Weekly Calendar and Notice of "Sunshine" Meetings.[35]

By direction of the Commission.

**Joel Christie,**

*Acting Secretary.*

[FR Doc. 2023–26946 Filed 12–7–23; 8:45 am]

**BILLING CODE 6750–01–P**

---

[34] *See* 16 CFR 1.13(d) ("The presiding officer's recommended decision will be limited to explaining the presiding officer's proposed resolution of disputed issues of material fact.").

[35] *See* 15 U.S.C. 57a(i)(2)(A); 16 CFR 1.18(c).

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Parts 115 and 125**

**[Docket No. FR–6355–N–02]**

**RIN 2529–AB07**

## Removing Criminal Conviction Restrictions for Testers in FHIP- and FHAP-Funded Testing Programs; Extension of Comment Period

**AGENCY:** Office of Fair Housing and Equal Opportunity, HUD.

**ACTION:** Proposed rule; extension of comment period.

---

**SUMMARY:** On October 31, 2023, HUD published in the **Federal Register** a notice of proposed rulemaking entitled "Removing Criminal Conviction Restrictions for Testers in FHIP- and FHAP-Funded Testing Programs," proposing to eliminate the tester restrictions for Fair Housing Initiatives Program (FHIP) grantees and for Fair Housing Assistance Program (FHAP) agencies that forbid FHIP and FHAP recipients from using fair housing testers with prior felony convictions or convictions of crimes involving fraud or perjury. The proposed rule provided for a 60-day comment period, which would have ended January 2, 2024. HUD has determined that a 9-day extension of the comment period, until January 11, 2024, is appropriate. This extension will allow interested persons additional time to analyze the proposal and prepare their comments.

**DATES:** The comment period for the proposed rule published on October 31, 2023, at 88 FR 74381, is extended. Comments should be received on or before January 11, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposed rule. There are two methods for submitting public comments. All submissions must refer to the above docket number and title.

*1. Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0500.

*2. Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely

receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *www.regulations.gov* website can be viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

*No Facsimile Comments:* Facsimile (FAX) comments are not acceptable.

*Public Inspection of Comments.* All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the public comments must be scheduled by calling the Regulations Division at 202–402–3055 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.* Copies of all comments submitted are available for inspection and downloading at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Demetria McCain, Principal Deputy Assistant Secretary for Fair Housing and Equal Opportunity, Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, 451 7th Street SW, Room 5250, Washington, DC 20410–8000, telephone number 202–402–7861 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone calls, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

**SUPPLEMENTARY INFORMATION:** On October 31, 2023, at 88 FR 74381, HUD published a notice of proposed rulemaking entitled "Removing Criminal Conviction Restrictions for Testers in FHIP- and FHAP-Funded Testing Programs," which proposes to eliminate restrictions for Fair Housing Initiatives Program (FHIP) grantees and

# Doc. 3

ALJ Recommended Decision, No. P064202 (FTC Apr. 12, 2024)

UNITED STATES OF AMERICA
Before the
FEDERAL TRADE COMMISSION
Washington, D.C. 20507

| | | |
|---|---|---|
| NEGATIVE OPTION RULE | : | RECOMMENDED DECISION |
| | : | April 12, 2024 |

APPEARANCES:   Katherine Johnson for the Federal Trade Commission,
Bureau of Consumer Protection, Division of Enforcement

Lartease M. Tiffith for the
Interactive Advertising Bureau (IAB)

Sarah Davies for the
International Franchise Association (IFA)

Michael Powell for the
NCTA – The Internet and Television Association (NCTA)

Thomas Haire for the
Performance Driven Marketing Institute (PDMI)

Berin Szoka for TechFreedom

BEFORE:   Carol Fox Foelak, Administrative Law Judge

## SUMMARY

This Recommended Decision (RD) finds that (1) the proposed amendment to the Negative Option Rule will have an annual effect on the national economy of $100 million or more; and (2) the record does not establish what the recordkeeping and disclosure costs associated with the proposed rule will be.

# I. INTRODUCTION

## A. <u>Procedural Background</u>

This RD addresses disputed issues of material fact arising in the instant rulemaking proceeding of the Federal Trade Commission (FTC).  The procedural history is as follows:

In 2019, the FTC issued an Advance Notice of Proposed Rulemaking, 84 Fed. Reg. 52393 (Oct. 2, 2019) (ANPR) seeking public comment on the need for amendments to the existing Negative Option Rule.  Following the ANPR, the FTC issued the *Negative Option Enforcement Policy Statement*, 86 Fed. Reg. 60822 (Nov. 4, 2021) (Policy Statement).  That document describes the several statutes and FTC rules that impact the FTC's negative option enforcement cases and provides an interpretation for the connection between such cases and the statutes and rules.[1]

In 2023, the FTC sought public comment on specific proposed amendments with a Notice of Proposed Rulemaking, *Negative Option Rule*, 88 Fed. Reg. 24716 (Apr. 24, 2023) (NPRM). The proceeding is a so-called Magnuson-Moss rulemaking, authorized pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a,[2] which provides additional procedural steps beyond those of the Administrative Procedure Act, 5 U.S.C. §§ 553, 601 *et seq.*, such as presentations by "interested persons" in an informal hearing.  The FTC appointed the undersigned Administrative Law Judge (ALJ) to preside over the informal hearing in the proceeding, *Negative Option Rule*, 88 Fed. Reg. 85525 (Dec. 8, 2023) (Hearing Notice); Fed. Trade. Comm'n, Notice Regarding Requests Relating to the Informal Hearing in Project No. P064202, the Negative Option Rule (Jan. 10, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/P064202-Neg-Option-Rule-Notice-Informal-Hrg-Requests.pdf (specifically authorizing the undersigned to "add or modify designated issues of material fact that are necessary to be resolved"); *see also* 16 C.F.R. § 1.13(b)(1)(ii) ("The presiding officer may at any time on the presiding officer's own motion or pursuant to a written petition by interested persons, add or modify any issues designated pursuant to § 1.12(a).").

---

[1] The statutes and FTC rules are:   Section 5 of the FTC Act, 15 U.S.C. § 45(a); the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-8405 (ROSCA); the Telemarketing Sales Rule, 16 C.F.R. §§ 310.1-.9; the Rule on the Use of Prenotification Negative Option Plans, 16 C.F.R. § 425.1 (applies to plans like book-of-the-month clubs in which sellers provide periodic notices to participating consumers offering goods that are sent and charged for if the consumers do not decline the offer); the Mailing of Unordered Merchandise Section of the Postal Reorganization Act, 39 U.S.C. § 3009 (authorizing the FTC to charge as an unfair or deceptive practice in violation of Section 5 of the FTC Act any use of the mails to send unordered merchandise); and the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693-1693r (protects individuals; enforced by the Consumer Financial Protection Bureau).

[2] *See* Magnuson-Moss Warranty – Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975).

Appellate Case: 24-3137     Page: 84     Date Filed: 12/05/2024 Entry ID: 5463205

As the FTC ordered in the Hearing Notice, the hearing before the undersigned Administrative Law Judge in this proceeding commenced on January 16, 2024. The following interested persons appeared: TechFreedom; the International Franchise Association (IFA); the Interactive Advertising Bureau (IAB); the Internet and Television Association (NCTA); the Performance Driven Marketing Institute (PDMI); and the FTC Bureau of Consumer Protection (BCP).[3] Following that hearing session, the undersigned designated these two issues of disputed material fact:

1. Will the proposed rule have an annual effect on the national economy of $100 million or more? *See* 88 Fed. Reg. at 24731.
2. What will the recordkeeping and disclosure costs associated with the proposed rule be? *See* 88 Fed. Reg. at 24733-34.

A second hearing session was held on January 31, 2024, to address the designated disputed issues of material fact. The expert report of Christopher Carrigan and Scott Walster, *Economic Analysis of the Federal Trade Commission's Proposed Negative Option Rule*, offered by IAB, was admitted in evidence.[4] A third hearing session was held on February 14, 2024, at which Katherine Johnson appeared for BCP, and Lartease M. Tiffith appeared for IAB. The authors of the expert report, Messrs. Carrigan and Walster, testified on cross-examination.

BCP and IAB filed post-hearing briefs on February 22, 2024, and IAB filed a response to BCP's post-hearing brief on February 28, 2024.

The findings in this RD are based on the record. Preponderance of the evidence was applied as the standard of proof in the absence of any precedential or statutory standard of proof for FTC rulemaking informal hearing proceedings.[5] All arguments and proposed findings that are inconsistent with this RD were considered and rejected.

---

[3] The Hearing Notice designated TechFreedom; IFA; IAB; NCTA; PDMI; and FrontDoor as "interested persons" to make oral presentations and/or additional documentary submissions during the hearing. *See* 15 U.S.C. § 57a(c)(2)(A) ("an interested person is entitled to present his position orally or by documentary submissions (or both)"); 16 C.F.R. § 1.11(e). The undersigned treated BCP Enforcement as an interested person, as well. All of the foregoing, except FrontDoor, appeared at the hearing sessions.

[4] Citations to the transcript will be noted as "[month, day] Tr. __." Citations to exhibits offered by an interested person will be noted with that party's name, *e.g.*, "IAB Ex. __."

[5] The substantial evidence standard is applied by a court in reviewing the FTC's factual determinations. *See Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 985 (D.C. Cir. 1985) ("The legislative history of the Magnuson-Moss Act further provides that the substantial evidence standard is to be applied only to the Commission's 'factual determinations' . . . ."). "A factual finding is supported by substantial evidence if the record contains 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522 (1981)). When the FTC is reaching its own factual determinations, if the record contains evidence supporting more than one possible factual

## B. Allegations and Arguments of the Parties

This proceeding concerns alleged disputed issues of material fact arising from the NPRM, which proposes to amend the FTC's Negative Option Rule, by replacing the current rule, 16 C.F.R. § 425.1, with a new rule, 16 C.F.R. §§ 425.1-.8. IAB and other commenters argue, *inter alia*, that the FTC glossed over significant costs in finding, in a conclusory manner, that the proposed rule would not have an annual effect of the national economy of $100 million or more and would not have a significant economic impact on a small number of small entities.[6] *See* NPRM, 88 Fed. Reg. at 24731 ("The Commission has preliminarily determined that the proposed amendments to the Rule will not have such effects . . . .").

In their comments in response to the NPRM, NCTA and IAB articulated twenty instances of what they argued were potential issues of disputed material fact. The Hearing Notice summarily found that these comments did not raise disputed issues of material fact.[7] At the first hearing session, the interested persons reiterated their arguments that there are disputed issues of material act. Thereafter, as noted above, the undersigned designated these two issues of disputed material fact:

1. Will the proposed rule have an annual effect on the national economy of $100 million or more? *See* 88 Fed. Reg. at 24731.
2. What will the recordkeeping and disclosure costs associated with the proposed rule be? *See* 88 Fed. Reg. at 24733-34.

---

determination, the agency "base[s] its determination on a 'preponderance' of reliable evidence." Trade Regulation Rule; Mail or Telephone Order Merchandise, 58 Fed. Reg. 49096, 49105 n.125 (Sept. 21, 1993); *cf. Steadman v. SEC*, 450 U.S. 91, 98-102 (1981) (concluding that the substantial evidence requirement under the Administrative Procedure Act, 5 U.S.C. § 556(d), means the traditional preponderance-of-the-evidence standard in the agency's decision-making). For this reason, preponderance is the more appropriate standard for this informal hearing. At any rate, "preponderance of the evidence" is a higher standard that "substantial evidence."

[6] *See* 15 U.S.C. § 57b-3(a), which requires a preliminary regulatory analysis to amend a rule if the FTC estimates that the amendment will have an annual effect on the economy of $100 million or more; 5 U.S.C. §§ 601-612, which requires a Regulatory Flexibility Act Analysis unless the FTC certifies that the rule will not have a significant economic impact on a substantial number of small entities. *See also* NPRM, 88 Fed. Reg. at 24731.

[7] The FTC stated that a disputed issue of material fact must raise "specific facts," and not "legislative facts," and must be not only "material" but also "necessary to be resolved." 88 Fed. Reg. at 85526-28 & nn., 18, 19, 21, 22. The FTC found that the commenters' proposed disputed issues of material fact are "quintessentially 'legislative facts' . . . . [and] not issues of 'specific fact'." Thus, it found that there are "no 'disputed issues of material fact' to resolve at the informal hearing." 88 Fed. Reg. at 85527-28.

Appellate Case: 24-3137    Page: 86    Date Filed: 12/05/2024 Entry ID: 5463205

The two issues are a distillation of the more specific and quantifiable of the commenters' proposed disputed issues of material fact. The issues are "necessary to resolve" because the FTC is required to consider them under 15 U.S.C. § 57b-3(a) and 5 C.F.R. § 1320.5, respectively. *See* 16 C.F.R. § 1.13(b) (disputed issues of material fact must be "necessary to resolve").

Many of the disputed issues of material fact proposed by NCTA and IAB relate to the prevalence of unfair or deceptive negative option practices as a whole or in specific industries, as the Commission noted in its December 8 Hearing Notice. *See* 88 Fed. Reg. at 85527. Others relate to the anticipated effectiveness of the proposed rule in reducing those harms. For both categories, the proposed issues do not raise issues of specific fact; these are "generalized conclusions" that would not be aided by "trial-type" factfinding. *Id.* at 85528. For example, NCTA commented, "Is there substantial evidence that (1) [various communications services] have failed to provide consumers with material information relating to their services and any negative option features and (2) such practices are prevalent." Comments of NCTA at 35 (June 23, 2023), quoted in 88 Fed. Reg. at 85526. A potential response to this type of question is not particularly quantifiable. Thus, it is a question that would be difficult to test through cross-examination at an evidentiary hearing. To designate an issue of material fact for cross-examination, it must be that "[a] full and true disclosure with respect to the issue can be achieved only through cross-examination." 16 C.F.R. § 1.12(b)(2).

In dismissing NCTA and IAB's argument that "there is insufficient evidence to support the Commission's initial finding that the costs imposed by implementing the Rule's . . . requirements are not significant," the FTC found that "this statement, without more, does not rise to the level of a bona fide dispute." Hearing Notice, 88 Fed. Reg. at 85527. However, during the first hearing session and in supplementary briefing, the interested parties presented additional facts supporting their contention that costs would be significant. NCTA stated that initial implementation of online systems that comply with the proposed rule would cost major cable operators $12 to $25 million per company, which could amount to over $100 million in that industry alone. Jan. 16 Tr. 13. IFA members estimated that compliance with the new rule would require hundreds of hours of review. Jan. 16 Tr. 8. IAB included in its briefing a report from Professor Yoram Jerry Wind, which estimated that compliance costs for six companies would exceed $53 million. IAB Supplemental Comment, Attachment B, Expert Report of Professor Yoram Jerry Wind ¶ 9 (Jan. 23, 2024). These oral statements and supplemental submissions, which were not before the Commission when it issued the Hearing Notice, were sufficient for the issue of costs to rise to the level of a bona fide dispute.

In its post-hearing brief BCP argues that the record has insufficient evidence to conclude that the economic impact of the proposed amendments will have an effect on the national economy of $100 million or more or that the specific recordkeeping and disclosure costs of the proposed amendments exceed the NPRM's estimated amounts. IAB argues, pointing to the Carrigan and Walster evidence, that the effects would easily surpass $100 million annually, regardless of whether the costs or benefits is considered. It also argues that the recordkeeping and disclosure costs will be higher than the NPRM's estimates, generalizing from limited estimates that it, IFA, and NCTA provided. BCP did not offer any evidence to counter the evidence offered by IAB, IFA, and NCTA.

## II. FINDINGS OF FACT

Based on the evidence in this proceeding: 1. It is found that the proposed rule will have an annual effect on the national economy of $100 million or more; and 2. There is insufficient evidence to make a finding as to the size of the recordkeeping and disclosure costs associated with the proposed rule.

*Background*

Negative option offers contain a term by which the seller may interpret a consumer's failure to take affirmative action to reject a good or service or to cancel an agreement as acceptance or continuing acceptance of the offer. Examples are: automatic renewals, such as newspaper subscriptions and cable service; continuity plans, in which consumers agree to receive and pay for periodic shipments of goods or provisions of services, such as ongoing credit monitoring; free trials in which consumers receive goods or services for free for a trial period, after which they are charged unless they take action to decline the offer; and prenotification plans, such as book-of-the-month clubs, in which sellers provide periodic notice to consumers offering goods and send and charge for the goods unless the consumers decline the offer.[8] The possible advantages to sellers are obvious – uninterrupted flow of revenues – as are the possible advantages to consumers – *e.g.*, uninterrupted telephone service.

At no time during the hearing did BCP offer any evidence as to either of the two issues of disputed material fact designated by the undersigned. It confined itself to cross-examination.

As noted above, offered by IAB and in evidence, is Christopher Carrigan and Scott Walster's January 30, 2024, expert report ("IAB Exp. Rept."). Mr. Carrigan, an academic, and Mr. Walster, a consultant, specialize in economic analysis in the context of regulatory policy. Feb. 14 Tr. 3-4; IAB Exp. Rept. at 2. They testified at the February 14, 2024, hearing session. IAB engaged them to perform an economic analysis of the possible benefits to consumers and costs to businesses of the proposed rule amendment to assess whether or not the economic effects of the rule would meet or exceed $100 million annually. Feb. 14 Tr. 4, 13. Neither was aware of the negative option rule prior to their engagement. *Id*. at 8. However, Mr. Carrigan conceded that he had been enrolled in a (unidentified) negative option program that he had difficulty in cancelling, and Mr. Walster vaguely recalled seeing credit card statements that suggested that he was enrolled in something that he was not aware of. *Id*. at 12.

*The Proposed Rule will have an Annual Effect on the National Economy of $100 Million or More*

The proposed rule amendment will have an annual effect on the national economy of $100 million or more, whether costs to businesses, or, separately, benefits to consumers are considered. IAB Ex., *passim*; Feb. 14 Tr., *passim*. Specifically:

---

[8] According to the FTC's Policy Statement, prenotification plans account for only a small fraction of current negative option marketing. 86 Fed. Reg. at 60824.

*Costs to Businesses - $100 Million or More*

The FTC estimates that 106,000 entities currently offer negative option features. NPRM, 88 Fed. Reg. at 24733. A comparator for the potential costs of compliance is the FTC's nearly contemporaneous Deceptive Fees rulemaking. *See* Notice of Proposed Rulemaking, *Trade Regulation Rule on Unfair or Deceptive Fees*, 88 Fed. Reg. 77420 (Nov. 9, 2023). In that proceeding the FTC estimated hourly wages for several professionals – lawyers, website developers, and data scientists – whose services might be used in bringing affected businesses into compliance with proposed disclosure enhancements. 88 Fed. Reg. at 77458. Those hourly wage rates ranged from $42.11 for website developers to $78.74 for lawyers. *Id*. Using even the lowest of these rates – for website developers – and omitting consultations with lawyers to determine whether a business's practices or proposed changes complied with the amended Negative Option rule, would mean that, unless each business, on average, used fewer than 23 hours of professional services to comply, the rule would cost more than $100 million. This is clearly unrealistically low inasmuch as there are several new requirements proposed that would require changes in existing practices and/or disclosure forms, such as: understandable clear and conspicuous display of disclosures in plain language; express informed consent to the negative option feature separately from the rest of the transaction; simple cancellation mechanism ("click to cancel"); a simple ("yes" or "no") means to allow customers to decline to receive any additional offers ("saves") during the cancellation process. *See* IAB Exp. Rept. *passim*. NCTA estimated that the proposed rule would cost major cable operators $12 to $25 million per company initially. Jan. 16 Tr. 13. IFA members estimated that compliance with the new rule would require hundreds of hours of review. *Id.* at 8.

In determining whether the proposed rule will have an annual effect on the national economy of $100 million or more, it is the incremental benefits and costs over the existing law that must be estimated. 15 U.S.C. § 57b-3(a); *see* Feb. 14 Tr. 20. BPC cross-examined Messrs. Carrigan and Walster on whether they sufficiently considered the existing regulatory scheme and whether their analysis appropriately discounted costs businesses are already expending. Feb. 14 Tr. 20-28. Mr. Walster testified that their expert report included various assumptions about the percentage of firms already in full compliance with the proposed rule to account for incremental cost increases. *Id.* at 24. Mr. Walster also identified gaps in the existing regulations and laws – which are highlighted in the NPRM – that the proposed rule would address. *Id.* at 23; *see* 88 Fed. Reg. at 24726. Applying the most extreme assumption in the expert report, 80% of the businesses using negative option marketing would have to be already in full compliance with the proposed rule for costs to remain under $100 million. IAB Ex. at 9-10. While it is conceivable that the practices of almost all businesses that would be affected by the proposed Negative Option Rule amendments already comply with the proposal, this would be inconsistent with the widespread problems and abuses that the NPRM describes.

*Benefits to Consumers - $100 Million or More*

Using the U.S. Bureau of Labor Statistics definition of "household," there are over 134 million households in the U.S. Even if only half of the households were affected, the annual benefits would have to average less than $1.50 per household to avoid reaching the $100 million threshold. Again using the Deceptive Fees rulemaking for comparison, the FTC calculated the

value to an individual of time saved by virtue of the proposed amendment at $24.40 per hour. 88 Fed. Reg. at 77456. An annual savings of $1.50 per household would equate to the value of three minutes of a non-work hour. Yet the proposed amendment to the Negative Option Rule was described as alleviating a problem of consumers' being forced to spend endless hours trying to cancel unwanted negative option programs.

*Recordkeeping and Disclosure Costs Associated with the Proposed Rule*

There is insufficient evidence to make a finding concerning the second issue – "What will the recordkeeping and disclosure costs associated with the proposed rule be?" IAB made a well-reasoned argument that the costs will be *higher* than the NPRM's estimates, generalizing from limited estimates that it, IFA, and NCTA provided. However, it did not provide any evidence to establish what the costs *would be*. Nor did BCP provide any evidence to support the NPRM's estimate. Accordingly, it is not possible for the undersigned to make a finding as to the recordkeeping and disclosure costs associated with the proposed rule. Further, in the absence of evidence, the issue is not genuinely disputed.

## III.  RECORD CERTIFICATION

It is certified that the record on which the findings of fact in this RD are based includes evidence from testimony taken in the hearings of January 16, January 31, and February 14, 2024, documentary exhibits admitted in evidence by the undersigned, and the rulemaking record to date. *See* 16 C.F.R. § 1.18(a).

## IV.  ORDER

This Recommended Decision is issued and shall become effective in accordance with and subject to the provisions of Section 1.13(d) of the FTC's rules for trade regulation rulemaking, 16 C.F.R. § 1.13(d). This ends the informal hearing portion of the Negative Option rulemaking proceeding.

*Carol Fox Foelak*
Carol Fox Foelak
Administrative Law Judge

8

# Doc. 4

Declaration of Helgi C. Walker

Appellate Case: 24-3137    Page: 91    Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF HELGI C. WALKER

I, Helgi C. Walker, hereby declare as follows:

1.  My name is Helgi C. Walker.  I am a resident of the District of Columbia.

2.  I am a Partner at Gibson, Dunn & Crutcher LLP ("Gibson Dunn").  I make the statements in this affidavit based on personal knowledge, personal experience, and personal participation in communications.  If called and sworn as a witness, I could and would testify to the facts stated in this declaration.  I submit this declaration in support of Custom Communications, Inc., d/b/a Custom Alarm, Electronic Security Association, Inc., Interactive Advertising Bureau, NCTA – The Internet & Television Association, Michigan Press Association, National Federation of Independent Business, Inc., the Chamber of Commerce of the United States of America, and the Georgia

Appellate Case: 24-3137     Page: 92     Date Filed: 12/05/2024 Entry ID: 5463205

Chamber of Commerce's (collectively, "Petitioners") Motion for Stay Pending Disposition of Petitions for Review.

3. Gibson Dunn represents Petitioners in the instant litigation.

4. On October 22, 2024, the Electronic Security Association, Inc., Interactive Advertising Bureau, and NCTA – The Internet & Television Association filed a petition for review of the Commission's Final Rule in *Negative Option Rule* ("Rule"), RIN 3084-AB60 (issued Oct. 16, 2024), in the United States Court of Appeals for the Fifth Circuit, No. 24-60542.

5. On October 22, 2024, the Michigan Press Association and National Federation of Independent Business, Inc. filed a petition for review of the Commission's Final Rule in the United States Court of Appeals for the Sixth Circuit, No. 24-3912.

6. On October 22, 2024, Custom Communications, Inc., d/b/a Custom Alarm filed a petition for review of the Commission's Final Rule in the United States Court of Appeals for the Eighth Circuit, No. 24-3137.

7. On October 22, 2024, the Chamber of Commerce of the United States of America and the Georgia Chamber of Commerce filed a petition for review of the Commission's Final Rule in the United States Court of Appeals for the Eleventh Circuit Court, No. 24-13436.

Appellate Case: 24-3137    Page: 93    Date Filed: 12/05/2024 Entry ID: 5463205

8. On October 25, 2024, I caused to be served on the Commission's Office of the Secretary a request to stay the Rule pending judicial review; file-stamped copies of the relevant petitions for review were also attached to that request. A true and correct copy of the letter submitting the request for a stay and the stay request itself are attached as Exhibit A.

9. On October 29, 2024, the Commission's General Counsel, Anisha Dasgupta, responded with a letter addressed to me, a true and correct copy of which is attached as Exhibit B.

10. On October 30, 2024, I replied to Ms. Dasgupta's response with a letter, a true and correct copy of which is attached as Exhibit C.

11. On November 1, 2024, Ms. Dasgupta responded to my reply with a letter, a true and correct copy of which is attached as Exhibit D.

12. As detailed in Ms. Dasgupta's letters, the Commission refused to notify the Judicial Panel on Multidistrict Litigation ("JPML") of the petitions for review that Petitioners had served on the Commission. So, on November 5, 2024, the Electronic Security Association, Inc., Interactive Advertising Bureau, and NCTA – The Internet & Television Association filed a petition for a writ of mandamus to compel the

Appellate Case: 24-3137   Page: 94   Date Filed: 12/05/2024 Entry ID: 5463205

Commission to notify the JPML of the pending petitions for review. On November 19, 2024, the Fifth Circuit issued a court order granting the petition for a writ of mandamus. A true and correct copy of that order is attached as Exhibit E.

13. I certify under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: November 27, 2024       */s/ Helgi C. Walker*

Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500
hwalker@gibsondunn.com

# Doc. 4.A

Letter from Helgi C. Walker to FTC Office of the Secretary, Oct. 25, 2024, and Attached Stay Request

Appellate Case: 24-3137    Page: 96    Date Filed: 12/05/2024 Entry ID: 5463205

**GIBSON DUNN**

Helgi C. Walker
Partner
T: +1 202.887.3599
M: +1 202.906.0848
hwalker@gibsondunn.com

October 25, 2024

VIA PERSONAL/HAND-DELIVERY (BY COURIER)

Office of the Secretary
Federal Trade Commission
9050 Junction Drive,
Annapolis Junction, MD 20701

Re:    Negative Option Rule Petitions for Review and Request for Stay

Office of the Secretary:

Pursuant to 28 U.S.C. § 2112(a)(1), and 16 C.F.R. § 4.4(f), I am hereby serving upon the Federal Trade Commission the enclosed Petitions for Review of the Commission's Negative Option Rule (issued Oct. 16, 2024). The Petitions were filed on October 22, 2024, and have been stamped by the United States Courts of Appeals for the Fifth, Sixth, Eighth, and Eleventh Circuits with the dates of filing as provided in 28 U.S.C. § 2112(a)(2). Per the letter order of Robert Rose, FTC, Director, Logistics & Security, dated February 8, 2024, personal/hand-delivery for the Commission must be redirected from 600 Pennsylvania Avenue NW, Washington, DC 20580, to BrightKey, Inc., at 9050 Junction Drive, Annapolis Junction, MD 20701. *See also* https://www.ftc.gov/about-ftc/bureaus-offices/office-secretary/file-documents-adjudicative-proceedings (directing courier or hand deliveries to 9050 Junction Drive).

The following enclosed Petitions are being submitted to the Office of the Secretary on behalf of the Petitioners listed below and their respective attorneys:

1. A petition filed on October 22, 2024, in the United States Court of Appeals for the Fifth Circuit by Electronic Security Association, Interactive Advertising Bureau, and NCTA— The Internet & Television Association;

2. A petition filed on October 22, 2024, in the United States Court of Appeals for the Sixth Circuit by Michigan Press Association and National Federation of Independent Business Inc.;

3. A petition filed on October 22, 2024, in the United States Court of Appeals for the Eighth Circuit by Custom Communications, Inc. d/b/a Custom Alarm; and

4. A petition filed on October 22, 2024, in the United States Court of Appeals for the Eleventh Circuit by The Chamber of Commerce of the United States of America and the Georgia Chamber of Commerce.

# GIBSON DUNN

In addition, the above-named Petitioners jointly submit the enclosed request to stay the Commission's Negative Option Rule pending judicial review, pursuant to Federal Rule of Appellate Procedure 18(a)(1) and 16 C.F.R. § 4.2(d). Petitioners respectfully request that the Commission rule on this request **by Friday, November 1, 2024**, to allow Petitioners to seek a judicial stay if needed, and to give the court of appeals that will hear these cases time to adjudicate that request before the Rule takes effect. If the Commission takes no action on this request by that date, Petitioners will deem the request denied.

Sincerely,

*Helgi Walker*

Helgi C. Walker

Enclosures

cc:     Anisha Dasgupta, General Counsel, FTC (via email (adasgupta@ftc.gov))
        April Tabor, Secretary of the Commission, FTC (via email) (atabor@ftc.gov)
        Office of the Secretary, FTC (via first-class mail and email (secretary@ftc.gov);
            electronicfilings@ftc.gov))
        Counsel of Record for Petitioners (via email)

## FEDERAL TRADE COMMISSION

| | |
|---|---|
| IN THE MATTER OF NEGATIVE OPTION RULE | Project No. P064202 |

## JOINT PETITION FOR STAY OF ELECTRONIC SECURITY ASSOCIATION, INC., INTERACTIVE ADVERTISING BUREAU, NCTA – THE INTERNET & TELEVISION ASSOCIATION, MICHIGAN PRESS ASSOCIATION, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., CUSTOM COMMUNICATIONS, INC. d/b/a CUSTOM ALARM, THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AND THE GEORGIA CHAMBER OF COMMERCE

## <u>RELIEF REQUESTED BY NOVEMBER 1, 2024</u>

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE LLC
P.O. Box 8248
Cincinnati, OH 45249
(513) 201-5775
bflowers@ashbrookbk.com

*Counsel for Petitioners Michigan Press Association and National Federation of Independent Business, Inc.*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.
777 Gloucester St.
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for Petitioners The Chamber of Commerce of the United States of America and The Georgia Chamber of Commerce*

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, DC 20006
(202) 783-8400
edavis@shb.com

*Counsel for Petitioner Custom Communications, Inc. d/b/a Custom Alarm*

Helgi C. Walker
Lucas C. Townsend
Michael P. Corcoran
Lael Weinberger
Andrew Ebrahem
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
hwalker@gibsondunn.com

Allyson N. Ho
Brad G. Hubbard
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201-2923

*Counsel for Petitioners Electronic Security Association, Inc., Interactive Advertising Bureau, and NCTA – The Internet & Television Association*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ......................................................................................................... 2

    I.   Petitioners' Challenges Are Likely To Succeed On The Merits ........................ 2

        A.   The FTC Lacks Authority To Promulgate The Rule ............................ 3

        B.   The FTC Failed To Satisfy The Statutory Requirements For A Rulemaking ................ 6

        C.   The Rule Is Arbitrary And Capricious And Lacks Substantial Evidence ...................... 7

        D.   The Rule Violates The Constitution ................................................... 10

            1.   The Rule Violates The First Amendment ................................. 10

            2.   The FTC Is Unconstitutionally Structured ............................. 12

    II.   The Irreparable Harm And Balance Of Equities Factors Warrant A Stay .......................... 12

CONCLUSION ................................................................................................... 15

Appellate Case: 24-3137    Page: 100    Date Filed: 12/05/2024 Entry ID: 5463205

## INTRODUCTION

The undersigned organizations ("Petitioners") respectfully request that the Federal Trade Commission ("FTC" or "Commission") stay the effectiveness of the FTC's Rule Concerning Recurring Subscriptions and Other Negative Option Programs ("Rule"), No. P064202, to allow for judicial review. *Accord* Fed. R. App. Proc. 18(a)(1); 16 C.F.R. § 4.2(d). The Rule was issued on October 16, 2024, and Petitioners filed petitions for review of the Rule in the U.S. Courts of Appeals for the Fifth, Sixth, Eighth, and Eleventh Circuits on October 22, 2024, and the Rule should not take effect pending judicial review.

Section 705 of the Administrative Procedure Act permits an agency to "postpone the effective date of action taken by it, pending judicial review," when "justice so requires." 5 U.S.C. § 705. The Commission recently exercised that authority to stay the Combating Auto Retail Scams Trade Regulation ("CARS") Rule due to the "uncertainty" it would cause and the "unnecessary changes" companies believed they would have to make to comply with the CARS Rule.[1]

For those same reasons, and because a court is likely to set aside the Rule, the FTC should stay the Rule, the bulk of which is scheduled to take effect 180 days from Federal Register publication, until the completion of judicial review. The Rule is unlikely to withstand judicial review because, among other things, it is in excess of the Commission's statutory authority, 15 U.S.C. § 57a(e)(3), 5 U.S.C. § 706; arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act, *id.* § 701 *et seq.*; unsupported by substantial evidence, 15 U.S.C. § 57a(e)(3)(A); based on determinations that "precluded disclosure of disputed material facts which w[ere] necessary for fair determination . . . of the rulemaking

---

[1] FTC, *Order Postponing Effective Date of Final Rule Pending Judicial Review*, https://www.ftc.gov/system/files/ftc_gov/pdf/P204800CARSExtensionOrder.pdf (Jan. 18, 2024).

proceeding taken as a whole," *id.* § 57a(e)(3)(B)(ii); and in violation of the U.S. Constitution and otherwise contrary to law, *id.* § 57a(e)(3), 5 U.S.C. § 706. Without a stay pending judicial review, companies in all industries and across all sectors of the economy will immediately suffer irreparable harm from unrecoverable costs of compliance, burdens on their free speech rights when communicating with customers, and confusion regarding how to comply with the Rule's overbroad, one-size-fits-all requirements. Consumers likewise will be confused and harmed by the Rule's complex requirements, and companies will lose their goodwill if forced to comply with the Rule's unlawful requirements.

To avoid those irreparable harms and the interim regulatory uncertainty, and in light of the balance of the equities, the Commission should stay the effective date of the Rule until the completion of judicial review. Petitioners further respectfully request that the Commission rule on this request by Friday, November 1, 2024, to allow petitioners to seek a judicial stay if needed, and to give the Court of Appeals that will hear these petitions time to adjudicate that request before the Rule takes effect. If the Commission takes no action on this request by that date, Petitioners will deem the request denied.

## ARGUMENT

### I.    Petitioners' Challenges Are Likely To Succeed On The Merits

The Rule is unlikely to withstand judicial review for multiple reasons. Most fundamentally, the FTC lacks authority to promulgate the Rule because the FTC's governing statute has no provisions authorizing the Rule and because Congress has enacted multiple, more limited and tailored statutes that specifically govern negative option plans. Moreover, the Commission violated several important statutory limitations on its rulemaking authority and related procedural requirements in the Magnuson-Moss Act, which modified the FTC Act, when it promulgated the

2

Rule. The Rule is also unlikely to withstand judicial review because it is arbitrary and capricious, unsupported by substantial evidence, and violates the First Amendment's right to free speech, and because the FTC is unconstitutionally structured.

### A. The FTC Lacks Authority To Promulgate The Rule

The entire Rule is unlikely to survive petitioners' challenges because the FTC lacks authority to promulgate the Rule. The Rule is sweeping, encompassing all manner of subscription agreements, which the Rule blithely refers to as "negative option" plans or marketing, across all economic sectors and marketed through all channels of communication. Rule §§ 425.1, 425.2. The Rule covers, by the FTC's own estimate, over a billion paid subscriptions in the United States. Rule at 175. Yet the FTC has conceded that there are "no [statutory] provisions that specifically address negative option marketing" in such a broad manner. *See* Notice of Proposed Rulemaking, *Negative Option Rule*, 88 Fed. Reg. 24716, 24717 (FTC Apr. 24, 2023); Rule at 10. The only legal basis the Commission invokes is its general authority to enact rules that "define with *specificity* acts or practices which are unfair or deceptive" and that are "*prevalent*" under Section 18 of the FTC Act, 15 U.S.C. § 57a(a)(1), (b)(3). *See* Rule at 4, 16 n.39. That general language, which Congress adopted to rein in the FTC's rulemaking authority, cannot support the Rule for multiple reasons.

*First*, the Rule is far from the sort of "specifi[c]" "trade rule" that the statute permits. 15 U.S.C. § 57a(a)(1)(B). Instead, each provision of the Rule contains overly broad and ambiguous terms and mandates including, for example: the disclosure requirement of "all Material terms," regardless of whether they directly relate to the negative option feature; the requirement for a separate consent to negative option features; the ban on misrepresentations of any material fact about a negative option transaction *and* about the underlying good or service; and the required

provision of "simple" cancellation mechanisms that are in the "same medium" and "as easy to use as" sign-up mechanisms. *E.g.*, Rule §§ 425.2(e), 425.3, 425.4(a), 425.5(a)(1), 425.6(b), (c). Worse, the Rule governs all negative option contracts in all industries and sectors of the economy—the opposite of a "specifi[c]" regulation. *See* Rule § 425.1.

*Second*, the FTC has failed to establish that the problems it identified with respect to negative option plans are "prevalent," 15 U.S.C. § 57a(b)(3), (d), in *any* industry—much less across *all* industries. To establish prevalence, the Commission relied on only a smattering of cases in different contexts and reports from State Attorneys General, without analyzing how any of these cases related to each other or established any widespread pattern. Rule at 7–8. A small number of cherry-picked cases does not establish that any unfairness or deception from negative option plans is so widespread as to be "prevalent."

*Third*, the FTC's lack of authority to promulgate such a sweeping, economy-wide rule is confirmed by the fact that Congress has enacted multiple laws that govern negative option plans, and each is far more limited than this Rule. In particular, each of the following statutes already provides discrete requirements for negative option marketing in certain industries or for all industries across only specific media: the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403; the Unordered Merchandise Statute, 39 U.S.C. § 3009; the Electronic Fund Transfer Act, 15 U.S.C. § 1693c; the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108; the Television Viewer Protection Act ("TVPA"), 47 U.S.C. § 562; and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, § 60504(a)-(b), 135 Stat. 429, 1244 (2021). The FTC cannot render all those statutes superfluous by promulgating a more prescriptive, one-size-fits-all Rule. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024).

Indeed, Congress's narrower statutes confirm that there is nothing inherently unfair or deceptive about contracts to provide goods or services until the customer cancels; they are a convenient and familiar arrangement in the economy. At minimum, to the extent certain *applications* of those contracts are unfair or deceptive, Congress has already addressed those applications through legislation, and the FTC is already authorized to enforce several of those statutes against impermissible negative option features. The FTC has never adequately explained why the statutes that Congress passed to regulate negative options are insufficient to prevent unfair or deceptive acts or practices. They only confirm that the FTC lacks authority to promulgate the Rule.

If there were any doubt about the absence of statutory authority here (and there isn't), it is resolved by the major questions doctrine and similar legal principles. The FTC's limited authority to promulgate "specifi[c]" regulations regarding unfair or deceptive acts or practices certainly contains no express grant of power to adopt the Rule. Congress has decided that more narrow statutes are appropriate, and the FTC cannot use a "long-extant" authority, derived from "vague language" in the FTC Act, to impose a broader, "transformative" set of regulations on all negative option contracts in all industries. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609–10 (2022).[2] Nor can the FTC federalize an area of traditional state regulation and severely disrupt the "usual constitutional balance of federal and state powers" without a clearer statement from Congress. *Bond v. United States*, 572 U.S. 844, 858 (2014) (internal quotation marks omitted).

---

[2] If FTC does have such authority, it would only confirm that Section 18 lacks any intelligible principle and thus violates the nondelegation doctrine. *See Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J.).

**B. The FTC Failed To Satisfy The Statutory Requirements For A Rulemaking**

Congress enacted the Magnuson-Moss Act for FTC rulemaking to authorize the agency to adopt only regulations that are targeted to a specific, widespread need and not unduly burdensome or unclear. A court is likely to vacate the Rule because the FTC exceeded this authority and failed to adhere to statutory requirements for rulemaking.

*First*, the Commission failed entirely to perform the required preliminary regulatory analysis in the NPRM pursuant to FTC Act Section 22. *See* 15 U.S.C. § 57b-3(b)(1). The NPRM asserted that the Commission did not "have sufficient empirical data" to perform a preliminary regulatory analysis, 88 Fed. Reg. 24,731, but that analysis was not optional. The Commission was *required* to perform the preliminary regulatory analysis because, as the presiding officer in the informal hearing found, *see* Recommended Decision, FTC No. P064202 (Apr. 12, 2024), the Rule will have annual effects on the national economy of $100 million or more. Rule at 154–161. Including a final regulatory analysis when promulgating the Rule does not cure this failure. 15 U.S.C. § 57b-3(b)(2)(E).

*Second*, the Commission's informal hearing was inadequate under 15 U.S.C. § 57a(b)(1)(C). In particular, the Commission improperly excluded multiple "disputed issues of material fact" by construing all the disputed issues raised by interested parties as "legislative facts" (*i.e.*, policy issues) and not "specific facts," and applying a novel and incorrect summary judgment standard.[3] Both of those arbitrary decisions fly in the face of the plain text, structure, and purpose of the informal hearing requirement. The Commission's rulings limiting cross-examination or

---

[3] Despite the Commission's improper decision that there were no disputed issues of material fact, the presiding officer of the informal hearing designated two issues: one related to the impact of the Rule on the economy and the other regarding disclosure and recordkeeping costs.

rebuttal submissions precluded the disclosure of disputed material facts necessary for a fair determination of the rulemaking proceeding. *See id.* § 57a(e)(3)(B).

*Third*, as explained above, the FTC failed to comply with the Act's substantive requirements that any rules adopted under Section 18 be specific and apply only to a substantiated "prevalent" practice.

### C. The Rule Is Arbitrary And Capricious And Lacks Substantial Evidence

The Rule is also unlikely to withstand judicial review because it is arbitrary and capricious and unsupported by substantial evidence. Agency rules are "arbitrary and capricious" where "the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And a Rule is unsupported by substantial evidence if the record lacks "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522 (1981). Here, the Commission has committed each of those errors.

**Failure to Consider Substantial Burdens on Companies and Consumers.** The Commission has failed to adequately justify or offer substantial evidence to support the Rule's requirements regarding cancellation, consent mechanisms, and disclosures. Among other things, the requirements for cancellation mechanisms "as easy to use as" and in the "same medium" as the sign-up mechanism will impede companies from providing their customers with additional, truthful information or better offers that could lower their prices or afford them other benefits. For example, when a consumer tries to cancel only one service in a bundle of services, the cancellation

typically will affect the price and terms of the other services in the bundle. But the requirement for a simple cancellation mechanism that is as easy to use as, and in the same medium as, the sign-up mechanism could impede many providers from truthfully explaining such effects to the consumer—including the possibility that other services would be canceled as well, that the price of other services in the discounted bundle would increase, or that the provider would offer a better price if the consumer retained the service. *See, e.g.*, Interactive Advertising Bureau Comment 16–17 (IAB Comment). That is a significant detriment to consumers, yet the Commission's cursory dismissal of this scenario and burdens is arbitrary and capricious. The Commission also has failed to address burdens that both companies and their customers will incur from compliance with the Rule's disclosure and consent requirements, including consumer fatigue from excessive disclosures and lost opportunity costs from overly complex consent mechanisms. And the Commission has failed to address substantial burdens that small businesses will face when complying with these complex regulations. All those failures are arbitrary and capricious. *See Chamber of Commerce v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023).

**Scope.** The Commission has failed to explain or justify the scope of the Rule, let alone offer substantial evidence to support the Rule's economy-wide scope. Most critically, the Commission fails to justify such a sweeping, one-size-fits-all rule for all the practices it calls negative option plans across all industries, rather than a narrower and more tailored rule in line with its statutory authority and existing statutes, and targeted to specific, harmful practices. *Accord Ryan LLC v. FTC*, No. 3:24-cv-00986, 2024 WL 3879954, at *13 (N.D. Tex. Aug. 20, 2024) (finding that the Commission's "handful of studies" did not support a "categorical ban" on non-competes). The Commission also fails to justify several aspects of the Rule, such as the cancellation requirement's application to bundled goods or services, the misrepresentation ban's

application to facts unrelated to the negative option feature, or why the Rule applies to business-to-business contracts—including contracts between small businesses and large commercial customers. The Commission's failure to explain or justify that overbreadth is arbitrary and capricious. *See Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 17–18 (D.C. Cir. 2015).

**Alternatives.** The Commission also fails to explain why other certain obvious alternatives are not sufficient to regulate negative option plans—such as a more targeted Rule that regulates only fraudulent negative option plans in certain industries. *See Ryan LLC*, 2024 WL 3879954 at *13–*14. The Rule has a terse discussion of two alternatives—not pursuing the rulemaking or limiting the Rule to only in-person or mail marketing—but then quickly rejects both as not covering a significant amount of conduct that the Commission would like to regulate. But again, the Rule ignores obvious alternatives such as targeting the most egregious problems (*e.g.*, fraud) and particular industries with a history of prevalent unfair or deceptive negative option features.

**Justification in light of existing law.** The Commission has not explained or justified the need for the Rule in light of extensive federal and state regulations already in place; nor has the Commission explained how the costs of navigating yet another layer of regulations are outweighed by the benefits of the Rule. *See* NCTA Supplementary Submission; PDMI Comment at 2; News Media Alliance Comment at 10–11. As detailed above, Congress has already provided the Commission with the means to enforce multiple statutes, such as ROSCA, that already regulate certain negative option plans. Multiple states also have statutes that govern negative option plans. *See* IAB Comment at 8. Given those federal and state laws, the Commission has failed to explain why the Rule is necessary—and worse, the Commission has failed to detail with specificity the unfair or deceptive acts or practices that existing statutes do not cover but that the Commission

9

believes to be so prevalent as to warrant the Rule. *See Ohio v. EPA*, 144 S. Ct. 2040, 2054–55 (2024) ("Awareness is not itself an explanation."); Rule at 185 n.587.

**Interaction with existing law.** The Rule is also arbitrary and capricious because the Commission did not explain how the Rule can be reconciled with the many existing federal and state laws that already govern negative option plans. For example, the disclosure requirements in the Rule are in many respects different from, and more extensive than, the TVPA. Although the Commission noted that the TVPA already regulates the very same practices as the Rule, Rule at 184–85 n.586, the Commission failed to recognize the significant differences and inconsistencies in the two regulatory schemes. And the highly prescriptive cancellation requirements in the Rule are inconsistent with the flexible "simple mechanisms" statutory cancellation regulation in ROSCA, 15 U.S.C. § 8403, by imposing a standard for cancellation mechanisms for each medium (over the internet, telephone, in-person) and prohibiting companies from having a customer service agent speak to a customer seeking to cancel service in most situations. The Commission did not clarify how the Rule avoids those problems, even though the "cumulative effect" of related rulemakings is "unquestionably an important aspect of the problem" that the Commission must consider. *All. For Hippocratic Med. v. FDA*, 78 F.4th 210, 246 (5th Cir.), *vacated on other grounds*, 144 S. Ct. 367 (2024).

### D. The Rule Violates The Constitution

#### 1. The Rule Violates The First Amendment

A court is also likely to vacate the Rule because it violates the First Amendment. The Rule regulates companies' speech—which is protected by the First Amendment even if it "does no more than propose a commercial transaction." *Va. State Bd. of Pharma. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quotation marks omitted). Commercial speech "that is

not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985); *see also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980). At least three provisions of the Rule fail this test.

**Restraints on communications.** Section 425.4's prohibition of communication that detracts from the mandatory disclosure runs afoul of the First Amendment because of that provision's extreme breadth and the chilling effect on truthful speech. What counts as "detract[ing] from" is easily manipulable and difficult to ascertain in advance, chilling protected speech. That is not proportionate or tailored to any interest the Commission thinks it has—indeed, the Commission has not even tried to identify a substantial interest in this speech prohibition. *See In re R.M.J.*, 455 U.S. 191, 203 (1982).

**Overbroad and unjustified compelled disclosures.** The Rule's extensive and burdensome disclosure requirements also run afoul of the First Amendment's right not to speak. Even commercial disclosure requirements cannot be "unjustified or unduly burdensome"; they must be designed to "remedy a harm that is potentially real[,] not purely hypothetical" and must "extend no broader than reasonably necessary." *Nat'l Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 776–78 (2018) (internal quotations and citations omitted). Here, the Commission has failed to identify real harms that the Rule's disclosure requirements will prevent. And the disclosure requirements—mandating that companies disclose all "material terms," regardless of their relation to a negative option feature, in a "clear and conspicuous manner" that is set off from other text—are patently overbroad and unduly burdensome.

**Chilling truthful and lawful speech.** The Rule's requirement for a "simple" cancellation mechanism that is as easy to use as the customer's sign-up mechanism and that effectively limits the company from sharing important information with the customer at the time of cancellation also severely burdens companies' First Amendment rights. The Rule requires the seller to provide a cancellation mechanism through the "same medium" as the original consent, Rule at 122, and estimates that a compliant mechanism will take "no more than 30 seconds to one minute," Rule at 164. These artificial constraints are unrealistic for many types of services and will prevent companies from providing important information to customers at the time of cancellation. Companies have a protected First Amendment right to speak with their customers, especially at the time of a cancellation, and the Rule directly burdens that speech without sufficient justification. *Va. Citizens Consumer Council, Inc.*, 425 U.S. at 762. At minimum, the Rule will chill companies from engaging in this speech out of fear that the FTC will interpret the "simple" cancellation requirement to preclude such speech. This, too, is a First Amendment violation.

### 2. The FTC Is Unconstitutionally Structured

The Commission also has no authority to adopt the Rule because the Commission's structure violates the Constitution. Since the Supreme Court upheld the constitutionality of the FTC Act's removal limits, *see Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Commission has acquired significant Executive Power that warrants overruling that case. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 216 n.2, 231 (2020); *id.* at 239 (Thomas, J., concurring).

## II. The Irreparable Harm And Balance Of Equities Factors Warrant A Stay

In the absence of a stay, businesses subject to the Rule face significant and irreparable harms. Irreparable harm exists where "there is no adequate remedy at law." *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (internal quotation marks omitted). Financial losses are

irreparable "where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation" or "where the loss threatens the very existence of the movant's business." *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (internal quotation marks omitted); *see also Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023); *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022); *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). As such, the "nonrecoverable costs of complying with a putatively invalid regulation typically constitutes irreparable harm." *Rest. L. Ctr. v. DOL*, 66 F.4th 593, 597 (5th Cir. 2023).

The Rule inflicts three kinds of irreparable harm. *First*, the Rule violates the First Amendment rights of covered entities. The loss of companies' "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As discussed, the prohibition on communication that "detracts" from required disclosures (as contained in both the disclosure and consent provisions) is a severe limitation on speech, and the requirement for a cancellation mechanism "as easy to use as" the sign-up mechanism that effectively limits companies from sharing important information with the customer at the time of cancellation will prohibit and chill a substantial amount of lawful speech—all of which violates the First Amendment. Subjecting all companies and entire industries to this unconstitutional regulation "even briefly" would inflict an irreparable injury. *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984).

*Second*, the Rule will cause harm to companies' customer goodwill. For example, the requirement to obtain "separate" consent to the negative option feature will confuse, frustrate, and annoy customers. The requirement for a "simple" cancellation mechanism that is "as easy to use as" the sign-up mechanism will likewise cause companies to suffer reputational injuries if

customers' important services, such as security services, are cancelled inadvertently, without a full understanding of the consequences of cancellation, or by third parties without authorization to cancel. And the requirement for excessive disclosures will irritate the customers of many businesses while unnecessarily complicating otherwise easy transactions for smaller businesses, like lawn care companies. The harm to companies from losing customer goodwill will be irreparable.

*Third*, the Rule will harm companies by causing them to incur massive new and unrecoverable costs of compliance. Companies must redesign their advertising, design and engineer new customer enrollment and cancellation processes across all media, make corresponding changes to their apps, websites, and telephone and in-person procedures, implement new training and staffing protocols, obtain legal review, and implement new recordkeeping systems—to name just a few of the many burdens that companies will incur. Because all of those changes will take time, companies will need to begin incurring these costs well ahead of the Rule's effective date in order to ensure compliance. And those costs will be compounded because of the Rule's often vague and ambiguous requirements—such as the requirement to offer an in-person cancellation method "where practical" or the ban on statements that "detract from" required disclosures and consent. If the Rule is not stayed, companies will be forced to incur substantial costs in trying to determine how to simultaneously comply with those vague requirements and with other existing federal and state laws and regulations. *See* Recommended Decision, *supra*; NCTA, Supplementary Submission, at 10–11. And those costs will be unrecoverable due to the Commission's sovereign immunity and thus constitute irreparable harm. *See Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994); *Georgia*, 46 F.4th at 1302.

A stay would do no harm to the Commission other than to briefly delay a Rule it adopted five years after the advance notice of proposed rulemaking. Rule at 15 n.38. This is a minor inconvenience and cannot outweigh the substantial costs and other harms that the regulated parties face due to the sweeping nature of the Rule. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). The stay is in the public interest for similar reasons: while the Commission claims that its Rule will ultimately benefit the public, that is contested and inconsistent with the record evidence in the FTC's proceeding. But the substantial costs and burdens this Rule will impose on the regulated entities are readily identifiable. *See id.* Given that the enforcement of this Rule would inflict harms on the parties, the costs imposed have been underestimated, and the benefits have been overestimated, the public interest favors resolving this crucial dispute before allowing this sweeping new regulation to take effect. Moreover, the many federal and state laws that already govern negative option plans will continue to protect against any actual consumer harm that may be caused by misuses of negative option plans while the litigation proceeds.

There is, in short, no reason *not* to pause implementation of this transformative, economy-wide Rule that categorically deems "deceptive" a convenient and familiar commercial arrangement that many consumers value and will dramatically affect the ways American businesses and their customers interact with each other.

## CONCLUSION

The above-described errors in the Rule and the resulting harms are not exhaustive, but they amply show why the Rule should be stayed until the completion of judicial review. Accordingly, we respectfully request that the Commission stay the effective date of the Rule pending judicial review.

Dated: October 25, 2024                  Respectfully submitted

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE LLC
P.O. Box 8248
Cincinnati, OH 45249
(513) 201-5775
bflowers@ashbrookbk.com

Helgi C. Walker
Lucas C. Townsend
Michael P. Corcoran
Lael Weinberger
Andrew Ebrahem
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners Michigan Press
Association and National Federation of
Independent Business, Inc.*

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, DC 20006
(202) 783-8400
edavis@shb.com

Allyson N. Ho
Brad G. Hubbard
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201-2923

*Counsel for Petitioner Custom
Communications, Inc. d/b/a Custom Alarm*

*Counsel for Petitioners Electronic Security
Association, Inc., Interactive Advertising
Bureau, and NCTA – The Internet &
Television Association*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD & MARTIN,
P.C.
777 Gloucester St.
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for Petitioners The Chamber of
Commerce of the United States of America
and The Georgia Chamber of Commerce*

# Doc. 4.B

Letter from Anisha Dasgupta, FTC General Counsel, to Helgi C. Walker, Oct. 29, 2024

App.117



United States of America
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

October 29, 2024

BY ELECTRONIC MAIL
Helgi C. Walker (hwalker@gibsondunn.com)
Gibson Dunn & Crutcher LLP
1700 M St., N.W.
Washington, DC 20036-4504

Re:     **Petitions for review of amendments to Negative Option Rule**

Dear Ms. Walker:

I write in response to your letter of October 25, 2024, to the Office of the Secretary of the Commission. I confirm receipt of the four petitions for review of the recent amendments to the Negative Option Rule enclosed with your letter.

The time for an interested person to petition for review of a Commission rule prescribed under Section 18(a)(1)(B) of the FTC Act runs from the date when the rule is "promulgated." 15 U.S.C. § 57a(e)(1)(A). "An agency rule is considered promulgated on the date it is published in the Federal Register." *New York Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 n.1 (D.C. Cir. 2021). Because the Rule has not yet been published in the Federal Register, it has not yet been promulgated. The Rule is still subject to revision and potential withdrawal. Moreover, until the Rule is published in the Federal Register, the Commission cannot file the administrative record because the final version of the Rule as published in the Federal Register is a critical part of the administrative record.

It follows that the ten-day period described in 28 U.S.C. § 2112(a)(1) has not yet commenced. That period runs from the "issuance of the order," and at least in this context, the date of issuance must also be the date of promulgation. Otherwise, interested parties seeking to challenge an FTC rule who wish their choice of forum to be considered would potentially be forced to file petitions before the public is formally put on notice of the rule by publication in the Federal Register.

Since the ten-day period has not commenced and it is still possible that additional parties may seek to challenge the Rule within that period, the Commission cannot notify the Judicial Panel on Multidistrict Litigation of the petitions at this time. Once the Rule is published in the Federal Register and the ten-day period has expired, the Commission will notify the Panel of your petitions (and any others that may be filed) pursuant to § 2112(a)(3) so that they may be consolidated for review in a single court of appeals.

App.118

You also submitted to the Commission a joint petition for stay of the Rule pending judicial review and requested action by November 1, 2024. The Commission is considering the stay petition, but it is unlikely that it will issue a decision by your requested deadline, which is only one week after you submitted the petition. It will likely take longer than that for each of the five Commissioners to consider the numerous statutory and constitutional arguments raised in your petition. Furthermore, there does not appear to be any immediate need for a stay since the Rule has not yet been published in the Federal Register, none of its provisions will take effect until 60 days after publication, and some provisions will not take effect until 180 days after that date. Under these circumstances, your assertion that petitioners will deem the request denied if the Commission does not act by November 1 does not represent a reasonable, good-faith effort to comply with the requirements of Fed. R. App. P. 18.

Sincerely,

*/s/ Anisha S. Dasgupta*
Anisha S. Dasgupta
General Counsel

cc:    Other counsel of record (by email)

# Doc. 4.C

Letter from Helgi C. Walker to Anisha
Dasgupta, Oct. 30, 2024

# GIBSON DUNN

Helgi C. Walker
Partner
T: +1 202.887.3599
M: +1 202.906.0848
hwalker@gibsondunn.com

October 30, 2024

<u>VIA E-MAIL</u>

Anisha S. Dasgupta
General Counsel
Federal Trade Commission
Washington, D.C. 20580

Re: Petitions for Review of Negative Option Rule in Fifth, Sixth, Eighth, and Eleventh Circuits

Dear Ms. Dasgupta:

I write in response to your letter of October 29, 2024 ("FTC OGC Letter"). Thank you for acknowledging service of the four petitions for review filed in connection with the Negative Option Rule (the "Final Rule"). You claim, however, that "the ten-day period described in 28 U.S.C. § 2112(a)(1) has not yet commenced" and thus refuse to notify the Judicial Panel on Multidistrict Litigation ("JPML") of the petitions. With respect, that is legally improper. Under the lottery statute, the Commission bears a *mandatory* duty to "promptly" transmit multiple petitions for review of the same order to the JPML, regardless of the agency's position regarding timeliness. Whether a "petition is . . . ripe" or not is a matter for the courts, not the Commission. *In re FERC*, — F. Supp. 3d —, 2024 WL 1596933, at *2 n.1 (J.P.M.L. 2024).

The ten-day period described in the lottery statute is triggered by "issuance" of the relevant order, 28 U.S.C. § 2112(a)(1), as your letter acknowledges, FTC OCG Letter at 1 (stating that "the ten-day period . . . runs from the 'issuance of the order'"). You also correctly recognize that the Final Rule counts as an "order" subject to the lottery statute. *See, e.g.*, *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1131 (D.C. Cir. 2015) (holding that "'Order'" encompasses "rule"). Here, the Negative Option Rule was plainly "issued" on October 16, 2024. Under 28 U.S.C. § 2112(a), an order adopting a rule is "issu[ed]" when the "substance" of the agency's "official action" has been "communicated to the public in some detail." *Saturn Airways, Inc. v. Civil Aeronautics Bd.*, 476 F.2d 907, 909 (D.C. Cir. 1973). Here, the Final Rule was publicly released—that is, its substance was communicated to the public—on October 16, 2024. On that day, the Commission posted the Rule in its entirety to the Commission's website, calling it "Negative Option Rule: Final Rule."[1] Indeed, in the Rule itself, the Commission described its action as "issu[ing] final amendments" to the prior version of the regulation,[2] and in the accompanying press released stated that the agency "today announced" the Rule.[3] Accordingly, the Commission, now having received multiple properly served petitions for review of the Final Rule within the ten days following October 16, "*shall . . .*

---

[1] Negative Option Rule ("Final Rule") at 1, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf.

[2] *Id.*

[3] *Federal Trade Commission Announces Final "Click-to-Cancel" Rulemaking Making It Easier for Consumers to End Recurring Subscriptions and Memberships*, FTC (Oct. 16, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/10/federal-trade-commission-announces-final-click-cancel-rule-making-it-easier-consumers-end-recurring.

*promptly . . .* notify the judicial panel on multidistrict litigation" of the pending petitions. 28 U.S.C. § 2112(a)(3) (emphasis added).

Your view about the timeliness of the petitions is based on the proposition that the Rule "has not yet been promulgated" within the meaning of the FTC Act because it "has not yet been published in the Federal Register." FTC OCG Letter at 1. But that is incorrect—and irrelevant. As noted, the Judicial Panel's process is governed by "issuance," not "promulgation." *See* 28 U.S.C. § 2112(a)(1); *see also, e.g.*, Notice of Multicircuit Petition for Review, *In re SEC*, MCP No. 180 (J.P.M.L. Mar. 19, 2024) (notifying the Panel after "issuance of the agency action," not publication in the Federal Register).

Regardless, under the FTC Act, it is promulgation "*by the Commission*" that matters, not action by the Office of Federal Register. 15 U.S.C. § 57a(e)(1)(A) (emphasis added). In the Final Rule, the Commission plainly concluded its decisionmaking process. The Final Rule made this crystal clear, *see* Final Rule at 3 (stating the Commission "now promulgates [the] final Rule"); *see also id.* at 230 (entering order "[b]y direction of the Commission"), as did the Press Release, *see Federal Trade Commission Announces Final "Click-to-Cancel" Rulemaking Making, supra* note 3 (stating that "[t]he Federal Trade Commission today announced a *final* 'click-to-cancel' rule") (emphasis added); *id.* at 2 (stating "the Commission *has voted* to adopt a final rule" (emphasis added). Despite your suggestion that the Rule is "still subject to revision," Final Rule at 1, there is no further action for the Commission to take, and the Rule released on October 16 was final.

In fact, the D.C. Circuit has rejected the argument that "only Federal Register publication creates a rule," holding that "the Federal Register Act forecloses" the proposition that "promulgation" requires publication. *Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 569 (2022). The Act defines a "document" transmitted to the Office of Federal Register to include "an order" or "rule" that has been "promulgated" by the agency. 44 U.S.C. § 1501. Thus, the Federal Register Act itself contemplates that a rule may be promulgated "*before* publication in the Federal Register." *Humane Soc'y*, 41 F.4th at 569. In other words, "an agency can prescribe a rule without publishing it." *Id.* at 570. The case you cite, *New York Stock Exchange LLC v. SEC*, 2 F.4th 989 (D.C. Cir. 2021), is not to the contrary. It does not define promulgation "by the Commission" for purposes of 15 U.S.C. § 57a(e)(1)(A), and it preceded the *Humane Society* case. Regardless, what matters here (as explained above) is when the order was "issu[ed]" under the lottery statute, § 2112. Moreover, your further assertion that the date of "issuance" must be the same as the date of "promulgation," FTC OGC Letter at 1, lacks any support.

In any event, questions about the meaning of "issuance" under the lottery statute, "promulgation" under the FTC Act, and the interaction of the two statutes are for the courts to decide in the exercise of the judicial power, not for you to unilaterally resolve. At this stage, the Commission's role is to play its part in a "purely mechanical" process. *In re NLRB*, 338 F. Supp. 3d 1343, 1345 (J.P.M.L. 2018). The Commission's mandatory, statutory obligation is to promptly notify the Panel of the pending petitions, not to adjudicate their ripeness. Ripeness is an issue "properly decided by" the courts. *In re FERC*, 2024 WL 1596933, at *2 n.1. That is why other agencies routinely notify the JPML of multiple petitions *even when they may object to the timing of the filings. See, e.g.*, Notice of Multicircuit Petitions for Review 1–4, *In re FERC*, MCP No. 175 (J.P.M.L. Jan. 18, 2024) (forwarding petitions to JPML despite dispute over the relevant order issuance date); Notice of Multicircuit Petitions for Review 1 n.1, *In re FERC*, MCP No. 164 (J.P.M.L. June 7, 2021) (forwarding petitions while noting that agency proceedings were still ongoing and that agency could file an appropriate motion with the designated court of appeals); Notice of Multicircuit

Petitions for Review 2–3, *In re FCC*, MCP No. 191 (J.P.M.L. Sept. 16, 2024) (forwarding petitions while explaining agency's view on their timeliness). Indeed, when we contacted the JPML, we were advised that they had never encountered a situation where an agency refused to notify the Panel after receiving multiple petitions for review of the same order in different circuits.

Your timing concerns, therefore, are no basis to refuse to comply with the Commission's duty "promptly" to "notify the judicial panel on multidistrict litigation" of the pending petitions. 28 U.S.C. § 2112(a)(3). The Commission must promptly transmit the above-captioned petitions to the JPML. If you have a timeliness objection, the courts are the proper forum.

Finally, your suggestion that a stay is not necessary due to the timeline for the effective date of the Rule is mistaken. It will take a substantial amount of time for many of the regulated entities to achieve compliance. Even at this stage, if the Rule is not stayed, the regulated entities will have to undertake measures to achieve compliance immediately. Furthermore, your assertion that the request is not a "good faith effort" to satisfy Federal Rule of Appellate Procedure 18 is not well taken either. FTC OGC Letter at 2. It is commonplace for agency stay requests to ask for an answer within one week, and other agencies, who are likewise composed of "five Commissioners," *id.*, are able to rule within that time, *see, e.g.*, Order Denying Stay Petition, *In the Matter of Safeguarding and Securing the Open Internet*, DA 24-544, Federal Communications Commission (June 7, 2024).

For all of these reasons, we respectfully ask you to reconsider your position and promptly transmit the petitions in accordance with law.

Sincerely,

Helgi C. Walker

cc:    Counsel of record (by email)

# Doc. 4.D

Letter from Anisha Dasgupta to Helgi C. Walker, Nov. 1, 2024

Appellate Case: 24-3137    Page: 124    Date Filed: 12/05/2024 Entry ID: 5463205



United States of America
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

November 1, 2024

BY ELECTRONIC MAIL
Helgi C. Walker (hwalker@gibsondunn.com)
Gibson Dunn & Crutcher LLP
1700 M St., N.W.
Washington, DC 20036-4504

> Re:     **Petitions for review of amendments to Negative Option Rule**

Dear Ms. Walker:

Thank you for your letter of October 30. We have carefully reviewed the authorities you cited, but they do not alter our conclusion that the proper time for notifying the Judicial Panel on Multidistrict Litigation of the petitions, in accordance with the statutory mandate of 28 U.S.C. § 2112(a)(3), will be upon the expiration of the ten-day period beginning when the Rule is published in the Federal Register. We will promptly notify the Panel of all petitions filed to date, and any others filed in the meanwhile, at that time.

The problem with notifying the Panel of the petitions now is that such action could prejudice the rights of other parties. Although the Commission has publicly announced the amendments to the Negative Option Rule and released the proposed text that it has transmitted to the Office of the Federal Register ("OFR"), those actions are not sufficient to formally put the public on notice of the Rule. What puts the public on notice of a rule is OFR's posting of the rule for public inspection and subsequent publication in the Federal Register, which typically occurs the following business day.[1] There may be interested persons other than your clients who wish to challenge the petition but do not regularly review the FTC's website and therefore are unaware of the Commission's action. If such a person were to file a petition for review within the proper period of time following OFC's posting and publication in a circuit where no petition has yet been filed, that circuit would not be included as a possible forum in the lottery to be conducted by the Panel. Such a person's choice of forum thus would be given no weight.

We agree with you that the question of when a rule "issues" for purposes of § 2112(a) is ultimately a question of law to be decided by a court. But that cuts in favor of waiting until after the rule is formally promulgated, *i.e.*, published in the Federal Register, before notifying the Panel. If another petition for review is filed, we will transmit that to the Panel along with the four petitions that have been filed so far. If you believe that the ten-day period should run from the date of the Commission's press release, you will then have an opportunity to argue before the Panel that petitions filed and served after that date should not be included in the lottery. By

---

[1] *See generally* 1 C.F.R. Pt. 17; https://www.federalregister.gov/public-inspection/current.

contrast, if we were to notify the Panel of the petitions now, and another party files a petition for review within 10 days after publication, that party would not be able to argue before the Panel that its petition should be included in the lottery because the Panel would already have made its decision.

Our conclusion that "issuance" of a rule refers to formal publication in the Federal Register is also consistent with ordinary legal usage. *Black's Law Dictionary* defines "issue" as "to send out or distribute *officially.*" (emphasis added). The "official" distribution of a rule occurs when it is published in the Federal Register. And it is also reinforced by the text of § 2112, which directs the agency to "file the record" with the court designated by the Panel for consolidation of the petitions. As explained in my prior letter, the agency cannot "file the record" of a rule until after it is published in the Federal Register, because the rule as published in the Federal Register is also a critical part of the record.

Furthermore, our reading of the statute is also consistent with longstanding precedent from multiple circuits that a rule is not "promulgated" or "prescribed" and has no legal effect until it is published in the Federal Register. In addition to the *New York Stock* exchange case cited in my prior letter, see *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 106 (2d Cir. 2018) ("It is a basic tenet of administrative law, set out by the APA, that a substantive regulation does not have legal effect—that is, it has not been established authoritatively—until it has been published in the Federal Register."); *Turtle Island Restoration Network v. Dep't of Commerce*, 438 F.3d 937, 943-44 (9th Cir. 2006) (regulations are "promulgated" when published in the Federal Register); *Horsehead Resource Dev. Co. v. EPA*, 130 F.3d 1090, 1093 (D.C. Cir 1997) (ordinary meaning of "promulgation" is publication in the Federal Register). It would be anomalous if a rule could be deemed issued for purposes of § 2112 before it is promulgated.

*Saturn Airways, Inc. v. Civil Aeronautics Board,* 476 F.2d 907 (D.C. Cir. 1973), which you cite in your letter, is not on point. That case was decided before the 1988 amendments that created the current lottery procedure in § 2112(a)(3) and it did not address the meaning of the term "issuance." Rather, the court simply held that petitions for review filed after an agency announced its action in a press release were not premature where the press release communicated the substance of the agency action in some detail. *Id.* at 909. The question here is not when your petitions could properly be filed. Rather it is when the ten-day clock in § 2112(a) begins to run.

*Humane Society of the United States v. United States Department of Agriculture*, 41 F.4th 564 (D.C. Cir. 2022) likewise does not address the meaning of issuance under § 2112. The question in that case was at what point an agency could withdraw a rule without going through notice and comment after the rule had been publicly announced. The majority held that the "point of no return" occurs when OFR makes the rule available for public inspection, *id.* at 569-75, while the dissent would have held that the rule can be withdrawn prior to publication, *id.* at 576 (Rao, J., dissenting). Regardless of which view is correct, neither of these events have yet occurred: OFR has not yet made the Rule available for public inspection or published it in the Federal Register. Arguably, the majority opinion in *Humane Society* could be read to suggest that the ten-day clock in § 2112 will begin to run when OFR makes the Rule available for public inspection, but that has not happened, so it makes no difference which of these two starting dates

is used. Either way, it would be improper for the Commission to notify the Panel of the petitions now.[3]

*In re FERC*, MCP No. 175, 2024 WL 1596933 (Apr. 11, 2024) also does not address when a rule issues for purposes of § 2112. That case did not involve a rule, but rather an agency order which under the FERC statute was deemed to have been issued when the agency denied a petition for rehearing. The agency had originally forwarded two petitions to the Panel, one from the District of Columbia Circuit and one from the First Circuit. The Panel initially conducted a lottery and consolidated the cases before the First Circuit, but upon reconsideration, it held that the First Circuit petition was not received by the agency within the ten-day period and vacated the consolidation order. If anything, this case supports the Commission's position because it confirms that a party can raise an objection before the Panel if it believes the agency has sent the Panel a petition that was not received within ten days after issuance of the order.

*In re FCC*, MCP No. 191, involved multicircuit challenges to a rule where the agency noted that the petitions were filed and served within ten days "after publication of a portion of the challenged order in the Federal Register." This supports our view that issuance occurs upon publication. *In re FERC*, MCP No, 164, does not involve a rule, and thus is not relevant.

That leaves *In re SEC*, MCP No. 180. In that case, it appears that the SEC did treat the public announcement of the order, rather than the date of publication, as the date of issuance. Absent any explanation of the SEC's reason for this action, that does not change our analysis of the statutory language. As discussed above, our view is that the best reading of the relevant statutory provisions is that the issuance of a rule prescribed under Section 18(a)(1)(B) of the FTC Act occurs when the rule is published in the Federal Register. It would therefore be potentially prejudicial to the rights of third parties, and thus improper, for the Commission to notify the Panel of the petitions now.

Contrary to your suggestion, the Commission is not refusing to comply with the statutory requirements. We will notify the Panel of all pending petitions as soon as the Rule is published and the ten-day period expires, in accordance with § 2112(a)(3). Our disagreement with you does not concern whether the Commission is obligated to notify the Panel, but rather when that obligation arises.

With respect to your request for a stay, I can confirm that the Commission is currently reviewing it. You state that it is "commonplace" for other agencies to act on stay requests within a week. I cannot speak to the practices at other agencies, but this Commission carefully reviews and considers requests for stays of agency action. In some cases, the Commission has granted stays pending judicial review; for example, earlier this year it granted a stay of the Combating Auto Retail Scams Rule. The Commission may or may not grant your requested stay, but your demand for a ruling within a week is not reasonable, particularly in light of the number of issues

---

[3] You also note that *New York Stock Exchange* preceded *Humane Society.* The two cases are not in conflict, but if they were, the earlier decision would control. *See, e.g.*, *Indep. Comm'ty Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) ("In the event of conflicting panel opinions … the earlier one controls, as one panel of this court may not overrule another.").

you have raised. I note that the example you provided of an order denying a stay was issued by a single official of the FCC. The process is considerably more complicated at this Commission because a stay request must be considered by all five Commissioners. While I cannot say precisely when the Commission will issue a decision on the stay request, I am confident that it will rule in sufficient time to allow the parties to seek a stay from the appropriate court if the stay request is denied. Under these circumstances, it would be improper for petitioners to seek a stay from a court at this time.

Sincerely,

*/s/ Anisha S. Dasgupta*
Anisha S. Dasgupta
General Counsel

cc:     Other counsel of record (by email)

# Doc. 4.E

Order Granting Writ of Mandamus, No. 24-60570 (5th Cir. Nov. 19, 2024)

Appellate Case: 24-3137    Page: 129    Date Filed: 12/05/2024 Entry ID: 5463205

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 19, 2024

Lyle W. Cayce
Clerk

No. 24-60570

In re Electronic Security Association; Interactive Advertising Bureau; NCTA-The Internet & Television Association,

*Petitioners.*

Appeal from the Federal Trade Commission
Agency No. 16 CFR Part 425

UNPUBLISHED ORDER

Before Stewart, Wilson, and Ramirez, *Circuit Judges.*

Per Curiam:

Petitioners seek entry of a writ of mandamus directing the Federal Trade Commission (FTC) to notify the Judicial Panel on Multidistrict Litigation (JPML) about multiple petitions for review challenging its recently announced "Click-to-Cancel" Rule (the "Rule"), as required by 28 U.S.C. § 2112(a)(3). Petitioners also move for an administrative stay of the Rule until the lottery process has concluded. We GRANT the petition for writ of mandamus and DENY the motion for an administrative stay.

I

On October 16, 2024, the FTC announced a final rule relating to the cancellation of recurring subscriptions by publishing the Rule on its official

website, issuing a press release, and sharing it on social media.[1] The Rule itself states: "The [FTC] *issues* final amendments to the Commission's trade regulation . . . 'Rule Concerning Recurring Subscriptions and Other Negative Option Programs' . . . ."[2]

On October 22, 2024, Petitioners filed a petition for review of the Rule in this court. Petitions for review of the Rule were also filed in the Sixth, Eight, and Eleventh Circuits. On October 25, 2024, Petitioners' counsel wrote to the FTC informing it of the four petitions for review. On October 29, 2024, the FTC informed Petitioners' counsel that it could not yet notify the JPML about the petitions for review as required by 28 U.S.C. § 2112(a)(3) because "the ten-day period described in § 2112(a)(1) ha[d] not yet commenced." The FTC contended the "issuance" date would be the date on which the Rule was published in the Federal Register.

On November 14, 2024, after the petition for mandamus relief was filed in this court, the FTC submitted the Rule to the Federal Register for public inspection. The Rule was made available for public inspection the next day. *See* Negative Option Rule, 89 Fed. Reg. 90476 (Nov. 15, 2024) (to be codified at 16 C.F.R. pt. 425). The FTC states that it will notify the JPML of any petitions filed on or before November 25, 2025, including those filed before October 28, 2024.

---

[1] *See* FTC, *Negative Option Rule: Final Rule*, Federal Register Notices, https://perma.cc/YY3W-WCLG; Press Release, FTC, Federal Trade Commission Announces Final "Click to Cancel" Rule, https://perma.cc/GFC8-2ADZ; FTC (@FTC), X (Oct. 16, 2024, 6:51 P.M.), https://perma.cc/3C6U-YDD4.

[2] FTC, *Negative Option Rule: Final Rule* 1 (Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf (Proposed text of Federal Register publication) (emphasis added).

Appellate Case: 24-3137    Page: 131    Date Filed: 12/05/2024 Entry ID: 5463205

No. 24-60570

Petitioners seek a holding that the Rule was "issued" on October 16, 2024, and a writ of mandamus (no later than November 19) ordering the FTC to notify the JPML of the petitions filed on or before October 28, 2024.[3] Petitioners also ask that the court enter an administrative stay of the Rule until the lottery process has concluded. The FTC responds that we lack jurisdiction to issue the writ under the All Writs Act and the APA.

## II

"On every writ of error or appeal, the first and fundamental question is that of jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Under the All Writs Act, courts may issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). But the All Writs Act, like the APA, is "not a source of subject matter jurisdiction." *United States v. Denedo*, 556 U.S. 904, 914 (2009); *Stockman*, 138 F.3d at 152 n.13.

Under Section 57a(e)(3) of the Federal Trade Commission Act (FTCA), we have jurisdiction over the petition for review pending in our court. 15 U.S.C. § 57a(e)(3). The statute expressly authorizes us to "to grant appropriate relief, including interim relief" as provided by the APA. *Id.* And we have "interpret[ed] the All Writs Act and the APA to provide separate, but closely intertwined, grounds for mandamus relief." *In re La. Pub. Serv. Comm'n*, 58 F.4th 191, 192 (5th Cir. 2023).

---

[3] Petitioners fail to explain why emergency relief is needed by November 19 as required by 5TH CIR. R. 27.3.

No. 24-60570

Section 57a(e)(5)(B) of the FTCA likewise vests the courts of appeal with "exclusive jurisdiction of any action to obtain judicial review" of FTC rules promulgated under 15 U.S.C. § 57a(a)(1)(B). This kind of exclusive "jurisdictional grant, 'when read in conjunction with the APA'" confers on the courts of appeal the "exclusive authority to resolve allegations that [the agency] unlawfully failed to act." *See JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 600 (5th Cir. 2016) ("[W]here courts of appeals have exclusive jurisdiction to review OSHA actions, they also have exclusive authority to resolve allegations that OSHA unlawfully failed to act."); *Telecomms. Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 75–79 (D.C. Cir. 1984) (holding that the All Writs Act authorizes courts of appeals to issue writs of mandamus compelling agencies to take "unreasonably delayed action" where they have exclusive jurisdiction to review final orders issued by the agency). Accordingly, if mandamus is warranted, this court is "empower[ed]" by the All Writs Act to issue it. *See In re La. Pub. Serv. Comm'n*, 58 F.4th at 192.

## III

"A writ of mandamus is 'a drastic and extraordinary remedy reserved for really extraordinary cases.'" *In re JPMorgan Chase & Co.*, 916 F.3d 494, 499 (5th Cir. 2019) (citation omitted). "Mandamus may only issue when (1) the plaintiff has a clear right to relief, (2) the defendant a clear duty to act, and (3) no other adequate remedy exists." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 768 (5th Cir. 2011). "[M]andamus is not available to review discretionary acts of agency officials." *Id.* (citations omitted).

## IV

At issue is when the Rule was "issued" for purposes of 28 U.S.C. § 2112(a)(3). Petitioners argue that the Rule was "issued" on October 16 because the FTC publicized the Rule to its website, released a press

statement about it, and posted it to social media. The FTC argues that the Rule was issued on November 15, when it was published in the Federal Register.

Under the Federal Trade Commission Act, the FTC "may prescribe . . . rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57a(a)(1)(B). "Not later than 60 days after a rule is promulgated[,]" any interested person may file a petition for judicial review of the rule in a court of appeals. *Id*. § 57a(e)(1)A). "If within ten days after issuance of the order," a rule is challenged in more than one court of appeals, the FTC "shall[] promptly" notify the JPML. 28 U.S.C. § 2112(a)(1), (a)(3). The JPML shall then,

> by means of random selection, designate one court of appeals, from among the courts of appeals in which petitions for review have been filed and received within the ten-day period specified[,] . . . in which the record is to be filed, and shall issue an order consolidating the petitions for review in that court of appeals. . . . The [FTC] shall file the record in the court of appeals designated pursuant to this paragraph.

*Id*. § 2112(a)(3). The parties do not dispute that the FTC must begin this process. Rather, they dispute *when* the FTC must do so.

We begin with the statutory text. *United States v. Palomares*, 52 F.4th 640, 642 (5th Cir. 2022). The term "issuance" is not defined in the statute. "This silence compels us to 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Russello v. United States*, 464 U.S. 16, 21 (1983) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). Issuance is "the action of supplying or distributing something, especially for official purposes" or "the action of formally making something known." *Issuance*, Oxford Dictionaries,

https://premium.oxforddictionaries.com/us/definition/american_english/ issuance (last visited Nov. 8, 2024). "Issuance" has been interpreted similarly by other courts. *See, e.g.*, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 676 (1950) ("[A] certificate cannot be said to have been *issued* for purposes of . . . seeking of reconsideration by an aggrieved person if its substance is merely in the bosom of the [agency]. Knowledge of the substance must to some extent be made manifest." (emphasis added)); *see also Fla. Mfrd. Hous. Ass'n, Inc. v. Cisneros*, 53 F.3d 1565, 1574 (11th Cir. 1995) (holding that a regulation was "issued" when it was published in the Federal Register because "[t]he verb 'issue' clearly refers to an act of public announcement");[4] *Paine v. Merit Sys. Prot. Bd.*, 467 F.3d 1344, 1347 (Fed. Cir. 2006) (finding that an agency had issued a decision when it placed it in the mail because it "had announced the decision in writing and had put it forth for distribution to the effected parties").

Here, the FTC made the Rule publicly known on October 16 by publishing it on its official website, releasing a press statement, and sharing it on social media. It specifically used the word "*issues*" in announcing the final amendments to the FTC's trade regulation. By contrast, the FTC cites no authority establishing that the only way to put the public on notice of the Rule is through publication in the Federal Register. Nor have we found any.

---

[4] The FTC cites *Cisneros* to support its argument that a rule "issues" only when it is published in the Federal Register. At issue in *Cisneros* was whether a regulation was "issued" on the date that the regulation itself was dated or on the date it was published in the Federal Register. 53 F.3d at 1573. The court held that the regulation was "issued" *when the public was put on notice of the regulation's content*. *Id*. at 1574. In *Cisneros*, that occurred when the regulation was published in the Federal Register. *Id*. Here, the public was put on notice when the FTC published the Rule to its website—before it was published in the Federal Register.

No. 24-60570

Petitioners, having filed a petition for review of the Rule, have a "clear right to relief." *Wolcott*, 635 F.3d at 768. Because the FTC, by its own statements, issued the Rule on October 16, it was obligated to notify the JPML of the petitions for review filed within the ten-day period following the Rule's issuance. *See* 28 U.S.C. § 2112(a)(3) ("If an agency, board, commission, or officer receives two or more petitions for review of an order[,] . . . the agency, board, commission, or officer *shall*, promptly after the expiration of the ten-day period . . . notify the [JPML] . . . ."). The FTC therefore had a "clear duty to act." *Wolcott*, 635 F.3d at 768. Absent mandamus, the FTC will wait until after November 25 to send the petitions to the JPML, by which point additional petitions may be filed in other circuits. Accordingly, no other adequate remedy exists. *Id*. Mandamus is granted.

Finally, Petitioners argue this court should administratively stay the Rule until the JPML lottery process is complete in order to preserve the status quo. Here, the Rule is not yet in effect, so an administrative stay is not necessary to preserve the status quo, especially in light of Petitioners' request that relief be granted by November 19. *See United States v. Texas*, 144 S. Ct. 797, 798 (2024) ("[A]n administrative stay buys the court time to deliberate. . . . [and] should last no longer than necessary to make an intelligent decision on the motion . . . .").

\* \* \*

The petition for writ of mandamus is GRANTED. Petitioners' motion for an administrative stay is DENIED.

# Doc. 5

Declaration of Melissa Brinkman,
Custom Communications, Inc., d/b/a
Custom Alarm

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF MELISSA BRINKMAN

I, Melissa Brinkman, hereby declare as follows:

1.    I am over the age of 18 and competent to make this declaration. The statements in this declaration are true and within my personal knowledge.

2.    I am the CEO of Custom Communications, Inc., d/b/a "Custom Alarm," which I will refer to herein as "Custom Alarm." My business address is 1661 Greenview Dr. SW, Rochester, MN 55902. Custom Alarm is a member of the Electronic Security Association.

3.    In my position as CEO of Custom Alarm, I am responsible for overseeing all aspects of the company and its operations. I oversee Custom Alarm's advertising and promotions, Custom Alarm's award-winning customer service, and Custom Alarm's administrative functions and recordkeeping. I have firsthand knowledge of Custom Alarm's operating budget, overhead, and expected costs of implementing changes to Custom Alarm's systems and business model. I also have firsthand knowledge of Custom Alarm's actual and expected costs of compliance with legal and regulatory standards. I am therefore qualified to provide the

1

information in this Declaration regarding Custom Alarm's costs of compliance with the Federal Trade Commission's new Rule on Negative Option Marketing (the "Rule"). Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

4.      Additionally, I personally know many of Custom Alarm's customers, in some cases for many years. Custom Alarm is a second-generation, family-owned business that works tirelessly to serve its customers. My father, Leigh J. Johnson, founded the company in 1968 and I became CEO in 2014. We seek to pursue excellence in every area. Custom Alarm has an A+ rating from the Better Business Bureau. Custom Alarm has been designated as a Top 100 Security Company by SDM Magazine, having held a spot on the top 100 list for twenty-seven consecutive years now. We have been recognized by Workforce Development, Inc. as one of the "Best Places to Work in Southeast MN" for eight straight years. Custom Alarm partners with a third-party monitoring service that has a TMA Five Diamond Monitoring Center designation for meeting high levels of responsibility to the local community and its customers through its investment of time and money into quality operator training. Custom Alarm is proud of its hard-earned reputation for excellence and its devotion to its employees and customers. I am therefore qualified

Appellate Case: 24-3137    Page: 139    Date Filed: 12/05/2024 Entry ID: 5463205

to provide the information in this Declaration regarding the irreparable harm that the Rule will inflict on Custom Alarm's customer goodwill.

5.     My father, Leigh J. Johnson, established Custom Alarm in 1968 in his basement in Rochester, Minnesota.  Its headquarters remain in Rochester to this day. Custom Alarm has always adhered to its core mission of providing safety and peace of mind to its clients.  Custom Alarm fulfills that mission today by offering a wide range of services to individuals, families, and businesses in southern Minnesota, northern Iowa, and western Wisconsin.

6.     For example, Custom Alarm provides security services to homes and businesses.  Custom Alarm offers a range of packages that includes installing, maintaining, and monitoring connected home technologies like electronic door locks and doorbells, hard wired and digital network cameras, glass break sensors, burglar and fire alarm systems, and more.  If a home's or business's alarm system is triggered, Custom Alarm operators review the trigger to verify an intrusion or fire and then contact emergency services and/or law enforcement through dispatch.  Custom Alarm operators can also communicate directly to intruders through IP speakers. This decreases response times and minimizes the risk of property losses or injury to individuals.

7.     Custom Alarm offers a variety of other services, including home automation systems that operate from a single digital platform; systems that monitor

3

properties for toxic gases, water leaks, and extreme temperatures; fire alarm systems; video surveillance; keyless access control systems; and more. These services provide owners of homes, businesses, and properties of all varieties enhanced protection and security and peace of mind.

8. For all of these services, Custom Alarm strives to maintain its excellent customer service. That includes maintaining a "100% Customer Satisfaction Guarantee" for post-installation services. Customer service is essential for security systems to ensure that customers' questions and concerns are resolved quickly, particularly because customers sometimes call regarding situations that require an immediate response.

9. Almost all of Custom Alarm's services are offered through recurring subscription plans.[1] The reason for this is obvious: by their nature, electronic security services require plans that continue and renew indefinitely until the customer cancels. Customers want peace of mind knowing that their security and fire alarm systems will be continuous; they do not want the burden of having to renew the security and/or fire alarm service at set intervals—with the risk of the service being terminated and leaving a property unprotected if the customer forgets to renew on time.

_____

[1] I understand that the FTC uses the term "Negative Option Feature" to refer to recurring subscriptions and free trial periods.

4

10.     Custom Alarm's subscription plans are tailored to each customer's needs.  The security needs of individuals and businesses vary, with different properties requiring different types of protection and varying numbers of cameras, smoke detectors, electronic locks, and other notification devices.  Some customers want the extra convenience of a more complete home automation package; others do not.  Therefore, Custom Alarm generally requires at least some information from customers before giving them a customized quote for their security needs, and nearly always performs on-site inspections before executing contracts for recurring security plans.

11.     I am familiar with the Rule, which will impose overly broad, unduly burdensome, and vague new legal obligations on Custom Alarm.  I believe the Rule is a solution in search of a problem, and it will create problems for Custom Alarm and its customers.  As I explain below, each part of the Rule will irreparably harm Custom Alarm by resulting in a loss of customer goodwill and by forcing Custom Alarm to incur substantial and unrecoverable costs of compliance in anticipation of the Rule.

**Section 425.4's Disclosure Requirements**

12.     The Rule imposes new disclosure requirements in 15 C.F.R. § 425.4 that will irreparably harm Custom Alarm by damaging customer goodwill and

5

forcing Custom Alarm to incur substantial costs of compliance that it will be unable to recover.

13. ***Loss of Customer Goodwill.*** Complying with Section 425.4's disclosure requirements will cause Custom Alarm to lose customer goodwill, both from potential and current customers.

14. First, Custom Alarm will be compelled to inundate customers with information. The Rule requires Custom Alarm to disclose—in a "Clear and Conspicuous" manner—any "Material" information related to the services offered, prior to obtaining the customer's billing information. The Rule defines "Material" to be anything "likely to affect a person's choice of, or conduct regarding, goods or services." § 452.2(e). Under this all-encompassing definition, a wide range of terms could be "Material." The Rule uses the malleable terms "likely," "affect," and "regarding," which give regulators maximum discretion to interpret the Rule to require the maximum disclosure. Further, the Rule does not limit the disclosure to the auto-renewing feature of the subscription, but broadly requires disclosure of anything regarding the "goods or services" themselves. Given this extremely broad disclosure requirement, Custom Alarm will be forced to guess as to what aspects of its transactions—including the subscription plans and the underlying goods and services—might be considered "Material" to customers. If Custom Alarm makes the wrong judgment and does not disclose terms that are later deemed "Material,"

6

Custom Alarm could be exposed to FTC enforcement and civil penalties. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

15.    For Custom Alarm, every customer presents a new and unique set of challenges in determining what to disclose as material. Disclosures about vital security services may be material to consumers who rely on these services to safeguard life and property in ways that disclosures about a magazine subscription or a gym membership are not similarly important to subscribers. However, the Rule's vague, one-size-fits-all standard gives no guidance on how electronic security and alarm companies should satisfy the materiality standard, or on what additional details Custom Alarm should disclose to its prospective and existing customers.

16.    Custom Alarm customizes its subscription agreements to fit the needs of each client. We do this because each contract presents a unique combination of features that includes, for example, the varieties of electronic monitoring and alarms, cameras, locks, fire alarm options, real-time, intelligent analytics-based monitoring, and so on. Depending on the final package, pricing details will be set for that particular transaction. What is material for each client will vary according to the characteristics of the client, what they are trying to protect, and what services they are subscribing to. Custom Alarm has customers ranging from individual homeowners to large, sophisticated businesses. What an individual homeowner

7

considers to be material in an electronic security service will often differ from what a sophisticated business considers to be material. Under the Rule, Custom Alarm will need to evaluate each transaction, service, and bundle of goods and services in order to disclose the terms that might be material to that customer. With the high stakes and exposure associated with any mistake, Custom Alarm will need to disclose every term that could likely be considered material, even when the customer is a sophisticated business.

17. One result of the Rule's disclosure requirement will be a massive amount of information disclosed in the "Clear and Conspicuous" format required by the Rule. The effect is analogous to shouting all of the information at the consumer. If visual, it "must stand out from any accompanying text or other visual elements so that it is easily noticed." If online, it must be "unavoidable." It will impose a great deal of information on the consumer with little ability for Custom Alarm to even attempt to organize or present the information in order of likely priority that might help consumers digest the information.

18. Our customers and potential customers will become irritated by lengthy, "Clear and Conspicuous" terms. This will harm Custom Alarm's relationships with customers who blame Custom Alarm for a lack of a user-friendly experience, when in fact the difficulty arises from the Rule's requirements. Customers even may walk away from offers rather than struggle to figure out the key terms of a transaction.

19.     Custom Alarm also regularly interacts with customers over the phone and often takes customers' billing information over the phone.  In those situations, the Rule will require Custom Alarm's employees to disclose all those material terms orally.  These disclosures will take time due to the complex, multi-faceted nature of the kinds of customized security contracts that Custom Alarm's customers regularly desire.  Some customers will end a conversation rather than listening to a recitation of all the possible material terms, as required by the government-mandated disclosure provision of this Rule.

20.     ***Unrecoverable Compliance Costs.***  In addition to lost business and customer goodwill, the Rule imposes compliance costs on Custom Alarm that Custom Alarm cannot recover from the government.  Those costs will need to be passed along to Custom Alarm's customers.

21.     Most of the Rule is scheduled to take effect on May 14, 2025.  If the Rule's effective date is not stayed, Custom Alarm will need to review its subscription plans to determine what additional "Material" information must be disclosed in a "Clear and Conspicuous" manner to comply with the Rule.  Custom Alarm also will need to immediately begin additional review under the Rule to ensure that Custom Alarm is correctly and thoroughly identifying what terms are "Material" for any given contract and customer—and which therefore must be disclosed in a "Clear and Conspicuous" manner.  For the same reason that the disclosures of all the details that

9

might be "material" will be burdensome on Custom Alarm's customers, the identification and enumeration of all the possible material terms will also be burdensome on Custom Alarm. Creating and distributing different sets of disclosures to different customers, such as individual customers and sophisticated businesses, will impose new burdens and costs on Custom Alarm. Custom Alarm will have to pass those costs on to its customers in the form of higher prices.

22.     The requirements for disclosures to be "Clear and Conspicuous" will cause Custom Alarm to incur further unrecoverable costs. Custom Alarm agrees that companies should deal with their customers in clear and fair ways, and Custom Alarm always strives to do so. But when the federal government regulates those dealings with vague standards and the threat of steep penalties, even scrupulous and well-meaning companies must reevaluate their communications and practices. As a result of Custom Alarm's review of existing operations, Custom Alarm may have to redesign its offers, its customer-facing webpages, and possibly other visual materials presented in conjunction with offers in order to make the disclosures required by the terms of the Rule in the format required. Custom Alarm also may have to retrain its customer service representatives to ensure that sufficient information is disclosed in the "Clear and Conspicuous" manner required by the Rule. Custom Alarm will need to ensure that enumerated disclosures in Section 425.4(a)(1)–(4) appear "immediately adjacent" to the negative option feature. This in turn will require

10

Appellate Case: 24-3137     Page: 147     Date Filed: 12/05/2024 Entry ID: 5463205

additional legal and compliance analysis.  And it may also lead to additional design challenges, depending on how feasible it is to incorporate all the required terms onto a single, legible piece of paper or webpage.

### Sections 425.2–.5's Ban on Certain Information With Promotions or Offers

23.    Next, the Rule restricts Custom Alarm from providing other information—even accurate information—when promoting or offering for sale Custom Alarm's services with negative option plans.  This restriction on communication would irreparably harm Custom Alarm.  It will cause Custom Alarm to lose business and customer goodwill; it will impose on Custom Alarm unrecoverable costs of compliance.  It also will cause Custom Alarm to suffer harm to its constitutional free speech rights.

24.    ***Loss of Consumer Goodwill.***   The speech regulations in Sections 425.2–.5 will irreparably harm Custom Alarm by causing it to lose business and customer goodwill.

25.    The Rule prohibits companies from providing promotional information that "detracts" from disclosures required under the Rule.  That language is broad enough to potentially bar Custom Alarm from providing typical and factually accurate language associated with offers or promotions for Custom Alarm's services.  Any time Custom Alarm makes a positive statement in its promotional materials,

11

Custom Alarm will run the risk that someday, a regulator will deem it to have "detract[ed]" from required disclosures.

26. The result will be that Custom Alarm will be chilled from providing positive and factually accurate information about its products lest such information be found, after the fact, to detract from or undermine any other required disclosures. Instead, Custom Alarm will naturally be compelled to place an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a product or service. Such customers are more likely to forgo Custom Alarm or be dissatisfied with existing commercial arrangements. Custom Alarm will be irreparably harmed by that increased customer alienation.

27. ***Unrecoverable Compliance Costs.*** Custom Alarm will incur unrecoverable and substantial compliance costs unless the Rule is stayed pending judicial review. For example, Custom Alarm will need to analyze information it provides about its fire alarm services and their sensitivity to smoke levels to discern if this is (a) a material term that *must* be disclosed, or if it might instead be (b) a term that "detracts from" the mandated disclosure of information about the negative option features of the contract. Custom Alarm will need to design systems to ensure that each plan contains the required disclosures, and that those disclosures do not trigger an obligation to remove content in promotional materials or on websites. All of this will take time and resources—and those costs will be compounded by the

12

need to ascertain how to comply with the Rule's vague, prohibitory terms. Unless the Rule is stayed, Custom Alarm will need to begin this work now to ensure compliance by the Rule's effective date.

28. ***First Amendment Harms.*** Because the Rule prohibits speech that detracts from the mandatory disclosure, the Rule raises First Amendment problems. The overbroad prohibition on speech and the chilling of truthful speech here violates the First Amendment. This interferes with Custom Alarm's First Amendment rights. The harm is irreparable.

### Section 425.5's Consent Requirement

29. The Rule's consent requirement in Section 425.5 also will cause Custom Alarm to suffer irreparable harm from lost customer goodwill. Section 425.5 also is already causing unrecoverable compliance costs.

30. ***Loss of Customer Goodwill.*** The consent requirement in Section 425.5 will irreparably harm Custom Alarm by causing it to lose customer goodwill. By requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires companies to obtain a consumer's consent twice—first, for the negative option feature, and second, for the rest of the transaction. And the Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages—because the Rule simultaneously requires both that the "consent request" for the negative option

13

feature be "free of any information not directly related to the consumer's acceptance of the negative option feature" and that companies disclose material terms unrelated to the negative option feature. §§ 425.4(a), 425.5(c). Requiring a customer to consent twice to a single transaction is not how business is usually done. By the time a prospective customer of Custom Alarm is ready to sign up for Custom Alarm's services, that customer has likely had extensive personalized conversations with Custom Alarm's team. Custom Alarm team members likely have visited the prospective customer's property and explored the locations for security coverage. At the end of this process, customers will find it odd for Custom Alarm to insist on double consent—one consent to the negative option character of the transaction, and a second consent to the transaction itself.

31. The added complexity that the Rule requires for entering a standard, auto-renewing subscription for electronic security services likely would confuse customers. A customer may sign one consent form but not the other, thinking that one consent was sufficient—and unaware that, without the second consent, the security arrangements that the customer seeks are not in effect. For customers seeking security arrangements, any period during which their properties or businesses are unsecured could have significant implications for the safety of their properties. For customers seeking fire alarm systems or other UL-listed systems, the

disruption could also put them in violation of local fire codes or UL requirements.[2] The resulting loss of coverage also could affect insurance coverage that requires continuous protection at the paid premium, or could trigger higher insurance premiums going forward. Having a multi-step consent process increases the risk of mistakes from customers attempting to sign up for services but failing to fully consent as the Rule requires. Failures in the signup process—and any window of time in which security and fire alarm services are not in place due to mistakes in the signup—will lead to customer frustration, potential gaps in protection, and dissatisfaction with Custom Alarm.

32. Custom Alarm takes these risks and burdens seriously. We work hard to ensure high levels of customer satisfaction, from the sign-up process through the duration of the customer's subscription. The Rule's new consent requirements will complicate and bureaucratize our interactions with clients, in ways that make little commercial sense and fatigue our customers. Customer dissatisfaction and negative word-of-mouth can be extremely damaging to companies, especially companies in the highly competitive electronic security industry, and these harms are irreparable.

33. ***Unrecoverable Compliance Costs.*** Custom Alarm is incurring unrecoverable costs in complying with the two-step consent requirement. Custom

---

[2] UL Solutions is a leading certification provider that helps companies demonstrate safety, security, and other regulatory compliance measures.

15

Alarm will need to redesign its offer letters, contracts, webpages, and the scripts for in-person and telephone customer service interactions to ensure that there are always places for two separate consents, one to the contract itself and the other to the auto-renewing feature of the contract. This requires Custom Alarm to expend substantial time and resources to ensure compliance by the Rule's effective date unless the Rule is stayed.

### Section 425.6's Simple Cancellation Requirement

34. Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with negative option features and limits companies' ability to offer consumers critical information when they seek to cancel such contracts. These requirements irreparably harm Custom Alarm.

35. ***Loss of Customer Goodwill.*** The Rule will cause Custom Alarm to lose customer goodwill for several reasons. The Rule requires that cancellation be easy and immediately effective. While that sounds laudable on paper, it will cause many problems and erroneous cancellations in practice. In the security industry, an erroneous cancellation of security and fire alarm services leaves customers unprotected and can result in serious harm.

36. The requirement for companies to "immediately" cancel recurring charges may not allow Custom Alarm to require customers to verify their identities and secure customer authorization when trying to cancel a security and/or fire alarm

16

subscription. The Rule does not define the terms "simple mechanism" and "at least as easy to use," and therefore may prohibit companies from asking for basic information, such as identity verification, when they receive cancellation requests. The Rule purports to allow "reasonable verification" at the time of cancellation, but then threatens that "[a]ny authentication, verification, or confirmation procedure that creates unreasonable asymmetry" with the enrollment process "runs afoul of Section 5 of the FTC Act and the Rule." 89 Fed. Reg. 90,476, 90,506 (Nov. 15, 2024). The Rule also assumes that "a final Rule-compliant cancellation should take no more than 30 seconds to one minute," *id.* at 90,520, thus placing the regulated community on notice that the FTC has companies under a stopwatch. And for Custom Alarm, that timeframe is impossible to achieve, given the information we need to verify before responsibly canceling a customer's monitoring service. Additionally, many of Custom Alarm's customers utilize automatic bill payment programs (paid either by credit card or Automated Clearing House (ACH)). Those automated charges and debiting programs will need to be stopped promptly in conjunction with any cancellation. If there are delays in stopping the automated payments—for example, because of delays at a third-party payment administrator—customers will be irritated at Custom Alarm, resulting in further loss of goodwill.

37. These requirements give FTC enforcement attorneys undue discretion to second-guess whether cancellation procedures designed to protect customers have

17

"unreasonable asymmetry" with enrollment procedures according to the regulator's own subjective standards. The threat of penalties for noncompliance will inappropriately incentivize Custom Alarm and other companies to scale back authentication and verification procedures at the time of cancellation, which in turn will increase the risk of wrongdoers taking advantage of this regulatory environment to cancel security services without authorization. It will also increase the risk that employees of a business client will inadvertently or purposely cancel businesses' security or fire alarm services because Custom Alarm could not verify the employees' authority to cancel the subscriptions. If this happens, it will harm customer goodwill toward Custom Alarm.

38. The Rule's requirement for immediate and simple cancellation will impair companies' ability to provide consumers with true, useful, and beneficial information when they seek to cancel a subscription. Customers sometimes seek to cancel subscriptions without being aware of the consequences of cancelling. For example, when a customer cancels their home security service, Custom Alarm must notify their insurance company according to industry practice. That customer may not realize that by canceling their home security service, their homeowners' insurance premiums may go up. Similarly, when a commercial customer cancels a fire alarm monitoring service for a commercial building that has sprinklers, we are required by law to notify the Fire Marshal and the authorities having jurisdiction.

18

This notification may trigger similar consequences for the customer. Many customers do not understand these consequences of changing their security services, which is why Custom Alarm's representatives explain these and other consequences at the time of cancellation so that customers are appropriately informed. But fully explaining these consequences may not be permitted under the Rule if doing so would make cancellation less "simple" or "easy" than signup had been. The Rule effectively forbids Custom Alarm from taking reasonable steps to explain the consequences of cancellation to the customer and ensuring that the customer understands these consequences.

39. For business customers, there are also situations where someone in the organization may try to cancel a monitoring service for the business but lacks the necessary authority. Individuals without appropriate authority may inadvertently cancel other services because the service being canceled is linked to other accounts. By having an appropriately responsible and rigorous verification process, Custom Alarm can prevent these mishaps in most instances. But under the Rule's "simple" cancellation requirement, these types of occurrences will become more frequent.

40. Relatedly, a customer may seek to cancel one of a bundle of services they receive from Custom Alarm, but the customer may be unaware of how that service interacts with the other bundled services. For instance, Custom Alarm sometimes offers customers discounts or promotional deals when they subscribe to

bundled services, such as video camera protection, burglar alarms, fire alarms, electronic keypad access systems, and intelligent analytics-based monitoring. The discount might be in the form of a promotion to encourage the purchase of additional Custom Alarm services. The discount might also reflect efficiencies that Custom Alarm achieves and passes on to the customer when we provide multiple services— for example, because it is more efficient for Custom Alarm to provide certain security services when we also manage the keyless access system for a building or monitor its fire alarm system. If a customer sought to cancel one item in the bundle, the cost for another item might be affected. A customer who decided to change its access system from Custom Alarm to an IT provider more directly integrated with its computer systems might not realize that this will lead to increased costs on the part of Custom Alarm's continued monitoring.

41. All of the information described above is the type of important information that Custom Alarm would explain to customers at the time of cancellation, and customers expect Custom Alarm to provide this information. However, the Rule's requirement that cancellation be "as easy" as signup may prevent Custom Alarm from explaining this important information. Customers who do not receive or understand this information and are later surprised by the consequences of their cancellation will be dissatisfied with the increased costs,

20

causing loss of customer goodwill to Custom Alarm due to the Rule's simple-cancellation requirement.

42. ***Unrecoverable Compliance Costs.*** The Rule's cancellation requirements is causing Custom Alarm to incur unrecoverable compliance costs and those costs will increase as the Rule's effective date approaches. Custom Alarm will need to expend resources to determine what cancellation mechanism is "as simple as" the sign-up methods normally offered, as required by the Rule. The standard signup process for Custom Alarm services involves detailed conversations and consultations. But the final signup stage is simply the creation of a contract. The Rule is ambiguous as to how much of the total process counts when considering whether cancellation is as simple as signup. The process of analyzing the steps of the signup and comparing them against the cancellation process is requiring Custom Alarm to expend time and resources.

43. In creating a simple cancellation option, Custom Alarm is also expending time and resources to implement the simple cancellation mechanism. Custom Alarm will need to review and potentially redesign its customer-facing interactive website pages, redo contract templates, and revise its employee training and the scripts for its customer service representatives. Automatic payment processing plans will also need to be stopped promptly, and Custom Alarm will need to develop new procedures to make this happen, resulting in additional compliance

21

costs. Given that the final stages of signups are often accomplished through in-person or telephone interactions, Custom Alarm will also likely have to hire additional personnel to ensure that any cancellation calls and messages, as well as the cancellation itself, are processed "promptly."

44. ***First Amendment Harms.*** The required provision of "simple" cancellation mechanisms that are in the "same medium" and "as easy to use as" sign-up mechanisms will burden Custom Alarm's ability to communicate with customers. Coupled with the prohibition on making the cancellation process more complex than signup, the Rule would significantly impede Custom Alarm's ability to speak with its customers at the time of a cancellation transaction—a time when there is an important need to communicate information about the consequences of cancellation. The restriction on Custom Alarm's communication and speech violates Custom Alarm's First Amendment rights and causes immediate and irreparable harm.

### The Rule's Recordkeeping Requirements

45. Finally, the Rule imposes new recordkeeping requirements on Custom Alarm. The Rule requires us to "[k]eep or maintain verification of the consumer's consent" to a negative option plan and the underlying transaction "for at least three years." § 425.5(a)(3). The Rule provides that we can avoid this requirement only if we "can demonstrate by a preponderance of the evidence that it uses processes

22

Appellate Case: 24-3137   Page: 159   Date Filed: 12/05/2024 Entry ID: 5463205

ensuring no consumer can technologically complete the transaction without consent."
*Id.*

46.   ***Loss of Customer Goodwill.***   These recordkeeping requirements will cause Custom Alarm to lose customer goodwill.   There are always risks to retaining customers' information, including improper disclosure through hacking, misplaced files, or other means.   The longer customer information is retained, the greater the risk that disclosure will take place, whether due to an accidental or malicious security breach.   Custom Alarm strives to protect the records of its clients, but all companies face risks from cyber incidents and malign actors.   If there should be any data breach, the reputational consequences are especially pronounced for a security sector business like Custom Alarm.   Retaining additional records for three years, as the Rule requires, will only increase the risk of improper disclosures of customers' information and increase the risk of lost customer goodwill.

47.   Even if no improper disclosures occur, Custom Alarm will still lose customer goodwill because customers generally do not want their records to be kept and maintained by a company for years.   Customers generally dislike having records about them kept by third parties, so knowing that Custom Alarm is maintaining such records will harm Custom Alarm's customer goodwill.   Customers additionally fear that such records will be inadvertently disclosed to others.

Appellate Case: 24-3137     Page: 160     Date Filed: 12/05/2024 Entry ID: 5463205

48.    ***Unrecoverable Compliance Costs.***   The Rule's new recordkeeping requirements also are causing Custom Alarm to incur unrecoverable costs, and those costs will increase as the Rule's effective date draws near.  Custom Alarm does not currently record or maintain this type of consumer consent verification that the Rule requires.  For cancellations over the internet, Custom Alarm will need to re-design software and websites to generate Rule-compliant records of customer consent.  For cancellations over the phone or in-person, we will need to train employees and design forms for employees to record consent.   Custom Alarm also will incur incremental new costs to maintain records of consumers' consent to transactions. Alternatively, we would need to devise new procedures for documenting our signup process if we redesigned our online, telephone, and in-person processes so as to make it technically impossible for any consumer to complete the transaction without consent.  This would require implementing new recordkeeping systems and training personnel to maintain the necessary information.

49.    Custom Alarm also will need to invest in its information technology security systems to safeguard the records that it is required by law to maintain for long periods.   It is imperative for Custom Alarm's customers—and for the maintenance of Custom Alarm's own reputation—that it do its utmost to ensure that those records are not improperly disclosed.  Custom Alarm would be able to handle much of the work on its internal servers, but it would require an investment in

24

additional hardware. To implement a new system, Custom Alarm would likely have to employ additional consultants to make the technology transition.

50. At a time when consumer costs are rising, Custom Alarm works hard to keep costs down for its customers. But the compliance costs that the Rule would impose on Custom Alarm would force Custom Alarm to raise prices to recoup those costs. Custom Alarm does not have the ability to absorb those costs itself. These government-mandated costs will ultimately harm our customers, even though our customers have been happy with Custom Alarm's subscription plans.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: 11/25/24

25

# Doc. 6

Declaration of Merlin Guilbeau,
Electronic Security Association, Inc.

Appellate Case: 24-3137    Page: 163    Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals
# for the Eighth Circuit

## DECLARATION OF MERLIN GUILBEAU

I, Merlin Guilbeau, hereby declare as follows:

     1.     I am the Director and CEO of the Electronic Security Association, Inc. ("ESA"). Established in 1948, ESA is the largest trade association in the United States representing the electronic security and life safety industry; ESA's member companies employ more than 500,000 industry professionals and serve more than 34 million residential and commercial clients. A vital function of the ESA is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. Accordingly, I routinely confer with and provide guidance to the ESA's members regarding compliance with applicable statutory and regulatory requirements, including actions taken by the Federal Trade Commission ("FTC") and the Rule on Negative Option Marketing ("Rule") adopted by the FTC recently. Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

Appellate Case: 24-3137    Page: 164    Date Filed: 12/05/2024 Entry ID: 5463205

2.	I have reviewed and analyzed the Rule, which imposes broad and burdensome new legal obligations on the ESA's members that offer, promote, or sell goods or services through negative option plans.  Negative option plans, as the FTC refers to them, are contracts for goods or services that continue until the customer cancels the plan.  In reality, these are nothing more than ordinary service plans and subscription agreements that are used widely throughout the economy to supply customers with utilities, news and periodicals, retail goods, and residential services, among other examples.  I will use the terms subscription plans and negative option plans interchangeably in this declaration.  As a result of my position with the ESA, I am familiar with the importance of subscription plans to the ESA's members.  I am also familiar with the effects that the Rule will have on the ESA's members and the actions that the ESA's members generally will take or refrain from taking because of the Rule.  Consequently, I understand how the Rule will cause immediate and irreparable harms to the ESA's members.

3.	The ESA's members use subscription plans to provide electronic security service to consumers and businesses.  Consumers and businesses commonly subscribe to continuing plans for security services, such as alarm systems for homes or businesses, fire protection services, video surveillance services, access control services, or interactive security services.  Those services often save lives and property.  These electronic services quickly detect home intrusions, fires, and other

2

dangerous situations and immediately notify emergency services, thereby decreasing the response time of first responders. If these services are inadvertently or maliciously terminated, homes and businesses may be left unprotected. It is therefore important for electronic security companies to ensure continued, uninterrupted electronic security service.

4. In fact, many of the ESA's members are required to have subscription plans with their customers in order to maintain general liability and Errors & Omissions insurance coverage, or to meet basic due diligence from monetary lenders. Many lenders that work with the electronic security industry require electronic security companies to have a subscription plan with a customer in order for the recurring monthly revenue generated from that account to be included as part of companies' borrowing base. If the Rule applies to alarm companies, it will change the ways that alarm companies enter, maintain, and terminate their subscription plans with customers. At a minimum, this will create new uncertainty for both insurers and lenders, such that the cost of insurance would increase and alarm companies' access to capital would likely decrease and/or become more expensive. In both cases, these costs would need to be passed through to the customers.

5. The Rule regulates the ESA's members that use subscription plans— which includes ESA's members that reside in Minnesota, such as Custom Communications, Inc., d/b/a Custom Alarm. *See* Declaration of Melissa Brinkman

3

for Custom Communications, Inc., d/b/a Custom Alarm ("Custom Alarm Decl.") ¶ 5. Those members have standing to challenge the Rule because of the immediate and irreparable harms that the Rule will cause them to suffer. One of the ESA's critical functions is to represent its members' interests in matters such as this petition for review and to protect its members from harms like those the Rule will cause. Many of the ESA's members are small companies that lack the resources for federal litigation. Because the ESA can adequately represent its members' interests, this petition for review does not require the participation of the ESA's individual members, although in this case certain of the ESA's members are participating as parties. *See* Custom Alarm Decl. ¶ 2; Declaration of Randall Renfroe for Allstate Security Industries, Inc. ("Allstate Decl.") ¶ 2.

6. Federal law does not directly regulate the use of negative option contracts by electronic security companies. In some instances, the Restore Online Shoppers' Confidence Act ("ROSCA") indirectly applies to electronic security companies where they market negative option plans over the internet. *See* 15 U.S.C. § 8403. Other statutes regulate negative option marketing for other industries. The Unordered Merchandise Statute provides that mailing unordered merchandise is an unfair trade practice, 39 U.S.C. § 3009(a), and the Electronic Fund Transfer Act ("EFTA") forbids sellers from imposing recurring charges on a consumer's debit card or bank account without written consent, 15 U.S.C. § 1693c. The

Telemarketing and Consumer Fraud and Abuse Prevention Act required the FTC to promulgate the Telemarketing Sales Rule, which in part regulates negative option marketing performed via telemarketing. *See* 15 U.S.C. §§ 6101–6108; 16 C.F.R. § 310. And most recently, the Infrastructure Investment and Jobs Act of 2021 directed the Federal Communications Commission to regulate trial period negative option marketing offered by broadband providers. *See* Pub. L. 117-58, § 60504(a)–(b), 135 Stat. 429, 1244 (2021) (requiring a "broadband consumer label" that shall disclose "whether the offered price is an introductory rate and, if so, the price the consumer will be required to pay following the introductory period").

7.    The reason that Congress has not regulated subscription plans for security services is that such regulation is unnecessary. Consumers and businesses are happy with their security subscription plans. *See, e.g.*, J.D. Power, *Home Security Customers Feeling Secure with Purchase and Experience* (Nov. 1, 2023), https://www.jdpower.com/business/press-releases/2023-us-home-security-satisfaction-study. Industry reporting provides that only about 1% to 2% of cancellations are due to service-related issues; the vast majority are due to financial hardship or customer relocation. The ESA is not aware of any significant reports of customer dissatisfaction with their electronic security services.

8.    The FTC's Rule is a solution in search of a problem. It will impose many unnecessary and burdensome requirements on the ESA's members without

creating benefits that could possibly justify those burdens. As set forth below, I describe each category of the Rule's major new requirements for security services companies that offer or promote goods or services through subscription plans. For each category of requirements, I explain how the Rule is causing two types of irreparable harm. First, the Rule harms the ESA's members' customer goodwill, because it requires them to make disclosures and take actions that will confuse, burden, and alienate their customers. The harm to companies from losing customer goodwill will be irreparable. Second, the Rule harms the ESA's members by causing them to incur new, substantial, and unrecoverable costs of compliance, just as the FTC's own administrative law judge found after an informal hearing. *Accord* Recommended Decision, April 12, 2024 (finding that the Rule "will have an annual effect on the national economy of $100 million or more"). Many of the ESA's members will need to redesign their advertising, change their customer intake processes, implement new training and staffing protocols, obtain legal review, and install new recordkeeping systems, along with incurring other costs. Because these actions will take time to implement, the ESA's members must begin incurring these costs now. If the Rule is later overturned following judicial review, the ESA's members will not be able to recover those costs. I therefore explain why the Rule would irreparably harm the ESA's members if not stayed pending judicial review.

6

**Section 425.4's Disclosure Requirements**

9.     The Rule imposes new disclosure requirements in 15 C.F.R. § 425.4 that will irreparably harm the ESA's members by causing them to lose customer goodwill and incur substantial, unrecoverable costs of compliance.

10.     Section 425.4 requires anyone offering a negative option plan to broadly "disclose, prior to obtaining the consumer's Billing Information, all Material terms, regardless of whether those terms directly relate to the negative option feature." § 425.4(a). Those disclosures must include, but are not limited to, the fact of the negative option feature, the deadline by which the consumer must act to stop all charges, the amount and frequency of the charges, and any information necessary to cancel the negative option feature. § 425.4(a)(1)–(4).

11.     The Rule does not specify what information companies must provide when offering negative option plans. Although the Rule provides non-exhaustive examples, it regulates "all Material terms" and only vaguely defines "Material" to mean "likely to affect a person's choice of, or conduct regarding, goods or services." § 425.2(e). The required disclosures are not limited to the negative option feature; in fact, the Rule explicitly states that companies must disclose "any material term related to the underlying good or service," "regardless of whether those terms directly relate to the negative option feature." § 425.4(a). Therefore, the Rule compels companies to make broad disclosures about their services or products

7

simply because those companies offer or promote the products through negative option plans.

12.     Section 425.4 also requires that these disclosures be "Clear and Conspicuous." § 425.4(b).  The Rule defines that phrase to mean "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers." § 425.2(c).  Among other things, the Rule provides that disclosures must (i) "stand out from any accompanying text" if made through visual means, (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it" if made audibly, and (iii) be "unavoidable" if made through electronic means.  *Id.*  Moreover, the specific disclosures required by Section 424.4(a)(1)–(4) "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature," and any other disclosures "must appear before obtaining the consent" of the consumer to the negative option feature. § 425.4(b)(2).  The Rule, therefore, not only requires the disclosure of an extensive amount of information, but also compels companies to communicate that information in unique and highly regulated ways.

13.     ***Loss of Customer Goodwill.***     Complying with Section 425.4's disclosure requirements will cause the ESA's members to lose the goodwill of their potential and existing customers.

8

14. First, companies, including the ESA's members, will need to ensure that they are providing customers with "material" information related to the services offered—all in a "clear and conspicuous manner"—prior to obtaining the customer's billing information. The Rule's definition of "Material" offers no specific guidance on what constitutes a "material term," leaving companies to guess as to what aspects of any given transaction might be "likely to affect a person's choice of, or conduct regarding, goods or services." If companies make the wrong judgment and do not disclose terms that a regulator later deems "material," companies could face the prospect of FTC enforcement and civil penalties of up to $51,744 per violation. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

15. The Rule's vague and malleable standards are especially harmful for companies, like the ESA's members, that provide vital security services for the protection of life and property. Information that a consumer does not consider material in purchasing a magazine subscription or an entertainment service—such as the risk of interrupted service—might be regarded as material to consumers in the market for a home security system. Security companies understand that their customers rely on their services to protect their homes, families, and businesses. Because of this, security companies will likely need to make increased disclosures

9

and warnings, relative to other companies, in order to satisfy the Rule's materiality, clarity, and relatedness requirements.

16.     Additionally, security companies sometimes offer tailored security services to individuals and businesses.  Security services may change based on the size and configuration of the premises, whether it is a home or business, and a host of other variables.  This variability sets apart security companies from the sellers of other goods and services, such as magazines and gym memberships.  And the variability increases the need for security companies to tailor their disclosures in promotions and advertising in order to comply with the Rule.  *See, e.g.*, Custom Alarm Decl. ¶¶ 15–16.

17.     The Rule's materiality, clarity, and relatedness requirements will lead to longer and more cluttered advertising by security companies.  Government-mandated warnings will crowd out the advertising content, leading to more consumer confusion and dissatisfaction.  Customized offers will quickly become voluminous, which will make it difficult for consumers to discern which terms are truly important and warrant their attention.  Consider, for example, a customer seeking video monitoring and interactive security services.  The Rule would require the company to disclose up front the fact that the company is offering a negative option contract, the cancellation mechanism, the cost of the transaction, the date each charge will be submitted for payment (which often varies by customer), and any

"material" terms, as that undefined term might later be construed. The company also may have to disclose material information related to the underlying service, such as the number and type of cameras installed, the data retention protocols for video captured, the number of security guards, the physical placement of security guards, the policies for guards calling out unexpectedly, and so on. *See* Allstate Decl. ¶¶ 15–18; Custom Alarm Decl. ¶¶ 14–17.

18. If the customer is interacting with the company in person or over the phone, all of these terms must be disclosed vocally—which could lead to customers ending a conversation rather than listening to legalese. If the company provides written offers or promotional materials, customers will become irritated by lengthy, "clear and conspicuous" terms and may walk away from offers rather than struggle to figure out the key terms of a transaction. Allstate Decl. ¶¶ 18–20; Custom Alarm Decl. ¶¶ 17–19. All of these negative effects of the Rule will cause ESA's members to lose customer goodwill.

19. ***Unrecoverable Compliance Costs.*** In addition to lost business and customer goodwill, the Rule imposes substantial and unrecoverable compliance costs on the ESA's members.

20. Some of the Rule is scheduled to take effect on January 14, 2025, with the rest scheduled to take effect May 14, 2025. If the effective date is not stayed, the ESA's members will need to begin a comprehensive review of their subscription

11

plans to determine what additional "material" information must be disclosed in a "clear and conspicuous" manner to comply with the Rule. And because security companies sometimes offer customized subscription plans to customers, companies also will need to immediately begin preparing methods to determine what terms are "material" for any given contract and must be disclosed in a "clear and conspicuous" manner. Allstate Decl. ¶ 22; Custom Alarm Decl. ¶ 21. Because the Rule's definition of "material" is vague, what terms are "material" may vary from customer to customer; for example, the type of motion detector sensor employed may be likely to affect one customer's decisions but not another's. Additionally, many of the ESA's members serve both individual and corporate clients, and what terms are "material" to an individual consumer are often very different from what terms are "material" to a business. This variation will require some security companies to create different sets of disclosures for businesses and individual consumers. For some security companies, this complex analysis will require consulting in-house or outside legal counsel, retraining personnel who prepare customized subscription plans, and hiring additional personnel to help ensure that customized plans comply with the Rule. Allstate Decl. ¶ 23; Custom Alarm Decl. ¶ 22. Many small security companies simply do not have the resources for this review.

21. The requirements for disclosures to be "clear and conspicuous" will cause the ESA's members to incur further unrecoverable costs. Some of the ESA's

Appellate Case: 24-3137    Page: 175    Date Filed: 12/05/2024 Entry ID: 5463205

members will have to redesign their trial plan and subscription offers, webpages, broadcast and print media, and other visual materials to comply with the disclosure requirements. Many security companies will need to retrain salespeople and re-write call scripts to ensure that sufficient information is disclosed in a "clear and conspicuous manner." Allstate Decl. ¶ 23; Custom Alarm Decl. ¶ 22. Security companies also will need to reconfigure their websites and electronic offers to ensure that the required disclosures are unavoidable to customers and that the specific disclosures required by Section 425.4(a)(1)–(4) appear "immediately adjacent to the means of recording the consumer's consent for the Negative Option feature." All of this may involve re-writing contracts and other materials, which will require significant time, money, technical resources, and legal review. Allstate Decl. ¶ 23; Custom Alarm Decl. ¶ 22. Security companies will not be able to recover these costs if the Rule is set aside.

### Sections 425.2–.5's Ban on Certain Information With Promotions or Offers

22. Next, the Rule forbids companies from providing other information—including truthful information—when promoting or offering for sale security services with negative option plans. This restriction on speech poses unique harms on security service companies, which operate in an industry where safety is of paramount importance. This burden on speech would irreparably harm the ESA's

Appellate Case: 24-3137    Page: 176    Date Filed: 12/05/2024 Entry ID: 5463205

members by causing them to lose customers and customer goodwill and incur unrecoverable costs of compliance. *See, e.g.*, Custom Alarm Decl. ¶¶ 25–27.

23. Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures" that the Rule requires. § 425.4(b)(3). Section 424.2, when defining the phrase "clear and conspicuous" for purposes of the disclosure requirements of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication." § 425.2(c)(7). Relatedly, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the negative option feature." § 425.5(a)(2). And Section 425.3 forbids companies from "misrepsent[ing], expressly or by implication, any Material Fact," including both facts about "the Negative Option Feature" and "any other Material fact." § 425.3.

24. ***Loss of Consumer Goodwill.*** The speech prohibitions of Sections 425.2–.5 will irreparably harm ESA's members by causing them to lose business and customer goodwill.

25. The Rule's speech regulation for offers and promotions of security services are unprecedented within the electronic security industry. The ESA's

14

members provide security services on a subscription basis, and the Rule regulates not only offers and promotions of the subscription terms, but also offers and promotions of the underlying services. No other rule or law regulates the advertising of the ESA's members so comprehensively.

26.    As a result of this new regulation, the ESA's members will need to review all of their offers and promotional materials for compliance with a new set of vague standards. For example, the ESA's members will need to review their websites, print materials, broadcast communications, and sales scripts to ensure that nothing "detracts from" or "otherwise undermines the ability of consumers" to "understand" disclosures about both the subscription plans and the underlying security services. *See* Custom Alarm Decl. ¶¶ 25–27. What consumers "understand" from an advertising message is an inherently subjective inquiry that invites disputes and disagreements. The ESA's members also will need to review their promotional communications to ensure that they do not "misrepresent," even "by implication," any "material" fact related to the transaction or underlying service or good. *See* Custom Alarm Decl. ¶¶ 25–27. Any one of these standards will require judgment calls; together, they provide no meaningful standard or limit at all. Any promotional communication by the ESA's members could potentially be covered.

Appellate Case: 24-3137    Page: 178    Date Filed: 12/05/2024 Entry ID: 5463205

27.     Many of ESA's members may conclude—either on their own or on the advice of counsel—that their promotional materials and offers will need to include new warnings and disclosures.

28.     The Rule's threat of monetary penalties "per violation" will severely chill speech.  FTC regulators will claim broad discretion in interpreting and applying their Rule to companies' communications after the fact, and in construing the "per violation" standard for maximum punishment and deterrence.  Faced with this threat, many of ESA's members will forgo ordinary and innocuous promotional communications to minimize their regulatory risk.  Many of ESA's members are small businesses that simply cannot withstand the burdens of a federal investigation and the imposition of monetary penalties.

29.     All of these consequences—increased warnings and disclosures, chilled promotional communications, and increased risk of regulatory scrutiny and enforcement—will harm customer goodwill for the ESA's members.  Customers and potential customers will be deterred by seeing new warnings and disclosures appear in a security company's promotional communications; deterrence is, after all, a significant purpose of warnings and disclosures.   These new warnings and disclosures will cause some of ESA's members to lose customers, or will cause existing customers to pass up promotions due to the attendant warnings.  *See* Custom Alarm Decl. ¶ 26.   The Rule would in essence require the ESA's members to

16

App.179

deprecate their services to their customers and potential customers, leading to potentially dangerous consequences for customers in the electronic security market.

30. ***Unrecoverable Compliance Costs.*** Security companies will incur substantial and unrecoverable compliance costs unless the Rule is stayed pending judicial review. For example, many of ESA's members will need to analyze all the information they provide to customers to determine whether any information "detracts from" or "otherwise undermines" the required disclosures or the ability of consumers to consent to the negative option feature. Allstate Decl. ¶ 28; Custom Alarm Decl. ¶ 27. Many of ESA's members also will need to analyze whether information on their websites or in their promotional materials could conceivably "detract from" or "undermine" disclosures that may be required in any customized negative option plan in the future. Allstate Decl. ¶ 28; Custom Alarm Decl. ¶ 27. And, in many cases, ESA's members will need to design systems to ensure that each customized plan contains the required disclosures, and that those disclosures do not trigger an obligation to remove content in promotional materials or on websites. In light of the Rule's vague and prohibitory terms, these efforts will entail making numerous judgment calls.

31. All of these efforts will take time and resources to complete. Many of ESA's members are small, family-owned businesses that do not have in-house legal and regulatory compliance resources. These companies may need to engage outside

App.180
Appellate Case: 24-3137   Page: 180   Date Filed: 12/05/2024 Entry ID: 5463205

legal counsel, or attempt to undertake the work themselves. Unless the Rule is stayed, many of ESA's members will need to begin devoting resources to this work now to ensure its completion by the Rule's effective date.

### Section 425.5's Consent Requirement

32.     The Rule's consent requirement in Section 425.5 also is causing the ESA's members to suffer irreparable harm from lost customer goodwill and unrecoverable compliance costs.

33.     The new Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." § 425.5(a)(1). Although the Rule does not define either "express informed consent" or "unambiguously affirmative consent," it provides that sellers will be "deemed in compliance with [these requirements] for all written offers . . . if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction." § 425.5(c). The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the negative option feature." *Id.*

18

34. **_Loss of Customer Goodwill._** Section 425.5's consent requirement will irreparably harm the ESA's members by causing them to lose customer goodwill. In particular, by requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires companies to obtain a consumer's consent twice—first, for the negative option feature, and second, for the rest of the transaction. But requiring a customer to consent twice to a single transaction is not how business is usually done. And the Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages—because the Rule simultaneously requires _both_ that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the negative option feature" _and_ that companies disclose material terms unrelated to the negative option feature. §§ 425.4(a), 425.5(c). Many consumers will become confused and frustrated by the need to consent twice, in separate places, to a single transaction, increasing the likelihood that customers will forego the transaction altogether.

35. Many potential customers also will not understand that two separate consents are required for a single transaction and, despite intending to sign up for a security service, provide only one step of consent before leaving the transaction or sending back a security plan contract. For example, some customers will sign only one page of a security plan contract that agrees to the negative option feature, but

19

not the next page that contains the consent required for the actual security services. Customers will then become annoyed if the security service is not initiated because they mistakenly think that they purchased the service—and, if anything should happen to their property in the time it takes to correct that mistake, some customers will blame the company. Even if security companies send notifications to follow up with customers and obtain both required consents, many customers will either disregard such notifications because they mistakenly think they already purchased the service, or become frustrated by the notification and the difficulty of having to consent again to a transaction they feel they already consented to. This will cause some customers to forego the transaction altogether. Allstate Decl. ¶¶ 31–32; Custom Alarm Decl. ¶¶ 30–32.

36. ***Unrecoverable Compliance Costs.*** The ESA's members independently will incur unrecoverable costs in complying with the two-step consent requirement. Most obviously, security companies will need to redesign their offers and contracts to have two separate places for customers to consent to subscription plans, and this work will require substantial time and technical resources. Allstate Decl. ¶ 33; Custom Alarm Decl. ¶ 33. Any security companies selling services in person or over the phone will need to re-write scripts and re-train their salespeople to include separate consent requests. Allstate Decl. ¶ 33; Custom Alarm Decl. ¶ 33. All of this

Appellate Case: 24-3137    Page: 183    Date Filed: 12/05/2024 Entry ID: 5463205

will require security companies to expend time and money today in anticipation of the Rule's effective date unless the Rule is stayed.

**Section 425.6's Simple Cancellation Requirement**

37. Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with negative option features and impeding companies from offering consumers critical information when they seek to cancel such contracts. These requirements will irreparably harm the ESA's members. Those harms will fall on customers, too, because the Rule will prevent the ESA's members from ensuring that their services are not cancelled by malicious actors, and it will limit the ESA's members from offering customers critical safety information when they seek to cancel a subscription plan.

38. Section 425.6 provides that companies offering or promoting security services with negative option features must "provide a simple mechanism for a consumer to cancel the Negative Option Feature and avoid being charged for the good or service." § 425.6(a). When a customer uses that mechanism, the company must "immediately stop any recurring Charges." *Id.* The Rule also provides that the "simple mechanism" to cancel "must be at least as easy to use as the mechanism the consumer used to consent to the negative option feature." § 425.6(b). The Rule then specifies that "[a]t a minimum," the cancellation must be offered "through the same medium the consumer used to consent to the negative option feature." § 425.6(c).

Appellate Case: 24-3137     Page: 184     Date Filed: 12/05/2024 Entry ID: 5463205

It further specifies rules for each medium: "For cancellation by Interactive Electronic Medium," the cancellation mechanism must be "easy to find" and that "[i]n no event shall a consumer be required to interact with a live or virtual representative (such as a chatbot) if the consumer did not do so to consent to the Negative Option Feature." § 425.6(c)(1). "For cancellation by telephone call," the seller must "promptly effectuate cancellations requested by the consumer via a telephone number, and assure that all calls to this number are answered promptly or records messages, made available during normal business hours, and are not more costly to use than the telephone call the consumer used to consent to the Negative Option Feature." § 425.6(c)(2). And "[f]or cancellation of consent obtained in person," the seller must offer, "where practical . . . an in-person method similar to that the consumer used to consent to the negative option feature," with the same requirements for telephone cancellations that are detailed above. *Id.*

39. ***Loss of Customer Goodwill.*** The Rule will cause the ESA's members to lose customer goodwill for several reasons. First, the requirement for a "simple mechanism" to cancel that is "at least as easy to use" as the sign-up mechanism is not defined and thus may not allow security companies to require customers to verify their identities or desire to cancel when trying to cancel a security service. For example, if a security company performed a walk-through of a home or business and then sent the customer a link to a subscription contract that required only

Appellate Case: 24-3137     Page: 185     Date Filed: 12/05/2024 Entry ID: 5463205

electronically signing, the Rule might require a mechanism to cancel that involves only an electronic signature. In that situation, the security company would not be able to require more information to ensure that a malicious third party is not attempting to cancel the service. Nor would the company be able to prevent cancellation of the service by inadvertence or by employees who are not authorized to cancel the service. Allstate Decl. ¶¶ 35–37; Custom Alarm Decl. ¶¶ 35–41.

40.    There are many scenarios where it is vitally important for the ESA's members to perform diligence and require more information before cancelling an electronic security service. This is critical for security services, the very nature of which requires ensuring that only the individuals authorized to cancel the service may cancel. Allstate Decl. ¶¶ 35–37; Custom Alarm Decl. ¶¶ 35–41. If the security service can be cancelled so easily, then the security service would not be secure. Security companies face significant reputational damage and lost customer goodwill if their services are cancelled by anyone other than those authorized to cancel—particularly if any harm befalls a business, home, or other property because of the loss of the security service. Allstate Decl. ¶¶ 35–37; Custom Alarm Decl. ¶¶ 35–41.

41.    Second, the requirement for immediate and simple cancellation will impair companies' ability to provide consumers with vital and beneficial information when they seek to cancel a subscription. If a sign-up mechanism consisted solely of an electronic signature or check box, then companies may not be able to provide

23

customers with information about the effects of cancellation or about potential offers or discounts when they seek to cancel. That restriction is unnecessary and dangerous as applied to the electronic security industry. Customers sometimes attempt to cancel part or all of their security services without being aware of the consequences of cancellation. Allstate Decl. ¶¶ 37–38; Custom Alarm Decl. ¶¶ 38–41. For example, customers may be unaware that an alarm or passcode system will be immediately disabled if they cancel a security service; even businesses may be unaware that video monitoring or interactive security services will immediately cease upon cancellation. Similarly, some customers who have bundled services—such as fire and anti-intruder services—may call to cancel one service and be unaware that cancelling will either also cancel the other services or increase the price of other services. And security companies may wish to offer customers discounted rates if they retain a service that they are seeking to cancel.

42. Security companies may not be able to provide customers with such information or offers if the FTC could construe such information or offers as rendering their cancellation mechanism not "simple" or "as easy to use" as the sign-up mechanism. For example, companies that provide tailored, bundled security services to customers may allow customers to sign-up for such services electronically, yet may need a live representative to examine the consequences of cancellation and explain those consequences to the customer, as well as determine

24

what discounts or offers are available to the customer. Customers who do not then receive any of that information will then become resentful of companies when their security services are unexpectedly terminated, when their bundled services are unexpectedly terminated, or when they learn that other customers received discounts for continuing the service. Allstate Decl. ¶¶ 37–38; Custom Alarm Decl. ¶¶ 38–41. Those risks are acute for security services companies because customers who suffer secondary consequences of a terminated service—such as damage to property—will blame the company, causing both lost goodwill from that customer and negative publicity. Allstate Decl. ¶¶ 37–38; Custom Alarm Decl. ¶¶ 38–41.

43. Security companies accordingly should be permitted to require customers to call them or chat virtually with a live representative in order to cancel a subscription plan, as many companies currently do, regardless of the sign-up mechanism. Such requirements ensure that only people authorized to cancel a security plan may do so, and that an employee of the company can explain the consequences and risks of cancellation. But the Rule prohibits these sensible steps. The result will be increased security risks for customers and lost goodwill for security companies.

44. *Unrecoverable Compliance Costs.* The Rule's cancellation requirements will cause the ESA's members to incur unrecoverable and expensive compliance costs. Security companies will need to expend resources determining

Appellate Case: 24-3137    Page: 188    Date Filed: 12/05/2024 Entry ID: 5463205

what sort of cancellation mechanism is "as simple as" the sign-up mechanism offered. Allstate Decl. ¶¶ 39–40; Custom Alarm Decl. ¶¶ 42–43. If security companies offer tailored security services plans in different ways to different customers, they will also need to design systems to determine what cancellation mechanisms must be offered to which customers.

45. For the actual cancellation mechanism, many security companies will need to re-design their websites, re-write call scripts, and train employees to ensure that they are complying with the Rule's new requirements and restrictions. Allstate Decl. ¶¶ 39–40; Custom Alarm Decl. ¶¶ 42–43.

**The Rule's Recordkeeping Requirements**

46. Finally, the Rule also imposes onerous recordkeeping requirements on companies that promote or offer security services with negative option plans. The Rule requires companies to "[k]eep or maintain verification of the consumer's consent" to a negative option plan and the underlying transaction "for at least three years." § 425.5(a)(3). The Rule allows a company to avoid that requirement if it "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." *Id.*

47. ***Loss of Customer Goodwill.*** These recordkeeping requirements will cause the ESA's members to lose customer goodwill. Many security companies are small businesses and do not have the means to document their website designs and

26

customer intake processes over time.  Moreover, the Rule does not permit companies to avoid the recordkeeping requirement if their customers subscribe to their services over the phone or in person, which is common for the ESA's members.  Many companies will accordingly need to retain additional records about their customers.

48.     There are risks to retaining customers' information, including improper disclosure through hacking, misplaced files, or other means.  Security services in particular must take care to minimize those risks because any improper disclosure of customers' information can threaten their security or lead to the perception that the company cannot adequately secure customers' information or property.  Allstate Decl. ¶¶ 43–44; Custom Alarm Decl. ¶¶ 46–47.  Yet the Rule will require security companies to keep additional records for three years, increasing the risk of improper disclosure.

49.     Even if no improper disclosures occur, security companies will still lose customer goodwill because customers generally dislike knowing that their records are being maintained by a third party, or fear that their privacy will be invaded and their records will be inadvertently disclosed to others.  Allstate Decl. ¶ 44; Custom Alarm Decl. ¶ 47.  Because the Rule requires companies to disclose all material terms about the services offered, security companies may have to disclose that they will keep these additional records, which will only exacerbate customers' dislike and cause a further loss of goodwill.

Appellate Case: 24-3137     Page: 190     Date Filed: 12/05/2024 Entry ID: 5463205

50. ***Unrecoverable Compliance Costs.*** Those requirements also will cause the ESA's members to incur unrecoverable costs. Most obviously, security companies will incur new costs because they will need to design either systems showing that it is technologically impossible for a consumer to subscribe to their services without consenting to the negative option feature of the service, or systems for recording customers' consent to transactions. Either undertaking will involve substantial resources for many companies.

51. Companies that need to keep records will also need to expend resources in physically or electronically maintaining those records. Allstate Decl. ¶¶ 45–47; Custom Alarm Decl. ¶¶ 48–50. Security companies also will need to design security systems or alter their existing security systems to ensure that those records are not improperly disclosed, which will require additional resources. All those costs will grow over time, given that companies will need to keep those records for three years minimum. Keeping records for any extended period of time increases costs because security companies need to update their systems and software, and such updates will require processing old records to maintain them on new systems. And when updating their systems or software, security companies will need to take care to avoid any inadvertent disclosures, including by updating their computer software protections to prevent hacking. All of this will require additional training for

Appellate Case: 24-3137   Page: 191   Date Filed: 12/05/2024 Entry ID: 5463205

employees and additional expenses for the ESA's members.  Allstate Decl. ¶ 46;

Custom Alarm Decl. ¶ 49.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

laws of the United States that the foregoing is true and correct.

DATED: <u>November 27, 2024</u>

29

Appellate Case: 24-3137     Page: 192     Date Filed: 12/05/2024 Entry ID: 5463205

# Doc. 7

Declaration of Randall Renfroe, Allstate
Security Industries, Inc.

# In the United States Court of Appeals
# for the Eighth Circuit

## DECLARATION OF RANDALL RENFROE

I, Randall Renfroe, hereby declare as follows:

1.      I am over the age of 18 and competent to make this declaration.  The statements in this declaration are true and within my personal knowledge.

2.      I am the President of Allstate Security Industries, Inc., which I will refer to herein as "ASI."  My business address is 3433 Plains Boulevard, Amarillo, Texas 79102.  ASI is a member of the Electronic Security Association.

3.      In my position as President of ASI, I am responsible for overseeing all aspects of the company and its operations.  I oversee ASI's advertising and promotions, ASI's award-winning customer service, and ASI's administrative functions and recordkeeping.  I have firsthand knowledge of ASI's operating budget, overhead, and expected costs of implementing changes to ASI's systems and business model.  I also have firsthand knowledge of ASI's actual and expected costs of compliance with legal and regulatory standards.  I am therefore qualified to provide the information in this Declaration regarding ASI's costs of compliance with the Federal Trade Commission's new Rule on Negative Option Marketing (the

1

App.194

"Rule"). Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

4.　Additionally, I personally know many of ASI's customers, in some cases for many years. ASI works tirelessly to serve its customers. ASI is a winner of the 2023 Official Community's Choice Awards: Best of Amarillo. ASI also is one of only 41 alarm companies nationwide recognized by Underwriters Laboratories, Inc. to install, service, monitor, and issue both burglary and fire alarm systems. ASI is proud of its hard-earned reputation for excellence and community service. I am therefore qualified to provide the information in this Declaration regarding the irreparable harm that the Rule will inflict on ASI's customer goodwill.

5.　ASI was established in 1926 in Amarillo, Texas, where its headquarters remain to this day. ASI's name has changed over the years as it has grown, but it has always adhered to its core mission of providing safety and peace of mind to its clients. ASI fulfills that mission today by offering a wide range of services to individuals, families, and businesses in seven states within 400 miles of Amarillo, Texas.

6.　For example, ASI provides security services to homes and businesses. ASI offers a range of packages that include installing, maintaining, and monitoring electronic door looks, digital network cameras, lighting sensors, fire and smoke

2

alarms, and more. ASI also employs a team of highly trained and state-licensed patrol officers ready to respond 24/7 to intrusions. If a home's or business's alarm system is triggered, ASI operators review the trigger to verify an intrusion or fire and then contact emergency services and/or ASI's patrol team for dispatch. This decreases response times and minimizes the risk of property losses or injury to individuals.

7. ASI also offers armed guards or patrols to secure commercial or residential properties or neighborhoods. For example, ASI's patrol officers do drive-bys of businesses or communities, patrol commercial properties and neighborhoods multiple times per day, and maintain a continuous, 24/7 active presence at a commercial properties or neighborhoods. These services deter would-be criminals from breaking into or vandalizing residential or commercial properties and, if any criminal or otherwise unwanted activity occurs, nearby patrol officers can respond quickly. In providing these and other services, ASI's patrol officers have caught 788 alleged burglars over the past 50 years. These services give ASI's customers peace of mind knowing that their home or business has the highest level of security and that a team of highly trained officers is dedicated to their safety.

8. ASI offers a variety of other services, including medical monitoring services that detect falls or allow individuals to trigger medical alerts; systems that monitor properties for toxic gases, water leaks, and extreme temperatures; pet

3

Appellate Case: 24-3137    Page: 196    Date Filed: 12/05/2024 Entry ID: 5463205

cameras that allow owners to ensure that their pets are safe while they are alone; drone surveillance that monitors properties; protections against workplace violence; and more. These services provide owners of homes, businesses, and properties of all varieties enhanced protection and security and peace of mind.

9. For all of these services, ASI strives to maintain its excellent customer service. That includes maintaining an exceptional customer service center, where customers can contact a live representative 24/7, 365 days a year. Customer service is essential for security systems to ensure that customers' questions and concerns are resolved quickly, particularly because customers sometimes call regarding situations that require an immediate response.

10. Almost all of ASI's services are offered through recurring subscription plans, and some are offered through free trial periods.[1] The reason for this is obvious: by their nature, continuing security services require plans that continue and renew indefinitely until the customer cancels. Customers want peace of mind knowing that their security system will be continuous; they do not want the burden of having to renew the security service at set intervals—with the risk of the service being terminated and leaving a property unprotected if the customer forgets to renew on time.

---

[1] I understand that the FTC uses the term "Negative Option Feature" to refer to recurring subscriptions and free trial periods.

4

11.     ASI's subscription plans are tailored to each customer's needs.  The reason for this is also obvious: security services generally are not a one-size-fits-all service.  The security needs of individuals and businesses vary, with different properties requiring different types of protection and varying numbers of cameras, smoke detectors, electronic locks, etc.  Some customers want the extra security of a continuous patrol officer presence; others do not.  ASI accordingly generally requires at least some information from customers before giving them a customized quote for their security needs, and often performs on-site inspections before executing contracts for recurring security plans.

12.     I am familiar with the Rule, which will impose overly broad, unduly burdensome, and vague new legal obligations on ASI.  I believe the Rule is a solution in search of a problem, and it will create problems for business like ASI and its customers.  As I explain below, each part of the Rule will irreparably harm ASI by resulting in a loss of customer goodwill and by forcing ASI to incur substantial and unrecoverable costs of compliance in anticipation of the Rule.

### Section 425.4's Disclosure Requirements

13.     The Rule imposes new disclosure requirements in 15 C.F.R. § 425.4 that will irreparably harm ASI by damaging customer goodwill and forcing ASI to incur substantial costs of compliance that it will be unable to recover.

5

14.  ***Loss of Customer Goodwill.***   Complying with Section 425.4's disclosure requirements will cause ASI to lose customer goodwill, both from potential and current customers.

15.   First, ASI will be compelled to inundate customers with information. The Rule requires ASI to disclose—in a "Clear and Conspicuous" manner—any "Material" information related to the services offered, prior to obtaining the customer's billing information.  But a wide range of terms could be "Material." Therefore, ASI will be forced to guess as to what aspects of its transactions might be considered "Material" to customers.  If ASI makes the wrong judgment and does not disclose terms that are later deemed "Material," ASI could be exposed to FTC enforcement and civil penalties.  *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

16.   For ASI, every customer presents a new and unique set of challenges in determining what to disclose as material.  Disclosures about vital security services may be material to consumers who rely on these services to safeguard life and property in ways that disclosures about a magazine subscription or a gym membership are not similarly important to subscribers.  However, the Rule's vague, one-size-fits-all standard gives no guidance on how electronic security and alarm companies should satisfy the materiality standard, or on what additional details ASI should disclose to its prospective and existing customers.

6

Appellate Case: 24-3137     Page: 199     Date Filed: 12/05/2024 Entry ID: 5463205

17.     Moreover, each security contract that ASI provides is customized. Accordingly, each of these contracts presents a unique combination of features—varieties of electronic monitoring and alarms, cameras, locks, fire alarm options, and real-time, individualized officer monitoring.  Depending on the final package, pricing details will also be set for that particular transaction.  What is material for each client will vary.  ASI has customers ranging from individual homeowners to large, sophisticated businesses.  What is material to an individual customer will often be different than what is material for a sophisticated business.  Under the Rule, ASI will need to evaluate each transaction, service, and bundle, and will disclose the terms material to that customer.  With the high exposure associated with any mistake, ASI will need to disclose every term that could possibly be considered material, even when the customer is a sophisticated business.

18.     One result will be a massive amount of information disclosed in the "Clear and Conspicuous" format required by the Rule.  The effect is analogous to shouting all of the information at the consumer.  If visual, it "must stand out from any accompanying text or other visual elements so that it is easily noticed."  If online, it must be "unavoidable."  It will impose a great deal of information on the consumer with little ability for ASI to even attempt to organize or present the information in order of likely priority that might help consumers digest the information.

App.200

Appellate Case: 24-3137    Page: 200    Date Filed: 12/05/2024 Entry ID: 5463205

19.     Customers will become irritated by lengthy, "clear and conspicuous" terms.  This may harm ASI's customer relationships as the customers may blame ASI for a lack of customer-friendliness when in fact the difficulty arises from the Rule's dictates.  Customers even may walk away from offers rather than struggle to figure out the key terms of a transaction.

20.     ASI also regularly interacts with customers over the phone and often takes customers' billing information over the phone.  In those situations, the Rule will require ASI's employees to disclose all those material terms orally.  These disclosures will take time due to the complex, multi-faceted nature of the kinds of customized security contracts that ASI's customers regularly desire.  Some customers will end a conversation rather than listening to a recitation of all the possible material terms, as required by the government-mandated disclosure provision of this Rule.

21.     ***Unrecoverable Compliance Costs.***  In addition to lost business and customer goodwill, the Rule imposes compliance costs on ASI that ASI cannot recover from the government.  Those costs will need to be borne by ASI or passed along to customers.

22.     Most of the Rule is scheduled to take effect on May 14, 2025.  If the Rule's effective date is not stayed, ASI will need to immediately begin a review of its negative option plans to determine what additional "Material" information must

Appellate Case: 24-3137     Page: 201     Date Filed: 12/05/2024 Entry ID: 5463205

be disclosed in a "Clear and Conspicuous" manner to comply with the Rule. ASI also will need to immediately begin additional review under the Rule to ensure that ASI is correctly and thoroughly identifying what terms are "Material" for any given contract—and which therefore must be disclosed in a "Clear and Conspicuous" manner. As noted above, the contracts that ASI enters with its customers are typically for customized combinations of services and products. What might be material to one customer may not be material to another—for instance, particular technical details about fire alarms, or options for integrating a system of electronic keypad locks into a larger IT environment. For the same reason that the disclosures of all the details that might be "material" will be burdensome to ASI's customers, the identification and enumeration of all the possible material terms will also be burdensome to ASI. Creating and distributing different sets of disclosures to different customers, such as individual customers and sophisticated businesses, will also impose burdens and costs on ASI. ASI will have to pass those costs onto its customers in the form of higher prices.

23. The requirements for disclosures to be "Clear and Conspicuous" will cause ASI to incur further unrecoverable costs. ASI agrees that companies should deal with their customers in clear and fair ways, and ASI always strives to do so. But when the federal government regulates those dealings with vague standards and the threat of steep penalties, even scrupulous and well-meaning companies must

9

reevaluate their communications and practices. As a result of ASI's review of existing operations, ASI may have to redesign its offers, its customer-facing webpages, and possibly other visual materials presented in conjunction with offers in order to make the disclosures required by the terms of the Rule in the format required. ASI also may have to retrain its customer service representatives to ensure that sufficient information is disclosed in the "Clear and Conspicuous" manner required by the Rule. ASI will need to ensure that enumerated disclosures in Section 425.4(a)(1)–(4) appear "immediately adjacent" to the negative option feature. This in turn will require additional analysis. And it may also lead to additional design challenges, depending on how feasible it is to incorporate all the required terms onto a single, legible piece of paper or webpage.

### Sections 425.2–.5's Ban on Certain Information With Promotions or Offers

24.     Next, the Rule restricts ASI from providing other information—even accurate information—when promoting or offering for sale ASI's services with negative option plans. This restriction on communication would irreparably harm ASI. It will cause ASI to lose business and customer goodwill; it will impose on ASI unrecoverable costs of compliance. It also will cause ASI to suffer harm to its constitutional free speech rights.

10

Appellate Case: 24-3137     Page: 203     Date Filed: 12/05/2024 Entry ID: 5463205

25.  **_Loss of Consumer Goodwill._**  The speech regulations in Sections 425.2–.5 will irreparably harm ASI by causing it to lose business and customer goodwill.

26.  The Rule prohibits companies from providing promotional information that "detracts" from disclosures required under the Rule.  That language is broad enough to potentially bar ASI from providing typical and factually accurate language associated with offers or promotions for ASI's services.  Any time ASI makes a positive statement in its promotional materials, ASI will run the risk that someday, a regulator will deem it to have "detract[ed]" from required disclosures.  ASI will be wary of giving out information other than the disclosures that are mandated by the Rule.  Any additional information—even if factual and potentially helpful to potential customers—poses some degree of risk that a regulator could find that the additional information is in some sense a distraction from some mandated disclosure.

27.  The result will be that ASI will be chilled from providing positive and factually accurate information about its products lest such information be found, after the fact, to detract from or undermine any other required disclosures.  Instead, ASI will naturally be compelled to place an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a product or service.  Such customers are more likely to forgo ASI or be dissatisfied

with existing commercial arrangements. ASI will be irreparably harmed by that increased customer alienation.

28. ***Unrecoverable Compliance Costs.*** ASI will incur unrecoverable and substantial compliance costs unless the Rule is stayed pending judicial review. For example, ASI will need to analyze information it provides about its fire alarm services and their sensitivity to smoke levels to discern if this is (a) a material term that *must* be disclosed, or if it might instead be (b) a term that "detracts from" the mandated disclosure of information about the negative option features of the contract. ASI will need to design systems to ensure that each plan contains the required disclosures, and that those disclosures do not trigger an obligation to remove content in promotional materials or on websites. All of this will take time and resources—and those costs will be compounded by the need to ascertain how to comply with the Rule's vague, prohibitory terms. Unless the Rule is stayed, ASI will need to begin this work now to ensure their compliance by the Rule's effective date.

29. ***First Amendment Harms.*** Because the Rule prohibits speech that detracts from the mandatory disclosure, the Rule raises First Amendment problems. The overbroad prohibition on speech and the chilling of truthful speech here violates the First Amendment. This interferes with ASI's First Amendment rights. The harm is irreparable.

12

**Section 425.5's Consent Requirement**

30.     The Rule's consent requirement in Section 425.5 also will cause ASI to suffer irreparable harm from lost customer goodwill, and is already causing unrecoverable compliance costs.

31.     ***Loss of Customer Goodwill.*** The consent requirement in Section 425.5 will irreparably harm ASI by causing it to lose customer goodwill. By requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires companies to obtain a consumer's consent twice—first, for the negative option feature, and second, for the rest of the transaction. And the Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages—because the Rule simultaneously requires both that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the negative option feature" and that companies disclose material terms unrelated to the negative option feature. §§ 425.4(a), 425.5(c). Requiring a customer to consent twice to a single transaction is not how business is usually done. By the time a prospective customer of ASI is ready to sign up for ASI's services, that customer has likely had extensive personalized conversations with ASI's team. ASI team members likely have visited the prospective customer's property and explored the locations for security coverage. At the end of this process, customers will find

13

App.206

it odd for ASI to insist on double consent—one consent to the negative option character of the transaction, and a second consent to the transaction itself. Moreover, the Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages by requiring *both* that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the Negative Option Feature" *and* that that companies disclose material terms unrelated to the negative option feature. § 425.5(c).

32.     The resulting maze of check boxes, consents, and forms likely would confuse customers. A customer may sign one consent form but not the other, thinking that one consent was sufficient—and unaware that, without the second consent, the security arrangements that the customer seeks are not in effect. For customers seeking security arrangements, any period of time during which their properties or businesses are unsecured could have significant implications for the safety of their properties, as well as additional significance for, e.g., their insurance arrangements. Having a multi-step consent process increases the risks of mistakes— attempting to sign up for services but failing to fully consent as required by the counterintuitive Rule. And failures in the signup process—and any window of time in which security services are not in place due to mistakes in the signup—will lead to customer frustration and dissatisfaction with ASI.

33.  ***Unrecoverable  Compliance  Costs.***  ASI  independently  will  incur unrecoverable costs in complying with the two-step consent requirement.  ASI will need to redesign its offer letters, contracts, webpages, and the scripts for in-person and telephone customer service interactions in order to ensure that there are always places  for  two  separate  consents,  one  to  the  contract  itself  and  the  other  to  the negative option character of the contract.  This work will require substantial time and resources to redo all of these forms of customer interaction.  This will require ASI to expend time and money today in anticipation of the Rule's effective date.

### Section 425.6's Simple Cancellation Requirement

34.  Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with negative option features and limits companies' ability to offer consumers  critical  information  when  they  seek  to  cancel  such  contracts.   These requirements irreparably harm ASI.

35.  ***Loss of Customer Goodwill.***  The Rule will cause ASI to lose customer goodwill  for  several  reasons.   The  Rule  requires  that  cancellation  be  easy  and immediately effective.  But this will facilitate erroneous cancellations.  And in the security industry, an erroneous cancellation of security services leaves customers unprotected, which can cause them serious harm.

36.  The  requirement  for  companies  to  "immediately"  cancel  recurring charges may not allow ASI to require customers to verify their identities when trying

15

to cancel a security subscription. The Rule does not define the terms "simple mechanism" and "at least as easy to use," and therefore may prohibit companies from asking for basic information, such as identity verification, when they receive cancellation requests. This creates serious risk of wrongdoers taking advantage of this regulatory environment to cancel security services without authorization. If this happens, it will harm customer goodwill toward ASI.

37. The Rule's requirement for immediate and simple cancellation will impair companies' ability to provide consumers with true, useful, and beneficial information when they seek to cancel a subscription. Customers sometimes seek to cancel subscriptions without being aware of the consequences of cancelling. A customer who seeks to cancel with the idea that next month she will take out a different policy may be unaware that ASI is required to "immediately cancel" the contract upon the customer's request—meaning that the customer would be unprotected in the interim between the cancellation request and the next month when the customer anticipates starting a new subscription with another provider. But explaining this may not be permitted if doing so would make cancellation less "simple" or "easy" than signup had been. As a result, the Rule effectively forbids ASI from explaining this to the customer or seeking to ensure that the customer understands these consequences.

Appellate Case: 24-3137    Page: 209    Date Filed: 12/05/2024 Entry ID: 5463205

38.     Relatedly, a customer may seek to cancel one of a bundle of services they receive from ASI.  But the customer may be unaware of how that one service interacts with other services also purchased from ASI.  For instance, sometimes customers are offered deals when they bundle services—visual camera protection, burglar alarms, fire alarms, electronic keypad access systems, and security officer monitoring.  The discount might be a promotion to encourage additional usage of ASI services.  It might also reflect efficiencies achieved by ASI and passed on to the customer—for instance, it is easier for ASI officers to provide their services when ASI also manages the keypad access system on a given building.  But if a customer sought to cancel one item in the bundle, the cost for another item might be affected.  A customer who decided to change its keypad access system from ASI to an IT provider more directly integrated with its computer systems might not realize that this will lead to increased costs on the part of ASI's continued security officer monitoring.  The Rule's requirement that cancellation be "as easy" as signup may prevent ASI from explaining this to a customer who might call to cancel the one service, unaware of the implications for other costs.  The customer would then be annoyed at the increased cost and ASI would lose goodwill.

39.     ***Unrecoverable Compliance Costs.***     The Rule's cancellation requirements is causing ASI to incur unrecoverable compliance costs and those costs will increase as the Rule's effective date approaches.  ASI will need to expend

Appellate Case: 24-3137     Page: 210     Date Filed: 12/05/2024 Entry ID: 5463205

resources to determine what cancellation mechanism is "as simple as" the sign-up methods normally offered, as required by the Rule. The standard signup process for ASI services involves detailed conversations and consultations. But the final signup stage is simply the creation of a contract. The Rule is ambiguous as to how much of the total process counts when considering whether cancellation is as simple as signup. The process of analyzing the steps of the signup and comparing them against the cancellation process will require expenditures of time and resources.

40. In creating a simple cancellation option, ASI will also have to expend time and resources to implement the simple cancellation mechanism. ASI will review and potentially redesign its customer-facing interactive website pages, redo contract templates, and revise its employee training and the scripts for its customer service representatives. Given that the final stages of signups are often accomplished through in-person or telephone interactions, ASI will also likely have to hire additional personnel to ensure that any cancellation calls and messages, as well as the cancellation itself, are processed "promptly."

41. ***First Amendment Harms.*** The required provision of "simple" cancellation mechanisms that are in the "same medium" and "as easy to use as" sign-up mechanisms will burden ASI's ability to communicate with customers. Coupled with the limitation on making the cancellation process any more complex than signup, the Rule would significantly impede ASI's ability to speak with its

18

customers at the time of a cancellation transaction—a time when there is an important need to communicate information about the consequences of cancellation. The restriction on ASI's communication and speech violates ASI's First Amendment rights and causes immediate and irreparable harm.

**The Rule's Recordkeeping Requirements**

42.      Finally, the Rule also imposes new recordkeeping requirements on ASI. The Rule requires us to "[k]eep or maintain verification of the consumer's consent" to a negative option plan and the underlying transaction "for at least three years." § 425.5(a)(3).  The Rule provides that we can avoid this requirement only if we "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." *Id.*

43.      ***Loss of Customer Goodwill.***  These recordkeeping requirements will cause ASI to lose customer goodwill.  There are always risks to retaining customers' information, including improper disclosure through hacking, misplaced files, or other means.  The longer customer information is retained, the greater the risk that disclosure will take place, whether due to an accidental or malicious security breach. ASI does its best to protect the records of its clients, but all companies face risks from cyber incidents and malign actors.  If there should be any data breach, the reputational consequences are especially pronounced for a security sector business like ASI.  Retaining additional records for three-year periods of time will only

Appellate Case: 24-3137     Page: 212     Date Filed: 12/05/2024 Entry ID: 5463205

increase the risk of improper disclosures of customers' information, increasing the risk of lost customer goodwill because of diminished customer security or the perception thereof.

44.     Even if no improper disclosures occur, ASI will still lose customer goodwill because customers generally do not want their records to be kept and maintained by a company for years. Customers generally dislike having records about them kept by third parties, so knowing that ASI is maintaining such records will harm ASI's customer goodwill. Customers additionally fear that such records will be inadvertently disclosed to others.

45.     ***Unrecoverable Compliance Costs.***     These requirements also are causing ASI to incur unrecoverable costs, and those costs will increase as the Rule's effective date draws near. ASI does not currently record or maintain this type of consumer consent verification that the Rule requires. For cancellations over the internet, ASI will need to redesign software and websites to generate Rule-compliant records of customer consent. For cancellations over the phone or in-person, we will need to train employees and design forms for employees to record consent. ASI also will incur incremental new costs to maintain records of consumers' consent to transactions. Alternatively, we would need to devise new procedures for documenting that our online, telephone, and in-person processes make it technically impossible for any consumer to complete the transaction without consent. This

Appellate Case: 24-3137     Page: 213     Date Filed: 12/05/2024 Entry ID: 5463205

would require implementing new recordkeeping systems and training personnel to maintain the necessary information.

46. ASI also will need to invest in its information technology security systems to safeguard the records that it is required by law to maintain for long periods. It is imperative for ASI's customers—and for the maintenance of ASI's own reputation—that it do its utmost to ensure that those records are not improperly disclosed. ASI would be able to handle much of the work on its internal servers, but it would require an investment in additional hardware. To implement a new system, ASI would likely have to employ additional consultants to make the technology transition.

47. At a time when consumer costs are rising, ASI works hard to keep costs down for its customers. But the compliance costs that the Rule would impose on ASI would force ASI to raise prices to recoup those costs. ASI does not have the ability to absorb those costs itself. These government-mandated costs will ultimately harm our customers, even though our customers have been happy with ASI's subscription plans.

Appellate Case: 24-3137   Page: 214   Date Filed: 12/05/2024 Entry ID: 5463205

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:  Nov. 27, 2024

_____

Appellate Case: 24-3137     Page: 215     Date Filed: 12/05/2024 Entry ID: 5463205

# Doc. 8

Declaration of Lartease Tiffith, Interactive Advertising Bureau

Appellate Case: 24-3137    Page: 216    Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF LARTEASE TIFFITH

I, Lartease Tiffith, hereby declare as follows:

1. I am over the age of 18 and competent to make this declaration. The statements in this declaration are true and within my personal knowledge.

2. I am the Executive Vice President of Public Policy at the Interactive Advertising Bureau (the "IAB"). Founded in 1996 and headquartered in New York City, the IAB represents over 700 leading media companies, brand marketers, agencies, and technology companies that are responsible for selling, delivering, and optimizing digital advertising and marketing campaigns. Together, our members account for 86 percent of online advertising and marketing campaigns. Working with our member companies, the IAB develops both technical standards and best practices for our industry. In addition, the IAB fields critical consumer and market research on interactive advertising, while also educating brands, agencies, and the wider business community on the importance of digital marketing. The organization is committed to professional development and elevating the knowledge, skills, expertise, and diversity of the workforce across the digital advertising and marketing

1

industry.  Not only does the IAB provide legal support for the online advertising industry, it also represents the interests of its members in matters before courts, Congress, and executive agencies.

3.    I have reviewed, and I am familiar with, the Federal Trade Commission's ("FTC") Rule on Negative Option Marketing ("Rule").  Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.  The Rule regulates a broad category of contracts that contain what the FTC calls a "negative option feature."  The Rule defines a "Negative Option Feature" as a contract for goods or services that continue until the consumer cancels the agreement.  § 425.2(f). Businesses and consumers know these types of contracts as recurring or automatically renewing subscriptions.  For purposes of this declaration, I will use the term "subscription plans" when referring to these contracts.

4.    The Rule's provisions apply to companies that engage in the "promoting" or "offering" of any good or service with a negative option feature. Thus, the Rule applies to those companies that market goods or services on behalf of a third party, even when those marketing companies cannot control how the subscription plan is structured.

2

5. Many of the IAB's members are businesses that advertise subscription plans or offer goods and services on a continuing basis through subscription plans. As a result, the Rule directly regulates those members and imposes broad and burdensome new obligations on them. As Executive Vice President of Public Policy at the IAB, I am familiar with how the Rule will irreparably harm many of our member companies, including retailers and publishers. I am also familiar with steps they will need to take before the Rule's effective date, and actions they will need to refrain from taking, to comply with the Rule.

6. One of the IAB's critical functions is to represent its members' interests in matters before the courts, such as the Petition for Review that IAB and other associations have filed. Because the IAB can adequately represent those interests—and has done so in other cases—this Petition for Review does not require the participation of the IAB's individual members.

7. Below, I outline the three irreparable harms our members will suffer as a result of the Rule's broad and vague requirements. *First*, the Rule will irreparably harm customer goodwill by forcing our members to make disclosures and take actions that will confuse, frustrate, and alienate their customers. *Second*, the Rule imposes steep compliance costs on our members, and will require them to redesign their advertising, engineer new customer intake processes, make corresponding changes to their apps and websites, implement new training and staff protocols,

3

obtain legal review and advice, and install new recordkeeping systems, among other things.  Because the actions take time to implement, companies will need to start taking these steps now and would not be able to recover these compliance costs if the Rule is overturned.  As the IAB's expert report explained, more than 100,000 companies will be subject to the Rule, and six of those companies have represented that annual costs of compliance would total at least $50 million for those six companies alone.  The annual costs of compliance across IAB's membership, and the broader economy, would far exceed $100 million.  These costs would ultimately be passed on to consumers.  *Third*, the Rule infringes on the IAB's members' First Amendment right to free speech.  The Rule imposes multiple requirements that either restrain or compel speech—which violates the First Amendment.  Those violations are well-recognized forms of irreparable harm, without any further showing necessary.  All these harms are exacerbated by the Rule's threat of enforcement and civil penalties.

### **The Overbreadth of the FTC's Rule**

8.    Before addressing the specific provision of the Rule, I begin by providing an overview of the Rule's overbroad, one-size-fits-all approach to regulating subscription plans.

9.    The Rule imposes broad new requirements on all companies, including the IAB's members, that not only "offer" goods or services through a subscription

4

plan, but also those "promoting" such goods or services. § 425.3. In general, subscription plans include four types of arrangements: (1) prenotification plans, in which a seller provides periodic notices of goods and then sends the goods to participating consumers absent some action taken to decline the offer (such as book-of-the-month clubs); (2) automatic renewals, where sellers automatically renew a subscription until the consumer cancels or the subscription expires (like newspaper subscriptions); (3) continuity plans, in which consumers agree in advance to receive periodic shipments of goods or services, without prenotification, that continue until the consumer cancels the agreement (such as periodic meal delivery services); and (4) free trial marketing, where consumers receive goods or services for free for a trial period, after which the seller begins charging a fee unless the consumer cancels. Prior to amendment, the Negative Option Rule regulated only prenotification plans. *See* 16 C.F.R. § 425.1.

10. The new Rule sweeps far beyond the FTC's prior regulation and includes all types of subscription plans across the entire economy, regardless of the product or service offered or promoted. The covered subscription plans include, for example, contracts for home security services, prepared food deliveries, medical monitoring services, health and fitness club memberships, cable subscriptions, internet broadband, interstate lawn cutting services, utility services, retail clubs, home insurance, car insurance, other forms of insurance, car wash subscriptions,

video game subscriptions and services—and much more. The only common feature of these widely varied products and services is the manner in which companies offer or provide them to customers through subscription plans.

11. Indeed, the Rule regulates subscription plans not only between consumers and businesses, but also between businesses. For example, the Rule regulates subscription plans between businesses for food services, technology support, cleaning services, shipping needs, advertising, office supplies, and payment processing—to name just a few examples. Thus, the Rule is unique in the overbroad way it regulates countless commercial arrangements that are common throughout the economy, regardless of whether they are carried out though e-commerce, the mails, by telephone, or in person.

12. In contrast to the Rule's overbreadth, Congress has enacted far more limited laws to regulate subscription plans in only certain defined contexts.[1]

---

[1] For example, the Restore Online Shoppers' Confidence Act ("ROSCA") provides certain requirements for subscription plans over the internet. *See* 15 U.S.C. § 8403. The Unordered Merchandise Statute provides that mailing unordered merchandise is an unfair trade practice, 39 U.S.C. § 3009(a), and the Electronic Fund Transfer Act ("EFTA") forbids sellers from imposing recurring charges on a consumer's debit card or bank account without written consent, 15 U.S.C. § 1693c. The Telemarketing and Consumer Fraud and Abuse Prevention Act required the FTC to promulgate the Telemarketing Sales Rule, which in part regulates telemarketing of subscription plans. *See* 15 U.S.C. §§ 6101–6108; 16 C.F.R. § 310. And most recently, the Infra-structure Investment and Jobs Act of 2021 directed the Federal Communications Commission to regulate trial period subscription plans offered by broadband providers. *See* Pub. L. 117-58, § 60504(a)–(b), 135 Stat. 429, 1244 (2021) (requiring a "broadband consumer label" that shall disclose "whether the offered

Appellate Case: 24-3137    Page: 222    Date Filed: 12/05/2024 Entry ID: 5463205

Companies have structured their subscription plan offers, promotions, and business affairs in reliance on those laws.

13. The FTC's new Rule goes beyond any statutory regulation of subscription plans. The Rule regulates subscription plans regardless of the product or service, regardless of the sophistication of the parties, and regardless of the medium of commerce. Not only that, but the Rule regulates even the advertising of these products and services if they will be offered through a subscription plan. The Rule accordingly is an unprecedented federal regulation of subscription plans across the economy. As such, its new requirements will impose outsized burdens on the IAB's members that use these contracts, and in particular small companies that offer such plans.

**Section 425.4's Disclosure Requirements**

14. The Rule's disclosure requirements will cause our members to lose customer goodwill and incur irreparable compliance costs.

15. Section 425.4 of the Rule requires anyone "offering" or "promoting" goods or services through a subscription plan to broadly "disclose . . . prior to obtaining the consumer's Billing Information, all Material terms, regardless of whether those terms directly relate to the Negative Option Feature." § 425.4(a).

---

price is an introductory rate and, if so, the price the consumer will be required to pay following the introductory period"). All of these statutes regulate or authorize the regulation of subscription plans only in specified contexts.

7

Those disclosures must include, but are not limited to, the fact of the subscription plan, the deadline by which the consumer must act to stop all charges, the amount and frequency of the charges, and any information necessary to cancel the subscription plan. § 425.4(a)(1)–(4). The disclosures are required before obtaining a customer's billing information in connection with both "offering or promoting for sale any good or service." with subscription plans. § 425.4(a).

16.    Despite the broad disclosures, the Rule fails to specify what information companies must disclose. The Rule supplies examples, but they are non-exhaustive. Still, the Rule purports to regulate "all Material terms" and only offers a vague definition of "Material" as that which is "likely to affect a person's choice of, or conduct regarding, goods or services." § 425.2(e). The required disclosures are not limited to the subscription plan itself; in fact, the Rule explicitly states that companies must disclose "all material terms "regardless of whether those terms directly relate to the Negative Option Feature." § 425.4(a). Therefore, the Rule compels all companies to make broad disclosures about the services or products they advertise or offer—regardless of whether those disclosures are related to the subscription plans—simply because those companies advertise or offer the products through subscription plans. The Rule's practical effect is to require companies across the economy to make new and burdensome disclosures about goods and services that have nothing to do with the subscription plans.

8

17.     In addition, Section 425.4 requires that these disclosures be "Clear and Conspicuous." § 425.4(b)(1). The Rule defines that phrase to mean "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers." § 425.5(c). Among other things, the disclosures must: (i) "stand out from any accompanying text" if made through visual means; (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it" if made audibly; and (iii) be "unavoidable" if made through electronic means. § 425.2(c)(2)–(4). Moreover, any disclosures required by Section 424.4(a)(1)–(4) "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature," and all disclosures "must appear before obtaining the consent" of the consumer to the negative option feature. § 425.2(b)(i)–(ii). The Rule, therefore, not only requires the disclosure of an extensive amount of information, but also compels companies to communicate that information in unique and highly regulated ways.

18.     **Loss of Customer Goodwill.** Complying with Section 425.4's disclosure requirements will cause the IAB's members to lose the goodwill of their potential and existing customers.

19.     First, companies will be compelled to inundate potential customers with information related to the goods or services offered, including information that has no relation to the subscription plan, simply because the good or service is promoted

9

or offered with a subscription plan. The Rule offers no real guidance on what constitutes a "Material term[]," leaving companies to guess as to what disclosures might be "likely to affect a person's choice of, or conduct regarding, goods or services"—Section 425.2(e)—an ambiguity that leaves discretion to regulators to conjure a definition after the fact. If companies guess wrong and do not disclose terms that are later deemed "Material," companies could face the prospect of FTC enforcement and civil penalties of up to $51,744 per violation. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024). And even apart from FTC enforcement actions, private plaintiffs might attempt to use the Rule's new requirements to support individual or class action lawsuits against companies that they accuse of violating state law premised on alleged infractions of the Rule. Even if such lawsuits are completely meritless, defending against them will prove costly to companies. Those costs ultimately will be passed on to consumers.

20. The natural result of the threat of penalties for under-disclosure will be that companies over-disclose the terms of their products and services (or simply forgo auto-renew subscription plans altogether). Straightforward transactions and offers will become bogged down in disclosures. For example, a fashion company operating in multiple states offering services on a continuing basis subject to cancellation by the customer would be subject to the Rule. The Rule would require

10

Appellate Case: 24-3137     Page: 226     Date Filed: 12/05/2024 Entry ID: 5463205

the company to disclose up front the fact that the company is offering a subscription plan, specific instructions for cancellation, the date each charge will be submitted for payment (which might vary by customer), and any other "material" terms, as that undefined term might later be construed. This would be quite difficult for even the largest businesses to determine individually for each customer. Depending on the service, the company might also have to disclose other terms, such as where the apparel is made, the type of materials used, how to care for the items, the company's sustainability efforts, and so on.

21. While some consumers may wish to have such detailed information about the transaction, many do not wish to review or digest such voluminous disclosures and prefer more efficient sign-up procedures. Many consumers will be unable to identify the most important terms of a transaction. They will become irritated by such extensive disclosures and decline to enter transactions rather than try to understand the information disclosed. And the more a company discloses to comply with the Rule's indefinite materiality standard, the more consumers it will irritate and lose. Under the Rule, companies will be caught between a rock and a hard place. Companies that disclose too much will lose the most customer goodwill. And those that disclose too little will risk enforcement proceedings and civil penalties.

11

22.     The "Clear and Conspicuous" requirement is another vaguely defined and subjective term with punitive consequences.  To avoid enforcement and penalties, companies will need to incorporate these disclosures into their customer-facing communications, including their advertising.  Such disclosures will clutter companies' messaging and detract from the underlying offers.  That clutter will further confuse, irritate, and alienate customers, resulting in loss of business and customer goodwill.

23.     The disclosure requirements of Section 425.4 do not exempt promotions and offers made verbally—either by telephone or in person.  For such verbal offers and promotions, the required disclosures will significantly interfere with customer-facing communications.  Many customers will become frustrated both by the amount of time that the verbal disclosures take and by having to listen to the oral analogue of "lawyers' fine print"—whether provided by a human or an answering machine.  Many customers will terminate the conversation or phone call rather than listen to these extensive, unwanted, and unnecessary disclosures.  The result for the IAB's members will be customer alienation and lost business.

24.     **Unrecoverable Compliance Costs.**  In addition to lost business and customer goodwill, the Rule imposes unrecoverable compliance costs on the IAB's members, which will ultimately be passed on to consumers.

Appellate Case: 24-3137     Page: 228     Date Filed: 12/05/2024 Entry ID: 5463205

25.     Section 425.4 of the Rule will take effect in 180 days from publication of the Rule.  If that effective date is not stayed, companies will need to immediately review their existing consumer experiences to assess and analyze what additional "Material" information must be disclosed to comply with the Rule.  Because the Rule's standard for disclosures is so broad and vague, that review will require companies to immediately analyze all aspects of not just their offerings but also their advertising of goods or services to determine what counts as a material term of the transaction so that they can ensure that those terms are disclosed—all this with the specter of civil penalties now hanging over them.  For many companies, this analysis will require consulting in-house or outside legal counsel, for companies large enough to afford that.

26.     The requirements for disclosures to be "Clear and Conspicuous" will also cause companies to incur further unrecoverable costs.  Companies will have to redesign their webpages, broadcast and print media, and other visual advertisements to comply with the disclosure requirements.  For example, many companies will need to reconfigure their websites to ensure that the required disclosures are "unavoidable" to customers.  § 425.2(c)(4).  Some companies will need to purchase additional advertising space or print additional materials to set out the required disclosures in a sufficiently large font to "stand out from any accompanying text" to satisfy the "Clear and Conspicuous" requirement.  § 425.2(c)(2).  For verbal

13

Appellate Case: 24-3137     Page: 229     Date Filed: 12/05/2024 Entry ID: 5463205

promotions and offers, companies will have to retrain salespeople and re-write call scripts. § 425.2(c)(3). All of this will require significant time, money, technical resources, and legal review. These requirements will stifle innovation by requiring all companies to provide disclosures in the same manner, preventing them from determining the best ways to provide appropriate disclosures to their customers for their unique goods or services.

27.     To justify the significant burdens that the Rule places on companies, the Commission has noted that some states already have rules regarding subscription plans. Yet none of these state-level rules imposes the type and magnitude of burdens on companies that the FTC's Rule does. Many states do not regulate subscription plans separately from their regulation of contracts generally. Even states with additional regulations on subscription plans overwhelmingly require only a specific list of enumerated disclosures.[2] Very few states require companies to disclose terms *unrelated* to the subscription plan. And although some of those states also specify that these more specific and targeted disclosures must be "clear and conspicuous,"

---

[2] *See* Cal. Bus. & Prof. Code § 17601; Colo. Rev. Stat. § 6-1-732; Conn. Gen. Stat. § 42-126b; Del. Code Ann. tit. 6, § 2732; D.C. Code § 27A-202; Fla. Stat. § 501.165; Ga. Code Ann. § 13-12-3; Haw. Rev. Stat. § 481-9.5; Idaho Code § 48-603G; 815 Ill. Comp. Stat. 601/1–601/20; Ky. Rev. Stat. Ann. § 367.580; La. Stat. Ann. § 9:2716; Me. Rev. Stat. tit. 10, § 1210; N.J. Stat. Ann. § 56:12-95.5; N.M. Code R. § 12.2.11.1; N.Y. Gen. Oblig. Law § 5-903(2); N.C. Gen. Stat. § 75-41; Va. Code Ann. § 59.1-207.45.

Appellate Case: 24-3137     Page: 230     Date Filed: 12/05/2024 Entry ID: 5463205

some do not define that term,[3] while others define it in a way that is far less complex and burdensome than the Rule.[4]  I am not aware of any states that require disclosures to appear "immediately adjacent" to the subscription plan terms or be "unavoidable" if made online.

28.    Ultimately, companies will pass these compliance costs on to consumers in the form of increased prices for goods and services and decreased offerings.

### Sections 425.2–.5's Ban on Certain Information With Promotions or Offers

29.    Next, the Rule forbids companies from providing other information—including truthful information—when promoting or offering for sale goods or services with subscription plans.  This regulatory gag order would irreparably harm the IAB's members by causing them to lose business and customer goodwill, incur unrecoverable costs of compliance, and suffer harms to their constitutional right to free speech under the First Amendment.

30.    Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines

---

[3] *See, e.g.*, Conn. Gen. Stat. § 42-126b; Fla. Stat. § 501.165; Ga. Code Ann. § 13-12-2; Idaho Code § 48-603G.

[4] *See, e.g.*, Ohio Admin. Code 109:4-3-04 ("close proximity with the offer"); Utah Code Ann. § 15-10-201 ("prominently displayed on the first page of a monthly statement").

Appellate Case: 24-3137     Page: 231     Date Filed: 12/05/2024 Entry ID: 5463205

the ability of consumers to read, hear, see, or otherwise understand the disclosures" required by the Rule. § 425.4(b)(3). Section 425.2, when defining the phrase "Clear and Conspicuous" for purposes of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication." § 425.2(c)(7). Relatedly, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature." § 425.5(a)(2). And Section 425.3 forbids companies from "misrepresent[ing], expressly or by implication, any Material fact," not only facts about "the Negative Option Feature" but "any other Material fact." § 425.3.

31. **Loss of Consumer Goodwill.** The speech prohibitions of Sections 425.2–425.5 will irreparably harm companies by causing them to lose business and customer goodwill. As an initial matter, that prohibitory language is broad enough to potentially bar companies from providing accurate information about their products or services if such information would be distracting or inconsistent with other required disclosures. For example, if an advertising company agrees to promote another company's technology support services, an overzealous regulator might determine that the advertising company cannot promote the services as "reliable" or "helps increase computer processing speeds." The regulator might

16

App.232

determine that such information would "distract from" or be "inconsistent with" required disclosures regarding the potential for ineffective services. Regulators could likewise determine that truthful testimonials about other customers' positive experiences with a product or service are distracting or confusing to consumers. The result will be that companies are chilled from providing positive and useful information about their products lest such information be found, after the fact, to detract from or undermine any other required disclosures.

32. Companies could also be prevented from providing consumers with typical language associated with offers or promotions for goods or services, such as ordinary and immaterial assurances. For example, a regulator might determine that the above advertising company offering marketing services cannot describe its product as "efficient" or "creative" if doing so would "distract from" or be "inconsistent" with the disclosure of hacking risks, or would "misrepresent" those hacking risks "by implication."

33. These prohibitions accordingly will chill companies from providing advertising services to other companies because, by providing such advertising services, companies may expose themselves to liability for information and disclosures it has little control over. Doing so will only hinder innovation in advertising.

17

34.     These prohibitions will similarly lead to companies placing an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a product or service.  Such customers are more likely to forgo commercial transactions or be dissatisfied with existing commercial arrangements.  The IAB's members will be irreparably harmed by that increased customer alienation.

35.     **Unrecoverable Compliance Costs.**  The Rule's prohibitions also contain vague terms that will increase companies' compliance costs.  For example, companies will need to analyze all the information they provide to customers to determine whether any information "detracts from" or "otherwise undermines" the required disclosures or the ability of consumers to consent to the subscription plan. Companies will expend more resources trying to ascertain the types of information covered by these vague, prohibitory terms.  Companies offering advertising services for third parties will need to expend resources reviewing each advertisement for potentially misleading information, which will prove particularly difficult when companies lack knowledge about the underlying good or service.  The uncertainty will lead to overdeterrence, as companies avoid making lawful statements or offering advertising services altogether for fear that the FTC will later give a broad construction to these vague terms.  And unless the Rule is stayed, companies will need to begin this work now to ensure their compliance by the Rule's effective date.

18

36.     Those costs of compliance are directly traceable to the Rule.  As far as I am aware, no state or federal statute specifically forbids companies that offer or promote subscription plans from communicating truthful information that "detracts from" other required disclosures or "interferes with" consumers' ability to understand disclosures.

37.     **First Amendment Harms.**  By prohibiting our members from communicating truthful information to their consumers, the Rule violates their right to free speech under the First Amendment.  These harms are irreparable.

### Section 425.5's Consent Requirement

38.     The Rule's consent requirement in Section 425.5 also is causing the IAB's members to suffer irreparable harm from lost customer goodwill and unrecoverable compliance costs.

39.     Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction."   § 425.5(a)(1) (emphasis added). Although the Rule does not define either "express informed consent" or "unambiguously affirmative consent," it provides that sellers will be "deemed in compliance with [the requirement to obtain consent] if that seller obtains the required consent through a check box, signature, or other substantially similar method, which

19

the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction." § 425.5(c). The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature." *Id.*

40.　**Loss of Customer Goodwill.** Section 425.5's consent requirement will irreparably harm the IAB's members by causing them to lose customer goodwill. Most obviously, by requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires a customer to consent twice to a single transaction—once for the negative option feature, and once for the transaction itself. But that is not how business is usually done. Many consumers will become confused and frustrated by the need to consent twice to a single transaction, increasing the likelihood that customers will forgo the transaction altogether rather than deal with a two-step transaction.

41.　Customers also will be confused by the Rule's requirement for the "consent request" to be "free of any information not directly related to the consumer's acceptance of the negative option feature." The Rule elsewhere requires companies to disclose all material terms of the transaction even if they are unrelated to the subscription plan. To comply with both requirements, companies may have to place the two consent requests on different pieces of paper or webpages—one for

20

the subscription plan, and one for the transaction itself. Doing so will make the sign-up process more cumbersome and frustrating for consumers.

42. Many consumers also will not understand that two separate consents are required for a single transaction and, despite intending to purchase a good or service, provide only one step of consent before leaving the transaction. For example, if consumers must navigate one webpage to consent to a subscription plan and then navigate a second webpage to purchase the good or service, some consumers will stop at the first webpage and think that their initial consent is sufficient to purchase the good or service. If a customer does not separately consent to the auto-renew feature, the company will stop providing services at the end of the initial period, whether or not that was the customer's intention. Consumers will then become irritated with the company when their service is interrupted, and the consumer irritation could lead to loss of goodwill through word-of-mouth or negative online reviews. To mitigate this loss of customer goodwill, companies will need to re-enroll customers and potentially provide services on a grace period—an out-of-pocket cost that I discuss below. All of this is burdensome, both for the company and for the customer, and the burden is unnecessary because the auto-renew feature was designed to make service continuous and uninterrupted.

43. **Unrecoverable Compliance Costs.** The IAB's members independently will incur unrecoverable costs in complying with the consent

21

requirement. Companies selling goods or services online will have to redesign their webpages to have two separate places for customers to consent to subscription plans, and this work will require substantial time and technical resources. Businesses offering goods or services with subscription plans to other businesses will have to re-write their contracts and obtain lawyer review. Companies selling goods or services with subscription features in person or over the phone will need to re-write scripts and re-train their salespeople to include separate consent requests. All of this will require companies to expend time and money today in anticipation of the Rule's effective date unless the Rule is stayed.

44. Furthermore, as noted above, the confusion stemming from the Rule's consent requirement will lead to interrupted service and unmet customer expectations. This too will impose real costs on companies after the Rule takes effect. When an existing customer's service is interrupted, the company must engage with the customer to restore that customer's service and potentially to cover any gaps in service as a goodwill gesture. For example, customers who expect to receive their magazine subscription may become frustrated when the latest issues are not delivered to them. The magazine would, in turn, as a gesture of goodwill, supply any missed issues free of charge to that customer. The magazine might also offer an additional issue free of charge to reenroll the customer. Re-enrolling a customer whose service was interrupted is comparable in cost and burden to enrolling a new

App.238

Appellate Case: 24-3137    Page: 238    Date Filed: 12/05/2024 Entry ID: 5463205

customer in the first instance. The cost of re-enrolling customers far exceeds the cost to companies of maintaining existing customers, which can be done easily and efficiently through auto-renew subscriptions. When customers' service is interrupted, it is often necessary for companies to provide a grace period during which they provide the service for free or at a discount to maintain good customer relations while customers re-enroll in the service. Thus, the Rule's separate consent requirement will impose real, out-of-pocket expenses on regulated companies subscription plans.

45. That some states regulate subscription plans does not lessen the Rule's burdens. Only 12 states have statutes that impose any consent requirement specifically for subscription plans.[5] And I am aware of only one state—Vermont— that even arguably requires companies to obtain consent for the subscription plan *separately* from the rest of the contract. And even Vermont, unlike the Rule, does not have conflicting disclosure requirements that arguably necessitate separate webpages or pieces of paper for the consent. *See* 9 Vt. Stat. Ann. § 2454.

---

[5] *See* Alaska Stat. § 45.45.920; Cal. Bus. & Prof. Code § 17601; Haw. Rev. Stat. § 481-9.5; 815 Ill. Comp. Stat. 601/1–601/20; Ky. Rev. Stat. Ann. § 367.580; La. Stat. Ann. § 9:2716; Mich. Comp. Laws § 445.903; N.M. Code R. § 12.2.11.1; N.D. Cent. Code § 51-37-01; Or. Rev. Stat. § 646A.292; Tenn. Code Ann. § 47-18-133; Va. Code Ann. § 59.1-207.45.

App.239

Appellate Case: 24-3137    Page: 239    Date Filed: 12/05/2024 Entry ID: 5463205

## Section 425.6's Simple Cancellation Requirement

46.     Section 425.6 of the Rule regulates how consumers and businesses may cancel subscription plans and requires companies to "immediately stop any recurring Charges." § 425.6(a).  These requirements irreparably harm the IAB's members.

47.     Section 425.6 provides that companies offering or promoting goods or services with subscription plans must "provide a simple mechanism for a consumer to cancel the Negative Option Feature" and "avoid being Charged . . . for the good or service." § 425.6(a).  When a customer attempts to cancel a recurring subscription, the company must "immediately stop any recurring Charges." *Id.*  The Rule also provides that the "simple mechanism" to cancel "must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature." § 425.6(b).  The Rule then specifies that "[a]t a minimum," the cancellation must be offered "through the same medium the consumer used to consent to the Negative Option Feature." § 425.6(c).  It further specifies rules for each medium: "For cancellation by Interactive Electronic Media," the cancellation mechanism must be "easy to find." § 425.6(c)(1).  "For cancellation by telephone," the seller must "promptly effectuate cancellations requested by the consumer via a telephone number that is answered or records messages, made available during normal business hours, and not more costly to use than the telephone call the consumer used to consent." § 425.6(c)(2).  And "[f]or cancellation of consent obtained in person"

24

the seller must offer "cancellation . . . via an in-person method similar to that the consumer used to consent to the Negative Option Feature" and also "must offer the simple mechanism through in Interactive Electronic Medium" or by "providing a telephone number" with the same requirements provided above. § 425.6(c)(3).

48. **Loss of Customer Goodwill.** The Rule will cause companies to lose customer goodwill for several reasons. *First*, the requirement for companies to "immediately" cancel recurring charges may not allow companies to require customers to verify their identities when trying to cancel a good or service. The Rule does not define the terms "simple mechanism" and "at least as easy to use," and therefore may prohibit companies from asking for even basic information, such as identity verification, when they receive cancellation requests. This will result in some instances in companies erroneously canceling services that the actual customer did not want to cancel, leading to consumer irritation and dissatisfaction. It could also have potentially significant safety and security ramification for some of our members' customers.

49. *Second*, customers sometimes accidentally cancel subscription plans for goods or services because of confusion or simple inadvertence. The Rule does not permit companies to protect customers against such inadvertent cancellations. Customers who accidentally cancel subscription plans—for example, by accidentally clicking on a hyperlink—may become irritated with sellers and service

Appellate Case: 24-3137    Page: 241    Date Filed: 12/05/2024 Entry ID: 5463205

providers, particularly if the good or service is used daily (such as internet broadband, cable, medical monitoring, or news media). The immediate and dramatic consequences of inadvertent cancellation will alienate customers and cause loss of goodwill.

50.     Third, the Rule will prevent companies from offering customers better deals because it requires companies to "immediately stop any recurring Charges." § 425.6(a). Many consumers expect to haggle with their service providers over the price of renewing a subscription plan. In many cases, customers are happy to retain a subscription plan if the company offers a lower price, a bundling of goods or services, or a higher quality good or service. But a requirement to immediately cancel a subscription plan will prevent companies from successfully offering these deals to their consumers. This is not in anyone's interest, least of all the customer who misses out on obtaining a better deal through an exchange with his or her service provider. The result will be a loss of goodwill from consumers, and a lost opportunity for companies to retain customers through better offers and extended promotions.

51.     All of these effects are an unfortunate return to the past. To meet modern customer expectations, companies must have flexibility to innovate best practices for auto-renewals and subscription cancellation. Companies are best positioned to know their own industries and customer bases, and to balance the need

26

for easy cancellation with the need to ensure that goods or services are cancelled only after a customer voluntarily and knowingly cancels. The Rule will stifle that innovation, harming companies and consumers alike.

52. **Unrecoverable Compliance Costs.** The Rule's cancellation requirements independently will cause companies to incur unrecoverable compliance costs. Many companies will need to re-design their websites, re-write call scripts, and train employees to ensure that they are complying with the Rule's new requirements. Companies also will need to hire additional staff to ensure that any cancellation calls or messages are answered and processed "promptly," and to cancel the subscription plan itself.

53. Complying with these requirements will be extremely difficult. Companies' call centers are sometimes inundated with calls by happenstance. Ensuring that all calls and messages are processed "promptly," as the Rule requires, may require unnecessarily staffing call centers to prepare for the single busiest day of the year. Similarly, ensuring that calls to cancel are "not more costly" than the call to accept an offer may depend on factors beyond the company's control, including whether the consumer has switched telephone providers or services. And the requirements that an Interactive Electronic Medium mechanism to cancel must be "as simple as" the mechanism used to purchase the good or service will hinder companies' ability to update their websites. Additionally, companies will need to

27

plan for the loss of customers' ability to haggle over the price of renewing an existing service. A "one-click" cancel mechanism necessarily means that many companies will have to expend new resources to re-acquire customers who would have maintained their service if they had an opportunity to negotiate a renewal price. The cost of re-acquiring a customer is comparable to the cost of acquiring a first-time customer, and exceeds the cost of maintaining an existing customer by many multiples.

54. That some states already regulate the cancellation mechanisms for subscription plans does not mitigate these harms. I am aware of only fifteen states that regulate cancellation mechanisms.[6] Many companies do not operate in those states, even over the internet. Those companies thus will face new regulations for cancellation mechanisms. Even companies that operate in those states will face new burdens from the Commission's Rule.

55. **The Rule's Recordkeeping Requirements.** Finally, the Rule also imposes an onerous recordkeeping requirement on companies that promote or offer subscription plans. The Rule requires companies to "[k]eep or maintain verification

---

[6] Cal. Bus. & Prof. Code § 17600; Colo. Rev. Stat. § 6-1-732; Del. Code Ann. tit. 6, § 2731; Fla. Stat. § 501.165; Haw. Rev. Stat. § 481-9.5; Idaho Code § 48-603G; 815 Ill. Comp. Stat. 601/1; Ky. Rev. Stat. Ann. § 367.580; Me. Rev. Stat. tit. 10, § 1210; N.J. Stat. Ann. § 56:12-95.5; N.D. Cent. Code § 51-37-01; Or. Rev. Stat. § 646A.292; Tenn. Code Ann. § 47-18-133; 9 Vt. Stat. Ann. tit. 9, § 2454a; Va. Code Ann. § 59.1-207.45.

of the consumer's consent for at least three years." § 425.5(a)(3). The only way companies could avoid this requirement is if they can demonstrate "by a preponderance of the evidence" that they "use[] processes ensuring no consumer can technologically complete the transaction without consent." *Id.* The Rule imposes this requirement even for consumers that back out of their subscription plans.

56. **Loss of Customer Goodwill.** By requiring companies to retain consumer records, the Rule increases the risks inherent in retaining customer's information, which will result in companies losing customer goodwill. Consumers generally dislike knowing that companies are maintaining their records, both because they dislike having records about them kept by third parties and because they fear that such records will be inadvertently disclosed to others. And this is especially the case when the consumer is no longer a customer of the company that is keeping records on him. Each additional record that companies must retain only heightens that dislike—and, because the Rule requires companies to disclose all material terms about the goods or services offered, some companies may have to disclose that they will be keeping these additional records, which may put off customers and lead to an even greater loss of customer goodwill.

57. Relatedly, each additional record that a company retains about their customers raises the risks that those records are inadvertently disclosed, either through hacking, misplacing files, or other means. When such inadvertent

App.245

Appellate Case: 24-3137    Page: 245    Date Filed: 12/05/2024 Entry ID: 5463205

disclosures occur, companies are usually required to notify affected parties, which generates negative press and leads to further losses of customer goodwill.

58. **Unrecoverable Compliance Costs.** Those requirements also will cause companies to incur unrecoverable compliance costs. Most obviously, companies will incur new costs of creating and keeping records of consumers' consent, which will require additional computer storage or physical storage space, as well as security to safeguard the records from hacking or physical theft. Companies also will need to devote employees' time to creating and keeping those records, and companies will need to design systems for recording consent and filing those records properly. For cancellations over the internet, that will require re-designing software and websites to record consent; for cancellations over the phone or in-person, that will require training employees and designing forms for employees to record consent. Alternatively, companies would need to devise new procedures for documenting that their online, telephone, and in-person processes make it technically impossible for any consumer to complete the transaction without consent. This would require implementing new recordkeeping systems and training personnel to maintain the necessary information.

59. All those costs will grow over time, given that companies will need to keep those records for each new consumer for three years minimum. Keeping records for such an extended period of time increases costs because companies need

Appellate Case: 24-3137    Page: 246    Date Filed: 12/05/2024 Entry ID: 5463205

to update their systems and software, and such updates will require processing old records to maintain them on new systems. And when updating their systems or software, companies will need to take care to avoid any inadvertent disclosures, including by updating their computer software protections to prevent hacking. All of this will require additional training for employees and additional expenses for companies.

60. Moreover, companies that try to abide by the Rule's exception to this requirement will be stifled in their ability to innovate. Companies will be afraid to update their technology that allows consumers to "complete the transaction without consent," out of fear that they would not be able to make the "preponderance of the evidence" showing that no consumer could sign up without consenting. As far as I am aware, no state requires companies to keep records of consumers' consent to subscription plans or their consent to receive a "save."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:

11/26/2024

*Lartease Tiffith*

# Doc. 9

Declaration of Joni Lupovitz, NCTA –
The Internet & Television Association

Appellate Case: 24-3137    Page: 248    Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF JONI LUPOVITZ

I, Joni Lupovitz, hereby declare as follows:

1. I am Vice President & Associate General Counsel at NCTA – The Internet & Television Association ("NCTA"). NCTA is the principal trade association for the U.S. cable industry. NCTA's members include cable operators providing broadband, video, and voice services in all 50 states, including Cox Communications, Inc. NCTA also represents entities providing both video programming services over traditional "cable TV" channels and streaming video services over the internet. My role at NCTA requires me to develop a general understanding of the operations of and regulatory compliance measures taken by NCTA's member companies. Accordingly, I routinely confer with and provide guidance to NCTA members regarding compliance with applicable statutory and regulatory requirements, including the rules adopted and other actions taken by the Federal Trade Commission ("FTC") in the recent rulemaking for the Rule Concerning Recurring Subscriptions and Other Negative Option Plans ("Rule") at issue in this proceeding. Negative Option Rule ("Rule"), RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/

1

p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. Part 425.

2.     I have reviewed and analyzed the Rule, which imposes broad and burdensome new legal obligations on NCTA members that offer or promote so-called negative option plans.  "Negative Option Feature" is the term that the Rule uses to describe contract provisions for goods or services that continue until the customer cancels the plan.  Negative option plans include enrollment contracts with an automatic renewal and recurring subscriptions that many companies use to provide goods or services on a continuing basis, and I generally refer to them in this declaration as subscription plans.  NCTA has many members that offer subscription plans both to consumers and businesses for broadband, cable, voice, and video streaming services.   All NCTA members that offer subscription plans will be regulated by the Rule.

3.     As a result of my position with NCTA, I am familiar with the importance of subscription plans to NCTA members and their customers.  I am also familiar with the compliance burdens and immediate and irreparable harmful effects that the Rule is likely to have on NCTA's members.

4.     These harms are directly relevant to NCTA's associational mission of representing its members' interests and assisting its members to operate efficiently and productively, including in relation to the regulatory environment.   One of

App.250

NCTA's major functions is to represent its members' interests in matters such as this petition for review and to protect its members from regulatory burdens and harms like those the Rule will cause.

5.    Below, I first explain the importance of subscription plans to NCTA members.  Then I explain how the Rule imposes new broad and burdensome requirements on such subscription plans.  I next describe how the Rule's requirements, coupled with the threat of enforcement and civil penalties, will cause NCTA members irreparable harm unless the Rule is stayed pending judicial review.

6.    For each category of requirements, I explain how the Rule—if not stayed—will cause two types of irreparable harm.  First, and most immediately, the Rule will harm NCTA members by causing them to incur new and unrecoverable costs of compliance.  Companies must redesign and reengineer customer offer, enrollment, and cancellation processes; make corresponding changes to their apps, websites, customer service call systems, and in-person procedures; implement new training and staffing protocols; obtain legal review; and implement new recordkeeping systems—to name just a few of the many burdens that companies will face.  And because these actions will take time to implement, NCTA members must begin incurring these costs immediately.  If the Rule is later overturned following judicial review, NCTA's members will not be able to recover those costs.  Second, the Rule will cause harm to NCTA members' customer goodwill, because it requires

3

Appellate Case: 24-3137    Page: 251    Date Filed: 12/05/2024 Entry ID: 5463205

them to take actions and make significant changes to their enrollment and cancellation processes that will confuse, burden, and alienate their customers. The harm to NCTA members from losing customer goodwill will be irreparable.

7. Finally, some of the Rule's requirements regulate the commercial speech of NCTA members. Unless the Rule is stayed, NCTA members will be irreparably harmed in the loss of their right to communicate freely and truthfully with their customers.

8. All of those harms are particularly acute and unnecessary for NCTA members. Subscription plans give customers the assurance that their cable, internet, telephone, information and entertainment services will continue without interruption for their homes and businesses. Customers often want such plans to continue for years. They do not want the hassle of renewing their subscriptions for cable, internet voice, or video streaming service; they prefer to simply have the service continue for however long they wish to use it, especially given the importance of services such as internet and phone for a wide variety of daily consumer needs. Customers are familiar with these services and do not expect or need the burdensome and complex disclosures and multiple consent mechanisms that the Rule requires; nor do they need the prescriptive cancellation mechanisms that the Rule dictates.

**The Importance of Subscription Plans to the Internet and Television Industry**

9. NCTA members provide communications and content services to

Appellate Case: 24-3137    Page: 252    Date Filed: 12/05/2024 Entry ID: 5463205

residential and business customers. Generally, the customer signs up once and then pays a monthly charge until the customer decides to change or cancel the service. This arrangement has become so desirable and common that customers have come to expect and demand the efficiency and reliability of continuing communications and content services.

10.     Some 71.3 million consumers subscribe to pay-television services, with cable operators providing video service to nearly half (34.1 million) of those subscribers.[1] Cable operators are also the largest providers of residential broadband internet services in the United States—services that have been recognized as essential for participation in modern life. *E.g.*, Federal Communications Commission, Broadband Data Collection Consumer Information (Apr. 16, 2024), https://www.fcc.gov/BroadbandData/consumers. Overall, 85% of American consumers give their home broadband service a positive rating.[2] An overwhelming majority (88%) of American households also have at least one streaming video service, and 42% of American adults stream a subscription video service daily. Survey evidence indicates that high percentages of Americans express satisfaction with their video streaming services: 72% in a 2022 survey said that "I love my user

---

[1] Leichtman Research Group, Research Notes, at 3 (2024), https://leichtmanre-search.com/wp-content/uploads/2024/03/LRG-Research-Notes-1Q-2024.pdf.

[2] Morning Consult, *cited in* Broadband Facts & Stats, https://www.ncta.com/broad-band-facts.

Appellate Case: 24-3137    Page: 253    Date Filed: 12/05/2024 Entry ID: 5463205

experience with video streaming services," and 93% plan to either increase their streaming options or make no changes to their existing streaming plans.[3]

11.    Broadband service is usually sold as a subscription plan, because most residential customers want to connect their devices to their home internet and not have to worry about periodically renewing to continue service.  Without an automatically renewing subscription, customers would have to regularly renew their subscription and reenter their payment and other information, and would risk losing internet service if they inadvertently forgot to do so.  Again, an automatically renewing subscription plan is the easiest way to provide what customers want and expect for communications services.

12.    Customers similarly want to be able to turn on the television and have ready access to video programming services.  And they do *not* want to have to reenter their credit card information monthly and purchase afresh their cable TV and streaming video services.  Here too, a recurring subscription plan meets customer needs and expectations.

---

[3] Lichtman Research Group, *supra* note 1, at 2; Supplementary Submission of NCTA, Negative Option Rule, FTC Project No. P064202, at 6 (Dec. 22, 2023), https://www.regulations.gov/comment/FTC-2023-0073-0008 (citing Erik Gruen-wedel, *Leichtman: 2023 U.S. Households SVOD Subscription Growth Rate Flat,* Media Play News (Aug. 14, 2023), https://www.mediaplaynews.com/leichtman-2023-u-s-household-svod-subscription-growth-flat/; Nielsen Report, *State of Play: The Video Streaming Industry Has Reached a Tipping Point* (Apr. 2022), https://www.nielsen.com/insights/2022/state-of-play/).

App.254

Appellate Case: 24-3137    Page: 254    Date Filed: 12/05/2024 Entry ID: 5463205

13.    The same is true for telephone and mobile data services, which many NCTA members provide.  Customers want and expect such services to continue unless and until they cancel so that they are functional at all times.  In short, for NCTA member companies, offering a subscription plan is the path to satisfied customers.

14.    In response to consumer demand, NCTA members routinely offer many services as part of bundled packages.  Bundled services give consumers the convenience and typically cost savings of purchasing several services together. Bundles may come in numerous combinations for a variety of consumer needs and budgets.  Cable and internet often can be purchased together.  Some NCTA members also offer phone service—both Voice over Internet Protocol (VoIP) and mobile wireless—as additional services that can be bundled with cable and/or internet.  Still other bundles can involve a variety of sports, news, and entertainment packages available via cable channels and/or streaming video options.  And customers can fine-tune the bundles with different internet speeds and performance measures, depending on individual needs.  These bundles are popular with customers.  In 2024, nearly half (45%) of the customers of NCTA member cable operators subscribed to bundled services.

**The Overbreadth of the FTC's Rule**

15.    The Rule imposes substantial new requirements on all companies,

7

Appellate Case: 24-3137     Page: 255     Date Filed: 12/05/2024 Entry ID: 5463205

including NCTA members, that offer or promote subscription plans—or what the Rule calls "Negative Option" programs. The Rule defines a "Negative Option Feature" as a provision of a contract in "which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer." 16 C.F.R. § 425.2(f).[4] The Rule applies to anyone "selling, offering, charging for, or otherwise marketing a good or service with a Negative Option Feature." § 425.2(g).

16. The new Rule sweeps far beyond the FTC's prior, more limited regulation of "prenotification" negative option plans for periodic shipments of physical goods and merchandise (like book of the month clubs) and includes all types of subscription plans across the entire economy, regardless of the product or service offered. The Rule regulates subscription plans not only between consumers and businesses, but also between businesses. This broad rule is applied indiscriminately without consideration for the dynamics of particular markets or sectors, like the cable, internet, and streaming video sectors, or consumer demand for business models that allow them to continue receiving service without repeatedly being required to opt-in to renew.

---

[4] All subsequent references to "§ 425" are to the Rule, to be codified at 16 C.F.R. part 425.

App.256

Appellate Case: 24-3137    Page: 256    Date Filed: 12/05/2024 Entry ID: 5463205

17.   To my knowledge, the FTC's new Rule exceeds any other federal law or regulation of negative option plans applicable to NCTA members.[5]  Its onerous new requirements for recurring subscription plans will impose significant burdens and irreparable harm on NCTA members absent a stay.  Among other things, the Rule imposes extensive new disclosure requirements, prohibits companies from including certain other information in their offers, requires companies to obtain a consumer's express consent separately for the negative option to enroll, imposes numerous requirements and restrictions for handling cancellation requests, and

---

[5] In contrast to the Rule's overbreadth, Congress has enacted far more limited laws to regulate negative option plans in certain defined contexts.  For example, the Restore Online Shoppers' Confidence Act ("ROSCA") provides specific requirements for negative option marketing over the internet.  *See* 15 U.S.C. § 8403.  The Unordered Merchandise Statute provides that mailing unordered merchandise is an unfair trade practice.  *See* 39 U.S.C. § 3009(a).  The Electronic Fund Transfer Act ("EFTA") forbids sellers from imposing recurring charges on a consumer's debit card or bank account without written consent.  *See* 15 U.S.C. § 1693c.  The Telemarketing and Consumer Fraud and Abuse Prevention Act required the FTC to promulgate the Telemarketing Sales Rule, which in part regulates negative option marketing performed via telemarketing.  *See* 15 U.S.C. §§ 6101-6108; 16 C.F.R. § 310.  The Television Viewer Protection Act ("TVPA") requires multichannel video program distributors, such as cable operators, to disclose to consumers, before entering a contract, the total monthly charge for service—and to explicitly note the amount of any promotional pricing and when it expires.  *See* Pub. L. No. 116-94, 133 Stat. 2534 (2019).  Most recently, the Infrastructure Investment and Jobs Act of 2021 directed the Federal Communications Commission to regulate disclosures regarding trial period negative option marketing offered by broadband providers.  *See* Pub. L. 117-58, § 60504(a)–(b), 135 Stat. 429, 1244 (2021) (requiring a "broadband consumer label" that shall disclose "whether the offered price is an introductory rate and, if so, the price the consumer will be required to pay following the introductory period").  All of these statutes regulate or authorize the regulation of negative option marketing only in specified contexts.

imposes new recordkeeping requirements. As explained below, these requirements will harm NCTA's members by causing companies to lose customer goodwill and potential loss of business, and by causing companies to incur unrecoverable costs to comply with the Rule. *See, e.g.*, Declaration of Curt Stamp, Vice President Government and Regulatory Affairs of Cox Communications, Inc. ("Cox Decl.").

### Disclosure Requirements

18. The Rule imposes new disclosure requirements in § 425.4 that will irreparably harm NCTA members by causing them to lose customer goodwill and incur substantial, unrecoverable costs of compliance.

19. NCTA members' services are already extensively regulated, and NCTA members already provide many disclosures—but now, under the Rule, even more disclosures will be required. The Rule's requirements would exceed substantially the disclosure requirements that Congress has enacted. For example, ROSCA, the federal statute governing negative option marketing on the internet, requires clear and conspicuous disclosure of material terms of the transaction. 15 U.S.C. § 8403. Moreover, the TVPA requires cable operators to disclose total monthly charges and explain promotional pricing (and when it expires). 47 U.S.C. § 562(a)-(b). Cable operators also must disclose this information within 24 hours of entering a contract via email, an online link, or comparable means. 47 U.S.C. § 562(a)-(b). Cable operators are required by other regulations to disclose various

10

specified sales conditions for the products or services provided. 47 C.F.R. § 76.1602(b). In addition to these requirements, in connection with offering any good or service with a subscription plan, the FTC Rule will now require NCTA members to disclose up front a litany of specific information about the negative option transaction and to disclose all "Material" terms, as that expansive term might later be construed by regulators. 16 C.F.R. § 425.4(a). The new FTC requirements will create yet another iteration of disclosures separate from the preexisting disclosure requirements, some of which would be repetitive or in slightly different form. *See, e.g.*, Cox. Decl. ¶¶ 8, 11.

20. Section 425.4 requires anyone offering a subscription plan to broadly "disclose . . . prior to obtaining the consumer's Billing Information, all Material terms, regardless of whether those terms directly relate to the Negative Option Feature." § 425.4(a). Those disclosures must include, but are not limited to, that consumers will be charged, if the charges are on a recurring basis, each deadline by which the consumer must act to stop the charges, the amount and frequency of the charges, and information necessary to find the "simple cancellation mechanism" required by the Rule. § 425.4(a)(1)–(4). The disclosures are required in connection with promoting or offering for sale any good or service with a negative option feature. § 425.4(a).

21.     The Rule does not specify all the information companies must provide when offering subscription plans.   Although the Rule provides non-exhaustive examples, it requires disclosure of "all Material terms."   § 425.4(a).   "Material" is defined as "likely to affect a person's choice of, or conduct regarding, goods or services."   § 425.2(e).   The required disclosures are not limited to the negative option feature; in fact, the Rule explicitly states that companies must disclose "all Material terms, regardless of whether those terms directly relate to the Negative Option Feature."   § 425.4(a).   Therefore, the Rule compels companies to make broad disclosures about their services or products simply because those companies offer or promote the products through subscription plans.  The Rule thus effectively regulates the transaction as a whole once it is established that the transaction includes the offer of a "negative option feature" as defined by the Rule.

22.     Section 425.4 also requires that these disclosures be "clear and conspicuous."   § 425.4(b)(1).   The Rule defines that phrase to mean "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers." § 425.2(c).  Among other things, the Rule provides that disclosures must (i) "stand out from any accompanying text" if made through visual means, (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand" if made audibly, and (iii) be "unavoidable" if made through electronic means.   § 425.2(c)(1)–(4).   Moreover, the specific disclosures required by

12

Section 424.4(a)(1)–(4) "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature," and all other disclosures must appear before obtaining the consumer's express informed consent. *Id.* § 425.4(b)(2). The Rule, therefore, not only requires the disclosure of an extensive amount of information, but also compels companies to communicate that information in highly prescriptive ways regarding form and placement.

23. ***Unrecoverable Compliance Costs.*** The Rule imposes unrecoverable compliance costs on NCTA's members. The Rule is scheduled to take full effect 180 days after the date of Federal Register publication. If the Rule's May 14, 2025, compliance date is not stayed, NCTA members need to immediately review their existing offer and enrollment materials and processes to determine what additional "material" information must be disclosed to comply with the Rule. *See, e.g.,* Cox Decl. ¶ 17. Because the Rule's standard for disclosures is broad and vague, that review requires NCTA members to immediately begin analyzing all aspects of their services to determine what counts as a material term of the transaction and whether this should lead to changes to their current disclosures. NCTA members will also have to compare the Rule's disclosure requirements with myriad other existing federal, state, and local disclosure requirements to determine any overlaps and inconsistencies. For many companies, this analysis will require consulting in-house and potentially outside legal counsel. *See, e.g., id.*

13

Appellate Case: 24-3137    Page: 261    Date Filed: 12/05/2024 Entry ID: 5463205

24.     The requirements for disclosures to be "clear and conspicuous" will cause NCTA members to incur additional unrecoverable costs.  NCTA members will have to redesign certain webpages, apps, print media, in-person and telephone scripts, and other communications to comply with the disclosure requirements.  For example, many NCTA members will need to reconfigure their websites and mobile apps to ensure that the required disclosures are "unavoidable" to customers.  § 425.2(c)(4).  Moreover, the specifically enumerated disclosures required by § 424.4(a)(1)-(4) "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature," and any other disclosures "must appear before obtaining the consent" of the consumer to the negative option feature.  *Id.* § 425.4(b)(2).

25.     The Rule's disclosure requirements change the way many NCTA members typically present the terms and conditions to their customers.  The disclosures pose special challenges for electronic media when consumers are navigating small screens on their mobile devices. *See, e.g.,* Cox. Decl. ¶ 18.  Too much text on a single page and requiring consumers to scroll through voluminous information can be a barrier to consumer-friendly, comprehensible disclosure.

26.     The disclosure compliance burden is multiplied several times over for NCTA member video streaming companies.  They must coordinate with each third-party purchasing platform partner and app store (*e.g.,* Amazon, Roku, Google, Ap-

14

ple, and others), each with its own unique user experience, potentially requiring compliant disclosures to be designed and built out platform-by-platform. For the app stores, member companies may have to coordinate compliance for both the mobile app and a connected TV device. The compliance burden and risk for streaming companies is further complicated given their unequal bargaining power and lack of control over the large third-party platforms and third-party devices.

27. The compliance burden for required disclosures is also exacerbated in the context of bundled services, which are common for NCTA members. Each service will come with its own set of disclosures. *See, e.g.,* Cox Decl. ¶¶ 15, 18.

28. Some NCTA members will need to print additional sales and enrollment materials to set out the required disclosures in such a way as to be "Clear and Conspicuous." § 424.4(b)(1). For verbal promotions and offers, NCTA members will have to re-train salespeople and customer service agents and re-write call and sales scripts. § 424.4(b)(1); § 425.2(c)(3). All of this will require significant time, money, technical resources, and legal review. *See, e.g.,* Cox Decl. ¶ 18.

29. ***Loss of Customer Goodwill.*** In addition to unrecoverable compliance costs, complying with Section 425.4's disclosure requirements will cause NCTA's members to lose the goodwill of their potential and existing customers.

30. First, NCTA members will be compelled to inundate potential customers with extensive information related to the negative option feature, the

enrollment transaction as a whole, and the underlying goods or services offered. The Rule offers no specific guidance on what constitutes a "Material term," leaving NCTA members to guess about what aspects of a given transaction might be considered "Material" to customers—or to regulators, after the fact. If companies guess wrong and do not disclose terms that are later deemed "Material," companies could face the prospect of FTC enforcement and civil penalties of up to $51,744 per violation. *See* 15 U.S.C. § 45(m); FTC, Adjustments to Civil Penalty Amount, 89 Fed. Reg. 1445, 1446 (Jan. 10, 2024).

31. The threat of penalties for under-disclosure will likely cause NCTA members to over-disclose the terms of their products and services. NCTA members will have particular challenges for bundled services, such as subscription plans that provide cable, internet, and telephone service under a single contract. The likely result of Section 425.4's disclosure requirements will be that over-disclosure in this context will be particularly pronounced—and particularly onerous and frustrating for customers because it would clutter customer communications, bury relevant information, and make it harder to identify some terms. *See, e.g.*, Cox Decl. ¶¶ 10, 12-15.

32. Many customers do not want to review or digest such voluminous disclosures, especially when added to the substantial disclosures already applicable to many NCTA members, and for services with which they are familiar and expect

16

will be offered on a continuing basis. *See, e.g.*, Cox Decl. ¶ 12. Many consumers will be unable to identify the most important terms of a transaction; many more will find it burdensome and time consuming to identify what matters from the mass of information that will be disclosed. Some of those consumers will become irritated by such extensive disclosures and decline to enter transactions rather than try to process the information disclosed. *See, e.g.*, *id*. And the more a company discloses to comply with the Rule's indefinite materiality standard, the more consumers that company is likely to alienate and lose. *See, e.g.*, *id*.

33. The disclosure requirements of Section 425.4 do not exempt promotions and offers made verbally—either by telephone or in person. For such verbal offers and promotions, the required disclosures will significantly interfere with customer-facing communications. Many customers will become frustrated both by the amount of time that the verbal disclosures take and by having to listen to the oral equivalent of "lawyers' fine print." *See, e.g.*, Cox Decl. ¶ 14. In signing up for a bundle of internet, telephone, cable, and premium television channels, each of these products will come with its own set of disclosures. A phone call sign-up will become inordinately long as all the material terms for each of these bundled services must be independently disclosed. Some customers will terminate the conversation or phone call rather than listen to extensive unwanted disclosures. The

Appellate Case: 24-3137     Page: 265     Date Filed: 12/05/2024 Entry ID: 5463205

result for NCTA members will be customer alienation and lost business.  *See, e.g.,* *id.* ¶ 15.

**Restrictions on Certain Information with Promotions or Offers**

34.    The Rule limits companies' ability to communicate certain information—including truthful information—when promoting or offering for sale goods or services with subscription plans.   This regulation on speech would irreparably harm NCTA's members.

35.    Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures" that the Rule requires.  § 425.4(b)(3).  Section 425.2, when defining the phrase "clear and conspicuous" for purposes of the disclosure requirements of Section 425.4, also provides that the required disclosures "must not be contradicted or mitigated by, or inconsistent with, anything else in the communication."   § 425.2(c)(7).  Relatedly, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature." § 425.5(a)(2).  As explained below, these prohibitions will cause various irreparable harms.

Appellate Case: 24-3137    Page: 266    Date Filed: 12/05/2024 Entry ID: 5463205

36.    ***Unrecoverable Compliance Costs.***   The Rule's prohibitions contain vague terms that will increase NCTA members' compliance costs.  For example, companies will need to analyze all the information they provide to customers to determine whether any information "detracts from" or "otherwise undermines" the required disclosures or the ability of consumers to consent to the negative option feature. *See, e.g.,* Cox Decl. ¶ 22.  NCTA members will expend more resources trying to ascertain the types of information covered by these vague, prohibitory terms.  And unless the Rule is stayed, companies need to begin this work now to ensure their compliance by the Rule's compliance date for Sections 425.4-.5.  *See, e.g., id.*

37.    ***Loss of Consumer Goodwill.***   The speech regulations of Sections 425.4–.5 also will irreparably harm companies by causing them to lose business and customer goodwill.  For example, if a company offering internet service with a subscription plan must disclose its typical download speed of 150 Mbps, a regulator could find that a promotion that says "super fast" or "high speed" would "detract[] from" or "otherwise undermine[] the ability of consumers to read, hear, see, or otherwise understand" the mandated disclosure.   Regulators could likewise determine that truthful testimonials about other customers' positive experiences with a product or service are distracting or confusing to consumers.   Overzealous regulators could also determine that representations about savings and price discounts ("save 25%!") for certain bundles or promotional offers interfere with or

19

App.267

detract from the price disclosures, discouraging such potentially consumer friendly language. As a result, companies could be chilled from offering discounts that can benefit consumers, which could decrease competition and harm consumers who could be offered lower prices during periods of low demand.

38. The result will be that companies are chilled from providing positive beneficial information about their products or services lest such information be found, after the fact, to detract from or undermine any other required disclosures. *See, e.g.*, Cox Decl. ¶ 21. These prohibitions accordingly will lead to companies placing an undue emphasis on warnings and negative disclosures, which will lead to increased customer alienation and irreparable harm to NCTA members. *See, e.g., id.*

39. ***Chilling Effect on Truthful Speech.*** The prohibition of communication that detracts from the mandatory disclosures would have a chilling effect on truthful, nondeceptive speech. And that harm is immediate and irreparable.

**Consent Requirement**

40. The Rule's consent requirements also will cause NCTA's members to suffer irreparable harm from unrecoverable compliance costs and lost customer goodwill.

41. Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's

20

unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." § 425.5(a)(1) (emphasis added). Although the Rule does not define either "express informed consent" or "unambiguously affirmative consent," it provides that sellers will be "deemed in compliance with the requirements [for separate consent for the negative option feature] for all written offers . . . if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction." § 425.5(c). The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature." *Id.*

42. By requiring the consumer to consent to the negative option feature separately from any other portion of the transaction, the Rule effectively requires companies to obtain a consumer's consent twice—first, for the negative option feature, and second, for the transaction itself. The Rule effectively requires companies to separate the consumer consent process into two steps, for the Rule simultaneously requires *both* that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the Negative Option Feature" *and* that that companies disclose material terms

21

unrelated to the negative option feature before obtaining the consumer's billing information and before obtaining the consumer's express informed consent and charging the consumer. §§ 425.4(a), 425.5(a), (c).

43. ***Unrecoverable Compliance Costs.*** NCTA members will incur unrecoverable costs in complying with the two-step consent requirement. NCTA members selling their products online will have to redesign their apps and webpages to have two separate places for customers to consent to subscription plans, and this work will require substantial time and technical resources. *See, e.g.,* Cox Decl. ¶ 28.

44. NCTA member streaming services would have to implement major changes to the way consumers sign up for subscriptions online. Streaming services often display the key subscription terms with a "buy now" box underneath, which essentially functions as consent (followed by an email sent to the subscriber confirming the purchase and terms). Having to provide two separate consents—one just for the negative option feature and the other for the rest of the transaction—would be a significant departure from the current online enrollment process.

45. Some NCTA member streaming companies also may need several months to conduct A/B testing to implement any changes to the online purchase and payment flow to ensure the new process works smoothly and to avoid any negative impact on customers completing the transaction. For some companies, this process typically spans about three calendar quarters to define the test based on require-

Appellate Case: 24-3137    Page: 270    Date Filed: 12/05/2024 Entry ID: 5463205

ments, execute, and implement successful tests (or run additional tests). For streaming services, the number of different purchasing platforms and third-party partners in scope will also significantly influence the timeline and required effort, especially considering the parties' unequal bargaining power and control. Accelerating the effort requires significant additional cost and resources, and would likely result in a significant risk of a reduction in completed sign-ups.

46. NCTA members offering goods or services with subscription plans to other businesses may need to amend or re-write their contracts and obtain legal review. *See, e.g.,* Cox Decl. ¶ 29. NCTA members selling goods or services with subscription plans in-person or over the phone will need to re-write scripts and re-train their salespeople to include separate consent requests. *See, e.g., id.* All of this will require companies to expend time and money today in anticipation of the Rule's compliance date for Section 425.5 unless the Rule is stayed.

47. ***Loss of Customer Goodwill.*** Section 425.5's double consent requirement also will irreparably harm NCTA's members by causing them to lose customer goodwill. Most obviously, requiring a customer to consent twice to a single transaction is not how business is usually done. Many consumers will become confused and frustrated by the need to consent twice to a single transaction, increasing the likelihood that customers will forgo the transaction altogether rather than deal with a two-step transaction. *See, e.g.*, Cox Decl. ¶ 25.

23

48. Customers also will be confused by the Rule's requirement for the "consent request" to be "free of any information not directly related to the consumer's acceptance of the Negative Option Feature." § 425.5(c). The Rule elsewhere requires NCTA members to disclose all material terms of the transaction even if they do not "directly relate" to the negative option feature. To comply with both requirements, NCTA members may have to create two consent requests—one for the recurring subscription plan feature, and one for the transaction itself. The two-step consent process will be more cumbersome and potentially frustrating for consumers, and could improperly suggest a more complicated or problematic recurring subscription service. *See, e.g.,* Cox Decl. ¶¶ 26, 27.

49. Every additional click a customer must make to complete a purchase creates one more opportunity to fail to complete the transaction, and it is common to see consumers drop out with each additional step in the process. That is, the additional steps may result in some consumers not completing the sign-up process. Many consumers will not immediately understand that two separate consents are required for a single transaction and, despite intending to purchase a good or service, provide only one step of consent before attempting to complete the transaction – or abandoning it. The frustration and irritation from the added "friction," unwieldy subscription process, and multiple checkboxes and consents, will cause further lost customer goodwill, both in the form of the customers themselves who do not receive

24

the goods or services and in the form of word-of-mouth or online reviews negatively reflecting on the company. *See, e.g.,* Cox Decl. ¶ 27.

### Simple Cancellation Requirement

50. Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with negative option features and restricts companies from offering consumers critical information when they seek to cancel such contracts. These requirements will irreparably harm NCTA members and their customers.

51. Section 425.6 provides that companies offering or selling goods or services with negative option features must "provide a simple mechanism for a consumer to cancel the Negative Option Feature" and "avoid being Charged" for "the good or service." § 425.6(a). When a customer uses that mechanism, the company must "immediately stop any recurring Charges." § 425.6(a). The Rule also provides that the "simple mechanism" to cancel "must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature." § 425.6(b). The Rule then specifies that "[a]t a minimum," the cancellation must be offered "through the same medium the consumer used to consent to the Negative Option Feature." § 425.6(c). It further specifies rules for each medium: For internet cancellations, the cancellation mechanism must be easy to find. § 425.6(c)(1). "For cancellation by telephone call," the seller "must promptly effectuate cancellations requested by the consumer via a telephone number that is answered or records

Appellate Case: 24-3137     Page: 273     Date Filed: 12/05/2024 Entry ID: 5463205

messages, made available during normal business hours, and not more costly to use than the telephone call the consumer used to consent to the Negative Option Feature." § 425.6(c)(2). And for cancellation where consent had been "obtained in person," the seller "must offer the simple mechanism" through the internet or by telephone in addition to, "where practical," an "in-person method similar to that the consumer used to consent to the Negative Option Feature," with the same requirements for online and telephone cancellations that are detailed above. § 425.6(c)(3).

52. ***Unrecoverable Compliance Costs.*** The Rule's cancellation requirements are causing NCTA members to incur unrecoverable compliance costs, starting immediately and increasing until the Rule goes into effect. Many NCTA members will need to re-design their apps and websites, re-write call scripts, and re-train employees to ensure that they are complying with the Rule's new requirements. *See, e.g.,* Cox Decl. ¶ 39. The requirement that the simple cancellation mechanism be "through the same medium" as the customer's enrollment is particularly burdensome and costly for cable operators, which permit customers to enroll by telephone, online, or in-person at retail outlets and typically provide cancellation by telephone. The effort to build an online mechanism from the ground up for consumers to cancel or modify these complex communications services, which are often "bundled" with one or more other services, requires numerous teams across different departments,

Appellate Case: 24-3137    Page: 274    Date Filed: 12/05/2024 Entry ID: 5463205

including highly skilled product and systems developers. *See, e.g., id.* ¶ 40. Furthermore, the Rule's requirement for a symmetrical cancellation mechanism will require some NCTA members to completely redesign their cancellation processes for some customers, including business customers, at significant time and expense. *See, e.g., id.* ¶ 41. NCTA members also will need to hire and/or (re)train additional staff to effectuate cancellation by telephone "promptly" and in compliance with the new Rule. *See, e.g., id.* ¶ 42

53. Complying with these requirements will be extremely difficult and highly expensive. Ensuring that calls to cancel are "not more costly" than the call to accept an offer may depend on factors beyond NCTA members' control, including whether the consumer has switched telephone providers or services.

54. Additionally, certain video streaming services or programming may be available via a cable service, a direct-to-consumer app that itself is available on a variety of platforms (*e.g.*, MacOS, Android, or Roku), mobile phone services, or gaming consoles, among other options. The streaming provider would have to sort through the various practical, technical, and contractual restraints of each platform regarding the consumer sign-up process and corresponding simple cancellation mechanism to ensure compliance. The compliance burdens will be significant.

55. ***Loss of Customer Goodwill.*** The Rule will cause NCTA members to lose customer goodwill for several reasons. First, the requirement for companies to

"immediately" cancel recurring charges may make accidental online cancellations more frequent and cause customers to unknowingly lose access to important services they had not intended to cancel. Customers sometimes accidentally cancel subscription plans for goods or services because of confusion or simple inadvertence, especially when "bundled" services are involved. For example, if a company must immediately cancel recurring charges for a customer subscribing to a bundle of video, broadband, and telephone service, that customer may lose access to 911 service even though they really only intended to cancel video or broadband service, but not their telephone service and certainly not their access to 911 emergency services. The Rule does not permit NCTA members to help customers avoid such inadvertent online cancellations by speaking with the customer by chat or phone, if those steps were not required for the customer's consent to the negative option feature. Customers who accidentally cancel subscription plans—for example, by accidentally clicking on a hyperlink that cancels all their services when that is not what they intended—will become irritated with sellers and service providers when they have to restart the entire contractual relationship – and especially if the loss of access resulted in other consumer harm, such as lack of access to telephone and 911 service during an emergency or loss of email stored on the internet provider's servers. This risk is particularly pronounced if the good or service is used daily—as is almost always the case for internet, telephone, and video services. The immediate and dramatic conse-

quences of inadvertent cancellation will alienate customers and cause loss of good-will.  *See, e.g.,* Cox Decl. ¶ 34.

56.     Second, the requirement for simple cancellation will impair companies' ability to provide consumers with true, useful, and beneficial information when they seek to cancel a subscription, causing irreparable harm to NCTA members.  Many cable and broadband consumers try to cancel parts of a subscription contract without being aware of the consequences of cancellation.  *See, e.g.,* Cox Decl. ¶ 35.  For example, many consumers have bundled services—such as internet and cable, or telephone and a video entertainment service, internet and home security service, or various other combinations.   These bundled services often provide customers efficiencies and discounts that would not be available for each component alone.  If a customer wishes to cancel one service, they may not be aware that their cancellation also will cancel or affect the price of the other services in that bundle. Similarly, consumers who wish to cancel daily services like internet access may not be aware that their cancellation could have immediate effect or that they will lose their ISP-provided email address.  A customer who cancels a subscription for voice services may not realize that this could affect access to emergency 911 services and Lifeline resources, or that they need to take certain steps to port their telephone number to a new provider.  The Rule could deter NCTA members from fully and truthfully explaining all these consequences to customers for fear the FTC could

Appellate Case: 24-3137     Page: 277     Date Filed: 12/05/2024 Entry ID: 5463205

construe such information or offers as rendering their cancellation mechanism not "simple" or "as easy to use" as the sign-up mechanism. Customers who are not informed will then become frustrated and/or suffer secondary consequences when bundled services are terminated or when cancellation of one or more services in the discounted bundle causes the price of the remaining service(s) to increase. *See, e.g.,* Cox Decl. ¶ 35.

57.    Third, many cable subscribers also are able to sign up for third-party video streaming subscription services like Netflix, Hulu, Prime Video, and others through their cable service, which customers appreciate as it allows them to manage and access all their video services through their cable TV provider. But if a customer that signed up online also cancels online and the company is prohibited from requiring a conversation with a customer service representative to walk the customer through the details and ramifications of the cancellation, one additional harm for some cable operators' customers is that the Netflix, Prime Video, and other third-party subscriptions for which they signed up through the cable service will also be cancelled, even though that is not at all what the customer intended, thus further increasing their frustration and loss of goodwill caused by the Rule. In contrast, ROSCA's requirement for a "simple cancellation mechanism" for online transactions is not as prescriptive and omits such restrictions on customer communications, and thus avoids these harms.

58. Fourth, for the same reasons, NCTA members also will be limited in their ability to offer customers better deals. In many cases, customers are happy to retain a subscription plan if the company offers a lower price, a different bundling of goods or services, or a higher tier of good or service. But the Rule's requirements for cancellation that is "simple," "as easy as," and "in the same medium" as sign-up in many cases may constrain NCTA members' ability to freely communicate with customers seeking to cancel and drastically limit their ability to make those offers—leading to a loss of customers. *See, e.g.*, Cox Decl. ¶ 36. And critically, low-income consumers could be deprived of information about lower-cost plans and special government programs that would allow their families to keep broadband service. For example, some customers wishing to cancel their subscriptions for cost reasons may not realize that there are programs available for qualifying low-income households to receive reliable broadband service at discounted rates. A conversation with a representative often is necessary to identify the right program and determine whether the subscriber qualifies, yet the Rule prohibits all companies from requiring access to such conversations with a representative (if the customer did not do so to consent to the recurring subscription plan) notwithstanding evidence in the record showing

31

Appellate Case: 24-3137    Page: 279    Date Filed: 12/05/2024 Entry ID: 5463205

that such conversations often result in such cost savings for customers.[6] *See, e.g.*, Cox Decl. ¶ 37.

59.    ***Chilling Effect on Truthful Speech.***    The restriction on communications will chill the ability of NCTA members to truthfully communicate with their customers. That harm is immediate and irreparable.

### Recordkeeping Requirements

60.    Finally, the Rule also imposes recordkeeping requirements on NCTA members that offer goods or services with subscription plans that will also cause irreparable harm.  The Rule requires companies to "[k]eep or maintain verification of the consumer's consent" to the negative option feature and the underlying transaction "for at least three years."   § 425.5(a)(3).   The Rule provides that companies can avoid this requirement only if they "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." *Id*.

61.    ***Unrecoverable Compliance Costs.***  Those recordkeeping requirements are causing NCTA members to incur unrecoverable costs, which will continue to accumulate (and accelerate) as the Rule's compliance date approaches.  Most NCTA

---

[6] *E.g.*, Supplementary Submission of NCTA, *supra* n.3, at 10 (NCTA analysis showing that cable, broadband, and voice customers respond favorably to "saves," with the vast majority (approximately 75%) retaining some or all service after speaking with an agent during a recent two-year period, often realizing cost savings and other customer benefits. In comparison, only 22% cancelled all their services.).

Appellate Case: 24-3137    Page: 280    Date Filed: 12/05/2024 Entry ID: 5463205

member companies do not record or maintain consumer consents in the precise form that the Rule requires. Most obviously, NCTA members will incur new costs of creating and keeping records of consumers' consent to the negative option feature and the transactions, which will require additional infrastructure and computer storage and/or physical storage space. *See, e.g.,* Cox Decl. ¶ 45. For cancellations over the internet or via apps, that will require re-designing software and websites to generate consent records; for cancellations over the phone or in-person, that will require training employees and designing forms or other means for employees to record consent; and all this will require costs to maintain such records. *See, e.g., id.* Alternatively, NCTA members would need to develop and implement processes ensuring that no consumer can technologically complete a subscription transaction without providing consent. This, too, will cause NCTA members to incur unrecoverable expenses that ultimately will be passed along to customers.

### Costs to Implement the Full Range of Rule-Imposed Regulatory Changes

62. NCTA member companies are preparing to comply with the Rule's many new requirements and working to meet the compliance date the Commission established to the extent feasible. This effort requires the companies to begin to incur significant burden and expense *immediately* if the Rule is not stayed. Some members already have started to incur costs and begin the long and complicated

Appellate Case: 24-3137     Page: 281     Date Filed: 12/05/2024 Entry ID: 5463205

implementation process in efforts to comply by the Rule's compliance date, and those efforts will increase unless the Rule is stayed.

63. Some NCTA cable operator members have attempted to quantify the compliance costs of overhauling their systems to comply with the full panoply of disclosure, consent, cancellation, and recordkeeping requirements for residential and business customers. They have estimated that some cable operators will have to spend in total somewhere in the range of $6 million to $10 million or more, *see, e.g.,* Cox Decl. ¶ 46, and for some large cable operators, as much as $38 million, to modify their systems across all sales platforms to comply with the Rule for residential and business consumers. The levels of consent, disclosure, recordkeeping, and the "simple" cancellation mechanism required by the Rule are considerably more complicated than current requirements and will accordingly be very burdensome and expensive to fully implement. The compliance efforts require numerous teams across departments, including highly skilled personnel and product and systems developers. Some members may well exceed the Rule's 180-day compliance deadline to fully implement some of the new processes and mechanisms across all platforms.

64. Given the short 180-day compliance deadline for the disclosure, consent, and cancellation requirements, NCTA members need to incur additional costs to perform the necessary work on an accelerated basis. *See, e.g.,* Cox Decl. ¶ 46.

Appellate Case: 24-3137    Page: 282    Date Filed: 12/05/2024 Entry ID: 5463205

65.     Some NCTA members will incur significant initial compliance costs even after the May 14, 2025 compliance date, for continued testing, refinement, and replication across additional platforms and sales channels.  Much of this work needs to be implemented sequentially and cannot be performed in parallel.

66.     In addition, NCTA cable operator members estimate that the ongoing costs of maintaining these systems, support, and recordkeeping, could be in the range of 15–20% of the initial implementation costs.

67.     Notably, many cable operators usually fulfill customer cancellation and service modification requests by telephone or in person with the assistance of a live agent, and do not currently provide an online cancellation mechanism.  For business customers, some cable operators may also permit cancellation by chatting with a customer service agent online.  *See, e.g.,* Cox Decl. ¶ 41.  Many cable operators need to build new online cancellation systems from the ground up, which is an extraordinary undertaking and expense given the array of cable, internet, and voice services offered and the multiple "bundled" service packages provided.  They must develop online cancellation "flows" for multiple scenarios, services, and bundles, to accommodate the vast majority of cable customers who want to retain some service (not completely cancel all their services), and to handle downgrades (dropping one service or changing a service tier), move/transfer requests, and temporary seasonal "suspends."  *See* Supplementary Submission of NCTA, *supra* note 3, at 10–11.

Appellate Case: 24-3137     Page: 283     Date Filed: 12/05/2024 Entry ID: 5463205

68.     For smaller cable operators, the compliance burden and costs are especially daunting.   Small operators lack scale, and the cost of building and operating the complex compliance system is being spread over a relatively small number of subscribers.  This cost will have to be financed and, at the current interest rate, will be even more expensive.   Moreover, because smaller operators have limited resources and capital, the time and money spent to comply with this rule will distract the small providers trying to expand internet service to "every last mile," to the detriment of consumers in rural and underserved areas.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:  *11-27-24*

_____

36

App.284

# Doc. 10

Declaration of Curt Stamp, Cox
Communications, Inc.

Appellate Case: 24-3137     Page: 285     Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF CURT STAMP

I, Curt Stamp, hereby declare as follows:

1.      I am over the age of 18 and competent to make this declaration.  The statements in this declaration are true and within my personal knowledge.

2.      I am the Vice President Government and Regulatory Affairs of Cox Communications, Inc. ("Cox").   My business address is 6205-B Peachtree Dunwoody Road, Sandy Springs, Georgia 30328.   Cox is the largest private broadband company in America and operates fiber-powered networks in more than 30 states, providing connections and advanced managed IT and cloud services for nearly 7 million homes and businesses nationwide.  Cox is a member of NCTA – the Internet & Television Association.

3.      In my position at Cox, I have responsibility for overseeing Cox's regulatory compliance for its operations.   I am familiar with how Cox uses automatically renewing subscriptions to provide services to our customers, and with the importance of such subscriptions to the broadband, cable, and telephone industries.   I am also familiar with the many federal and state regulatory

App.286
Appellate Case: 24-3137     Page: 286     Date Filed: 12/05/2024 Entry ID: 5463205

requirements that apply to subscriptions and how Cox complies with those requirements. In particular, and as discussed in more detail below, Cox is subject to a number of regulations issued by the Federal Communications Commission ("FCC"). I am knowledgeable about how new regulatory requirements would affect Cox's ability to meet our customers' expectations. I am also familiar with how new requirements would create new costs for Cox, and how those costs would translate into new charges and higher prices for consumers.

4.    Cox provides residential and business customers with vital communications services, including broadband, cable, and voice. Generally, the customer signs up once and then pays a monthly charge until the customer decides to change or cancel the service. Cox's residential and small- and medium-sized business customers subscribe to these services for periods ranging from one month to one year to several years. Most residential contracts are month-to-month and can be canceled at any time. With the exception of mobile wireless service, residential customers on month-to-month service plans can have their charges prorated for the portion of the month they had service. A small portion of residential customers have longer-term contracts, after the conclusion of which, the contracts then generally switch to automatic renewal on a month-to-month basis. After the service converts to month-to-month renewal, customers can cancel in the same manner as customers with month-to-month service, with proration for a partial month of service.

Commercial customers subscribe using a mix of term contracts and month-to-month service. The subscriptions automatically renew in almost all cases. Cox has long offered automatic renewal because customers prefer the convenience of continuous service without the risk of interruption if they fail to renew and the cancellation process is well understood to customers should they so choose.

5. Cox offers many services as part of a bundled package. A bundled package gives consumers the convenience and, typically, the cost savings of purchasing several services together. Bundles may come in numerous combinations for a variety of consumer needs and budgets. Cable and internet often can be purchased together. Cox also offers phone services—both Voice over Internet Protocol (VoIP) and mobile wireless—as additional services that can be bundled with cable and internet. Mobile wireless cannot be purchased separately and must be purchased as part of a bundle with internet service. Other bundles can involve sports, news, and entertainment packages available via cable channels and streaming video options. Customers can customize the bundles with different internet speeds and performance measures, depending on individual needs.

6. I am familiar with the new rule adopted by the Federal Trade Commission ("FTC" or "Commission") regarding negative-option marketing ("Rule"). "Negative Option Rule" ("Rule"), RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf,

Appellate Case: 24-3137    Page: 288    Date Filed: 12/05/2024 Entry ID: 5463205

*published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425. The Rule imposes new requirements on contracts with a "negative option feature," which is the term that the Rule uses to define contracts for goods or services that continue until the customer cancels the contract. Most consumers would recognize these contracts as recurring subscription plans, and I will generally use the term recurring subscriptions when referring to the FTC's definition of contracts with a negative option.

7.      The Rule will impose unnecessary and burdensome new legal requirements on Cox's use of recurring subscriptions to provide services to our customers. As I explain below, the Rule will irreparably harm Cox by causing a reduction of consumer goodwill and a potential loss of business and by forcing us to incur unrecoverable costs of compliance in anticipation of the Rule. Ultimately these harms will fall on our customers, who may experience higher prices and diminished service as a result of the Rule.

**Section 425.4's Disclosure Requirements**

8.      ***Loss of Customer Goodwill.*** Complying with Section 425.4's new disclosure requirements will cause Cox to lose business and the goodwill of our potential and existing customers. Simply put, consumers will be overwhelmed because existing FCC regulations already require very specific stand-alone disclosures at point of sale in a highly specific format. The new FTC requirements

will create yet another iteration of disclosures separate from the others, some of which would be repetitive or in a different form.

9.       Cox of course does not object to disclosing the terms and conditions of its subscription offers to prospective customers, and Cox provides those disclosures under existing laws.  But the Rule adds a layer of new disclosure requirements that go beyond the subscription plan itself and impose vague new standards that will be difficult to implement.  Among other requirements, the Rule requires Cox to disclose "all Material terms" even if they do not "directly relate to the Negative Option Feature," and requires Cox to do so "prior to obtaining the consumer's Billing Information."  § 425.4(a).  The Rule also requires the disclosures to be "Clear and Conspicuous," and forbids any other information that "interferes with, detracts from, or otherwise undermines" consumers' ability to "read, hear, see, or otherwise understand" the required disclosures. § 425.5(b).  These broad and vague commands cover an indeterminately wide range of communications and create an enormous amount of enforcement discretion for the FTC, backed by the threat of punitive monetary sanctions if the FTC finds noncompliance.

10.       The inevitable result of these vague standards will be over-disclosure. Cox will be compelled to inundate potential customers with extensive information related to the negative option feature, the subscription transaction as a whole, and the underlying goods or services offered—and to do so early in the transaction,

5

before obtaining customers' billing information. The Rule offers no specific guidance on what constitutes "Material terms," leaving Cox to guess about what aspects of a given transaction might be considered "Material" to customers or regulators after the fact. If a regulator second-guesses our judgment about what terms are "Material," Cox could face the prospect of FTC enforcement and civil penalties for each violation.

11. The Rule's new disclosure requirements go well beyond the already extensive regulation of Cox's phone, broadband, and cable services. Video program distributors are required to disclose total monthly charges and explain promotional pricing (and when it expires). 47 U.S.C. § 562(a)–(b). They also must disclose this information within 24 hours of entering a contract via email, an online link, or comparable means. 47 U.S.C. § 562(a)–(b). Cable operators are required by other regulations to disclose various specified sales conditions for the products or services provided. 47 C.F.R. § 76.1602(b). Internet service providers ("ISPs") such as Cox are required to disclose extensive information on the characteristics of their service prior to sale on the Broadband Fact Label, 37 FCC Rcd. 13686 (2022). The label must be in a prescribed format modeled on the FDA's nutrition labels and must disclose the term of the contract, whether a promotional rate applies, how long the rate applies, and the rate after the promotional period ends. It must also disclose early termination penalties and governmental taxes and fees. Further, ISPs are

6

required to disclose additional information in our Internet Service Disclosures, *see* 33 FCC Rcd. 311 (2018), including network management practices and commercial terms, such as price, privacy policies, and redress options. But the Rule would impose even more obligations on Cox by requiring us to disclose up front—in any offers or promotional materials—the fact that we are offering a recurring subscription, the cancellation mechanism, the cost of the transaction, and any other "Material terms." The vagueness of "Material terms" only creates confusion as to whether the multiple terms already disclosed under existing rules promulgated by the FCC are sufficient or whether more terms will be required by the Commission. This may only be possible to learn through future Commission enforcement actions.

12. It is well understood by our customers that they are signing up for a recurring subscription when they buy a service from Cox or indeed any broadband, cable, or telephone provider. Customers will not want to review or digest even more voluminous disclosures of terms relating to the subscription and underlying service, especially when added to the substantial, often required, disclosures already applicable to Cox's subscription plans. Many consumers will be unable to identify the most important terms of a transaction in the mass of information that will be disclosed. Many consumers will become irritated by such extensive disclosures and decline to proceed with the transaction. And the more Cox discloses to comply with the Rule's indefinite materiality standard, the more consumers we will alienate and

lose.  Unfortunately, the more we disclose to reduce the risk of Rule violations, with the accompanying effect of confusing and overwhelming customers, the greater the chance we lose customer goodwill.

13.    Section 425.4 requires Cox to make all these disclosures in a "Clear and Conspicuous" manner, and early in the transaction, before obtaining customers' billing information.   To avoid enforcement and penalties, Cox will need to incorporate these disclosures into our customer-facing communications.   Such disclosures will clutter Cox's promotional materials and detract from the underlying offers.  That clutter will further irritate and alienate customers and cause Cox to lose business and customer goodwill.

14.    The disclosure requirements of Section 425.4 apply as well to promotions and offers made verbally, in person, or by telephone.  For such verbal offers and promotions, the required disclosures will significantly interfere with customer-facing communications.  Many customers will become frustrated both by the amount of time that the verbal disclosures take and by having to listen to the oral analogue of lawyers' fine print.

15.    The burdens of disclosure are exacerbated with bundled services. When customers sign up for a bundle of internet, telephone, and cable, each of these products will come with its own set of disclosures.  Online enrollment will become verbose to be Rule-compliant.  A phone call sign-up will become inordinately long

8

because Cox will need to disclose all material terms for *each* bundled service. Many customers will choose to end the online transaction or phone call rather than endure lengthy, unwanted disclosures. The result for Cox will be customer alienation and lost business.

16. ***Unrecoverable Compliance Costs.*** In addition to lost business and customer goodwill, the Rule imposes unrecoverable compliance costs on Cox.

17. Section 425.4 of the Rule is scheduled to take effect on May 14, 2025, which is 180 days from Federal Register publication. Cox has already begun its efforts to comply with the Rule by the effective date, and those efforts will increase unless the Rule's effective date is stayed. As part of these efforts, Cox has begun reviewing our existing advertising to determine what additional "material" information must be disclosed to comply with the Rule. Because the Rule's standard for disclosures is broad and vague, that review requires Cox to immediately begin analyzing all aspects of our services to determine what counts as a Material term of the transaction and whether this should lead to changes to our current disclosures. Cox also must compare the Rule's disclosure requirements with other existing federal, state and local disclosure requirements to identify and reconcile any overlaps and inconsistencies. This analysis requires Cox to consult with in-house counsel and likely outside legal counsel, at an expense to Cox.

9

18.    The requirements for disclosures to be "Clear and Conspicuous" will cause Cox to incur additional unrecoverable costs. Cox will have to redesign our webpages, apps, broadcast and print media, and other visual communications to comply with the disclosure requirements. For example, Cox will need to redesign and configure our websites to ensure that the required disclosures fit onto a single page and are "unavoidable" to customers. §§ 425.2(c)(4), 425.4(b)(1). Cox plans to allow customers to add services through our mobile app later this year and the Rule's requirements present significant challenges in fitting voluminous information on small screens. This burden is exacerbated in the context of bundled services, which are common among Cox products, and would apparently require disclosures for all the products that are being purchased together. Cox also may need to purchase additional advertising space or print additional materials to set out the required disclosures in a sufficiently large font to be "clear and conspicuous." §§ 425.2(c)(4), 425.4(b)(1). For verbal promotions and offers, Cox will have to retrain salespeople and customer service agents and re-write call scripts. We also will need to ensure that all required disclosures are made early in the transaction, before obtaining customer billing information, which may require us to reconfigure the sequence of our enrollment processes. All of these efforts will require significant time, money, technical resources, and legal review.

Appellate Case: 24-3137    Page: 295    Date Filed: 12/05/2024 Entry ID: 5463205

**Sections 425.2–.5's Ban on Certain Information With Promotions or Offers**

19.     The Rule forbids companies from providing certain information—even factually accurate information—when promoting or offering for sale goods or services with recurring subscription plans.  Among other provisions, Section 425.2(c)(1) limits the type and manner of communications that can constitute a "Clear and Conspicuous" disclosure; Section 425.2(c)(7) prohibits information that "contradict[s]," "mitigate[s]," or is "inconsistent with" a required disclosure; Section 425.3 broadly prohibits misrepresentations of any Material fact, whether "expressly or by implication"; Section 425.4(b)(3) prohibits communications that contain information that "interferes with, detracts from, contradicts, or otherwise undermines" the ability of consumers to see, hear, and understand required disclosures; Section 425.5(2) prohibits communicating information, in connection with promoting or offering a negative option feature, that "interferes with, detracts from, contradicts, or otherwise undermines" the ability of consumers to provide their express informed consent; and Section 425.5(c) forbids including in consent requests "any information not directly related to the consumer's acceptance of the Negative Option Feature."  Individually and collectively, these provisions would irreparably harm us by causing us to lose business and customer goodwill, incur unrecoverable costs of compliance, and suffer a loss of free speech rights.

11

Appellate Case: 24-3137     Page: 296     Date Filed: 12/05/2024 Entry ID: 5463205

20. ***Loss of Consumer Goodwill.*** The speech prohibitions of Sections 425.2–.5 will irreparably harm Cox by causing us to lose business and customer goodwill. For example, if Cox touted our "spectacular" array of sports programming available on our cable network, Cox could run the risk that this promotion would "detract[] from" disclosures of the recurring subscription character of our service. Regulators could likewise determine that truthful testimonials about other customers' positive experiences with a product or service are distracting or confusing to consumers.

21. Cox will be chilled from providing positive information about our products or services lest such information be found, after the fact, to detract from or undermine any other required disclosures. The Rule will lead to an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a product or service. Such customers are more likely to forgo commercial transactions with Cox or be dissatisfied with existing commercial arrangements. Cox will be irreparably harmed by the loss of goodwill.

22. ***Unrecoverable Compliance Costs.*** The Rule's prohibitions also contain vague terms that will increase Cox's compliance costs. For example, companies will need to analyze all the information they provide to customers to determine whether any information "detracts from" or "otherwise undermines" the required disclosures or the ability of consumers to consent to the recurring

12

subscription. Cox has already begun this work and will need to expend more resources trying to ascertain the types of information covered by these vague, prohibitory terms unless the Rule is stayed.

23. ***First Amendment Harms.*** The prohibition of communication that "detracts from" the mandatory disclosure under Sections 425.2–.5 of the Rule violates the First Amendment because the Rule is overbroad and has a chilling effect on truthful speech. This impinges Cox's communication and speech. Violation of First Amendment rights is a harm in itself that is immediate and irreparable.

### Section 425.5's Consent Requirement

24. The Rule requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." § 425.5(a)(1) (emphasis added). The FTC claims that it eliminated the proposed requirement that sellers must obtain consumers' separate consent to the rest of the transaction, but in reality that requirement remains because consumers must consent to the subscription to form a contract. Indeed, the Rule makes clear that the consent to the Negative Option Feature must be offered "separately" from the rest of the transaction. The Rule's separate consent requirement in Section 425.5 also will cause Cox to suffer irreparable harm from lost customer goodwill and unrecoverable compliance costs.

App.298

25.    ***Loss of Customer Goodwill.***  Section 425.5's effective double consent requirement will irreparably harm Cox by causing us to lose customer goodwill. Most obviously, requiring a customer to consent twice to a single transaction is not how business is usually done.  Many consumers will become confused and frustrated by the need to consent twice to a single transaction, increasing the likelihood that customers will forgo the transaction altogether rather than deal with a two-step transaction.

26.    Customers also will be confused by the Rule's requirement for the "consent request" to be "free of any information not directly related to the consumer's acceptance of the Negative Option Feature."  The Rule elsewhere requires Cox to disclose all material terms of the transaction even if they are unrelated to the Negative Option Feature.  To comply with both requirements, Cox may have to place the two consent requests on different pieces of paper or online screens—one for the subscription plan feature, and one for the transaction itself. Doing so will make the two-step consent process more cumbersome and frustrating for consumers.

27.    The increased number of screens, check boxes, and consents that will be required to comply with the Rule will improperly suggest a more complicated or problematic recurring subscription service.  The additional "red tape" will result in some consumers simply not completing the process to subscribe to Cox services.

Appellate Case: 24-3137    Page: 299    Date Filed: 12/05/2024 Entry ID: 5463205

The consumer frustration resulting from an unwieldy subscription process will diminish customer goodwill, both in the form of the customers themselves who do not receive the goods or services and in the form of word-of-mouth or online reviews negatively reflecting on the company.

28. ***Unrecoverable Compliance Costs.*** Cox independently will incur unrecoverable costs in complying with the two-step consent requirement. Cox will have to redesign our apps and webpages to have two separate places for customers to consent to subscription plans, and this work will require substantial time and technical resources. Having to provide two separate consents—one just for the negative option feature and the other for the rest of the transaction—would be a significant departure from the current enrollment process and it is unclear what information would go in the second consent provision, since the key information is the recurring nature of the subscription, the price, and the cancellation mechanism. If there is one consent for the negative option feature and then a separate consent for these very interrelated terms, it would be confusing for service providers and consumers alike.

29. When Cox offers goods or services with subscription plans to business customers, we will have to re-write our contracts and obtain attorney review. For our customer service representatives, Cox will need to re-write scripts and re-train

Appellate Case: 24-3137    Page: 300    Date Filed: 12/05/2024 Entry ID: 5463205

employees so that any sales transacted over the phone will include separate consent requests.

30. Even though the separate consent requirement takes effect in 180 days, it will take substantial planning and time to implement this requirement. That work has already begun and will increase unless the Rule is stayed.

**Section 425.6's Simple Cancellation Requirement**

31. Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with recurring subscriptions. Among other things, the Rule requires sellers to provide a "simple" cancellation mechanism that is in the "same medium" and "as easy to use as" the sign-up mechanism and that will "immediately stop" recurring charges. § 425.6(a)–(c). The FTC estimates that "a final Rule-compliant online cancellation should take no more than 30 seconds to one minute." 89 Fed. Reg. at 90,520. These requirements will irreparably harm Cox.

32. ***Loss of Customer Goodwill.*** The Rule will cause Cox to lose customer goodwill for several reasons.

33. First, the Rule's requirement for a cancellation mechanism that is symmetrical with the sign-up mechanism will prevent Cox from taking reasonable steps to verify customer identity and intent. If a customer subscribes on-line, Cox must provide for online cancellation under the "same medium" requirement. And although the Rule purports to allow companies to authenticate, verify, or confirm

16

customer information, the FTC broadly warns that "[a]ny authentication, verification, or confirmation procedure that creates unreasonable asymmetry runs afoul of Section 5 of the FTC Act and the Rule." 89 Fed. Reg. at 90,506. These requirements may result in some instances of Cox mistakenly canceling services that the actual customer did not want to cancel, leading to consumer frustration or worse. Children, pranksters, and malicious actors all could find it easier to interfere with our customers' communications services as a result of the Rule.

34. Second, the Rule will make accidental cancellations more frequent. The Rule hinders Cox's ability to protect customers against such inadvertent cancellations. For example, if customers accidentally click on a cancellation link, they could lose vital communications services because Cox cannot speak with them by phone prior to cancellation. Similarly, if a customer who subscribed online later intends to cancel one service in a bundled subscription but accidentally cancels the other services as well, Cox cannot speak with that customer by phone prior to the accidental cancellation.

35. Third, the "simple" and symmetrical cancellation requirements may prohibit Cox from providing important information to our customers about the consequences of cancellation. Many consumers have bundled services, such as internet broadband and cable, or cable and a video entertainment service, or various combinations of cable channels. These bundled services often offer customers

17

Appellate Case: 24-3137    Page: 302    Date Filed: 12/05/2024   Entry ID: 5463205

efficiencies and discounts that would not be available for each component alone. If a customer wishes to cancel one service, they may not be aware that their cancellation may also affect the price of the other services in that bundle or, in some cases, result in the cancellation of a desired service. Customers leasing Cox equipment may be confused when they continue to receive equipment charges unless they return the equipment, which is usually explained by an agent. Customers who cancel telephone service or mobile service may be surprised when they lose their telephone number after 45 days, or they may not understand how to get the number back through the mobile network operator that administers the telephone numbers. Similarly, consumers may not be aware that their cancellation could have an immediate effect, such as those subscribers who cancel landline voice telephone service but do not realize that they will lose 911 service as well. Without an interactive cancellation process in which Cox can explain the consequences of cancellation and customers can ask questions in real time, customers will not receive important information that they need to make informed choices. This will cause customer frustration and loss of goodwill.

36.     Fourth, the Rule's "simple" cancellation requirement will restrict Cox's ability to provide customers a more customized offering as an incentive to continuing their subscription. Although the Rule purports to omit the proposed prohibition on "saves," the Rule effectively contains that prohibition through the

"simple," "as easy as," and "same medium" requirements. In many cases, customers who consider cancelling a subscription are happy to retain a subscription plan if the company offers a different bundling of goods or services, a higher tier of good or service, or a lower price. Explaining these options adequately can take time, yet the FTC warns that a Rule-compliant cancellation should take no more than 30 seconds to one minute—an unrealistic and arbitrary time limit.

37. By burdening these types of communications, the Rule harms consumers—particularly low-income consumers—who may benefit the most from learning about lower-priced options for continued service. For instance, when customers seek to cancel due to financial difficulties, Cox can offer our Connect2Compete program, designed to provide low-cost internet to families with K–12 students. Some customers do not know about Connect2Compete, and learning about this program provides important information and a potential opportunity to continue broadband service for families in need—an opportunity that they otherwise would not know about. Similarly, some customers canceling services due to financial difficulties would benefit from Connect-Assist, a Cox program that provides low-cost, reliable internet service to individuals on one or more government assistance programs. Some Cox customers are unaware that these programs exist until they have a conversation with a Cox representative. The Rule would prevent

App.304

many customers from learning about these resources in an interactive call with a Cox representative at the time of cancellation.

38.     Similarly, some subscriptions have early termination fees due to associated service discounts, but in certain circumstances Cox can waive those fees. However, for Cox to know when the circumstances warrant a waiver, a Cox representative must have a conversation with the customer.   The "simple" cancellation requirement would make it more difficult, if not impossible, for Cox to have these conversations with customers.  This will irreparably harm Cox's customer goodwill.

39.     ***Unrecoverable Compliance Costs.***     The Rule's cancellation requirements already are causing Cox to incur unrecoverable compliance costs, starting immediately and increasing until the Rule goes into effect.  Cox will need to re-design our apps and websites, re-write call scripts, and train employees to ensure that they are complying with the Rule's new requirements for "Simple Cancellation."  The cost for Cox to design a relatively customer friendly "simple" online cancellation process will be immense.  And Cox ultimately will need to pass those costs on to consumers, resulting in higher prices and increased customer frustration.

40.     Cox also will need to engineer solutions to numerous difficult technical problems caused by the Rule's "simple" cancellation requirement.  For example,

when customers port their telephone number to another carrier or cancel their service, Cox sends them a one-time PIN to use to validate that the person canceling the service is the subscriber and not a fraudster trying to port service to their own phone. This would need to be an added step in the "simple" cancellation process. However, it would be complex and technically difficult to provide this capability for mobile customers with multiple telephone numbers on their account who wish to cancel only one line but not the entire account.

41. In addition, the Rule will result in new compliance costs for Cox's business-to-business services. Currently, to minimize the inadvertent discontinuance of service and ensure a smooth transition for business continuity purposes, Cox's small- and medium-sized business customers can cancel only in person, by telephone, or by chatting with a customer service agent online. To comply with the Rule's new symmetrical cancellation requirements, Cox will have to link the new online cancellation process to our back-office systems, and this will be a complex technological undertaking. The effort to complete this system change will require numerous teams across different departments, including skilled product and systems developers, and may well exceed the Rule's 180-day compliance deadline.

Appellate Case: 24-3137    Page: 306    Date Filed: 12/05/2024 Entry ID: 5463205

42.     In addition, Cox will need to hire additional telephone operators and staff to ensure that any cancellation calls are processed "promptly," another of the Rule's new requirements.

43.     ***First Amendment Harms.***  The FTC estimates that a Rule-compliant online cancellation should take no more than 30 seconds to one minute.  This time constraint, in conjunction with the "same medium" and "as easy to use" requirements, will severely burden Cox's ability to communicate with its customers during critical transactions.  To the extent that this burden violates the First Amendment, the harm to Cox is immediate and irreparable.

### The Rule's Recordkeeping Requirements

44.     Finally, the Rule imposes costly and harmful recordkeeping requirements.  The Rule requires Cox to "[k]eep or maintain verification of the consumer's consent" to a recurring subscription and the underlying transaction "for at least three years."  § 425.5(a)(3).  The Rule allows a company to avoid that requirement if it "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent."  *Id*.

45.     ***Unrecoverable Compliance Costs.***  Those requirements also are causing Cox to incur unrecoverable compliance costs.  Cox does not currently record or maintain the type of consumer consent verification that the Rule requires.  For

cancellations over the internet or via apps, Cox will need to re-design software and websites to generate Rule-compliant records of customer consent. For cancellations over the phone or in-person, we will need to train employees and design forms for employees to record consent. Cox also will incur incremental new costs to maintain records of consumers' consent to transactions. Alternatively, we would need to devise new procedures for documenting that our online, telephone, and in-person processes make it technically impossible for any consumer to complete the transaction without consent. This would require implementing new recordkeeping systems and training personnel to maintain the necessary information.

### The Cost of Implementing the Rule

46.     Based on my knowledge of the Rule and of the scale of change that would be required, I estimate that Cox's costs of compliance with the various aspects of the Rule will, in total, exceed $6 million dollars and may be as high as $10 million dollars or more. Indeed, given the Rule's short 180-day compliance deadline, Cox will need to incur additional costs to perform the necessary work on an accelerated timeframe. Furthermore, because some development must be done sequentially, acceleration of the timeframe may impact our ability to fully test our processes, which could lead to additional costs to correct any post-production errors.

Appellate Case: 24-3137    Page: 308    Date Filed: 12/05/2024 Entry ID: 5463205

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:    November 26, 2024

# Doc. 11

Declaration of James Tarrant, Michigan
Press Association

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF JAMES TARRANT

I, James Tarrant, hereby declare as follows:

1.      I am the Executive Director of the Michigan Press Association ("MPA"), which was established in 1868 to promote press freedom and to represent its members' business interests through its public policy work and other services. Its members include more than 320 publications that provide trusted and quality journalism to readers throughout Michigan—both digitally and by print publication. The MPA distributes its own monthly publication called *The Bulletin* to MPA members.  Through our newsletter, we keep MPA members connected and informed on legislative developments affecting the press industry.  We also have a public policy team that tracks legislative and administrative initiatives that affect our members and their ability to serve their communities.  On issues of great importance, the MPA also represents the interests of its members in litigation.

2.      The Rule on Negative Option Marketing ("Rule") adopted by the Federal Trade Commission ("Commission") is of significant concern to the MPA and its members.  Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024),

Appellate Case: 24-3137    Page: 311    Date Filed: 12/05/2024 Entry ID: 5463205

https://www.ftc.gov/sytem/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.  I have reviewed the Rule and I am familiar with its requirements.  The Rule imposes burdensome new requirements and restrictions on the MPA's members who market and use recurring subscriptions (which the FTC calls "negative option plans").  Recurring subscriptions are contracts for goods or services that continue until the customer cancels the subscription.  They are a common way for newspapers, including the MPA's members, to attract and retain customers.  News publications historically have offered subscriptions to customers who wished to receive daily, weekly, or monthly news publications.  That model continues to this day, with digital and print recurring subscriptions constituting a substantial share of news publishers' revenues.  Virtually all of the MPA's members market subscription plans for their publications, including the *Detroit Free Press*.

3.      The MPA has standing to represent its members in this litigation.

4.      *First*, as described in greater detail below, the Rule imposes many new requirements on MPA members and forbids MPA members from engaging in common forms of marketing.  New regulatory requirements and restrictions are a well-established injury in fact that would give the MPA's members standing to challenge the Rule in their own right.  Furthermore, that injury in fact would be

2

Appellate Case: 24-3137    Page: 312    Date Filed: 12/05/2024 Entry ID: 5463205

irreparable for many of the MPA's members, including the *Detroit Free Press*, if the Rule is not stayed.

5.      *Second*, the interests that the MPA seeks to protect in this litigation are germane to the MPA's purpose.  One of the purposes of the MPA is to advocate for its members against laws, regulations, and government policies that would harm the Michigan press industry.  The Rule would do just that, because it would make it more difficult for Michigan's newspapers to market their publications and retain customers.  It would also expose newspapers to new litigation and enforcement risks, and interfere with their protected communications with customers.  These interests are core to the MPA's mission.  That is why, for example, the MPA has featured the Rule in past issues of *The Bulletin*.

6.      *Third*, the claims asserted in this litigation, and the relief sought, do not require the participation of the MPA's members as parties in the litigation.  It is well settled that trade associations can (and routinely do) challenge and seek to set aside administrative rules on behalf of their members without the members' participation.  Indeed, this is a fundamental purpose of many trade associations.  None of the MPA's members is indispensable to a proper resolution of this case.

7.      Below, I first explain the importance of subscription plans in the newspaper industry.  Then, I explain how the Rule imposes new requirements and prohibitions on newspapers that offer subscription plans.  I next describe how each

3

category of the Rule's requirements and prohibitions, coupled with the threat of enforcement and civil penalties, will cause the MPA's members irreparable harm unless the Rule is stayed.

8.     For each of the Rule's major new requirements and prohibitions, I explain how the Rule—if not stayed—will cause two types of irreparable harm. First, the Rule will cause harm to newspapers' customer goodwill, because it requires newspapers to take actions that will confuse, burden, and alienate their customers.  The harm to newspapers from losing customer goodwill will be irreparable.  Second, the Rule will harm newspapers by causing them to incur new and unrecoverable costs of compliance.  Newspaper publishing companies must redesign and reengineer customer intake processes, make corresponding changes to their apps and websites, implement new training and staffing protocols, obtain legal review, and install new recordkeeping systems—to name just a few of the many burdens that the MPA's members will incur.  And because these actions will take time to implement, the MPA's members must begin incurring these costs immediately, and those costs will mount as the Rule's effective date approaches.  If the Rule is later overturned following judicial review, the MPA's members will not be able to recover those costs.  These burdens and loss of customer goodwill will also place newspapers at a competitive disadvantage with respect to other major sources of news today, such as online social media platforms and other online

4

sources of news and information that will not need to shoulder the burdens of this unwarranted Rule.

9.      Finally, some of the Rule's requirements burden the commercial speech of the MPA's members in violation of the First Amendment.  Unless the Rule is stayed, the MPA's members will be irreparably harmed in the loss of their First Amendment rights.

10.      All of these harms are acute and unnecessary for newspaper publishing companies.  The FTC has completely failed to identify any problems that consumers or businesses have with subscription plans for newspapers.  That is likely because consumers and businesses overwhelmingly are happy with their subscription plans for newspapers.  Subscription plans give customers the assurance that they will continue to have daily access to digital news sources, or that they will continue to receive periodic deliveries of print newspapers, so that they may continue to receive the quality journalism so important to their daily lives that their subscription provides.

11.      Customers often wish for such plans to continue for years.  They do not want the hassle of revisiting their contracts for newspapers; they prefer to simply have access to the digital source whenever they wish to access it, or to receive a periodic and convenient delivery of the newspaper on a recurring basis.  Customers

Appellate Case: 24-3137      Page: 315      Date Filed: 12/05/2024 Entry ID: 5463205

do not wish for or need the burdensome and complex disclosures that the Rule requires; nor do they need the cancellation mechanism that the Rule dictates.

**The Importance of Subscription Plans to the Newspaper Industry**

12.     Our nation's newspapers are essential to our democracy.  For hundreds of years, they have provided timely and important information to voters free from government coercion.   Millions of Michiganders (and Americans) rely on newspapers for quality journalism regarding current events, weather, politics, sports, crime, and more.  Local newspapers ensure that individuals are informed of local events, thus allowing citizens to participate more actively in their communities. State-wide or national newspapers similarly help individuals keep informed on state or national events.  Newspapers thus serve a critical role for our democracy, helping to keep citizens informed about important issues and fostering debate that shapes our body politic.

13.     The newspaper industry has long used subscription plans to deliver periodic newspapers to customers.  Subscription plans are well suited to newspapers and other periodicals.  To receive such periodic newspapers, customers naturally enter subscriptions with newspapers so that they keep receiving their news sources until they decide to cancel the subscription.  Without subscriptions, customers would face the difficulty of having to repeatedly renew a contract to receive newspapers. If a customer forgets to renew, they likely would become frustrated when the

Appellate Case: 24-3137     Page: 316     Date Filed: 12/05/2024 Entry ID: 5463205

newspaper is not delivered—and possibly blame the newspaper for the lack of delivery. Subscriptions and newspapers have accordingly become so synonymous that people do not think twice about them.

14. In recent years, as the newspaper industry has faced challenges from competing sources of news and information in the Internet era, many newspapers have begun providing digital publications as well, either alongside or in the place of their print publications. Subscriptions are the most natural way for customers to access these digital newspapers. Readers typically want to access their digital news sources on a regular basis, often multiple times per day. They do not want the hassle of having to renew a contract to access a digital news source, or the irritation of having their access blocked if they forget to renew a contract. A subscription allows them to access their news sources on a continual basis until they decide to cancel the subscription.

15. Many newspapers market bundled offers, in which customers enter one subscription to receive multiple newspapers. These bundled subscriptions allow customers to receive multiple newspapers for a lower cost than it would otherwise cost to subscribe to each newspaper individually. Bundled subscriptions also assist newspapers by boosting readership from customers who might not have subscribed individually to a particular newspaper.

Appellate Case: 24-3137    Page: 317    Date Filed: 12/05/2024 Entry ID: 5463205

16.     In 2022, total U.S. daily newspaper circulation was 20.9 million for both print and digital newspapers. *See* Newspapers Fact Sheet, Pew Research Center (Nov. 10, 2023), https://www.pewresearch.org/journalism/fact-sheet/newspapers/. While still significant, newspaper circulation has been shrinking in recent years. The *Washington Post* has reported that between January 2005 and December 2020, approximately a quarter of local print newspapers in the United States closed their doors. *See* https://www.washingtonpost.com/magazine/interactive/2021/local-news-deserts-expanding/ (Nov. 30, 2021). Traditional newspapers face intense competition from a proliferation of online sources and platforms. This difficult marketplace has forced many newspapers to increase their advertising, marketing, and subscription efforts, including through the bundling of publications. It has also become more imperative than ever that newspapers work hard to maintain customer loyalty and goodwill, so that they can continue to provide citizens with the news, both national and local, that is so important to their daily lives.

17.     Additional regulatory burdens on newspaper subscriptions would only exacerbate these problems for the newspaper industry. Subscriptions are estimated to constitute over half of newspapers' revenues. Newspapers Fact Sheet, Pew Research Center (Nov. 10, 2023), https://www.pewresearch.org/journalism/fact-sheet/newspapers/. Regulations that make those subscriptions more costly for newspapers or more difficult for customers to enter will threaten the longstanding

Appellate Case: 24-3137     Page: 318     Date Filed: 12/05/2024 Entry ID: 5463205

business model of newspapers at a time when many newspapers are already struggling.

**The Overbreadth of the FTC's Rule**

18.     The Rule imposes substantial new requirements on all newspapers that offer or promote subscription plans—or what the Rule calls "Negative Option" plans.  The Rule defines a "Negative Option Feature" to include any contract in "which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer."  § 425.2(f).  It applies to companies that sell, offer, or "otherwise market[]" goods or services with a negative option feature, as well as companies that merely promote such goods or services.  § 425.2(g).

19.     The new Rule extends far beyond the FTC's prior, more limited regulation of negative option plans.  It also extends far beyond the existing patchwork of state laws, federal legislation, and standards for automatic renews that credit card companies use.[1]  Newspapers already comply with those various laws,

---

[1] For example, the Restore Online Shoppers' Confidence Act ("ROSCA") provides specific requirements for negative option marketing over the internet.  *See* 15 U.S.C. § 8403.  The Unordered Merchandise Statute provides that mailing unordered merchandise is an unfair trade practice.  *See* 39 U.S.C. § 3009(a).  The Electronic Fund Transfer Act ("EFTA") forbids sellers from imposing recurring charges on a consumer's debit card or bank account without written consent.  *See* 15 U.S.C. § 1693c.  The Telemarketing and Consumer Fraud and Abuse Prevention Act
*(cont'd)*

9

Appellate Case: 24-3137    Page: 319    Date Filed: 12/05/2024 Entry ID: 5463205

which are more than sufficient to protect their customers. Indeed, the FTC has identified no problems with newspaper subscriptions, and customers are overwhelmingly satisfied with their newspaper subscriptions. Yet the Rule will impose outsized burdens on newspapers with respect to the subscription plans that serve as their lifeblood.

20. As I explain below, the Rule sets forth several categories of requirements that will cause the MPA's members irreparable harm absent a stay. Section 425.4 of the Rule imposes new disclosure requirements on companies offering or promoting goods or services with a negative option feature. Sections 425.2 through 424.6 effectively prohibit companies from including certain information with their promotions or offers. Section 425.5 requires companies to obtain a consumer's express consent to a negative option feature "separately from any other portion of the transaction." Section 425.6 requires companies to offer a simple mechanism for consumers to cancel negative option contracts that is "as easy

---

required the FTC to promulgate the Telemarketing Sales Rule, which in part regulates negative option marketing performed via telemarketing. *See* 15 U.S.C. §§ 6101–6108; 16 C.F.R. § 310. Most recently, the Infrastructure Investment and Jobs Act of 2021 directed the Federal Communications Commission to regulate trial period negative option marketing offered by broadband providers. *See* Pub. L. 117-58, § 60504(a)–(b), 135 Stat. 429, 1244 (2021) (requiring a "broadband consumer label" that shall disclose "whether the offered price is an introductory rate and, if so, the price the consumer will be required to pay following the introductory period"). All of these statutes regulate or authorize the regulation of negative option marketing only in specified contexts.

App.320

to use as" whatever "mechanism" employed by the consumer "to consent to the Negative Option Feature."  And Section 425.5 also requires companies to keep records of any consumer consent to negative option transactions.

21.    As I explain below, each of these features of the Rule will harm the MPA's members by causing companies to lose customer goodwill, and by causing companies to incur unrecoverable costs of compliance in anticipation of the Rule.

**Section 425.4's Disclosure Requirements**

22.    The Rule imposes new disclosure requirements in 15 C.F.R. § 425.4 that will irreparably harm the MPA's members by causing them to lose customer goodwill and incur substantial, unrecoverable costs of compliance.  That loss of goodwill and those costs will also place newspapers at a competitive disadvantage to other major sources of news for Americans today, such as social media platforms and other online sources of news and information that do not operate on a subscription model and thus are not subject to this Rule.

23.    Section 425.4 requires anyone offering a negative option plan to broadly "disclose . . . prior to obtaining the consumer's Billing Information, all Material terms regardless of whether those terms directly relate to the Negative Option Feature." § 425.4(a).  Those disclosures must include, but are not limited to, the fact of the negative option feature, the deadline by which the consumer must act to stop all charges, the amount and frequency of the charges, and any information

Appellate Case: 24-3137    Page: 321    Date Filed: 12/05/2024 Entry ID: 5463205

necessary to find the "simple cancellation mechanism" required by Section 425.6. § 425.4(a)(1)–(4). The disclosures are required in connection with sales, offers, and "otherwise marketing" goods or services with negative option features. §§ 425.2(g); 425.4.

24. The Rule does not specify what information companies must provide when offering negative option plans. Although the Rule provides non-exhaustive examples, it regulates "all Material terms." § 425.2(a). "Material" is defined as "likely to affect a person's choice of, or conduct regarding, goods or services." § 425.2(e). The required disclosures are not limited to the negative option feature; in fact, the Rule explicitly states that companies must disclose "all material terms, regardless of whether those terms directly relate to the Negative Option Feature." § 425.2(a). Therefore, the Rule compels companies to make broad disclosures about their services or products simply because those companies offer or promote the products through negative option plans. The Rule thus effectively regulates the transaction as a whole once it is established that the transaction falls under the "negative option" definition established by the Rule.

25. Section 425.4 also requires that these disclosures be "clear and conspicuous." § 425.4(b)(1). The Rule defines that phrase to mean "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers." § 425.2(c). Among other things, the Rule provides that disclosures must (i) "stand

Appellate Case: 24-3137    Page: 322    Date Filed: 12/05/2024 Entry ID: 5463205

out from any accompanying text" if made through visual means, (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it" if made audibly, and (iii) be "unavoidable" if made through electronic means. § 425.2(c)(1)–(4). Moreover, the specific disclosures required by Section 425.4(a)(1)–(4) "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature," and any other disclosures "must appear before obtaining the consent" of the consumer to the negative option feature. *Id.* § 425.4(b)(2). The Rule, therefore, not only requires the disclosure of an extensive amount of information, but also compels companies to communicate that information in unique and highly regulated ways.

26. ***Loss of Customer Goodwill.*** Complying with Section 425.4's disclosure requirements will cause the MPA's members to lose the goodwill of their potential and existing customers.

27. First, the MPA's members will be compelled to inundate potential customers with information related to the goods or services offered. The MPA's members will have to disclose extensive information that has no relation to the subscription plan features, simply because the newspaper is promoted or offered with a subscription plan. The Rule offers little guidance on what constitutes a "Material" term, leaving the MPA's members to guess about what aspects of a given transaction might be considered "Material" to customers—or to regulators, after the

13

fact. If companies guess wrong and do not disclose terms that are later deemed "material," companies could face the prospect of FTC enforcement and civil penalties of up to $51,744 per violation. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

28. The natural result of the threat of penalties for under-disclosure will be that the MPA's members will over-disclose the terms of their products and services. The Rule's broad materiality requirement could easily serve as a gateway for regulators to impose their policy preferences on newspapers by claiming that some readers find some issues important. The SEC is already doing this by attempting to use the securities laws' materiality requirement to require disclosures of climate risks, which has led to litigation based on the alleged nondisclosure of those allegedly "material" risks. Newspapers will accordingly feel pressured to disclose more than needed to avoid regulatory scrutiny, and these excessive disclosures will harm newspapers' relationship with their subscribers.

29. The MPA's members will have additional challenges—which will prove particularly burdensome for smaller, local newspapers—in determining what needs to be disclosed when many of the products and services they provide are bundled, such as subscription plans for multiple newspapers. These bundled service plans are an efficient way for customers to obtain essential services, often at a discounted rate that reflects the efficiencies. The likely result of Section 425.4's

14

Appellate Case: 24-3137   Page: 324   Date Filed: 12/05/2024 Entry ID: 5463205

disclosure requirements will be significant over-disclosure in this context. The excessive disclosures will be particularly onerous and frustrating for customers. Purchasers of newspapers will be inundated with disclosures about every newspaper within the bundle in every transaction.

30. The MPA's members are already extensively regulated and the MPA's members already provide many disclosures—but now, under the Rule, even more disclosures will be required. For example, many newspapers already provide a confirmation email, after a customer accepts a subscription plan, that memorializes the terms of the transaction. But the Rule would require the MPA's members to disclose up front, in any offers or promotional materials, the fact that the company is offering a negative option contract, the cancellation mechanism, the cost of the transaction, and any "material" terms, as that undefined term might later be construed. Depending on the service, the MPA's members also may have to disclose various other terms, such as the potential for factual errors in reporting, the fact that some articles are opinion journalism, the fact that print newspapers may not be delivered because of extenuating circumstances, and so on. Section 425.4's disclosure mandate could compromise newspapers' appearance of objectivity and harm goodwill. *See* Detroit Free Press Decl. ¶¶ 13–15.

31. While some consumers may wish to have such detailed information about the subscription, many do not wish to review or digest such voluminous

Appellate Case: 24-3137    Page: 325    Date Filed: 12/05/2024 Entry ID: 5463205

disclosures—particularly before they enter a transaction online or over the telephone. Many consumers will be unable to identify the most important terms of a transaction; many more will find it burdensome and time consuming to identify what matters from the mass of material that will be disclosed. Many consumers will become irritated by such extensive disclosures and decline to enter transactions rather than try to process the information disclosed. *See* Detroit Free Press Decl. ¶ 14. And the more a newspaper discloses to comply with the Rule's indefinite materiality standard, the more consumers that newspaper will irritate and potentially lose, and the more the newspaper will be placed at a competitive disadvantage with respect to online competitors that do not use a subscription model, such as social media platforms. Under the Rule, the MPA's members that disclose the most will be those that lose the most customer goodwill.

32. Section 425.4 also requires the MPA's members to provide all these disclosures in a "Clear and Conspicuous" manner—another expansive term with punitive consequences in case of noncompliance. To avoid enforcement and penalties, the MPA's members will need to incorporate these disclosures into their customer-facing communications. A visual disclosure "must stand out from any accompanying text or other visual elements so that it is easily noticed." Such disclosures will clutter the MPA's members' promotional materials and detract from the underlying offers. *See* Detroit Free Press Decl. ¶¶ 16–17. That clutter will

Appellate Case: 24-3137    Page: 326    Date Filed: 12/05/2024 Entry ID: 5463205

further irritate and alienate customers and cause the MPA's members to lose business and customer goodwill.

33. The disclosure requirements of Section 425.4 do not exempt promotions and offers made verbally—either by telephone or in person. For such verbal offers and promotions, the required disclosures will significantly interfere with customer-facing communications. Many customers will become frustrated both by the amount of time that the verbal disclosures take and by having to listen to the oral analogue of "lawyers' fine print." In signing up for a bundle of newspapers, each of these newspapers will come with its own set of disclosures. A phone call sign-up will become inordinately long as all the material terms for each of these bundled services must be independently disclosed. Many customers will terminate the conversation or phone call rather than listen to extensive unwanted disclosures. The result for the MPA's members will be customer alienation and lost business. *See* Detroit Free Press Decl. ¶ 18.

34. ***Unrecoverable Compliance Costs.*** In addition to lost business and customer goodwill, the Rule imposes unrecoverable compliance costs on the MPA's members.

35. Most of the Rule is scheduled to take effect on May 14, 2025. The MPA's members are already incurring compliance costs, and if the Rule's effective date is not stayed, those costs will increase as the effective date draws near. The

App.327

MPA's members will need to review their existing advertising to determine what additional "material" information must be disclosed to comply with the Rule. *See* Detroit Free Press Decl. ¶ 21. Because the Rule's standard for disclosures is broad and vague, that review also will require the MPA's members to immediately begin analyzing all aspects of their services to determine what counts as a material term of the transaction and whether this should lead to changes to their current disclosures. For some newspapers, this analysis will require consulting in-house legal counsel. For many local newspapers that often employ only a few dozen staff, this analysis will require finding outside counsel, an outsize burden for their operations.

36. The requirements for disclosures to be "clear and conspicuous" will cause the MPA's members to incur additional unrecoverable costs. The MPA's members will have to redesign their webpages and other visual communications to comply with the disclosure requirements. For example, many of the MPA's members will need to reconfigure their websites and apps to ensure that the required disclosures are "unavoidable" to customers. § 425.2(c)(4). This burden is exacerbated in the context of bundled services: Some of MPA's members will need to purchase additional advertising space or print additional materials to set out the required disclosures in a sufficiently large font to be "Clear and Conspicuous." § 425.2(c)(2). For verbal promotions and offers, the MPA's members will have to retrain salespeople and re-write call scripts. § 425.2(c)(3). All of this will require

18

significant time, money, technical resources, and legal review that many local newspapers simply do not have.  *See* Detroit Free Press Decl. ¶¶ 21–22.

### Sections 425.2–.5's Ban on Certain Information With Promotions or Offers

37.    The Rule forbids companies from providing certain information—including truthful information—when promoting or offering for sale goods or services with negative option plans.  This regulatory ban on speech would irreparably harm the MPA's members by causing them to lose business and customer goodwill, incur unrecoverable costs of compliance, and suffer a loss of First Amendment speech rights.

38.    Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures" that the Rule requires.  § 425.4(b)(3).  Section 424.2, when defining the phrase "clear and conspicuous" for purposes of the disclosure requirements of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication."  § 425.2(c)(7).  Relatedly, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the negative option feature." § 425.5(a)(2).  And Section 425.3 forbids companies from "misrepresent[ing],

19

Appellate Case: 24-3137     Page: 329     Date Filed: 12/05/2024 Entry ID: 5463205

expressly or by implication, any Material Fact," including both facts about "the Negative Option Feature" and "any other Material fact." § 425.3.

39. ***Loss of Consumer Goodwill.*** The speech prohibitions of Sections 425.2–.5 will irreparably harm newspapers by causing them to lose business and customer goodwill. For example, if a newspaper must disclose the risk that its reporting may contain inadvertent factual inaccuracies, then an overzealous regulator might determine that the newspaper cannot describe itself as providing "trusted journalism" or "news you can trust" if doing so could be construed by a regulator to "detract[] from" the disclosure of inaccurate reporting risks. Or if a newspaper must disclose that print deliveries may be interrupted by weather or other conditions, an overzealous regulator might determine that the newspaper cannot market its print deliveries as "reliable" or "on time."

40. The result will be that newspapers are chilled from providing positive information about their products or services lest such information be found, after the fact, to "detract[] from" or "otherwise undermine[]" any other required disclosures. Detroit Free Press Decl. ¶ 26. These prohibitions accordingly will lead to companies placing an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a newspaper. Such customers are more likely to forgo commercial transactions or be dissatisfied with existing

commercial arrangements. *See* Detroit Free Press Decl. ¶ 27. The MPA's members will be irreparably harmed by that increased customer alienation.

41. ***Unrecoverable Compliance Costs.*** The Rule's prohibitions also contain vague terms that will increase the MPA's members' compliance costs. For example, newspapers need to analyze all the information they provide to customers to determine whether any information "detracts from" the required disclosures or the ability of consumers to consent to the negative option feature. Detroit Free Press Decl. ¶ 28. The MPA's members will expend more resources trying to ascertain the types of information covered by these vague, prohibitory terms. For many smaller and local newspapers, these costs are disproportionate to their budgets and readership and will need to be passed onto their customers, which may decrease their readership.

42. The uncertainty also will lead to overdeterrence, as newspapers avoid making lawful statements for fear that the FTC will later give a broad construction to these vague terms. Unless the Rule is stayed, newspapers will need to begin this work now to ensure their compliance by the Rule's effective date.

43. ***First Amendment Harms.*** The prohibition of communication that detracts from the mandatory disclosure runs afoul of the First Amendment because of the Rule's extreme breadth and the chilling effect on truthful speech. This burdens the communication and speech of the MPA's members. Violation of First

21

Appellate Case: 24-3137    Page: 331    Date Filed: 12/05/2024 Entry ID: 5463205

Amendment rights is a per se harm to the MPA's members. And that harm is immediate and irreparable. *See* Detroit Free Press Decl. ¶ 29.

### Section 425.5's Consent Requirement

44.     The Rule's consent requirement in Section 425.5 also will cause the MPA's members to suffer irreparable harm from lost customer goodwill and unrecoverable compliance costs, again while placing them at a competitive disadvantage with respect to other modern sources of news, such as social media platforms.

45.     Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." § 425.5(a)(1). Although the Rule does not define either "express informed consent" or "unambiguously affirmative consent," it provides that sellers will be "deemed in compliance with [these requirements] for all written offers . . . if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction." § 425.5(c). The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and

Appellate Case: 24-3137     Page: 332     Date Filed: 12/05/2024 Entry ID: 5463205

free of any information not directly related to the consumer's acceptance of the negative option feature." *Id.*

46.     By requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires companies to obtain a consumer's consent twice—first, for the negative option feature, and second, for the transaction itself.  The Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages, for the Rule simultaneously requires *both* that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the negative option feature" *and* that that companies disclose material terms unrelated to the negative option feature.  §§ 425.4(a), 425.5(c).

47.     ***Loss of Customer Goodwill.***  Section 425.5's consent requirement will irreparably harm the MPA's members by causing them to lose customer goodwill.  Requiring a customer to consent twice to a single transaction is not how business is usually done.  The very nature of newspaper subscriptions is that the product delivered and the subscription itself are inseparable; newspapers are published periodically, and when a customer agrees to pay to receive those periodic publications, they are necessarily agreeing to pay periodically.  The so-called "negative option feature" and the newspaper itself are inseparable.

48.     Many consumers will become confused and frustrated by the need to consent twice to a single transaction, increasing the likelihood that customers will forgo the transaction altogether rather than deal with a two-step transaction.  Detroit Free Press Decl. ¶¶ 32–33.  That frustration and confusion will be particularly problematic for newspapers, who now compete directly with social media platforms as a source of news.  Most of those platforms operate solely off advertising revenue and thus do not charge consumers.  If newspaper subscriptions are confusing or difficult for consumers to sign up for, then many customers will forgo the subscription in favor of receiving news from free social media platforms.

49.     Customers also will be confused by the Rule's requirement for the "consent request" to be "free of any information not directly related to the consumer's acceptance of the Negative Option Feature."  § 425.5(c).  The Rule elsewhere requires the MPA's members to disclose all material terms of the transaction even if they are unrelated to the negative option feature.  § 425.4(a).  To comply with both requirements, the MPA's members may have to place the two consent requests on different pieces of paper or webpages—one for the subscription plan feature, and one for the transaction itself.  Doing so will make the two-step consent process more cumbersome and frustrating for consumers.  Because periodically published newspapers are not easily separated from the "Negative

24

Option Feature" of the subscription, it is unclear what information should go on each webpage or piece of paper.

50.     Many consumers also will not understand that two separate consents are required for a single transaction and, despite intending to purchase a good or service, provide only one step of consent before leaving the transaction.   For example, if consumers must navigate one webpage to consent to a subscription plan feature and then navigate a second webpage to purchase the newspaper itself, some consumers will stop at the first webpage and think that their initial consent is sufficient to purchase the service.   Consumers will then become irritated with the newspaper when a print publication is not delivered or access to the newspaper's website is not provided—all because the consumer mistakenly thinks that they purchased the newspaper subscription.   That irritation will cause further lost customer goodwill, both in the form of the customers themselves who do not receive the goods or services and in the form of word-of-mouth or online reviews negatively reflecting on the newspaper.   Detroit Free Press Decl. ¶ 33.

51.     ***Unrecoverable Compliance Costs.***     The MPA's members independently will incur unrecoverable costs in complying with the two-step consent requirement.  The MPA's members selling online subscriptions will have to redesign their apps and webpages to have places for two separate consents, one for subscription plans and the other for the underlying contract as a whole.   This work

25

will require substantial time and technical resources.  Detroit Free Press Decl. ¶ 35. The MPA's members offering goods or services with subscription plans to other businesses will have to re-write their contracts and obtain lawyer review.  The MPA's members selling goods or services with subscription plans in person or over the phone will need to re-write scripts and re-train their salespeople to include separate consent requests.  All of this will require newspapers to expend time and money today in anticipation of the Rule's effective date unless the Rule is stayed. Many smaller newspapers do not have this time or money.

### Section 425.6's Simple Cancellation Requirement

52.     Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with negative option features and impedes companies from offering consumers critical information when they seek to cancel such contracts.  These requirements will irreparably harm the MPA's members.

53.     Section 425.6 provides that companies offering or selling goods or services with negative option features must "provide a simple mechanism for a consumer to cancel the Negative Option Feature" and "avoid being Charged" for "the good or service."  § 425.6(a).  When a customer uses that mechanism, the company must "immediately stop any recurring Charges."  § 425.6(a).  The Rule also provides that the "simple mechanism" to cancel "must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature."

Appellate Case: 24-3137     Page: 336     Date Filed: 12/05/2024 Entry ID: 5463205

§ 425.6(b).  The Rule then specifies that "[a]t a minimum," the cancellation must be offered "through the same medium the consumer used to consent to the Negative Option Feature."  § 425.6(c).  It further specifies rules for each medium: For internet cancellations, the cancellation mechanism must be provided online.  § 425.6(c)(1). "For cancellation by telephone call," the seller "must promptly effectuate cancellations requested by the consumer via a telephone number that is answered or records messages, made available during normal business hours, and not more costly to use than the telephone call the consumer used to consent to the Negative Option Feature."  § 425.6(c)(2).  And for cancellation where consent had been "obtained in person," the seller "must offer the simple mechanism" through the internet or by telephone in addition to, "where practical," an "in-person method similar to that the consumer used to consent to the Negative Option Feature," with the same requirements for online and telephone cancellations that are detailed above. § 425.6(c)(3).

54.  ***Loss of Customer Goodwill.***  The Rule will cause the MPA's members to lose customer goodwill for several reasons.  First, the requirement for companies to "immediately stop any recurring charges" may not allow the MPA's members to require customers to verify their identities when trying to cancel a newspaper subscription.  The Rule does not define the terms "simple mechanism" and "at least as easy to use," and therefore may prohibit companies from asking for even basic

App.337

information, such as identity verification, when they receive cancellation requests. This will result in some instances of the MPA's members erroneously cancelling newspaper subscriptions that the actual customer did not want to cancel, leading to more consumer irritation and dissatisfaction. Detroit Free Press Decl. ¶ 37.

55. Second, customers sometimes accidentally cancel negative option plan newspaper subscriptions because of confusion or simple inadvertence. *See* Detroit Free Press Decl. ¶¶ 37–38. The Rule does not permit the MPA's members to protect customers against such inadvertent cancellations. Customers who accidentally cancel subscription plans—for example, by accidentally clicking on a hyperlink— may become irritated with newspaper publishers when they have to restart the entire contractual relationship. This risk is particularly pronounced if the subscription plan is used daily—as is usually the case for newspaper subscriptions. The immediate and dramatic consequences of inadvertent cancellation will alienate customers and cause loss of goodwill.

56. Third, the Rule's requirement for immediate and simple cancellation will impair MPA members' ability to provide consumers with useful information when the customers seek to cancel their contracts. Many consumers initially sign up for a newspaper subscription at a lower, introductory rate that will last for only a certain period of time. When that period ends, the price of the subscription often increases and some customers try to cancel the subscription to avoid paying that

28

Appellate Case: 24-3137    Page: 338    Date Filed: 12/05/2024 Entry ID: 5463205

higher price. When they do so, newspapers often allow the customer to retain their subscription at the lower rate (or with additional bundled services)—and many customers are happy to continue their subscription for that lower price (or with those additional services). But the Rule's simple cancellation requirement will effectively prohibit many of these forms of communication with the customer, because doing so would make the cancellation take longer or become not as simple as the signup mechanism. The Commission estimates that "a final Rule-compliant online cancellation should take no more than 30 seconds to one minute." 89 Fed. Reg. at 90,520. The result is a limitation on MPA members' ability to communicate with subscribers. This imposes costs on MPA's members, who will lose business and goodwill (as well as a cost on consumers, who miss out on discounts). *See* Detroit Free Press Decl. ¶ 39.

57. Fourth, many consumers try to cancel subscription contracts without being aware of the consequences of cancellation. Consumers may not be aware that cancelling a newspaper subscription will have immediate effects and lead to an immediate loss of access to the newspaper's website. Similarly, many consumers who have bundled services—such as combined print and digital newspaper subscriptions, or multiple newspapers in one subscription plan—may want to cancel only one part of the subscription but not the rest. The simple cancellation requirement will interfere with MPA members' ability to explain the consequences

Appellate Case: 24-3137    Page: 339    Date Filed: 12/05/2024 Entry ID: 5463205

of cancellation to customers. The risk of customers withholding consent and instead cancelling the subscription altogether is especially acute given the Rule's requirement that companies provide a web-based cancellation mechanism for all web-based sales, even if allowing a human being to describe the effects of cancellation would benefit a consumer. Customers whose bundled news services are unexpectedly terminated or whose access to news publications are immediately terminated will be annoyed at MPA members, leading to further loss of goodwill. *See* Detroit Free Press Decl. ¶ 40. And newspapers will lose customers who otherwise would have retained the subscription.

58. ***Unrecoverable Compliance Costs.*** The Rule's cancellation requirements are causing the MPA's members to incur unrecoverable compliance costs, starting immediately and increasing until the Rule goes into effect. Many of the MPA's members will need to re-design their apps and websites, re-write call scripts, and train employees to ensure that they are complying with the Rule's new requirements. *See* Detroit Free Press Decl. ¶¶ 41–42. The MPA's members may also need to hire additional staff members to ensure cancellations through telephone are effectuated "promptly" and hire additional staff to provide in-person cancellation options. *See* Detroit Free Press Decl. ¶ 43.

59. ***First Amendment Harms.*** The required provision of "simple" cancellation mechanisms that are in the "same medium" and "as easy to use as" sign-

Appellate Case: 24-3137    Page: 340    Date Filed: 12/05/2024 Entry ID: 5463205

up mechanisms will burden MPA's members' ability to communicate with their customers. To the extent that this violates the First Amendment, the harm is immediate and irreparable. *See* Detroit Free Press Decl. ¶ 44.

**The Rule's Recordkeeping Requirements**

60. Finally, the Rule also imposes onerous recordkeeping requirements on the MPA's members that promote or sell goods or services with subscription plans. The Rule requires MPA's members to "[k]eep or maintain verification of the consumer's consent" to a negative option plan and the underlying transaction "for at least three years." § 425.5(a)(3). The Rule provides that a seller can avoid this requirement only if it "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." *Id*.

61. ***Loss of Customer Goodwill.*** These recordkeeping requirements will cause the MPA's members to lose customer goodwill because of the risks of retaining customers' information. Customers generally dislike knowing that their records are being maintained by a company, both because they dislike having records about them kept by third parties and because they fear that such records will be inadvertently disclosed to others. *See* Detroit Free Press Decl. ¶ 47. Each additional record that the MPA's members must retain only heightens that dislike. Because the Rule requires companies to disclose all material terms about the goods

Appellate Case: 24-3137    Page: 341    Date Filed: 12/05/2024 Entry ID: 5463205

or services offered, the MPA's members may be required by the Rule to disclose that they will be keeping these additional records. Many customers will find this off-putting and this will lead to additional lost customer goodwill.

62. Relatedly, each additional record that the MPA's members retain about their customers raises the risks that those records are inadvertently disclosed, either through hacking, misplacing files, or other means. When such inadvertent disclosures occur, companies are usually required to notify affected parties, which generates negative press and leads to further losses of customer goodwill. *See* Detroit Free Press Decl. ¶ 46.

63. ***Unrecoverable Compliance Costs.*** Those requirements also are causing the MPA's members to incur unrecoverable costs, and the costs will continue to accumulate (and accelerate) as the time that the Rule goes into effect approaches. Most obviously, the MPA's members will incur new costs of keeping records of consumers' consent to transactions, which will require additional computer storage or physical storage space. *See* Detroit Free Press Decl. ¶ 48. The MPA's members also will need to devote employees' time to keeping those records, and they will need to design systems for recording consent and filing those records properly. *See id*. For cancellations over the internet or via apps, that will require re-designing software and websites to record consent; for cancellations over the phone

32

or in-person, that will require training employees and designing forms for employees to record consent. *See id.*

64.     Keeping records for longer periods of time increases costs because companies need to update their systems and software, and such updates will require processing old records to maintain them on new systems. When updating their systems or software, the MPA's members will need to take care to avoid any inadvertent disclosures, including by updating their computer software protections to prevent hacking. All of this will require additional training for employees and additional expenses for companies. *See* Detroit Free Press Decl. ¶ 48. These costs will be difficult to bear for local newspapers with smaller offices and budgets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: $11$-$26$-$24$

33

# Doc. 12

Declaration of Aaron Velthoven, Detroit
Free Press

Appellate Case: 24-3137    Page: 344    Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals
# for the Eighth Circuit

====

**DECLARATION OF AARON VELTHOVEN**

====

I, Aaron Velthoven, hereby declare as follows:

1.      I am over the age of 18 and competent to make this declaration.  The statements in this declaration are true and within my personal knowledge.

2.      I am the Vice President, Marketing & Events of the *Detroit Free Press*, Michigan's oldest newspaper.  My business address is 160 West Fort Street, Detroit, Michigan 48226.  The *Detroit Free Press* is part of the USA TODAY network, the largest local-to-national publishing and digital media organization in the country. The *Detroit Free Press* is owned by Gannett Co., Inc., the largest newspaper publisher in the United States.  Gannett also is a majority owner of the Detroit Newspaper Partnership L.P. d/b/a Michigan.com, a limited partnership that operates the business side of another area paper, the *Detroit News*, for which I also manage business operations.  The *Detroit Free Press* is a member of the Michigan Press Association.

3.      The *Detroit Free Press* was founded in 1831 and became the first daily paper in the Michigan region in 1835.  We began publishing the first regular Sunday

1

Appellate Case: 24-3137     Page: 345     Date Filed: 12/05/2024 Entry ID: 5463205

edition in the nation in 1853. We became the first American paper to be published in London for European distribution in 1881. Like many papers, the *Detroit Free Press* is now available in several forms. Readers can subscribe to a digital-only edition, a Sunday print subscription (with digital access), or a multi-day print subscription (also with digital access).

4. In my position as Vice President, Marketing & Events of the *Detroit Free Press*, I am responsible for maintaining consumer satisfaction and upholding the high standards and excellent reputation of our newspaper brands. I oversee the marketing of our newspapers and the business operations of our Joint Operating Agreement. I am directly familiar with the ways in which the *Detroit Free Press* maintains reader loyalty and attracts new readers. I know what kinds of marketing and subscription plans our readers and potential readers expect and how readers can be expected to react if we do not meet those expectations.

5. Like most newspapers, the *Detroit Free Press* relies on recurring subscription plans, which the Federal Trade Commission includes in a broad category of contracts that it refers to as "negative-option contracts." I will generally refer to subscription plans and negative-option contracts interchangeably. I am directly familiar with the *Detroit Free Press*'s marketing and use of negative-option contracts, how they enhance customer goodwill, and the role they play in the readership of our newspaper.

2

6. First-time subscribers of the *Detroit Free Press* often take advantage of new subscriber discounts and pay for a year's subscription up front. Discounts of this type are common across the economy. In the newspaper industry, new subscriber discounts help to attract new readers and establish brand loyalty and goodwill. Typically, after the end of the introductory period, the *Detroit Free Press* offers continued service on a recurring, month-to-month or annual basis. This, too, is a common arrangement throughout the newspaper industry.

7. When readers subscribe for news, they usually want that news to keep coming unless and until they choose to cancel the service because it is an important part of their daily lives. As long as readers continue to receive their papers on a daily or other periodic basis, they know that their subscription is continuing. Readers typically do not want their news to stop being delivered or provided. Most readers also do not want the inconvenience of having to renew their subscriptions on a periodic basis to maintain their news service.

8. Print subscribers to the *Detroit Free Press* have an option to pay by a method known as EZ Pay, which includes an auto-renewal feature, or by a printed bill, which does not have an auto-renewal feature. The vast majority of our subscribers choose EZ Pay for the convenience of having a recurring subscription plan. Recurring subscription plans help the *Detroit Free Press* meet customer expectations for convenience and uninterrupted news service. All *Detroit Free*

App.347

Appellate Case: 24-3137    Page: 347    Date Filed: 12/05/2024 Entry ID: 5463205

*Press* customers—those who opt into a recurring subscription and those who receive printed bills—can easily access their account balance online at any time to see any charges and credits. Once the recurring subscription is in place, customers do not need to take any further steps to renew the service. Our customers are satisfied with our subscription plans, and our subscription plans have not been a significant source of customer complaints.

9.      I have reviewed the Federal Trade Commission's Rule on Negative Option Marketing (the "Rule"). "Negative Option Rule" ("Rule"), RIN 3084-AB60 (issued                          Oct.                          16,                          2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425. The Rule would impose many new requirements and restrictions on the *Detroit Free Press*'s marketing and use of negative-option contracts. In this declaration, I focus on how the Rule would harm the goodwill that the *Detroit Free Press* enjoys with its readers. I also describe how the Rule would impose new compliance costs that the *Detroit Free Press* must begin to incur in advance of the Rule's effective date. Finally, I describe how the Rule would burden our communications with customers and harm our protected commercial speech.

4

**Section 425.4's Disclosure Requirements**

10.　　The Rule imposes new disclosure requirements in 15 C.F.R. § 425.4 that will irreparably harm the *Detroit Free Press* by damaging customer goodwill, inflicting competitive injury, and forcing us to incur substantial costs of compliance that we cannot recover if the Rule is set aside.

11.　　***Loss of Customer Goodwill.***　Complying with Section 425.4's disclosure requirements will cause the *Detroit Free Press* to lose customer goodwill, both from potential and current customers.

12.　　The Rule mandates that companies disclose in a "Clear and Conspicuous" manner any "Material" information related to the services offered, prior to obtaining the customer's billing information.　A wide range of terms could be "Material."　Therefore, the Rule will have the practical effect of requiring us to make our best guess as to what aspects of our transactions potential customers might consider to be "material" to our news services.

13.　　Malleable terms such as "Material" are subjective and invite hindsight second-guessing.　But the Rule further incentivizes second-guessing by attaching punitive regulatory consequences for companies that do not disclose "material" information.　If companies do not disclose information that FTC enforcement staff later deems "material," those companies could be exposed to the risk of FTC

5

enforcement and civil penalties.  *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

14.    The risk of enforcement consequences will pressure regulated entities to err on the side of over-disclosure.  But the disclosure of more terms and conditions in marketing materials often irritates potential customers and deters them from signing up for the goods or services.  This in turn damages companies' goodwill with customers and potential customers.

15.    The Rule's subjective and malleable standards also create an entryway for regulators and plaintiffs to enforce their policy preferences on newspapers like the *Detroit Free Press*.  In an analogous context, the Securities and Exchange Commission is attempting to use the federal securities laws' "materiality" standard to require issuers to make broad disclosures about climate change, a politically charged issue in our society.  Whether or not such disclosures are good policy, they would be particularly dangerous in the context of the news industry, where public perceptions of viewpoint and objectivity are fundamental to newspapers' goodwill. The Rule would invite similar efforts to force newspapers to disclose similar information on politically charged topics, further harming newspapers' goodwill.

16.    The Rule exacerbates this problem by requiring that all material terms be disclosed in a "Clear and Conspicuous" format.  Under the Rule, every electronically disclosed material term must be "unavoidable."  If visual, the

Appellate Case: 24-3137    Page: 350    Date Filed: 12/05/2024 Entry ID: 5463205

disclosure "must stand out from any accompanying text or other visual elements so that it is easily noticed." The net effect will be to clutter advertising with warnings and disclosures. The Rule thus would strictly limit the ways in which the *Detroit Free Press* could design and present its marketing to potential customers.

17. Potential customers will become irritated by these lengthy "Clear and Conspicuous" terms. Customer irritation with our marketing materials would harm our ability to form and maintain customer relationships. This is a serious concern. The *Detroit Free Press* relies on its subscriber base to help pay for the cost of our award-winning original reporting. But in recent years, we—like many newspapers—have faced the challenge of competing with online news sources that run entirely on ad revenue. For a subscription-based model to work, it is essential that our subscription signup is easy to understand and navigate. Adding layers of complication and clutter to our advertising directly harms our customer goodwill and our overall business.

18. In some instances, the *Detroit Free Press* signs up new customers over the phone. In those situations, the Rule will require us to disclose all material and related terms orally. This will make phone signup longer and, in the process, substantially interfere with our communications with customers. The Rule will require the *Detroit Free Press* to impose on customers a great deal of information that they may find completely uninteresting or irrelevant. Many potential customers

7

Appellate Case: 24-3137    Page: 351    Date Filed: 12/05/2024 Entry ID: 5463205

will end a conversation rather than listening to a lengthy recitation of disclosures and boilerplate. This, too, will harm the *Detroit Free Press* by causing us to lose potential customers.

19. ***Competitive Injury.*** In addition to lost customer goodwill, the Rule inflicts a competitive injury on the *Detroit Free Press*. As noted above, the *Detroit Free Press* operates on a subscription model. This model is essential to enabling us to offer original, high-quality reporting. But many news sources readily available online rely solely on advertising revenue, instead of subscription models, and therefore do not require payment before consuming news. Many of these do not require any kind of signup. Every additional complication in the subscription process raises obstacles to potential subscribers. The Rule's disclosure requirements impose considerable additional burdens on the subscription process. It thus inflicts a competitive injury on the *Detroit Free Press*.

20. ***Unrecoverable Compliance Costs.*** The Rule imposes compliance costs on the *Detroit Free Press* that we cannot recover if a court sets aside the Rule. Those costs will either need to be borne by the *Detroit Free Press* or passed along to customers.

21. Section 425.4 of the Rule is scheduled to take effect in 180 days. If the Rule's effective date is not stayed, the *Detroit Free Press* and its parent company, Gannett, will need to immediately begin a comprehensive review of our subscription

8

Appellate Case: 24-3137    Page: 352    Date Filed: 12/05/2024 Entry ID: 5463205

renewal plans to determine what additional "Material" information must be disclosed in a "Clear and Conspicuous" manner to comply with the Rule. We will also need to begin additional review to ensure we are disclosing material terms in a "Clear and Conspicuous" manner. These reviews will be burdensome and costly for the *Detroit Free Press*.

22. As a result of these reviews, the *Detroit Free Press* may have to redesign its offers, customer-facing webpages, and other marketing materials to conform to the Rule's new requirements. The *Detroit Free Press* also may have to retrain customer service representatives to ensure that sufficient information is disclosed in the "Clear and Conspicuous" manner required by the Rule. The *Detroit Free Press* will need to ensure that enumerated disclosures in Section 425.4(a)(1)–(4) appear "immediately adjacent" to the disclosure of that feature. This will require additional analysis and may require further redesign of our marketing materials.

### Sections 425.2–.5's Ban on Certain Information With Promotions or Offers

23. The Rule restricts the *Detroit Free Press* from providing other information when it promotes or offers subscriptions with negative option plans. This restriction on communication would irreparably harm the *Detroit Free Press* by causing us to lose customer goodwill, imposing unrecoverable costs of compliance, and violating our constitutional free speech rights.

Appellate Case: 24-3137    Page: 353    Date Filed: 12/05/2024 Entry ID: 5463205

24. **_Loss of Consumer Goodwill._** The speech regulations in Sections 425.2–.5 will irreparably harm the _Detroit Free Press_ by causing us to lose customer goodwill.

25. Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures" that the Rule requires. Rule § 425.4(b)(3). Section 424.2, when defining the phrase "clear and conspicuous" for purposes of the disclosure requirements of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication." Rule § 425.2(c)(7). Relatedly, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the negative option feature." Rule § 425.5(a)(2). And Section 425.3 forbids companies from "misrepsent[ing], expressly or by implication, any Material Fact," including both facts about "the Negative Option Feature" and "any other Material fact." Rule § 425.3.

26. The Rule prohibits companies from providing promotional information that detracts from disclosure of the negative option feature. Under the Rule, the _Detroit Free Press_ will have to worry that any promotional statement it makes could thereafter be construed by a regulator to "detract[] from" some term that it was

Appellate Case: 24-3137    Page: 354    Date Filed: 12/05/2024 Entry ID: 5463205

required to disclose. For instance, if a paper must disclose the risk that its reporting will contain accidental inaccuracies, then a regulator may claim that an advertisement promoting its "reliable" or "trustworthy" reporting "interferes with" or "detracts from" the disclosure.

27. The Rule will thus have the effect of encouraging companies to place greater emphasis on warnings and negative disclosures. This will lead to customers having less information overall about the paper, harming customer goodwill. The Rule's prohibition also would severely chill a fundamental purpose of any advertising: the communication of positive information about a good or service. For the *Detroit Free Press*, the service is news reporting. News reporting is a constitutionally protected service and a fundamental feature of our democracy. Newspapers like the *Detroit Free Press* must be permitted to promote their service. The FTC's Rule would harm the *Detroit Free Press*'s customer goodwill and chill protected First Amendment expression.

28. ***Unrecoverable Compliance Costs.*** The *Detroit Free Press* will incur unrecoverable compliance costs unless the Rule is stayed pending judicial review. For example, the *Detroit Free Press* will need to analyze all information it provides about the newspaper and its coverage to discern if any characteristic is a material term that must be disclosed—or instead, if it might be a term that "detracts from" the mandated disclosure of information about the negative option features of the

11

contract. We will need to design systems to ensure that each subscription plan contains the required disclosures, and that those disclosures do not trigger an obligation to remove content in promotional materials or on websites. These efforts will take time and resources. Unless the Rule is stayed, we will need to begin this work now to ensure compliance by the Rule's effective date.

29. ***First Amendment Harms.*** Because the Rule prohibits speech that detracts from the mandatory disclosure of the negative option feature, the Rule raises serious First Amendment problems. The Rule unduly burdens the *Detroit Free Press*'s ability to promote its news services and chills protected speech with potential customers. And because those news services are themselves protected by the First Amendment, the Rule's constitutional violation is severe. The harm is per se irreparable.

### Section 425.5's Consent Requirement

30. The Rule's consent requirement in Section 425.5 will irreparably harm the *Detroit Free Press* through lost customer goodwill and competitive harms. And the requirement is already harming us through unrecoverable compliance costs.

31. Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." Rule § 425.5(a)(1) (emphasis added).

12

32.     ***Loss of Customer Goodwill.*** The consent requirement in Section 425.5 will irreparably harm the *Detroit Free Press* by causing us to lose customer goodwill. In particular, by requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires companies to obtain a consumer's consent twice—first, for the negative option feature, and second, for the rest of the transaction. And the Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages—because the Rule simultaneously requires *both* that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the negative option feature" *and* that that companies disclose material terms unrelated to the negative option feature. Rule §§ 425.4(a), 425.5(c). But requiring a customer to consent twice to a single transaction is not how business is usually done. It will strike the customer as odd for the *Detroit Free Press* to insist on separate consents, as required by the Rule—one consent to the negative option character of the transaction, and a second consent to the transaction itself. This will confuse and frustrate consumers.

33.     Redesigning our customer intake processes to comply with the Rule's consent requirements likely would confuse customers. A customer may sign or click one consent form but not the other, thinking that one consent was sufficient—and unaware that, without the second consent, the subscription arrangement that the

13

customer seeks is not in effect. If the prospective subscriber then cannot access the news content—or is not delivered the paper—she may just forgo the subscription. Having a multi-step consent process increases the risks of mistakes from attempting to sign up for a subscription but failing to fully consent as required by the counterintuitive Rule. If a customer does not check all the boxes, the customer may lose the benefit of their subscription or inadvertently miss out on the auto-renew feature, causing interrupted news service. Failures in the signup process will cause customer frustration and dissatisfaction, harming our customer goodwill.

34. ***Competitive Injury.*** As explained above, the *Detroit Free Press* relies on subscriptions. But many competitors providing news online fund their operations through advertising revenue and do not require payment in advance; many of these do not require signup at all. Keeping a subscription signup simple is essential for the *Detroit Free Press* to effectively compete for readers with online news sources. Every additional burden on signup has competitive effects. The Rule's consent requirements will add burdens on signups and thus inflict a competitive injury on the *Detroit Free Press*.

35. ***Unrecoverable Compliance Costs.*** The *Detroit Free Press* will incur unrecoverable costs in complying with the two-step consent requirement. We will need to redesign our contracts, webpages, and the scripts for in-person and telephone customer service interactions to ensure that there are always places for two separate

14

Appellate Case: 24-3137    Page: 358    Date Filed: 12/05/2024 Entry ID: 5463205

consents, one to the contract itself and the other to the negative option character of the contract. This work will require substantial time and resources. The *Detroit Free Press* will need to begin this work now to ensure compliance by the Rule's effective date. If the Rule is later set aside in litigation, those compliance costs will be unrecoverable.

### Section 425.6's Simple Cancellation Requirement

36.     Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with negative option features and impedes companies from offering consumers critical information when they seek to cancel such contracts. These requirements irreparably harm the *Detroit Free Press*.

37.     ***Loss of Customer Goodwill.*** The Rule will cause the *Detroit Free Press* to lose customer goodwill for several reasons. The Rule requires that cancellation be simple and immediately effective. But this requirement will increase the incidence of erroneous cancellations, including by individuals who may not have authority to cancel business subscriptions. Erroneous cancellations will lead to annoyance, inconvenience, and loss of customer goodwill.

38.     The Rule's requirement for companies to "immediately" cancel recurring charges may not allow us to verify customer identities when trying to cancel a newspaper subscription. The Rule does not define the terms "simple mechanism" and "at least as easy to use," and therefore may prohibit us from asking

15

for even basic information, such as identity verification. If this happens, it will harm our customer goodwill.

39. Second, the requirement for immediate and simple cancellation will impair companies' ability to provide consumers with true, useful, and beneficial information when they seek to cancel a subscription. Many new subscribers take advantage of introductory rates for a fixed term, often a year. These rates are widely popular with customers. At the end of the introductory term, some customers seek to cancel their service. However, many newspapers, including the *Detroit Free Press*, sometimes offer extensions of the introductory rate as a way of keeping customers and building loyalty—and many customers take those offers. The Rule may prohibit the *Detroit Free Press* from sharing this information if the FTC could construe such information or offers as rendering their cancellation mechanism not "simple" or "as easy to use" as the signup mechanism. The result is harmful for all parties concerned—the *Detroit Free Press* would needlessly lose customers while customers would miss out on beneficial offers. And customers who realize this after the fact may resent not being told of special offers at the time of cancellation. The loss of newspaper subscribers also would have negative effects on society and voter engagement. Our models suggest that the *Detroit Free Press* stands to lose substantial subscription revenues without the opportunity to explain discount options for continued subscriptions. Using Customer Lifetime Value (CLV) calculations that

Appellate Case: 24-3137    Page: 360    Date Filed: 12/05/2024 Entry ID: 5463205

incorporate three years of lost revenue, we estimate potential lost revenue of $1,280,646 for 2025 due to the changes mandated by the Rule.

40. For similar reasons, the Rule also would prevent the *Detroit Free Press* from explaining the effects of cancelling bundled news services. Many newspapers, including the *Detroit Free Press*, offer bundled access to several papers or news sources at a discount. A customer who wishes to cancel only one service may not realize that the cancellation will affect the price of the remaining services. Under the Rule, we would be unable to explain these consequences of cancellation to our customers. This in turn would lead to customer alienation and loss of goodwill.

41. ***Unrecoverable Compliance Costs.*** The Rule's cancellation requirements is presently causing the *Detroit Free Press* to incur unrecoverable compliance costs and those costs will increase as the Rule's effective date approaches. We will need to expend resources to, first, determine what cancellation mechanism is "as simple as" the signup methods normally offered, as required by the Rule. The process of analyzing the steps of the signup will require expenditures of time and resources.

42. In creating a simple cancellation option, the *Detroit Free Press* will also have to devote time and resources to implement the simple cancellation mechanism. We will need to review and potentially redesign our customer-facing interactive

Appellate Case: 24-3137   Page: 361   Date Filed: 12/05/2024   Entry ID: 5463205

website pages, redo contract templates, and revise employee training and scripts for its customer service representatives.

43.     Additionally, the Rule requires cancellation options to be available "through the same medium" as that used by the consumer "to consent to the Negative Option Feature."   This provision will require the *Detroit Free Press* to incur expenses to ensure not just that there are internet options for anyone who subscribed online, but also phone, mail, and even in-person options if there are customers who used any of these alternative means of signup.

44.     ***First Amendment Harms.***   The required provision of "simple" cancellation mechanisms that are in the "same medium" and "as easy to use as" signup mechanisms will burden the *Detroit Free Press*'s ability to communicate with customers.   Furthermore, the Commission estimates that "a final Rule-compliant online cancellation should take no more than 30 seconds to one minute." These provisions together would severely hinder the *Detroit Free Press*'s ability to communicate with customers at the time of a cancellation transaction, which is often when there is greatest need to communicate important information about the consequences of cancelling or inducements to continue the subscription.   The violation of our First Amendment rights is per se irreparable harm.

18

**The Rule's Recordkeeping Requirements**

45.     Finally, the Rule imposes additional recordkeeping requirements on the *Detroit Free Press*.  The Rule requires us to "[k]eep or maintain verification of the consumer's consent" to a negative option plan and the underlying transaction "for at least three years."  Rule § 425.5(a)(3).  The Rule provides that we can avoid this requirement only if we "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent."  *Id*.

46.     ***Loss of Customer Goodwill.***  These recordkeeping requirements will cause the *Detroit Free Press* to lose customer goodwill.  There are always risks to retaining customers' information, including improper disclosure through hacking, misplaced files, or other means.  The longer customer information is retained, the greater the risk that disclosure will take place, whether due to an accidental or malicious security breach.  Every extension of the time we must keep customer records increases the risks.  We take every reasonable step to protect the records of our clients, but all companies face risks from cyber incidents and malign actors.  If there should be any data breach, we will suffer reputational harm and loss of goodwill.

47.     Even if no improper disclosures occur, the *Detroit Free Press* will still lose customer goodwill because customers generally do not want their records to be

19

kept and maintained by a company indefinitely. Customers generally dislike having records about them kept by third parties, so knowing that the *Detroit Free Press* is maintaining such records for extended time periods will harm our customer goodwill. Customers additionally fear that such records will be inadvertently disclosed to others.

48. ***Unrecoverable Compliance Costs.*** These requirements also are causing the *Detroit Free Press* to incur unrecoverable costs, and those costs will increase as the Rule's effective date draws near. We will incur new costs because we will need to secure, purchase, or design systems for recording customers' consent to transactions and we will then need to expend resources in physically or electronically maintaining those records. Alternatively, we would need to develop and implement protocols for documenting that no consumer can technologically complete a subscription transaction without providing consent, and we would need to train personnel on maintaining those records. To implement these new systems, we would likely have to employ additional consultants to make the technology transition.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: 11/22/2024

_____

App.364

Appellate Case: 24-3137    Page: 364    Date Filed: 12/05/2024 Entry ID: 5463205

# Doc. 13

Declaration of Elizabeth Milito, National Federation of Independent Business, Inc.

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF ELIZABETH MILITO

I, Elizabeth Milito, hereby declare as follows:

1.    I am the Executive Director of the Small Business Legal Center for the National Federation of Independent Business, Inc. ("NFIB"), one of the plaintiffs in this action.

2.    NFIB is the nation's leading small business association, representing hundreds of thousands of members across the United States. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

3.    An affiliate of NFIB, the NFIB Small Business Legal Center, Inc. ("NFIB Legal Center") is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses.

4.    As Executive Director of the NFIB Legal Center, I routinely confer with and provide guidance to NFIB's members regarding compliance with

1

Appellate Case: 24-3137    Page: 366    Date Filed: 12/05/2024 Entry ID: 5463205

applicable statutory and regulatory requirements, including actions taken by the Federal Trade Commission ("FTC") and the Rule on Negative Option Marketing ("Rule") adopted by the FTC recently. Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

5.    I have reviewed and analyzed the Rule, which imposes broadly applicable and burdensome new legal obligations on NFIB's members that offer or promote negative option plans. Negative option plans are simply contracts for goods or services that continue until the customer cancels the plan, and I also will refer to them as recurring subscriptions. Due to my position with the NFIB Legal Center, I am familiar with the role recurring subscriptions have in certain business industries. I am familiar with the effects that the Rule will have on NFIB's small business members. Consequently, I understand how the Rule will result in immediate and irreparable harm to NFIB's small business members.

6.    NFIB has countless members that use recurring subscription plans with consumers. Subscription plans are a common means for companies to provide recurring products or services. It is my understanding that all NFIB members using recurring subscriptions will be regulated by the Rule. Those members have standing to challenge the Rule because of the immediate and irreparable harm that the Rule

App.367
Appellate Case: 24-3137    Page: 367    Date Filed: 12/05/2024 Entry ID: 5463205

will cause them to suffer. One of NFIB's main functions is to represent the interests of its members. NFIB advances this function by ensuring regulatory requirements do not make it harder for NFIB members to own, operate, and grow their businesses. Because the Rule will cause NFIB's small business members harm, NFIB has filed a petition for review to protect its members. NFIB can adequately represent the interests of its members—and has done so in many other cases. Therefore, this petition for review does not require the participation of NFIB's individual members.

7.     The NFIB Legal Center has spoken to multiple small business members about the Rule. These NFIB members have described how the Rule would impose burdensome new regulations on their businesses. They have agreed to be listed in this declaration as just a few examples of the many small business NFIB members that will suffer harm as a result of the Rule.

   a. Herbi-Systems, Inc. is an NFIB member located in Memphis, Tennessee. For 40 years, Herbi-Systems has provided lawn and landscaping needs to both residential and commercial properties in the greater Memphis area. Because Herbi-Systems provides its own declaration detailing the harm to its business from the Rule, I will not recount those harms here.

   b. Buckeye Gym is an NFIB member located in Tallmadge, Ohio. Buckeye Gym was established in 1985 and is a family-owned and -

3

App.368

operated small business. Buckeye Gym is a fitness facility providing a space for individuals to advance their health goals. As a member of the fitness industry, Buckeye Gym routinely uses recurring subscriptions for facility membership. The Rule will impose immediate and costly harms on Buckeye Gym.

For example, Section 425.4 will require Buckeye Gym to create and provide additional disclosures to current and prospective gym members. Section 425.5(a)(1) mandates that Buckeye Gym will have to obtain consent to the negative option feature of recurring membership separately from consent for its underlying gym membership. This separate consent requirement risks frustrating and confusing consumers just seeking to obtain a gym membership, with little patience for a long list of disclosures and separate consent forms. Section 425.5(a)(3) imposes a recordkeeping burden on Buckeye Gym, requiring it to keep records of the consumer's consent for at least three years.

c. First Fitness is an NFIB member located in West Branch, Michigan. First Fitness is an independently-owned and -operated small business. First Fitness is a fitness facility providing a space for individuals to advance their health goals. First Fitness also provides body scan

4

services to assess a person's health profile, personal training, and tanning services. As a member of the fitness industry, First Fitness routinely uses recurring subscriptions for facility membership and tanning services. The Rule will impose immediate and costly harms to First Fitness.

For example, Section 425.4 will require First Fitness to create and provide additional disclosures to current and prospective gym members. Section 425.5(a)(1) mandates that First Fitness will have to obtain consent to the negative option feature of recurring membership separately from consent for its underlying gym membership. This separate consent requirement risks frustrating and confusing consumers just seeking to obtain a gym membership or tanning services, with little patience for a long list of disclosures and separate consent forms. Section 425.5(a)(3) imposes a recordkeeping burden on First Fitness, requiring it to keep records of the consumer's consent for at least three years.

d. The MAAC Sports & Fitness is an NFIB member located in Clio, Michigan. Established in 2005, The MAAC Sports & Fitness began from a desire to provide a safe and fun environment for local individuals to practice their basketball skills. It now serves as both a

5

Appellate Case: 24-3137    Page: 370    Date Filed: 12/05/2024 Entry ID: 5463205

fitness facility providing a space for individuals to achieve their health goals, and a basketball facility allowing people to practice their skills and participate in leagues, tournaments, and camps. As a member of the fitness industry and a space for communal basketball enjoyment, The MAAC Sports & Fitness routinely uses recurring subscriptions for facility membership. The MAAC Sports & Fitness offers multiple membership types, including single, couples, and family memberships. The Rule will impose immediate and costly harms to The MAAC Sports & Fitness.

For example, Section 425.4 will require the MAAC Sports & Fitness to create and provide additional disclosures to current and prospective facility members. Section 425.5(a)(1) mandates that it will have to obtain consent to the negative option feature of recurring membership separately from consent for its underlying facility membership. This separate consent requirement risks frustrating and confusing consumers just seeking to obtain a facility membership or place to play basketball, with little patience for a long list of disclosures and separate consent forms. Section 425.5(a)(3) imposes a recordkeeping burden on the MAAC Sports & Fitness, requiring it to keep records of the consumer's consent for at least three years.

6

8.      As set forth below, I first describe how the Rule imposes broad and vague requirements on companies that offer or promote recurring subscriptions. I explain how the vagueness of the Rule's terms, coupled with the threat of enforcement and civil penalties for violations of the Rule, will cause business uncertainty that harms NFIB members. I also explain how NFIB's members must immediately begin taking actions to prepare for the Rule to take effect, and how those necessary actions are causing irreparable harm to NFIB members.

9.      I then describe each category of the Rule's major new requirements for companies that offer or promote recurring subscriptions. For each category of requirements, I explain how the Rule is causing two types of irreparable harm. First, the Rule is causing harm to companies' customer goodwill, because it requires companies to make disclosures and take actions that will confuse, burden, and alienate their customers. The harm to companies from losing customer goodwill is irreparable. Second, the Rule is harming companies by causing them to incur new and unrecoverable costs of compliance. Companies must redesign their advertising, engineer new customer intake processes, make corresponding changes to their apps and websites, implement new training and staffing protocols, obtain legal review, and install new recordkeeping systems—to name just a few of the many burdens that companies will incur. Because these actions will take time to implement, NFIB members must begin incurring these costs now. If the Rule is later overturned

7

following judicial review, NFIB's members will not be able to recover those costs. Instead, there will be additional costs to NFIB members of reverting back to their prior advertising, apps and websites, customer intake processes, staff training, and recordkeeping systems—all of which better reflect business realities and customer expectations than the changes mandated by the Rule. To avoid these unrecoverable costs, NFIB members need stay relief now, before the Rule goes into effect.

10. Alongside those two types of irreparable harm is a third: the loss of NFIB members' First Amendment rights to free speech. The Rule imposes multiple requirements that either restrain companies' speech or compel them to speak—both of which are violations of the First Amendment. Those violations of First Amendment rights are well-recognized forms of irreparable harm, without any further showing necessary. I therefore explain why the Rule would irreparably harm NFIB members if not stayed pending judicial review.

**The Overbreadth of the FTC's Rule**

11. The Rule imposes broad new requirements on all companies, including NFIB members, that offer or promote recurring subscriptions. The Rule defines a "negative option" plan to include any contract in "which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer." § 425.2(f).

8

12.     In general, negative option plans include four types of arrangements: (1) prenotification plans, in which a seller provides periodic notices of goods and then sends the goods to participating consumers absent some action taken to decline the offer (such as book-of-the-month clubs); (2) automatic renewals, where sellers automatically renew a subscription until the consumer cancels or the subscription expires (like gym memberships); (3) continuity plans, in which consumers agree in advance to receive periodic shipments of goods or services, without prenotification, that continue until the consumer cancels the agreement (such as periodic meal delivery services); and (4) free trial marketing, where consumers receive goods or services for free for a trial period, after which the seller begins charging a fee unless the consumer cancels. Prior to amendment, the Negative Option Rule regulated only prenotification plans. *See* 16 C.F.R. § 425.1.

13.     The new Rule sweeps far beyond the FTC's prior regulation and includes all types of recurring subscriptions across the entire economy, regardless of the product or service offered. The covered recurring subscriptions include, for example, contracts for home security services, prepared food deliveries, medical monitoring services, health and fitness club memberships, cable subscriptions, internet broadband, interstate lawn cutting services, utility services, retail clubs, home insurance, car insurance, other forms of insurance, car wash subscriptions, video game subscriptions and services—and much more. The only common feature

9

of these widely varied products and services is the manner in which companies offer or provide them to customers through recurring subscriptions.

14.     Indeed, the Rule regulates recurring subscriptions not only between consumers and businesses, but also between businesses.  For example, the Rule regulates recurring subscriptions between businesses for food services, technology support, cleaning services, shipping needs, advertising, office supplies, and payment processing—to name just a few examples.  Thus, the Rule is unique in the overbroad way it regulates countless commercial arrangements that are common throughout the economy, regardless of whether they are carried out though e-commerce, the mails, by telephone, or in person.

15.     In contrast to the Rule's overbreadth, Congress has enacted far more limited laws to regulate recurring subscriptions in only certain defined contexts. Companies have structured their recurring subscription offers, promotions, and business affairs in reliance on those laws.

16.     For example, the Restore Online Shoppers' Confidence Act ("ROSCA") provides certain requirements for recurring subscription marketing over the internet.  *See* 15 U.S.C. § 8403.  The Unordered Merchandise Statute provides that mailing unordered merchandise is an unfair trade practice, 39 U.S.C. § 3009(a), and the Electronic Fund Transfer Act ("EFTA") forbids sellers from imposing recurring charges on a consumer's debit card or bank account without written

App.375
Appellate Case: 24-3137     Page: 375     Date Filed: 12/05/2024 Entry ID: 5463205

consent, 15 U.S.C. § 1693c. The Telemarketing and Consumer Fraud and Abuse Prevention Act required the FTC to promulgate the Telemarketing Sales Rule, which in part regulates recurring subscription marketing performed via telemarketing. *See* 15 U.S.C. §§ 6101–6108; 16 C.F.R. § 310. And most recently, the Infrastructure Investment and Jobs Act of 2021 directed the Federal Communications Commission to regulate trial period negative option marketing offered by broadband providers. *See* Pub. L. 117-58, § 60504(a)–(b), 135 Stat. 429, 1244 (2021) (requiring a "broadband consumer label" that shall disclose "whether the offered price is an introductory rate and, if so, the price the consumer will be required to pay following the introductory period"). All of these statutes regulate or authorize the regulation of negative option marketing only in specified contexts.

17. The FTC's new Rule goes beyond any statutory regulation of recurring subscriptions. The Rule regulates recurring subscriptions regardless of the product or service, regardless of the sophistication of the parties, and regardless of the medium of commerce. The Rule accordingly is an unprecedented federal regulation of negative option contracts across the economy. As such, its new requirements will have outsized burdens on NFIB members that utilize these contracts.

18. As I explain below, the Rule sets forth several categories of requirements that will cause NFIB's members irreparable harm absent a stay. Section 425.4 of the Rule imposes new disclosure requirements on companies

11

offering or promoting goods or services with a negative option feature. Sections 425.2 through 424.5 prohibit companies from including certain information with their promotions or offers. Section 425.5 requires companies to obtain a consumer's express consent to a negative option feature separately from their consent to any other portion of the transaction. Section 425.5 also requires companies to keep years of records of any consumer consent to negative option transactions unless they can meet conditions that few small businesses will be able to meet. Section 425.6 requires companies to offer a mechanism for consumers to cancel negative option contracts that is "as easy to use as" the sign-up mechanism; if a consumer cancels, the company must immediately terminate the contract. As I explain below, each of these features of the Rule will harm NFIB's members by causing companies to lose customer goodwill, and by causing companies to incur unrecoverable costs of compliance in anticipation of the Rule.

**Section 425.4's Disclosure Requirements**

19. The Rule imposes new disclosure requirements in 16 C.F.R. § 425.4 that will irreparably harm NFIB's members by causing them to lose customer goodwill and incur substantial, unrecoverable costs of compliance.

20. Section 425.4 requires anyone offering a recurring subscription to broadly "disclose to a consumer, prior to obtaining the consumer's Billing information, all Material terms, regardless of whether those terms directly relate to

12

the Negative Option feature." § 425.4(a). Those disclosures must include, but are not limited to, the fact of the negative option feature, the deadline by which the consumer must act to stop all charges, the amount and frequency of the charges, and any information necessary to cancel the negative option feature. *Id.* The Rule also defines "Material terms" as including any terms "likely to affect a person's choice of, or conduct regarding, goods or service." § 425.2(e). The disclosures are required before obtaining a customer's billing information in connection with both offers and promotions of goods or services with negative option features. § 425.4(a).

21.  The Rule does not specify what information companies must provide when offering recurring subscriptions. Although the Rule provides non-exhaustive examples, it regulates "all Material terms" and provides only a vague, nonspecific definition of "Material terms." The required disclosures are not limited to the negative option feature; in fact, the Rule explicitly states that companies must disclose "all Material terms, regardless of whether those terms directly relate to the negative option feature." § 425.4(a). Therefore, the Rule compels companies to make broad disclosures about their services or products—regardless of whether those disclosures are related to negative option features—simply because those companies offer or promote the products through recurring subscriptions. The Rule's practical effect is to require companies across the economy to make new and

13

App.378

burdensome disclosures about their goods and services that have nothing to do with the recurring subscription itself.

22.     Section 425.4 also requires that these disclosures be "clear and conspicuous." § 425.4(b). The Rule defines that phrase to mean "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers." § 425.2(c). Among other things, the Rule provides that disclosures must (i) "stand out from any accompanying text" if made through visual means, (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it" if made audibly, and (iii) be "unavoidable" if made through electronic means. *Id.* Moreover, the disclosures specifically identified as required by Section 425.4(a) "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature," and all disclosures must also "appear before obtaining the [consumer's] consent" to the negative option feature. § 425.4(b)(2). The Rule, therefore, not only requires the disclosure of an extensive amount of information, but also compels companies to communicate that information in unique and highly regulated ways.

23.     ***Loss of Customer Goodwill.***     Complying with Section 425.4's disclosure requirements will cause NFIB's members to lose the goodwill of their potential and existing customers.

14

App.379

24.     First, companies will be compelled to inundate potential customers with information related to the goods or services offered, including information that has no relation to the negative option feature, simply because the good or service is promoted or offered with a negative option plan.   The Rule offers no specific guidance on what constitutes a "Material term," leaving companies to guess as to what aspects of any given transaction might be considered "material" to customers— or to regulators, after the fact.   If companies guess wrong and do not disclose terms that are later deemed "material," companies could face the prospect of FTC enforcement and civil penalties of up to $51,744 per violation.   *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).   And even apart from FTC enforcement actions, private plaintiffs might attempt to use the Rule's new requirements to support individual or class action lawsuits against companies that they accuse of violating state law premised on alleged infractions of the Rule.   Even if such lawsuits are completely meritless, defending against them will prove costly to companies.   Those costs ultimately will be passed on to consumers.

25.     The natural result of the threat of penalties for under-disclosure will be that companies over-disclose the terms of their products and services.   Straightforward transactions will become bogged down in disclosures.   For example, take a company offering lawn and garden maintenance on a continuing basis subject

to cancellation by the customer—a negative option plan under the Rule. The Rule would require the company to disclose up front the fact that the company is offering a recurring subscription, specific instructions for cancellation, and any other "material" terms, as that undefined term might later be construed. This would be quite difficult for even the largest businesses to determine individually for each customer. Depending on the service, the company might also have to disclose various other terms, such as the days of the week any service will be performed, the potential for shifting the days of service based on the weather, the type of pesticides or other lawn chemicals used, so on. *See, e.g.*, Declaration of Kenny Crenshaw ¶ 14.

26.     While some consumers may wish to have such detailed information about the transaction, many do not wish to review or digest such voluminous disclosures. Many consumers will be unable to identify the most important terms of a transaction. They will become irritated by such extensive disclosures and decline to enter transactions rather than try to understand the information disclosed. *See id.* ¶ 16. And the more a company discloses to comply with the Rule's indefinite materiality standard, the more consumers that company will irritate and lose. Under the Rule, the companies that disclose the most will be the companies that lose the most customer goodwill.

27.     Section 425.4 also requires companies to provide all these disclosures in a "clear and conspicuous" manner—another vaguely defined and subjective term

16

Appellate Case: 24-3137     Page: 381     Date Filed: 12/05/2024     Entry ID: 5463205

with punitive consequences. To avoid enforcement and penalties, companies will need to incorporate these disclosures into their customer-facing communications. Such disclosures will clutter companies' messaging and detract from the underlying offers. *See* Crenshaw Decl. ¶ 16–17. That clutter will further irritate and alienate customers and cause companies to lose business and customer goodwill.

28. The disclosure requirements of Section 425.4 do not exempt promotions and offers made verbally—either by telephone or in person. For such verbal offers and promotions, the required disclosures will significantly interfere with customer-facing communications. Many customers will become frustrated both by the amount of time that the verbal disclosures take and by having to listen to the oral analogue of "lawyers' fine print." Many customers will terminate the conversation or phone call rather than listen to extensive unwanted disclosures. The result for NFIB's members will be customer alienation and lost business. *See id.*

29. *Unrecoverable Compliance Costs.* In addition to lost business and customer goodwill, the Rule imposes unrecoverable compliance costs on NFIB's members.

30. Most of the Rule is scheduled to take effect on May 14, 2025. If the Rule's effective date is not stayed, companies will need to immediately review their existing consumer experiences to determine what additional "material" information must be disclosed to comply with the Rule. *See* Crenshaw Decl. ¶ 19. Because the

17

Rule's standard for disclosures is so broad and vague, that review also will require companies to immediately begin analyzing all aspects of their goods or services to determine what counts as a material term of the transaction so that they can ensure that those terms are disclosed in a "clear and conspicuous" manner to comply with the Rule—with the specter of civil penalties now hanging over them.

31.     NFIB's members especially will have difficulty understanding and complying with Section 425.4's disclosure requirements.   The average NFIB member has approximately 8 employees, meaning they are the smallest of small businesses.   These NFIB members do not have legal or compliance teams and generally lack the resources to hire outside experts.  For these NFIB members, it will be the business owner having to determine what constitutes a "material term" and how it must create or adapt its disclosures to comply with the Rule.  This time spent determining legal obligations detracts from the business owner working in the business, including by managing employees and performing operational tasks.

32.     The requirements for disclosures to be "clear and conspicuous" will cause companies to incur further unrecoverable costs.   Companies will have to redesign their webpages, broadcast and print media, and other visual advertisements to comply with the disclosure requirements.   For example, many companies will need to reconfigure their websites to ensure that the required disclosures fit onto a single page and are unavoidable to customers. *E.g.*, Crenshaw Decl. ¶ 20.   Some

Appellate Case: 24-3137     Page: 383     Date Filed: 12/05/2024 Entry ID: 5463205

companies will need to purchase additional advertising space or print additional materials to set out the required disclosures in a sufficiently large font to be "clear and conspicuous." *See id.* For verbal promotions and offers, companies will have to retrain salespeople and re-write call scripts. All of this will require significant time, money, technical resources, and legal review. *See id.*

33.  To justify the significant burdens that the Rule places on companies, the FTC has noted that some states already have rules regarding recurring subscriptions. However, none of these state-level rules impose the type and magnitude of burdens on companies that the FTC's Rule does. Many states do not regulate recurring subscription plans separately from their regulation of contracts generally. Even states with additional regulations on recurring subscriptions overwhelmingly require only a specific list of enumerated disclosures.[1] Very few states require companies to disclose terms *unrelated* to the negative option feature. And although some of those states also specify that these more specific and targeted disclosures must be "clear and conspicuous," some do not define that term,[2] while

---

[1] *See* Colo. Rev. Stat. § 6-1-732; Conn. Gen. Stat. § 42-126b; Del. Code Ann. tit. 6, § 2732; D.C. Code § 27A-202; Fla. Stat. § 501.165; Ga. Code Ann. § 13-12-3; Haw. Rev. Stat. § 481-9.5; Idaho Code § 48-603G; 815 Ill. Comp. Stat. 601/1–601/20; Ky. Rev. Stat. Ann. § 367.580; La. Stat. Ann. § 9:2716; Me. Rev. Stat. tit. 10, § 1210; N.J. Stat. Ann. § 56:12-95.5; N.M. Code R. § 12.2.11.1; N.Y. Gen. Oblig. Law § 5-903(2); N.C. Gen. Stat. § 75-41; Va. Code Ann. § 59.1-207.45.

[2] *See, e.g.*, Conn. Gen. Stat. § 42-126b; Fla. Stat. § 501.165; Ga. Code Ann. § 13-12-2; Idaho Code § 48-603G.

App.384

Appellate Case: 24-3137     Page: 384     Date Filed: 12/05/2024 Entry ID: 5463205

others define it a way that is far less complex and burdensome than the FTC's Rule.[3] I am not aware of any states that require disclosures to appear "immediately adjacent" to the negative option feature or be "unavoidable" if made online.

### Sections 425.2–.5's Ban on Certain Information With Promotions or Offers

34. Next, the Rule forbids companies from providing other information—including truthful information—when promoting or offering for sale goods or services with recurring subscriptions. This burden on speech would irreparably harm NFIB's members by causing them to lose business and customer goodwill and incur unrecoverable costs of compliance.

35. Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures" specifically identified by Section 425.4(a). *See* § 425.4(b)(3). Section 424.2, when defining the phrase "clear and conspicuous" for purposes of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication." § 425.2(c)(7). Relatedly, Section 425.5 forbids companies from including "any information that interferes

---

[3] *See, e.g.*, Ohio Admin. Code 109:4-3-04 ("close proximity with the offer"); Utah Code Ann. § 15-10-201 ("prominently displayed on the first page of a monthly statement").

Appellate Case: 24-3137     Page: 385     Date Filed: 12/05/2024 Entry ID: 5463205

with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature." § 425.5(a)(2). And Section 425.3 forbids companies from "misrepresent[ing], expressly or by implication," not only facts about "the Negative Option Feature" but "any other Material fact" about the transaction and good or service. § 425.3(e).

36. ***Loss of Consumer Goodwill.*** The speech prohibitions of Sections 425.2–.5 will irreparably harm companies by causing them to lose business and customer goodwill. As an initial matter, that prohibitory language is broad enough to potentially bar companies from providing accurate information about their products or services if such information would be distracting or inconsistent with other required disclosures. For example, if a technology company offering cloud services with a recurring subscription must disclose the risk of hackers obtaining users' data, then a regulator might determine that the company cannot describe its product as "never hacked," or that its product "scored the best safety rating" from a trade group. A regulator might determine that such information so would "distract from" or be "inconsistent" with the disclosure of hacking risks, or would "misrepresent" those hacking risks "by implication." Regulators could likewise determine that truthful testimonials about other customers' positive experiences with a product or service are distracting or confusing to consumers. The result will be that companies are chilled from providing positive information about their products

App.386

Appellate Case: 24-3137     Page: 386     Date Filed: 12/05/2024 Entry ID: 5463205

lest such information be found, after the fact, to detract from or undermine any other required disclosures. *See* Crenshaw Decl. ¶¶ 24–25.

37. These prohibitions accordingly will lead to companies placing an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a product or service. Such customers are more likely to forgo commercial transactions or be dissatisfied with existing commercial arrangements. *See id*. NFIB's members will be irreparably harmed by that increased customer alienation.

38. ***Unrecoverable Compliance Costs.*** The Rule's prohibitions also contain vague terms that will increase companies' compliance costs. For example, companies will need to analyze all the information they provide to customers to determine whether any information "detracts from" or "otherwise undermines" the required disclosures or the ability of consumers to consent to the negative option feature. Crenshaw Decl. ¶ 26. Companies will expend more resources trying to ascertain the types of information covered by these vague, prohibitory terms. The uncertainty will lead to overdeterrence, as companies avoid making lawful statements for fear that the FTC will later give a broad construction to these vague terms. And unless the Rule is stayed, companies will need to begin this work now to ensure their compliance by the Rule's effective date.

22

Appellate Case: 24-3137     Page: 387     Date Filed: 12/05/2024 Entry ID: 5463205

39.     NFIB members will be especially harmed by this vague language. Without in-house counsel or compliance teams, NFIB members will have to determine for themselves whether information "detracts from" or "otherwise undermines" the required disclosures or ability of consumers to consent to the negative option feature. The lack of clear terms will lead to NFIB members over-including information and disclosures, meaning increased compliance costs for NFIB members.

40.     Those costs of compliance are directly traceable to the Rule. So far as I am aware, no state or federal statute specifically forbids companies that offer or promote negative option contracts from communicating truthful information that "detracts from" other required disclosures or "interferes with" consumers' ability to understand disclosures.

**Section 425.5's Consent Requirement**

41.     The Rule's consent requirement in Section 425.5 also is causing NFIB's members to suffer irreparable harm from lost customer goodwill and unrecoverable compliance costs.

42.     The new Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." § 425.5(a). The Rule does

23

not explicitly require sellers to obtain the consumer's consent to the rest of the transaction, but sellers will have to obtain that additional consent lest their customers have consented only to a small sliver of the transaction, but not the rest of it. The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature." *Id.*

43.     ***Loss of Customer Goodwill.*** Section 425.5's consent requirement will irreparably harm NFIB's members by causing them to lose customer goodwill. Most obviously, requiring a customer to consent twice to a single transaction is not how business is usually done. Many consumers will become confused and frustrated by the need to consent twice to a single transaction, increasing the likelihood that customers will forgo the transaction altogether rather than deal with a two-step transaction. Crenshaw Decl. ¶¶ 29–30.

44.     Customers also will be confused by the Rule's requirement for the "consent request" to be "free of any information not directly related to the consumer's acceptance of the Negative Option Feature." The Rule elsewhere requires companies to disclose all material terms of the transaction even if they are unrelated to the negative option feature. To comply with both requirements, companies may have to place the two consent requests on different pieces of paper or webpages—one for the negative option feature, and one for the transaction itself.

24

Doing so will make the two-step consent process more cumbersome and frustrating for consumers.

45.     Many consumers also will not understand that two separate consents are required for a single transaction and, despite intending to purchase a good or service, provide only one step of consent before leaving the transaction.  For example, if consumers must navigate one webpage to consent to a negative option feature and then navigate a second webpage to purchase the good or service, consumers will stop at the first webpage and think that their initial consent is sufficient to purchase the good or service.  Consumers will then become irritated with the company when the good or service never arrives because they mistakenly think that they purchased the good or service.  That irritation will cause further lost customer goodwill, both in the form of the customers themselves who do not receive the goods or services and in the form of word-of-mouth or online reviews negatively reflecting on the company.  Crenshaw Decl. ¶¶ 29–30.

46.     ***Unrecoverable Compliance Costs.***  NFIB's members independently will incur unrecoverable costs in complying with the two-step consent requirement. Companies selling goods or services online will have to redesign their webpages to have two separate places for customers to consent to recurring subscriptions, and this work will require substantial time and technical resources.  Crenshaw Decl. ¶ 31. Businesses offering goods or services with recurring subscriptions to other

25

businesses will have to rewrite their contracts and obtain lawyer review. Companies selling goods or services with recurring subscriptions in person or over the phone will need to rewrite scripts and retrain their salespeople to include separate consent requests. *Id.* All of this will require companies to expend time and money today in anticipation of the Rule's effective date unless the Rule is stayed.

47.    In discussions with NFIB members, the NFIB Legal Center has been made aware that NFIB members are concerned about the unrecoverable costs imposed by the Rule's requirement that consent for the negative option feature be separate from the underlying good or service. In the fitness and health industry, for example, NFIB members will be forced to create separate agreements for the facility membership and the membership's automatic renewal. The creation of these new agreements will cost NFIB members time and money that they cannot recover. Additionally, personal trainers and facility staff will require new training about the separate agreements, what they mean, and how they should be explained to customers.

48.    That some states regulate recurring subscriptions does not lessen the Rule's burdens. Only 12 states have statutes that impose any consent requirement specifically for negative option plans.[4]    And I am aware of only one state—

---

[4] *See* Alaska Stat. § 45.45.920; Cal. Bus. & Prof. Code § 17601; Haw. Rev. Stat. § 481-9.5; 815 Ill. Comp. Stat. 601/1–601/20; Ky. Rev. Stat. Ann. § 367.580; La. Stat. Ann. § 9:2716; Mich. Comp. Laws § 445.903; N.M. Code R. § 12.2.11.1; N.D.

*(cont'd)*

App.391

Appellate Case: 24-3137    Page: 391    Date Filed: 12/05/2024 Entry ID: 5463205

Vermont—that even arguably requires companies to obtain consent for the negative option feature of a contract *separately* from the rest of the contract. And even Vermont, unlike the Rule, does not have conflicting disclosure requirements that arguably necessitate separate webpages or pieces of paper for the consent. *See* 9 Vt. Stat. Ann. § 2454.

### Section 425.6's Simple Cancellation Requirement

49.     Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with recurring subscriptions and inhibits companies from offering consumers critical, beneficial information—such as better prices—when they seek to cancel such contracts. These requirements irreparably harm NFIB's members.

50.     Section 425.6 provides that companies offering or promoting goods or services with recurring subscriptions must "provide a simple mechanism for a consumer to cancel the Negative Option Feature; [and] avoid being Charged, or Charged an increased amount for the good or service." § 425.6(a). When a customer uses that mechanism, the company must "immediately stop any recurring Charges." *Id.* The Rule also provides that the "simple mechanism" to cancel "must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature." § 425.6(b). The Rule then specifies that "[a]t a minimum," the

---

Cent. Code § 51-37-01; Or. Rev. Stat. § 646A.292; Tenn. Code Ann. § 47-18-133; Va. Code Ann. § 59.1-207.45.

Appellate Case: 24-3137     Page: 392     Date Filed: 12/05/2024 Entry ID: 5463205

cancellation must be offered "through the same medium the consumer used to consent to the Negative Option Feature." § 425.6(c). It further specifies rules for each medium: "For cancellation by Interactive Electronic Medium, the simple cancellation mechanism must be easy to find" and the consumer cannot "be required to interact with a live or virtual representative (such as a chatbot) to cancel if the consumer did not do so to consent." § 425.6(c)(1). "For cancellation by telephone call," the seller must "promptly effectuate cancellations requested by the consumer" and assure that all calls "are not more costly to use than the telephone call the consumer used to consent to the Negative Option Feature." § 425.6(c)(2). And for "cancellation of consent obtained in person," the seller must offer cancellation, "where practical, via an in-person method similar to that the consumer used to consent to the Negative Option Feature," in addition to a simple mechanism offered via telephone or an Interactive Electronic Medium, with the same requirements for telephone cancellations that are detailed above. § 425.6(c)(3).

51. ***Loss of Customer Goodwill.*** The Rule will cause companies to lose customer goodwill for several reasons. First, the requirement for companies to "immediately" cancel recurring charges may not allow companies to require customers to verify their identities when trying to cancel a good or service. The Rule does not define the terms "simple mechanism" and "at least as easy to use," and the Commission cautions that any identity verification cannot create a "distinctly

28

asymmetrical experience[]" between signup and cancellation, 89 Fed. Reg. 90,506—all of which may prohibit some companies from asking for even basic information, such as identity verification, when they receive cancellation requests. This will result in some instances in companies erroneously canceling services that the actual customer did not want to cancel, leading to consumer irritation and dissatisfaction.

52.     Second, customers sometimes accidentally cancel recurring subscriptions for goods or services because of confusion or simple inadvertence. The Rule does not permit companies to protect customers against such inadvertent cancellations. Customers who accidentally cancel recurring subscriptions—for example, by accidentally clicking on a hyperlink—may become irritated with sellers and service providers, particularly if the good or service is used daily (such as internet broadband, cable, medical monitoring, or news media). The immediate and dramatic consequences of inadvertent cancellation will alienate customers and cause loss of goodwill.

53.     Third, the Rule will inhibit companies from offering customers important information regarding the effects of cancellation, as well as better offers or discounts when they seek to cancel. Many consumers try to cancel recurring subscriptions without being aware of the consequences of cancellation. For example, many consumers have bundled services—such as internet broadband and cable, lawn and garden care, or combined news subscriptions. These bundled

29

App.394

services sometimes offer customers efficiencies and discounts that would not be available for each component alone. If a customer wishes to cancel one service, they may not be aware that their cancellation also will cancel or affect the price of the other services in that bundle. Similarly, consumers who wish to cancel daily necessities like internet broadband may not be aware that their cancellation will have immediate effect. And consumers who cancel important contracts for medical monitoring, dialysis, home safety, cloud computing services, or computer safety services may not be aware of possible consequences of such cancellations, such as the immediate loss of access to automatic medical calls, home security systems, cloud-based storage for software or personal photographs, or anti-malware protections for computers. Companies additionally often wish to offer customers better deals, such as additional services or lower prices, which many customers are happy to accept. But the Rule inhibits many companies from providing these offers or that information by preventing companies from asking consumers to speak with a representative when they seek to cancel and requiring immediate cancellation upon request. The result will be lost consumer goodwill from lost customers who would have otherwise retained a service with a better offer or more information, as well as irritated customers who suffer some secondary and unanticipated consequence from immediate cancellation.

30

54. ***Unrecoverable Compliance Costs.*** The Rule's cancellation requirements independently will cause companies to incur unrecoverable compliance costs. Many companies will need to re-design their websites, rewrite call scripts, and train employees to ensure that they are complying with the Rule's new requirements. Companies also will need to hire additional telephone operators to ensure that any cancellation calls are resolved "promptly" and hire additional staff to provide in-person cancellation options.

55. Complying with these requirements will be extremely difficult for NFIB members. For example, ensuring that calls to cancel are "not more costly" than the call to accept an offer may depend on factors beyond the company's control, including whether the consumer has switched telephone providers or services. And the requirements that an internet-based mechanism to cancel must be "as easy to find" the mechanism used to purchase the good or service will require judgment calls, close review of websites and apps, and re-designing websites and apps.

56. That some states already regulate the cancellation mechanisms for recurring subscriptions does not mitigate these harms. I am aware of only fifteen states that regulate cancellation mechanisms.[5] Many companies do not operate in

---

[5] Cal. Bus. & Prof. Code § 17600; Colo. Rev. Stat. § 6-1-732; Del. Code Ann. tit. 6, § 2731; Fla. Stat. § 501.165; Haw. Rev. Stat. § 481-9.5; Idaho Code § 48-603G; 815 Ill. Comp. Stat. 601/1; Ky. Rev. Stat. Ann. § 367.580; Me. Rev. Stat. tit. 10, § 1210; N.J. Stat. Ann. § 56:12-95.5; N.D. Cent. Code § 51-37-01; Or. Rev. Stat.
*(cont'd)*

App.396

Appellate Case: 24-3137     Page: 396     Date Filed: 12/05/2024 Entry ID: 5463205

those states, even over the internet. Those companies thus will face new regulations for cancellation mechanisms. Even companies that operate in those states will face new burdens from the FTC's Rule.

### The Rule's Recordkeeping Requirements

57. Finally, the Rule also imposes onerous recordkeeping requirements on companies that promote or offer goods or services with recurring subscriptions. The Rule requires companies to "[k]eep or maintain verification of the consumer's consent" to a recurring subscription and the underlying transaction "for at least three years." § 425.5(a)(3). The Rule provides that companies may avoid that requirement only if they "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." *Id.*

58. ***Loss of Customer Goodwill.*** These recordkeeping requirements will cause companies to lose customer goodwill because of the risks of retaining customers' information. The safe harbor offered by the Rule will be of little service to many small businesses that rely heavily on in-person or telephonic consent to transactions and will be unable to demonstrate that "no consumer can technologically complete the transaction without consent." Even small businesses

---

§ 646A.292; Tenn. Code Ann. § 47-18-133; 9 Vt. Stat. Ann. tit. 9, § 2454a; Va. Code Ann. § 59.1-207.45.

that rely on electronic media for transactions often lack the tools to meet that high standard.

59. In general, customers dislike knowing that their records are being maintained by a company, both because they dislike having records about them kept by third parties and because they fear that such records will be inadvertently disclosed to others. *See* Crenshaw Decl. ¶ 34. Each additional record that companies must retain only heightens that dislike—and, because the Rule requires companies to disclose all material terms about the goods or services offered, some companies may have to disclose that they will be keeping these additional records, which may put off customers and lead to an even greater loss of customer goodwill.

60. Relatedly, each additional record that a company retains about their customers raises the risks that those records are inadvertently disclosed, either through hacking, misplacing files, or other means. When such inadvertent disclosures occur, companies are usually required to notify affected parties, which generates negative press and leads to further losses of customer goodwill. Worse, the recordkeeping requirements are tied to when customers terminate their recurring subscriptions, and many customers retain recurring subscriptions for magazine subscriptions, newspapers, home security services, or other services for decades. Accordingly, the Rule will require companies to keep records of their customers'

App.398

Appellate Case: 24-3137     Page: 398     Date Filed: 12/05/2024 Entry ID: 5463205

consent for decades or more, which only heightens the risks of inadvertent disclosures at some point in time.

61.    ***Unrecoverable Compliance Costs.*** Those requirements also will cause companies to incur unrecoverable compliance costs. Most obviously, companies will incur new costs of keeping records of consumers' consent to transactions, which will require additional computer storage or physical storage space, as well as security to safeguard the records from hacking or physical theft. *See* Crenshaw Decl. ¶ 35. Companies also will need to devote employees' time to keeping those records, and companies will need to design systems for recording consent and filing those records properly. *See id.* For cancellations over the internet, that will require re-designing software and websites to record consent; for cancellations over the phone or in-person, that will require training employees and designing forms for employees to record consent.

62.    All those costs will grow over time, given that companies will need to keep those records for three years minimum. Keeping records for extended periods of time increases costs because companies need to update their systems and software, and such updates will require processing old records to maintain them on new systems. And when updating their systems or software, companies will need to take care to avoid any inadvertent disclosures, including by updating their computer

App.399

Appellate Case: 24-3137    Page: 399    Date Filed: 12/05/2024 Entry ID: 5463205

software protections to prevent hacking.  All of this will require additional training for employees and additional expenses for companies.

63.    So far as I am aware, no state requires companies to keep records of consumers' consent to recurring subscriptions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:  11/25/2024

App.400
Appellate Case: 24-3137     Page: 400     Date Filed: 12/05/2024 Entry ID: 5463205

# Doc. 14

# Declaration of Kenny Crenshaw, Herbi-Systems, Inc.

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF KENNY CRENSHAW

I, Kenny Crenshaw, hereby declare as follows:

1.  I am over the age of 18 and competent to make this declaration. The statements in this declaration are true and within my personal knowledge.

2.  I am the Founder & Owner at Herbi-Systems, Inc., a lawn and landscaping company servicing both residential and commercial properties in Memphis and the surrounding area. My business address is 2240 Covington Pike, Memphis, TN 38128. Herbi-Systems is a member of the National Federation of Independent Business.

3.  I founded Herbi-Systems in 1984 with one used Ford Truck, and I have worked as the President and Owner for over forty years. As the Owner, I oversee all aspects of Herbi-Systems' business and operations. As a result of my position, I am familiar with Herbi-Systems' different lines of business, the importance of safeguarding Herbi-Systems' goodwill in the market, customer relations, and the nature of the contracts and services Herbi-Systems offers to consumers.

1

Appellate Case: 24-3137    Page: 402    Date Filed: 12/05/2024 Entry ID: 5463205

4.     Since I founded Herbi-Systems, it has grown to become the largest locally owned lawn care company in the Greater Memphis area.  Herbi-Systems currently employs more than 60 individuals and services over 11,000 clients alongside 15,000 miles of roadside.  We offer comprehensive lawn care and landscape care services, including fertilization, lime treatments, insect control, tree care, irrigation, and disease control.  Our skilled technicians visit properties over 100,000 times per year to perform those services.  All of our employees are highly professional and our technicians are highly trained and certified in multiple services. And we take pride in being a part of the Memphis community and giving back, such as by sponsoring events like golf tournaments, little leagues, and more.

5.     Like other lawn and landscaping companies, Herbi-Systems relies on recurring subscriptions (which the FTC describes as "negative option contracts") as part of its business model and services offered to consumers.  Herbi-Systems' subscriptions are transparent and customer-friendly.  Many customers sign up by telephone or in-person for subscriptions for lawn or landscape care, irrigation maintenance, and/or other services.  Among the many benefits to consumers, a recurring subscription provides customers the peace of mind that their services from Herbi-Systems will automatically renew from service-to-service, year-to-year without any effort on their part.  Herbi-Systems' customers know when they are

2

receiving our services, and we also send annual reminders to customers describing their programs and pricing for the upcoming year.

6.     Our services continue year-to-year unless the customer affirmatively chooses to modify or cancel the subscription.  This is standard practice in the landscape care profession: customers expect the convenience of automatically renewing subscriptions, because it would be inconvenient and problematic if a consumer's service were discontinued for failing to resubscribe.  For example, if a customer's service were discontinued because they forgot to renew the service before going out of town for the summer or winter, insects or disease could re-infest their lawn or trees; their lawns could suffer from lack of care and fertilization; or their irrigation systems could suffer damage if they are not shut down during the winter.  Even if they go out of town for shorter periods, our customers generally like their lawn and garden to be consistently maintained.  And the interruption of some services, such as disease control services, for even a couple of days can lead to significant problems, such as diseases destroying valuable landscapes.  If customers must affirmatively renew their contracts, most would be exposed to these problems because—although they want consistent, uninterrupted service—customers typically do not return phone calls or mail from their lawn services company.

7.     Herbi-Systems also offers a wide variety of bundled services to its customers, and its customers often change which services are part of their bundled

Appellate Case: 24-3137     Page: 404     Date Filed: 12/05/2024 Entry ID: 5463205

subscriptions—sometimes more than once per year. For example, customers may start the year with both front and backyard landscape care services, but may want to cease backyard care services for several months while installing a pool and irrigation system, and then may want to re-start the backyard landscape care services and also include irrigation shutdown services. Herbi-Systems makes it easy for customers to change their bundled services, with most customers simply informing a Herbi-Systems technician about the requested change in person, at their home, while a service is being performed. Customers also communicate their wishes to Herbi-Systems by telephone or through email or live chats online. These bundled recurring subscriptions allow our customers to receive discounted prices for the services they are already using.

8. Herbi-Systems' consumers not only benefit from recurring subscriptions, they have become part of their reasonable expectation in dealing with Herbi-Systems. All of our residential customers, and many of our commercial customers, rely on recurring subscriptions in one form or another.

9. I am familiar with the new rule adopted by the Federal Trade Commission regarding recurring subscriptions (the "Rule"). "Negative Option Rule" ("Rule"), RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425. I believe

4

that the Rule is a solution in search of a problem. Herbi-Systems has earned an excellent reputation for providing quality, hassle-free services to its customers year after year. Many of our customers have been with us for decades, and yet the Rule will force us to change a business model that has been overwhelmingly good for our customers. This Rule will impose overly broad, unduly burdensome, and vague new legal obligations on Herbi-Systems and will harm our customers in the end. As I explain below, each part of the Rule will irreparably harm Herbi-Systems (and its customers), resulting in a loss of customer goodwill and forcing Herbi-Systems to incur unrecoverable costs of compliance. Because Herbi-Systems is a small, locally owned business, it cannot simply absorb these costs, and it will need to pass them along to its customers in the form of higher prices.

### Section 425.4's Disclosure Requirements

10.     Herbi-Systems already provides its customers with disclosures about its lawn and landscaping services, as well as the pricing arrangements.

11.     The Rule imposes new disclosure requirements in 15 C.F.R. § 425.4 that will irreparably harm Herbi-Systems by losing customer goodwill and incurring substantial, unrecoverable costs of compliance.

12.     ***Loss of Customer Goodwill.*** Complying with Section 425.4's disclosure requirements will cause Herbi-Systems to lose the goodwill of both potential and existing customers.

Appellate Case: 24-3137    Page: 406    Date Filed: 12/05/2024 Entry ID: 5463205

13.     First, Herbi-Systems will be compelled to inundate customers with "material" information related to the services offered—all in a "clear and conspicuous manner"—prior to obtaining the customer's billing information. But the Rule offers no specific guidance on what constitutes a "material term," so Herbi-Systems will be forced to guess as to what aspects of its transactions might be considered "material" to customers—or to regulators, after the fact. If Herbi-Systems makes the wrong judgment and does not disclose terms that are later deemed "material," it could face the prospect of FTC enforcement and civil penalties of up to $51,744 per violation. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

14.     Determining what counts as a "material" term will be particularly problematic for Herbi-Systems because many of Herbi-Systems services are bundled or tailored to specific customers. For example, some customers may want irrigation and tree care services, while others may want lawn and pest control services. Some customers may have only one or two trees on their property that require little maintenance, while others may have dozens of trees that require more care. For those reasons, customers typically must request a quote from Herbi-Systems after describing the services they need. It will be extremely difficult for Herbi-Systems to determine, for each quote and transaction, which terms are likely to affect a

customer's choices and which terms of these customized and bundled services must be disclosed.

15.     Those difficulties will be compounded by the fact that Herbi-Systems' customers frequently change which services are part of their bundled subscriptions. Each time a customer adds a service to their bundled subscription, Herbi-Systems would have to make additional disclosures regarding the material terms of that service.  Doing so is simply not feasible; most customers add services to their subscriptions by verbally requesting the service from a technician who is working on their property.  Customers enjoy the flexibility and ease with which they can modify their services.  Customers will become frustrated if Herbi-Systems' technicians cannot verbally confirm their additional service because Herbi-Systems has to send printed materials with disclosures to customers before they can add the additional service to their bundled subscription.  Many customers will forgo the additional service both to their detriment and to Herbi-Systems' detriment.

16.     If Herbi-Systems is required to provide all those terms in written offers or promotional materials, customers will become irritated by lengthy, "clear and conspicuous" terms.  As a general matter, Herbi-Systems agrees that advertising and communications with customers should be clear and understandable, and we always strive to ensure that our communications meet that standard.  Clear and fair dealing is good business, and it is an important reason why Herbi-Systems' customers have

remained loyal to us for decades. But the Rule goes too far in regulating the form and design of our offers and promotional materials, and customers may walk away from offers rather than struggle to figure out the key terms of a transaction. Again, Herbi-Systems generally requires customers to describe the services they require before obtaining a quote. Herbi-Systems has found that customers generally want to hear the bottom line of that quote as quickly as possible and that adding additional disclosures can deter customers from following through with the transaction.

17. Herbi-Systems takes pride in its reachability. It regularly interacts with customers in person, over the phone, or over live chats online; provides quotes over the phone; and often takes customers' billing information over the phone. In those situations, the Rule will require Herbi-Systems' employees to disclose all those terms orally—which could lead to customers ending a conversation rather than listening to a long list of government-mandated warnings.

18. ***Unrecoverable Compliance Costs.*** In addition to lost business and customer goodwill, the Rule imposes compliance costs on Herbi-Systems that it cannot recover from the government. As a small business, Herbi-Systems does not have the ability to absorb those costs, which will be passed along to customers in the form of higher prices, further harming our customer goodwill.

19. The majority of the Rule is scheduled to take effect 180 days after publication in the Federal Register. If the Rule's effective date is not stayed, Herbi-

Appellate Case: 24-3137    Page: 409    Date Filed: 12/05/2024 Entry ID: 5463205

Systems will need to immediately begin a comprehensive review of its negative option plans to determine what additional "material" information must be disclosed in a "clear and conspicuous" manner to comply with the Rule. And Herbi-Systems will also need to immediately begin preparing methods to determine what terms are "material" for any given contract and must be disclosed in a "clear and conspicuous" manner. Although the term "material" is defined as "likely to affect a person's choice of, or conduct regarding, goods or services," that definition offers no real or specific guidance on what terms are likely to affect a given customer's choices. What terms are "material" therefore will require extensive analysis and some sort of methodology to determine what terms are "material" for customized lawn and landscape service plans. With fewer than 70 employees, Herbi-Systems hardly has the time or resources for such a comprehensive review.

20. The requirements for disclosures to be "clear and conspicuous" will cause Herbi-Systems to incur further unrecoverable costs. Herbi-Systems will have to re-design its webpage and all printed materials to provide additional disclosures. Herbi-Systems also airs four television commercials in its local market, and the Rule may require us to produce new commercials that comply with the FTC's new standards for offers and promotional materials. Doing all of this will be costly and time-intensive, and the additional disclosures will likely deter customers from requesting services from Herbi-Systems. Herbi-Systems will also have to redesign

9

its quotes to customers and retrain salespeople to ensure that each customized quote contains all material terms for the quote. And Herbi-Systems will need to ensure that certain terms related to negative option features appear immediately adjacent to the negative option feature, which will require additional time and expense to re-design quotes provided electronically or by paper.

21. The cost of providing additional disclosures will be substantial, particularly for disclosures that Herbi-Systems will need to provide when customers wish to add additional services to a bundled subscription. Herbi-Systems works primarily with printed materials and mails approximately 200,000 pieces of direct mail per year to customers and prospective customers. The cost of printing and mailing additional disclosures for each subscription and each change to a subscription will be substantial, and will need to be passed onto consumers. Moreover, Herbi-Systems currently has an annual budget of approximately $300,000 for marketing, including advertisements on television. Herbi-Systems will need to reallocate or increase that budget to ensure that Herbi-Systems' marketing efforts are compliant with the Rule's requirements.

### Sections 425.2–.5's Ban on Certain Information

22. Next, the Rule forbids Herbi-Systems from providing other information—including truthful information—when promoting or offering for sale lawn and weed control services with negative option plans. Among other provisions,

10

Section 425.2(c)(1) limits the type and manner of communications that can constitute a Clear and Conspicuous disclosure; Section 425.2(c)(7) prohibits information that "contradict[s]," "mitigate[s]," or is "inconsistent with" a required disclosure; Section 425.3 broadly prohibits misrepresentations of any Material fact, whether "expressly or by implication"; Section 425.4(b)(3) prohibits communications that contain information that "interferes with, detracts from, contradicts, or otherwise undermines" the ability of consumers to see, hear, and understand required disclosures; Section 425.5(2) prohibits communicating information, in connection with promoting or offering a negative option feature, that "interferes with, detracts from, contradicts, or otherwise undermines" the ability of consumers to provide their express informed consent; and Section 425.5(c) forbids including in consent requests "any information not directly related to the consumer's acceptance of the Negative Option Feature." These provisions collectively burden speech and would irreparably harm Herbi-Systems by causing it to lose business and customer goodwill and incur unrecoverable costs of compliance.

23. ***Loss of Consumer Goodwill.*** The speech prohibitions of Sections 425.2–.5 will irreparably harm Herbi-Systems by causing it to lose business and customer goodwill.

24. That prohibitory language is broad enough to potentially bar Herbi-Systems from providing typical and factually accurate language associated with

11

offers or promotions for lawn and landscape care services care. Any time Herbi-Systems makes a positive statement in a generic promotional material, it will run the risk that a federal regulator could find that the statement mitigates or is inconsistent with some other required disclosure, or misrepresents (perhaps by omission or by implication) some fact that the regulator deems important, in connection with a negative option plan. The Rule uses terms designed to give federal regulators the maximum amount of enforcement discretion, even though the terms regulate and limit companies' protected communications with their customers and potential customers.

25. The result will be that Herbi-Systems will be chilled from providing positive and factually accurate information about its products lest such information be found, after the fact, to detract from or undermine any other required disclosures. Instead, Herbi-Systems will naturally be compelled to place an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a product or service. Such customers are more likely to forgo Herbi-Systems landscaping services or be dissatisfied with existing commercial arrangements. Herbi-Systems will be irreparably harmed by that increased customer alienation.

26. ***Unrecoverable Compliance Costs.*** Herbi-Systems will incur unrecoverable compliance costs unless the Rule is stayed pending judicial review.

Appellate Case: 24-3137    Page: 413    Date Filed: 12/05/2024 Entry ID: 5463205

For example, Herbi-Systems will need to analyze all the current statements contained on its website and promotional materials, as well as the information its sales representatives currently provide to customers, to determine if that information "detracts from" or "otherwise undermines" the Rule's required disclosures or the ability of consumers to consent to negative option features in contracts. Herbi-Systems will need to design systems to ensure that each plan contains the required disclosures, and that those disclosures do not trigger an obligation to remove content in promotional materials or on websites. All of this will take resources and time that none of Herbi-Systems' employees have—and those costs will be compounded by the need to ascertain how to comply with the Rule's vague, prohibitory terms. Unless the Rule is stayed, Herbi-Systems will need to begin this work now to ensure their compliance by the Rule's effective date. And the costs of this work ultimately will be borne by Herbi-Systems' customers in the form of higher prices.

### Section 425.5's Consent Requirement

27. Herbi-Systems does not currently obtain consent for the automatic renewal separately from the underlying lawn and landscaping service itself.

28. The Rule's consent requirement in Section 425.5 also is causing Herbi-Systems to suffer irreparable harm from lost customer goodwill and unrecoverable compliance costs.

Appellate Case: 24-3137    Page: 414    Date Filed: 12/05/2024 Entry ID: 5463205

29.   ***Loss of Customer Goodwill.***  Section 425.5's consent requirement will irreparably harm Herbi-Systems by causing it to lose customer goodwill.  The Rule requires Herbi-Systems to obtain a customer's consent to the negative option feature "separately" from the rest of the transaction, so Herbi-Systems will need to obtain a customer's consent twice: once for the negative option feature, and once for the rest of the transaction.  But requiring a customer to consent twice to a single transaction is not how business is usually done.  Like most companies, Herbi-Systems usually presents all terms to customers in a single offer, which the customer then accepts only once.  The Rule also effectively requires companies to separate those two steps of consent with different pieces of paper or webpages by requiring *both* that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the negative option feature" *and* that the companies disclose material terms unrelated to the negative option feature.  Rule § 425.5(c).  Particularly because Herbi-Systems offers tailored quotes to customers for different bundled services, it will be difficult for Herbi-Systems to ensure that all the information about negative option features is on a different page from the rest of the contract.

30.   Customers will become irritated on the phone or in person if they feel like they are being asked to agree twice to a single transaction.  They also may provide only one of the two required consents on paper or electronic contracts and

14

then become irritated when Herbi-Systems contacts them to obtain consent to a transaction they believe they already consented to. Customers already do not respond to many of Herbi-Systems' phone calls and mailings, and it will be extremely difficult and cause substantial irritation for Herbi-Systems to track customers down to obtain yet another round of consent for transactions. One of Herbi-Systems' chief assets is its good reputation in the Memphis area, and even minor customer irritation over matters like these can result in a loss of business.

31. ***Unrecoverable Compliance Costs.*** Herbi-Systems independently will incur unrecoverable costs in complying with the separate consent requirement. Herbi-Systems will need to retrain its salespeople for sales executed over the telephone and it will need to redesign offer contracts to have two separate places for customers to consent to negative option plans, and this work will require substantial time and technical resources that Herbi-Systems simply does not have. This will require Herbi-Systems to expend time and money today in anticipation of the Rule's effective date. The costs of this work ultimately will be borne by Herbi-Systems' customers in the form of higher prices.

**The Rule's Recordkeeping Requirements**

32. The Rule also imposes onerous recordkeeping requirements on companies that promote or offer services with negative option plans. The Rule requires companies to "[k]eep or maintain verification of the consumer's consent"

to a negative option plan and the underlying transaction "for at least three years" unless they can "demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." Rule § 425.5(a)(3).

33. ***Loss of Customer Goodwill.*** These recordkeeping requirements may cause Herbi-Systems to lose customer goodwill. Herbi-Systems often obtains a customer's consent to its auto-renewing services by telephone or in-person. Similarly, our customers sometimes modify their auto-renewing arrangements through oral requests—for example, when an existing customer asks a landscaping care technician to begin lawn fertilization or pest control treatments. In the past, we have handled these requests expeditiously and with minimal paperwork, and our customers have appreciated the convenience the efficiency of our services. But the Rule will now require new paperwork and written consents in order for Herbi-Systems to comply with the requirement to maintain records of Rule-complaint customer consents for at least three years. This new inconvenience and paperwork will burden our customers and increase the likelihood that our customers will be frustrated and dissatisfied.

34. Additionally, customers will not want their lawn and landscape care company to retain any more information about them than necessary. There are risks to retaining customers' information, including improper disclosure through hacking,

Appellate Case: 24-3137    Page: 417    Date Filed: 12/05/2024 Entry ID: 5463205

misplaced files, or other means. Most of our records are in paper form, and we do not have data entry personnel or extensive databases to maintain those records. Even if no improper disclosures actually occur, companies will still lose customer goodwill because customers generally dislike knowing that their records are being maintained by a company, both because they dislike having records about them kept by third parties and because they fear that such records will be inadvertently disclosed to others.

35. ***Unrecoverable Compliance Costs.*** These requirements also will cause Herbi-Systems to incur unrecoverable costs. Most obviously, Herbi-Systems will incur new costs because we will need to design systems for recording customers' consent to transactions, and we will then need to expend resources in physically maintaining those records. Alternatively, if we were to take advantage of the Rule's exception for evidence that we use processes ensuring that no customer can technologically complete a subscription transaction without consent, we would need to develop those new technological means and new systems for documenting and maintaining the evidence. Herbi-Systems also will need to design security systems or alter our existing security systems to ensure that those records are not improperly disclosed, which will require additional resources. All of these measures will impose substantial new costs on Herbi-Systems—costs that we must begin incurring well in advance of the Rule's effective date. Ultimately, Herbi-Systems will be forced to

pass these expenses along to our customers in the form of higher prices. This will only harm our customers and cause further loss of customer goodwill.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: <u>11-25-2024</u>

<u>                                    </u> President
Kenny Crenshaw

18

Appellate Case: 24-3137    Page: 419    Date Filed: 12/05/2024 Entry ID: 5463205

# Doc. 15

Declaration of William Ashley Gum, U.S. Chamber of Commerce

Appellate Case: 24-3137    Page: 420    Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals
# for the Eighth Circuit

## DECLARATION OF WILLIAM ASHLEY GUM

I, William Ashley Gum, hereby declare as follows:

1.      I am Vice President of Consumer Policy at the Chamber of Commerce for the United States of America ("the Chamber"). In that capacity, I routinely confer with and provide guidance to the Chamber's members regarding compliance with applicable statutory and regulatory requirements, including actions taken by the Federal Trade Commission ("FTC") and its recently adopted Rule on Negative Option Marketing ("Rule"). Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

2.      I make this declaration to detail the effects of the new Rule on the Chamber's members. The new Rule regulates so-called "negative option" plans, which are contractual agreements for goods or services that continue until the customer exercises an option to cancel the plan. Negative option plans include autorenewal marketing, free trial conversions, and recurring subscriptions that many

1

companies use to provide goods or services on a continuing basis, and I generally refer to them in this declaration as subscription plans.

3.    Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Chamber. If called as a witness, I could and would testify competently thereto.

**The Chamber's Mission and Members**

4.    The Chamber is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry, and from every region of the country.  The Chamber represents the interests of its members in matters before Congress, the Executive Branch, and the Courts.

5.    The Chamber's mission is to advocate for policies that help businesses grow and create jobs in their communities.  To advance that mission, the Chamber advocates for policies that promote healthy market competition, which benefits consumers through lower prices, higher quality products and services, more choices, and greater innovation.  The Chamber opposes any attempts by the FTC to overstep its regulatory authority, undermine our system of checks and balances, ignore due process, or bypass longstanding regulatory norms to expansively regulate industries and manage our economy with a "government knows best" approach.

Appellate Case: 24-3137    Page: 422    Date Filed: 12/05/2024 Entry ID: 5463205

6.     American companies face historic challenges with inflation, strained supply chains, and worker shortages, and the Chamber believes that micromanagement by the FTC will only accelerate uncertainty and threaten our economy.  The Chamber advocates for an FTC that promotes competition and benefits consumers within the scope of legal authority granted to it by Congress.

7.     The Chamber has many members that offer subscription plans both to consumers and to other businesses.  One example of such a member is Gannett Co., Inc. ("Gannett").  *See* Declaration of Kristin Roberts.  Consumers choose subscription plans to get recurring product deliveries, subscriptions, utilities, and services.  The Rule governs any of the Chamber's members that offer subscription plans.

**The Overbreadth of the FTC's Rule**

8.     The Rule imposes broad new requirements on all companies, including Chamber members, that offer or promote subscription plans—or what the Rule calls "negative option" plans.  The Rule defines a "negative option" plan to include any contract in "which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer."  § 425.2(f).

9.     In general, subscription plans include four types of arrangements: (1) prenotification plans, in which a seller provides periodic notices of goods and

3

Appellate Case: 24-3137     Page: 423     Date Filed: 12/05/2024 Entry ID: 5463205

then sends the goods to participating consumers absent some action taken to decline the offer (such as book-of-the-month clubs); (2) automatic renewals, or "autorenewal marketing," where sellers automatically renew a subscription until the consumer cancels or the subscription expires (like newspaper subscriptions); (3) continuity plans, in which consumers agree in advance to receive periodic shipments of goods or services, without prenotification, that continue until the consumer cancels the agreement (such as periodic meal delivery services); and (4) free trial marketing, where consumers receive free goods or services for a trial period, after which the seller is entitled to a fee unless the consumer cancels. Prior to amendment, the Negative Option Rule regulated only prenotification plans. *See* 16 C.F.R. § 425.1.

10. The new Rule sweeps in all types of subscription plans across the entire economy, regardless of the product or service offered. The covered subscription plans include, for example, contracts for home security services, prepared food deliveries, medical monitoring services, health and fitness club memberships, cable subscriptions, internet broadband, interstate lawn cutting services, utility services, retail clubs, home insurance, car insurance, other forms of insurance, car wash subscriptions, video game subscriptions, and much more.

Appellate Case: 24-3137    Page: 424    Date Filed: 12/05/2024 Entry ID: 5463205

11.     The Rule even regulates subscription plans *between* businesses, including plans for food services, technology support, cleaning services, shipping needs, advertising, office supplies, and payment processing.

**Section 425.4's Disclosure Requirements**

12.     Section 425.4 of the Rule requires anyone offering a subscription plan to broadly "disclose . . . prior to obtaining the consumer's Billing Information, all Material terms" related to the underlying good or service "regardless of whether those terms directly relate to the Negative Option Feature." § 425.4(a). Such disclosures must include, but are not limited to, the fact of the subscription plan, the deadline by which the consumer must act to stop all charges, the amount and frequency of the charges, the date each charge will be submitted for payment, and any information necessary to cancel the subscription plan. *Id.* The disclosures are required before obtaining a customer's billing information in connection with both offers and promotions of goods or services with subscription plans. *Id.*

13.     Section 425.4 also requires that these disclosures be "clear and conspicuous." § 425.4(b)(1). The Rule defines that phrase to mean "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers." § 425.2(c). Among other requirements, the Rule provides that disclosures must (i) "stand out from any accompanying text" if made through visual means, (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to

5

easily hear and understand it" if made audibly, and (iii) be "unavoidable" if made through electronic means. § 425.2(c)(2)–(4). Moreover, any disclosures related to the negative option feature "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature." § 425.4(b)(2)(i). The Rule, therefore, not only requires the disclosure of an extensive amount of information, but also regulates almost to the letter how companies must communicate that information.

14. ***Loss of Customer Goodwill.*** By complying with Section 425.4's disclosure requirements, the Chamber's members (among other businesses) will lose the hard-earned goodwill of potential and existing customers.

15. Under Section 425.4, companies will be forced to inundate their customers with often "unavoidable" information, including information that has no relation to the subscription plan, simply because the good or service is promoted or offered with a subscription plan. The Rule offers no specific guidance on what constitutes a "material term," leaving companies to guess as to what aspects of any given transaction might be considered "material" to customers—or to regulators, after the fact. If companies guess wrong and do not disclose terms that the FTC later deems "material," companies could face the prospect of investigation, enforcement and civil penalties of up to $51,744 per violation. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

6

The threat of these penalties will pressure companies to over-disclose the terms of their products and services. Notice fatigue will set in. Many consumers will become irritated and decline to enter transactions rather than try to parse the required disclosures.

16.    Section 425.4 also requires companies to provide all these disclosures in a "clear and conspicuous" manner—another vaguely defined and subjective term with punitive consequences. To avoid enforcement and penalties, companies will need to incorporate these disclosures into their customer-facing communications. Such disclosures will clutter companies' messaging and detract from the underlying offers. That clutter will further irritate and alienate customers and cause companies to lose business and customer goodwill.

17.    And because the disclosure requirements of Section 425.4 do not exempt promotions and offers made verbally—either by telephone or in person—the required disclosures will significantly interfere with customer-facing communications. Many customers will become frustrated both by the amount of time that the verbal disclosures take and by having to listen to the oral analogue of "lawyers' fine print."

18.    And the harm to consumer goodwill will be exacerbated by private plaintiffs' attempts to use the Rule's new requirements to support individual or class action lawsuits against companies. Even if such lawsuits are completely meritless,

7

defending against them will prove costly to companies and those costs ultimately will be passed on to consumers.

19. ***Unrecoverable Compliance Costs.*** In addition to lost business and customer goodwill, the Rule imposes unrecoverable compliance costs on the Chamber's members.

20. The Rule is scheduled to take effect 60 days after the date of publication in the Federal Register, except that Sections 425.4 through 425.6 will be effective 180 days after date of publication in the Federal Register. A stay of those dates is critical to avoid significant irremediable costs. Specifically, because the reticulated scheme for disclosures and mechanisms of cancellation will take time to build and deploy, companies must begin to review their existing consumer experiences now to determine what additional "material" information must be disclosed and how. *See* Roberts Declaration ¶¶ 16–19. That effort will require significant staff time and, because that standard is so vague, may require consulting in-house or outside legal counsel. *See id.* at ¶¶ 17–18.

21. Once companies discern the substance of necessary disclosures, they must then redesign their webpages, broadcast and print media, and other visual advertisements to comply with the Rule's appearance requirements. For example, many companies will need to reconfigure their websites to ensure that the required disclosures fit onto a single page and are unavoidable to customers. Roberts

App.428

Appellate Case: 24-3137    Page: 428    Date Filed: 12/05/2024 Entry ID: 5463205

Declaration ¶ 18.  Some companies will need to purchase additional advertising space or print additional materials to set out the required disclosures in a larger font. *Id.*  For verbal promotions and offers, companies will have to retrain salespeople and re-write call scripts.  *Id.*  All of this will require significant time, money, technical resources, and legal review.  *See id.* at ¶¶ 17–18.

### Sections 425.2–424.5's Ban on Certain Information With Promotions or Offers

22.    The Rule forbids companies from providing other information—including truthful information—when offering for sale goods or services with subscription plans.  Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures."  § 425.4(b)(3).  Section 425.2, when defining the phrase "clear and conspicuous" for purposes of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication."  § 425.2(c)(7).  Relatedly, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature."  § 425.5(a)(2).  And Section 425.3 forbids companies from "misrepresent[ing], expressly or by

9

Appellate Case: 24-3137     Page: 429     Date Filed: 12/05/2024 Entry ID: 5463205

implication, any Material fact" in connection with promoting or offering any subscription plan.  § 425.3.

23.    ***Loss of Consumer Goodwill.***   The speech prohibitions of Sections 425.2–.5 are broad enough to be read to bar companies from providing even accurate information about their products or services, irreparably causing them to lose business and customer goodwill.  For example, if a technology company offering cloud services with a subscription plan must disclose the risk of hackers obtaining users' data, then a regulator might determine that the company cannot describe its product as "never hacked" or that its product "scored the best safety rating" from a trade group, lest such disclosures "distract from" the disclosure of hacking risks. The result will be that companies are chilled from providing positive and useful information about their products out of fear that the FTC later determines that such information detracts from or undermines any other required disclosures.

24.    These prohibitions accordingly will lead to companies placing an undue emphasis on warnings and negative disclosures.   And customers in such circumstances are more likely to forgo commercial transactions or be dissatisfied with existing commercial arrangements.

25.    ***Unrecoverable Compliance Costs.***   The Rule's prohibitions also contain vague terms that will increase companies' compliance costs, such as the requirement that the communication of truthful information not "detract[] from"

other required disclosures or "interfere[] with" consumers' ability to understand disclosures. Members will expend resources attempting to analyze and comply with these terms.

### Section 425.5's Consent Requirement

26. The Rule's Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." § 425.4(a) (emphasis added). Although the Rule does not define either "express informed consent" or "unambiguously affirmative consent," it provides that sellers will be "deemed in compliance with [the requirement to obtain consent for the rest of the transaction] if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction." § 425.5(c). The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature." *Id.*

27. ***Loss of Customer Goodwill.*** Section 425.5's consent requirement will irreparably harm the Chamber's members by causing them to lose customer goodwill. Most obviously, a mechanism requiring a customer to consent twice to a

single transaction does not comport with customer expectations. Many consumers will become confused and frustrated by the need to consent twice to a single transaction, increasing the likelihood that customers will abandon the transaction altogether. *See* Roberts Declaration ¶ 26.

28. Customers also will be confused by the Rule's requirement for the "consent request" to be "free of any information not directly related to the consumer's acceptance of the negative option feature." The Rule elsewhere requires companies to disclose all material terms of the transaction even if they are unrelated to the subscription plan. To comply with both requirements, companies may have to place the two consent requests on different pieces of paper or webpages—one for the underlying transaction, and one for the autorenewal of the transaction. Doing so will make the two-step consent process more cumbersome and frustrating for consumers.

29. Many consumers also will not understand that two separate consents are required for a single transaction and, despite intending to purchase a good or service, provide only one step of consent before leaving the transaction. For example, if consumers must navigate one webpage to consent to a subscription plan and then navigate a second webpage to purchase the good or service, consumers will stop at the first webpage, justifiably believing that their initial consent is sufficient to purchase the good or service. Consumers will then become irritated with the

company when the good or service never arrives, because they mistakenly think that they purchased the good or service. That irritation will lead to further lost customer goodwill, both in the form of the customers themselves who do not receive the goods or services and in the form of word-of-mouth or online reviews negatively reflecting on the company.

30. ***Unrecoverable Compliance Costs.*** The Chamber's members independently will incur unrecoverable costs in complying with the two-step consent requirement. Companies selling goods or services online will have to redesign their webpages, and this work will require substantial time and technical resources. *See* Roberts Declaration ¶ 27. Businesses offering goods or services with subscription plans to other businesses will have to re-write their contracts and pay for lawyer review. Companies selling goods or services with subscription features in person or over the phone will need to re-write scripts and re-train their salespeople to include separate consent requests. *See id.* All of this will require companies to expend time and money today in anticipation of the Rule's effective date unless the Rule is stayed.

**Section 425.6's Simple Cancellation Requirement**

31. Section 425.6 provides that companies offering or promoting goods or services with subscription plans must "provide a simple mechanism for a consumer to cancel the Negative Option Feature; avoid being Charged, or Charged an increased amount, for the good or service; and immediately stop any recurring

13

Charges." § 425.6(a). The Rule also provides that the "simple mechanism" to cancel "must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature." § 425.6(b). The Rule then specifies that "[a]t a minimum," the cancellation must be offered "through the same medium the consumer used to consent to the Negative Option Feature" and specifies rules for each medium. § 425.6(c).

32.    ***Loss of Customer Goodwill.*** The Rule's requirement that companies "immediately" cancel recurring charges will cause the loss of customer good will if it results in cancellation of services when the consumer did not want such cancellation. This could occur either because the Rule does not clearly permit companies to even verify a customer's identity when an individual tries to cancel a good or service or because customers accidentally cancel the subscription plan through confusion or inadvertence.

33.    ***Unrecoverable Compliance Costs.*** Many companies will incur costs to re-design their websites, re-write call scripts, and train employees to ensure that they are complying with the Rule's new cancellation requirements. *See* Roberts Declaration ¶¶ 29–31.

**The Rule's Recordkeeping Requirements**

34.    Finally, the Rule also imposes recordkeeping requirements on companies that promote or offer goods or services with subscription plans. The Rule

14

requires companies to "[k]eep or maintain verification of the consumer's consent" to a subscription plan "for at least three years," unless "the seller can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." § 425.5(a)(3).

35. ***Loss of Customer Goodwill.*** These recordkeeping requirements will cause companies to lose customer goodwill because of the risks of retaining customers' information. In general, customers dislike knowing that their records are being maintained by a company, both because they dislike having records about them kept by third parties and because they fear that such records will be inadvertently disclosed to others. Although there is a route to avoid these recordkeeping requirements, that route imposes risks for a business if their regulator later disagrees about whether they met a "preponderance of the evidence" standard. Those businesses that elect not to run that risk will face a loss of customer good will from customers who object to the business maintaining these records.

36. Relatedly, each additional record that a company retains about their customers raises the risk that those records are inadvertently disclosed, either through hacking, misplacing files, or other means. When such inadvertent disclosures occur, companies are usually required to notify affected parties, which generates negative press and potential litigation and leads to further losses of customer goodwill.

Appellate Case: 24-3137    Page: 435    Date Filed: 12/05/2024 Entry ID: 5463205

37.    ***Unrecoverable Compliance Costs.***  Those requirements also will cause companies to incur unrecoverable compliance costs.  These will include re-designing software and websites to record consent, as well as retraining employees and designing forms for employees to record consent. *See* Roberts Declaration ¶¶ 34–35.

38.    All those costs will grow over time, given that companies will need to keep those records for three years.  Such recordkeeping increases costs for each update to systems and software, as well as increases risks of inadvertent disclosures during such updates.  All of this will require additional training for employees and additional expenses for companies. *See* Roberts Declaration ¶ 34.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: November 25, 2024

# Doc. 16

# Declaration of Kristin Roberts, Gannett Co.

Appellate Case: 24-3137   Page: 437   Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals
# for the Eighth Circuit

## DECLARATION OF KRISTIN ROBERTS

I, Kristin Roberts, hereby declare as follows:

1.      I am over the age of 18 and competent to make this declaration.  The statements in this declaration are true and within my personal knowledge.

2.      I am the Chief Content Officer of Gannett Co., Inc. ("Gannett") and publisher of USA TODAY.  Gannett is the largest newspaper publisher in the United States.  Gannett is a member of the Chamber of Commerce of the United States of America.

3.      Gannett was founded in 1906 and currently publishes USA TODAY, the Detroit Free Press, The Arizona Republic, Florida Today, Savannah Morning News, and hundreds of other brands.  Gannett publishes daily and weekly periodicals in approximately 220 local markets across the United States and receives 132 million monthly unique visitors on average.  Many of Gannett's publications are in small and mid-size markets where they are often the primary provider of comprehensive local market news and information, reporting on topics such as local news and

Appellate Case: 24-3137     Page: 438     Date Filed: 12/05/2024 Entry ID: 5463205

politics, community and regional events, health and wellness, personal finance, youth sports, local schools, obituary, and crime news.

4.     While Gannett's newspapers have newsrooms in these local communities, most administrative functions are handled at Gannett's headquarters in New York.  Gannett oversees regulatory compliance for its newspapers, oversees their budget and accounting functions, and handles national advertising and promotional campaigns.  As a result, the Federal Trade Commission's ("FTC") Negative Option Rule (the "Rule") will directly impact Gannett's operations and the management of its newspapers across the country.  "Negative Option Rule" ("Rule"), RIN        3084-AB60        (issued        Oct.        16,        2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

5.     Gannett's publications are available to readers in several forms.  USA TODAY, for example, offers readers the ability to subscribe to a digital-only edition or to a multi-day print subscription (with digital access included).  Many of our local newspapers offer readers similar subscription options.

6.     As Chief Content Officer of Gannett, and publisher of USA TODAY, I am familiar with the ways in which our publications maintain reader loyalty and attract new readers.  I am also familiar with how our publications market their brands and content, including the subscription plans that our newspapers' readers and

Appellate Case: 24-3137     Page: 439     Date Filed: 12/05/2024 Entry ID: 5463205

potential readers expect. I am familiar with how readers of our publications are likely to react if we do not meet their expectations for delivering uninterrupted news coverage.

7. Like most newspaper publications, Gannett's publications rely on recurring subscription plans, which the FTC includes in a broad category of contracts that have what the FTC describes as a "Negative Option Feature." Negative option feature is an unclear term, and most consumers will know these contracts as recurring or auto-renew subscriptions. For clarity, I will generally refer to these contracts as "subscription plans." I am familiar with how Gannett's publications market and use subscription plans, how they enhance customer goodwill with our local and national publications, and the role they play in increasing readership of our newspapers.

8. As with many subscription plans, first-time newspaper subscribers often take advantage of new subscriber discounts and pay for a year's subscription, at a discounted rate, at the time of enrollment. Discounts of this type attract new readers and establish brand loyalty and goodwill with local and national newspapers. At the end of the introductory period, Gannett's newspapers offer continued service on a recurring, month-to-month or an annual basis. This too, is a common arrangement throughout the newspaper industry and many other industries as well.

App.440

Appellate Case: 24-3137    Page: 440    Date Filed: 12/05/2024 Entry ID: 5463205

9.      When readers subscribe for news, they usually expect their news to arrive until they choose to cancel the service.  This auto-renew model is what readers expect, and it is standard practice in the newspaper industry.  Most readers do not want the inconvenience of having to renew their subscriptions on a periodic basis to maintain their news service.

10.      Print subscribers to our newspapers have an option to pay by a method known as EZ Pay, which includes an auto-renewal feature, or by a printed bill, which does not have an auto-renewal feature.  The vast majority of subscribers to our newspapers choose EZ Pay for the convenience of having a recurring subscription plan.  Recurring subscriptions help Gannett's publications meet customer expectations for convenience and uninterrupted news service.  All subscribers to our newspapers—those who opt for printed bills and those who opt for EZ Pay—can easily access their account balance online at any time to see their charges and credits.  Once the recurring subscription is in place, customers do not need to take any further steps to renew the service.  Readers of our newspapers are satisfied with our subscription plans, and our subscription plans have not been a significant source of customer complaints.

11.      Based on my review, I have concluded that the Rule would impose many new requirements and restrictions on Gannett's marketing and use of subscription plans for its newspapers.  In this declaration, I focus on how each part

4

of the Rule imposes significant compliance costs on Gannett. As a result, Gannett will be forced to pass these costs on to readers of its newspapers, and it will have to do so at a time when Gannett and its newspapers (especially local newspapers) are facing the challenge of competing with online news sources that run entirely on ad revenue. These increased costs will harm customer goodwill and drive down readership, which in turn will create a vicious cycle of increased costs and lower readership across our local papers. Because compliance with the Rule will require significant time and effort, Gannett will incur these costs well in advance of the effective date. And if the Rule is later vacated by judicial order, these costs will not be recoverable. In addition to these costs, the Rule also infringes on our protected speech.

12. Despite its costs, the Rule addresses a problem that does not exist. Most subscribers to our newspapers prefer to pay by EZ Pay—the recurring subscription—over traditional methods of payment. And this makes sense. A recurring subscription is more efficient, and allows us to provide our newspapers to our consumers without them having to worry about remembering to make payments every month on time.

### Section 425.4's Disclosure Requirements

13. I begin with the Rule's disclosure requirements, which has two components. First, Section 425.4 requires anyone promoting or offering a

App.442

Appellate Case: 24-3137    Page: 442    Date Filed: 12/05/2024 Entry ID: 5463205

subscription plan to broadly "disclose . . . prior to obtaining the consumer's Billing Information, all Material terms, regardless of whether those terms directly relate to the Negative Option Feature." Rule § 425.4(a). Those disclosures must include, but are not limited to, the fact of the subscription plan, the deadline by which the consumer must act to stop all charges, the amount and frequency of the charges, and any information necessary to cancel the subscription plan. *Id.* § 425.4(a)(1)–(4). The disclosure requirement applies from the time the goods or services are "promot[ed]." *Id.* § 425.4(a). It applies not only to the offering of the goods or services, but to their advertising as well.

14. Despite its broad disclosure requirements, the Rule fails to specify what information companies must provide when offering subscription plans. Although the Rule provides non-exhaustive examples, it regulates "all Material terms" and only vaguely defines "Material" to mean "likely to affect a person's choice of, or conduct regarding, goods or services." Rule § 425.2(e). And because the disclosures are not limited to information about the subscription plan—requiring disclosure "regardless of whether those terms directly relate to the Negative Option Feature"— the Rule imposes broad disclosures about services or products themselves simply because those they are offered or promoted through subscription plans. The Rule thus effectively regulates the entire transaction as long as it falls under the "negative option" definition of the Rule.

6

15.     The second component of Section 425.4 is that the disclosures must be "Clear and Conspicuous."  Rule § 425.4(b).  Although that sounds laudable on its face, it raises the question—how clear is clear?  The Rule attempts to define that phrase with subjective terms that will be difficult to apply in practice.  According to the Rule, clear and conspicuous means "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers."  *Id.* § 425.2(c).  The Rule then requires that disclosures must: (i) "stand out from any accompanying text" if made through visual means; (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it" if made audibly; and (iii) be "unavoidable" if made through electronic means.  *Id.* § 425(c)(2)–(4).  It also provides that the specific disclosures required by Section 425.4(a)(1)–(4) "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature," and any other disclosures "must appear before obtaining the consent" of the consumer to the negative option feature.  *Id.* § 425.4(b)(2).

16.     The Rule therefore requires companies to communicate a significant amount of information in highly regulated ways to all customers and prospective customers.  Complying with these requirements would impose significant costs on Gannett that we would not be able to recover if a court sets aside the Rule.  Indeed, Gannett already discloses the necessary information that consumers need and that

the Rule explicitly lists, such as the fact of the subscription plan, the cancellation deadline, the amount and frequency of the charges, and any information necessary to cancel the subscription plan. So reconfiguring and redesigning these disclosures to comply with the Rule is a cost to Gannett with no added benefit to the consumer.

17. Section 425.4 of the Rule is scheduled to take effect in 180 days from publication. If the Rule is not stayed, Gannett will need to immediately begin a comprehensive review of all the subscription plans offered by its publications to determine what additional "Material" information must be disclosed in a "Clear and Conspicuous" manner. To say that this is a significant undertaking would be an understatement. Each one of the hundreds of Gannett's publications offers several subscription plans. Gannett would need to review every one of these subscription plans and would need to determine—to the extent possible—what "Material" information is missing and must be disclosed. It would also need to do an independent review to determine if the information is being disclosed—again, if that is possible—in a "Clear and Conspicuous" manner. The work required to conduct this analysis would be costly and time-consuming. And Gannett would also be required to pay for legal advice in navigating the Rule's vague requirements to determine what is "Material" and whether a disclosure is "Clear and Conspicuous."

18. Applying the Rule's requirements would also be extremely costly. Gannett may have to redesign each of its publications' subscription plan offerings.

8

This comes with a ripple effect: Gannett must also redesign the publications' customer-facing webpages, apps, and other customer-facing material to ensure compliance. Gannett will incur significant costs in reconfiguring hundreds of newspaper websites to ensure that the required disclosures are "unavoidable" to customers. Similarly, whenever Gannett needs to advertise a publication, Gannett would need to purchase additional advertising space or print additional materials to set out the required disclosures in a sufficiently large font to be "Clear and Conspicuous." For verbal promotions and offers, Gannett would be forced to hire salespeople and re-write call transcripts for hundreds of newspapers. In short, the disclosure requirements will require significant time, money, technical resources, and legal review.

19. All these costs will ultimately be borne by the consumers in the form of a more costly subscription. This, in turn, will result in decreased readership, which is particularly harmful to our smaller publications. These regulatory burdens will place us and our newspapers at a competitive disadvantage with respect to other major sources of news today, such as online social media platforms and other online sources of news and information that will not need to shoulder the burden of this unwarranted Rule. And the burdens will unduly harm small local newsrooms that—through their constitutionally protected service—benefit their local communities at a time when people need access to trustworthy news.

9

## **Section 425.2–.5's Ban on Certain Information With Promotions or Offers**

20.    The Rule forbids companies from providing certain information— including truthful information—when promoting or offering subscription plans. Three provisions are relevant here.  First, Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures" that the Rule requires.  Rule § 425.4(b)(3). Section 425.2, when defining the phrase "clear and conspicuous" for purposes of the disclosure requirements of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication." *Id.* § 425.2(c)(7).  Second, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature." *Id.* § 425.5(a)(2).  Third, Section 425.3 forbids companies from "misrepsent[ing], expressly or by implication, any Material Fact," including both facts about "the Negative Option Feature" and "any other Material fact." *Id.* § 425.3

21.    To comply with these requirements, Gannett will incur unrecoverable compliance costs unless the Rule is stayed pending judicial review.  Gannett will

Appellate Case: 24-3137      Page: 447      Date Filed: 12/05/2024 Entry ID: 5463205

need to analyze all information it provides, across hundreds of newspapers, to discern if any characteristic is a material term that must be disclosed—or instead, if it might be a term that "detracts from" the mandated disclosure of information about the subscription plan features of the contract. These judgments will require Gannett to pay for and confer with legal counsel to ensure compliance. Gannett will also need to design systems—again across hundreds of newspapers and the websites they run—to ensure that each subscription plan contains the required disclosures, and that those disclosures do not trigger an obligation to remove content in promotional materials or on websites. These efforts will take time and resources. Unless the Rule is stayed, Gannett will need to begin this work now to ensure compliance by the Rule's effective date. Again, these costs will make Gannett's publications more expensive to consumers and will ultimately decrease readership and customer goodwill.

22.     Because the Rule prohibits speech that detracts from the mandatory disclosure of subscription plan, the Rule raises serious First Amendment problems. The Rule unduly burdens Gannett's ability to promote its news publications and chills its protected speech. In particular, because the Rule prohibits companies from providing promotional information that detracts disclosure of the subscription plan, Gannett's advertising communications will be chilled. And because Gannett's press

11

services are themselves protected by the First Amendment, burden on Gannett's speech results in a severe constitutional violation. The harm is per se irreparable.

### Section 425.5's Consent Requirement

23.     I next address the Rule's consent requirement in Section 425.5. This requirement also will cause Gannett irreparable harm.

24.     Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." Rule § 425.5(a)(1). Although the Rule does not define either "express informed consent" or "unambiguously affirmative consent," it provides that sellers will be "deemed in compliance with [these requirements] for all written offers . . . if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction." *Id.* § 425.5(c). The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature." *Id.*

25.     By requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires companies to obtain

a consumer's consent twice—first, for the negative option feature, and second, for the transaction itself. Further, the Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages—because the Rule simultaneously requires *both* that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the Negative Option Feature" *and* that that companies disclose material terms unrelated to the negative option feature. Rule §§ 425.4(a), 425.5(c).

26. These inefficient steps for sign-up will frustrate consumers and will result in a decrease in newspaper subscriptions. Consumers want efficiency. As mentioned, most people choose EZ Pay, which is more efficient. And consumers are asking Gannett to implement more efficient sign-up processes, such as implementing Apple Pay for easier payment. But efficiency is far from what the Rule requires. The Rule will force us to ask consumers to agree to multiple layers of consent before their transaction is complete. Making consumers jump through several hoops to sign up—as this Rule requires—will make them frustrated and ultimately decrease subscriptions.

27. On top of that, Gannett will incur significant unrecoverable costs in complying with the consent requirement for the hundreds of papers it owns. The consent requirement will force Gannett to redesign hundreds of subscription plans. Gannett must also reconfigure hundreds of webpages and applications to have two

13

separate places for customers to consent to subscription plans and the transactions themselves. In addition, Gannett will need to redesign hundreds of scripts for in-person and telephone customer service interactions for each of its newspapers. Gannett also will need to re-train its salespeople to effectively convey those scripts and handle customer calls. All of this work will require substantial time and significant technical resources, as well as legal fees for attorney review. To ensure compliance by the Rule's effective date, Gannett will need to begin this work now. If the Rule is later set aside in litigation, those compliance costs will be unrecoverable. All these costs that Gannett incurs ultimately will be passed through to consumers in the form of higher prices or reduced offerings, resulting in decreased readership for newspapers already facing market challenges. These harms will be irreparable.

### Section 425.6's Simple Cancellation Requirement.

28. The Rule's cancellation requirements in Section 425.6 will cause Gannett to incur unrecoverable compliance costs. The Rule requires Gannett to "immediately" cancel recurring charges, which does not give us an opportunity to verify consumer identities. The Rule does not define the terms "simple mechanism" and "at least as easy to use," and therefore prohibits us from asking for even basic information, such as identify verification, when we receive cancellation requests. As a result, Gannett will need to redesign hundreds of apps and websites, re-write

14

hundreds of call scripts, and train hundreds of employees to ensure that they are complying with the Rule's new cancellation requirements. Gannett will need to hire additional staff to ensure that any cancellation calls or messages, as well as the cancellation itself, are processed "promptly."

29.     Complying with these requirements will be extremely difficult, if not impossible, given the large number of individual publications that Gannett owns. Gannett's call centers are sometimes inundated with calls by happenstance. Ensuring that all calls or messages are processed so that cancellations are always effectuated "promptly," as the Rule requires, may require additional staffing. For example, if there were a particularly busy period and the call centers had to send a larger percentage of callers to recorded messages or voicemail, we would still have to process the calls for cancellation "promptly," as the FTC construes that term, or face the consequences of being deemed noncompliant with the Rule. This new risk will require us to reevaluate and ensure ample staffing to cover busy periods. This may result in unnecessarily staffing call centers to prepare for the busiest periods of the year, which are not always predictable in advance. This imposes expenses on Gannett. Similarly, ensuring that calls to cancel are "not more costly to use" than the call to accept an offer may depend on factors beyond Gannett's control, including whether the consumer has switched telephone providers or services.

30.     Additionally, the Rule requires cancellation options to be available "through the same medium" as that used by the consumer "to consent to the Negative Option Feature."  This ensures that Gannett will have expenses in ensuring, not just that there are internet options for anyone who subscribed online, but also phone, mail, and even in-person cancellation options if there are customers who used any of these alternative means of signup.  In short, this mandate regarding the means of cancellation imposes ongoing costs on Gannett as it requires Gannett to maintain the infrastructure to support these various mediums of cancellation.

31.     These increased costs will be passed on to consumers and will reduce consumer goodwill and readership.  This is doubly burdensome here because the Rule may also prohibit Gannett (and its publications) from sharing information about cost-saving alternatives when a customer asks to cancel, if sharing this information could be construed as rendering their cancellation mechanism not "simple" or "as easy to use" as the sign-up mechanism.

32.     To the extent the simple cancellation requirement is a restriction on communication, it also infringes on Gannett's speech.  The Commission estimates that a "final Rule-compliant online cancellation should take no more than 30 seconds to one minute."  This time constraint, in conjunction with the "same medium" and "as easy to use" requirements, will burden Gannett's ability to communicate with its customers during critical transactions.  For example, these provisions effectively

16

prevent Gannett representatives from communicating beneficial offers to customers who indicate they wish to cancel their subscriptions. To the extent that this violates the First Amendment, that harm is immediate and irreparable.

### **The Rule's Recordkeeping Requirements**

33. Finally, even when the customer backs out of his subscription plan, the Rule still imposes costly recordkeeping requirements on Gannett. The Rule requires us to "[k]eep or maintain verification of the consumer's consent" to a negative option plan and the underlying transaction "for at least three years." Rule § 425.5(a)(3). The Rule allows us to avoid that requirement only if we "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." *Id.*

34. These requirements will also cause Gannett to incur unrecoverable costs, and those costs will increase as the Rule's effective date draws near. We will incur new costs because we will need to secure, purchase, or design systems for recording millions of customers' consent to transactions and we will then need to expend resources in physically or electronically maintaining those records. We also will need to invest in information technology security systems to safeguard the records that we are required by law to maintain for at least three years. Alternatively, we would need to devise new procedures for documenting that our online, telephone, and in-person processes make it technically impossible for any consumer to

17

complete the transaction without consent. This would require implementing new recordkeeping systems and training personnel to maintain the necessary information. While we would be able to handle much of the work on our internal servers, we would likely need to invest in additional hardware. To implement a new system, we would likely have to employ additional consultants to assist in the technological transition and implementation of these systems.

35. As with the other aspects of this Rule, consumers will bear these increased compliance costs in the form of increased subscriptions. The increased subscriptions will result in decreased readership. This places us and our newspapers at a competitive disadvantage to other major sources of news for Americans today, such as social media platforms and other online sources of news and information that do not operate on a subscription model and thus are not subject to this Rule. The overall impact of the Rule will be a cycle of increased subscription costs leading to decreased readership until many of the smaller newspapers find themselves without any readers at all. This ultimately deprives local communities of the benefit of a trustworthy news source.

Appellate Case: 24-3137    Page: 455    Date Filed: 12/05/2024 Entry ID: 5463205

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:   11/25/2024

Kristin Roberts
Chief Content Officer

# Doc. 17

Declaration of Chris Clark, Georgia Chamber of Commerce

Appellate Case: 24-3137    Page: 457    Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF CHRIS CLARK

I, Chris Clark, hereby declare as follows:

1.    I am the President & CEO of the Georgia Chamber of Commerce ("Georgia Chamber"). In that capacity, I routinely confer with and provide guidance to the Georgia Chamber's members regarding compliance with applicable statutory and regulatory requirements, including actions taken by the Federal Trade Commission ("FTC") and the Rule on Negative Option Marketing ("Rule") adopted by the FTC recently. Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

2.    The purpose of this declaration is to discuss the effects of the new rule on the Georgia Chamber's members. The new Rule regulates so-called negative option plans, which are contractual agreements for goods or services that continue until the customer cancels the plan. Negative option plans include enrollment contracts with an automatic renewal and recurring subscriptions that many

1

companies use to provide goods or services on a continuing basis, and I generally refer to them in this declaration as subscription plans.

3. Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Georgia Chamber. If called as a witness, I could and would testify competently thereto.

**The Georgia Chamber's Mission and Members**

4. The Georgia Chamber serves the unified interests of its nearly 50,000 members—ranging in size from small businesses to Fortune 500 corporations—covering a diverse range of industries across all of Georgia's 159 counties. The Georgia Chamber is the State's largest business advocacy organization and is dedicated to representing the interests of both businesses and citizens in the State. Established in 1915, the Georgia Chamber's primary mission is creating, keeping, and growing jobs in Georgia. The Georgia Chamber pursues this mission by, among other things, advocating the business and industry viewpoint in the shaping of law and public policy to ensure that Georgia is economically competitive nationwide and in the global economy. A vital function of the Georgia Chamber is to represent the interests of its members in matters before the courts, legislatures, and executive agencies at the federal and state level. The Georgia Chamber supports reasonable consumer-protection laws and regulations that penalize and deter bad actors. These protections and regulations provide transparency to consumers and ensure that

2

harmful, illegal practices do not negatively impact Georgians. But the Georgia Chamber opposes rules, like the Negative Option Rule, that overreach and harm businesses acting in good faith. Overly burdensome regulations prevent Georgian businesses from effectively serving customers as well as remaining responsive to evolving consumer preferences and demands.

5. The Georgia Chamber has many members that use subscription plans both with consumers and with other businesses. One example of such a member is LOUD Security Systems, Inc. *See* Declaration of John Loud ("Loud Declaration"). Subscription plans are a common means for companies to provide recurring product deliveries, subscriptions, utilities, and services. All of the Georgia Chamber's members that use subscription plans will be regulated by the Rule.

**The Overbreadth of the FTC's Rule**

6. The Rule imposes broad new requirements on all companies, including the Georgia Chamber's members, that offer or promote subscription plans—or what the Rule calls "negative option" plans. The Rule defines a "negative option" plan to include any contract in "which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer." § 425.2(f).

Appellate Case: 24-3137    Page: 460    Date Filed: 12/05/2024 Entry ID: 5463205

7. In general, subscription plans include four types of arrangements: (1) prenotification plans, in which a seller provides periodic notices of goods and then sends the goods to participating consumers absent some action taken to decline the offer (such as book-of-the-month clubs); (2) automatic renewals, where sellers automatically renew a subscription until the consumer cancels or the subscription expires (like newspaper subscriptions); (3) continuity plans, in which consumers agree in advance to receive periodic shipments of goods or services, without prenotification, that continue until the consumer cancels the agreement (such as periodic meal delivery services); and (4) free trial marketing, where consumers receive goods or services for free for a trial period, after which the seller begins charging a fee unless the consumer cancels. Prior to amendment, the Negative Option Rule regulated only prenotification plans. *See* 16 C.F.R. § 425.1.

8. The new Rule sweeps in all types of subscription plans across the entire economy, regardless of the product or service offered. The covered subscription plans include, for example, contracts for home security services, prepared food deliveries, medical monitoring services, health and fitness club memberships, cable subscriptions, internet broadband, interstate lawn cutting services, utility services, retail clubs, home insurance, car insurance, other forms of insurance, car wash subscriptions, video game subscriptions and services—and much more.

4

9.      The Rule also regulates subscription plans between businesses, including for food services, technology support, cleaning services, shipping needs, advertising, office supplies, and payment processing.

**Section 425.4's Disclosure Requirements**

10.     Section 425.4 requires anyone offering a subscription plan to broadly "disclose . . . prior to obtaining the consumer's Billing Information, all Material terms" related to the underlying good or service, "regardless of whether those terms directly relate to the Negative Option Feature." § 425.4(a). Those disclosures must include, but are not limited to, the fact of the subscription plan, the deadline by which the customer must act to stop all charges, the amount and frequency of the charges, the date each charge will be submitted for payment, and any information necessary to cancel the subscription plan. *Id.* The disclosures are required before obtaining a customer's billing information in connection with both offers and promotions of goods or services with subscription plans. *Id.*

11.     Section 425.4 also requires that these disclosures be "[c]lear and [c]onspicuous." § 425.4(b)(1). The Rule defines that phrase to mean "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers." § 425.2(c). Among other things, the Rule provides that disclosures must (i) "stand out from any accompanying text" if made through visual means, (ii) be "delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and

5

understand it" if made audibly, and (iii) be "unavoidable" if made through electronic means. § 425.2(c)(2)–(4). Moreover, any disclosures related to the negative option feature "must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature." § 425.4(b)(2)(i). The Rule, therefore, not only requires the disclosure of an extensive amount of information, but also compels companies to communicate that information in unique and highly regulated ways.

12. ***Loss of Customer Goodwill.*** Complying with Section 425.4's disclosure requirements will cause the Chamber's members to lose the goodwill of their potential and existing customers.

13. Companies that wish to keep offering subscription plans will be compelled to inundate potential customers with information related to the goods or services offered, including information that has no relation to the subscription plan, simply because the good or service is promoted or offered with a subscription plan. The Rule offers no specific guidance on what constitutes a "material term," leaving companies to guess as to what aspects of any given transaction might be considered "material" to customers—or to regulators—after the fact. If companies guess incorrectly and do not disclose terms that are later deemed "material," companies could face the prospect of FTC enforcement and civil penalties of up to $51,744 per violation. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024). The threat of these penalties will pressure

6

companies to over-disclose the terms of their products and services. Many customers will become irritated and decline to enter transactions rather than try to understand the information disclosed. *See* Loud Declaration ¶¶ 16–19.

14. Section 425.4 also requires companies to provide all these disclosures in a "[c]lear and [c]onspicuous" manner—another vaguely defined and subjective term with punitive consequences. To avoid enforcement and penalties, companies will need to incorporate these disclosures into their customer-facing communications. Such disclosures will clutter companies' messaging and detract from the underlying offers. *See* Loud Declaration ¶ 17. That clutter will further irritate and alienate customers and cause companies to lose business and customer goodwill.

15. And because the disclosure requirements of Section 425.4 do not exempt promotions and offers made verbally—either by telephone or in person— the required disclosures will significantly interfere with customer-facing communications. Many customers will become frustrated both by the amount of time that the verbal disclosures take and by having to listen to the oral analogue of "lawyers' fine print." *See* Loud Declaration ¶ 19.

16. And the harm to customer goodwill will be exacerbated by private plaintiffs' attempts to use the Rule's new requirements to support individual or class action lawsuits against companies. Even if such lawsuits are completely meritless,

7

defending against them will prove costly to companies and those costs ultimately will be passed on to customers.

17. ***Unrecoverable Compliance Costs.*** In addition to lost business and customer goodwill, the Rule imposes unrecoverable compliance costs on the Chamber's members.

18. The Rule is scheduled to take effect 60 days after the date of publication in the Federal Register, except that Sections 425.4 through 425.6 will be effective 180 days after date of publication in the Federal Register. A stay of those dates is necessary to avoid significant irremediable costs. Specifically, because the reticulated scheme for disclosures and mechanisms of cancellation will take time to build and deploy, companies must begin to review their existing customer experiences now to determine what additional "material" information must be disclosed and how. *See* Loud Declaration ¶ 21. That effort will take up significant staff time and, because the standard is so vague, may require consulting in-house or outside legal counsel. *See id.* ¶ 22.

19. Once the substance of necessary disclosures is discerned, companies will also have to redesign their webpages, broadcast and print media, and other visual advertisements to comply with the Rule's appearance requirements. For example, many companies will need to reconfigure their websites to ensure that the required disclosures fit onto a single page and are unavoidable to customers. *See* Loud

8

Declaration ¶ 22.  Some companies will need to purchase additional advertising space or print additional materials to set out the required disclosures in a larger font. *See id.*  For verbal promotions and offers, companies will have to retrain salespeople and re-write call scripts.  *See id.*  All of this will require significant time, money, technical resources, and legal review.  *See id.* ¶¶ 21–22.

### Sections 425.2–424.5's Ban on Certain Information With Promotions or Offers

20.    The Rule forbids companies from providing other information—including truthful information—when offering for sale goods or services with subscription plans.  Section 425.4 provides that companies cannot communicate "any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures."  § 425.4(b)(3).  Section 425.2, when defining the phrase "clear and conspicuous" for purposes of Section 425.4, also provides that the required disclosures cannot "be contradicted or mitigated by, or inconsistent with, anything else in the communication."  § 425.2(c)(7).  Relatedly, Section 425.5 forbids companies from including "any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature."  § 425.5(a)(2).  And Section 425.3 forbids companies from "misrepresent[ing], expressly or by

9

implication, any Material fact" in connection with promoting or offering any subscription plan. § 425.3.

21. ***Loss of Consumer Goodwill.*** The speech prohibitions of Sections 425.2 through 425.5 are broad enough to be read to bar companies from providing even accurate information about their products or services, irreparably causing them to lose business and customer goodwill. For example, if a technology company offering cloud services with a subscription plan must disclose the risk of hackers obtaining users' data, then a regulator might determine that the company cannot describe its product as "never hacked" or that its product "scored the best safety rating" from a trade group lest such disclosures "distract from" the disclosure of hacking risks. The result will be that companies are chilled from providing positive and useful information about their products lest such information be found, after the fact, to detract from or undermine any other required disclosures. *See* Loud Declaration ¶¶ 26–27.

22. These prohibitions accordingly will lead to companies placing an undue emphasis on warnings and negative disclosures. And customers in such circumstances are more likely to forgo commercial transactions or be dissatisfied with existing commercial arrangements. *See* Loud Declaration ¶ 27.

23. ***Unrecoverable Compliance Costs.*** The Rule's prohibitions also contain vague terms that will increase companies' compliance costs, such as the

requirement that the communication of truthful information not "detract[] from" other required disclosures or "interfere[] with" customers' ability to understand disclosures. Members will expend resources attempting to analyze and comply with these terms.

### Section 425.5's Consent Requirement

24.     The Rule's Section 425.5 requires companies "to obtain the consumer's express informed consent before Charging the consumer," including "the consumer's unambiguously affirmative consent to the Negative Option Feature offer *separately* from any other portion of the transaction." § 425.5(a) (emphasis added). Although the Rule does not define either "express informed consent" or "unambiguously affirmative consent," it provides that sellers will be "deemed in compliance with [the requirement to obtain consent for the rest of the transaction] if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction." § 425.5(c). The "consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature." *Id.*

25.     ***Loss of Customer Goodwill.*** Section 425.5's consent requirement will irreparably harm the Chamber's members by causing them to lose customer

11

goodwill. Most obviously, requiring a customer to consent twice to a single transaction is not how business is usually done. Many customers will become confused and frustrated by the need to consent twice to a single transaction, increasing the likelihood that customers will forgo the transaction altogether. *See* Loud Declaration ¶¶ 31–33.

26. Customers will also be confused by the Rule's requirement for the "consent request" to be "free of any information not directly related to the consumer's acceptance of the negative option feature." The Rule elsewhere requires companies to disclose all material terms of the transaction even if they are unrelated to the subscription plan. To comply with both requirements, companies may have to place the two consent requests on different pieces of paper or webpages—one for the subscription plan, and one for the transaction itself. Doing so will make the two-step consent process more cumbersome and frustrating for customers.

27. Many customers will also not understand that two separate consents are required for a single transaction and, despite intending to purchase a good or service, provide only one step of consent before leaving the transaction. For example, if customers must navigate one webpage to consent to a subscription plan and then navigate a second webpage to purchase the good or service, consumers will stop at the first webpage and think that their initial consent is sufficient to purchase the good or service. Consumers will then become irritated with the company when the good

Appellate Case: 24-3137    Page: 469    Date Filed: 12/05/2024 Entry ID: 5463205

or service never arrives because they mistakenly think that they purchased the good or service. That irritation will cause further lost customer goodwill, both in the form of the customers themselves who do not receive the goods or services and in the form of word-of-mouth or online reviews negatively reflecting on the company. *See* Loud Declaration ¶¶ 32–33.

28. ***Unrecoverable Compliance Costs.*** The Chamber's members independently will incur unrecoverable costs in complying with the two-step consent requirement. Companies selling goods or services online will have to redesign their webpages, and this work will require substantial time and technical resources. *See* Loud Declaration ¶ 34. Businesses offering goods or services with subscription plans to other businesses will have to re-write their contracts and obtain lawyer review. *See id.* Companies selling goods or services with subscription features in person or over the phone will need to re-write scripts and re-train their salespeople to include separate consent requests. *See id.* All of this will require companies to expend time and money today in anticipation of the Rule's effective date unless the Rule is stayed.

**Section 425.6's Simple Cancellation Requirement**

29. Section 425.6 provides that companies offering or promoting goods or services with subscription plans must "provide a simple mechanism for a consumer to cancel the Negative Option Feature; avoid being Charged, or Charged an

13

increased amount, for the good or service; and immediately stop any recurring Charges." § 425.6(a). The Rule also provides that the "simple mechanism" to cancel "must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature." § 425.6(b). The Rule then specifies that "[a]t a minimum," the cancellation must be offered "through the same medium the consumer used to consent to the Negative Option Feature" and specifies rules for each medium. § 425.6(c).

30. ***Loss of Customer Goodwill.*** The Rule's requirement for companies to "immediately" cancel recurring charges will cause the loss of customer good will if it results in cancellation of services when the consumer did not want such cancellation. This could occur either because the Rule does not clearly permit companies to even verify a customer's identity when an individual tries to cancel a good or service or because customers accidentally cancel the subscription plan through confusion or inadvertence. *See* Loud Declaration ¶¶ 36–40.

31. ***Unrecoverable Compliance Costs.*** Many companies will need to re-design their websites, re-write call scripts, and train employees to ensure that they are complying with the Rule's new cancellation requirements. *See* Loud Declaration ¶¶ 41–42.

Appellate Case: 24-3137   Page: 471   Date Filed: 12/05/2024 Entry ID: 5463205

### The Rule's Recordkeeping Requirements

32.     Finally, the Rule also imposes recordkeeping requirements on companies that promote or offer goods or services with subscription plans. The Rule requires companies to "[k]eep or maintain verification of the consumer's consent" to a subscription plan "for at least three years," unless "the seller can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." § 425.5(a)(3).

33.     ***Loss of Customer Goodwill.***  These recordkeeping requirements will cause companies to lose customer goodwill because of the risks of retaining customers' information. In general, customers dislike knowing that their records are being maintained by a company, both because they dislike having records about them kept by third parties and because they fear that such records will be inadvertently disclosed to others. *See* Loud Declaration ¶ 46. Although there is a route to avoid these recordkeeping requirements, that route imposes risks for a business if their regulator later disagrees about whether they met a "preponderance of the evidence" standard. Those businesses that elect not to run that risk will face a loss of customer good will from customers who object to the businesses maintaining these records.

34.     Relatedly, each additional record that a company retains about their customers raises the risk that those records are inadvertently disclosed, either

App.472

through hacking, misplacing files, or other means. When such inadvertent disclosures occur, companies are usually required to notify affected parties, which generates negative press and leads to further losses of customer goodwill. *See* Loud Declaration ¶ 45.

35. ***Unrecoverable Compliance Costs.*** Those requirements will also cause companies to incur unrecoverable compliance costs. These will include re-designing software and websites to record consent, as well as retraining employees and designing forms for employees to record consent. *See* Loud Declaration ¶¶ 47–48.

36. All those costs will grow over time, given that companies will need to keep those records for three years. Such recordkeeping increases costs for each update to systems and software, as well as increases risks of inadvertent disclosures during such updates. All of this will require additional training for employees and additional expenses for companies. *See* Loud Declaration ¶¶ 47–49.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


DATED:  _12/3/24_____


_____

Appellate Case: 24-3137    Page: 473    Date Filed: 12/05/2024 Entry ID: 5463205

# Doc. 18

# Declaration of John Loud, LOUD Security Systems, Inc.

Appellate Case: 24-3137     Page: 474     Date Filed: 12/05/2024 Entry ID: 5463205

# In the United States Court of Appeals for the Eighth Circuit

## DECLARATION OF JOHN LOUD

I, John Loud, hereby declare as follows:

1.      I am over the age of 18 and competent to make this declaration.  The statements in this declaration are true and within my personal knowledge.

2.      I am the founder and president of LOUD Security Systems, which I will refer to herein as "LOUD."  My business address is 1690 Roberts Blvd., Suite 102, Kennesaw, Georgia 30144.  LOUD is a member of the Georgia Chamber of Commerce, as well as a member of the Electronic Security Association.

3.      In my position as President of LOUD, I am responsible for overseeing all aspects of the company and its operations.  I oversee LOUD's advertising and promotions, LOUD's award-winning customer service, and LOUD's administrative functions and recordkeeping.  I have firsthand knowledge of LOUD's operating budget and overhead.  I have knowledge of the expected costs of implementing changes to LOUD's systems and business model.  I also have firsthand knowledge of LOUD's actual and expected costs of compliance with legal and regulatory standards.  I am therefore qualified to provide the information in this Declaration

1

Appellate Case: 24-3137      Page: 475      Date Filed: 12/05/2024 Entry ID: 5463205

regarding the effects that the Federal Trade Commission's new Rule on Negative Option Marketing (the "Rule") are having, and will continue to have, on LOUD costs of compliance. Negative Option Rule, RIN 3084-AB60 (issued Oct. 16, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf, *published at* 89 Fed. Reg. 90,476 (Nov. 15, 2024); *see* 16 C.F.R. § 425.

4.      Additionally, I personally know many of LOUD's customers, in some cases for decades. At LOUD, we work tirelessly to serve our customers. We are a Better Business Bureau accredited business with an A+ ranking. In 2014, the Cobb County Chamber of Commerce recognized LOUD as Small Business of the Year. LOUD is proud of its hard-earned reputation for excellence and community service. I am therefore qualified to provide the information in this Declaration regarding the irreparable harm that the Rule will inflict on LOUD's customer goodwill.

5.      LOUD was established in 1995 in Powder Springs, Georgia. Its headquarters since 1997 have been located in Kennesaw, Georgia. LOUD has been recognized as an SDM Top 100 security dealer, a nationwide survey-based ranking of industry security dealers. LOUD's vision is to provide top-of-the-line security systems and monitoring accompanied with outstanding customer service. LOUD has earned the trust of thousands of families and businesses and has grown to serve all of Georgia and beyond, with customers in 31 states.

2

Appellate Case: 24-3137    Page: 476    Date Filed: 12/05/2024 Entry ID: 5463205

6.     LOUD provides security services to both homes and businesses. LOUD offers a range of packages that include installing, maintaining, and monitoring electronic door locks, digital network cameras, fire and smoke alarms, carbon monoxide alarms, and more.  If a home's or business's alarm system is triggered, LOUD operators review the trigger to verify an intrusion or fire and then contact emergency services for dispatch.  This decreases response times and minimizes the risk of property losses or injury to individuals.

7.     LOUD offers many other services, including systems that monitor properties for water leaks; pet cameras that allow owners to ensure that their pets are safe while they are alone; various kinds of video surveillance that monitors properties; safety inspection services; custom technology solutions to businesses; and more.  These services provide owners of homes, businesses, and properties enhanced protection and peace of mind.

8.     For all of these services, LOUD strives to maintain its excellent customer service.  That includes maintaining an exceptional customer service center, where customers can contact a live representative 24/7, 365 days a year.  Customer service is essential for security systems to ensure that customers' questions and concerns are resolved quickly, particularly because customers sometimes call regarding situations that require an immediate response.  As president of the company, I make my cell phone number available on LOUD's website so that any

3

customer can reach out to me directly. It is just one more way we fulfill our commitment to providing the highest quality, most accessible, and most responsive customer service on the market.

9. LOUD offers nearly all of its services through recurring subscription plans. I understand that the FTC uses the term "Negative Option Feature" to refer to recurring subscriptions, but I will generally refer to them as subscription plans. The reason we use recurring subscription plans is obvious: by their nature, electronic security services require plans that continue and renew indefinitely until the customer cancels. Customers want the peace of mind knowing that their electronic security service will not be interrupted. They do not want the burden of having to renew the security service at set intervals—with the risk of the service being terminated and leaving a property unprotected if the customer forgets to renew on time.

10. LOUD's subscription plans are tailored to each customer's needs. Security services generally are not a one-size-fits-all service. The security needs of individuals and businesses vary, with different properties requiring different types of protection and varying numbers of cameras, smoke detectors, electronic locks, and monitoring technologies. To provide this customization, LOUD usually requires some information from customers before giving them a customized quote for their

security needs. Members of the LOUD team often perform on-site inspections before executing contracts for automatically renewing security plans.

11. I am familiar with the Rule, which will impose overly broad, unduly burdensome, and vague new legal obligations on LOUD. I believe the Rule imposes new obligations where there have been no problems in my field, and that it is a solution in search of a problem. And unfortunately, the Rule will create problems for LOUD and its customers. As I explain below, each part of the Rule will irreparably harm LOUD by resulting in a loss of customer goodwill and by forcing us to incur substantial and unrecoverable costs of compliance ahead of parts of the Rule taking effect on January 15, 2025, and the remainder of the rule taking effect on May 14, 2025.

**Section 425.4's Disclosure Requirements**

12. The Rule imposes new disclosure requirements in 15 C.F.R. § 425.4 that will irreparably harm LOUD by damaging customer goodwill and forcing LOUD to incur substantial costs of compliance that it cannot recover.

13. ***Loss of Customer Goodwill.*** Complying with Section 425.4's disclosure requirements will cause LOUD to lose customer goodwill, both from potential and current customers.

14. First, the Rule will compel LOUD to inundate customers with information that they do not want or need. The Rule requires LOUD to disclose in

5

a "Clear and Conspicuous" manner any "Material" information related to the services offered prior to obtaining the customer's billing information. In practice, this will not be as easy as it sounds. A wide range of terms could be "Material" to consumers in the market for security services. Therefore, LOUD will be forced to guess as to what aspects of its transactions might be considered "Material" to its customers. If LOUD makes the wrong judgment and does not disclose terms that are later deemed "Material," the Rule exposes LOUD to possible FTC enforcement and civil penalties. *See* 15 U.S.C. § 45(m); Adjustments to Civil Penalty Amounts, 89 Fed. Reg. 1445, 1446–47 (Jan. 10, 2024).

15.     For LOUD, every customer will present a unique set of challenges in determining what information to disclose as material. Customers subscribe to electronic security services to protect personal safety, homes, businesses, and other valuable property. With these high stakes, many LOUD customers might view terms to be "material" that subscribers to a magazine or a gym membership might not. However, the Rule's vague standard gives no direction on how electronic security and alarm companies should satisfy the materiality standard, or on what additional details LOUD should disclose to its prospective and existing customers.

16.     Moreover, each security contract that LOUD provides is customized. Each of these contracts presents a unique combination of features—varieties of electronic monitoring and alarms, cameras, locks, fire alarm options, and live

6

monitoring. Depending on the final package, pricing details will be set for that particular transaction. LOUD has customers ranging from individual homeowners to large, sophisticated businesses. What is material for an individual homeowner may not be material for a sophisticated business. Under the Rule, LOUD will need to evaluate each transaction, service, and bundle, and then make a judgment on what terms and information LOUD needs to disclose to that customer. With the high exposure associated with any mistake, LOUD will need to err on the side of over-disclosure and disclose every term that could possibly be considered material, even when the customer is a sophisticated business.

17.     One result will be a massive amount of information disclosed in the "Clear and Conspicuous" format required by the Rule. If visual, the information "must stand out from any accompanying text or other visual elements so that it is easily noticed." If online, the information must be "unavoidable." This disclosure requirement will impose a great deal of information on the consumer with little ability for LOUD to even attempt to organize or prioritize the information in ways that help consumers digest the information.

18.     A foreseeable consequence of the Rule is that customers will become irritated by lengthy, "Clear and Conspicuous" terms. This may harm LOUD's customer relationships as the customers may blame LOUD for a lack of customer-friendliness when in fact the difficulty arises from the Rule's requirements.

7

Appellate Case: 24-3137     Page: 481     Date Filed: 12/05/2024 Entry ID: 5463205

Customers even may walk away from offers rather than struggle to figure out the key terms of a transaction.

19.     LOUD also regularly interacts with customers over the phone and often receives customers' billing information in telephone transactions. In those situations, the Rule will require LOUD's employees to disclose all those material terms orally. These disclosures will take time due to the complex, multi-faceted nature of the kinds of customized security contracts that LOUD's customers regularly want. Some customers will end a conversation rather than listening to a recitation of all the possible material terms, as required by the government-mandated disclosure provision of this Rule.

20.     ***Unrecoverable Compliance Costs.*** In addition to lost business and customer goodwill, the Rule imposes compliance costs on LOUD that LOUD cannot recover from the government.

21.     Most of the Rule is scheduled to take effect on May 14, 2025. LOUD has already begun efforts to comply with the Rule, and LOUD will need to increase those efforts if the Rule's effective date is not stayed. For example, LOUD needs to begin a review of its subscription agreements to determine what existing or new "Material" information must be disclosed in a "Clear and Conspicuous" manner to comply with the Rule. Technical details about fire alarms, or options for integrating a system of electronic keypad locks into a larger IT environment, might be material

to some customers but not others. Identifying and enumerating all the possible material terms will be burdensome to LOUD. Creating and distributing different sets of disclosures to different customers, such as individual customers and sophisticated businesses, also will impose new burdens and costs on LOUD.

22.     The requirements for disclosures to be "Clear and Conspicuous" will cause LOUD to incur further unrecoverable costs. LOUD agrees that companies should deal with their customers in clear and fair ways, and LOUD always strives to do so. But when the federal government regulates those dealings with vague standards and the threat of steep penalties, even scrupulous and well-meaning companies must reevaluate their communications and practices. As a result of LOUD's review of existing operations, LOUD may have to redesign its offers, its customer-facing webpages, and other advertising materials to make the disclosures that the Rule requires in the format required. LOUD also may have to retrain its customer service representatives to ensure that sufficient information is disclosed in the "Clear and Conspicuous" manner required by the Rule. LOUD will need to perform additional analysis to ensure that enumerated disclosures in Section 425.4(a)(1)–(4) appear "immediately adjacent" to the negative option feature. This analysis may lead to additional design challenges, depending on how feasible it is to incorporate all the required terms onto a single, legible piece of paper or webpage.

9

23.     LOUD is a small business that has no means to absorb these new costs of compliance with the Rule.  Ultimately, LOUD will need to pass these costs along to customers in the form of higher prices.

**Sections 425.2–.5's Ban on Certain Information With Promotions or Offers**

24.     Next, the Rule restricts LOUD from providing other information—even accurate information—when promoting or offering for sale LOUD's services with negative option plans.  This restriction on communication will irreparably harm LOUD.  It will cause LOUD to lose business and customer goodwill; it will impose on LOUD unrecoverable costs of compliance, and it will cause LOUD to suffer harm to its constitutional free speech rights.

25.     ***Loss of Consumer Goodwill.***   The speech regulations in Sections 425.2–.5 will irreparably harm LOUD by causing it to lose business and customer goodwill.

26.     The Rule prohibits companies from providing promotional information that "detracts" from disclosures required under the Rule.  That language is broad enough to potentially bar LOUD from providing typical and factually accurate language associated with offers or promotions for LOUD's services.  Any time LOUD makes a positive statement in its promotional materials, LOUD will run the risk that someday, a regulator will deem LOUD's communications to have "detract[ed]" from required disclosures.

10

27.     The result will be that LOUD will be chilled from providing positive and factually accurate information about its products lest such information be found, after the fact, to detract from or undermine any other required disclosures. Instead, LOUD will naturally be compelled to place an undue emphasis on warnings and negative disclosures, resulting in customers who lack complete information about a product or service. Such customers are more likely to forgo LOUD or be dissatisfied with existing commercial arrangements. Increased customer dissatisfaction as a result of the Rule will irreparably harm LOUD.

28.     ***Unrecoverable Compliance Costs.*** LOUD is incurring, and will continue to incur, unrecoverable and substantial compliance costs unless the Rule is stayed pending judicial review. For example, LOUD needs to analyze information it provides about its fire alarm services and their sensitivity to smoke levels to discern if this is (a) a material term that *must* be disclosed, or if it might instead be (b) a term that "detracts from" the mandated disclosure of information about the negative option features of the contract. Unless the Rule is stayed, LOUD would need to ensure that each subscription plan contains the required disclosures, and that those disclosures do not trigger an obligation to remove content in promotional materials or on websites. All of this will take time and resources to ensure compliance by the Rule's effective date.

11

Appellate Case: 24-3137     Page: 485     Date Filed: 12/05/2024 Entry ID: 5463205

29.    ***First Amendment Harms.***  Because the Rule prohibits ordinary speech that could be deemed to detract from the Rule's mandatory disclosures, the Rule raises First Amendment problems.  The Rule's overbroad prohibition on speech and the resulting chilling of truthful speech violates the First Amendment.  The harm to LOUD's First Amendment rights is irreparable.

### Section 425.5's Consent Requirement

30.    The Rule's consent requirement in Section 425.5 will cause LOUD to suffer irreparable harm from lost customer goodwill.  Section 425.5 also is already causing LOUD to incur unrecoverable compliance costs.

31.    ***Loss of Customer Goodwill.***  The consent requirement in Section 425.5 will irreparably harm LOUD by causing it to lose customer goodwill.  By requiring the consumer to consent to the negative option feature but no other portion of the transaction, the Rule effectively requires companies to obtain a consumer's consent twice—first, for the negative option feature, and second, for the rest of the transaction.  And the Rule effectively requires companies to separate those two steps of consent with different pieces of paper or webpages—because the Rule simultaneously requires *both* that the "consent request" for the negative option feature be "free of any information not directly related to the consumer's acceptance of the negative option feature" *and* that companies disclose material terms unrelated to the negative option feature.  §§ 425.4(a), 425.5(c).  Requiring a customer to

12

consent twice to a single transaction is not how business is usually done. By the time a prospective customer of LOUD is ready to sign up for LOUD's services, that customer likely has had extensive personalized conversations with LOUD's team. LOUD team members likely have visited the prospective customer's property and surveyed the locations for security coverage. At the end of this process, customers will find it odd for LOUD to insist on double consent—one consent to the auto-renewing character of the subscription, and a second consent to the subscription transaction itself.

32. The added complexity that the Rule requires for entering a standard, auto-renewing subscription for electronic security services likely would confuse customers. A customer may sign one consent form but not the other, thinking that one consent was sufficient—and unaware that, without the second consent, the security arrangements that the customer seeks are not in effect. For customers seeking security arrangements, any period during which their properties or businesses are unsecured could have significant implications for the safety of their properties. The resulting loss of coverage also could affect insurance coverage that requires continuous protection at the paid premium, or could trigger higher insurance premiums going forward. Having a multi-step consent process increases the risk of mistakes from customers attempting to sign up for services but failing to fully consent as the Rule requires. Failures in the signup process—and any window of

13

Appellate Case: 24-3137     Page: 487     Date Filed: 12/05/2024 Entry ID: 5463205

time in which security services are not in place due to mistakes in the signup—will lead to customer frustration and dissatisfaction with LOUD.

33.     LOUD takes these risks and burdens seriously.  We work hard to ensure high levels of customer satisfaction, from the sign-up process through the duration of the customer's subscription.  The Rule's new consent requirements will complicate and bureaucratize our interactions with clients, in ways that make little commercial sense and that will fatigue our customers.  Customer dissatisfaction and negative word-of-mouth can be extremely damaging to companies, especially companies in the highly competitive electronic security industry, and these harms are irreparable.

34.     ***Unrecoverable Compliance Costs.***  LOUD is incurring unrecoverable costs in anticipation of complying with the two-step consent requirement.  LOUD will need to redesign its offer letters, contracts, webpages, and the scripts for in-person and telephone customer service interactions to ensure that there are always places for two separate consents, one to the subscription agreement itself and the other to the auto-renewing feature of the subscription.  This requires LOUD to expend substantial time and resources to ensure compliance by the Rule's effective date unless the Rule is stayed.

Appellate Case: 24-3137     Page: 488     Date Filed: 12/05/2024 Entry ID: 5463205

**Section 425.6's Simple Cancellation Requirement**

35.     Section 425.6 of the Rule regulates how consumers and businesses may cancel contracts with negative option features and limits companies' ability to offer consumers critical information when they seek to cancel such contracts.  These requirements irreparably harm LOUD.

36.     ***Loss of Customer Goodwill.***  The Rule will cause LOUD to lose customer goodwill for several reasons.  The Rule requires that cancellation be easy and immediately effective.  While that sounds laudable on paper, it will cause many problems and erroneous cancellations in practice.   In the security industry, an erroneous cancellation of security services leaves customers unprotected and can result in serious harm.

37.     The requirement for companies to "immediately" cancel recurring charges may not allow LOUD to require customers to verify their identities when trying to cancel a security subscription.  The Rule does not define the terms "simple mechanism" and "at least as easy to use," and therefore may prohibit from asking for basic information, such as identity verification, when they receive cancellation requests.   The Rule purports to allow "reasonable verification" at the time of cancellation, but then threatens that "[a]ny authentication, verification, or confirmation procedure that creates unreasonable asymmetry" with the enrollment process "runs afoul of Section 5 of the FTC Act and the Rule."  89 Fed. Reg. 90,476,

15

90,506 (Nov. 15, 2024). The Rule also assumes that "a final Rule-compliant cancellation should take no more than 30 seconds to one minute," *id.* at 90,520, thus placing the regulated community on notice that the FTC has companies under a stopwatch.

38.     These requirements give FTC enforcement attorneys undue discretion to second-guess whether cancellation procedures designed to *protect* customers have "unreasonable asymmetry" with enrollment procedures according to the regulator's own subjective standards. The threat of penalties for noncompliance will incentivize LOUD and other companies to scale back authentication and verification procedures at the time of cancellation, which in turn will increase the risk of wrongdoers taking advantage of this regulatory environment to cancel security services without authorization. If this happens, it will harm customer goodwill toward LOUD.

39.     The Rule's requirement for immediate and simple cancellation also will impair LOUD's ability to provide customers with useful information when they seek to cancel a subscription. Customers sometimes seek to cancel subscriptions without being aware of the consequences of cancelling. A customer who seeks to cancel with the idea that next month she will take out a different policy may be unaware that LOUD is required to "immediately cancel" the contract upon the customer's request—meaning that the customer would be unprotected in the interim between the cancellation request and the next month when the customer anticipates starting a

16

Appellate Case: 24-3137     Page: 490     Date Filed: 12/05/2024 Entry ID: 5463205

new subscription with another provider. But explaining this may not be permitted if doing so would make cancellation less "simple" or "easy" than signup had been. The Rule effectively forbids LOUD from taking reasonable steps to explain the consequences of cancellation to the customer and ensuring that the customer understands.

40. Relatedly, a customer may seek to cancel one of a bundle of services they receive from LOUD, but the customer may be unaware of how that service interacts with the other bundled services. For instance, LOUD sometimes offers customers discounts and promotional deals when they subscribe to bundled services, such as visual camera protection, burglar alarms, fire alarms, electronic keypad access systems, and live system monitoring. The discount might be in the form of a promotion to encourage the purchase of additional LOUD services. The discount also might represent efficiencies that LOUD achieves and passes on to the customer when it provides multiple services—for example, because it is more efficient for LOUD inspectors to provide their safety inspection services when LOUD also manages the keypad access system for a building. If a customer sought to cancel one item in the bundle, the cost for another item might go up. A customer who decided to change the keypad access system from LOUD to an IT provider more directly integrated with the customer's computer systems might not realize that this will lead to increased costs on the part of LOUD's security inspection services. This

17

is the type of important information that LOUD would explain to customers at the time of cancellation, and customers expect LOUD to provide this information. However, the Rule's requirement that cancellation be "as easy" as signup may prevent LOUD from explaining this information to customers. Customers who do not receive or understand this information and are later surprised by the consequences of their cancellation will be dissatisfied with the increased costs, causing loss of customer goodwill to LOUD due to the Rule's simple-cancellation requirement.

41. ***Unrecoverable Compliance Costs.*** The Rule's cancellation requirements are causing LOUD to incur unrecoverable compliance costs and those costs will increase as the Rule's effective date approaches. LOUD will need to expend resources to determine what cancellation mechanism is "as simple as" the sign-up methods normally offered, as required by the Rule. The standard signup process for LOUD services involves detailed conversations and consultations. But the final signup stage is simply the creation of a contract. The Rule is unclear as to how much of the total process counts when considering whether cancellation is as simple as signup. The process of analyzing the steps of the signup and comparing them against the cancellation process is requiring LOUD to expend time and resources.

Appellate Case: 24-3137    Page: 492    Date Filed: 12/05/2024  Entry ID: 5463205

42. In creating a simple cancellation option, LOUD is also expending time and resources to implement the simple cancellation mechanism. LOUD will need to review and potentially redesign its customer-facing interactive website pages, redo contract templates, and revise its employee training and the scripts for its customer service representatives. Given that the final stages of signups are often accomplished through in-person or telephone interactions, LOUD will also likely have to hire additional personnel to ensure that any cancellation calls and messages, as well as the cancellation itself, are processed "promptly."

43. ***First Amendment Harms.*** The required provision of "simple" cancellation mechanisms that are in the "same medium" and "as easy to use as" sign-up mechanisms will burden LOUD's ability to communicate with customers. Coupled with the prohibition on making the cancellation process more complex than signup, the Rule would significantly impede LOUD's ability to speak with its customers at the time of a cancellation transaction—a time when there is an important need to communicate information about the consequences of cancellation. The restriction on LOUD's communication and speech violates LOUD's First Amendment rights and causes immediate and irreparable harm.

**The Rule's Recordkeeping Requirements**

44. Finally, the Rule imposes new recordkeeping requirements on LOUD. The Rule requires us to "[k]eep or maintain verification of the consumer's consent"

19

Appellate Case: 24-3137    Page: 493    Date Filed: 12/05/2024 Entry ID: 5463205

to a negative option plan and the underlying transaction "for at least three years." § 425.5(a)(3). The Rule provides that we can avoid this requirement only if we "can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent." *Id*.

45. ***Loss of Customer Goodwill.*** These recordkeeping requirements will cause LOUD to lose customer goodwill. There are always risks to retaining customers' information, including improper disclosure through hacking, misplaced files, or other means. The longer customer information is retained, the greater the risk that disclosure will take place, whether to due to an accidental or malicious security breach. LOUD strives to protect the records of its clients, but all companies face risks from cyber incidents and malign actors. If there should be any data breach, the reputational consequences are especially pronounced for a security sector business like LOUD. Retaining additional records for three years, as the Rule requires, will only increase the risk of improper disclosures of customers' information and increase the risk of lost customer goodwill.

46. Even if no improper disclosures occur, LOUD will still lose customer goodwill because customers generally do not want their records to be kept and maintained by a company for years. Customers generally dislike having records about them kept by third parties, so knowing that LOUD is maintaining such records

will harm LOUD's customer goodwill. Customers additionally fear that such records will be inadvertently disclosed to others.

47. ***Unrecoverable Compliance Costs.*** The Rule's new recordkeeping requirements also are causing LOUD to incur unrecoverable costs, and those costs will increase as the Rule's effective date draws near. LOUD does not currently record or maintain this type of consumer consent verification that the Rule requires. For cancellations over the internet, LOUD will need to re-design software and websites to generate Rule-compliant records of customer consent. For cancellations over the phone or in-person, we will need to train employees and design forms for employees to record consent. LOUD also will incur incremental new costs to maintain records of consumers' consent to transactions. Alternatively, we would need to devise new procedures for documenting that our online, telephone, and in-person processes make it technically impossible for any consumer to complete the transaction without consent. This would require implementing new recordkeeping systems and training personnel to maintain the necessary information.

48. LOUD also will need to invest in its information technology security systems to safeguard the records that it is required by law to maintain for long periods. It is imperative for LOUD's customers—and for the maintenance of LOUD's own reputation—that it do its utmost to ensure that those records are not improperly disclosed. LOUD would be able to handle much of the work on its

21

internal servers, but it would require an investment in additional hardware. To implement a new system, LOUD would likely have to employ additional consultants to make the technology transition.

49.     At a time when consumer costs are rising, LOUD works hard to keep costs down for its customers. But the compliance costs that the Rule would impose on LOUD would force LOUD to raise prices to recoup those costs. LOUD does not have the ability to absorb those costs itself. These government-mandated costs will ultimately harm our customers, even though our customers have been happy with LOUD's subscription plans.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: November 27, 2024

President
LOUD Security Systems, Inc.

22

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2024, an electronic copy of the foregoing appendix was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

 */s/* Helgi C. Walker
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*