# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

_____

IN RE: MCP NO. 192, NEGATIVE OPTION RULE

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, ET AL.,
*Petitioners,*

v.

FEDERAL TRADE COMMISSION,
*Respondent.*

_____

On Petition for Review of a Final Rule of the
Federal Trade Commission (RIN 3084—AB60)

_____

## OPPOSITION OF THE FEDERAL TRADE COMMISSION TO MOTION FOR STAY PENDING DISPOSITION OF PETITIONS FOR REVIEW

_____

Of Counsel:
JAMES A. KOHM
*Associate Director*

LAURA KOSS
*Assistant Director*

KATHERINE JOHNSON
*Attorney*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

ANISHA S. DASGUPTA
*General Counsel*

MATTHEW M. HOFFMAN
BENJAMIN F. AIKEN
BRADLEY DAX GROSSMAN
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
bgrossman@ftc.gov
202-326-2994

# TABLE OF CONTENTS

Table of Authorities.................................................................................iii

Introduction ........................................................................................... 1

Background............................................................................................ 3

    A.   The FTC's Rulemaking Authority ................................. 3

    B.   The Negative Option Rule Amendments ...................... 5

Argument................................................................................................ 8

I.    Petitioners Are Unlikely to Succeed............................... 9

    A.   The Commission Had Authority under Section 18 to Amend the Rule. .............................................. 9

    B.   The Commission Complied with Procedural Requirements.................................................... 15

    C.   The Amendments Are Not Arbitrary and Capricious................. 18

    D.   The Rule Comports with the First Amendment. ......................... 22

II.   Petitioners' Irreparable Harm Claims Are Speculative and Outweighed by the Public Interest in Preventing Harm to Consumers. ......................................................... 24

III. Any Relief Should Be Limited. ......................................... 27

Conclusion ........................................................................................... 29

Appellate Case: 24-3137    Page: 2    Date Filed: 12/20/2024    Entry ID: 5469046

# TABLE OF AUTHORITIES

## CASES

*Am. Fin. Servs. Ass'n v. FTC,*
767 F.2d 957 (D.C. Cir. 1985) .................................................................. 4

*California v. Yamasaki,*
442 U.S. 682 (1979) ................................................................................ 27

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ................................................................................ 18

*Freedom Holdings, Inc. v. Spitzer,*
408 F.3d 112 (2d Cir. 2005) .................................................................... 25

*Gill v. Whitford,*
585 U.S. 48 (2018) .................................................................................. 27

*Gundy v. United States,*
588 U.S. 128 (2019) ................................................................................ 15

*H&R Block, Inc. v. Block, Inc.,*
58 F.4th 939 (8th Cir. 2023) ................................................................... 25

*Labrador v. Poe,*
144 S. Ct. 921 (2024) .............................................................................. 27

*Missouri v. Biden,*
112 F.4th 531 (8th Cir. 2024) .......................................................... 8, 9, 24

*Morehouse Enters., LLC v. ATF,*
78 F.4th 1011 (8th Cir. 2023) ................................................................. 24

*Nat'l Inst. Of Fam. & Life Advocs. v. Becerra,*
585 U.S. 755 (2018) ................................................................................ 24

*Nat'l Petroleum Refiners Assoc. v. FTC,*
482 F.2d 672 (D.C. Cir. 1973) .................................................................. 3

*Nken v. Holder,*
556 U.S. 418 (2009) .................................................................................. 9

*Packard Elevator v. ICC,*
782 F.2d 112 (8th Cir. 1986) ................................................................. 8, 9

*Posadas v. Nat'l City Bank of N.Y.,*
296 U.S. 497 (1936) ................................................................................ 13

Appellate Case: 24-3137     Page: 3     Date Filed: 12/20/2024 Entry ID: 5469046

*Props. of the Villages, Inc. v. FTC,*
No. 5:24-cv-316, 2024 WL 3870380 (M.D. Fla.
Aug. 15, 2024) ........................................................................28

*Religious Sisters of Mercy v. Becerra,*
55 F.4th 583 (8th Cir. 2022) .................................................28

*Ryan LLC v. FTC,*
No. 3:24-cv-00986-E, 2024 WL 3297524 (N.D.
Tex. July 3, 2024) ..................................................................28

*West Virginia v. EPA,*
597 U.S. 697 (2022) .........................................................13, 14

**STATUTES**

15 U.S.C. § 45 ................................................................ 3, 13, 15

15 U.S.C. § 57a ........................................... 2, 4, 9, 12, 14, 17

15 U.S.C. § 57b-3 .................................................... 14, 15, 16

5 U.S.C. § 705 .........................................................................27

5 U.S.C. § 801 ...........................................................................8

**RULES AND REGULATIONS**

16 C.F.R. § 1.13 .....................................................................17

16 C.F.R. Pt. 429 ......................................................................5

16 C.F.R. Pt. 433 ......................................................................5

16 C.F.R. Pt. 435 ......................................................................5

16 C.F.R. Pt. 436 ......................................................................5

16 C.F.R. Pt. 444 ......................................................................5

17 C.F.R. § 240.10b-5 ............................................................10

84 Fed. Reg. 52393 (Oct. 2, 2019) .........................................6

86 Fed. Reg. 38542 (July 22, 2021) ......................................17

88 Fed. Reg. 24716 (Apr. 4, 2023) ................................. 12, 16

89 Fed. Reg. 90476 (Nov. 15, 2024) ......................................6

**OTHER AUTHORITIES**

H.R. Rep. No. 93-1107 (1974) .................................................4

Appellate Case: 24-3137     Page: 4     Date Filed: 12/20/2024 Entry ID: 5469046

H.R. Rep. No. 93-1606 (1974) ....................................................4

Pub. L. 93-637, § 202(c),
  88 Stat. 2198 (1975) ......................................................4, 14

v

# INTRODUCTION

Petitioners' request for a stay of the Federal Trade Commission's amended Negative Option Rule ("Rule") should be denied. Petitioners fail to show that their challenge to the Rule is likely to succeed or that they will suffer irreparable injury absent a stay. Moreover, any harm to petitioners is outweighed by the public interest in prompt implementation of the Rule, which will prevent unfair and deceptive practices causing ongoing financial harm to consumers.

The Commission amended the Rule to address widespread abuse of "negative option" features, which allow a seller to interpret a consumer's silence or failure to take affirmative action as acceptance of an offer and agreement to recurring charges for goods or services. Familiar examples include gym memberships, streaming services, and "free" trials that convert to automatically billed subscriptions after a cancellation period. Although negative option programs can benefit sellers and consumers, many consumers are enrolled unwittingly and can go months or years without discovering how much money they are losing through recurring charges. And once consumers discover the charges and try to cancel, they often face insuperable obstacles from

sellers who force them to endure multiple phone calls, long hold times, and countless automated help menus. Because of these obstacles, many consumers are stuck paying for subscriptions they no longer want.

The amended Rule does not restrict the use of negative option programs but instead imposes four common-sense requirements to prevent abuse. First, sellers may not make material misrepresentations. Second, sellers must disclose important information, including how much and when a consumer will be charged and how to cancel recurring charges. Third, sellers must obtain the consumer's express, informed consent to the negative option feature. Finally, sellers must provide a cancellation mechanism at least as easy to use as the method the consumer used to enroll, *e.g.*, a consumer who signed up online must be able to cancel online without having to call and speak to a live agent. This provision is known as the "click-to-cancel" requirement.

None of petitioners' attacks on the Rule have merit. The FTC has express authority to prescribe rules that define conduct that is unfair or deceptive and impose prophylactic requirements to prevent such conduct. 15 U.S.C. § 57a(a)(1)(B). The Commission properly exercised

those authorities, followed all procedural requirements, and reasonably justified the Rule's requirements and scope. The First Amendment does not prevent the Commission from prohibiting deceptive commercial speech or imposing reasonable disclosure and consent requirements. Furthermore, petitioners' claims of irreparable injury are speculative, overstate likely compliance costs, and ignore the ongoing harm to consumers if the Rule's implementation is delayed.

## BACKGROUND

### A.    The FTC's Rulemaking Authority

The FTC Act prohibits "unfair or deceptive acts or practices" and "empower[s] and direct[s]" the Commission to prevent them. 15 U.S.C. § 45(a)(2). The Commission may define unfair or deceptive acts or practices through case-by-case adjudication, *id.* § 45(b), or rulemaking. Courts have recognized that rulemaking may be "fairer to regulated parties" than adjudication because it provides clear guidance and allows public participation in the decision-making process. *Nat'l Petroleum Refiners Assoc. v. FTC*, 482 F.2d 672, 681-82 (D.C. Cir. 1973).

In 1975, Congress enacted Section 18 of the FTC Act, which preserved existing rules and confirmed the Commission's authority to prescribe "rules which define with specificity acts or practices which are

Appellate Case: 24-3137     Page: 8     Date Filed: 12/20/2024 Entry ID: 5469046

unfair or deceptive," including "requirements … for the purpose of preventing such acts or practices." 15 U.S.C. § 57a(a)(1)(B); Pub. L. 93-637, § 202(c), 88 Stat. 2198 (1975). Congress also established special rulemaking procedures beyond those the Administrative Procedure Act ("APA") ordinarily requires. Among other things, the Commission must give interested persons an opportunity for an informal hearing, and the final rule must include a statement of basis and purpose ("SBP") describing the prevalence of the unfair or deceptive acts or practices. *See* 15 U.S.C. § 57a(b)(1), (c), (d)(1).

Contrary to petitioners' contention (Mot.6), Congress did not intend Section 18 to "effectively prohibit" rulemakings. Congress saw rulemaking as "an important power by which the Commission can fairly and efficiently pursue its statutory mission." H.R. Rep. No. 93-1606 at 31 (1974). Congress found that the Commission would be "hampered as an effective force in promoting fair and free competition" if forced to rely exclusively on case-specific enforcement. H.R. Rep. No. 93-1107 at 29 (1974). Section 18 thus effects a "broad delegation of discretionary authority to the FTC to define unfair practices" by rule. *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 969 (D.C. Cir. 1985). The Commission has

Appellate Case: 24-3137    Page: 9    Date Filed: 12/20/2024 Entry ID: 5469046

used Section 18 over the years to issue or amend numerous rules, including several that apply across industries and economic sectors.[1]

## B.    The Negative Option Rule Amendments

The Commission first issued the Negative Option Rule in 1973 and reaffirmed and amended it in 1998. Since then, negative option features have proliferated, often with adverse effects on consumers. Studies show that more than half of Americans have been unwittingly enrolled in recurring subscriptions; such charges take three months to cancel on average. App.13. Each year, the Commission receives tens of thousands of complaints about marketers across industries who failed to obtain informed consent or disclose important information about recurring charges, created unduly onerous barriers to cancellation, and made overt misrepresentations. App.11-14. These violations have generated dozens of FTC and state enforcement actions. App.14.

In light of these problems, the Commission in 2019 initiated the process of amending the Rule, explaining that "[t]he existing patchwork

---

[1] *E.g.*, Mail, Internet, or Telephone Order Merchandise Rule, 16 C.F.R. Pt. 435; Cooling Off Rule, 16 C.F.R. Pt. 429; Franchise Rule, 16 C.F.R. Pt. 436; Holder-in-Due-Course Rule, 16 C.F.R. Pt. 433; Credit Practices Rule, 16 C.F.R. Pt. 444.

of laws and regulations does not provide industry and consumers with a consistent legal framework across different media and types of plans." 84 Fed. Reg. 52393, 52396 (Oct. 2, 2019). In 2023, the Commission issued a notice of proposed rulemaking ("NPRM") and received 16,000 public comments. App.10. In early 2024, a neutral presiding officer conducted three informal hearings at which interested parties, including petitioners Interactive Advertising Bureau and NCTA, made written and oral submissions regarding disputed factual questions. *See* App.83-90.

After considering the comments and evidence from the informal hearings, the Commission issued the final Rule, which revised and narrowed the proposal. 89 Fed. Reg. 90476 (Nov. 15, 2024). The Rule contains four core provisions that are separate and severable and apply "[i]n connection with promoting or offering for sale any good or service with a Negative Option Feature." App.68-69.

- Section 425.3 bars **s**ellers from misrepresenting material facts, including the terms of the negative option feature, cost, and other information about the good or service.

- Section 425.4 requires sellers to clearly and conspicuously disclose all material terms of the transaction, including the recurring nature of the charges, the amount and frequency of the charges, the deadlines for consumers to prevent or stop the charges, and how to cancel the charges.

- Section 425.5 requires sellers to obtain the consumer's express, informed consent to the negative option feature. The consent must be unambiguous and separate from the rest of the transaction.

- Section 425.6 requires sellers to provide "a simple mechanism" that allows consumers to cancel the negative option feature and immediately stop all recurring charges. The cancellation mechanism "must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature," and must allow consumers to cancel "through the same medium the consumer used to consent." If a consumer consented in person, the seller must provide consumers with either a phone number or an electronic medium to cancel.

7

The Rule becomes effective on January 19, 2025.[2] To accommodate the potential need of businesses to "implement or modify systems, software, or procedures," the Commission set a compliance date of May 14, 2025, for most of the new provisions. App.46. The only operative provision with a January compliance date is the prohibition on material misrepresentations; because the FTC Act already forbids material misrepresentations, the prohibition will impose no additional compliance costs. *Id.* On December 13, 2024, the Commission denied petitioners' request to stay the Rule pending review. *See* FTC Att.A.

## ARGUMENT

To obtain a stay, petitioners must show (1) they are likely to succeed on the merits, (2) they will suffer irreparable injury absent a stay, and a stay will not substantially injure (3) other parties or (4) the public interest. *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986). The first factor is the most significant. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024). In addition, a stay is warranted only

---

[2] The Federal Register states that the Rule becomes effective January 14, but under 5 U.S.C. § 801(a)(3)(A), it may not take effect until 60 days after the Commission submitted it to Congress, which occurred on November 20, 2024.

when the movants' "irreparable" injury is "certain and great," *Packard Elevator*, 782 F.2d at 115, and exceeds the harm consumers and the public would likely suffer if a stay were granted, *see Missouri*, 112 F.4th at 538. Petitioners have not carried their burden under this stringent standard.

## I. PETITIONERS ARE UNLIKELY TO SUCCEED.

Petitioners raise a hodgepodge of undeveloped arguments, none of which establishes the requisite "strong showing that [petitioners are] likely to succeed on the merits." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (cleaned up).

### A. The Commission Had Authority under Section 18 to Amend the Rule.

Section 18 of the FTC Act authorizes the FTC to "prescribe … rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57a(a)(1)(B). The amended Rule accordingly describes a specific category of contracts—those with "Negative Option Features"—and specifies certain conduct related to such contracts that is unfair or deceptive.

9

1. Petitioners' argument that the Rule fails the specificity requirement is wrong and unsupported by authority. Petitioners contend that the Rule "wraps together over *one billion* recurring subscriptions" in various industries that "have nothing in common *except that they continue until the customer cancels*." Mot.13 (second emphasis added). The last clause shows the error in petitioners' argument. These contracts *do* have something in common: They all contain negative option features that allow sellers to keep charging consumers, month after month, until consumers affirmatively cancel. Petitioners' suggestion that rules must be limited to particular industries or fewer transactions is completely atextual—nothing in Section 18 imposes such constraints. *See supra* 5 n.1 (listing industry-neutral FTC Rules).

2. Petitioners' complaint that the requirement to disclose "material terms" is "amorphous" (Mot.13) is unsupported and meritless. Materiality requirements are commonplace in agency regulations; a well-known example is SEC Rule 10b-5, which makes material misstatements or omissions unlawful in connection with securities transactions. 17 C.F.R. § 240.10b-5. Here, in response to comments from

industry, the Commission defined "material" to mean "likely to affect a person's choice of, or conduct regarding, goods or services" and explained that this definition is "consistent with established law." App.22; *see* App.27 & n.298; *see also* App.8 (explaining that the FTC Act already requires marketers to "disclose the material terms of a negative option offer"). That different kinds of information may be material for different kinds of transactions does not make the materiality standard amorphous or vague.

3. Petitioners are also wrong that the prohibition on misrepresentations of "*any* material fact" simply restates the statute's ban on deceptive acts or practices. Mot.13. First, the prohibition does not encompass *all* deceptive acts or practices—it is limited to misrepresentations, a particular kind of deceptive conduct. Second, it is limited to material misrepresentations "[i]n connection with promoting or offering for sale any good or service with a Negative Option Feature." App.68. With those limitations, the prohibition is neither "amorphous" nor non-specific.

4. Petitioners' arguments regarding prevalence, Mot.14, ignore both statutory language and the Commission's findings. Section 18

11

provides that the SBP must include "a statement as to the prevalence of the acts or practices treated by the rule." 15 U.S.C. § 57a(d)(1)(A).[3] The Commission included such a statement. *See* App.11-14. Regardless, petitioners cannot challenge the prevalence finding because the "contents and adequacy" of the SBP are not "subject to judicial review in any respect." 15 U.S.C. § 57a(e)(5)(c).

In any case, the Commission documented a widespread pattern of unfair or deceptive conduct relating to negative options based on (1) "State, private, and Federal actions"; (2) "consumer complaints and comments"; and (3) "studies." App.11. That plainly satisfies the requirement. Nothing in Section 18 requires the Commission to separately address prevalence for each industry that a rule covers.

5.    Petitioners err in suggesting that the amended Rule conflicts with other federal laws. Mot.15. Those statutes set a floor of conduct

---

[3] Section 18 separately provides that the Commission may issue an NPRM only where it has "reason to believe" that the conduct addressed in the proposed rule is prevalent. 15 U.S.C. § 57a(b)(3). The Commission satisfied the requirement by identifying in the NPRM dozens of "recent FTC cases" as well as "thousands of complaints" received "each year related to negative option marketing." 88 Fed. Reg. 24716, 24719 (Apr. 4, 2023).

Appellate Case: 24-3137    Page: 17    Date Filed: 12/20/2024 Entry ID: 5469046

that Congress decided must be prohibited, but they do not *authorize* any conduct that the Rule prohibits. At most, the FTC Act and the Rule overlap with other statutes that address negative options in certain contexts, but it is well-established that where two statutory schemes apply to "the same subject, effect should be given to both if possible." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). Petitioners are also wrong that the Rule "is broader and more prescriptive than any statute enacted by Congress." Mot.16. The Rule defines with specificity conduct that is already unlawful—and subject to FTC adjudication— under section 5 of the FTC Act. *See* 15 U.S.C. § 45.

6. The major questions doctrine does not apply here. That doctrine counsels hesitation when an agency purports to "discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority," especially when the "newfound power" arises from "vague language of an ancillary provision." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (cleaned up). In such cases, the agency must "point to clear congressional authorization for the power it claims." *Id.* at 744.

Here, Congress authorized the FTC to issue rules defining unfair or deceptive acts or practices. 15 U.S.C. § 57a(a)(1)(B). Section 18 is not "vague," "ancillary," or "newfound." *West Virginia*, 597 U.S. at 724. It is a core part of the Commission's mandate, pursuant to which—over decades—the Commission has issued or amended numerous rules, including several that apply across industries. *See supra* 5 n.1. Indeed, when Congress enacted Section 18, the Commission already had a rule regulating some negative option plans, and Congress preserved such existing rules. *See* 88 Stat. 2198. Furthermore, Section 22 of the FTC Act recognizes that amendments to Section 18 rules may "have an annual effect on the national economy of $100,000,000 or more." 15 U.S.C. § 57b-3 (a)(1)(A). Congress could not have been clearer both in authorizing the Commission to define unfair or deceptive acts or practices by rule and in recognizing that such rules might have significant economic effects.

Nor does Section 18 violate the nondelegation doctrine. Mot.17. The Supreme Court has "held, time and again, that a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to

Appellate Case: 24-3137    Page: 19    Date Filed: 12/20/2024 Entry ID: 5469046

exercise the delegated authority is directed to conform." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (cleaned up). That standard is "not demanding." *Id.* at 146. Here, Congress has limited the Commission's rulemaking authority to addressing acts or practices that are "unfair or deceptive," and these guideposts easily satisfy the "intelligible principle" standard.[4]

### B. The Commission Complied with Procedural Requirements.

Petitioners are also unlikely to prevail on their claims that the Commission contravened FTC Act procedural requirements.

1.     In focusing on the requirements for a "rule" in Section 22 of the FTC Act (Mot.18-19), petitioners overlook an important statutory exception. To be sure, Section 22 provides that an NPRM for a proposed "rule" must include a preliminary regulatory analysis containing, *inter alia*, a preliminary cost-benefit analysis. 15 U.S.C. § 57b-3(b)(1). But Section 22 also provides that a "rule" "does not include any amendment to a rule" unless—among other things—the Commission "estimates that the amendment will have an annual effect on the national economy of

---

[4] Section 5(n) of the FTC Act establishes standards for determining when an act or practice is "unfair." *See* 15 U.S.C. § 45(n).

Appellate Case: 24-3137     Page: 20     Date Filed: 12/20/2024 Entry ID: 5469046

"$100 million or more." *Id.* § 57b-3(a)(1)(A). This rulemaking involved an amendment, and when it issued the NPRM, the Commission "preliminarily determined that the proposed amendments to the Rule w[ould] not have such effects on the national economy" and that none of the other conditions for making an amendment a "rule" applied. 88 Fed. Reg. at 24731. Accordingly, the Commission was not required to prepare a preliminary regulatory analysis. Nonetheless, it requested comment on the economic effects of the rule. *Id.*

Several parties, including some of the petitioners, submitted comments arguing that the proposed amendments would have an annual effect of more than $100 million. They requested an informal hearing, and the presiding officer agreed with their position. App.88. In light of the comments and that decision, the Commission revisited its analysis and included a final regulatory analysis with the final Rule. App.47-64; *see also* 15 U.S.C. § 57b-3(b)(2). Thus, petitioners had ample opportunity to comment on the Rule's economic effects and to present evidence at the informal hearing, and they took those opportunities. Petitioners cite nothing to support their suggestion that the

Appellate Case: 24-3137    Page: 21    Date Filed: 12/20/2024 Entry ID: 5469046

Commission was required to restart the entire rulemaking process simply to supply a preliminary regulatory analysis.

2.    Petitioners' complaints about the informal hearing process, Mot.18, likewise lack merit. The process here was streamlined compared to past rulemakings because the Commission revised its rules in 2021 to reform processes that had become costly and wasteful. *See* 86 Fed. Reg. 38542, 38544 (July 22, 2021) (amending 16 C.F.R. § 1.13). The amendments were designed to "modernize the procedures governing rulemaking …, provide for efficient conduct of rulemaking proceedings, and … better reflect the requirements of the FTC Act." *Id*. Petitioners do not contend that these amendments violated the FTC Act.

Petitioners' complaint that the Commission "refused to consider" certain issues makes no sense. Mot.18. The Commission does not officiate informal hearings; a neutral presiding officer does. 15 U.S.C. § 57a(c)(1)(B). At the informal hearing, interested persons may present their position and, "if the Commission determines that there are disputed issues of material fact it is necessary to resolve," they may submit rebuttals and conduct cross-examination. 15 U.S.C. § 57a(c)(2)(B). In this case, the Commission did not designate any

disputed issues, but the presiding officer did at the request of interested parties, including some petitioners. App.11. Petitioners have not identified any required procedure that was not followed.

### C. The Amendments Are Not Arbitrary and Capricious.

Petitioners' arbitrary-and-capricious claims (Mot.19-22) are also unlikely to succeed because the Commission addressed each issue that petitioners claim was ignored. The arbitrary-and-capricious standard is "deferential," and "simply ensures that the agency has acted within a zone of reasonableness and, in particular, reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Commission's detailed explanation of the basis for the Rule, spanning 61 pages of the Federal Register, satisfies this standard.

1. Contrary to petitioners' contentions (Mot.19), the Commission explained why an economy-wide rule addressing negative option features was necessary. Evidence showed that abuses of negative option programs are prevalent across diverse industries and sectors. App.11-14. Because the same kind of harms can occur in any industry,

the amended Rule properly addresses such abuses in an "industry-neutral fashion." App.13-14, 24-25.

2. The Commission did not "ignore" that small businesses may offer subscription services to larger businesses. Mot.19. It declined to exempt business-to-business ("B2B") transactions given evidence that marketers target small-and-medium sized businesses with deceptive and predatory negative option practices. App.19. But the Commission emphasized that "sophisticated business consumers" will retain the "ability … to individually negotiate B2B agreement terms," including cancellation methods. *Id.*

3. Regarding "simple cancellation" requirements, the Commission considered and responded to the comments it received, which were overwhelmingly supportive. App.34-42. It addressed petitioners' concerns (Mot.20) in confirming that the Rule allows sellers to respond to a cancellation request by (1) imposing "reasonable verification, authentication, or confirmation procedures"; (2) "appris[ing] consumers of any negative consequences of cancellation"; and (3) offering "valuable concessions (*e.g.*, lower prices) to consumers." App.36, 42.

19

Petitioners seize on the Commission's estimate that an average online cancellation should take less than a minute (Mot.20), but they ignore the Commission's caveat that this estimate "is not intended to set a standard." App.50 & n.545. The Rule merely requires that cancellation be as simple as was sign-up, not that cancellation be completable in a particular timeframe. The Commission also addressed bundled services (Mot.20), explaining that the Rule does not require sellers to employ the "exact same" mechanism for enrollment and cancellation. App.40. A seller may cancel individual services even if consumers had signed up for a bundle, so long as there is reasonable symmetry between the enrollment and cancellation process in terms of "time, burden, expense, and ease of use." *Id.*

4. The Commission also explained the need for the requirement that sellers obtain separate informed consent to the negative option feature. This provision ensures that consumers do not "miss[] the negative option feature," and is justified by the "imperative" need for consumers to "unequivocally understand [that] they are agreeing to enrollment in a negative option program and demonstrate their agreement." App.29, 33.

Appellate Case: 24-3137     Page: 25     Date Filed: 12/20/2024 Entry ID: 5469046

Petitioners misstate the Commission's decision to abandon a proposed requirement that sellers obtain "unambiguously affirmative consent to the rest of the transaction" as holding that *any contracts* that seek "*two* consents" would be unnecessary and confusing. Mot.21; *see* App.29-33. The Commission embraced no such principle: Of course, consumers routinely enter contracts that require them to initial or sign next to multiple key terms without issue. The Commission rejected an *additional* requirement that consumers unambiguously consent to "the rest of the transaction" beyond consents already in a contract. App.32. The Commission's decision to drop that requirement while retaining a separate consent requirement for the negative option was reasonable, especially given evidence showing that most Americans have been enrolled in recurring charges without informed consent. *See supra* 5.

5.     Finally, the Commission explained why it was prohibiting material misrepresentations (§ 425.3) and requiring material disclosures (§ 425.4). App.8, 14-15, 21-27. Although the amended Rule identifies specific forbidden misrepresentations and required disclosures, its coverage is not limited to them. Because materiality will "vary depending on the transaction's terms," limiting the Rule to

Appellate Case: 24-3137     Page: 26     Date Filed: 12/20/2024 Entry ID: 5469046

specific claims would create a "leaky sieve," leaving harmful conduct unaddressed. App.15. As discussed above, the concept of materiality is widely used in statutes and regulations and easily understood, even though different types of information may be material to different transactions.

### D. The Rule Comports with the First Amendment.

Petitioners are also unlikely to prevail on their First Amendment claim. Petitioners' cited case (Mot.22) establishes that commercial speech is protected by the First Amendment only when it "is not false or deceptive and does not concern unlawful activities." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 638 (1985). "The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading." *Id.* Here, the Rule targets only conduct that the Commission has determined to be unfair or deceptive, and therefore unlawful under the FTC Act.

Petitioners' arguments that the Rule will restrain lawful speech are based on mischaracterizations and overreadings of the Rule. There is nothing "malleable" or "nebulous" (Mot.23) about prohibiting information that "interferes with, detracts from, contradicts, or

Appellate Case: 24-3137    Page: 27    Date Filed: 12/20/2024 Entry ID: 5469046

otherwise undermines" consumers' ability to understand the Rule's required disclosures. Mot.22. (quoting § 425.4(b)(3)). As the Commission explained in the SBP, this provision "is consistent with longstanding Commission precedent that consent can be subverted" by "practices used to manipulate users into making choices they would not otherwise have made." App.29 & n.310. The Rule does not prohibit sellers from providing information outside the context of the required disclosure.

Nor is there any merit to petitioners' suggestion (Mot.23) that the Rule "directly prohibit[s] companies from speaking with customers that wish to cancel" or "prevent[s] companies from understanding customers' reasons for cancelling and providing useful information or offering better prices or more suitable plans." Nothing in the Rule prevents sellers from communicating with consumers, and the Commission expressly agreed, after considering public comments, that sellers may offer consumers incentives to maintain their negative option program or inform consumers about the consequences of cancellation. *See* App.42, 57.

Finally, petitioners acknowledge (Mot.24) that mandatory truthful disclosures do not conflict with the First Amendment when they

Appellate Case: 24-3137     Page: 28     Date Filed: 12/20/2024 Entry ID: 5469046

"remedy a harm that is potentially real, not purely hypothetical" and "extend no broader than reasonably necessary." *Nat'l Inst. Of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 776 (2018) (cleaned up). The SBP documents the harms that the Rule's disclosures address, along with cases involving those very harms and comments from law enforcement explaining why the disclosures are necessary. *See* App.7 & nn.10-11; App.26.

## II. PETITIONERS' IRREPARABLE HARM CLAIMS ARE SPECULATIVE AND OUTWEIGHED BY THE PUBLIC INTEREST IN PREVENTING HARM TO CONSUMERS.

Petitioners also fail to show that the Rule would cause irreparable harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (cleaned up). To the extent that petitioners would suffer any harm if the Rule takes effect, they have not shown that it "exceeds the … likely harm" that consumers will suffer if the Rule is stayed. *Missouri*, 112 F.4th at 538 (cleaned up).

Petitioners' claims of First Amendment injury (Mot.25) fail because, as shown above (at 22-24), the Rule does not infringe any free-speech rights. Petitioners also assert that the Rule will result in

Appellate Case: 24-3137     Page: 29     Date Filed: 12/20/2024 Entry ID: 5469046

consumer confusion and lost goodwill (Mot.26-27), but those claims are speculative and thus "inadequate to demonstrate a clear and present need for equitable relief." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 952 (8th Cir. 2023) (cleaned up). Furthermore, the credibility of petitioners' assertions is undermined by the fact that most of the 14 declarations they submitted contain identical rote assertions, *e.g.*, that consumers "will become confused and frustrated" and that this "is not how business is usually done." App.151, 182, 206, 236, 271, 299, 333-34, 357, 389, 415, 432, 469. Such boilerplate should be viewed with extreme skepticism and does not refute the evidence—based on economic studies and years of consumer complaints and enforcement actions—demonstrating that consumers will benefit from consent, disclosure, and simple-cancellation requirements.

Petitioners also assert that they will incur compliance costs if the Rule goes into effect, but "ordinary compliance costs are typically insufficient" to warrant a stay. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (collecting cases). That is particularly true here. First, sellers already must comply with the FTC Act, and many of the Rule's requirements and prohibitions simply codify

Appellate Case: 24-3137     Page: 30     Date Filed: 12/20/2024 Entry ID: 5469046

requirements implicit in the Act's prohibition on unfair and deceptive acts and practices. As the SBP explained, FTC guidance and case law make clear that material misrepresentations are prohibited and that marketers must clearly and conspicuously disclose material terms of a negative option offer before purchase, obtain consumer consent, and honor cancellation requests. App.8. Many businesses are also subject to other federal and state laws that address negative-option practices. App. 46-47. Businesses already complying with the law thus will have "a significant head start on their compliance efforts," App.47, and the Rule likely will not require wholesale changes. Furthermore, the Commission has already granted an extended 180-day runway for compliance with most of the Rule's provisions (except for the prohibition on misrepresentations).

In any event, petitioners' interests in avoiding compliance costs do not trump the public's interest in avoiding financial injury from deceptive and unfair negative-option programs. The Commission cited evidence that many consumers are unknowingly enrolled in recurring-bill programs, denied refunds for goods they never ordered, subjected to onerous cancellation requirements, and inundated with upsell attempts

before being allowed to cancel. App.11-14. These harms are so pervasive that an entire industry has emerged in which firms charge consumers a fee to identify and cancel unwanted subscriptions. App.12. Petitioners are therefore wrong to claim "the public would not be harmed by a stay." Mot.29. The public equities far outweigh petitioners' private interests.

## III.  ANY RELIEF SHOULD BE LIMITED.

If the Court were to determine that a stay is warranted, it should be limited to petitioner Custom Communications, Inc. and the specific businesses that submitted declarations claiming injury. Article III permits a court to grant relief only insofar as it remedies "the inadequacy that produced [a plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (quotation omitted). Reinforcing that limitation is the traditional principle that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *California v. Yamasaki*, 442 U.S. 682, 702 (1979). These principles apply equally to a stay of the Rule's effective date, which under the APA must be limited "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705; *see Labrador v. Poe,* 144 S. Ct. 921, 923, 925-28 (2024)

(Gorsuch, J., concurring) (discussing the significant legal and practical problems with nonparty relief generally and universal injunctions specifically).

For this reason, any stay this Court issues should be limited to parties that have established their standing to sue. That is the approach taken by two recent decisions that stayed another FTC rule pending judicial review. *See Ryan LLC v. FTC*, No. 3:24-cv-00986-E, 2024 WL 3297524, at *16 (N.D. Tex. July 3, 2024) ("limit[ing] the scope of the [preliminary] injunctive relief" to named parties); *Props. of the Villages, Inc. v. FTC*, No. 5:24-cv-316, 2024 WL 3870380, at *11 (M.D. Fla. Aug. 15, 2024) (same).

Although Custom Communications appears to have standing, the other petitioners are associations that "lack[] associational standing to sue on behalf of unnamed members." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). The associational petitioners have submitted declarations from some members, but have not identified their full membership, demonstrated their authority to litigate on behalf of unnamed members, or established that their members agree to be bound by any judgment. For these reasons, any

Appellate Case: 24-3137    Page: 33    Date Filed: 12/20/2024 Entry ID: 5469046

relief should be limited—at most—to Custom Communications and the members of associational petitioners that submitted declarations.

Any relief also should account for the Rule's severability provision. *See* App.69 (§ 425.9). The Court should stay only those provisions of the Rule for which it finds petitioners have demonstrated each of the preliminary injunction factors; any shortcoming in that showing as to any provision means that such provision should not be stayed.

## CONCLUSION

This Court should deny the motion for a stay.

Respectfully submitted,

ANISHA S. DASGUPTA
 *General Counsel*

December 20, 2024    MATTHEW M. HOFFMAN
            BENJAMIN F. AIKEN

            */s/ Bradley Grossman*
            BRADLEY DAX GROSSMAN
             *Attorneys*

            FEDERAL TRADE COMMISSION
            600 Pennsylvania Ave., NW
            Washington, D.C. 20580
            bgrossman@ftc.gov
            202-326-2994

Of Counsel:

JAMES A. KOHM
 *Associate Director*

LAURA KOSS
 *Assistant Director*

KATHERINE JOHNSON
 *Attorney*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that the foregoing response complies with the volume limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,183 words, as created by Microsoft Word, excluding the items that may be excluded under Fed. R. App. P. 32(f).

December 20, 2024

*/s/ Bradley Grossman*
Bradley Dax Grossman
Attorney
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

**CERTIFICATE OF SERVICE**

I certify that on December 20, 2024, I served the foregoing response on counsel of record using the Court's electronic case filing system.  All counsel of record are registered ECF filers.

Dated: December 20, 2024      /s/ Bradley Grossman
                                               Bradley Dax Grossman
                                             Attorney
                                             Federal Trade Commission
                                             600 Pennsylvania Avenue, NW
                                             Washington, DC 20580