Nos. 24-3137 (L), 24-3388, 24-3415, 24-3442, 24-3469

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, *et al.*,

*Petitioners*,

*v.*

FEDERAL TRADE COMMISSION,

*Respondent*.

---

On Petition for Review of a Rule
of the Federal Trade Commission
(Negative Option Rule, RIN 3084-AB60)

---

**MOTION TO INTERVENE BY MAIN STREET ALLIANCE**

---

Kevin E. Friedl
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 894-6035
kfriedl@democracyforward.org

*Counsel for Main Street Alliance*

# TABLE OF CONTENTS

Introduction ............................................................................................................1

Background .............................................................................................................3

Legal Standard .......................................................................................................6

Argument................................................................................................................7

THE COURT SHOULD GRANT MAIN STREET ALLIANCE LEAVE TO INTERVENE..........7

A.  Intervention is necessary for Main Street Alliance to protect the important
    interests of its members at stake in this case. .................................................7

    1.  The small business members that Main Street Alliance represents
        have a strong interest in the outcome of this litigation...........................7

    2.  Main Street Alliance will be unable to protect its interests absent
        intervention, and the parties do not adequately represent it. ..................9

B.  This request to intervene is timely................................................................13

C.  Intervention will not prejudice any party or delay resolution of this case. ...17

CONCLUSION .......................................................................................................18

# TABLE OF AUTHORITIES

**Cases**                                                              **Page**

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
595 U.S. 267 (2022) ...................................................................6, 13

*City of Naples Airport Auth. v. FAA*,
No. 03-1308, 2004 WL 1080160 (D.C. Cir. May 13, 2004) ...............16

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
No. 16-2424, 2017 WL 10350992 (6th Cir. Mar. 27, 2017) ...............12

*Entergy Arkansas, LLC v. Thomas*,
76 F.4th 1069 (8th Cir. 2023) ................................................ 10, 12, 13

*Env't Integrity Project v. Wheeler*,
No. 1:20-cv-1734, 2021 WL 6844257 (D.D.C. Jan. 27, 2021)...........12

*Fed. Mar. Comm'n v. Port of Seattle*,
521 F.2d 431 (9th Cir. 1975) ..............................................................15

*FTC v. Johnson*,
800 F.3d 448 (8th Cir. 2015) ..............................................................10

*Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*,
837 F.3d 593 (6th Cir. 2016) ..............................................................16

*Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*,
60 F.3d 1304 (8th Cir. 1995) ..............................................................13

*Mille Lacs Band of Chippewa Indians v. State of Minn.*,
989 F.2d 994 (8th Cir. 1993) ..............................................................13

*Nat'l Parks Conservation Ass'n v. EPA*,
759 F.3d 969 (8th Cir. 2014) ................................................................7

*Taylor v. Sw. Bell Tel. Co.*,
251 F.3d 735 (8th Cir. 2001) ..............................................................13

*United States v. Union Elec. Co.*,
64 F.3d 1152 (8th Cir. 1995)...............................................................13

*Utahns for Better Transp. v. Dep't of Transp.*,
  295 F.3d 1111 (10th Cir. 2002) ................................................................7

*W. Energy All. v. Zinke*,
  877 F.3d 1157 (10th Cir. 2017) ...............................................................12

*Wilkins v. United States*,
  598 U.S. 152 (2023) ........................................................................... 15, 16

*Zeigler Coal Co. v. Off. of Workers' Comp. Programs*,
  490 F.3d 609 (7th Cir. 2007) ...................................................................16


**Statutes**

15 U.S.C. § 45(c) ...................................................................................14

15 U.S.C. § 57a ......................................................................................14

5 U.S.C. § 551 .......................................................................................14


**Rules**

16 C.F.R. pt. 425 ............................................................................... 3, 4, 8

Fed. R. App. P. 15..................................................................................13

Fed. R. Civ. P. 24............................................................................ 6, 10, 13

Negative Option Rule, 89 Fed. Reg. 90476 (Nov. 15, 2025) ......................... 3, 4, 8


**Other Authorities**

*Statement of Commissioner Andrew N. Ferguson, Joined by Commissioner
  Melissa Holyoak, Regarding the Motion to Delegate* (Jan. 23, 2025),
  https://www.ftc.gov/legal-library/browse/cases-proceedings/public-
  statements/statement-of-ferguson-cmr-holyoak-motion-to-delegate-authority-
  to-chairman-to-comply-with-jan-2025-executive-orders-on-DEI .......................11

*Statement of Commissioner Rebecca Kelly Slaughter Regarding the Motion to Delegate* (Jan. 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/2025-1-23_rks_statement_motion_delegation.pdf ........................................................6

Lina Khan (@linakhanFTC), X (Jan. 21, 2025, 1:00 PM), https://x.com/linakhanFTC/status/1881763874757845055 ...................................6

Main St. All., Comment Letter on Proposed Negative Option Rule (June 28, 2023), https://www.regulations.gov/comment/FTC-2023-0033-0870...............4, 9

Press Release, FTC, *Andrew N. Ferguson Takes Over as FTC Chairman* (Jan. 22, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/andrew-n-ferguson-takes-over-ftc-chairman.............................5

Press Release, FTC, *FTC Chairman Ferguson Announces that DEI is Over at the FTC* (Jan. 22, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-chairman-ferguson-announces-dei-over-ftc.........................5

**INTRODUCTION**

The case concerns the validity of an FTC rule that protects both consumers and businesses from unfair and deceptive practices in negative-option agreements. Such agreements are widespread and include common arrangements like free trial periods, automatically renewing subscriptions, and regular deliveries of goods or services that continue until cancelled. The rule requires sellers offering negative options to accurately disclose the terms of the deal, confirm that the buyer has accepted the deal, and make it as easy for the buyer to cancel as it was to enroll.

Movant Main Street Alliance (MSA) is a membership association representing approximately 30,000 small businesses across the country. It seeks to organize, empower, and advocate for small business owners in order to create a thriving and inclusive economy.

MSA's small business members have a significant interest in the outcome of this litigation that they can no longer count on the existing parties to represent. MSA's members routinely purchase goods and services for their small businesses and for themselves as individual consumers using negative-option agreements. These members therefore doubly benefit from the rule's protections and would be harmed if the rule were invalidated. Members would suffer other injuries, too, if the rule were struck down, including competitive disadvantage—namely, lost sales

due to huge competitors using unfair and deceptive negative-option contracts to rig consumer choices in their favor.

Until recently, the FTC could be relied upon to represent those interests here. No longer. The transition to a new administration just two weeks ago, and events since then, have raised serious doubts that the FTC will continue to vigorously defend and seek to implement its rule and so have necessitated this intervention. The FTC's new chair—designated on January 20—voted against the rule and has announced that he will pursue a radical break from his predecessor, who recently left the Commission. Consistent with his announced ambitions, the new chair has already sought and received a delegation of power to reverse other decisions previously approved by the full Commission. Particularly given the expedited briefing schedule in this case, Main Street Alliance cannot afford to sit back and wait to see if the FTC stays the course.

The Court should grant leave for MSA to intervene in defense of the rule. Intervention is necessary for MSA to protect the interests of its members, which are no longer being adequately represented. This request is also timely: It comes just two weeks after the events giving rise to the need to intervene, and before merits briefing has even begun. Finally, intervention will not prejudice any party or delay resolution of this case. To the contrary, it will assist the Court by ensuring

adversarial presentation of the legal issues and by providing the important

perspective of small business owners who are not currently represented here.[1]

## BACKGROUND

1. *The rule and this litigation.* The FTC finalized the challenged

regulation—commonly known as the "Click-to-Cancel" Rule—in October 2024,

and it appeared in the Federal Register on November 15. 89 Fed. Reg. 90467.

The Commission approved the rule by a 3-2 vote, with Commissioners Andrew

Ferguson and Melissa Holyoak voting against.

The rule amends and updates the FTC's longstanding Negative Option Rule.

*See* 16 C.F.R. pt. 425. The Commission determined that it was necessary to update

that rule—first promulgated more than 50 years ago—to replace "[t]he existing

patchwork of laws and regulations … with a consistent legal framework across

media and offers," 89 Fed. Reg. 90479, and to address "persistent" harms from

unfair and deceptive practices in connection with negative options, *id.* at 90477.

Those harms were extensively documented in the rulemaking record and, to

many, will sound familiar. For example, the FTC found copious evidence of sellers

using unfair and deceptive tactics to trap buyers into deals they no longer wanted

(or never wanted in the first place), such as by making it difficult or impossible for

buyers to cancel, failing to honor refunds even for buyers who enrolled

---

[1] Petitioners and Respondent oppose the motion.

unknowingly, and subjecting buyers to multiple upsells before allowing cancellation. 89 Fed. Reg. at 90481. The record also established that, too often, sellers lure buyers into unwanted negative options through misleading marketing or by failing to confirm that the buyer has in fact accepted the offer.

Under the new rule, sellers offering negative-option contracts are barred from making material misrepresentations, must disclose the key terms of the deal, must secure the buyer's unambiguous consent, and must offer buyers a simple means of declining to extend the arrangement. 16 C.F.R. §§ 425.3-.6. MSA filed a comment letter alongside several other groups supporting the FTC's proposal.[2]

Importantly, the rule extends to business-to-business transactions, meaning that it protects both individual consumers and business consumers that purchase goods or services through negative-option arrangements. *See* 89 Fed. Reg. at 90488-90. The Commission found that several of its recent enforcement actions, among other evidence, "underscore the fact [that] deceptive practices pertaining to negative option features occur in B2B [business-to-business] transactions just as they do with individual consumers." *Id.* at 90489.

Several trade associations and one single company filed petitions for review, and those petitions were consolidated in this Court. In papers filed before the change in administration, the FTC opposed Petitioners' motion to stay the rule

---

[2] https://www.regulations.gov/comment/FTC-2023-0033-0870

4

pending review. The Court denied Petitioners' request for a stay. It ordered expedited briefing and warned that no extensions would be granted.

2. *The Commission.* On January 20, President Trump designated Commissioner Ferguson as chair of the FTC. Commissioner Ferguson soon took steps to signal a stark change in direction for the agency, announcing that "we will end the previous administration's assault on the American way of life, and we will usher in a new Golden Age." Press Release, FTC, *Andrew N. Ferguson Takes Over as FTC Chairman* (Jan. 22, 2025).[3]

Consistent with that rhetoric, Commissioner Ferguson unilaterally ordered the shuttering of offices within the FTC and started an effort to root out initiatives undertaken by the previous administration. Press Release, FTC, *FTC Chairman Ferguson Announces that DEI is Over at the FTC* (Jan. 22, 2025).[4] And he moved quickly to secure a broad delegation of "the authority he needs to be able to comply fully with President Trump's orders," *id.*—a delegation that one of his fellow commissioners described as "ambiguous and undefined" and "a radical

---

[3] https://www.ftc.gov/news-events/news/press-releases/2025/01/andrew-n-ferguson-takes-over-ftc-chairman
[4] https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-chairman-ferguson-announces-dei-over-ftc

5

departure from agency practice," FTC, *Statement of Commissioner Rebecca Kelly Slaughter Regarding the Motion to Delegate* (Jan. 23, 2025).[5]

In the midst of these changes, the previous chair, Commissioner Lina Khan, who supported the rule and cast the deciding vote to issue it, announced that she would (and in fact did) depart the Commission on January 31. Lina Khan (@linakhanFTC), X (Jan. 21, 2025, 1:00 PM).[6]

## LEGAL STANDARD

"No statute or rule provides a general standard to apply in deciding whether intervention on appeal should be allowed." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 276 (2022). In the absence of such a rule, the Supreme Court—in line with several circuit courts of appeals—has "considered the policies underlying intervention in the district courts." *Id.* at 277 (quotation marks omitted). In doing so, the Court has focused on: (1) "the legal 'interest' that a party seeks to 'protect' through intervention on appeal," *id.* (quoting Fed. R. Civ. P. 24(a)(2)); (2) the "[t]imeliness" of the request to intervene, *id.* at 280-81, and (3) and whether intervention "would prejudice" the other parties, *id.* at 281-82.

---

[5] https://www.ftc.gov/system/files/ftc_gov/pdf/2025-1-23_rks_statement_motion_delegation.pdf

[6] https://x.com/linakhanFTC/status/1881763874757845055

# ARGUMENT

## THE COURT SHOULD GRANT MAIN STREET ALLIANCE LEAVE TO INTERVENE

Main Street Alliance's thousands of small business members have a compelling interest in the outcome of this case, which will have a very real impact on their bottom lines and their ability to compete with companies that use negative options to trick and trap both individual consumers and small businesses into deals they neither want nor need. Absent intervention, MSA will be unable to protect that important interest, including because recent events demonstrate that the existing parties can no longer be counted on to adequately represent that interest. MSA has moved promptly to intervene, and granting its request will neither prejudice the parties nor delay resolution of this case. Intervention is warranted.

### A. Intervention is necessary for Main Street Alliance to protect the important interests of its members at stake in this case.

#### 1. The small business members that Main Street Alliance represents have a strong interest in the outcome of this litigation.

This Court has recognized that "[t]he threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest" to intervene. *Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 976 (8th Cir. 2014) (quoting *Utahns for Better Transp. v. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002)). Main Street Alliance's small business membership has a clear

and concrete economic stake in the outcome of this case. *See generally* Decl. of Shawn Phetteplace, Nat'l Campaigns Dir., Main Street Alliance (attached).

The rule at issue protects both individual consumers and business consumers. *See* 89 Fed. Reg. at 90488-90. Were the rule to be struck down in whole or in part, it would deprive MSA's members of important legal protections when they purchase goods or services from other businesses through negative-option plans. And make no mistake: Countless small business owners rely on negative-option arrangements every day to keep their businesses running, from the daycare center with an automatically recurring order of diapers to the web developer who tries out new software on a trial basis to the bar owner who buys a cable subscription to be able to put the game on.

Members face serious risk to their bottom lines if suppliers and other sellers—not infrequently, large entities able to impose their terms on a take-it-or-leave-it basis—were allowed to employ the unfair and deceptive practices that the rule prohibits. Without the rule, MSA's members could also be deprived of important information necessary to evaluate whether a deal is right for their business. *See* 16 C.F.R. § 425.4 (requiring sellers to disclose key details of the transaction). And some would find themselves—like many of us—at some point stuck in costly deals they no longer want but are unable to cancel. *See id.* § 425.6 (requiring sellers to provide simple means to cancel negative-option agreements).

MSA's members would suffer other harms too if the rule were thrown out. As MSA warned in the joint comment letter it submitted on the proposed rule, unfair and deceptive negative-option deals "implicate both anti-monopoly and consumer protection concerns" because the very largest companies can use them to lock in their market dominance instead of competing on quality, service, and innovation.[7] As MSA's comment explained, "[b]usinesses should be relying on the quality of their goods or services to retain customers, not by forcing them to research how to cancel their subscription or by making termination as frustrating as possible."

Given the significant economic and informational injuries that Main Street Alliance's members would face if the rule were struck down, they have at least as compelling an interest in the outcome of this litigation as do the petitioners on the other side that seek to invalidate the rule.

## 2. Main Street Alliance will be unable to protect its interests absent intervention, and the parties do not adequately represent it.

Without intervention, Main Street Alliance will not be able to protect its members' strong interest in the rule remaining in effect. All petitions for review of the rule have been consolidated in this case, and this Court will determine whether

---

[7] https://www.regulations.gov/comment/FTC-2023-0033-0870

those legal challenges succeed or fail. Main Street Alliance will not have another opportunity to defend its interests against those claims.

Nor are Main Street Alliance's interests adequately represented by any existing party. *Cf.* Fed. R. Civ. P. 24(a)(2). To be sure, where an existing party is "a government entity," the Court ordinarily will "presume that the government entity adequately represents the public." *FTC v. Johnson*, 800 F.3d 448, 452 (8th Cir. 2015). But that presumption yields if the intervenor can show "[1] that it stands to gain or lose from the litigation in a way different from the public at large, or [2] that its interest is narrower and more parochial than the government's," or [3] if the intervenor otherwise makes "a strong showing of inadequacy." *Entergy Arkansas, LLC v. Thomas*, 76 F.4th 1069, 1071-72 (8th Cir. 2023) (quotation marks and citation omitted).

The recent change in presidential administration on January 20, and the FTC's actions since then, are enough to easily overcome the presumption of adequate representation here. The Commission majority that supported issuing the rule is now gone, and those who opposed the rule are now in charge. The rule was approved on a 3-2 party-line vote, with Commissioners Ferguson and Holyoak dissenting. The decisive vote in favor of the rule, Commissioner Khan, announced on January 21 that she would leave the Commission, which she did on January 31. *See supra* at 6.

Commissioner Ferguson, meanwhile, has been appointed the new chair. From the day he assumed that authority, he has taken aggressive steps to reverse the policies of the prior administration, policies he has characterized generally as an "assault on the American way of life." *See id.* at 5. Most concerning of all, Commissioner Ferguson has already sought, received, and exercised unilateral authority to roll back past decisions that were authorized by the full Commission. *See id.* at 5-6.

In so doing, Commissioner Ferguson has emphasized that—notwithstanding the FTC's long history as an independent agency—he views himself as a tool of presidential will whose job is to prosecute the new administration's deregulatory agenda. *See, e.g.*, *Statement of Commissioner Andrew N. Ferguson, Joined by Commissioner Melissa Holyoak, Regarding the Motion to Delegate* (Jan. 23, 2025) (stating that the president "direct[s] the Commission's priorities").[8] Nothing in Commissioner Ferguson's rhetoric or actions since he became chair supports—or even consistent with—a presumption that the FTC will continue to defend and seek to implement actions taken under the previous administration, particularly those the new chair himself already publicly disapproved.

---

[8] https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-of-ferguson-cmr-holyoak-motion-to-delegate-authority-to-chairman-to-comply-with-jan-2025-executive-orders-on-DEI

Numerous courts have recognized that a "change in the Administration raises the possibility of divergence of interest or a shift during litigation" that may leave an intervenor's interests unprotected. *W. Energy All. v. Zinke*, 877 F.3d 1157, 1169 (10th Cir. 2017) (quotation marks omitted); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, No. 16-2424, 2017 WL 10350992, at *1 (6th Cir. Mar. 27, 2017) (granting motion to intervene where agency's "recent actions imply that the new administration will less aggressively" seek to advance the movant's interests, even where that risk "ha[d] yet to crystallize"); *Env't Integrity Project v. Wheeler*, No. 1:20-cv-1734, 2021 WL 6844257, at *3 (D.D.C. Jan. 27, 2021) (Jackson, J.) (granting motion to intervene where, "given the recent change in administration, it is not at all clear that the Federal Defendants will continue to defend the prior administration's rule").

Here, much more than just a change in administration has occurred. The agency's new leadership is on record specifically opposing the rule at issue in this case, it has made clear it will vigorously seek to dismantle the work of the prior administration, and it has already taken aggressive steps to do so. In these circumstances, Main Street Alliance can have no certainty that the FTC will continue to defend its rule or, if it does, that it will do so full-throatedly. The situation here therefore more than suffices to make out a "strong showing of inadequacy" supporting intervention. *Entergy*, 76 F.4th at 1072 (quotation marks

omitted). Similarly, it demonstrates that Main Street Alliance's interest in this litigation—i.e., that the rule's protections remain in effect—are likely "different" or "narrower and more parochial" than the FTC's. *See id.* at 1071-72.[9]

## B.  This request to intervene is timely.

"Timeliness is an important consideration in deciding whether intervention should be allowed." *Cameron*, 595 U.S. at 279. Timeliness is judged in relation to when the "need to seek intervention … ar[o]se." *Id.* at 280.

As explained above, Main Street Alliance's need to intervene arose only over the last two weeks, when events demonstrated that it could no longer rely on the FTC to continue defending the rule. That is well within the range that this Court has previously found sufficient for timeliness. *See, e.g.*, *Taylor v. Sw. Bell Tel. Co.*, 251 F.3d 735, 741 (8th Cir. 2001) (11 days); *Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 60 F.3d 1304, 1308 (8th Cir. 1995) ("less than a month"); *United States v. Union Elec. Co.*, 64 F.3d 1152, 1158-59 (8th Cir. 1995) (four months); *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989 F.2d 994, 999 (8th Cir. 1993) (more than 11 months).

---

[9] MSA's strong interest in the subject matter of this case would, under the rules applicable to intervention in district court, give MSA the requisite interest to intervene as of right, *see* Fed. R. Civ. P. 24(a)(2), as well as a "defense that shares with the main action a common question of law or fact," as required for permissive intervention, *see* Rule 24(b)(1)(B).

The original parties may argue that this motion is untimely under Federal Rule of Appellate Procedure 15(d). Rule 15(d) requires that a motion to intervene in a proceeding for "review or enforcement of an agency order" be filed within 30 days of the petition for review. But Rule 15(d), by its logic and express terms, does not apply to this proceeding, which seeks review of an agency *rule*—not an "order." And even if Rule 15(d) did apply, good cause exists for the Court to enlarge the time for intervention in the circumstances here.

First, Rule 15 does not apply in this case. By its plain and unambiguous language, it governs petitions for "review or enforcement of an agency *order*." An order is not a rule. *E.g.*, 5 U.S.C. § 551(4), (6) (provision of APA defining rules and orders as mutually exclusive categories); 15 U.S.C. §§ 45(c), 57a(e) (provisions of FTC Act separately authorizing petitions for review of "orders" and of "rules"). Petitioners here seek review of a rule, not an order.

Rule 15's reference to "an agency *order*" is no stray scrivener's error. The word "order" appears repeatedly and consistently throughout Rule 15 as well as neighboring rules, which together make up Title IV of the Rules of Appellate Procedure, titled "Review or Enforcement of an *Order* of an Administrative Agency, Board, Commission, or Officer." Nor can the term "order" be read atextually to mean "rule or order" since—setting aside that rules and orders are different things—Rule 15 also governs proceedings for "*enforcement* of an agency

14

order," and agencies do not typically, if ever, petition for enforcement of a rule in the courts of appeals. (Indeed, it is not clear they even could.)

It makes good sense that time limits governing intervention would vary between cases involving orders versus rules. By their very nature, agency orders are narrower in effect and more party-specific than rules, and entities whose interests are implicated by an agency order can be expected to be aware of that fact and to promptly intervene in relevant court proceedings. And because Rule 15 also governs petitions to *enforce* orders, it is reasonable that interested parties would be required to intervene promptly so as to avoid potentially delaying government enforcement proceedings that may implicate time-sensitive matters of public health or safety. *Cf. Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 433 (9th Cir. 1975) ("It is beyond cavil that the very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate … and the right under the appropriate conditions to have … courts enforce its [orders].").

The Court need not resolve this question here, however, because even if Rule 15(d) did govern, good cause exists in these circumstances to enlarge the time to intervene.

Rule 15(d) is non-jurisdictional and so may be waived or extended for cause under Rule 26(b). Courts will "treat a procedural requirement as jurisdictional only

if Congress clearly states that it is." *Wilkins v. United States*, 598 U.S. 152, 157 (2023) (quotation marks omitted). "[Rule 15(d)] lacks a jurisdictional clear statement, and nothing about [Rule 15(d)'s] text or context gives reason to depart from th[e Supreme] Court's observation that most time bars are nonjurisdictional." *See id.* (quotation marks omitted). So too, this motion to intervene in defense of the rule is not among the limited set of filings for which Rule 26(b) specifies that courts may not extend the deadline.

Rule 15(d) is thus, as the Sixth Circuit has explained, "straightforward[ly]" a nonjurisdictional "claim-processing rule that the courts of appeals can excuse." *Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*, 837 F.3d 593, 596 (6th Cir. 2016); *see also Zeigler Coal Co. v. Off. of Workers' Comp. Programs*, 490 F.3d 609, 610 n.1 (7th Cir. 2007) (excusing untimeliness under Rule 15(d) for good cause shown and allowing intervention); *City of Naples Airport Auth. v. FAA*, No. 03-1308, 2004 WL 1080160, at *1 (D.C. Cir. May 13, 2004) (denying intervention but recognizing that the failure to timely file under Rule 15(d) can be excused for good cause).

The Court not only can but should extend Rule 15(d)'s non-jurisdictional time limit here. The petitions for review that have been consolidated in this case were filed between October 22 and 24, 2024, meaning that Rule 15(d), if it controlled, would have required Main Street Alliance to seek intervention by

November 25. At that time, however, the Commission majority that voted in favor of the challenged regulation was still in office and the FTC had yet to give any sign it might fail to adequately represent MSA's interests in this case. Indeed, the FTC's actions prior to January 20—including opposing Petitioners' motion for a stay—were consistent with a continued defense of the rule. Main Street Alliance therefore had no cause to seek intervention before the Rule 15(d) deadline, and it should not be penalized for declining to seek intervention until the need to do so became compelling. (Nor should the Court lightly adopt a rule that would require parties to file protective motions to intervene within 30 days of any petition for review that might potentially warrant intervention in the future.)

## C. Intervention will not prejudice any party or delay resolution of this case.

Allowing Main Street Alliance to intervene in defense of the rule will in no way prejudice any existing party or slow the resolution this case. This litigation remains at an early stage, and merits briefing has not yet begun. Main Street Alliance stands ready to file its brief by the deadline set for respondent's brief (March 14), and its participation will occasion no delay to the existing briefing schedule. Because Main Street Alliance seeks to intervene in defense of the rule, this is also not a case in which its participation will multiply the issues requiring the Court's resolution; Main Street Alliance merely seeks to defend its members' compelling interest in answering Petitioners' challenges to the rule. Doing so will

aid the Court's resolution of this litigation by ensuring full and vigorous party presentation of the relevant issues and providing important context concerning the interests of Main Street Alliance's thousands of small business members.

**CONCLUSION**

For all these reasons, the Court should grant Main Street Alliance leave to intervene.

Dated: February 5, 2025

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 894-6035
kfriedl@democracyforward.org

*Counsel for Main Street Alliance*

**CERTIFICATE OF SERVICE**

On February 5, 2025, a true and accurate copy of this document was filed

electronically via CM/ECF and served on all counsel of record.

*/s/ Kevin E. Friedl*
Kevin E. Friedl

**CERTIFICATE OF COMPLIANCE**

This motion complies with the length limit in Federal Rule of Appellate Procedure 27(d)(2). It contains 3,919 words, excluding the portions exempted by Rule 32(f).

*/s/ Kevin E. Friedl*
Kevin E. Friedl

# ATTACHMENT

**Declaration of Shawn Phetteplace,**
**National Campaigns Director, Main Street Alliance**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

CUSTOM COMMUNICATIONS, INC.,
D/B/A CUSTOM ALARM, *et al.*,

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent*.

Case No. 24-3469 (L)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## DECLARATION OF SHAWN PHETTEPLACE

I, Shawn Phetteplace, declare as follows:

1.     I am the national campaigns director of the Main Street Alliance ("MSA").
I have held that position since 2023 and been on staff with MSA since 2020.

2.     This declaration is based on my firsthand knowledge of the facts as stated
here.

3.     MSA is a national network of small businesses, which represents
approximately 30,000 small businesses across the United States.

4.     MSA helps small business owners realize their full potential as leaders for
a just future that prioritizes good jobs, equity, and community through organizing,
research, and policy advocacy on behalf of small businesses. MSA also seeks to amplify
the voices of its small business membership by sharing their experiences with the aim of
creating an economy where all small business owners have an equal opportunity to
succeed.

5.　　　In my role as national campaigns director, and in my prior role as Midwest Regional Manager, I work closely with MSA's small business members. Members contact me nearly every day to share their concerns and describe the challenges faced by their small businesses. A large part of my day-to-day responsibilities involves helping to identify those challenges and working to find solutions for our members so that their businesses, and the communities they serve, can grown and thrive.

6.　　　Members have described to me problems with the sorts of arrangements that the Federal Trade Commission's "Click-to-Cancel Rule" calls "negative option features"—things like automatically renewing purchases and subscription services that can be easy to sign up for but impossible to cancel.

7.　　　Many of our members buy goods and services for their small businesses and for themselves personally using negative-option deals. One example of this would be a small business that has a standing order for regular deliveries of goods from a supplier that will automatically continue until the small business takes affirmative steps to cancel.

8.　　　When these deals are offered on fair and transparent terms, they can benefit our members by ensuring a steady and predictable supply of the goods and services our members need to operate their small businesses.

9.　　　But when sellers hide the true terms of these deals with misleading marketing, or enroll our members in subscriptions they never asked for, or refuse to honor cancellation or refund requests, it can cause all of the harms that the FTC identified in its rule. Those include the cost of paying for goods the small business never wanted in the first place plus the aggravation, time, and expense of trying to cancel and get your money back.

10. Our members don't just use "negative option" arrangements to make purchases, they also use them to sell their own products. Our members lose sales and experience direct harm to their bottom lines when customers turn down fair and transparent negative options like automatic recurring deliveries just because they've had bad experiences in the past with sellers using the kind of unscrupulous tactics the FTC's rule prohibits.

11. Our members are also hurt by large corporations being able to abuse negative options as a way to rig consumer choice in their favor, keeping their market dominance by misleading customers into deals they don't want, rather than trying to compete on price and quality.

12. These kinds of concerns are what led MSA to file a joint comment in June 2023 with several other groups in support of the Federal Trade Commission's proposed amendments to the Negative Option Rule.

13. Our members have a significant interest in this case. Because they use negative options both to buy what they need for their small businesses and to sell their own goods—and want to be able to keep doing so without the biggest competitors abusing these kinds of deals—our members would be hurt coming and going if the rule is struck down.

Executed on February 5, 2025

_____
Shawn Phetteplace
Main Street Alliance