# In the United States Court of Appeals for the Eighth Circuit

---

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, ET AL.,

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

---

On Petitions for Review of an Order of the
Federal Trade Commission

## PETITIONERS' OPENING BRIEF

Helgi C. Walker
  *Counsel of Record*
Lucas C. Townsend
Michael P. Corcoran
Lael D. Weinberger
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

*Additional counsel listed on next page*

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, D.C. 20006
(202) 783-8400
edavis@shb.com

*Counsel for Custom
Communications, Inc., d/b/a
Custom Alarm*

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE
FLOWERS LLC
P.O. Box 8248
Cincinnati, OH 45249
(513) 201-5775
bflowers@ashbrookbk.com

*Counsel for Michigan Press
Association and the National
Federation of Independent
Business, Inc.*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD &
MARTIN, P.C.
777 Gloucester Street
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for the Chamber of
Commerce of the United States of
America and the Georgia
Chamber of Commerce*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062

*Counsel for the Chamber of
Commerce of the United States of
America*

# SUMMARY OF THE CASE

These consolidated cases challenge a Federal Trade Commission rule issued without statutory authority. In decades past, the Commission stifled commerce with overbroad and indiscriminate rules regarding purportedly unfair or deceptive acts or practices. To stop these regulatory excesses, Congress expressly limited the Commission's rulemaking power to "specific" rules regarding "prevalent" unfair or deceptive acts or practices. Here, the Commission brushed aside those restrictions and requirements. In a return to days gone by, the Commission issued a rule that regulates over *a billion* recurring subscription agreements that hundreds of millions of Americans use and rely on for everything from newspapers to lawn care. Although Congress has already enacted multiple statutes regulating particular types of subscriptions, this rule would displace all those statutes with new, one-size-fits-all requirements that effectively override and extend well beyond Congress's more targeted laws.

To properly address the issues presented, Petitioners respectfully submit that oral argument would be beneficial and that 30 minutes per side would be adequate.

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 8th Cir. R. 26.1A, petitioners Custom Communications, Inc., d/b/a Custom Alarm, Electronic Security Association, Inc., Interactive Advertising Bureau, NCTA – The Internet & Television Association, Michigan Press Association, National Federation of Independent Business, Inc., the Chamber of Commerce of the United States of America, and the Georgia Chamber of Commerce, make the following disclosures:

Custom Communications, Inc., d/b/a Custom Alarm has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Electronic Security Association, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Interactive Advertising Bureau has no parent corporation, and no publicly held company owns 10% or more of its stock.

NCTA – The Internet & Television Association has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Michigan Press Association has no parent corporation, and no publicly held company owns 10% or more of its stock.

Appellate Case: 24-3137     Page: 4     Date Filed: 02/19/2025 Entry ID: 5487347

The National Federation of Independent Business, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Chamber of Commerce of the United States of America has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Georgia Chamber of Commerce has no parent corporation, and no publicly held company owns 10% or more of its stock.

Dated: February 18, 2025

Respectfully submitted,

*/s/ Helgi C. Walker*

Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 887-3599
hwalker@gibsondunn.com

*Counsel for Petitioners*

iii

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

JURISDICTION ................................................................. 5

STATEMENT OF ISSUES ................................................... 7

STATEMENT OF THE CASE ............................................. 7

    A.    The Federal Trade Commission Act ....................... 7

    B.    Recurring Subscriptions ....................................... 14

    C.    The Rule ................................................................. 18

    D.    Petitioners' Challenges ......................................... 26

SUMMARY OF ARGUMENT ............................................ 27

STANDARD OF REVIEW .................................................. 30

ARGUMENT ..................................................................... 31

    I.    The Rule Exceeds The Commission's Limited Statutory Authority ................................................ 31

        A.    The Rule Violates The "Specificity" Requirement ....... 31

        B.    The Rule Violates The "Prevalence" Requirement ...... 44

        C.    The Rule Overrides Numerous Federal Statutes That Already Regulate Recurring Subscriptions ........ 49

        D.    The Rule Contravenes The Nondelegation Doctrine. ........ 52

    II.    The Commission Violated A Key Procedural Requirement By Failing To Issue A Preliminary Regulatory Analysis ................................................ 54

    III.    The Rule Is Arbitrary And Capricious ................................. 60

Appellate Case: 24-3137    Page: 6    Date Filed: 02/19/2025 Entry ID: 5487347

IV.  The Rule Should Be Vacated ................................................... 66

CONCLUSION ............................................................................. 67

Appellate Case: 24-3137     Page: 7     Date Filed: 02/19/2025 Entry ID: 5487347

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ................................................................ 8

*Am. Fin. Servs. Ass'n v. FTC*,
767 F.2d 957 (D.C. Cir. 1985) ................................................ 8

*Am. Optometric Ass'n v. FTC*,
626 F.2d 896 (D.C. Cir. 1980) .............................................. 45

*AMG Cap. Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) ................................................................ 43

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) .......................................................... 38

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .............................................................. 66

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
112 F.4th 507 (8th Cir. 2024) ................................... 31, 59, 65

*Fort Worth & Denver Ry. Co. v. Lewis*,
693 F.2d 432 (5th Cir. 1982) ................................................ 53

*Garland v. Cargill*,
602 U.S. 406 (2024) ................................................................ 7

*Gundy v. United States*,
588 U.S. 128 (2019) .............................................................. 52

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980) .............................................................. 53

*Iowa League of Cities v. EPA*,
711 F.3d 844 (8th Cir. 2013) ................................................ 67

Appellate Case: 24-3137    Page: 8    Date Filed: 02/19/2025 Entry ID: 5487347

# TABLE OF AUTHORITIES

*(continued)*

*Katharine Gibbs Sch. (Inc.) v. FTC,*
  612 F.2d 658 (2d Cir. 1979) ........................................................ 32, 40

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ...................................................................... 7, 30

*Me. Cmty. Health Options v. United States,*
  590 U.S. 296 (2020) .......................................................................... 55

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................. 7, 60, 65

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC,*
  76 F.4th 291 (4th Cir. 2023) ............................................................ 38

*Nat'l Auto. Dealers Ass'n v. FTC,*
  ___ F.4th ___, 2025 WL 304460 (5th Cir. Jan. 27, 2025)....7, 30, 58, 67

*NFIB v. Dep't of Lab.,*
  595 U.S. 109 (2022) .......................................................................... 37

*North Dakota v. EPA,*
  730 F.3d 750 (8th Cir. 2013) ............................................................ 67

*Ohio v. EPA,*
  603 U.S. 279 (2024) ...................................................................... 7, 60

*Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey,*
  167 F.3d 458 (8th Cir. 1999) ............................................................ 53

*Wallace v. ConAgra Foods, Inc.,*
  747 F.3d 1025 (8th Cir. 2014) .......................................................... 53

*Warth v. Seldin,*
  422 U.S. 490 (1975) ............................................................................ 6

Appellate Case: 24-3137    Page: 9    Date Filed: 02/19/2025 Entry ID: 5487347

# TABLE OF AUTHORITIES
*(continued)*

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ............................................................... 38

## Statutes

5 U.S.C. § 706 ............................................................... 30, 60

12 U.S.C. § 5519 ............................................................... 14, 36

15 U.S.C. § 45 ............................................... 7, 8, 13, 42, 43, 52

15 U.S.C. § 57a ............................... 2, 11, 30, 44, 45, 58, 59, 65

15 U.S.C. § 57b-3 ..................... 3, 4, 11, 12, 29, 30, 53, 54, 55, 56, 57, 59

15 U.S.C. § 1693c ............................................... 3, 17, 39, 50, 51

15 U.S.C. § 1693e ............................................................... 17, 51

15 U.S.C. § 6101 ............................................................... 14

15 U.S.C. § 6102 ............................................................... 18, 50

15 U.S.C. § 8403 ............................... 3, 8, 39, 50, 51, 52, 63

28 U.S.C. § 2112 ............................................................... 5

39 U.S.C. § 3009 ............................................................... 17

42 U.S.C. § 6294 ............................................................... 14, 36

47 U.S.C. § 562 ............................................... 3, 17, 39, 49, 50, 51

47 U.S.C. § 1753 ............................................................... 18, 39, 50

Cal. Bus. & Prof. Code §§ 17600-17606 ................................... 18

Colo. Rev. Stat. § 6-1-732 ............................................... 18

Appellate Case: 24-3137   Page: 10   Date Filed: 02/19/2025 Entry ID: 5487347

# TABLE OF AUTHORITIES
*(continued)*

Fla. Stat. § 501.165 ................................................................ 18

FTC Improvements Act of 1980, Pub. L. No. 96-252, 94 Stat.
374 ................................................................. 10, 35, 54

Pub. L. No. 93-637, 88 Stat. 2183 (1975).................................... 9

Pub. L. No. 103-312, 108 Stat. 1691 (1994) ............................. 10

## Congressional Documents

H.R. Rep. 103-138 (1993)................................................ 10, 34

S. Hrg. 111-647 (Feb. 4, 2010)................................12, 13, 35, 36

S. Conf. Rep. 93-1408 (1974) .............................................. 33, 34

S. Rep. 96-500 (1979).......................9, 10, 34, 35, 39, 54, 55, 56

## Other Authorities

*Ask the Commissioner: Federal Trade Commissioner
Christine Varney*, 14 No. 2 ACCA Docket 36 (1996)..................... 12, 35

J. Howard Beales III & Timothy J. Muris, *Back to the
Future: How Not to Write a Regulation*, AEI (June 2022),
https://www.aei.org/research-products/report/back-to-the-
future-how-not-to-write-a-regulation/ ............................................. 9, 13

Journal of Education, March 4, 1897 ........................................ 15

*Legal Library: Rules*, FTC.gov, https://www.ftc.gov/legal-
library/browse/rules ...................................................... 13, 36

Lina Khan, Posting on X (Oct. 16, 2024),
https://x.com/linakhanFTC/status/1846610107867484522?
mx=2 .................................................................... 22

Appellate Case: 24-3137    Page: 11    Date Filed: 02/19/2025 Entry ID: 5487347

# TABLE OF AUTHORITIES
*(continued)*

Mark T. Spriggs & John R. Nevin, *Negative Option Selling Plans: Current Forms Versus Existing Regulations*, 15 J. Pub. Pol'y & Mktg. 227 (1996) ................................................................ 15

The American Heritage College Dictionary (3d ed. 1993) ...................... 44

Cambridge International Dictionary (1995) ........................................... 44

Merriam-Webster.com (last accessed Feb. 14, 2024) ................. 32, 33, 44

The Record of Christian Work, January 1894 ........................................ 15

Rulemaking, FTC.gov (last accessed Feb. 14, 2025), https://www.ftc.gov/enforcement/rulemaking .................................... 36

American Heritage Dictionary (5th ed. 2018) .................................. 32, 33

Webster's Third New International Dictionary (1976) .............. 32, 38, 39

Today, *New FTC Rules Aim to Make It Easier to Cancel Subscriptions* (Oct. 16, 2024) ................................................................. 22

Vice President Kamala Harris, Posting on X (Oct. 16, 2024), https://x.com/VP46Archive/status/1846593909679407520 ............... 22

White House, Posting on X (Oct. 16, 2024), https://x.com/WhiteHouse46/status/1846566780988178538 ............. 22

The Woman's Journal, April 4, 1891 ...................................................... 15

## Treatises

Restatement (First) of Contracts § 72 (1932) ........................................ 15

Restatement (Second) of Contracts § 18 (1981) .................................... 64

Appellate Case: 24-3137     Page: 12     Date Filed: 02/19/2025 Entry ID: 5487347

# TABLE OF AUTHORITIES
*(continued)*

## Regulations

16 C.F.R. ch. I, subch. F ........................................................ 14, 36

16 C.F.R. pt. 305 ........................................................................ 14

16 C.F.R. pt. 436 ........................................................................ 35

16 C.F.R. pt. 437 ........................................................................ 35

16 C.F.R. pt. 444 ........................................................................ 35

16 C.F.R. pt. 310 ........................................................................ 14

16 C.F.R. § 310.3 ....................................................................... 17

16 C.F.R. § 463.1 ....................................................................... 14

27 Fed. Reg. 22,933 (Dec. 29, 1962) ......................................... 8

38 Fed. Reg. 4,896 (Feb. 22, 1973) .......................................... 16

40 Fed. Reg. 51,582 (Nov. 5, 1975) ........................................... 8

76 Fed. Reg. 76,816 (Dec. 8, 2011) .......................................... 13

84 Fed. Reg. 52,393 (Oct. 2, 2019) ........................................... 19

86 Fed. Reg. 38,542 (July 22, 2021) ......................................... 19

88 Fed. Reg. 24,716 (Apr. 24, 2023) ......................................... 19

FCC Public Notice, DA: 16-357 (Apr. 4, 2016) .................... 18, 50

Appellate Case: 24-3137     Page: 13     Date Filed: 02/19/2025 Entry ID: 5487347

## INTRODUCTION

This is no ordinary administrative challenge. In the final days of the Biden Administration, the Federal Trade Commission used a statute that *limits* the agency's rulemaking power to hurriedly promulgate, by a 3-2 vote, a rule regulating over a *billion* recurring subscription agreements across all sectors of the U.S. economy (the "Rule"). These are contracts that more than 220 million Americans rely on for everything from newspapers and internet service to lawn care and home security. Their only shared feature? They continue to provide some good or service until the customer cancels, allowing consumers the convenience of uninterrupted service and lower transaction costs. The Commission calls these subscriptions "negative option" contracts, and the Rule deems them categorically "unfair or deceptive" unless sellers meet a new set of complex requirements.

The Commission lacks authority for this indiscriminate regulation. In the 1970s, the Commission earned a reputation as the "second most powerful legislature in America" because it tried to use its powers over "unfair or deceptive acts or practices" to issue overbroad rules on everything from funeral homes to door-to-door sales. App.449 n.11

1

(Add.66 n.11). Congress responded by sharply limiting the Commission's rulemaking powers. Specifically, Section 18 of the Federal Trade Commission Act ("FTC Act") provides that the Commission may make rules regarding only "specific[]" and "prevalent" "unfair or deceptive acts or practices," 15 U.S.C. § 57a(a)(1)(B), (b)(3), and then only after following rigorous procedural requirements that go above and beyond the Administrative Procedure Act. These express statutory restrictions on the Commission's powers essentially ended its rulemakings for several decades.

Yet in a return to old form, the Commission brushed aside those unique restrictions here. The Commission issued a Rule broadly regulating *all* recurring subscription agreements in *all* sectors of the economy. But regulating a billion-plus contracts across every industry, with terms that the Commission concedes will "vary" for each contract, App.393 (Add.10), is hardly "specific." And the Commission itself has acknowledged that it lacks evidence of "prevalent" unfair or deceptive recurring subscriptions in multiple industries that the Rule covers.

Worse, Congress has *already* regulated certain recurring subscriptions by statute. For example, Congress has enacted statutes

2

that regulate online subscriptions, cable and broadband subscriptions, and electronic fund transfer subscriptions. *See* 15 U.S.C. §§ 8403, 1693c; 47 U.S.C. § 562. Each of those statutes provides custom-fit regulations for the targeted industries, showing Congress never meant to regulate all recurring subscriptions, much less in a uniform way. Yet the Rule is broader and more onerous than all of those statutes combined, sweeping aside their differences and limits with a one-size-fits-all code of consumer protection that deems subscriptions to be unfair or deceptive even when they comply with Congress's policy choices. But the Commission's limited authority cannot be a license to override Congress. In fact, that is the sort of power-grab that Congress meant to *stop* when it cut back the agency's rulemaking power.

The Commission also disregarded a key procedural requirement that Congress enacted to cabin the Commission's rulemakings. Because the Rule will have massive economic effects, the Commission was required to issue an additional, preliminary regulatory analysis. 15 U.S.C. § 57b-3(b)(1). That analysis needed to contain a description of any reasonable alternatives to the proposed rule and a cost-benefit analysis of the proposed rule and each alternative. *Id.* The statute expressly

3

requires a "public comment period" for the preliminary regulatory analysis, *id.* § 57b-3(b)(2)(E), thus helping the Commission both to understand the consequences of the proposed rule and to keep the rule within the limits of its authority. But the Commission has conceded that it never issued that required preliminary analysis. Opposition of the FTC to Motion for Stay, Entry ID 5469046, at 15-16 (8th Cir. Dec. 20, 2024) ("FTC Stay Opp."). That failing alone requires vacatur under the FTC Act. *See* 15 U.S.C. § 57b-3(c). And it underscores the Commission's disregard for the statutory limits in its desire to push ahead with such a broad rule.

Beyond those failures, the Rule is arbitrary and capricious because the Commission failed properly to grapple with multiple problems in its pre-election rush to get this economy-wide Rule out the door. For example, the Rule requires all covered entities to make cancelling a recurring subscription "at least as easy" as signing up for one. Rule § 425.6; App.447 (Add.64). Although that might sound simple enough, the reality is far more complex. There are many times—such as when dealing with home security services—when additional steps are required for cancelling to ensure customer security and continuity of potentially

4

life-saving services. And making it harder for companies to explain the potential consequences of cancelling services or to tell customers about better deals and discounts makes no sense at all. Yet the Commission never adequately addressed those problems, failing even to *try* to assess how the Rule will affect the many different types of companies that offer recurring subscriptions.

Petitioners thus respectfully request that the Court vacate the Rule.

## JURISDICTION

The Court has jurisdiction to review the Rule under 15 U.S.C. § 57a(e)(1)(A) and 28 U.S.C. § 2112(a). Petitioners filed their four petitions for review on October 22, 2024, six days after the Commission issued and promulgated the Rule on October 16, 2024. Because different Petitioners filed in different courts of appeals, the Commission was required to "promptly . . . notify the judicial panel on multidistrict litigation" ("JPML") of those petitions so that the JPML could run a lottery and consolidate the petitions in one court. 28 U.S.C. § 2112(a). After the Commission initially refused to notify the JPML, several Petitioners filed a petition for a writ of mandamus in the Fifth Circuit to

5

compel the Commission to do so. The Fifth Circuit issued the requested writ of mandamus, *see* Order, *In re Elec. Sec. Ass'n*, No. 24-60570 (5th Cir. Nov. 19, 2024), and the JPML then designated this Court to consolidate the petitions, Consolidation Order, *In re FTC, Negative Option Rule*, MCP No. 192 (Nov. 21, 2024). All petitions were transferred to and consolidated in this Court by December 4, 2024.

Petitioners have Article III standing to challenge the Rule. Custom Communications, Inc., d/b/a Custom Alarm will be directly regulated and harmed by the Rule. *See, e.g.*, Appendix to Motion to Stay at 137-62, Entry ID 5463205 (8th Cir. Dec. 5, 2024) ("Stay App."). Other Petitioners, including (but not limited to) the Electronic Security Association and the U.S. Chamber of Commerce, have submitted declarations from identified members who will be regulated and harmed by the Rule. *See, e.g.*, Stay App.163-215; Stay App.420-56. Those Petitioners will adequately represent their members, and their members' participation is not required for these petitions. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975).

## STATEMENT OF ISSUES

I.      Whether the Rule exceeds the Commission's statutory authority under 15 U.S.C. § 57a.

- *Garland v. Cargill*, 602 U.S. 406 (2024)

- *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)

II.     Whether the Commission failed to follow the statutory procedures in 15 U.S.C. § 57b-3.

- *Nat'l Auto. Dealers Ass'n v. FTC*, ___ F.4th ___, 2025 WL 304460 (5th Cir. Jan. 27, 2025)

III.    Whether the Rule is arbitrary and capricious.

- *Ohio v. EPA*, 603 U.S. 279 (2024)

- *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)

## STATEMENT OF THE CASE

### A.    The Federal Trade Commission Act

Section 5 of the FTC Act provides the Commission with authority to "prevent . . . unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). But the Commission must follow a multi-step process before it can bring an enforcement action for penalties under Section 5. It must first initiate an administrative proceeding and issue a

7

cease-and-desist order, which is subject to judicial review; only then may the Commission try to bring a lawsuit for civil penalties for any violation of the cease-and-desist order. *See id.* § 45(b), (c), (*l*), (m). That process ensures that companies have notice before they are accused of violating Section 5's vague language and that the Commission remains "within its statutory authority," as checked by an Article III court. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 533 (1935).

For much of the Act's history, the Commission respected those limits and relied exclusively on administrative cease-and-desist orders for enforcement purposes. *See Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 967 (D.C. Cir. 1985). But in the 1970s, the Commission began to propose a series of sweeping rules that deemed certain acts "unfair or deceptive" under dubious assertions of authority. App.449 (Add.66). For example, the Commission issued rules governing mail order merchandising, door-to-door sales, and prenotification recurring subscriptions. *See* 27 Fed. Reg. 22,933 (Dec. 29, 1962); 40 Fed. Reg. 51,582 (Nov. 5, 1975). These rules helped make it easier for the Commission to obtain cease-and-desist orders—but they sparked a backlash in Congress about the Commission's power and the "breadth of

8

[its] discretion." J. Howard Beales III & Timothy J. Muris, *Back to the Future: How Not to Write a Regulation* at 1, 7, AEI (June 2022), https://www.aei.org/research-products/report/back-to-the-future-how-not-to-write-a-regulation/ (noting the Commission's former status as "the second-most powerful legislature in Washington").

Congress responded with the Magnuson-Moss Warranty–FTC Improvement Act of 1974. Magnuson-Moss codified the Commission's rulemaking power in Section 18 of the FTC Act while also imposing limits "to control the [Commission's] discretion." Beales & Muris, *supra*, at 8. Magnuson-Moss clarified that the Commission had authority only to issue rules that "define with *specificity*" "unfair or deceptive acts or practices," and then only after satisfying numerous procedural requirements above and beyond the typical APA rulemaking. Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193 (1975) (emphasis added).

Instead of heeding those limits, the Commission "launched a rulemaking binge." Beales & Muris, *supra*, at 8. Within a few years, it started more than a dozen rulemakings on everything from health spas and funeral homes to the general standards for the size, quality, and safety of goods and materials. *See id.*; S. Rep. 96-500, at 19 (1979). The

9

Commission even proposed a ban on all television advertising to children, earning it the moniker "National Nanny" from the Washington Post. App.449 (Add.66).

Congress quickly clarified that the Commission "had [gone] beyond [its] intent." S. Rep. 96-500, at 2. As Congress viewed things, the Commission only had "authority to issue *industry*-wide rules." *Id.* at 2-3. Congress thus suspended the Commission's funding for a few years and prohibited it from continuing with rulemakings for "overly broad" and "far reaching" rules on children's advertising or standards for goods and materials. *Id.* (emphasis added); FTC Improvements Act of 1980, Pub. L. No. 96-252, 94 Stat. 374; *see also* H.R. Rep. 103-138, at 3 (1993). Congress also enacted additional "procedural refinements" to "minimize these problems" with respect to the "scope" of the Commission's rules. S. Rep. 96-500, at 4; Pub. L. No. 96-252. A few years later, Congress amended the FTC Act again, adding new restrictions on the Commission's rulemaking powers while attempting to clarify the Commission's authority over "unfair or deceptive acts or practices." *See* Pub. L. No. 103-312, § 5, 108 Stat. 1691, 1692 (1994) (adding a "prevalence" requirement).

Appellate Case: 24-3137     Page: 23     Date Filed: 02/19/2025 Entry ID: 5487347

The result of these reforms is the modern Section 18—which gives the Commission authority to promulgate only rules "which define with specificity acts or practices which are unfair or deceptive," and then only if the Commission has evidence that those acts or practices are "prevalent." 15 U.S.C. § 57a(a)(1)(B), (b)(3), (d)(1). Within those substantive limits, the Commission must also satisfy numerous procedural steps under the FTC Act. Among other things, the Commission must:

- Publish an "advance notice of proposed rulemaking," with notice to Congress, *id.* § 57a(b)(2)(A)–(B), followed by a "notice of proposed rulemaking," *id.* § 57a(b)(1)(A);

- Provide an opportunity for "an informal hearing," which involves additional submissions and cross-examination on "disputed issues of material fact," *id.* § 57a(b)(1)(C), (c), (e)(3)(B);

- If the proposed rule will affect the economy by $100 million or more annually, prepare and issue:

  - a "preliminary regulatory analysis" for public comment that must contain a "description of any reasonable alternatives" and a "preliminary analysis of the projected benefits and any

11

adverse economic effects" for both the rule and its potential alternatives, *id.* § 57b-3(a)(1)(A), (b)(1); and

o a "final regulatory analysis" for any final rule, including further analysis on top of the preliminary regulatory analysis and a response to "comments submitted . . . in response to the preliminary regulatory analysis," *id.* § 57b-3(b)(2).

The few rules that made it through that uniquely restrictive process took years, and sometimes over a decade, of proceedings before the Commission. S. Hrg. 111-647, at 61-62 (Feb. 4, 2010) (Commerce, Science, and Transportation Committee hearing listing the Commission's Section 18 rulemakings).

The Commission soon realized that all these limitations, checks, and procedural hurdles were meant to nearly "prohibit" it "from proposing or imposing regulatory burdens on industry under its own initiative" and return that authority to Congress. *Ask the Commissioner: Federal Trade Commissioner Christine Varney*, 14 No. 2 ACCA Docket 36, 36 (1996). The Commission accordingly finalized a few industry-specific rules regarding, for example, eyeglasses and home insulation, in the early 1980s before almost ceasing all new rulemakings for decades.

12

*See* Beales & Muris, *supra*, at 8; S. Hrg. 111-647, at 61-63. Since then, the Commission has focused almost exclusively on updating, amending, or repealing its existing Section 18 rules. *See* Beales & Muris, *supra*, at 13. In fact, until the past few years, the Commission had issued only *one* new rule under Section 18—a "Business Opportunity Rule" that was little more than an outgrowth of the Commission's longstanding Franchise Rule. 76 Fed. Reg. 76,816, 76,817 (Dec. 8, 2011).[1]

Although the Commission's rulemaking process is onerous and circumscribed, it does come with a big payoff for the agency: Once the Commission has promulgated a rule under Section 18, it can enforce it directly against covered parties. *See* 15 U.S.C. § 45(m). The Commission thus need not go through an administrative cease-and-desist and potential judicial review process before seeking civil penalties, as it must for Section 5 violations. *See id.* § 45(b), (c), (*l*). Rather, it can simply commence a civil action seeking more than $53,000 per violation. *Id.* § 45(m); 90 Fed. Reg. 5580 (Jan. 17, 2025) (setting civil penalty).

---

[1] The Commission has organized these rules on its website by each industry covered. *Legal Library: Rules*, FTC.gov, https://www.ftc.gov/legal-library/browse/rules (last accessed Feb. 14, 2025).

Appellate Case: 24-3137     Page: 26     Date Filed: 02/19/2025 Entry ID: 5487347

Although the Commission has only ever promulgated a handful of Section 18 rules, and (until recently) had issued almost no new Section 18 rules since Congress completed the Magnuson-Moss reforms, it *has* promulgated rules under other statutory grants of authority. For example, Congress has over the years granted the Commission specific rulemaking authority over motor vehicle dealers, 12 U.S.C. § 5519(d), telemarketing practices, 15 U.S.C. § 6101, energy labeling requirements, 42 U.S.C. § 6294(b)(2), and fair credit reporting, *see* 16 C.F.R. ch. I, subch. F. The Commission has exercised those specific rulemaking powers. *E.g.*, 16 C.F.R. pt. 310 (telemarketing); *id.* § 463.1 (auto dealers); *id.* pt. 305 (energy labeling).

## B. Recurring Subscriptions

Recurring subscriptions are commonplace contracts that have been used since at least the nineteenth century. In essence, a recurring subscription provides some good or service to a customer on a continuing basis until the customer cancels. That basic arrangement offers the customer the convenience and security of knowing that the customer will not stop receiving the good or service simply because the customer forgets to renew. Magazine publications began to offer recurring subscriptions

in the nineteenth century, and, by the end of that century, it was common to find publications announcing that subscriptions would continue indefinitely until cancelled. *See, e.g.*, The Woman's Journal, April 4, 1891; The Record of Christian Work, January 1894; Journal of Education, March 4, 1897, at 144. Book-of-the-month clubs followed soon thereafter. *See* Mark T. Spriggs & John R. Nevin, *Negative Option Selling Plans: Current Forms Versus Existing Regulations*, 15 J. Pub. Pol'y & Mktg. 227, 227 (1996). From those early days, recurring subscriptions have been analyzed like any other contract—and a party's silence could operate as consent if established by prior agreement. Restatement (First) of Contracts § 72 (1932).

Today, recurring subscriptions are used in virtually all industries and professions. Newspapers, internet providers, cable providers, video streaming services, food preparation services, cloud storage services, utility services, and lawn care services—to name a few examples—all offer recurring subscriptions as a convenient way of ensuring that consumers receive goods or services on an uninterrupted basis until they decide to cancel. Naturally, these recurring subscriptions look very different for different services. A lawn care subscription could involve

15

informal, verbal arrangements that are updated on an ad hoc basis, whereas a subscription for security services can involve complex contractual terms that last for years unchanged. *Compare* Stay App.408 *with* Stay App.144-45. Similarly, consumer subscriptions can look very different than those used by sophisticated businesses; a corporate office park with recurring subscriptions for security could have different needs than the average consumer. The consequences of some recurring subscriptions ending unintentionally can be stark—no one, for example, would suddenly want to discover that their medical monitoring or home security services had ended by their inadvertence or the actions of criminals.

Before Congress enacted Magnuson-Moss, the Commission adopted a regulation for a specific type of recurring subscription: "prenotification plans," where sellers provide notices of offers for physical goods and then ship and charge for the goods if the consumer does not decline the offer. App.385-86, 448 (Add.2-3, 65). When it promulgated that regulation, the Commission focused on book-of-the-month clubs and record clubs. *See* 38 Fed. Reg. 4,896, 4,899 (Feb. 22, 1973). The Commission also relied in part on the then-recently enacted Unordered Merchandise Statute, 39

16

U.S.C. § 3009, which prohibits sending unordered merchandise to consumers, *see* 38 Fed. Reg. at 4,908. Neither that statute nor the Commission's prior regulation, however, reached any other type of recurring subscription.

In the years since the Commission issued that rule and Congress enacted Magnuson-Moss, Congress has established its own set of regulations for other recurring subscriptions. But Congress hasn't covered all recurring subscriptions, and for those it has covered, it hasn't adopted a one-size-fits-all approach. Rather, Congress has enacted *five* separate statutes regulating particular recurring subscriptions offered by specific industries or over certain media.

For example, Congress has enacted statutes governing recurring electronic funds transfers, 15 U.S.C. §§ 1693c(a), 1693e(a) (Electronic Fund Transfer Act of 1978 ("EFTA")), and recurring subscriptions offered by cable and satellite television providers, 47 U.S.C. § 562. The Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994 ("Telemarketing Act") directed the Commission to prescribe rules "prohibiting deceptive telemarketing acts or practices" outside the strictures of Section 18; the Commission included recurring subscriptions

17

offered by telemarketing in its Telemarketing Sales Rule. 15 U.S.C. § 6102(a)(1); 16 C.F.R. § 310.3(a)(1)(vii). More recently, the Restore Online Shoppers' Confidence Act of 2010 ("ROSCA") regulates recurring subscriptions offered online, 15 U.S.C. § 8403, and a 2021 statute requires a discrete list of disclosures for recurring subscriptions offered by broadband providers, 47 U.S.C. § 1753(a) (incorporating FCC Public Notice, DA: 16-357 (Apr. 4, 2016)).

Many states, too, have enacted statutes that regulate recurring subscriptions, with varying requirements and scopes that reflect each state's preferences. For example, California, Colorado, and Florida have enacted statutes that regulate recurring subscriptions in different ways. Cal. Bus. & Prof. Code §§ 17600-17606; Colo. Rev. Stat. § 6-1-732; Fla. Stat. § 501.165. But many states, including Iowa and Missouri, have not enacted any statutes regarding recurring subscriptions, leaving them subject to the common law of contracts.

## C. The Rule

Not satisfied with Congress's or the states' work, the Commission promulgated the Rule, by a 3-2 vote, to establish a one-size-fits-all code for over a billion recurring subscriptions used by over three-quarters of

18

American consumers across the economy. The rulemaking process began with an innocuous, bipartisan advance notice of proposed rulemaking ("ANPRM") in 2019. *See* App.1-6; App.450 (Add.67); 84 Fed. Reg. 52,393 (Oct. 2, 2019). The ANPRM chiefly asked a series of benign questions regarding the Commission's old, narrow Prenotification Negative Option Rule, such as whether there was "a continuing need for the Rule as currently promulgated" and "[w]hat modifications, if any," the Commission should make to it. App.5. The ANPRM elicited only 17 comments. App.451 (Add.68).

When the Commission's composition changed in 2021, that rulemaking process underwent a major evolution. App.449-51 (Add.66-68). First, to "streamline" the Magnuson-Moss procedural requirements, the Commission amended its rules of practice in 2021 by a 3-2 vote to compress the rulemaking timeline and diminish the rigor of informal hearings. *See id.*; 86 Fed. Reg. 38,542 (July 22, 2021). Then, in April 2023, the Commission issued a notice of proposed rulemaking ("NPRM") that proposed a series of new, complex regulations on *all* recurring subscriptions everywhere. App.44-46; 88 Fed. Reg. 24,716 (Apr. 24, 2023). Among other things, the NPRM proposed new regulations

19

regarding the disclosures, consent mechanisms, and cancellation mechanisms used for recurring subscriptions. *Id.* The NPRM's proposed regulations also reached contracts between sophisticated businesses that often negotiate the terms of their recurring subscription contracts. That NPRM generated about 16,000 comments from across the economy. App.451 (Add.68).

The NPRM caught multiple commenters' eyes both for what it contained and for what it lacked: evidence of prevalence, and a preliminary regulatory analysis. For prevalence, the Commission mustered only a dozen enforcement actions it had taken and claimed that the FTC, states, and consumer organizations receive "thousands" of complaints, App.35—a number that, even if accurate, is miniscule compared to the billion-plus recurring subscription contracts economy-wide. The cited enforcement actions and referenced complaints also didn't document prevalent unfair or deceptive acts or practices in many industries that the rule would affect, such as the lawn care, cable, or security industries. *Id.* As for the preliminary regulatory analysis, the Commission flatly said that it didn't need to provide one. App.41. The Commission insisted that, despite proposing such a broad rule that would

20

immediately affect over 220 million Americans and at least 106,000 businesses, it didn't think the rule would affect the economy by $100 million or more annually—even though that figure would represent less than $1,000 in average compliance costs for each affected business annually.  App.41, 43.[2]

The Commission then held an informal hearing, and the ALJ allowed for limited submissions and cross-examination relating to whether the Rule would reach the $100 million threshold.  App.337. Several interested parties offered detailed submissions and expert reports on the proposed rule's costs—while the Commission submitted no evidence at all.  App.297-332; App.325-335; App.339-344; App.353-61; App.380.  The ALJ presiding over the hearing then concluded that the proposed rule would affect the economy by $100 million or more annually—a fact that the Commission has now conceded.  App.381;

---

[2] The Commission's estimate of the number of businesses that offer recurring subscriptions was artificially low.  To reach that number, the Commission guessed that only 20% of businesses in some artificial set of industries offer recurring subscriptions.  App.435 (Add.52).  Yet at least one commenter estimated that up to 60,000 car wash providers alone offer recurring subscriptions.  App.429 (Add.46).  The Commission didn't take into account that number, and it conceded that it lacked data to quantify business-to-business subscriptions.  App.445 n.639 (Add.62).

Appellate Case: 24-3137     Page: 34     Date Filed: 02/19/2025 Entry ID: 5487347

App.425-27 (Add.42-44).  Nevertheless, the Commission never issued any preliminary regulatory analysis that the public could comment on.

Instead, less than three weeks before the presidential election, the Commission issued the final Rule by a 3-2 vote to much fanfare.[3]  Stay App.130-31.  The Commission acknowledged that several other statutes and regulations already address certain recurring subscriptions in more limited ways than the Rule.  App.386-87 (Add.3-4).  The Commission also conceded that the Rule will extend more broadly to over a billion recurring subscriptions used by over 220 million Americans—representing around three-quarters of our nation's consumers.  App.431 (Add.48).  In fact, the Commission emphatically declared that it was tossing out "the old [prenotification plan] Rule's prescriptive requirements" in favor of new, "flexible" standards applicable to "all

---

[3] Among other things, then-Chair Khan, then-presidential candidate Kamala Harris, and the White House all posted about the Rule on social media.  *See, e.g.,* Lina Khan, Posting on X (Oct. 16, 2024), https://x.com/linakhanFTC/status/1846610107867484522?mx=2;  Vice President Kamala Harris, Posting on X (Oct. 16, 2024), https://x.com/VP46Archive/status/1846593909679407520; *see also* White House, Posting on X (Oct. 16, 2024), https://x.com/WhiteHouse46/status/1846566780988178538; Today, *New FTC Rules Aim to Make It Easier to Cancel Subscriptions* (Oct. 16, 2024) (available on YouTube).

Appellate Case: 24-3137     Page: 35     Date Filed: 02/19/2025 Entry ID: 5487347

forms of negative option marketing" across "all media" and "nearly every economic sector." App.394 (Add.11).

The Commission also admitted that it lacked evidence of prevalent unfair or deceptive acts or practices in every industry that the Rule covers. App.391-92 (Add.8-9). In fact, the Commission again mustered only a few dozen cases, the majority of which were settled and never litigated, representing a miniscule fraction of the billion-plus covered subscriptions, alongside a few studies that almost all focus on deceptive "free trials" that roll into paid recurring subscriptions. App.389-91 (Add.6-8). Indeed, for some industries, such as newspapers, the Commission cited at most a few complaints or examples of an unfair or deceptive practice. App.391-92 n.103 (Add.8-9 n.103).

Nevertheless, the Rule imposes the following regulations on anyone who offers subscription agreements:

- *A Misrepresentation Ban*: Companies may not misrepresent "any Material fact," regardless of whether the fact relates to the recurring subscription feature, the underlying good or service, or anything else. Rule § 425.3.

23

- *A Disclosure Requirement*: Companies must disclose "all Material terms" prior to obtaining the customer's billing information, "regardless of whether those terms directly relate to the [recurring subscription] [f]eature." Rule § 425.4(a). The disclosure must be "immediately adjacent" to the means of recording the consumer's consent to the recurring subscription, *id.* § 425.4(b)(2)(i), yet they must also be "Clear and Conspicuous"—they must, for example, "stand out from any accompanying text or other visual elements" and be "unavoidable" if offered over any electronic medium. *Id.* §§ 425.2, 425.4(b).

- *A Separate Consent Requirement*: Companies must obtain a customers' "unambiguously affirmative consent to the [recurring subscription] [f]eature offer *separately* from any other portion of the transaction." Rule § 425.5(a)(1) (emphasis added).

- *Speech Restrictions*: Companies cannot provide "any other information that interferes with, detracts from, contradicts, or otherwise undermines" consumers' ability to either "read, hear, see, or otherwise understand" the required disclosures or to consent to the recurring subscription feature. Rule §§ 425.4(b)(3), 425.5(a)(2).

24

- *A Cancellation Requirement*: Companies must provide a "simple mechanism for a consumer to [immediately] cancel" the recurring subscription that is "at least as easy to use as the mechanism the consumer used to consent" to the subscription. Rule § 425.6(a)-(b). If customers sign up for a subscription by electronic means, the company may not require customers to interact with live or virtual representatives when the customer seeks to cancel unless the customers consents. *Id.* § 425.6(c)(1).

The Rule specifies that it preempts only state laws that do not afford "greater protection" than it. Rule § 425.7.

Commissioner Holyoak and now-Chair Ferguson both dissented, with Commissioner Holyoak noting that she had mere "weeks" "to review this economy-wide Rule" because of the Commission's "rush to the finish line" before the presidential election. App.449 (Add.66). Commissioner Holyoak also explained that the Rule exceeds Section 18's "specificity" requirement, and that the Commission "failed to appropriately establish the 'prevalence' of unfair and deceptive practices related to all [recurring subscriptions]" that the Rule covers. App.451 (Add.68).

25

**D.    Petitioners' Challenges**

Petitioners are or represent sellers from all manner of industries that offer recurring subscription plans, including security services, lawn care, newspapers, magazines, telecommunications, cable, internet, video streaming, health services, fitness, and advertising companies. Those sellers range from small, family-owned companies to large, nationwide ones. Yet the Rule will regulate all Petitioners or their members (collectively, "Petitioners") with equal force.

Petitioners are Custom Communications, Inc., d/b/a Custom Alarm, a family-owned security services company; the Electronic Security Association, Inc., representing home security companies and emergency services; the Interactive Advertising Bureau, representing 700 media companies, brand marketers, and technology companies; NCTA – The Internet & Television Association, representing cable and broadband operators and cable TV programmers; the U.S. Chamber of Commerce, representing more than 300,000 companies that provide a wide range of goods and services; the Georgia Chamber of Commerce, representing a wide variety of companies operating in Georgia; the Michigan Press Association, representing newspapers and magazines in Michigan; and

26

the National Federation of Independent Business, Inc., representing hundreds of thousands of small businesses across the country.

## SUMMARY OF ARGUMENT

The Rule must be set aside in its entirety for three independent reasons: it exceeds the Commission's limited authority; it is procedurally defective; and it is arbitrary and capricious.

I. *Exceeds the Commission's Authority*. This plenary, one-size-fits-all regulation of all recurring subscriptions everywhere is precisely what Congress meant to put an end to in enacting Magnuson-Moss. Congress gave the Commission only a limited power to promulgate "*specific[]*" rules targeting "*prevalent*" unfair or deceptive acts or practices—guardrails meant to restrict the Commission to rulemakings that target well-defined unlawful practices in particular industries. Section 18 thus allows the Commission to regulate only particular, widespread unfair or deceptive practices in certain industries—not to issue prophylactic rules that limit commerce across the economy based on a perceived risk of unfair or deceptive practices.

Yet this Rule extends to all recurring subscriptions in every industry, imposing regulations with loose language such as "material" or

27

"easy." None of that is "specific[]." Additionally, the Commission has conceded that it does not have evidence that all affected industries have "prevalent" unfair or deceptive recurring subscriptions. The failure to satisfy either of Section 18's specificity or prevalence requirements means that the Rule exceeds the Commission's statutory authority and constitutes an end-run around Section 5's procedures for the imposition of civil penalties.

Congress's own regulation of recurring subscriptions confirms that the Rule's breadth is unlawful. Congress's statutes target specific groups or classes of recurring subscriptions with custom regulations for each category of subscriptions. Yet the Rule would wipe out those distinctions, imposing a more stringent set of requirements on all recurring subscriptions—including subscriptions that Congress has never regulated. Indeed, the Commission will now deem recurring subscription agreements unfair or deceptive if they fail to comply with the Rule, even if those agreements comply with all applicable federal statutes. Congress never authorized the Commission to take such a step.

Any doubt is resolved by the nondelegation doctrine. If the Commission could declare a historically common and often beneficial

28

form of contract unlawful without evidence of prevalent unfair practices and in the teeth of Congress's own more tailored statutory schemes, it would raise serious questions about which body was acting as the legislature. Congress cannot have allowed the Commission to override Congress's own work, and principles of constitutional avoidance counsel against the Commission's sweeping view of its Section 18 authority.

II. *Procedurally Improper*. Beyond those failures, the Rule must be set aside because the Commission concedes that it didn't issue a statutorily required preliminary regulatory analysis. That analysis was supposed to be a critical step in the rulemaking process and allow the public to engage with the Commission on the costs and benefits of the rule and its potential alternatives. The FTC Act expressly directs courts to "set aside" rules for the Commission's failure to issue this analysis. 15 U.S.C. § 57b-3(c)(1).

III. *Arbitrary and Capricious*. The Rule must also be set aside because it is arbitrary and capricious. The Commission failed adequately to grapple with several key problems that the Rule will cause by, among other things, treating all recurring subscription agreements in the entire country the same way and making it harder for consumers to learn

29

beneficial information from their service providers.  In some situations, the Commission acknowledged that there would be a problem with a particular requirement, but then simply pretended that the Rule didn't contain that requirement.  The APA does not permit such a blinkered view of reality.

## STANDARD OF REVIEW

Section 18 provides that courts "shall hold unlawful and set aside the [R]ule" if it is arbitrary and capricious, unconstitutional, in excess of the Commission's authority, or without observance of procedure required by law.  15 U.S.C. § 57a(e)(3) (incorporating 5 U.S.C. § 706(2)(A)-(D)).  Courts should also "set aside" the Rule "if the Commission has failed entirely to prepare a regulatory analysis."  *Id.* § 57b-3(c)(1); *id.* § 57a(e)(3).

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  An agency's procedural violations also compel vacatur unless the error "clearly had no bearing on the procedure used or the substance of [the] decision reached."  *Nat'l Auto. Dealers Ass'n v. FTC*, ___ F.4th ___, 2025 WL

30

304460, at *7 (5th Cir. Jan. 27, 2025). Although courts give some deference to agencies under arbitrary-or-capricious review, they must ensure that the agency action is not "internally inconsistent" and is "reasonable and reasonably explained." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 519-20 (8th Cir. 2024).

## ARGUMENT

## I. The Rule Exceeds The Commission's Limited Statutory Authority.

No other federal agency is subject to the tight rulemaking constraints that Congress imposed on the Commission. The Rule exceeds the Commission's limited statutory authority for two distinct reasons. *First*, the Rule is not "specific" as Section 18 requires. *Second*, the Commission lacks evidence that the Rule covers only "prevalent" unfair or deceptive acts or practices. Were there any doubt on either score, it would be resolved by Congress's own statutes regarding recurring subscriptions, as well as the nondelegation doctrine.

### A. The Rule Violates The "Specificity" Requirement.

Section 18 authorizes the Commission to promulgate only "rules which define with specificity acts or practices which are unfair or deceptive." 15 U.S.C. § 57a(a)(1)(B). The Rule goes far beyond the

31

"specificity" constraint in two different ways. *First*, the term "specificity" limits the *scope* of the Commission's rules, and this economy-wide, all-industry Rule exceeds that limit. *Second*, the term "specificity" also requires *unambiguous* regulations that give precise guidance on what acts or practices are not permitted. But the Rule is rife with ambiguous terms, and the Commission itself declared that it needed to use vague language in the Rule to encompass all the billion-plus subscriptions at issue. Either of those excesses is fatal to the Rule.

### 1.  *The Rule Is Overbroad*

By definition, a Rule that targets over a billion commonplace contracts used by 220 million American consumers and businesses in every industry from newspapers to health care is not "specific[]." The plain meaning of "specificity" and legislative history of Magnuson-Moss both confirm that, at most, the Commission can issue rules on an industry-by-industry basis. *See, e.g.*, *Katharine Gibbs Sch. (Inc.) v. FTC*, 612 F.2d 658, 662, 667 (2d Cir. 1979) (remanding an "overbr[oad]" rule for lacking "specificity").

In the 1970s, as today, "specificity" meant "the condition of being peculiar to a particular individual or group." *Specificity*, Webster's Third

32

New International Dictionary 2187 (1976); *Specificity*, Merriam-Webster.com (last accessed Feb. 14, 2025) (same); *see also Specific*, American Heritage Dictionary 1681 (5th ed. 2018) ("limited, distinctive, or unique"); *Specific*, Merriam-Webster.com (last accessed Feb. 14, 2025) ("constituting or falling into a specifiable category").  That language thus calls for rules that are targeted and focused on particular practices in definable industries. *See supra*, at 9-13.  It does *not* permit economy-wide rules that affect a billion-plus contracts, including contracts entered between sophisticated businesses, with almost nothing in common except some highly generalized trait that the Commission comes up with.

Congress made that clear in enacting Magnuson-Moss and its progeny.  Before Magnuson-Moss, the Commission had issued rules regarding, for example, door-to-door sales and prenotification plans that addressed general topics and cut across different industries. *See supra*, at 8.  In response, Congress reined in the Commission's "broad" authority, noting that the Commission should "continue to specify such matters" as "*what octane rating should be posted on gasoline pumps*."  S. Conf. Rep. 93-1408, at 7763-64 (1974) (emphasis added).  That narrow focus reflected Congress's view that Section 18 gave the Commission only

"authority to issue *industry*-wide rules"—not economy-wide rules—on discrete topics. S. Rep. 96-500, at 3 (1979) (emphasis added). Again and again, across multiple statutes, Congress specifically noted that Section 18 granted only the "authority to issue *industry*-wide trade regulation rules," H.R. Rep. 103-138, at 3 (1993) (emphasis added), "*trade* regulation rules," S. Conf. Rep. 93-1408, at 7763 (emphasis added), and rules that operate "on an *industrywide* basis," S. Rep. 96-500, at 17 (emphasis added). But there is no "recurring subscription" industry. There are many industries that *offer* recurring subscriptions, but many of those industries have little to nothing else in common.

When the Commission tried to issue rules like this one under Section 18, Congress rejected them. After Congress enacted Section 18's "specificity" limit, the Commission proposed more sweeping rules regarding children's advertising and the general standards for the quality, weight, and measure of goods and materials—neither of which were tethered to any industry. *See supra*, at 9-10. Congress denounced those proposed rules as "overly broad" and "beyond the intent of Congress." S. Rep. at 96-500, at 2. In a remarkable example of legislative oversight, Congress defunded the Commission, directly terminated those

34

rulemaking proceedings, and forbade the Commission from undertaking rulemakings on those subjects. *See supra*, at 9-13. Congress made its intent to scale back the agency's rulemakings crystal clear, stating that "[t]he children's advertising proceeding . . . shall not proceed further," and "the Commission shall not develop or promulgate any trade rule or regulation with regard to . . . the standards and certification" of goods and materials or children's advertising. Pub. L. No. 96-252, §§ 7, 11, 94 Stat. 374, 376, 379 (1980). Yet this Rule is exactly like those discredited regulations: "overly broad," "far reaching," and extending across multiple industries throughout the economy. S. Rep. at 96-500, at 2-3.

The rules that Congress did *not* block only confirm the point. All of the Commission's surviving rules from that era were limited to specific industries like home insulation, ophthalmic practices, or funeral homes. *See* S. Hrg. 111-647, at 61-63; *see supra*, at 9-10, 12-13. Even the broadest rules issued under Section 18 before the past few years were limited to either the financial industry or the franchising and business opportunity industries. *See* 16 C.F.R. pts. 436, 437, 444.

In fact, the Commission itself has recognized as much over the years. In the 1990s, then-Commissioner Varney discussed how

35

Magnuson-Moss restricted the Commission "from proposing or imposing regulatory burdens on industry." *Ask the Commissioner*, *supra*, 14 No. 2 ACCA Docket at 36. In 2010, then-Chair Leibowitz stated to Congress that the Commission's rules might "establish clear standards for industry." S. Hrg. 111-647, at 59. Even today, the Commission states on its website that it has authority "to issue industry-wide regulations," and lists its Section 18 rules under specific industry headings. *Rulemaking*, FTC.gov (last accessed Feb. 14, 2025), https://www.ftc.gov/enforcement/rulemaking; *Legal Library: Rules*, FTC.gov (last accessed Feb. 14, 2025), https://www.ftc.gov/legal-library/browse/rules.[4] Yet not one of its industry headings captures this economy-wide Rule.

Congress has legislated on that assumption as well, providing the Commission with separate rulemaking powers over, *e.g.*, car dealers, energy labeling, and fair credit reporting. 12 U.S.C. § 5519(d); 42 U.S.C. § 6294(b)(2); 16 C.F.R. ch. I, subch. F. Those statutes are likewise limited

---

[4] For example, the Commission's website lists the Credit Practices Rule under the "Finance" industry. *Legal Library: Rules*, FTC.gov, *supra*. But the Commission has not listed this Negative Option Rule under any industry heading. *Id.*

Appellate Case: 24-3137     Page: 49     Date Filed: 02/19/2025 Entry ID: 5487347

to specific industries, with varying requirements, confirming again that Congress has consistently wanted the Commission to issue rules no wider than on an industry-by-industry basis and with customized standards for individual industries.

Yet after decades of almost no use, and notwithstanding Magnuson-Moss's strict limits, the Commission is suddenly asserting that Section 18 is really a license to regulate a billion contracts used by 220 million Americans for everything from their home security to their meal-delivery services. *Accord NFIB v. Dep't of Lab.*, 595 U.S. 109, 119-20 (2022) (per curiam) ("OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind . . . . This lack of historical precedent, coupled with the breadth of authority that the Secretary now claims, is a telling indication that the mandate extends beyond the agency's legitimate reach." (quotation marks omitted)). Just take the Commission's own words: the Rule will "establish a common set of requirements applicable to all types of negative option marketing," across "all media" and in "nearly every economic sector." App.394 (Add.11). Yet

Appellate Case: 24-3137    Page: 50    Date Filed: 02/19/2025 Entry ID: 5487347

both Congress and the Commission had recognized for decades that vast, economy-wide rules are exactly what Section 18 prohibits.[5]

Congress's use of the word "specificity" is therefore a critical limitation on the scope of the Commission's rulemaking power under Section 18. Its plain meaning requires the application of rules to a "particular individual or group," which in the context of Section 18 means on an industry-by-industry basis. *Specificity*, Webster's, *supra*, at 2187. Any broader interpretation of Section 18 would permit the Commission to play games with the level of generality in its rules, looking for just the right gossamer thread to unite however many contracts, advertisements, or practices that it wants to regulate. "[T]aken to its logical conclusion," almost anything "could be considered unfair" under the Commission's

---

[5] As other agencies have suddenly discovered such similarly expansive authority, the Supreme Court has repeatedly cautioned that courts must "hesitate before concluding that Congress" conferred an "[e]xtraordinary grant[] of regulatory authority" in a "rarely . . . used" or "vague" statute. *West Virginia v. EPA*, 597 U.S. 697, 723-25 (2022) (cleaned up); *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023). And as particularly relevant here, courts must be even "more hesitant to recognize" such expansive powers "against a backdrop of an agency failing to invoke them previously." *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 297 (4th Cir. 2023).

Appellate Case: 24-3137    Page: 51    Date Filed: 02/19/2025 Entry ID: 5487347

approach. *See* S. Rep. 96-500, at 2 (rejecting that approach). That's not what Section 18 allows.

At a minimum, a Rule that is broader than all of Congress's statutes addressing allegedly unfair and deceptive subscriptions combined is surely not "specific." Congress is not bound by any "specificity" limit, yet even that body has never lumped all recurring subscriptions together like the Commission did here. Instead, Congress has mostly targeted specific industries that use recurring subscriptions, such as cable and broadband providers, or electronic fund transfers. 15 U.S.C. § 1693c; 47 U.S.C. §§ 562, 1753. At its broadest, Congress has regulated recurring subscriptions only over a specific medium: the internet. 15 U.S.C. § 8403. But even that statute is narrower than the Rule. If Congress never treated recurring subscriptions as a single category subject to the same restrictions when it enacted these statutes, then the Rule can't do so within Section 18's "specificity" limit.

### 2. The Rule Is Impermissibly Vague

The Rule also fails the "specificity" requirement because it is replete with vague and ambiguous standards. The effect of those amorphous standards is an end-run around Section 5 of the FTC Act, giving a case-

39

by-case enforcement power to impose civil penalties without complying with Section 5's protections.

To be specific, a rule must be "free from . . . ambiguity." *Specific*, Webster's, *supra*, at 2187; *see also, e.g.*, *Katharine Gibbs Sch.*, 612 F.2d at 662 (forbidding "possible future violations of [a rule's] remedial requirements" is not specific). But to capture the myriad different contracts that the Rule covers—including contracts between businesses—the Rule self-consciously adopts "flexible . . . standards" that will need to be defined on a case-by-case basis. App.394 (Add.11).

In many places, the Rule leaves key terms undefined altogether. The requirement for an "easy" or "simple" cancellation, for example, does not define those vague standards. Rule § 425.6(b). Although the Rule claims to offer some "minimum" requirements for a "simple" mechanism, it never says whether complying with those requirements is sufficient to avoid liability. *Id.* § 425.6(c). And even those minimum requirements ultimately refer to the same "easy" standard as well. *Id.* What is "easy" may differ from context to context, and company to company. Companies will need to guess whether scrolling down a webpage requires too much effort to be "easy," or whether their identity verification procedures are

too difficult to be "simple," among countless other judgment calls. Because the Rule covers so many contracts, that guesswork will take wildly different forms for companies offering everything from medical monitoring to internet broadband.

The Rule's definition of "Material fact" is even less helpful. Under the Rule, it means anything "likely to affect a person's choice of, or conduct regarding, goods or services." Rule § 425.2. The Rule incorporates that definition both when banning misrepresentations of any "Material fact" and when requiring disclosures of any "Material" terms—including terms and facts that are about the underlying good or service (or other unspecified terms) that have *nothing* to do with the recurring subscription feature. *Id.* §§ 425.3, 425.4(a). That critical definition is anything but specific. By the Commission's own telling, whether any given term in any particular contract is "Material" will "vary" depending on the term and contract at issue. App.393 (Add.10). Companies offering goods and services as varied as cloud computing storage and pet meal deliveries will thus need to guess as to whether the Commission will believe that any particular terms or facts are likely to affect their customer's choices. Are facts about the ethical sourcing of pet

41

food likely to influence customer's choices? Do cloud computing subscriptions need to disclose the location of their data servers? The Rule itself offers no guidance.

Another vague standard is the Rule's prohibitions on information that "interferes with, detracts from, contradicts, or otherwise undermines" the required disclosures or consent mechanism. Rule §§ 425.4(b)(3), 425.5(a)(2). The broad phrasing and catch-all language proscribe a wide swath of information, and regulated sellers lack sufficient notice of what specific information is prohibited. Companies again will need to guess as to whether any particular statement "detracts from" or somehow "undermines" a required disclosure—or whether the Commission will later view their statements as violating those amorphous standards.

The upshot of these fuzzy standards is "a back-door effort at obtaining civil penalties in any industry where" recurring subscriptions are used. App.451 (Add.68). Because the Rule issued under Section 18, the Commission can enforce it directly in court and seek penalties of more than $53,000 per violation. 15 U.S.C. § 45(m). The tradeoff for that power, however, is the requirement that prohibited conduct be defined

42

with specificity so that regulated parties know in advance what is required of them. Here, the Commission promulgated a rule designed to proscribe the broadest reach of commerce and retain the maximum discretion for enforcement staff. *See* App.394 (Add.11) (the Commission "eliminat[ed] the old Rule's prescriptive requirements applicable to prenotification plans and replac[ed] them with flexible, but enforceable, standards" applicable to "all forms of negative option marketing . . . in all media . . . over nearly every economic sector"). Section 18 abolished this style of Commission rulemaking.

If the Commission wanted to define unfair or deceptive conduct on a case-by-case basis, it was obligated to proceed under Section 5—not Section 18. Under Section 5, the Commission must go through an administrative and judicial review process before it can even try to hold companies liable—all of which ensures that the Commission gives notice to companies before imposing penalties under this broad grant of authority. 15 U.S.C. § 45(a), (c), (*l*); *see also AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 72-73 (2021). But if the Commission issues a *rule*, Section 18 requires that the rule be precise and clear to ensure that the Commission does not obtain a Section 5 power without following Section

43

5's safeguards.  Here, because the Rule lacks the requisite "specificity" and further constitutes an end-run around Section 5, it must be vacated.

## B.   The Rule Violates The "Prevalence" Requirement.

The Rule independently must be vacated because it exceeds Section 18's "prevalence" requirement.   That requirement applies to all the practices that any given rule deems unfair or deceptive.   Here, the Commission claims that there are prevalent unfair or deceptive practices regarding recurring subscriptions across the economy, including both consumer and business-to-business subscriptions, despite the existence of these commonplace contracts for well over a hundred years.  *See supra*, at 14-15.  But extraordinary claims of prevalence require extraordinary proof.  The Commission has not come close to that showing.

When this requirement was added in 1994, "prevalence" meant (and still means) "widely or commonly occurring," *Prevalent*, American Heritage College Dictionary 1084 (3d ed. 1993), "existing very commonly," *Prevalent*, Cambridge International Dictionary 1102 (1995), or "dominant," *Prevalent*, Merriam-Webster.com.  Section 18 contains two prevalence requirements: *First*, the Commission is permitted to issue a notice of proposed rulemaking only if "it has reason to believe that the

44

unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." 15 U.S.C. § 57a(b)(3); *see also id*. § 57a(b)(3)(A)-(B) (limiting any finding of prevalence to situations where the Commission "has issued cease and desist orders regarding such acts or practices" or there is a "widespread pattern" of unfair or deceptive practices). *Second*, when issuing a final rule, the Commission must issue a statement of basis and purpose that includes "a statement as to the prevalence of the acts or practices treated by the rule." *Id.* § 57a(d)(1)(A). By its plain text, Section 18 thus requires a Rule that regulates more than a billion existing contracts to be supported by evidence of not just the existence but the dominance of the targeted unlawful practice across all of the particular trade sectors being regulated. *Id.* § 57a(b)(3), (d)(1)(A).[6] Yet again, the Commission has not come close to that showing.

---

[6] The Commission has asserted that the Court cannot review the prevalence requirement. FTC Stay Opp. at 12. But Section 18 precludes judicial review only of the "contents and adequacy" of the statutorily required "statement of basis and purpose"—and Petitioners don't challenge that statement. Rather, Petitioners challenge *the Rule* as contrary to law because the Commission has not met the prevalence requirement, and Section 18 expressly permits reference to the Commission's reasoning when reviewing the Rule for legal excesses, insubstantial evidence, or arbitrary rationales. 15 U.S.C. § 57a(e)(3); *Am. Optometric Ass'n v. FTC*, 626 F.2d 896, 906 (D.C. Cir. 1980). At a

Appellate Case: 24-3137    Page: 58    Date Filed: 02/19/2025 Entry ID: 5487347

To start, the Commission has identified at most a handful of examples of unfair recurring subscriptions for some of the sectors that the Rule covers. For example, the Commission cites only *four* examples of allegedly unfair or deceptive recurring subscriptions between businesses. App.397 (Add.14). Yet the Rule will cover *all* these subscriptions, including those sold by newspapers to libraries; by internet companies to Fortune 500 companies; by lawn companies to commercial office parks; and by security companies to sports arenas.

Similarly, the Commission cites *one* example of a supposedly unfair lawncare subscription and *four* examples of supposedly unfair newspaper subscriptions. App.392, 420 (Add.9, 37). The Commission cites only a handful of discrete examples for other industries—not a widespread pattern or dominant practice. *E.g.*, App.389-392 (Add.6-9). And for many industries that will be covered by the Rule, such as pet food or medical monitoring, it cites no examples at all.

Even if the Rule were limited to one of the industries for which the Commission had some examples (and thus was "specific"), those

---

minimum, the required prevalence finding in the NPRM has nothing to do with the required statement of basis and purpose. 15 U.S.C. § 57a(b)(3).

Appellate Case: 24-3137    Page: 59    Date Filed: 02/19/2025 Entry ID: 5487347

examples would surely be insufficient because they fail to establish that the challenged practices are widely or commonly occurring or dominant even within a single industry. Yet the Rule will regulate *all* recurring subscriptions in *all* of these industries. That ignores Section 18's prevalence requirement.

To create the illusion of prevalence, the Commission refers to "at least 35" enforcement actions it has taken, a smattering of state enforcement actions and private lawsuits, and a couple of comments about "free trials" that many recurring subscription providers don't offer. App.389-91 (Add.6-8). But the Commission might as well have said that its cases and complaints "involving the internet means that the entire internet should be the subject of a Section 18 rulemaking." App.451 (Add.68). Even crediting the Commission's examples, they amount to a tiny fraction of the billion-plus subscriptions that the Rule will govern. And the Commission does not even attempt to justify the Rule's application to any particular industry, preferring instead to extrapolate from these few examples. App.385, 391-91 (Add.2, 8-9). That is far too slapdash to satisfy the prevalence requirement that is meant to cabin the Commission's rulemaking authority. If prevalence in Section 18 means

47

anything, it must at least mean that the deceptive act or practice is a dominant occurrence in *each sector* of the economy that the FTC is regulating.

Even the few examples that the Commission *did* muster don't hold up on closer inspection. Most of the Commission's own enforcement actions settled, so there was no adjudicated finding of liability.[7] Most also involved an alleged violation of ROSCA, the EFTA, or state law, so there's no reason to think an additional rule was needed to address those particular cases. And similar problems plague the Commission's references to unverified consumer complaints or class actions. *See* App.389, 392 (Add.6, 9). Even if these citations somehow could encompass a statistically significant number of recurring subscriptions (they don't), the Commission never bothers to verify any of these complaints or tie them to any specific practice. The Commission's

---

[7] *E.g.*, *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *FTC v. WealthPress, Inc.*, No. 3:23-cv-00046 (M.D. Fla. 2023); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. Credit Bureau Ctr., LLC*, No. 1:17-cv-00194 (N.D. Ill. 2017); *FTC v. NutraClick, LLC*, No. 2:16-cv-06819 (C.D. Cal. 2016); *FTC v. Pact, Inc.*, No. 2:17-cv-1429 (W.D. Wash. 2017); *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. 2017); *FTC v. BunZai Media Grp., Inc.*, No. 2:15-cv-04527 (C.D. Cal. 2015); *FTC v. RevMountain, LLC*, No. 2:17-cv-02000 (D. Nev. 2017).

48

"prevalence" findings are thus no more than *ipse dixit* on a remarkably thin record.

The Commission's insistence that there are "prevalent" problems with recurring subscriptions is a symptom of its lack of specificity when defining the problem "at the highest level of generality" in the first place. App.451 (Add.68). The Commission *has* to extrapolate from small sample sizes or studies focused on only particular examples of problems because it would be a herculean task to actually document prevalence for all of the different contracts, practices, and industries that the Rule covers. And by covering practices as generalized as "misrepresentations," or contracts that are not "easy" to cancel, the Commission can reverse-engineer Section 18 to fit whatever it pleases. By saying, for example, that the relevant problem is contracts that are not "easy" to cancel, the Commission sets itself up to find problems everywhere. But Congress demanded more. The Commission cannot bootstrap prevalence from its own lack of specificity.

## C. The Rule Overrides Numerous Federal Statutes That Already Regulate Recurring Subscriptions.

The Rule's invalidity is confirmed by Congress's other statutes regarding recurring subscriptions. That is because the Rule second-

49

guesses Congress's judgment about what practices are lawful and unlawful for those recurring subscriptions, harkening back to the agency's efforts to sit as a super-legislature.

*First*, the Rule is *broader than any of Congress's regulations of recurring subscriptions*. Congress has provided separate rules for subscriptions offered by telemarketers, cable, broadband, and electronic fund transfer providers, as well as those offered online. *See* 15 U.S.C. §§ 1693c (EFTA), 6102 (Telemarketing Act), 8403 (ROSCA); 47 U.S.C. §§ 562 (cable), 1753 (broadband). Yet in one fell swoop, the Rule would add additional requirements to all of those different subscriptions, as well as subscriptions that Congress has never regulated—such as security or medical monitoring subscriptions offered over the telephone or in person. There is little reason to think Congress would have gone to this trouble if it believed the Commission were authorized to do this.

*Second*, the Rule *nullifies Congress's customized regulations for particular recurring subscriptions*. For example, the 2021 Infrastructure Act requires a "consumer label[]" for broadband subscriptions that includes a discrete list of terms, including the monthly price, download speed, and upload speed of the service. 47 U.S.C. § 1753(a); FCC Public

50

Notice, DA: 16-357. The EFTA, however, requires electronic funds transfers to disclose *different* terms, such as the consumer's right to stop payment and receive documentation of the transfers. 15 U.S.C. § 1693c(a)(5)-(6). Similarly, the EFTA provides that consumers can stop a fund transfer three days *before* the transfer occurs, *id.* § 1693e(a), but the Television Viewer Protection Act provides that consumers can cancel a cable or satellite TV subscription within 24 hours *after* they receive a copy of required disclosures, 47 U.S.C. § 562.

The Rule would wipe out all of those differences in one fell swoop. Overnight, all the recurring subscriptions already governed by those customized statutes will suddenly face a new, one-size-fits-all Rule that requires more than Congress ever required. For example, this new Rule will mandate disclosing all material terms—not just the list of terms that Congress detailed for certain transactions—and a cancellation requirement that is more restrictive than even the requirement that Congress imposed in ROSCA just for online subscriptions. *See* 15 U.S.C. § 8403 (requiring a "simple" cancellation mechanism, without any same mechanism requirement or limits on customer interaction). And the Rule would deem all these businesses to be engaged in unfair or deceptive

51

practices even if they comply with all of Congress's specific requirements. That is precisely the sort of power-grab that Section 18 is meant to prevent.

### D. The Rule Contravenes The Nondelegation Doctrine.

The statutory violations are plain on their face. Were there any doubt, however, the nondelegation doctrine would resolve it. Under that doctrine, Congress must have "supplied an intelligible principle to guide" the Commission's "use of discretion." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.). Although Congress has prohibited use of an "unfair or deceptive act or practice," 15 U.S.C. § 45(a)(1), (n), that standard does not help when the Commission is overriding Congress's own judgments as to what practices cross the line. That's what this Rule does: it decides that recurring subscriptions are unfair or deceptive even if they comply with statutes, like ROSCA, that already declare certain practices to be unfair or deceptive. *Id.* § 8403. If the Commission has authority to override Congress's judgments, it surely needs a more definitive principle on when to do so.

At a minimum, the Court should construe Section 18 to "avoid[] [the] kind of open-ended grant" of authority that affirmance of the Rule

52

would require.  *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality op.); *see also Fort Worth & Denver Ry. Co. v. Lewis*, 693 F.2d 432, 435 (5th Cir. 1982).  Were the Rule authorized by Section 18, then it would surely raise "the type of non-delegation concerns that Section 18's guardrails were meant to prevent."  App.451 (Add.68); *see also Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 461 (8th Cir. 1999).  When faced with such problems, this Court has consistently construed statutes to "avoid" them where possible. *Planned Parenthood*, 167 F.3d at 461; *see also Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1031-32 (8th Cir. 2014).  Here, a reading that avoids these problems is not only possible, but the most straightforward interpretation of Section 18's plain text, as understood by Congress and the Commission itself for decades.  Section 18 allows for only industry-wide rules that specifically regulate prevalent unfair or deceptive practices—a narrow authority that does not risk overriding Congress's judgments.  This Rule exceeds that authority.

*     *     *

All of these problems would have been avoided if the Commission had adhered to the substantive strictures that Congress imposed on

Section 18. The Commission could have attempted to promulgate specific rules with concrete terms that are tailored to particular industries, just as Congress intended in the Magnuson-Moss reforms. But the Commission overreached. This Rule exceeds the Commission's statutory authority under Section 18 of the FTC Act.

## II. The Commission Violated A Key Procedural Requirement By Failing To Issue A Preliminary Regulatory Analysis.

The Rule's excesses may have been caused in part by the Commission's failure to follow a critical procedural step that is fatal under the FTC Act: issuing a preliminary regulatory analysis that the public could comment on. 15 U.S.C. § 57b-3(b)(1). Congress added that procedural requirement in response to the Commission's prior attempts to issue sweeping regulations under Section 18, such as the rules banning television advertising to children or the standards for the weights and measures of goods. Pub. L. No. 96-252; *see supra*, at 9-10. In doing so, Congress meant to help focus and shape the Commission's rulemakings, "curtailing serious adverse effects" of potential rules. S. Rep. 96-500, at 29.

The Commission accordingly "*shall* issue a preliminary regulatory analysis" whenever it estimates that a rule will affect the economy by

Appellate Case: 24-3137    Page: 67    Date Filed: 02/19/2025 Entry ID: 5487347

$100 million or more annually. 15 U.S.C. § 57b-3(a)(1)(A), (b)(1) (emphasis added); *see also Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("shall" is "mandatory"). The analysis must describe alternatives to the rule and set forth a preliminary cost-benefit analysis of both those alternatives and the proposed rule. 15 U.S.C. § 57b-3(b)(1). The Commission must then provide a "public comment period in response to the preliminary regulatory analysis" before issuing a "final regulatory analysis" that responds to those comments. *Id.* § 57b-3(b)(2)(E). Through that process, Congress meant to "aid the Commission in shaping its rules in a manner that will reduce the burdens of regulation on business." S. Rep. 96-500, at 9.

Here, the Commission concedes that the Rule will affect the economy by $100 million or more annually. App.425 (Add.42). Yet the Commission also concedes that it didn't issue a preliminary regulatory analysis. FTC Stay Opp. at 15-16. Under the statute's plain terms, that "fail[ure] entirely to prepare a regulatory analysis" means that the Rule must be "set aside." 15 U.S.C. § 57b-3(c)(1); *see also id.* (referring to "any regulatory analysis").

The Commission tries to dodge this straightforward conclusion by insisting that it issued a *final* regulatory analysis. FTC Stay Opp. at 15-16. But that's no substitute for the process that Congress required—which mandates a *separate* preliminary regulatory analysis that the public can review and comment on. That separate preliminary analysis is a critical tool that allows the public to comment on the costs and benefits of alternatives to the proposed rule, helping the Commission narrow or shape the rule. Here, for example, the public never got the chance to point out that the Commission's cost-benefit analysis missed several significant costs that the Rule will impose while overstating its benefits. Nor did the public get the chance to engage with the Commission's cost-benefit analyses on potential alternatives that may have achieved the same goals in a less costly manner.

The final regulatory analysis doesn't make up for those shortcomings. Among other things, it doesn't need to contain an analysis of the costs and benefits of alternatives to the rule, and it skips entirely the public's ability to comment on the preliminary analysis. *See* 15 U.S.C. § 57b-3(b)(1)-(2); S. Rep. 96-500, at 3 (the process "require[s] the Commissioners to more carefully weigh the relationship between the

56

alleged unlawful conduct and the proposed remedy" and "carefully analyz[e]" all available "options"). Indeed, the Commission's discussion of alternatives to the Rule in the final regulatory analysis consisted of three paltry paragraphs with only two alternatives, one of which was to terminate the rulemaking altogether. App.426 (Add.43). The Commission cannot shirk its statutory duty and shortchange the public like this.

The Commission has also suggested that it didn't need to issue a preliminary regulatory analysis because, when it issued the NPRM, it hadn't yet realized that the Rule would affect the economy by $100 million or more. FTC Stay Opp. at 15-16. But that's no excuse. The statute requires a preliminary regulatory analysis for "*any* case in which the Commission publishes notice of a proposed rulemaking" of a rule that will have these effects. 15 U.S.C. § 57b-3(b)(1) (emphasis added). The Commission certainly issued an NPRM and not long after realized that the Rule will affect the economy by $100 million or more annually. App.26, App.143, App.179, App.381. Once the Commission understood this economic impact, it was obligated to issue a preliminary regulatory analysis for public comment. 15 U.S.C. § 57b-3(b)(1), (2)(E). Nothing in

57

the statute requires that the preliminary regulatory analysis appear alongside the NPRM.

Regardless, the Commission *should have* known the likely costs of the Rule based on its sheer scope. And it *would have* known those costs if it had accurately described the "area of inquiry under consideration" and the "objectives which the Commission seeks to achieve" in the ANPRM—rather than its severely downplayed ANPRM that elicited only 17 comments. *See supra* at 18-19; App.167. If the Commission had been up front that it was considering an economy-wide rule that encompassed all recurring subscriptions everywhere, it certainly would have received additional comments on the expected costs of an economy-wide rule and the actual number of businesses affected by the Rule. *See supra*, at 18-21 & n.2. And the Commission then could have turned square corners, issuing a preliminary regulatory analysis in 2023 and responding to public comment on it in the final rule. But instead, the Commission skipped an important step in the notice and comment process.[8] *Accord*

---

[8] In the same vein, the Commission also skipped a mandatory procedural step when it "precluded disclosure of disputed material facts which was necessary for fair determination . . . of the rulemaking proceeding taken as a whole" by refusing to hear multiple disputed issues of material fact

Appellate Case: 24-3137     Page: 71     Date Filed: 02/19/2025 Entry ID: 5487347

*Nat'l Auto. Dealers Ass'n*, 2025 WL 304460, at *8 (vacating the CARS rule for failing entirely to issue an ANPRM).

In any event, the Commission's initial claim that the Rule would not affect the economy by $100 million or more annually was specious even with the record it had. As the ALJ later found, the Commission's initial cost estimate was "clearly unrealistically low"—because at least *80%* of affected businesses would already have to be in *full compliance* with the Rule for the Commission's claim to hold water. App.382. If so, then the Rule would be tilting at windmills. *Id.* But the Commission insisted that the Rule is needed because of supposedly prevalent problems with recurring subscriptions. App.35. The Commission's attempt to have it both ways in the NPRM would be arbitrary and capricious and require vacatur. *See Firearms Regul. Accountability Coal., Inc.*, 112 F.4th at 519-20 (agency actions are arbitrary and capricious if they are "internally inconsistent").

And again, once the ALJ settled the question that the proposed rule would "have an annual effect on the national economy of $100,000,000 or

---

raised by the public and restricting the public's ability to participate in the informal hearing mandated by Magnuson-Moss. 15 U.S.C. § 57a(b)(1)(C), (c)(2), (e)(3)(B).

Appellate Case: 24-3137     Page: 72     Date Filed: 02/19/2025 Entry ID: 5487347

more," the Commission should have performed the then-triggered requirement to issue the preliminary regulatory analysis and make it available for public comment before adopting the Rule. 15 U.S.C. § 57b-3(a)(1)(A), (b)(1). The Commission's failure to do so by itself requires vacatur of the Rule. *Id.* § 57b-3(c)(1).

## III. The Rule Is Arbitrary And Capricious.

The Rule should be vacated for the independent reason that it is arbitrary and capricious. *See* 15 U.S.C. § 57a(e)(3) (incorporating 5 U.S.C. § 706(2)(A)). Agency rules are arbitrary and capricious when the agency has "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or offered an explanation that is simply "implausible." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). At bottom, the Commission must have provided "a satisfactory explanation for its action" for the Rule to survive. *Ohio v. EPA*, 603 U.S. 279, 292 (2024). But the Commission did not make that showing here. The Commission failed to grapple with multiple problems that this vast

Appellate Case: 24-3137     Page: 73     Date Filed: 02/19/2025 Entry ID: 5487347

Rule will create while contradicting itself in its rush to issue the Rule right before the election.

The Rule's cancellation requirement illustrates the problems. Rule § 425.6. The obligation to ensure that cancellation is "as easy to use as" the sign-up mechanism and over the "same medium" as sign-up might sound simple enough, but the reality is far more complex. Because the Rule is so broad, it encompasses many instances where that requirement is unworkable and counter-productive. In the security services industry, for example, whenever someone tries to cancel a security service, the service needs to ensure that the correct person is cancelling and that they are not doing so by mistake. *See, e.g.*, App.88, App.190-91; Stay App.153-55. These are real-world problems; many companies need to ensure that malicious actors are not wrongfully cancelling a security, fire, medical, or other sensitive service. But if the service allowed a customer to sign up by an email contract or similar online mechanism, then the Rule would restrict the company in having a representative speak with the customer to verify the customer's identity, ensure that their email wasn't hacked,

61

or confirm that cancellation is desired before terminating their service. *See* Rule § 425.6(c)(1); App.88; App.190-91; Stay App.153-55.

The Commission promises it will allow for reasonable verification at cancellation, App.414 (Add.31), but that is cold comfort. The Commission did not place that assurance in the Rule's text, and elsewhere the Commission warns that "a final Rule-compliant online cancellation should take no more than 30 seconds to one minute," App.428 (Add.45), so the Commission has made clear that companies are now under a ticking stopwatch. Companies will be chilled from taking important steps to protect their customers under the Rule. App.88, App.190-91; Stay App.153-55. The Commission also has said that "reasonable verification" cannot lead to "asymmetrical experiences" and that cancellation must be over the "same medium" as sign-up—all of which would, as noted, prevent the email sign-up company above from having the customer talk to a representative or provide another form of verification before cancelling. The Commission never addressed those problems.

Similarly, the Commission never adequately addressed how companies can make cancellation as easy as sign-up for bundled services.

62

With bundled services, a customer can sign up for multiple services at once, often for a discounted price—such as a cable and internet bundle, or a gym membership and spa services combo. Because such discounted bundles are popular, companies often make them easy to sign up for; customers just pick a pre-arranged bundle and sign up online. App.114-15, 132. But what if the customer wants to cancel only *one* of the bundled services? The company might need to interact with the customer to explain the impact on the price or availability of the remaining service. *See, e.g.*, App.131-32.

Yet under the Rule, the company cannot do so unless the customer consents. Rule § 425.6(c)(2). Companies are similarly hindered in their ability to describe lower cost options or alternative services when a customer, without knowing what they are missing, declines a live interaction. App.133-34. Notably, none of these problems occurs under the statutes that Congress enacted. ROSCA, for example, requires a simple cancellation mechanism but still allows companies to have customer representatives conduct adequate verification of, and convey important information to, customers wishing to cancel. *See* 15 U.S.C. § 8403. Despite creating these problems, the Commission simply swept

63

them under the rug, making it harder for consumers to get beneficial information. App.418 (Add.35).

The Rule's requirement that companies obtain consent to the recurring subscription feature "separately from" the rest of the transaction is also arbitrary and capricious. Rule § 425.5. For almost all contracts, this requirement will necessitate two different consents: one for the recurring subscription (as required by the rule), and one for the rest of the transaction (as required by contract law). *See* Restatement (Second) of Contracts § 18 (1981) (contracts require mutual assent). The Commission effectively conceded as much, stating that recurring subscription features are not themselves "a product or service." App.410 (Add.27).

Yet a two-step requirement will be costly and prove near-impossible for many industries, such as lawn care services that customers often request on an informal basis. Stay App.408; *see also* App.191. The Commission conceded this point as well, stating that a two-step consent requirement is "unnecessary, potentially confusing, and may be hard to implement" and removing an express two-step consent requirement from the Rule. App.410 (Add.27). But at the same time the Commission

64

acknowledged in a footnote that the Rule effectively requires two-step consent anyway. App.410 n.350 (Add.27 n.350). The Commission obviously has not grappled with this important aspect of the problem. *See State Farm*, 463 U.S. at 42.

The Commission was also arbitrary and capricious in its adoption of the definition of "Material." First, the Commission contradicted itself when approaching that definition. In some places, the Commission asserted that it was providing "clarity" to companies by defining "Material" as "likely to affect" a consumer's choices. App.401 (Add.18). But elsewhere, the Commission insisted that it needed to leave the definition of "Material" vague because more concrete guidance would "make its rules no better than a leaky sieve," unable to address the "vary[ing]" terms that might matter to different contracts. App.393 (Add.10). The Commission cannot have this both ways. The Rule either provides clarity and guidance (as Section 18 requires), or it is malleable and open-ended (which the Rule is). That contradiction was arbitrary and capricious. *See Firearms Regul. Accountability Coal., Inc.*, 112 F.4th at 519-20 (agency actions are arbitrary and capricious if they are "internally inconsistent").

Appellate Case: 24-3137    Page: 78    Date Filed: 02/19/2025 Entry ID: 5487347

Second, the Commission was arbitrary and capricious by extending the scope of materiality far beyond the recurring subscription features that it said was the problem at issue. Again, the Rule requires disclosures of "all Material terms"—including terms that have nothing to do with the recurring subscription feature (ranging from, say, calorie content to carbon emissions). Rule § 425.4; *see also id.* § 425.3. But the Commission has never justified regulating statements about the underlying good or service, or even the company, that are untethered from the recurring subscription. That mismatch between the Commission's stated goals and the scope of the Rule is illogical.

## IV. The Rule Should Be Vacated.

Because of the Rule's manifold defects, the Court should vacate it in its entirety. Section 18 itself directs that courts "*shall* hold unlawful and set aside the rule" if it is contrary to law, arbitrary and capricious, or procedurally defective. 15 U.S.C. § 57a(e)(3) (emphasis added). That text requires that "[i]n *all* cases," unlawful "agency action *must* be set aside." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (emphases added).

Accordingly, when this Court has found an agency rule to be unlawful, it has "vacated" it, whether for substantive or procedural error. *North Dakota v. EPA*, 730 F.3d 750, 764 (8th Cir. 2013); *see Iowa League of Cities v. EPA*, 711 F.3d 844, 875-76 (8th Cir. 2013) (vacating rule that was issued "without observance of procedure required by law"); *see also Nat'l Auto. Dealers Ass'n*, 2025 WL 304460, at *8 ("vacat[ing] the [Commission's] CARS Rule" for failure to issue ANPRM). The legal violations here—including the lack of statutory authority, failure to follow statutorily required procedures, and failure to grapple with multiple problems that this overbroad Rule will create while contradicting itself—are serious and fundamental, and each serve as independent bases for this Court to vacate this Rule too.

## CONCLUSION

On a rushed election-year schedule, the Commission blew past the uniquely restrictive limitations on its rulemaking power that Congress imposed in direct response to the agency's past regulatory excesses. This economy-wide Rule that regulates every single recurring subscription in America—regardless of industry, nature of the relationship, or any other rational consideration—exceeds the Commission's authority, fails to

67

satisfy mandatory statutory process, and dispenses with reasoned decisionmaking. For all these reasons, the Court should grant the petitions for review and vacate the Rule.

Dated: February 18, 2025

Respectfully submitted,

*/s/ Helgi C. Walker*
Helgi C. Walker
  *Counsel of Record*
Lucas C. Townsend
Michael Corcoran
Lael D. Weinberger
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, D.C. 20006
(202) 783-8400
edavis@shb.com

*Counsel for Custom Communications, Inc., d/b/a Custom Alarm*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.
777 Gloucester Street
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for the Chamber of Commerce of the United States of America and the Georgia Chamber of Commerce*

68

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE
FLOWERS LLC
P.O. Box. 8248
Cincinnati, OH 45249
(513) 201-5775
bflowers@ashbrookbk.com

*Counsel for Michigan Press Association and the National Federation of Independent Business, Inc.*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

*Counsel for the Chamber of Commerce of the United States of America*

69

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f), it contains 12,698 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook LT.

I further certify that this brief has been scanned for viruses and is virus-free.

Dated: February 18, 2025

/s/ Helgi C. Walker
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

                                         */s/ Helgi C. Walker*
                                         Helgi C. Walker
                                         GIBSON, DUNN & CRUTCHER LLP
                                         1700 M Street, N.W.
                                         Washington, D.C.  20036
                                         (202) 955-8500
                                         hwalker@gibsondunn.com

                                         *Counsel for Petitioners*