Nos. 24-3137 (L), 24-3388, 24-3415, 24-3442, 24-3469

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, *et al.*,

*Petitioners*,

*v.*

FEDERAL TRADE COMMISSION,

*Respondent*.

On Petition for Review of a Rule
of the Federal Trade Commission
(Negative Option Rule, RIN 3084-AB60)

# REPLY OF MAIN STREET ALLIANCE
# IN SUPPORT OF MOTION TO INTERVENE

Kevin E. Friedl
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 894-6035
kfriedl@democracyforward.org

*Counsel for Main Street Alliance*

MSA timely sought intervention to protect its members' interests in upholding the Click-to-Cancel Rule. Those members are uniquely situated vis-à-vis the rule. Small businesses are directly regulated by the rule *and* direct beneficiaries of its protections. And the harms to small businesses from the prohibited unfair and deceptive practices are different in kind from the harms to others. Small businesses are at risk of being trapped in deceptive and unfair negative-option deals *and* they suffer competitive harms when large companies use those tactics to cement their market position or when customers turn down appropriately disclosed recurring deals because of past bad experiences with other sellers.

The parties oppose MSA's motion, but the Court should grant it. MSA has demonstrated that its members have an important interest in the outcome here and are no longer adequately represented. MSA moved to intervene as soon as the need to do so became clear; requiring earlier action would only incentivize unnecessary interventions. And to allow MSA's participation would not slow resolution of this case. Instead, it will assist the Court by guaranteeing full party presentation of all issues relevant to the merits and to any other questions that may arise, such as requests by the parties to delay the rule's implementation.

# ARGUMENT

## I. MSA and its members have important interests at stake in this litigation and standing to protect those interests.

MSA's motion described some of the vital interests its members have here, including the direct economic harms they would suffer if they lost the rule's commonsense protections. Mot. at 7-9. Petitioners do not question those interests. The FTC does, but it is wrong.

The FTC does not dispute that the rule protects MSA's members against unfair and deceptive practices, and it acknowledges that those members "of course have an interest in avoiding scams and not losing business to shady competitors," FTC Opp'n at 12. The FTC claims, however, that a party may not intervene unless the interest it asserts is one "upon which it could seek judicial relief in a separate lawsuit." *Id.* at 18 (quoting *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 840 (8th Cir. 2009)). That is not the law and not a fair reading of the cited decision. *Metro. Sewer* stated that judicial economy is served when intervenors "might otherwise have to bring a lawsuit on their own to protect their interests." 569 F.3d at 840. But the basis of the Court's holding was that the intervenor's claimed interest was "too tangential to the core issues of this enforcement case to establish a right to intervene." *Id.* The Court thus did not announce the rule the FTC imagines. And that rule is contrary to *Cameron v. EMW Women's Surgical Center, P.S.C.*, 595 U.S. 267, 277-78 (2022), which held that a state attorney

2

general had sufficient interest to intervene in a situation in which he could not have protected that interest by filing a separate lawsuit.[1]

The FTC also disputes that MSA has standing to intervene unless it names a particular affected member. FTC Opp'n at 12. While the detailed declaration MSA previously filed should suffice, MSA now submits an additional declaration to satisfy the FTC's stated concern. *See* Hendrickson Decl. (attached).

In disputing MSA's standing, the FTC mischaracterizes MSA's relevant interests. MSA is not pursuing a "generalized grievance" better resolved through "the political process," *contra* FTC Opp'n at 14—no more than are Petitioners. MSA is seeking to protect its small-business members' concrete interest in specific protections provided by a particular agency action against four identified unfair and deceptive practices. The FTC chose to extend those protections to MSA's small-business membership, and they are at risk here. If they were struck down or delayed, the resulting injuries to MSA members—far from being "generalized"— would be all too real and individualized. *Contra id.* at 12. This is a far cry from the undifferentiated interest a business trade association, like all city residents, has in a functioning sewer system. *See Metro. Sewer*, 569 F.3d at 835.

---

[1] The FTC overreads *ACLU of Minnesota v. Tarek ibn Ziyad Academy*, 643 F.3d 1088, 1093 (8th Cir. 2011), in similar fashion, erroneously presenting the Court's explanation why that particular intervenor had standing as a necessary condition for *any* intervenor to have standing. In any event, it is far from clear here—unlike in *ACLU*—that "[the FTC] and the intervenor seek the same outcome." *See id.*

3

The FTC fails to distinguish *National Parks Conservation Ass'n v. EPA*, 759 F.3d 969 (8th Cir. 2014). *See* FTC Opp'n at 13. The fact that *National Parks* involved economic harm to a specific company does not differentiate it from this case, where the outcome threatens economic harm to numerous MSA members. That pocketbook injury suffices to establish both standing and the interest needed to intervene. *See Nat'l Parks*, 759 F.3d at 975-76; *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989 F.2d 994, 998 (8th Cir. 1993) (finding interest to intervene in part because "[t]he result of the litigation … may affect the proposed intervenors' property values").

## II. Without intervention, no party will adequately represent and protect the interests of MSA's members.

Petitioners and the FTC say that MSA can count on the government to protect its interests here. The Court should conclude otherwise.

The existing parties focus on the FTC's defense of the rule prior to January 20, 2025. All that shows, however, is that MSA did not have cause to intervene before then (and that the parties' arguments that MSA should have intervened earlier, *see infra* Sec. III, are disingenuous). And it is notable that in its response, while the FTC discusses the policy benefits of the rule, it never quite brings itself to committing to defend the rule going forward or to contesting future requests to stay its implementation—an easy enough commitment to have offered.

4

Both sides say that a mere change in administration is not enough. MSA's motion, however, is not based simply on that change but on the FTC's specific actions since January 20—including the new chair's steps to overrule decisions previously taken by the full Commission. *See* Mot. at 10-12. The FTC insists (without explanation) that those actions "have nothing to do with this case," FTC Opp'n at 8 n.4, but where the Chair has already taken the remarkable step to overrule prior Commission action, he cannot reasonably be counted on to maintain the agency's prior course with respect to this rule either.

Subsequent events confirm the need to intervene. On February 18, President Trump issued an executive order asserting his direct control over the FTC and other independent agencies. Executive Order 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447 (Feb. 18, 2025). The order states that such agencies "have been permitted to promulgate significant regulations without review by the President." *Id.* at 10447. It establishes White House control over the FTC's budget and rulemakings. *Id.* And it prohibits the FTC from advancing any position in litigation or when issuing rules other than those authorized by the President or Attorney General. *Id.* The order, in short, purports to end the FTC's 110-year history as an independent agency. Consistent with that view, President Trump has already attempted to remove the heads of other independent commissions. *See, e.g.*, Andrea Hsu, *Trump Fires EEOC and Labor Board*

5

*Officials*, NPR (Jan. 28, 2025), https://www.npr.org/2025/01/28/nx-s1-5277103/nlrb-trump-wilcox-abruzzo-democrats-labor. In these circumstances, the existing parties cannot reasonably expect MSA and the Court to just assume—contrary to all evidence and logic—that the FTC will not change course.

In claiming that it represents MSA's interests, the FTC again misconstrues what those interests are. It repeatedly suggests that MSA seeks intervention so that it—not the FTC—can represent "the public interest." *E.g.*, FTC Opp'n at 6. In fact, MSA seeks intervention to represent its members' strong interests in the rule being upheld and implemented on schedule. *See* Mot. at 7-9. While the FTC previously considered defending the rule to be in the public interest, MSA cannot afford to wait and see if that continues to be the agency's view, given concrete indicia of a possible change in position and, as the parties note, the prompt briefing schedule here. MSA's interests, meanwhile, remain the same: upholding the rule. That MSA's interests may be "narrower and more parochial than the government's" shows it is not adequately represented here. *See Entergy Ark., LLC v. Thomas*, 76 F.4th 1069, 1071-72 (8th Cir. 2023).

The FTC's reliance on *FTC v. Johnson*, 800 F.3d 448 (8th Cir. 2015), is misplaced. *See, e.g.*, FTC Opp'n at 2. That case involved an attempt by consumers to intervene in an FTC enforcement action. "[B]ecause the FTC … seeks relief for the same deceptive and unconscionable business practices alleged by the

6

consumers," the Court held, "[t]he consumers have not made the necessary strong showing of inadequate representation." *Johnson*, 800 F.3d at 452 (quotation marks omitted). Here, by contrast, MSA has shown there is no adequate basis to presume that the FTC and MSA will seek the same outcome in this case.

The parties also point to 15 U.S.C. § 56(a)(2), which Petitioners say shows MSA's interests are represented and the FTC claims actually forecloses intervention outright. Pets.' Opp'n at 13-14; FTC Opp'n at 15-16. Even a cursory review of that provision, however, makes clear that it serves to allocate litigation responsibilities as between the Commission and the Attorney General—not as between the FTC and any party that may meet the standard for intervention. Nor is it clear that the FTC will or even can continue to invoke this provision, since it appears to be contrary to President Trump's recent executive order asserting that he and the Attorney General alone have exclusive authority to determine all legal positions taken by the executive branch.

The FTC also appears to forget that MSA has moved to intervene, not to substitute itself for the FTC, and that it is the Court, not the FTC, that will resolve the legal issues in this case. Yes, "[t]he Commission must weigh the costs and benefits of advancing specific arguments." FTC Opp'n at 16. No, that does not mean it will "undermin[e] … the public interest," *id.*, for an intervenor to advance arguments in defense of its own interests in this litigation, arguments that will aid

7

the Court's resolution of the issues before it. The FTC can continue to make its arguments; so should MSA. The Court—not the FTC—will decide.

Lastly, the parties suggest MSA can protect its interests by filing an amicus brief. But that would not be enough. The word limits on amicus briefs would leave MSA unable to articulate a full defense of the rule if the FTC changes course. And amici—unlike intervenors—have limited ability to participate by, for example, addressing motions ancillary to the merits, such as motions to stay the rule, or filing or contesting petitions for further review. *Cf. Mausolf v. Babbitt*, 85 F.3d 1295, 1302 (8th Cir. 1996) (reversing order that denied intervention while allowing amicus participation).

## III. MSA's request to intervene is timely.

MSA moved to intervene within two weeks of the FTC's specific actions demonstrating that the agency could no longer be counted on to represent MSA's interests. *See* Mot. at 10-13. Neither Petitioners nor the FTC suggest that two weeks is too long—nor could they, given this Circuit's precedent to the contrary, *see id.* at 13. Instead, they argue that Federal Rule of Appellate Procedure 15(d)'s time limit with respect to intervention in proceedings to review *orders* should be read atextually as applying to this proceeding for review of a *rule*. And they argue that no good cause exists to extend that time limit because MSA could have and should have intervened earlier. The parties miss the mark again.

8

Petitioners especially devote significant ink and bombast to arguing that it is "frivolous" and "absurd" to suggest the Court should interpret Rule 15(d) according to its clear terms. Pets.' Opp'n at 5-10.[2] Try as they might, however, neither they nor the FTC can transform the word "order" into the word "rule." *See Wilson v. CTW Transp. Servs., Inc.*, 74 F.4th 924, 926 (8th Cir. 2023) ("When a statute is unambiguous, interpretation both begins and ends with the text."). The case citations they accumulate do not help them either, as none actually considered and addressed the issue MSA has raised. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings of this sort … have no precedential effect.").

In any case, and as MSA has explained, the Court need not decide that issue here because even if Rule 15(d) did apply, good cause exists to extend its deadline. *See* Fed. R. App. P. 26(b). The parties do not disagree with MSA or its cited cases that the Rule 15(d) deadline is nonjurisdictional and therefore may be extended by Rule 26(b)'s provisions permitting extensions of time generally. They merely argue there is no good cause because MSA should have sought intervention immediately after the election.

---

[2] Both sides say that to apply Rule 15(d) according to its text would mean that no rule would specifically govern petitions for review of agency regulations. But no rule specifically governs appellate intervention either, *see Cameron*, 595 U.S. at 276, and no one doubts appellate courts' capacity to ably resolve such requests.

9

If MSA were relying solely on the change in presidential administration, this argument might carry force. But MSA is not doing so. Instead, and as explained, specific events since January 20—and even just since MSA's motion—show that MSA can no longer reasonably rely on the FTC to continue defending the rule. The FTC barely engages with these specific events, and Petitioners not at all. And the parties' argument that MSA should have intervened earlier, when the FTC was defending the rule, is contradicted by their own insistence that intervention is impossible so long as the FTC continues to defend the rule. The Court should reject that obvious catch-22. The parties' interpretation would also create perverse incentives for parties to seek to intervene too frequently and too early.

Similarly, Petitioners complain that the case is too far along for intervention. Pets.' Opp'n at 12-13. But the fact that MSA did not participate in the circuit lottery or the assembly of the joint appendix, *see id.*, is irrelevant.

## IV. Intervention will aid—not impede—resolution of this appeal.

The FTC does not allege that intervention will be prejudicial or disruptive. Petitioners do. Yet, for all their thundering that intervention will be "highly disruptive and prejudicial," "burdensome and disruptive," "very unfair," and also "unfair, disruptive, and prejudicial," Petitioners notably fail to identify any actual prejudice, disruption, or unfairness that will result. Pets.' Opp'n at 14-16.

Petitioners claim, implausibly, that they relied on the lack of intervenor in negotiating the administrative record, joint appendix, and proposed briefing schedule. *Id.* at 15. MSA does not seek to change any of those things, however, and its participation does not affect them and will not delay the briefing schedule.

Petitioners complain that answering MSA's motion while preparing their brief has already been an intolerable burden. *See id.* at 15. But Petitioners include some of the most powerful business interests in the country and are represented by experienced and capable counsel. Any burden on Petitioners will be minimal and more than outweighed by the benefit to the Court and to MSA from ensuring a full airing of the issues.

## CONCLUSION

The Court should grant MSA leave to intervene.

Dated:  February 25, 2025                                    Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 894-6035
kfriedl@democracyforward.org

*Counsel for Main Street Alliance*

# CERTIFICATE OF SERVICE

On February 25, 2025, a true and accurate copy of this document was filed electronically via CM/ECF and served on all counsel of record.

*/s/ Kevin E. Friedl*
Kevin E. Friedl

# CERTIFICATE OF COMPLIANCE

This motion complies with the length limit in Federal Rule of Appellate Procedure 27(d)(2). It contains 2,594 words, excluding the portions exempted by Rule 32(f).

*/s/ Kevin E. Friedl*
Kevin E. Friedl

# ATTACHMENT

**Declaration of Corrine Hendrickson,
Sole Proprietor, Corrine's Little Explorers**

Appellate Case: 24-3137     Page: 15     Date Filed: 02/25/2025 Entry ID: 5489217

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, *et al.*,

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent*.

Case No. 24-3137 (L)

## DECLARATION OF CORRINE HENDRICKSON

I, Corrine Hendrickson, declare as follows:

1. I am the owner of Corrine's Little Explorers, a licensed childcare center in New Glarus, Wisconsin. Corrine's Little Explorers is licensed to provide childcare for children from six weeks to 12 years old.

2. I make this declaration as a representative of Corrine's Little Explorers based on my personal knowledge and my review of Corrine's Little Explorers's business records.

3. I founded Corrine's Little Explorers in 2007. I am Corrine's Little Explorers's only full-time employee; Corrine's Little Explorers also has one part-time employee.

4. Corrine's Little Explorers has been a member of the Main Street Alliance (MSA) since 2020, when they expanded into Wisconsin.

5. Like many small businesses, mine operates on thin margins. Even small extra costs can have a big impact—especially when those costs are recurring.

6. My business keeps me busy too. As the center's only full-time employee, I don't have a lot of time to spend on the phone arguing or haggling with another company if they overcharge my business or want to change the terms of a contract. What time I have, I want to devote to the kids I take care of at Corrine's Little Explorers.

7. To help run my small business, I rely on a number of subscription services. These subscriptions continue until I take some action to cancel them. For example, we maintain a Netflix account so that we can play videos for enrichment and education—such as to reinforce foundational concepts like letters, numbers, and shapes—or to inspire the children's creativity through singing and dancing.

8. While I do use some subscription and other recurring services to run my small business, I would like to use more. It would save me time, effort, and money to be able to set up recurring deliveries for the things I need for Corrine's Little Explorers or to switch over our insurance contracts so that they automatically renew. But I purposely don't do that. And the reason I don't is because I don't want to find out later that it's impossible to get out of something, even when the seller decides to raise its prices or changes its terms.

9. I've had bad experiences with these kinds of deals before. For example, I used to have a subscription to the *Wisconsin State Journal* that I used for my small business to stay on top of news about state and federal laws dealing with child care. I signed up for the subscription about a year ago and was able to do so easily online. The price was around $20 a month.

10. Last summer, I got a letter saying that the newspaper was raising the price to about $30 a month. When I went to cancel, I found out I couldn't do it online, even

2

though they had let me sign up that way. They made you call a phone number to cancel though, and call during business hours. Well, I couldn't just drop everything and call because my kids were waking up from their naps. It's not easy finding a time during business hours because that's exactly when I have my hands full running my own business.

11. Even though I didn't want to be paying $30 a month, I was not able to cancel my subscription until last month. That's when I realized that the *State Journal* had started allowing subscribers to cancel online. I think they made that change because of the FTC's rule requiring that sellers make it simple to cancel these kinds of deals.

12. From my perspective as a small-business owner, the FTC rule is important for people like me. I don't have the time and my business doesn't have the money to waste fighting to get out of contracts that are supposed to be voluntary but that are no longer worth it for my business. If this new rule went away, I am sure it would cost me in the end and would cause me to continue to avoid these deals in the future because I know from experience what can happen.

Executed on February 24, 2025

Corrine Hendrickson
Sole Proprietor, Corrine's Little Explorers

3