Nos. 24-3137 (lead case), 24-3388, 24-3415, 24-3442, 24-3469

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CUSTOM COMMUNICATIONS, INC.,
D/B/A CUSTOM ALARM, ET AL.,

    Petitioners,

    vs.

FEDERAL TRADE COMMISSION,

      Respondent.

On Petition for Review of a Final Trade Regulation Rule
of the Federal Trade Commission

# BRIEF OF SERVICE CONTRACT INDUSTRY COUNCIL, AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION, AND CONSUMER CREDIT INDUSTRY ASSOCIATION, *AMICUS CURIAE* IN SUPPORT OF PETITIONERS

Marci V. Kawski
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, WI 53703
608-255-4440
Marci.Kawski@huschblackwell.com

Lisa M. Lawless
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202-3819
414-273-2100
Lisa.Lawless@huschblackwell.com

Attorneys for *Amicus Curiae*, Service Contract Industry Council, American Property Casualty Insurance Association, and Consumer Credit Industry Association

4922-5882-5244

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and 8th Cir. R. 26.1A, *Amicus Curiae*, Service Contract Industry Council, American Property Casualty Insurance Association, and Consumer Credit Industry Association, make the following disclosures:

Service Contract Industry Council ("SCIC") has no parent corporation, and no publicly held company owns 10% or more of its stock.

American Property Casualty Insurance Association ("APCIA") has no parent corporation, and no publicly held company owns 10% or more of its stock.

Consumer Credit Industry Association ("CCIA") has no parent corporation, and no publicly held company owns 10% or more of its stock.

Dated: February 26, 2025.

s/Lisa M. Lawless
LISA M. LAWLESS
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202-3819
414-273-2100
Lisa.Lawless@huschblackwell.com

Counsel for *Amicus Curiae*, Service Contract Industry Council, American Property Casualty Insurance Association, and Consumer Credit Industry Association

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ........................................................... iv

INTEREST OF *AMICUS CURIAE* .................................................. 1

SERVICE CONTRACTS ................................................................ 3

THE NEGATIVE OPTION RULE ................................................... 5

ARGUMENT ................................................................................ 8

    I. As Seen in Service Contracts with Auto-Renew Terms, the
       Negative Option Rule Exceeds FTC Authority Because it
       Fails to Meet Section 18's Specificity and Prevalence
       Requirements. ..................................................................... 11

        A. The Rule is Not Specific to an Industry and Does Not
           Specifically Define the Unfair or Deceptive Practice.... 12

        B. The Prevalence Requirement is not Met Because
           There is not a Widespread Pattern of Unfair or
           Deceptive Practices in Auto Renewal in Service
           Contracts. ..................................................................... 15

    II. Auto-Renew Terms in Service Contracts are not "Unfair"
       Because Consumers Strongly Benefit From Auto-Renew
       Terms and Such Value Outweighs the Minimal Risk of
       Injury From Such Terms. ..................................................... 22

        A. Auto-Renew Terms in Service Contracts are Strongly
           Beneficial to Consumers and to Businesses. ................. 22

        B. The Rule Will Increase Costs For Service Contract
           Companies, Which Will Increase Customer Prices and
           Potentially Reduce Competition. ................................... 26

CERTIFICATE OF COMPLIANCE ............................................... 31

4922-5882-5244

Appellate Case: 24-3137    Page: 3    Date Filed: 02/27/2025 Entry ID: 5490478

CERTIFICATE OF SERVICE ...................................................................... 31

4922-5882-5244

Appellate Case: 24-3137     Page: 4     Date Filed: 02/27/2025 Entry ID: 5490478

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Community Financial Services Association of America, Limited v. Consumer Financial Protection Bureau,*
    51 F.4th 616 (5th Cir. 2022) ............................................................... 25
*Harry & Bryant Co. v. F.T.C.,*
    726 F.2d 993 (4th Cir. 1984) ............................................................... 9
*Katharine Gibbs Sch. (Inc.) v. F.T.C.,*
    612 F.2d 658 (2d Cir. 1979) ............................................................... 9

**Statutes**

15 U.S.C. § 57a(a)(1)(B) ........................................................................ 9
15 U.S.C. § 57a(a)(1)(B), (b)(3), (d)(1) ....................................... 5, 8, 11
15 U.S.C. § 57a(b)(3) ..................................................................... 9, 19
15 U.S.C.§ 45(n) ............................................................... 9, 11, 22, 25
601 U.S. 416 .......................................................................................... 25
Ark. Stat. § 4-114-106(g)(6)(A) ......................................................... 17
Cal. Civ. Code § 1794.4 ....................................................................... 20
Fla. Stat. § 501.165 ............................................................................. 20
Mo. Stat. § 385.306.12 ......................................................................... 17
NY Ins. § 7903(e) ................................................................................ 17

**Rules**

Fed. R. App. P. 26.1 ............................................................................... 1
Federal Rule of Appellate Procedure 29(a)(2) ...................................... 2
Federal Rule of Appellate Procedure 32(a)(5) .................................... 31
Federal Rule of Appellate Procedure 32(a)(6) .................................... 31
Federal Rule of Appellate Procedure 32(f) ......................................... 31
Federal Rule of Appellate Procedure 32(g) ......................................... 31
Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) .......... 31

4922-5882-5244

Appellate Case: 24-3137     Page: 5     Date Filed: 02/27/2025 Entry ID: 5490478

## Regulations

Credit Practices Rule,
  49 Fed. Reg. 7740 (Mar. 1, 1984) ................................................ 8
Negative Option Rule (the "Rule"),
  89 Fed. Reg. 90476 (Nov. 15, 2024) ......................................... Passim
Ophthalmic Practice Rules,
  89 Fed. Reg. 60742 (Jul. 26, 2024) ............................................ 8

## Other Authorities

.com Disclosures: How to Make Effective Disclosures in Digital
  Advertising" (Mar. 2013) .......................................................... 27
84 Fed. Reg. 52393 (Oct. 2, 2019) ................................................ 17
84 Fed. Reg. 52396 ...................................................................... 18
84 Fed. Reg. 82394 ...................................................................... 18
84 Fed. Reg. 90477 ...................................................................... 18
88 Fed. Reg. 24717 ...................................................................... 18
88 Fed. Reg. 24719 ...................................................................... 18
88 Fed. Reg. 24725 ................................................................. 18, 19
88 Fed. Reg. 24730 ...................................................................... 21
H.R. 2460 ...................................................................................... 21
S. 1091 ........................................................................................... 21
S.1067 ............................................................................................ 21
"About SCIC," available at https://go-scic.com/about/ ................ 20
Comment by SCIC to NPR (Apr. 24, 2023) at p.8, posted by FTC
  on 6/28/2023 ..................................................................... 4, 16, 24
Federal Reserve, Economic Well-Being of U.S. Households in 2023
  at p.32 (May 2024) ...................................................................... 4
NAIC Service Contracts Model Act, Section 5.L ............................ 17
Press Release, Van Hollen, Clarke Introduce Bill to Safeguard Consumers, Require
  Companies to Shift from Opt-Out Requirements to Opt-In (Mar. 30, 2023) ...... 21
The FTC's Use Of Unfairness Authority: Its Rise, Fall, And Resurrection,
  2003 WL 21501809 (FTC 2003) ................................................ 22

# INTEREST OF *AMICUS CURIAE*

The Service Contract Industry Council ("SCIC"), American Property Casualty Insurance Association ("APCIA"), and Consumer Credit Industry Association ("CCIA"), collectively, "Amici," are the leading national trade associations whose members offer service contracts, also known as home warranties or protection plans, to consumers. Those contracts often include an automatic renewal feature, which the FTC considers a negative option feature. The recently finalized Negative Option Rule (the "Rule"), 89 Fed. Reg. 90476 (Nov. 15, 2024), seeks to regulate all contracts that include a negative option feature, including within such breadth service contracts with auto-renew terms.

SCIC is a national trade association comprised of manufacturers, service contract providers, administrators, and retailers offering service contracts for homes and consumer goods. Its members constitute a significant share of the service contract market and many of such service contracts contain auto-renew terms.

APCIA is the primary national trade association for home, auto, and business insurers. APCIA's member companies represent approximately 65% of the total U.S. property-casualty insurance market and approximately 62% of the automobile insurance market. APCIA's membership also includes market-leading providers of service contracts.

4922-5882-5244

CCIA is a national trade association that represents service contract providers and administrators that distribute and service consumer asset and credit protection products to consumers, including contracts with negative option terms.

Amici's perspective regarding the Rule may be useful to the Court. Amici respectfully submit that the Federal Trade Commission (the "FTC" or "Commission") hastily and improperly adopted a regulation that mischaracterizes the perceived issues it seeks to address and creates purported solutions that do not actually solve those issues. By adding new barriers that are inconsistent with existing regulation, the Negative Option Rule will result in higher prices, greater confusion, and reduced consumer choice, all of which are outcomes contrary to the FTC's mission of protecting consumers. The Rule's requirements can cause consumers to lose the protection they sign up for and expect when they enter into service contracts with auto-renew terms.

Consistent with Federal Rule of Appellate Procedure 29(a)(2), this brief is submitted without a motion because all parties have consented to these Amici filing an amicus brief in support of Petitioners. Pursuant to Rule 29(a)(4)(E), Amici state that no party or its counsel authored this brief in whole or in part, or contributed money intended to fund preparing or submitting this brief. No other person contributed money intended to fund preparing or submitting this brief other than Amici and their counsel.

4922-5882-5244

## SERVICE CONTRACTS

The typical service contracts offered by Amici provide for the repair, replacement, and maintenance of products and residential or other property for the operational or structural failure due to defect in materials, workmanship, accidental damage from handling, or normal wear and tear. Service contracts are extremely common and of great importance to consumers and their being in continued force is vitally important. These contracts offer consumers the ability to protect important investments by limiting the financial hardship and disruption to their lives that can result when household appliances, consumer goods, and other products break down. When consumers sign up for service contracts, whether online, in person, by telephone, or via email, they generally do so for peace of mind, knowing their significant purchases are protected from damage.

Many important consumer products may be sold with service contracts, including consumer electronics (*e.g.*, computers, cell phones, televisions), mechanical equipment (*e.g.*, furnaces, boilers, home air conditioning units), or appliances (*e.g.*, refrigerators). Consumers may also elect to protect the appliances and systems in their homes with a home service contract. These types of service contracts provide the customer protection for unexpected costs to repair or replace their consumer products. Because it is important that these contracts remain in force to provide the benefits sought by the consumer, they often have terms under

Appellate Case: 24-3137     Page: 9     Date Filed: 02/27/2025 Entry ID: 5490478

which the contract renews automatically.  This is of vital importance to

consumers—the protection provided by service contracts makes a significant

difference in their daily lives.  It protects consumers who would otherwise be

caught flat-footed by unexpected break-down of important products, leading to

unplanned replacement or repair bills.  For example, the Federal Reserve's 2023

Survey of Household Economics and Decisionmaking reports that 37% of

customers would struggle to come up with $400 to pay an unexpected bill.[1]

The great importance and value of service contracts to consumers are shown

by their numbers.  As of December 2022, more than 200 million service contracts

were in effect in the U.S.[2]  A large proportion of these service contracts—more

than 70 million—have terms under which they renew automatically.  Auto-renew

terms are a convenience to the consumer, and they are vitally important in service

contracts, which protect products particularly valued and used by consumers in

their day-to-day lives.

Consumers voluntarily elect to enter into service contracts, obtaining them

through various channels.  For example, consumers may obtain their service

---

[1]  Federal Reserve, Economic Well-Being of U.S. Households in 2023 at p.32
(May 2024), available at
https://www.federalreserve.gov/publications/files/2023-report-economic-well-being-us-households-202405.pdf.

[2]  *See* Comment by SCIC to NPR (Apr. 24, 2023) at p.8, posted by FTC on
6/28/2023, available at https://www.regulations.gov/comment/FTC-2023-0033-0879.

4

contracts directly from the service provider.  Or consumers may obtain their service contracts through indirect means, such as from a retailer, with the service contract issued by an unaffiliated service contract obligor, with the service contract purchased in conjunction with the purchase of the underlying consumer good to be protected.  Or consumers might purchase home service contracts in conjunction with the sale of real estate or in the course of receiving maintenance or repair services.

Service contracts may be for an annual term or on a monthly term.  Some cover a term of years, while other service contracts are offered on a renewable monthly or annual basis until the consumer elects to cancel protection.

## THE NEGATIVE OPTION RULE

On November 15, 2024, the FTC promulgated the Negative Option Rule under FTC Act Section 18, 15 U.S.C. § 57a(a)(1)(B), (b)(3), (d)(1).  The Rule broadly encompasses all contracts across all industries that have a "negative option" feature.  Rule § 425.2.  A negative option feature is a contract provision under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller as acceptance or continuing acceptance of the offer.  This includes terms under which the contract automatically renews.  *Id.*

Appellate Case: 24-3137    Page: 11    Date Filed: 02/27/2025 Entry ID: 5490478

The Rule applies to the more than one billion paid subscriptions, including those with an auto-renew terms, in the United States, imposing onerous requirements economy-wide that will result in substantial costs of compliance and difficulties in compliance. The Rule covers a variety of topics and requirements related to negative option contract terms as well as other aspects of contracts containing such terms. For example:

*Materiality.* The Rule requires clear and conspicuous disclosures of "Material terms" before obtaining billing information for negative option contracts. Rule § 425.4. "Material terms" relate to the negative option feature and various other topics concerning the transaction; "material" is broadly defined to mean "likely to affect a person's choice of or conduct regarding goods or services." Rule § 425.02. But because the Rule applies broadly across the economy, it fails to address with any specificity what terms meet this standard. Further, the Rule specifies the form and content of the disclosures and placement of the negative option information along with other information provided to customers. Rule §§ 425.4, 425.2. As such, it regulates truthful communications to customers.

*Consent.* The Rule also imposes a layer of complexity in the provision of negative option contracts by requiring the seller to obtain the customer's express informed consent "separately from any other portion of the transaction." It vaguely and non-specifically provides that the seller may not include "information

4922-5882-5244

that interferes with, detracts from, or otherwise undermines the customer consent to the negative option feature." Rule § 425.5. The Rule imposes additional record-keeping requirements upon sellers, requiring them to keep or maintain verification of the customer's consent for at least three years. Rule § 425.5.

*Misrepresentations.* All negative option contracts are deemed to be deceptive unless they comply with the Rule and the Rule prohibits any misrepresentations of material fact. Rule § 425.3. Because the Rule applies broadly across the economy, the Rule fails to address with any specificity what a material fact may be. Further, the Rule's broad, non-specific prohibition is already covered by existing UDAP laws.

*Simple Cancellation.* There must be a "simple mechanism" to cancel the goods or services under a negative option contract. Rule § 425.6. The Rule requires the simple mechanism for cancellation to be through the same medium as the original consent. It specifies the form of cancellation methods that must be made available. *Id.*

*Preemption of State Law.* Existing state laws already impose disclosure, form, and other requirements upon contracts covered by the Rule. The Rule provides that it supersedes state statutes or regulations relating to negative option requirements to the "extent it is inconsistent" with the Rule. Rule § 425.7.

***Exemption.*** The Rule allows regulated persons to petition for an exemption from the Rule. Rule § 425.8.

## ARGUMENT

FTC Act Section 18 allows for only industrywide rules that specifically regulate prevalent unfair or deceptive practices. As shown by Petitioners, the Negative Option Rule exceeds that authority.

Section 18 gives the FTC authority to promulgates rules "which define with specificity acts or practices which are unfair or deceptive[,]" and then only if the Commission has evidence that those acts or practices are "prevalent." 15 U.S.C. § 57a(a)(1)(B), (b)(3), (d)(1). After promulgating a rule that meets those criteria, the FTC may then proceed against covered companies and file suit for civil penalties for unfair and deceptive acts and practices under the rule.

There are two fundamental requirements to promulgate rules under Section 18 – specificity and prevalence. The rule must "define with specificity acts or practices which are unfair or deceptive." Specificity limits the scope of the rules, requiring that rules be adopted industry-by-industry. One recent example is the Eyeglass Rule, which applies to optometrists or ophthalmologists.[3] To meet the

---

[3]  Ophthalmic Practice Rules, 89 Fed. Reg. 60742 (Jul. 26, 2024) (declaring an unfair practice for optometrist or ophthalmologist to fail to provide a patient with a copy of patient's eyeglass prescription immediately after an eye examination is completed); Credit Practices Rule, 49 Fed. Reg. 7740 (Mar. 1, 1984) (prohibiting as unfair credit practices certain practices of lenders and

4922-5882-5244

specificity requirement, the unfair or deceptive practices and acts must be in definable industries. Additionally, specificity requires the rules to unambiguously define what acts or practices are prohibited. Rules promulgated under Section 18 must "define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce ...." 15 U.S.C. § 57a(a)(1)(B). That is, the rule must give notice of what exactly is prohibited, so regulated parties can govern themselves accordingly.

Additionally, to promulgate a rule under Section 18, the FTC may issue a notice of proposed rulemaking "only where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." 15 U.S.C. § 57a(b)(3). The FTC shall make a determination that unfair or deceptive acts or practices are "prevalent" only if: "(A) it has issued cease and desist orders regarding <u>such acts or practices</u>, or (B) any other information available to the Commission indicates <u>a widespread pattern of unfair or deceptive acts or practices.</u>" *Id.* (emphasis added).

---

retail installment sellers); *see also Katharine Gibbs Sch. (Inc.) v. F.T.C.*, 612 F.2d 658, 678 (2d Cir. 1979) ("Congress enacted Magnuson-Moss to give the Commission the authority to combat deceptive practices with <u>industry-wide requirements</u>.") (Newman, dissenting) (emphasis added); *Harry & Bryant Co. v. F.T.C.*, 726 F.2d 993, 999 (4th Cir. 1984) ("The Funeral Rule defines unfair practices in the sale of funeral goods and services and prescribes preventive requirements. It clearly falls within the Commission's statutory authority.").

4922-5882-5244

The FTC exceeded its authority under Section 18 in promulgating the Negative Option Rule because it fails to meet the specificity requirement. The economy-wide rule is not crafted to a particular industry, addressing unfair and deceptive acts or practices specific to that industry, and the rule fails to specifically define unfair or deceptive acts or practices so regulated companies can know what they can and cannot do.

Critically, as important to the Amici here, considering the Rule in the context of service contracts demonstrates that it falls far short under the specificity requirement. The example of service contracts demonstrates why rules must be adopted on an industry-by-industry basis, rather than economy-wide.

Additionally, the FTC exceeded its statutory authority in promulgating the economy-wide Rule because there is not a widespread (*i.e.*, prevalent) pattern of unfair and deceptive acts and practices. The prophylactic rule assumes a problem that does not exist, including, as again relevant here, in the context of auto-renew terms in service contracts. There is no basis to presume that automatic renewal of service contracts is an unfair or deceptive act or practice. On the contrary, such terms serve consumers in this context and are expected and valued. Moreover, the isolated enforcement actions and problems arising when consumers are saddled with continuing contracts for products they do not need or want do not involve service contracts. Simply put, auto-renew terms in service contracts do not involve

4922-5882-5244

unfair or deceptive terms or practices; the FTC has not set forth any evidence they do.

Finally, auto-renew terms in service contracts are not "unfair" as defined by the FTC Act. They are not likely to cause substantial injury to consumers. 15 U.S.C.§ 45(n). They are reasonably avoidable by consumers themselves. *Id.* And, even assuming for argument's sake that there is a risk of injury, it is outweighed by countervailing benefits to consumers. *Id.* Consumers receive substantial benefits from auto-renew terms in service contracts. The Negative Option Rule harms consumers because it is an obstacle to these benefits that imposes burdens and costs upon service contracts that will increase prices and potentially reduce competition. The Rule does not yield any notable benefits to consumers to overcome this substantial harm it causes.

I.    **As Seen in Service Contracts with Auto-Renew Terms, the Negative Option Rule Exceeds FTC Authority Because it Fails to Meet Section 18's Specificity and Prevalence Requirements.**

Section 18 authorizes FTC to promulgate rules defining with "specificity" "unfair or deceptive acts or practices," only if such acts or practices are "prevalent." 15 U.S.C. § 57a(a)(1)(B). The FTC exceeded its authority because the Rule does not meet these requirements. The FTC usurped the role of Congress and improperly legislated by rule. The Rule must be set aside.

4922-5882-5244

**A.      The Rule is Not Specific to an Industry and Does Not Specifically Define the Unfair or Deceptive Practice.**

Section 18's specificity requirement limits FTC's authority to promulgate rules on an industry-wide basis.  FTC is not authorized to adopt rules for the entire economy.  The FTC has exceeded its authority because it failed to meet the specificity requirements in adopting the Rule.  This is evidenced by the fact that the Rule applies to more than a billion existing contracts across industries.[4]

The Rule fails to meet the specificity requirement because (1) it is an economy-wide rule and is not limited to a particular industry and (2) the Rule does not define the unfair or deceptive practices with specificity.

First, the Rule is unduly broad and vague and not addressed to any industry with specificity.  Contracts in different industries may have different features and nuances, and the concerns about negative option terms in one industry (such as subscriptions for clothing or personal grooming items) are not necessarily applicable to another industry (such as service contracts).

In applying to all negative option contracts across industries, the FTC lumps all negative option features into one category for purposes of the Rule.  However, not all contracts containing auto-renew contract terms are the same.  The FTC has

---

[4]   Just in the digital marketplace (online subscriptions) alone, there were more than one billion paid subscriptions in the first quarter of 2023.  89 Fed. Reg. 90484 n.103.  The global subscription e-commerce market is expected to reach $904.2 billion by 2026.  *Id.* at n.102.

Appellate Case: 24-3137      Page: 18      Date Filed: 02/27/2025 Entry ID: 5490478

identified unfair practices in online trial offers for products or items the customer did not intend to buy or did not need. These give rise to problems and potential for deception and unfair practices. Given this premise, the FTC could have tailored a rule to those specific practices. However, it did not tailor the Rule to address those problems. The Rule applies more broadly than simply unfair or deceptive online trial offers. Instead, the Rule treats completely unregulated and potentially unknown internet sellers the same as well-regulated entities offering products pursuant to highly prescriptive state laws such as service contracts. Yet the problems arising from online sellers utilizing free offers are different.

Second, the Rule does not specify what practice is unfair or deceptive and what exactly the business must do to avoid such practice. Rather than addressing actual findings of deceptive or unfair acts and practices, the Rule is a broad prophylactic that applies to all contracts with negative option terms. Thus, the FTC has effectively attempted to use a shotgun to kill a gnat.

The only shared feature of the myriad disparate contracts that the Rule regulates is that they continue until the customer cancels or the contract automatically renews for another term (the negative option feature). This includes subscription contracts to obtain products such as clothing, make-up/beauty products, health products, and meal-prep deliveries. It also includes subscriptions for news and media delivery, entertainment content, wireless telephone service,

13

satellite radio, and the like.  This subscription model is notably different from terms in service contracts under which the contract automatically renews.  For subscriptions with auto-renew terms, the customer continues to receive the products without interruption.  However, automatic renewal in service contracts provides the consumer the peace of mind that the protection for the product will be there when they need it.  The customer enters into the service contract with the expectation that the protection will be continuing and the contract will automatically renew.  If the service contract does not automatically renew, the customer may be left without the protection they sought at the contract's inception at the time they most need it.

Thus, the role and circumstances of auto-renew terms vary by industry and the goods or services obtained.  Consumers enter these contracts in different circumstances, for different purposes, obtaining different products and services.  For example, service contracts serve extremely important purposes and consumers specifically want them to automatically renew.  As noted, service contracts providing customers protection for product malfunction or disrepair require the protection to be available when the customer needs it.  Customers thus need the protection to be continuing and if the protection ceases, the customer suffers harm from not having the protection when it is most needed.

4922-5882-5244

More than 70 million of the in-force service contracts have terms under which the contract automatically renews.  Auto-renew terms are an inherent and expected feature of many service contracts and customers depend upon the contracts' automatically renewing.  Many service contracts by their nature are expected to automatically renew and consumers will be harmed if they are inadvertently not renewed.

**B.     The Prevalence Requirement is not Met Because There is not a Widespread Pattern of Unfair or Deceptive Practices in Auto Renewal in Service Contracts.**

The Rule exceeds FTC's rulemaking authority under Section 18 because the FTC does not have reason to believe that there are widespread unfair and deceptive acts and practices—that is, a prevalence of such practices—in auto-renew terms in contracts in specific industries.  It has not cited a widespread pattern of acts or practices that meets the prevalence requirement for specific categories of contracts in specific industries.  At most, the Rule cites a handful of FTC and state attorneys-general enforcement actions—none of which involve service contracts.  Given the billions of contracts with negative option features through the U.S., these represent a tiny fraction of all transactions.

As described in the Rule, unfair and deceptive practices relating to negative option terms sometimes burden customers with recurring payments for products and services they did not intend to purchase nor to continue buying.  89 Fed. Reg.

15

90476.  The FTC cites a small number of enforcement actions and lawsuits to suggest a widespread issue with negative option terms nationwide.  However, these are only a small fraction of the billion contracts with negative option terms nationwide, and these issues do not arise with the typical service contracts provided by the Amici—and the FTC has not cited any evidence to the contrary.

The problems the Rule purports to address do not establish a widespread pattern of deception and unfairness in a particular industry and certainly not in the context of auto-renew terms in service contracts.  Indeed, the cited concerns would not arise with service contracts given their inherent nature because service contracts serve a particular need of the customer to contract for service to address repair and replacement of products, to help the customer pay for unexpected events.  The customer chooses to purchase service contracts as a protection/precaution, to help plan and budget for unexpected expenses.  Consumer survey research demonstrates that consumers purchase service contracts that automatically renew in order to provide the peace of mind in knowing that there will not be a lapse in coverage of the product protection plan.[5]  Thus, it is vitally important that the protection under the service contract is provided on a continuing basis, automatically renewing without interruption.  Moreover, service contracts

---

[5]  Comment letter by SCIC, see above at page 4, n.2 (Sachs Media survey obtained by SCIC, summary at 3).

with auto-renew terms typically contain terms allowing the consumer to easily cancel the contract when they decide they no longer need the protection.

These contracts are not an example of a customer signing up for a product they don't need or want. They are voluntarily chosen by the customer. Indeed, under state laws governing service contracts, many states require a "free-look" period during which the customer may return the service contract for a full refund if no claims have been made.[6] These free-look periods are ubiquitous in the industry. Service contracts also commonly contain terms providing for pro-rata refunds upon cancellation after the free-look period.[7]

In that way, service contracts are unlike subscription contracts for products the customers might not have intended to order or did not intend to continue purchasing, for example:

- The FTC explored methods "to help consumers avoid recurring payments for products and services they did not intend to order and to allow them to cancel such payments without unwarranted obstacles." 84 Fed. Reg. 52393 (Oct. 2, 2019).

---

[6] For example, the NAIC Service Contracts Model Act, Section 5.L provides for "free-look time periods on service contracts[.]" Model Act, available at https://content.naic.org/sites/default/files/inline-files/MDL-685.pdf. *See, e.g.*, Mo. Stat. § 385.306.12; Ark. Stat. § 4-114-106(g)(6)(A); S.C. § 38-78-30(F).

[7] Model Act, Section 5.L.; *see, e.g.*, NY Ins. § 7903(e).

Appellate Case: 24-3137      Page: 23      Date Filed: 02/27/2025 Entry ID: 5490478

- The FTC is concerned with marketers failing to make adequate disclosures, billing consumers without their consent, or making cancellation difficult or impossible.  84 Fed. Reg. 82394.  Those acts cause consumers harm because they "saddl[ed] consumers with recurring payments for products and programs they did not intend to purchase or did not want."  *Id.*  Certain negative option contracts have left consumers with products or services they did not intend to purchase and did not want to continue buying.  84 Fed. Reg. 90477.

- The FTC has seen "inadequate disclosures for 'free' offers and other products or programs, enrollment without consumer consent, and inadequate or overly burdensome cancellation and refund procedures."  84 Fed. Reg. 52396; *see also* 88 Fed. Reg. 24719.

- The FTC stated that "[s]ome negative option offers include upsell or bundled offers, where sellers use consumers' billing data to sell additional products from the same seller or pass consumers' billing data to a third party for their sales."  88 Fed. Reg. 24717.

- Consumers have been "unwittingly enrolled in negative option programs and then found it difficult to impossible to cancel."  88 Fed. Reg. 24725.

- The FTC stated that deceptive free trial offers are "rampant online and throughout social media" and customers are lured into recurring payments

without clearly and conspicuously disclosing future payment obligations. 88 Fed. Reg. 24725.

These do not establish a widespread pattern of deception or unfair practices or acts particular to a specific industry. These concerns are not applicable to auto-renew terms in service contracts and the FTC does not have information showing that these are prevalent in service contracts. The FTC has not issued cease-and-desist orders regarding such terms in service contracts and the FTC has no other information indicating a widespread pattern of unfair or deceptive acts or practices. *Id.*

None of the cases or enforcement actions cited in the Rule involved service contract companies. As a result, even if the FTC could establish that there may be isolated unfair or deceptive practices in some industry, it certainly cannot establish that unfair or deceptive practices regarding auto-renew terms are prevalent in service contracts, as was required before the FTC could issue a rule under Section 18. This conclusion is further supported by the lack of auto-renew-related complaints from state regulators about service contracts. Thus, the FTC exceeded its statutory authority to promulgate rules under Section 18 because it has provided no basis to believe that unfair or deceptive acts or practices are prevalent in auto-renew terms in service contracts. 15 U.S.C. § 57a(b)(3).

Appellate Case: 24-3137    Page: 25    Date Filed: 02/27/2025 Entry ID: 5490478

Notably, the Rule is aimed at harms that have nothing to do with auto-renew terms in service contracts, including signing up for continuing contracts the customer did not intend, or ordering products or items the customer did not need or want. These issues are not present in the well-regulated service contract industry,[8] and nothing in the Rule indicates otherwise. As described above, the nature of many service contracts is that they are expected to automatically renew. The customer intends and wants auto renewal as a feature of the contract.

Experience at the state level indicates that policymakers do not regard auto renewal in service contracts to present risks of deception of consumers or unfair practices towards them. On the contrary, several have made the policy determination that service contracts should be exempt from state auto-renewal laws. In those states, policymakers have determined that the benefits and consumer value in service contracts with automatic renewal outweigh any potential risks to consumers. Many state law auto-renew laws exempt service contracts.[9] Similarly, proposed federal legislation concerning auto-renew laws exempts

---

[8] Many states have adopted legislation modeled on the NAIC Service Contracts Model Act, which contains detailed consumer protection requirements. *See* "About SCIC," available at https://go-scic.com/about/ (Model Act was adopted by the NAIC and legislation was adopted in more than 35 states.).

[9] *See, e.g.*, Cal. Civ. Code § 1794.4; Fla. Stat. § 501.165.

Appellate Case: 24-3137     Page: 26     Date Filed: 02/27/2025 Entry ID: 5490478

service contracts.[10]  Notably, consumer organizations such as the National

Consumer Law Center have publicly endorsed the proposed legislation including

the exemption.[11]

For these reasons, the prevalence requirement is not met as to service

contracts with auto-renew terms.[12]  There is no evidence of widespread deception

or unfair acts or practices in that industry.

---

[10]  U.S. Senator Van Hollen and U.S. Representative Clarke have introduced legislation addressing automatic renewal contracts.  Consumer Online Payment Transparency and Integrity Act, S.1091, 118th Cong. (2023); Consumer Online Payment Transparency and Integrity Act, H.R. 2460, 118th Cong. (2023). S.1067, 118th Cong. (2023).

[11]  Press Release, Van Hollen, Clarke Introduce Bill to Safeguard Consumers, Require Companies to Shift from Opt-Out Requirements to Opt-In (Mar. 30, 2023), available at https://www.vanhollen.senate.gov/news/press-releases/van-hollen-clarke-introduce-bill-to-safeguard-consumers-require-companies-to-shift-from-opt-out-requirements-to-opt-in.

[12]  In the 2023 NPRM, the FTC noted that commenters including service contract providers urged the FTC to exempt their industries from the rule.  88 Fed. Reg. 24730.  The FTC invited comments detailing which, if any industries should be exempt, and why, including whether the proposed Rule would conflict with existing state regulations.  *Id.*  In response to the 2023 NPRM the FTC received more than 16,000 comments.  Among the comments, *Amicus Curiae* filed a comment requesting that the FTC exempt service contracts from the Rule. However, the FTC declined to exempt service contracts from the Rule.  89 Fed. Reg. 90488.

Appellate Case: 24-3137     Page: 27     Date Filed: 02/27/2025 Entry ID: 5490478

**II.  Auto-Renew Terms in Service Contracts are not "Unfair" Because Consumers Strongly Benefit From Auto-Renew Terms and Such Value Outweighs the Minimal Risk of Injury From Such Terms.**

The FTC provides no evidence of consumer deception caused by auto-renew terms in service contracts.  Further, there is no showing of a widespread pattern of unfair acts or practices with respect to auto-renew terms in service contracts.  An act or practice is "unfair" only if it "is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C.§ 45(n).  For unfairness, the practice must cause substantial, unavoidable consumer injury that is not outweighed by benefits to consumer or competition. "The FTC's Use Of Unfairness Authority: Its Rise, Fall, And Resurrection," 2003 WL 21501809 (FTC 2003).  This considers both the costs of imposing a remedy (*e.g.*, required disclosures), and benefits consumers enjoy as a result of the practice, such as the avoided costs of the added requirements and the value of consumer convenience.  *Id.*, *6.

**A.  Auto-Renew Terms in Service Contracts are Strongly Beneficial to Consumers and to Businesses.**

As the FTC recognizes, negative option contracts are "widespread in the marketplace" and they "can provide substantial benefits to sellers and consumers." 89 Fed. Reg. 90476.  For businesses, negative option marketing provides an improved ability to advance plan.  *Id.* at 90477.  Customers are benefitted by

22

4922-5882-5244

contracts with negative option terms to provide the "convenience of uninterrupted products or services." *Id.*

Consumers receive substantial benefits from auto-renew terms in service contracts, and they expect and depend upon uninterrupted service. For many consumers, having service contracts that automatically renew ensures they are covered when the need arises. Auto-renew terms simplify the customer's life and provide them assurance. Marketing and sale arrangements that allow consumers to provide consent in advance to receive and pay for goods or services in the future on a continuing or periodic basis provide convenience to both consumers and businesses.

Such service contracts with auto-renew terms are convenient and beneficial to both consumers and marketers. Auto-renew terms are desired by customers because they take one thing off their plate given busy workdays, hectic family schedules, or other demanding circumstances. These programs provide uninterrupted protection under the service contract for as long as the consumer wants and simplify the renewal process so consumers can maintain the protection without going through the enrollment process month after month, or year after year.

Without an auto-renew term in a service contract, if the customer forgets to renew the contract, the customer has a lapse in protection provided by the service

contract.  For example, if the consumer forgets to renew their home service contract, and their home heating system breaks down in the middle of winter, that exposes the consumer to inconvenience, difficulty, and expense.  The homeowner would be without heat until they are able to locate a reliable repair person at which point they must fully fund the repair or replacement costs.

Indeed, according to a survey conducted on behalf of *amicus* SCIC, nine out of ten Americans report having owned a product that broke after its service contract or extended warranty ended, forcing them to pay for replacement or repair out of their own pocket.[13]  This may explain why nearly two-thirds of consumers say they have regretted not signing up for an automatically renewing or a longer-term service contract, and seven in ten of those who have had service contracts say they would value "auto-renew" options in at least one type of service contract.[14]  Consumers are strongly in favor of auto-renew contract terms in service contracts.

Forcing consumers to affirmatively re-consent to the auto-renew provisions in these contracts separately from the overall agreement may lead to an unintended result:  consumers being without protection when they need it most.  Because a service contract by its nature is automatically renewing and that is why the customer is purchasing it, having the customer to further re-consent to the auto-

---

[13]  Comment letter by SCIC, see above at page 4, n.2 (Sachs Media survey obtained by SCIC, summary at 4).

[14]  *Id.* (summary at 2).

4922-5882-5244

renew term is unnecessary, confusing, and redundant.  Further, the FTC cannot meet the "reasonable avoidability" test:  given that consumers can and do choose not to enter into service contracts, they can reasonably avoid any conceivable harm that flows from them.[15]  In addition, consumers can reasonably avoid any harm from automatically renewing contracts given the prevalence of free-look and pro rata refund terms in service contracts.

On the business side, advance consent marketing provides businesses with the opportunity to market and operate at a reduced cost and keep the service affordable.  Auto-renew terms save transaction costs and increase customer convenience.  Without them, manually sending and processing invoices and customer payments is a substantial cost.  Further, if protection or service is interrupted due to the consumer forgetting to pay, business resources are used to re-solicit and gain re-enrollment in the plan or service.  If a consumer forgets to

---

[15] FTC Act Section 5(n) provides that ''unfair'' practices are those that cause or are likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.  15 U.S.C. 45(n); *see* 89 Fed. Reg. 90478 n.15.  An injury to a consumer is "reasonably avoidable," as required for a practice that caused the injury to be unfair under the FTC Act, if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact. *Community Financial Services Association of America, Limited v. Consumer Financial Protection Bureau*, 51 F.4th 616 (5th Cir. 2022), *certiorari granted*, 143 S. Ct. 978, *certiorari denied*, 143 S. Ct. 981, *reversed and remanded*, 601 U.S. 416, *on remand*, 104 F.4th 930 (5th Cir. 2024).

pay, their protection may lapse, and customers will not have the protection they thought they did when something breaks.

### B. The Rule Will Increase Costs For Service Contract Companies, Which Will Increase Customer Prices and Potentially Reduce Competition.

In addition to direct harms, the Rule's wide-ranging requirements will increase costs on service contract companies, which will be passed on to consumers, compounding the consumer harm caused by the Rule. This effect will be widespread and profound given the more than 70 million service contracts containing auto-renew terms.

The Rule will impose substantial compliance costs, with little-to-no marginal benefit. This ultimately will harm consumers in the form of increased prices due to increased transaction costs and reduced competition due to the regulatory costs driving competition out of the market.

The Rule causes substantial compliance costs for service contracts. For example, it imposes the cost of revamping disclosures. Companies that have relied on previous FTC guidance and state laws and regulations specific to the service contract industry to craft their clear and conspicuous disclosures will have to revamp their disclosures for little-to-no consumer gain. For example, companies may have relied on the FTC's longstanding Dot Com Disclosures guidance to craft

4922-5882-5244

descriptive hyperlink text that includes links to additional information.[16]  The Rule

instead mandates a one-size-fits-all approach to disclosures that does not

necessarily benefit consumers.  It is uncertain whether hyperlinks provide the clear

and conspicuous disclosure, fonts may have to be smaller, and consumers may

need to scroll to get material information.  Other important information, such as

information about inclusions and exclusions from service, may get crowded out

under the Rule's new form, content, and placement requirements.

Additionally, significant costs may be imposed for businesses to implement

consent recordkeeping systems.  The Rule requires businesses to retain proof of

consent to the negative option feature for three years.  The Rule requires entities to

maintain comprehensive records on consumer consents to the contract's auto-

renew provision.  These recordkeeping requirements would require service

contract companies to implement brand new systems, which represent significant

costs.  For example, it is not uncommon for consumers to enter into service

contracts over the phone.  To maintain the necessary records required by the Rule,

service contract companies will need to implement and maintain recording systems

that would capture the consumer's verbal consent and then annotate the recording

with sufficient information for the company to identify the recording contents and

---

[16]  ".com Disclosures:  How to Make Effective Disclosures in Digital Advertising"
(Mar. 2013), available at https://www.ftc.gov/system/files/documents/plain-
language/bus41-dot-com-disclosures-information-about-online-advertising.pdf.

Appellate Case: 24-3137     Page: 33     Date Filed: 02/27/2025 Entry ID: 5490478

how long that recording needs to be retained. The cost of developing and implementing these new systems to address the myriad ways in which consumer consent to service contracts would be significant and may result in higher costs to consumers.

Service contract sellers also would incur additional significant costs, such as the cost of training salespeople in new enrollment flows and investing in hardware and software (*e.g.*, keypads for signing consent forms). Further, for indirect sales sale through retailers or other distributors, the service contract companies are dependent upon the distributor for point-of-sale compliance for auto-renew contracts. The Rule will require re-programming of point-of-sale kiosks.

Other costs caused by the Rule are the compliance costs of reviewing every form for compliance with the Rule and comparison of the Rule's requirements with those of applicable state laws. The Rule preempts state laws to the extent they are inconsistent with the Rule. Rule § 425.7(a). Further, the Rule permits state laws to impose greater consumer protections than are imposed by the Rule. Rule § 425.7(b). Thus, service contract companies must expend significant compliance costs and time to consider whether applicable state laws are consistent or conflicting with the requirements of the Rule. Thus, the Rule imposes substantial increased costs of legal compliance.

Thus, the costs of compliance with the Rule for service contract companies, which are already regulated, will be substantially higher than the cost of compliance for other types of subscription contracts that have negative option features offered by unregulated entities about which the FTC has noted a history of problematic negative option practices. Service contract companies consist of large companies as well as small businesses. The compliance costs may be felt disproportionately by small businesses, especially with respect to in-person and telephone transactions, where additional training, forms, and consent recording systems would be required. Increased costs may squeeze smaller competitors out of the market. Reduced competition will ultimately harm consumers.

The Rule will increase costs for service contract sellers, which will be passed on to consumers, without corresponding benefits. Thus, the Rule will harm consumers because it increases transaction costs and reduces competition. The substantial compliance costs could cause companies to cease providing these contracts, thus reducing competition for service contracts offered to consumers. Reduced competition can lead to higher prices for consumers. In this context, the Rule causes more harm to consumers than the status quo. Thus, the Rule is counterproductive to FTC's mission of protecting consumers and promoting competition in the context of auto-renewal in service contracts.

4922-5882-5244

Dated:  February 26, 2025.

s/ Marci V. Kawski
Marci V. Kawski
HUSCH BLACKWELL LLP
P.O. Box 1379
33 East Main Street, Suite 300
Madison, WI 53701-1379
608-255-4440
Marci.Kawski@huschblackwell.com

s/ Lisa M. Lawless
Lisa M. Lawless
HUSCH BLACKWELL LLP
511 North Broadway, Suite 1100
Milwaukee, Wisconsin 53202
414.273.2100
Lisa.Lawless@huschblackwell.com

Attorneys for *Amici Curiae*,  Service Contract Industry Council, American Property Casualty Insurance Association, and Consumer Credit Industry Association

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because this brief contains 6,496 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: February 26, 2025.

s/ Lisa M. Lawless
LISA M. LAWLESS

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2025, the foregoing brief was served on all parties or their counsel of record through the Court's electronic filing system.

Dated: February 26, 2025.

s/ Lisa M. Lawless
LISA M. LAWLESS

4922-5882-5244