Nos. 24-3137 (lead), 24-3388, 24-3415, 24-3442, 24-3469

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

CUSTOM COMMUNICATIONS, INC.,
D/B/A CUSTOM ALARM, ET AL.,
*Petitioners,*

v.

FEDERAL TRADE COMMISSION,
*Respondent.*

--------------------

SERVICE CONTRACT INDUSTRY COUNCIL, ET AL.,
*Amici on Behalf of Petitioners.*

On Petitions for Review of a Final Rule of the
Federal Trade Commission (RIN 3084—AB60)

## BRIEF OF THE FEDERAL TRADE COMMISSION

Of Counsel:
JAMES A. KOHM
    *Associate Director*

LAURA KOSS
    *Assistant Director*

KATHERINE JOHNSON
HARRIS A. SENTURIA
JONATHAN W. WARE
    *Attorneys*

FEDERAL TRADE COMMISSION
    Washington, D.C. 20580

LUCAS CROSLOW
    *General Counsel*

H. THOMAS BYRON III
    *Deputy General Counsel*

BENJAMIN F. AIKEN
BRADLEY DAX GROSSMAN
MATTHEW M. HOFFMAN
    *Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
 Washington, D.C. 20580
 bgrossman@ftc.gov
 202-326-2994

# SUMMARY OF THE CASE

The Federal Trade Commission modernized its 1973 Negative Option Rule to address widespread evidence that sellers are using unfair and deceptive practices when marketing subscriptions with recurring charges. The amended Rule does not limit or prohibit recurring charges but is tailored to prevent four specific, well-documented forms of abuse: material misrepresentations, omission of key facts, enrollment without consent, and unnecessary obstacles to cancellation.

Petitioners challenge the amended Rule based principally on a false premise that the Commission cannot adopt rules affecting more than one industry. Petitioners' argument contravenes the statutory text, case law, and decades of historical practice. Given the Rule's importance to consumers, the Commission believes that oral argument would be beneficial, and that 20 minutes per side would be sufficient.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ........................................................................i

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION .................................................................................1

JURISDICTION ....................................................................................3

STATEMENT OF ISSUES .....................................................................3

STATEMENT OF THE CASE ................................................................4

    A.    The Federal Trade Commission Act .......................................4

    B.    Unfair and deceptive recurring charges ..............................11

    C.    Amendments to the Negative Option Rule ...........................14

SUMMARY OF ARGUMENT ...............................................................19

STANDARD OF REVIEW ....................................................................23

ARGUMENT .......................................................................................24

I.    The Commission Properly Exercised Its Statutory
Authority to Issue the Rule .........................................................24

    A.    The Rule defines with specificity unfair or
deceptive acts or practices in or affecting
commerce ...........................................................................25

    B.    Congress did not bar the Commission from
prohibiting unfair or deceptive practices across
industries ...........................................................................28

    C.    The Rule is not vague .........................................................38

II.    Congress Did Not Preclude the Commission from
Regulating Negative Option Programs .........................................43

Appellate Case: 24-3137    Page: 3    Date Filed: 03/17/2025   Entry ID: 5496705

III. The Commission Reasonably Justified the Rule's
Requirements and Scope..............................................................48

    A.    The Commission properly found that unfair and
deceptive practices are prevalent, and those
findings are not reviewable.....................................................49

    B.    The Commission appropriately exercised its
discretion when crafting the Rule's requirements
to prevent future wrongdoing. ...............................................56

IV. The Commission Complied with Procedural
Requirements, and Any Alleged Errors Were Harmless. ............63

    A.    The Commission complied with Section 22. .........................63

    B.    Petitioners have not demonstrated prejudice......................66

V.   Any Remedies Should Be Limited in Scope...................................69

CONCLUSION ........................................................................................71

Appellate Case: 24-3137    Page: 4    Date Filed: 03/17/2025 Entry ID: 5496705

# TABLE OF AUTHORITIES

## CASES

*Adam & Eve Jonesboro, LLC v. Perrin*,
933 F.3d 951 (8th Cir. 2019) ............................................................... 39

*Adventist Health Sys./Sunbelt, Inc. v. HHS*,
17 F.4th 793 (8th Cir. 2021) ........................................................ 48, 49

*Am. Fin. Servs. Ass'n v. FTC*,
767 F.2d 957 (D.C. Cir. 1985) ...................... 3, 4, 5, 9, 26, 28, 44, 53, 57

*Am. Optometric Ass'n v. FTC*,
626 F.2d 896 (D.C. Cir. 1980) ........................................................... 52

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ............................................................. 70

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) .......................................................................... 36

*Chicago Copper & Chem. Co. v. Apex Mining Co.*,
281 F.2d 530 (8th Cir. 1960) ............................................................. 61

*Citizens Telecomms. Co. of Minn., LLC v. FCC*,
901 F.3d 991 (8th Cir. 2018) ............................................................. 69

*Consumers Union of U.S. v. FTC*,
801 F.2d 417 (D.C. Cir. 1986) ........................................................... 23

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015) .......................................................................... 38

*Falco Lime, Inc. v. Tide Towing Co.*,
29 F.3d 362 (8th Cir. 1994) ......................................................... 36, 66

*FCC v. Prometheus Radio Proj.*,
593 U.S. 414 (2021) .......................................................................... 24

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......................................................................... 25

*FTC v. AT&T Mobility LLC*,
883 F.3d 848 (9th Cir. 2018) ........................................................ 44, 45

*FTC v. Cyberspace.com LLC*,
453 F.3d 1196 (9th Cir. 2006) ........................................................... 42

iv

*FTC v. Kuykendall,*
371 F.3d 745 (10th Cir. 2004) ...................................................55

*FTC v. Mainstream Mktg. Servs. Inc.,*
345 F.3d 850 (10th Cir. 2003) ...................................................55

*FTC v. Sperry & Hutchinson Co.,*
405 U.S. 233 (1972) ...................................................44

*FTC v. Standard Oil Co. of Calif.,*
449 U.S. 232 (1980) ...................................................51

*FTC v. Tashman,*
318 F.3d 1273 (11th Cir. 2003) ...................................................4

*Gill v. Whitford,*
585 U.S. 48 (2018) ...................................................70

*Gundy v. United States,*
588 U.S. 128 (2019) ...................................................47

*In re Cliffdale Assocs., Inc.,*
103 F.T.C. 110 (1984) ...................................................41

*Indep. Directory Corp. v. FTC,*
188 F.2d 468 (2d Cir. 1951) ...................................................55

*Jacob Siegel Co. v. FTC,*
327 U.S. 608 (1946) ...................................................57

*Katharine Gibbs Sch. (Inc.) v. FTC,*
612 F.2d 658 (2d Cir. 1979) ...................................................3, 27, 30, 31

*Labrador v. Poe,*
144 S. Ct. 921 (2024) ...................................................70

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm*
*Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ...................................................49

*Nat'l Petroleum Refiners Ass'n v. FTC,*
340 F. Supp. 1343 (D.D.C. 1972) ...................................................6

*Nat'l Petroleum Refiners Ass'n v. FTC,*
482 F.2d 672 (D.C. Cir. 1973) ...................................................6

*Nielsen v. Preap,*
586 U.S. 392 (2019) ...................................................47

v

Appellate Case: 24-3137     Page: 6     Date Filed: 03/17/2025 Entry ID: 5496705

*North Dakota v. EPA*,
   730 F.3d 750 (8th Cir. 2013) ............................................................ 70

*Novartis Corp. v. FTC*,
   223 F.3d 783 (D.C. Cir. 2000) .......................................................... 41

*Penn. Funeral Dirs. Ass'n v. FTC*,
   41 F.3d 81 (3d Cir. 1994) ........................................ 4, 50, 52, 53, 54, 57

*Posadas v. Nat'l City Bank of N.Y.*,
   296 U.S. 497 (1936) ......................................................................... 45

*Religious Sisters of Mercy v. Becerra*,
   55 F.4th 583 (8th Cir. 2022) ............................................................ 71

*Sears, Roebuck & Co. v. FTC*,
   676 F.2d 385 (9th Cir. 1982) ............................................................ 54

*Sebelius v. Cloer*,
   569 U.S. 369 (2013) ......................................................................... 25

*Shinseki v. Sanders*,
   556 U.S. 396 (2009) ....................................................... 4, 23, 67, 68

*Telebrands Corp. v. FTC*,
   457 F.3d 354 (4th Cir. 2006) ............................................................ 54

*Thompson Med. Co. v. FTC*,
   791 F.2d 189 (D.C. Cir. 1986) .......................................................... 44

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ......................................................................... 70

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ........................................................................... 30

*United States ex rel. Cairns v. D.S. Medical LLC*,
   42 F.4th 828 (8th Cir. 2022) ............................................................ 37

*United States v. Am. Bldg. Maint. Indus.*,
   422 U.S. 271 (1975) ......................................................................... 25

*United States v. JS & A Grp., Inc.*,
   716 F.2d 451 (7th Cir. 1983) ............................................................ 33

*United States v. MyLife.com, Inc.*,
   567 F. Supp. 3d 1152 (C.D. Cal. 2021) ............................................ 60

vi

Appellate Case: 24-3137   Page: 7   Date Filed: 03/17/2025 Entry ID: 5496705

*United States v. Texas,*
   599 U.S. 670 (2023) ................................................................ 70

**STATUTES**

15 U.S.C. § 1693e ................................................................... 46

15 U.S.C. § 2302 ................................................................... 34

15 U.S.C. § 44 ...................................................................... 25

15 U.S.C. § 45 ......................................... 4, 5, 25, 26, 30, 38, 43, 46

15 U.S.C. § 46 ....................................................................... 5

15 U.S.C. § 53 ....................................................................... 5

15 U.S.C. § 57a ............................................................... *passim*

15 U.S.C. § 57b ...................................................................... 5

15 U.S.C. § 57b-3 ....................................... 4, 8, 9, 64, 65, 66

15 U.S.C. § 6102 ................................................................... 36

15 U.S.C. § 6105 ................................................................... 20

15 U.S.C. § 6502 ................................................................... 36

15 U.S.C. § 8403 .............................................................. 45, 60

15 U.S.C. § 8404 ......................................................... 20, 45, 46

47 U.S.C. § 1753 ................................................................... 46

47 U.S.C. § 562 .................................................................... 46

5 U.S.C. § 706 ................................................................ 23, 67

Magnuson-Moss Warranty-FTC Improvement Act
   of 1974,
   Pub. L. 93-637, 88 Stat. 2183 (1975) ..................... 5, 6, 7, 8, 32, 33, 34

**RULES AND REGULATIONS**

Amplifier Rule,
   39 FR 15387 (May 3, 1974) ....................................................... 28

Business Opportunity Rule,
   16 C.F.R. Pt. 437 ................................................................. 9

Appellate Case: 24-3137     Page: 8     Date Filed: 03/17/2025 Entry ID: 5496705

Consumer Reviews and Testimonials Rule,
    89 FR 68034 (Aug. 22, 2024) ..................................................... 10

Credit Practices Rule,
    16 C.F.R. Pt. 444 ...................................................................... 9

Franchise Rule,
    43 FR 59614 (Dec. 21, 1978) .................................................... 8

Funeral Rule,
    47 FR 42260 (Sept. 24, 1982) ................................................ 28

Holder Rule,
    40 FR 53506 (Nov. 18, 1975) ............................................ 8, 33

Holder Rule,
    16 C.F.R. Pt. 433 .................................................................. 33

Impersonation Rule,
    89 FR 15017 (Mar. 1, 2024) .................................................... 10

Interpretations of Magnusson-Moss Warranty
    Act,
    16 C.F.R. Pt. 700 .................................................................. 34

Mail Order Merchandise Rule,
    40 FR 49492 (Oct. 22, 1975) ...................................... 8, 28, 32

Mail Order Rule Amendments
    79 FR 55615 (Sep. 17, 2014) .................................................. 10

Mail, Internet, or Telephone Order Merchandise
    Rule,
     16 C.F.R. Pt. 435 .................................................................. 32

Negative Option Rule
    38 FR 4896 (Feb. 22, 1973) ................................... 7, 27, 31, 32

Negative Option Rule,
    16 C.F.R. Pt. 425 .................................................................. 69

Non-Compete Clause Rule,
    89 FR 38342 (May 7, 2024) ...................................................... 5

Recommendations of the Administrative
    Conference of the United States (ACUS),
    44 FR 38817 (Jul. 3, 1979) ...................................................... 9

Appellate Case: 24-3137     Page: 9     Date Filed: 03/17/2025 Entry ID: 5496705

Revisions to Rules of Practice,
  86 FR 38542 (July 22, 2021) ............................................................ 10

SEC Rule 10b-5,
  17 C.F.R. § 240.10b-5 ..................................................................... 41

Telemarketing Sales Rule,
  16 C.F.R. Pt. 310 ............................................................................ 41

## OTHER AUTHORITIES

32 *Federal Practice & Procedure* (Wright and
  Miller) (2d ed. 2024) ......................................................................... 7

Black's Law Dictionary (4th ed. 1968) ................................................ 26

H.R. Rep. 93-1107 (Jun. 13, 1974) ................................................... 6, 7

John Harrison, *Vacatur of Rules Under the
  Administrative Procedure Act*,
  40 Yale J. Reg. 119 (2023) ............................................................. 69

S. Conf. Rep. 93-1408 (Dec. 18, 1974) ...................................... 6, 37, 50

S. Rep. 93-151 (May 14, 1973) ............................................................ 6

S. Rep. 96-500 (Dec. 14, 1979) ................................................ 8, 35, 37, 66

S. Rep. No. 103-130 (Aug. 24, 1993) ................................................. 51

Webster's Third New International Dictionary
  (1976) .............................................................................................. 39

Appellate Case: 24-3137    Page: 10    Date Filed: 03/17/2025 Entry ID: 5496705

## INTRODUCTION

In recent years, sellers have expanded their use of recurring payment models in industries ranging from dating services to satellite radio to beer. In 2024, the Federal Trade Commission completed a five-year rulemaking process to address prevalent abuse of "negative option" features—contractual provisions allowing a seller to impose recurring charges for goods and services unless the consumer takes affirmative steps to cancel the arrangement.

Although negative option programs can benefit sellers and consumers, many consumers are enrolled unwittingly and go months or years without discovering how much money they are losing through recurring charges. And once consumers discover the charges and try to cancel a subscription they signed up for online, they often face unnecessary obstacles from sellers who force them to endure multiple phone calls, long hold times, and countless automated menus. Studies show that most Americans pay hundreds annually for unwanted subscriptions.

The Rule does not prohibit or restrict the use of negative option programs; it simply adopts four common-sense measures to prevent

abuse: sellers must (1) avoid material misrepresentations; (2) disclose important information, including how much and when a consumer will be charged and how to cancel; (3) obtain express informed consent to the recurring charges; and (4) provide a cancellation mechanism at least as easy to use as the method the consumer used to enroll.

Petitioners challenge the Rule based on a fallacy that the FTC cannot adopt regulations affecting "multiple industries" or "sectors of the economy." Br.2. The statute authorizing Commission rulemaking imposes no such restriction. Tellingly, the Negative Option Rule *itself* has applied to all industries within the FTC's jurisdiction for 50 years. And it's not alone: the Commission has a long history of cross-industry rulemaking.

Congress gave the Commission broad discretion to issue rules defining unfair and deceptive conduct with specificity and to issue requirements to prevent that conduct from recurring. 15 U.S.C. § 57a(a)(1)(B). Here, the Commission found that negative option programs present four specific types of wrongdoing common across industries: misrepresentations, omission of material facts, enrollment without consent, and onerous barriers to cancellation. These findings

2

rest on a long record of enforcement actions, tens of thousands of consumer complaints per year, and numerous studies. The Commission carefully tailored the Rule to define the prevalent misconduct and prevent it from recurring.

## JURISDICTION

This Court has jurisdiction to review the Rule under 15 U.S.C. § 57a(e)(1)(A). Petitioners filed petitions for review in four circuits on October 22, 2024, before the Rule's publication in the Federal Register. App.384 (Add.1). The Commission thereafter transmitted the petitions to the Judicial Panel on Multidistrict Litigation, which ordered that the petitions be consolidated in this Court. Petitioners then filed an additional, "protective" petition for review in this Court on December 4, 2024.

## STATEMENT OF ISSUES

1.    Did the Commission properly exercise its rulemaking authority under 15 U.S.C. § 57a?

- *Katharine Gibbs Sch. (Inc.) v. FTC*, 612 F.2d 658, 662 (2d Cir. 1979).

- *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 984 (D.C. Cir. 1985).

3

2.     Did the Commission reasonably explain the Rule's requirements and scope?

- *Am. Fin. Servs.*, 767 F.2d at 985-89.

- *Penn. Funeral Dirs. Ass'n v. FTC*, 41 F.3d 81, 86-90 (3d Cir. 1994).

3.     Did the Commission comply with procedural requirements under 15 U.S.C. § 57b-3, and if not, should the Rule be vacated when petitioners do not demonstrate that any alleged errors were harmless?

- *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009).

### STATEMENT OF THE CASE

**A.     The Federal Trade Commission Act**

**1.** The FTC Act forbids "unfair or deceptive acts or practices" and "empower[s] and direct[s]" the Commission, a bipartisan expert agency, to prevent them. 15 U.S.C. § 45(a). A practice is "unfair" when it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). And a "deceptive" practice is one that involves a representation that is material and likely to mislead reasonable consumers. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). The Commission

4

pursues its mandate through administrative adjudication, *id.* § 45(b), federal-court litigation, *id.* § 53(b), and rulemaking, *id.* § 57a.

Section 18 of the FTC Act, 15 U.S.C. § 57a, is a "broad delegation of discretionary authority to the FTC to define unfair practices" by rule. *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 969 (D.C. Circ. 1985). Section 18 authorizes the Commission to adopt "rules which define with specificity acts or practices which are unfair or deceptive," along with "requirements prescribed for the purpose of preventing such acts or practices." 15 U.S.C. § 57a(a)(1)(B). The Commission may enforce these rules in civil actions seeking injunctive relief, *id.* § 53(b), and monetary redress for injured consumers, *id.* § 57b(a)-(b). Civil penalties are available if the defendant violated a rule with actual or implied knowledge that its practices were prohibited. *Id.* § 45(m)(1)(A).

Congress enacted Section 18 as part of the Magnuson-Moss Warranty-FTC Improvement Act of 1974, Pub. L. 93-637, 88 Stat. 2183 (1975). Before then, the Commission relied upon 15 U.S.C. § 46(g) to promulgate dozens of rules defining conduct as unfair or deceptive. *See* 89 FR 38342, 38349 (May 7, 2024) (summarizing this history). Uncertainty arose in the early 1970s, when a district-court decision—

5

later overturned—concluded that § 46(g) did not confer substantive rulemaking authority. *Nat'l Petroleum Refiners Ass'n v. FTC*, 340 F. Supp. 1343 (D.D.C. 1972), *rev'd* 482 F.2d 672 (D.C. Cir. 1973). In response, Congress adopted Magnuson-Moss and "reaffirm[ed] the legislative rulemaking authority of the Commission." S. Rep. 93-151 at 32 (May 14, 1973). Magnuson-Moss simultaneously directed the Commission to adopt new rules governing consumer warranties, Pub. L. 93-637 §§ 102-03, 109-10.[1]

Congress emphasized that rulemaking is "an important power by which the Commission can fairly and efficiently pursue its important statutory mission." S. Conf. Rep. 93-1408, at 31 (Dec. 18, 1974). Rulemaking provides "obvious advantages" over case-specific adjudication by (1) offering affected persons an "opportunity to be heard"; (2) creating "uniform[]" standards providing notice to the public; and (3) giving regulated parties an opportunity for judicial review. H.R. Rep. 93-1107 at 32 (Jun. 13, 1974).

---

[1] Petitioners claim that Magnuson-Moss resulted from congressional "backlash" (Br.8). They confuse that 1975 statute, which enacted Section 18, with later laws. *See infra* 8.

6

Magnuson-Moss was one example of "congressional experimentation" with a "hybrid" rulemaking model more demanding than the Administrative Procedure Act's informal rulemaking procedures but less stringent than the APA's formal rulemaking procedures, which had fallen out of use. *See* 32 *Federal Practice & Procedure* (Wright and Miller) § 8187 (2d ed. 2024). Congress recognized that FTC rules could have "pervasive and deep effect," H.R. Rep. 93-1107 at 45, and thus required the Commission to clear additional procedural hurdles. Among other things, the Commission must "stat[e] with particularity the … reason for the proposed rule" and conduct an "informal hearing" as part of any Section 18 rulemaking. 15 U.S.C. § 57a(b)(1); *see* 88 Stat. at 2193.

Because Magnuson-Moss departed from previous Commission rulemaking practice, Congress limited its effect. Congress provided that the new rulemaking provisions "shall not affect the validity of any current rule," 88 Stat. at 2198, which included the original Negative Option Rule promulgated in 1973. *See* 38 FR 4896 (Feb. 22, 1973). Also, Congress authorized the Commission to finish using ordinary APA procedures for rules that were "substantially completed" at the time of

7

Magnuson-Moss. 88 Stat. at 2198. That provision applied to several significant rules. *See, e.g.*, Mail Order Merchandise Rule, 40 FR 49492 (Oct. 22, 1975) (requiring sellers of merchandise via mail-order to have reasonable basis for stated shipping times); Franchise Rule, 43 FR 59614 (Dec. 21, 1978) (requiring disclosure of material information to franchisees); Holder Rule, 40 FR 53506 (Nov. 18, 1975) (preserving certain defenses in any "consumer credit contract").

**2.** Five years after Magnuson-Moss, Congress added more requirements for Commission rulemaking. This effort followed backlash to the Commission's attempt to restrict advertisements aimed at young children. *See* S. Rep. 96-500 at 2 (Dec. 14, 1979). In 1980, Congress required the Commission to publish an advance notice of proposed rulemaking (ANPRM) and submit that notice to Congress. 15 U.S.C. § 57a(b)(2). Congress also required the Commission to conduct a preliminary regulatory analysis accompanying a notice of proposed rulemaking (NPRM), and then a final regulatory analysis accompanying a final rule. *See* 15 U.S.C. § 57b-3(b)(1)-(2). But the regulatory analysis requirement does not apply to "any amendment" to an existing rule unless the amendment meets one of several specified

8

criteria, including having an annual economic effect of $100 million or more. *Id.* § 57b-3(a)(1).

In the 1980s, FTC rulemaking activity began to slow down because the Commission adopted unwieldy rulemaking procedures beyond what Congress required. For example, Magnuson-Moss required cross-examination for "disputed issues of material fact that [are] necessary to resolve," 15 U.S.C. § 57a(c)(2)(B), but the Commission allowed cross-examination on "any points" of "policy or opinion." Recommendations of the Administrative Conference of the United States, 44 FR 38817, 38821-22 (Jul. 3, 1979). Hearings "seldom produced useful factual information" but spawned "massive and poorly organized" administrative records. *Id.*

Still, the Commission maintained an active rulemaking agenda. For example, in 1984, the Commission promulgated the Credit Practices Rule, 16 C.F.R. Pt. 444, which applies to all consumer credit transactions (except real estate), and forbids finance companies and retailers from committing several unfair practices. *See Am. Fin. Servs.*, 767 F.2d at 991 (upholding Credit Practices Rule). In 2011, the Commission adopted the Business Opportunity Rule, 16 C.F.R. Pt. 437,

9

which requires sellers of business opportunities, such as work-at-home programs, to make disclosures and avoid misrepresentations. The Commission also has amended many rules under Section 18, such as in 2014, when the Commission amended the Mail Order Rule to clarify that it covers all internet merchandise orders. 79 FR 55615 (Sep. 17, 2014).

In 2021, the Commission streamlined its rulemaking procedures to eliminate "[s]elf-imposed red tape," which had "reinforced the myth that Section 18 rulemakings required elaborate, interminable judicial processes instead of straightforward public participation." 86 FR 38542, 38551-52 (July 22, 2021).[2] The Commission renewed its rulemaking efforts using these new procedures. *See, e.g.*, Consumer Reviews and Testimonials Rule, 89 FR 68034 (Aug. 22, 2024) (prohibiting false reviews and purchase or suppression of customer reviews); Impersonation Rule, 89 FR 15017 (Mar. 1, 2024) (forbidding commercial impersonation of government, businesses, or their agents).

---

[2] Petitioners do not challenge the amended procedures.

## B. Unfair and deceptive recurring charges

The Commission first promulgated a rule addressing negative option programs in 1973. The original rule forbade unfair and deceptive practices in connection with "prenotification plans" in which sellers send periodic notices offering books, flowers, apparel, or other merchandise to consumers and then send—and charge for—the merchandise unless consumers decline. App.385-86 (Add.2-3). The rule required sellers to disclose key terms (including consumers' rights to cancel or reject goods), give consumers adequate time to respond to notices, and promptly honor cancellation requests. App.386 (Add.3).

Convinced that the original rule had become outdated, the Commission set out in 2019 to tackle the ubiquitous problem of recurring charges that consumers never authorized or no longer want. App.1. Thanks to advances in e-commerce, recurring-subscription models have spread across industries, including media services, meal-preparation kits, shaving products, and beer and wine. App.392 & nn.102-103 (Add.9). Studies show that more than half of Americans have incurred recurring charges without consent. App.391 (Add.8). Nearly two-thirds of consumers pay more than $50 monthly for

Appellate Case: 24-3137     Page: 21     Date Filed: 03/17/2025 Entry ID: 5496705

subscriptions they no longer want. *Id.* One survey found that unwanted charges take three months to cancel on average. *Id.* These problems have generated a "burgeoning industry offering to help consumers identify and cancel their unwanted subscriptions." App.390 (Add.7).

Negative option programs can benefit consumers by providing convenient, uninterrupted access to goods and services, often at lower prices than if the consumer had to make separate purchases each time. App.385 (Add.2). But consumers are harmed if sellers charge them for products they never ordered, secure their consent through deception, omit key facts, or make it overly difficult to cancel. App.385, 389-90 (Add.2, 6-7). The FTC receives tens of thousands of complaints along these lines each year, resulting in dozens of state and FTC enforcement actions. *Id.*

Negative option programs are often plagued with misleading claims about all aspects of the transaction. App.391-92, 399, 401-03 (Add.8-9, 16, 18-20). Deception occurs through overt claims and omission of key facts, including the recurring nature of the charges, cancellation deadlines, and refund rights. App.392 (Add.9). Even where

Appellate Case: 24-3137    Page: 22    Date Filed: 03/17/2025 Entry ID: 5496705

sellers disclose these facts, they often do so in inscrutable fine print or after the charges have begun. App.404 (Add.21).

Moreover, sellers often fail to secure consumers' express consent to recurring charges. App.392 (Add.9). Sellers promise free trials or discounted products, hiding that consumers will be enrolled in costly memberships unless they cancel before the trial ends. App.391-92, 407-08, 410 (Add.8-9, 24-25, 27). The harms multiply over time, as consumers often fail to notice the unauthorized recurring charges until encountering them on a bank statement months later. App.390-91 & n.66, App.403, 410 (Add.7-8, 20, 27).

Finally, sellers frequently adopt byzantine cancellation procedures to trap consumers in unwanted subscriptions. App.392, 412-18 (Add.9, 29-35). Many Americans have wasted hours on the phone attempting to cancel subscriptions while enduring disconnected calls, interminable hold times, and aggressive upsells. *Id.* & nn.361-375, 401, 416-17, 424, 437. Other times, sellers make consumers hunt for cancellation terms buried in fine print or deep within the sellers' websites. App.417 & n.425 (Add.34). Fitness centers particularly are notorious for making consumers cancel in person or by certified letter when they signed up

online. App.429-30 (Add.46-47). Importantly, honest businesses also suffer when consumers hesitate to sign up for free trials or negative option-based products for fear of being trapped. App.404 (Add.21).

Despite the efforts of federal and state enforcers to combat unfair and deceptive recurring charges through case-specific enforcement, the Commission found that amending the Negative Option Rule was necessary to protect consumers and the public. App.385, 389-90 (Add.2, 6-7). A bipartisan coalition of state attorneys general supported the rulemaking effort from its inception. *See* App.7-19 (comment from 23 state AGs); App.90-109 (comment from 26 AGs).

## C.    Amendments to the Negative Option Rule

The Commission's 2019 ANPRM sought comment on whether to "expand the scope and coverage" of the Negative Option Rule. App.2. The existing rule failed to "reach most modern negative option marketing," and case-by-case enforcement had proven insufficient to deter "problematic negative option practices." *Id.* The Commission observed that "[t]he existing patchwork of laws and regulations does not provide industry and consumers with a consistent legal framework across different media." App.4.

14

Based on comments responding to the ANPRM, the NPRM proposed extending the scope of the Negative Option Rule to "all forms of negative option marketing in all media." App.26. The Commission found that unfair and deceptive practices were prevalent across industries based on "complaint data, studies, survey results, and law-enforcement actions." App.35. The NPRM included proposals to forbid misrepresentations, require disclosures and advance consent, and mandate that consumers be permitted to cancel through simple mechanisms. App.36-39.

The Commission determined that the proposal largely restated "existing requirements" in "other rules and statutes," App.36, and therefore would not generate more than $100 million in annual economic effects. App.41. For that reason, the NPRM did not include a preliminary regulatory analysis. *See id.* ("compliance with the proposed requirements should not create any substantial added burden," as sellers were already obligated to "provide some sort of disclosures, follow consent procedures, and offer cancellation mechanisms"). But the Commission invited comments, evidence, and data on the proposed

15

rule's "economic effects," its "likely effectiveness," and whether "other approaches" or "alternatives" would be more effective. App.40-41.

The Commission received 16,000 public comments in response to the NPRM. App.388. In early 2024, a neutral presiding officer conducted a three-day informal hearing at which petitioners IAB and NCTA presented written submissions, expert reports, and oral testimony (with cross-examination) on the proposed rule's costs and benefits. App.378-81. The presiding officer issued a recommended decision finding that the proposed rule's "incremental benefits and costs over the existing law" would exceed $100 million annually. App.382-83.

After considering the comments and evidence from the informal hearing, the Commission issued the final Rule. App.384-453 (Add.1-70). The Commission reaffirmed its finding that four types of "unfair or deceptive acts or practices in the negative option marketplace are prevalent": (1) "material misrepresentations … to induce consumers to enter into negative option programs"; (2) "failure to provide important information … prior to billing consumers"; (3) "lack of informed consumer consent"; and (4) "failure to provide consumers with a simple cancellation method." App.389 (Add.6).

The Rule accordingly contains four core requirements, all "[i]n connection with promoting or offering for sale any good or service with a Negative Option Feature," App.446-47 (Add.63-64):

- **Misrepresentations:** Section 425.3 bars sellers from misrepresenting material facts, including cost, negative option feature terms, and other information about the goods or services.

- **Disclosures:** Section 425.4 requires sellers to clearly and conspicuously disclose all material terms, including the amount and frequency of the charges and their recurring nature, the deadlines for consumers to prevent or stop the charges, and how to cancel.

- **Consent:** Section 425.5 requires sellers to obtain the consumer's express informed consent to the negative option feature, separate from the rest of the transaction.

- **Cancellation:** Section 425.6 requires sellers to provide "a simple mechanism" that allows consumers to cancel the negative option feature and immediately stop all recurring charges. The cancellation mechanism "must be at least as easy

17

to use as the mechanism the consumer used to consent to the
Negative Option Feature," and must allow consumers to cancel
"through the same medium the consumer used to consent." If a
consumer consented in person, the seller must provide either a
phone number or an electronic medium to cancel.

The Commission decided not to adopt several other proposed
requirements. App.384, 442-43 (Add.1, 40-41).

The Commission also issued a final regulatory analysis, which
addressed the presiding officer's recommended decision, the public
comments, and the testimony and submissions from the informal
hearing. App.425-42 (Add.42-59). The Commission reaffirmed its earlier
finding that the Rule would impose less than $100 million in additional
costs per year but found that the benefits of the Rule would run much
higher. App.427 (Add.44).

Although the Rule became effective in January 2025, the
Commission deferred the compliance dates for most of the new
requirements until May 14, 2025. App.384, 424-25 (Add.1, 41-42).
Petitioners (an individual business and various associations) sought
review of the Rule in this Court and three other circuits. After the

18

petitions were consolidated in this Court, petitioners sought a stay of the Rule, which this Court denied.

## SUMMARY OF ARGUMENT

I. Section 18 of the FTC Act requires the Commission to "define with specificity" unfair or deceptive practices "in or affecting commerce." The Commission satisfied this requirement by defining particular conduct, all related to agreements with negative option features, as unfair or deceptive. Petitioners erroneously contend that the statute's specificity requirement limits the economic scope of FTC rulemaking, but the statute's plain text links the "specificity" requirement with the Commission's definition of "acts or practices." The only limit Congress placed on economic scope is that rules must address acts or practices "in or affecting commerce," which this Rule indisputably does.

Petitioners stake their case on a theory that the FTC Act forbids the Commission from regulating across multiple industries. That argument has no basis in the statutory text, finds no support in precedent, and contradicts decades of Commission practice promulgating cross-industry rules—many of which Congress has

19

endorsed. Petitioners' argument that the Rule is impermissibly vague, meanwhile, relies on a misleading definition of specificity and fails on its own terms. Petitioners identify no genuine ambiguities in the Rule text, and they ignore the Commission's detailed guidance clarifying each requirement.

II. Congress authorized the Commission to prohibit unfair or deceptive practices within its jurisdiction even if the relevant conduct is also subject to other laws. Petitioners incorrectly claim that the Rule "overrides" statutes, Br.49, but they cite no statutes that forbid the Commission from regulating negative option programs. In fact, two statutes petitioners cite explicitly do not "limit the authority of the Commission under any other provision of law." 15 U.S.C. §§ 6105(c), 8404(c).

Petitioners further claim that Section 18 would violate the nondelegation doctrine if it allowed the Commission to override statutes, but the Rule overrides no statutes. In any event, the FTC Act's unfair-or-deceptive standard provides an intelligible principle and is therefore constitutional.

20

III. The Rule rests on copious evidence—including dozens of enforcement actions, tens of thousands of consumer complaints, comments from industry and consumer groups, and economic studies—showing that unfair and deceptive negative option practices are prevalent. The Commission reasonably found that these abuses could arise in any industry, since they are a function of common marketing strategies rather than the underlying goods or services. The Commission's prevalence findings are not judicially reviewable, *see* 15 U.S.C. § 57a(e)(5)(C), but those findings easily pass muster under the arbitrary-and-capricious standard. Most important, the FTC Act does not require the Commission to show that the prevalence of unfair or deceptive practices meets a certain numerical threshold, as petitioners contend.

The Commission properly found that the Rule's requirements are the most effective way to prevent the unfair or deceptive conduct and reasonably explained why. For example, in response to evidence of sellers trapping consumers with recurring charges, the Rule (§ 425.6) requires sellers to provide cancellation mechanisms that are at least as easy to use as the mechanisms for enrollment. At the same time, the

21

Rule strikes an appropriate balance by preserving sellers' ability to authenticate consumers' identities, confirm their intent to cancel, alert them about the consequences, and offer discounts. Likewise, the Rule (§ 425.5) reasonably requires sellers to obtain consumers' express informed consent to the negative option in response to the danger of consumers being inadvertently enrolled.

IV. Petitioners argue the Commission failed to follow procedural requirements by not conducting a preliminary regulatory analysis. The statute did not require such an analysis to accompany the NPRM because the Commission estimated that the proposed rule's annual economic effects would not surpass the statutory threshold. Petitioners argue that the Commission should have conducted a preliminary regulatory analysis after the informal hearing. But nothing in the FTC Act requires a preliminary regulatory analysis at that late stage. Regardless, petitioners have not carried their burden to show that any procedural errors caused them prejudice. Petitioners had ample opportunity to submit evidence on the Rule's costs and benefits, and they have not shown that a preliminary regulatory analysis would have made a difference.

V. Finally, should this Court agree with any of petitioners' arguments, it should tailor any remedy. The Rule includes a severability provision to preserve the remainder of the Rule if any portion is invalid. And the Court should limit any relief to parties that have established standing.

## STANDARD OF REVIEW

The Court should deny the petitions unless it determines that the Rule exceeds the Commission's statutory authority, is arbitrary and capricious, lacks substantial evidence, or fails to observe required procedures. 15 U.S.C. § 57a(e)(3); 5 U.S.C. § 706(2)(A)-(D). The Court must "tak[e] due account of the rule of prejudicial error," 15 U.S.C. § 57a(e)(3), which requires petitioners to bear "the burden of showing … prejudice." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (cleaned up).

Under Section 18 of the FTC Act, the Commission's "factual determinations" are governed by the substantial-evidence test while all other determinations are governed by the arbitrary-and-capricious test. *Consumers Union of U.S. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986) (Scalia, J.). The two tests, however, "are one and the same insofar as the requisite degree of evidentiary support is concerned." *Id.* (cleaned

23

up). The Commission's decision must be "reasonable and reasonably explained," but the Court "may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Proj.*, 593 U.S. 414, 423 (2021).

## ARGUMENT

## I.  The Commission Properly Exercised Its Statutory Authority to Issue the Rule.

Section 18 of the FTC Act authorizes the Commission to "prescribe … rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce" and provides that those rules "may include requirements prescribed for the purpose of preventing such acts or practices." 15 U.S.C. § 57a(a)(1), (a)(1)(B). The amended Rule accordingly defines specific acts or practices that are unfair or deceptive in the context of contracts with negative option features. That approach satisfies Section 18's "specificity" requirement. Petitioners' contrary approach—requiring that a rule be limited to a single industry—contravenes the FTC Act's plain text and relies on a false historical narrative.

**A.** **The Rule defines with specificity unfair or deceptive acts or practices in or affecting commerce.**

On issues of "statutory construction," courts "start, of course, with the statutory text, and proceed[] from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (cleaned up). Courts must read "the words of a statute … in their context and with a view to their place in the overall statutory scheme" rather than in "isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (cleaned up).

Section 18(a)(1)(B) creates three criteria for FTC rulemaking. First, the Commission must define "specific[]" acts or practices. Second, the defined acts or practices must be "unfair or deceptive." And third, they must be "in or affecting commerce."[3] Petitioners assert only that the Rule fails the "specificity" requirement, but they misconstrue the statutory language. 15 U.S.C. § 57a(a)(1)(B).

---

[3] The FTC's authority to regulate commerce is "coextensive with the constitutional power of Congress under the Commerce Clause." *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 277 n.6 (1975); *see* 15 U.S.C. § 44. The FTC Act also carves out certain industries and activities from the Commission's jurisdiction. *See* 15 U.S.C. § 45(a)(2).

25

When Congress enacted Section 18, "specific" meant "[p]recisely formulated or restricted; definite; explicit; of an exact or particular nature." *Specific*, Black's Law Dictionary (4th ed. 1968) *cf.* Br.32-33 (noting other, similar dictionary definitions).[4] Section 18 thus authorizes the Commission to define particular (specific) acts or practices that are unfair or deceptive. That is, the Commission cannot merely adopt a rule that broadly prohibits "any unfair or deceptive act or practice" across the economy, without more, such that the rule simply restates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). That would not be specific. Instead, the Commission must identify particular acts or practices that are unfair or deceptive.

Appellate decisions confirm this interpretation of the specificity requirement. The D.C. Circuit has explained that the Commission complies with Section 18 when it "identifies specific practices … as *per se* unfair and prohibits those practices." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 984 (D.C. Circ. 1985). The D.C. Circuit contrasted the Credit Practices Rule at issue there with an earlier rule that did not

---

[4] "Specificity" merely means "the quality or condition of being specific." *See Specificity*, Merriam-Webster https://www.merriam-webster.com/dictionary/specificity (2025).

Appellate Case: 24-3137    Page: 36    Date Filed: 03/17/2025 Entry ID: 5496705

satisfy the statutory standard. As the D.C. Circuit explained, the earlier Vocational Schools Rule did not define *any* unfair or deceptive practices but simply "adopted a rule regulating tuition refund policies," intending to prevent "unspecified unfair enrollment advertising and sales practices." *Id.* (quoting *Katharine Gibbs Sch. (Inc.) v. FTC*, 612 F.2d 658, 661 (2d Cir. 1979)). Because the Vocational Schools Rule failed to define any practices as unfair or deceptive, the Second Circuit struck it down. *Gibbs*, 612 F.2d at 662.

This Rule conforms with the plain meaning of specificity and its construction by courts. The Rule defines it as unfair or deceptive for a Negative Option Seller to: (1) make material misrepresentations (such as about cancellation deadlines); (2) fail to disclose material terms (like the amount and frequency of recurring charges); (3) fail to obtain express informed consent before charging the consumer; and (4) fail to provide a simple mechanism to cancel the negative option feature. App.446-47 (Add.63-64). The definitions echo acts or practices that the Commission has defined as unfair or deceptive in other contexts.[5] And

---

[5] *See* Negative Option Rule, 38 FR 4896 (Feb. 22, 1973) (requiring sellers to comply with certain cancellation procedures); Amplifier Rule,

each provision is targeted to a specific type of contract: those with a "Negative Option Feature," App.446-47 (Add.63-64), which is a defined term that petitioners do not address or challenge. Thus, the Negative Option Rule, like the Credit Practices Rule, "defined with specificity the acts or practices deemed unfair" related to the identified problem (here, negative option programs), and thus "fully complied with the statutory requirements of section 18(a)(1)(B)." *Am. Fin. Servs. Ass'n*, 767 F.2d at 984.

### B. Congress did not bar the Commission from prohibiting unfair or deceptive practices across industries.

**1.** Petitioners' argument starts with empty rhetoric, claiming that "[b]y definition, a Rule that targets over a billion commonplace contracts used by 220 million American consumers and businesses in every industry from newspapers to health care is not 'specific[].'" Br.32 (cleaned up). But that argument, although it purports to rely on

---

39 FR 15387 (May 3, 1974) (defining as unfair or deceptive the failure to make certain disclosures); Mail Order Rule, 40 FR 49492 (Oct. 22, 1975) (defining certain unfair or deceptive acts or practices based on customers' consent); Funeral Rule, 47 FR 42260 (Sept. 24, 1982) (defining unfair or deceptive acts or practices to include certain misrepresentations).

statutory text, is completely divorced from Section 18's meaning. The quoted term—"specificity"—does not limit the number of consumers harmed by unfair or deceptive acts practices, nor does it limit the number of businesses who engage in prohibited conduct. Instead, specificity requires only that the Commission define the acts or practices themselves. In fact, as petitioners later recognize, the Commission can issue proposed rules only when it has reason to believe the defined deceptive acts or practices are "prevalent," demonstrating that Congress intended the Commission to target widespread misconduct. 15 U.S.C. § 57a(b)(3).

Petitioners cite various definitions of "specificity" and "specific" that require distinctiveness or uniqueness. Br.32-33. No one disputes those definitions. But petitioners ignore the statutory text that "specificity" modifies: the definition of acts or practices. Instead, petitioners assert without explanation that the statute "calls for rules that are targeted and focused on particular practices in definable industries." Br.33.

The text of Section 18 says nothing about industries; indeed, it refutes petitioners' premise that the FTC is prohibited from rulemaking

Appellate Case: 24-3137   Page: 39   Date Filed: 03/17/2025 Entry ID: 5496705

addressing multiple industries. Rather, Congress provided that Commission rules may reach conduct "in or affecting commerce," 15 U.S.C. § 57a(a)(1)(B), while also exempting from the Commission's jurisdiction a handful of statutorily enumerated industries, confirming that participants in any non-exempted industry can be subject to Commission rules, *id.* § 45(a)(2). Congress thus expressly allowed the Commission to target acts or practices that "affect[] commerce," whether that effect occurs in one industry or many. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (internal quotation omitted)).

Petitioners fail to cite a single case supporting their single-industry theory. Their brief mention of *Gibbs* includes a parenthetical claiming the Second Circuit overturned an "'overbr[oad]' rule for lacking 'specificity.'" Br.32 (alteration in original) (quoting *Gibbs*, 612 F.2d at 667).[6] As explained above, however, the problem in *Gibbs* was that the

---

[6] The quoted reference to "overbreadth" came in the court's analysis of whether the FTC could preempt state laws and had nothing to do with industries. *Gibbs*, 612 F.2d at 667.

Commission had failed to define *any* conduct as unfair or deceptive and instead issued a purely "remedial" rule that would have permitted civil penalties for conduct not specifically defined as an FTC Act violation. *Gibbs*, 612 F.2d at 662. *Gibbs* has no relevance here because the Rule indisputably defines specific conduct as unfair or deceptive.

**2.** The crux of petitioners' argument is that this Rule is, in their view, too broad. They claim that "Congress rejected" rules extending beyond any one industry but "did *not* block" rules that stayed industry-specific. Br.34-35. Put aside that this point has nothing to do with the text of Section 18. It also simply isn't true. While some Commission rules are industry-specific, the Commission has consistently promulgated industry-agnostic or multi-industry rules both before and after Magnuson-Moss, without congressional interference.

The original Negative Option Rule, promulgated in 1973, applied to "the use of any negative option plan," "[i]n connection with the sale, offering for sale, or distribution of goods and merchandise in commerce." 35 FR 4896 (Feb. 22, 1973). While negative option plans initially arose with book-of-the-month and record clubs (*cf.* Br.16), the Commission explained that the plans "began to proliferate" and applied to "an

Appellate Case: 24-3137     Page: 41     Date Filed: 03/17/2025 Entry ID: 5496705

infinite variety of products, including flowers, wines, Bibles, dogs, dolls, handkerchiefs, and dresses." 35 FR at 4897-98; *see also id.* at 4900, 4914 (identifying practices within some of these industries). Importantly, Magnuson-Moss guaranteed that its amendments "shall not affect the validity of any rule" promulgated before the "date of enactment of this section." 88 Stat. at 2198. That included the Negative Option Rule, confirming that Congress did not object to its multi-industry reach.

There are plenty of other examples. As explained above (at 8, 10), the Mail Order Rule—now MITOR—defined certain acts or practices as unfair or deceptive "[i]n connection with mail order sales in commerce." 40 FR 49492 (Oct. 22, 1975); *see* 16 C.F.R. Pt. 435. Countless industries sold goods through the mail—and today, even more sell through mail, internet, or telephone orders—and the rule reached (and reaches) them all. The Franchise Rule, Credit Practices Rule, and Business Opportunity Rule likewise reach across industries.[7] *See supra* 8-10 (describing each rule's reach).

---

[7] In an aside, petitioners refer to the "franchising industry," Br.35, but franchising is no more an "industry" as petitioners use the term than

Appellate Case: 24-3137    Page: 42    Date Filed: 03/17/2025 Entry ID: 5496705

Similarly, the Holder Rule determined that, "[i]n connection with any sale or lease of goods or services to consumers," it was an unfair or deceptive act or practice for sellers to fail to include specific contractual language in any "consumer credit contract." 40 FR 53506 (Nov. 18, 1975); 16 C.F.R. Pt. 433. As in the Negative Option Rule, the Commission defined an unfair or deceptive act or practice connected to contracts used by businesses across many industries.

Congress expressly allowed the Commission to promulgate several of these rules. As explained above (at 7-8), Magnuson-Moss provided that any proposed rule that was "substantially completed" at the time of Section 18's enactment "may be promulgated in the same manner and with the same validity as such rule could have been promulgated had this section not been enacted." 88 Stat. at 2198. That provision applied to the Mail Order Rule, Franchise Rule, and Holder Rule. *See United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454-55 (7th Cir. 1983)

recurring subscriptions constitute a "subscription industry." Notably, at least one comment—on behalf of three major trade associations that *opposed* the rule—referred to the "subscription industry." *See* Comment of Entertainment Software Ass'n, Digital Media Ass'n, and Motion Picture Ass'n, FTC-2023-0033-0867, https://www.regulations.gov/comment/FTC-2023-0033-0867.

Appellate Case: 24-3137    Page: 43    Date Filed: 03/17/2025 Entry ID: 5496705

(holding that Congress intended to preserve the Mail Order Rule). Had Congress not wanted the Commission to maintain these cross-industry rules, it would have prohibited those rulemakings—as petitioners emphasize, Congress stepped in when it believed the Commission had gone too far. *See* Br.34-35; *see also* 15 U.S.C. § 57a(h) (removing Commission's "authority to promulgate any rule" similar to the pending "children's advertising rule").

Petitioners' theory also collides with Congress's directive in Magnuson-Moss requiring the Commission to adopt rules governing consumer warranties. 88 Stat. at 2185-87, 2189-92; *see* 15 U.S.C. § 2302. Petitioners never explain why Congress would have limited the Commission to single-industry rulemaking while simultaneously ordering the Commission to promulgate rules governing anyone using a "written warranty" to "warrant[] a consumer product" regardless of industry. 15 U.S.C. § 2302; *see also* 16 C.F.R. Pt. 700.

**3.** Petitioners' theory that "Congress rejected" cross-industry rules thus runs headlong into numerous cross-industry rules that Congress approved or mandated. Br.34. Congress rejected rules that proposed to regulate children's advertising and the general standards for the

34

quality, weight, and measure of goods and materials because it disliked *those rules* and believed they went too far, not because of any multi-industry concern. The children's advertising rule included an "unbounded definition of 'unfairness.'" S. Rep. 96-500 at 2. The standards rule failed to "indicate a 'pattern' of violations." *Id*. Those problems do not exist here, and neither the statutory text nor legislative history give any inkling that Congress rejected those rules because they affected multiple industries.

Nor are petitioners correct that "[t]he rules that Congress did *not* block" somehow "confirm" their point. Br.35. Congress did not block the original Negative Option, Holder, Mail Order, Franchise, Credit Practices, or Business Opportunity rules, refuting any notion that "the Commission is suddenly asserting" newfound authority to promulgate cross-industry rules. Br.37-38. The Commission has promulgated such rules for decades—before, during, and after Magnuson-Moss.[8]

---

[8] For the same reason, there is no merit to petitioners' offhand reference to the major questions doctrine. Br.38 n.5. The rulemaking authority here has not been "suddenly discovered" or "rarely … used," and this Rule was not promulgated "against a backdrop of an agency failing to invoke" this power. Br.38 (citations omitted). In any event, petitioners forfeited this argument by including it in only an

35

Petitioners are also wrong that when Congress has "provid[ed] the Commission with separate rulemaking powers," it has "limited" those statutes "to specific industries." Br.36-37. Congress has charged the Commission with promulgating rules governing the "operator of any website or online service directed to children that collects personal information from children." 15 U.S.C. § 6502(b)(1)(A). Congress has also directed the Commission to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1); *see also supra* 34 (discussing Magnuson-Moss). Those statutes are not industry-specific.

**4.** Beyond their revisionist historical narrative, petitioners' atextual theory relies on sources irrelevant to the interpretation of Section 18, enacted in 1975. Petitioners cite a Senate Report from 1979, a House Report from 1993, and a Senate hearing from 2010. Br.34-35. But "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). In any event, statements in those

---

undeveloped footnote. *See Falco Lime, Inc. v. Tide Towing Co.*, 29 F.3d 362, 367 n.7 (8th Cir. 1994).

36

sources (and from individual Commissioners decades later, Br.35-36) do not articulate any atextual single-industry limitation on the Commission's power.

The only timely legislative history petitioners rely on lends no support—even setting aside the relevance of legislative history, *see United States ex rel. Cairns v. D.S. Medical LLC*, 42 F.4th 828, 836 (8th Cir. 2022). When explaining the language authorizing the Commission to prescribe preventive requirements*, see* 15 U.S.C. § 57a(a)(1)(B), Congress observed that the Commission could "continue to specify such matters" as "what octane rating should be posted on gasoline pumps." Br.33 (quoting S. Conf. Rep. 93-1408, at 7763-64 (Dec. 18, 1974)). That snippet was merely an "example," S. Conf. Rep. 94-1408 at 7764, and was not discussing the specificity requirement. It does not suggest that Congress intended the Commission to make only industry-specific rules but forgot to place that limitation in the statute.

**5.** Finally, petitioners gesture at a policy argument, claiming that unless the Court grafts onto the statute petitioners' preferred limitation then "almost anything 'could be considered' unfair." Br.38-39 (quoting S. Rep. 96-500). Petitioners ignore that the FTC Act defines "unfair." 15

37

U.S.C. § 45(n). And of course, the Commission's rulemaking is subject to judicial review. 15 U.S.C. § 57a(e). Petitioners' atextual limitation is thus unnecessary to ensure that the statute's unfairness standard has metes and bounds.

The history of FTC practice and the absence of supporting precedent merely reaffirm what Section 18's text already demonstrates. There is simply nothing in Section 18 or anywhere else in the FTC Act that says the Commission may make only "industry-specific" rules. Petitioners' "problem … is the one that inheres in most incorrect interpretations of statutes: It asks [the Court] to add words to the law to produce what is thought to be a desirable result." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). If Congress had meant to impose industry-specific boundaries on FTC rulemaking, it would have said so instead of authorizing rules regulating practices "in or affecting commerce." 15 U.S.C. § 57a.

### C.    The Rule is not vague.

Petitioners next argue that the Rule fails the specificity requirement "because it is replete with vague and ambiguous

standards." Br.39.[9] To challenge the Rule's straightforward requirements, petitioners imagine edge cases they believe would demonstrate hypothetical problems in applying the Rule. *E.g.* Br.41-42. But those examples are improper for a facial attack on a regulation. Should those scenarios ever come to pass, a defendant could argue against a particular application of the Rule.[10]

Petitioners' vagueness argument fails at the outset because it rests on a false premise. Petitioners no longer rely on dictionary definitions of "specific" or "specificity" that cohere around the basic concept of "particular" or "distinctive" (Br.32-33), but instead contend "specificity" means "free from … ambiguity." Br.40. That misrepresents the definition petitioners rely on. They partially quote the second clause in the fourth meaning of "specific" in the 1976 Webster's Third New International Dictionary, which says (at 2187) "specific" can mean "free

---

[9] Though petitioners use the word "vague," they do not invoke the Constitution's vagueness doctrine. *Cf., e.g.*, *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019) (explaining the standard for constitutional vagueness challenges).

[10] A facial attack based on specific applications of the Rule is particularly improper because regulated entities "may petition the Commission for a partial or full exemption." App.447 (Add.64).

Appellate Case: 24-3137    Page: 49    Date Filed: 03/17/2025 Entry ID: 5496705

from such ambiguity as results from careless lack of precision or from omission of pertinent matter." In addition to distorting the quoted definition, Petitioners make no effort to show a "careless lack of precision" or "omission of pertinent matter" here. Their handful of hypotheticals do not demonstrate any omission or carelessness. The Court can reject petitioners' argument for this reason alone.

In any event, none of petitioners' vagueness arguments hold water. They complain the Rule does not define a "simple" and "easy" cancellation mechanism, Br.40, but the Rule prescribes detailed "[m]inimum requirements for" a "simple mechanism." App.447 (Add.64) (§ 425.6(c)). The Commission also explained that the "as easy as standard" is "a flexible measure that ensures consumers have similar cancellation and consent experiences in terms of time, burden, expense, and ease of use, among other things." App.414 (Add.31). Beyond that, "[t]he Commission has provided considerable guidance on what constitutes a simple or 'easy' cancellation mechanism through numerous cases and its 2021 Enforcement Policy Statement." App.413 n.384 (Add.30) (collecting cases); App.20-25 (policy statement).

Appellate Case: 24-3137     Page: 50     Date Filed: 03/17/2025 Entry ID: 5496705

Petitioners ignore this material and never explain how it deprives regulated entities of sufficient notice.

Petitioners next attack the "Rule's definition of '[m]aterial fact.'" Br.41. But in direct response to a comment from Petitioner Chamber of Commerce, the Commission defined "Material" in the Rule. App.446 (Add.63); *see* App.401 & n.238 (Add.18) (noting the Chamber's comment). As the Commission explained, that definition is "consistent with section 5" of the FTC Act and the Commission's Telemarketing Sales Rule. App.401 & n.238 (Add.18) (citing 16 C.F.R. § 310.2(t); Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)). Courts have long accepted and applied this standard. *See, e.g.*, *Novartis Corp. v. FTC*, 223 F.3d 783, 787 (D.C. Cir. 2000). And materiality requirements are commonplace outside the FTC context too. *See, e.g.*, 17 C.F.R. § 240.10b-5 (SEC Rule 10b-5). Petitioners identify no decision holding that "material" in any law or regulation is impermissibly vague. In any event, the Rule identifies some specific categories of material information, including "consent" terms, the "deadline to prevent or stop a Charge," "Cost," the "recurring basis" of charges, the "frequency of charges," and

41

"information necessary for the consumer to find the simple cancellation mechanism." *See* App.446 (Add.63) (§§ 425.3-425.4).

Lastly, petitioners complain that "the Rule's prohibitions on information that 'interferes with, detracts from, contradicts, or otherwise undermines' the required disclosures or consent mechanism" fails to give "regulated sellers … sufficient notice of what specific information is prohibited." Br.42; *see* App.446-47 (Add.63-64). But the Commission explained that this language "is consistent with longstanding Commission precedent that consent can be subverted." App.407 (Add.24). That explanation identifies a robust body of precedent giving regulated entities sufficient notice. *See id.*; *see also, e.g.*, *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (collecting cases holding that advertisers may not skirt the FTC Act by burying key terms in fine print). But these prohibitions are not even subject to the specificity requirement. Instead, they draw on the Commission's Section 18 authority to "include requirements prescribed for the purpose of preventing [unfair or deceptive] acts or practices." 15 U.S.C. § 57a(a)(1)(B). These are prophylactic measures to ensure that parties do not circumvent the Rule's requirements.

42

Petitioners conclude with another policy argument that again misunderstands the FTC Act. They claim the "upshot of these fuzzy standards" is that the Commission can seek civil penalties for violations, whereas if the Commission were to proceed under Section 5 adjudication it would have to "go through an administrative and judicial review process before it can even try to hold companies liable." Br.43. But the Commission must still go through both an administrative process (the rulemaking) and a judicial review process (the Commission may only seek civil penalties in court) before any award of civil penalties. And penalties are available only when defendants "violate[] any rule … with actual knowledge or knowledge fairly implied on the basis of objective circumstances," among other limitations. 15 U.S.C. § 45(m)(1)(A). Petitioners ignore these safeguards.

## II. Congress Did Not Preclude the Commission from Regulating Negative Option Programs.

The Rule implements the Commission's statutory authority under Section 18 and is not foreclosed by any other statutes. Petitioners claim the Rule "*is broader than*" various statutes administered by the FTC and other agencies. Br.50. Even if true, that would not be unusual or problematic: *every* business must comply with overlapping laws and

43

regulations. Petitioners identify nothing in those statutes that limits the FTC's rulemaking authority here.

The FTC regularly investigates or regulates conduct subject to other statutes, but "[i]n the administrative context, two cops on the beat is nothing unusual." *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 862 (9th Cir. 2018) (en banc). "Such concurrent jurisdiction makes sense, as different federal agencies bring to the table discrete forms of expertise and specific enforcement powers." *Id*. There is "not even a faint clue that Congress" sought to "constrict[]" the FTC's jurisdiction to prevent unfair and deceptive practices simply because "[o]ther agencies and their mandates … overlap" with the Commission. *Thompson Med. Co. v. FTC*, 791 F.2d 189, 192-93 (D.C. Cir. 1986). Thus, FTC enforcement actions and rules can—and often do—reach conduct that is subject to, and even permitted by, other statutory regimes. In fact, Congress authorized the Commission to "consider established public policies," 15 U.S.C. § 45(n)—including policies established by statutes—when deciding whether a practice is unfair. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 243-44 & n.5 (1972); *Am. Fin. Servs.*, 767 F.2d at 971.

44

In any case, "where two statutes apply to 'the same subject, effect should be given to both if possible.'" *AT&T*, 883 F.3d at 862 (quoting *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936)). Here, petitioners identify no irreconcilable conflict between the FTC's exercise of its Section 18 rulemaking power and any other statutory scheme, so the Court should give full effect to all these authorities.

Despite petitioners' inaccurate hyperbole that the Rule "*nullifies*" statutes, Br.50 (emphasis in original), petitioners cite no statute that prohibits FTC regulation of negative option programs. First, petitioners (Br.50-51) invoke two statutes the FTC administers—the Telemarketing Act and the Restore Online Shoppers' Confidence Act (ROSCA)—but both clarify that nothing in them "shall be construed to limit the authority of the Commission under any other provision of law." 15 U.S.C. §§ 6105(c), 8404(c). ROSCA, like the Rule, requires internet negative-option marketers to clearly and conspicuously disclose "material terms," obtain "express informed consent," and "provide simple mechanisms" for cancellation. 15 U.S.C. § 8403. And Congress plainly intended ROSCA to coexist with Section 18: ROSCA says that

45

violations of "any regulation prescribed under this Act shall be treated as a violation of a rule under section 18." *Id.* § 8404(a).

Next, petitioners invoke statutes other agencies enforce, but those statutes have no bearing on FTC rulemaking authority. Petitioners claim (Br.51) the Rule conflicts with a provision of the Electronic Funds Transfer Act requiring "financial institution[s]" to let consumers stop preauthorized fund transfers. 15 U.S.C. § 1693e(a). But the Rule governs "Sellers" (*see* Rule § 425.6(a)), not financial institutions.[11] Likewise, petitioners cite statutes allowing cable subscribers to cancel after receiving fee disclosures, 47 U.S.C. § 562(a), and requiring broadband sellers to disclose prices on consumer labels, 47 U.S.C. § 1753. Petitioners do not explain how these statutes demonstrate congressional intent to prevent the FTC from regulating negative option programs. Petitioners have shown only that businesses are subject to multiple consumer-protection laws, which is commonplace.

Finally, petitioners assert that if Section 18 allowed the Commission to "overrid[e] Congress's own judgments as to what

---

[11] The FTC lacks jurisdiction over banks, federal credit unions, and savings and loan associations. 15 U.S.C. § 45(a)(2).

Appellate Case: 24-3137     Page: 56     Date Filed: 03/17/2025 Entry ID: 5496705

practices cross the line," Br.52, it would violate the Constitution's "nondelegation doctrine." Petitioners urge the Court to read Section 18 to "avoid" this hypothesized problem. Br.52-53. But there is no problem because the Rule does *not* override congressional judgments, as shown above.

There is no nondelegation concern here. The Supreme Court has held "that a statutory delegation is constitutional as long as Congress" provides "an intelligible principle" to which "the delegated authority" must "conform." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (cleaned up). That standard is "not demanding." *Id.* at 146. Here, Congress limited the Commission's rulemaking authority to addressing "unfair or deceptive" acts or practices. 15 U.S.C. § 57a(a)(1)(B). Courts have long applied those standards without question. Indeed, petitioners appear to acknowledge that "unfair or deceptive acts or practices" is an "intelligible principle" to constrain the Commission's discretion. *See* Br.52. And because petitioners have raised no "serious doubt" about Section 18's constitutionality, their attempt to invoke the canon of constitutional avoidance is misplaced. *See Nielsen v. Preap*, 586 U.S. 392, 418-19 (2019) (cleaned up).

## III. The Commission Reasonably Justified the Rule's Requirements and Scope.

Drawing on a voluminous record of law-enforcement actions, studies, consumer complaints, and public comments, the Commission found that sellers have engaged in four prevalent forms of unfair and deceptive practices connected with negative option programs. App.389-92 (Add.6-9). Across economic sectors, sellers have (1) misrepresented material facts, (2) omitted important details, (3) enrolled consumers without consent, and (4) imposed unreasonable barriers to cancellation. App.392 (Add.9). The Rule's four core provisions are tailored to prevent these four abuses. Rule §§ 425.3-425.6; App.399-420 (Add.16-37) (section-by-section analysis).

Petitioners object to the Commission's factual analysis (Br.44-49) and the Rule's requirements (Br.60-66), but those challenges fail under the "highly deferential" arbitrary-and-capricious standard of review.[12] *Adventist Health Sys./Sunbelt, Inc. v. HHS*, 17 F.4th 793, 803 (8th Cir. 2021) (cleaned up). In an exhaustive analysis spanning over 60 pages of

---

[12] Although petitioners assert in a footnote that the Commission's analysis of prevalent violations was "contrary to law" (Br.45 n.6), they concede that their grievance is with the Commission's factual "proof." Br.44.

the Federal Register, the Commission "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Deference is especially warranted when, as here, "the dispute involves primarily issues of fact" resolved by an agency "acting within the sphere of its expertise." *Adventist*, 17 F.4th at 803 (cleaned up). Petitioners' argument would improperly require this Court to "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43 (cleaned up).

### A. The Commission properly found that unfair and deceptive practices are prevalent, and those findings are not reviewable.

**1.** Section 18 directs that when the Commission finalizes a rule, it must publish a "statement of basis and purpose" containing a "statement as to the prevalence of the acts or practices treated by the rule." 15 U.S.C. § 57a(b)(1)(D), (d)(1)(A). And the statute defines an unfair or deceptive act or practice as "prevalent" if (A) the agency "has … issued cease-and-desist orders regarding" the practice; or (B) "any other information available to the Commission indicates a widespread

49

pattern of unfair or deceptive acts or practices." App.389 (Add.6) (quoting 15 U.S.C. § 57a(b)(3)).

Applying these standards, the Commission issued a statement of prevalence based on (1) dozens of federal, state, and private enforcement actions; (2) tens of thousands of consumer complaints and hundreds of public comments; and (3) studies showing that countless Americans are trapped in unwanted and unauthorized subscriptions. App.389-92 (Add.6-9). The Commission met its statutory duty because the statement provides "evidence … to suggest that the practice the FTC rule seeks to regulate does indeed occur." *Penn. Funeral Dirs. Ass'n v. FTC*, 41 F.3d 81, 87 (3d Cir. 1994).

**2.** Congress provided that the "contents and adequacy" of the statement of basis and purpose–which includes the statement of prevalence—"shall not be subject to judicial review in any respect." 15 U.S.C. § 57a(e)(5)(C). *See also* S. Conf. Rept. 93-1408 at 32 (the statement's "contents are not to be subject to court review on any basis at any time").

Petitioners confusingly assert that they "don't challenge [the prevalence] *statement*," but are only arguing that "the Commission has

not met the prevalence *requirement*." Br.45 n.6 (emphasis added). Yet Section 18's only relevant "prevalence requirement" is the one requiring a statement as to prevalence. That statement is not reviewable.

Nor may petitioners rely on Section 18's separate requirement that the Commission may issue an NPRM "only where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." 15 U.S.C. § 57a(b)(2)(A). *See* Br.44-45. When Congress adopted this provision, it clarified that the "'reason to believe' standard is intended to bar any judicial review." S. Rep. No. 103-130, at 10 (Aug. 24, 1993). *Cf. FTC v. Standard Oil Co. of Calif.*, 449 U.S. 232, 238-46 (1980) (courts may not review FTC complaint alleging "reason to believe" defendants violated the law). In any event, the Commission satisfied the requirement by identifying in the NPRM dozens of "recent FTC cases" as well as "thousands of complaints" received "each year related to negative option marketing." App.26, 29, 35-36.

**3.** Even if the Commission's prevalence findings were reviewable, petitioners wrongly suggest (Br.44-48) that the Court should impose some numerical threshold to demonstrate prevalence. As the Third

51

Circuit held, "there appears to be no mandate that a practice *be* prevalent (*i.e.*, occur in a certain number of transactions) in order for the FTC to adopt a rule regulating the practice." *Penn. Funeral*, 41 F.3d at 87 (emphasis added). Section 18 requires only "some basis or evidence … to suggest" the practices subject to the rule "do[] indeed occur." *Id.*

Petitioners thus have no grounds to assert that Section 18 required "extraordinary proof" of "the dominance of the targeted unlawful practice across all of the particular trade sectors being regulated." Br.44-45. Such claims have no foundation in the statute or case law, and petitioners cite none. Congress authorized the Commission to deem acts "prevalent" if the Commission "has issued cease and desist orders regarding such acts," *or* if "any information available to the Commission indicates a widespread pattern of unfair or deceptive acts or practices." 15 U.S.C. § 57a(b)(3).

Moreover, the Commission need not "undertake a full scale economic investigation prior to the promulgation of [a] rule," or "account in unreasonable detail for its conclusions." *Am. Optometric Ass'n v. FTC*, 626 F.2d 896, 906 (D.C. Cir. 1980) (cleaned up). Section 18 does

52

not require "substantial, rigorous, quantitative studies." *Penn. Funeral*, 41 F.3d at 86. Courts must affirm Section 18 rules "if a rational basis exists for the agency's decision." *Am. Fin. Servs.*, 767 F.2d at 986 (cleaned up).

**4.** The Commission had far more than a "rational basis" to find that unfair and deceptive negative option practices not only occur but are prevalent.

***Multi-industry scope***: The Commission found that unfair and deceptive recurring charges could arise in "virtually every industry," since they are a function of a common sales method, the negative option, not the underlying product. App.391-92 (Add.8-9). Indeed, the Commission and the states have encountered unfair and deceptive recurring charges in a sweeping array of industries, including dating, wealth opportunities, credit monitoring, satellite radio, apparel, social networking, and language learning. App.389-90 (Add.6-7).[13]

---

[13] Petitioners complain that many of these cases settled (Br.48), but Congress authorized the Commission to rely on "any" information germane to prevalence, 15 U.S.C. § 57a(b)(3)(B), without excluding settled cases.

53

The Commission had no duty to find that violations are prevalent in "*each sector*," Br.48 (emphasis in original), as unfair and deceptive "marketing strateg[ies]" often are "transferable" to other "product[s] or service[s]" across industries. *Telebrands Corp. v. FTC*, 457 F.3d 354, 361 (4th Cir. 2006); *see also supra* 28-38 (Section 18 authorizes cross-industry rulemaking). Limiting an FTC rule or order to specific product lines would be self-defeating, as "the Commission is concerned not with how [the underlying products] work, but with how [they] are sold." *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982). Accordingly, the Commission need not also cite past violations involving "pet food" (Br.46), since consumers' injuries arise from widespread marketing strategies, not a particular product.

**Frequency of abuses**: Petitioners claim that abuses occur in only a "tiny fraction" of subscriptions (Br.47), but the Commission had no burden to prove that "the practice occurs in a certain percentage of transactions." *Penn. Funeral*, 41 F.3d at 86. Regardless, petitioners do not contest the Commission's reliance on studies showing that most Americans have been enrolled in recurring charges without consent and pay hundreds per year in unwanted recurring fees, which often take

Appellate Case: 24-3137     Page: 64     Date Filed: 03/17/2025 Entry ID: 5496705

months to cancel. App.391 (Add.8); App.30-31, 35, 54, 57, 62-63, 104, 283-90; *supra* 11-13. Those studies alone demonstrate prevalence.

**Business-to-business transactions**: Petitioners object that the Rule protects business customers (Br.46), but the Commission found—based on consumer complaints and past enforcement actions—that deceptive and unfair recurring charges harm small- and medium-sized businesses in all the same ways as individual consumers. App.396-97 (Add.13-14). Courts have long held that the FTC Act protects business consumers. *See, e.g.*, *Indep. Directory Corp. v. FTC*, 188 F.2d 468, 470 (2d Cir. 1951).

**Consumer complaints**: Petitioners blast the Commission for relying on tens of thousands of supposedly "unverified" consumer complaints (Br.48). *See* App.390-92 (Add.7-9); App.54-56. But the Commission and Congress often rely on FTC complaint statistics in setting policy. *See, e.g.*, *FTC v. Mainstream Mktg. Servs. Inc.*, 345 F.3d 850, 857, 860 (10th Cir. 2003) (discussing origins of telemarketing regulation). And courts have often ruled that large numbers of consumer complaints are probative of deception. *See, e.g.*, *FTC v. Kuykendall*, 371 F.3d 745, 758, 767 (10th Cir. 2004) (en banc) (citing

Appellate Case: 24-3137     Page: 65     Date Filed: 03/17/2025 Entry ID: 5496705

over 900 consumer complaints "show[ing] pervasive confusion about the total cost, duration, and cancellation policies of [defendant's] subscription packages").

Beyond describing the complaint statistics in the aggregate, the Commission linked them to "specific [unfair or deceptive] practices." Br.48. The Commission provided detailed summaries of comments from consumers who: (1) did not receive appropriate disclosures,[14] (2) were enrolled without consent,[15] and (3) lacked any convenient or feasible way to cancel the charges.[16] This record evidence amply supports the Commission's statement as to prevalence.

## B. The Commission appropriately exercised its discretion when crafting the Rule's requirements to prevent future wrongdoing.

Petitioners challenge several of the Rule's requirements, but the scope of review is "quite limited," as "[t]he Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed." *Am. Fin. Servs.*,

---

[14] App.404 & nn.267-71 (Add.21).

[15] App.408 & n.315 (Add.25).

[16] App.412-13 & nn.361-74 (Add.29-30); App.415-20 & nn. 401, 413-17, 424-25, 437, 447-48 (Add.32-37).

767 F.2d at 988 (quoting *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612-13 (1946)). Petitioners fail to meet their heavy burden to overturn the Commission's informed determination that the Rule represents "the most effective way to eliminate the unfair practices." *Id.* "[T]he FTC's decision that the [Rule] will reduce consumer injury is supported by substantial evidence and is not arbitrary and capricious." *Penn. Funeral*, 41 F.3d at 90.

**1. *Simple cancellation (§ 425.6)*:** Sellers often prevent consumers from cancelling subscriptions by subjecting them to unreasonable hold times, frequent disconnects, aggressive upsell tactics, and obscure cancellation procedures disclosed in fine print, if at all. App.412-19 (Add.29-36). The Rule requires sellers to allow consumers to cancel via mechanisms "at least as easy to use as the mechanism the consumer used to consent" and "through the same medium the consumer used to consent." App.447 (Add.64).

The Commission addressed petitioners' concern that companies will need to "verify the consumer's identity" or "confirm that cancellation is desired." Br.61-62. The Rule allows sellers to respond to cancellation requests by: (1) following "reasonable verification,

57

authentication, or confirmation procedures"; (2) "appris[ing] consumers of any negative consequences of cancellation"; and (3) offering "valuable concessions (*e.g.*, lower prices) to consumers." App.414, 420 (Add.31, 37). In fact, the Commission declined to finalize a proposal to prohibit sellers from attempting to "save" a transaction, recognizing that sellers may need to give consumers "necessary and valuable information" before cancelling. App.419-20 (Add.36-37).

Petitioners fail to explain why live phone calls are necessary to convey this information. *See* Br.61-62.[17] Consumers routinely authenticate their identities and agree to contracts online. App.418 (Add.35). If a seller uses a website to disclose information, verify consumers' identities, and confirm intent to *enroll*, the seller can—and now, must—adopt reasonably "symmetrical" procedures when responding to cancellation requests. App.414, 418 (Add.31, 35). As the Commission found, consumers interpret a simple online enrollment experience as an implied assurance that online cancellation will be

---

[17] Petitioners improperly rely on declarations they prepared *after* the Rule was issued, accompanying their motion to stay. *See* Br.16, 61-62, 64 (citing "Stay App."). Judicial review is limited to "evidence in the rulemaking record" before the agency. 15 U.S.C. § 57a(e)(1), (3).

equally simple, without the added hassle of conversing with a live agent. App.418 (Add.35).

Still, the Rule does not categorically forbid phone cancellation: If a seller requires a phone call for consumers to enroll in a negative-option program, the seller may continue requiring a phone call to cancel. App.418-19 (Add.35-36).

Petitioners seize on the Commission's estimate that an average online cancellation should take less than a minute (Br.62), but they ignore the caveat that this estimate "is not intended to set a standard." App.428 & n.545 (Add.45). The Rule merely requires that cancellation be as simple as sign-up, not that cancellation occur in a particular timeframe.

The Commission also addressed bundled services (Br.62-63), explaining that a seller may cancel individual services even if consumers signed up for a bundle, provided there is reasonable symmetry between the enrollment and cancellation process in terms of "time, burden, expense, and ease of use." App.418 (Add.35). Petitioners fail to explain why phone calls are needed to cancel bundled services obtained online. If a seller uses a website to describe its bundled service

59

packages and verify consumers' intent to enroll, it can use similar means to describe the cancellation options and verify consumers' intent to disenroll. *Id.*[18]

Nor is there any inconsistency with ROSCA's requirement that internet sellers "provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's … account." 15 U.S.C. § 8403(3). *See* Br.51, 63. Like the Rule, ROSCA requires sellers to offer "cancellation mechanisms at least through the same medium … the consumer used to consent." App.24 (2021 FTC policy statement); *see United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1167, 1169 (C.D. Cal. 2021) (internet company violated ROSCA by limiting "cancellation" to "telephone"). The Rule provides specific guidance consistent with ROSCA's requirements. *See* App.386-87 (Add.3-4).

---

[18] *Amici* franchise associations incorrectly assert (at 10) that the simple-cancellation requirement prevents sellers from setting a "notice period prior to cancellation." As *amici* later acknowledge (at 14-15), the Rule expressly allows parties to set by contract "[e]ach deadline … by which the consumer must act to prevent or stop the Charges." Rule § 425.4(a)(2). The Rule addresses only the *mechanisms* for cancelling future recurring charges (§ 425.6), and does not permit consumers to cancel "the entire contract" or avoid obligations already due. *See* App.413 n.382 (Add.30).

60

**2. Consent (§ 425.5)**: The Commission found a "need for clear, unambiguous, affirmative consent to a negative option feature," given abundant evidence demonstrating that Americans are unwittingly enrolled in subscriptions with recurring charges. App.391, 408, 411 (Add.8, 25, 28). The Rule thus requires sellers to obtain the consumer's "unambiguously affirmative consent to the Negative Option Feature offer separately from any other portion of the transaction," through "a check box, signature, or other substantially similar method." App.446-47 (Add.63-64).

Petitioners object that this provision will "necessitate two different consents" (Br.64), but contracts routinely require consumers to sign, initial, or check a box next to multiple key terms. *E.g.*, *Chicago Copper & Chem. Co. v. Apex Mining Co.*, 281 F.2d 530, 532 (8th Cir. 1960) (explaining that contract was formed when defendant's representative "signed it and initialed each paragraph"). Petitioners misconstrue the Commission's decision to abandon a proposed requirement that sellers obtain consent to the "rest of the transaction." App.410 (Add.27). The Commission found this proposal "unnecessary" and "potentially confusing," *id.*, but did not suggest that all contracts

Appellate Case: 24-3137    Page: 71    Date Filed: 03/17/2025 Entry ID: 5496705

seeking multiple consents would be unnecessary and confusing. The Commission simply rejected an *additional* consent requirement. *Id.* The Commission did exactly what petitioner National Federation of Independent Business requested in public comments: "tailor proposed section 425.5 to address consent to the negative option feature, leaving the matter of consents to other aspects of the transaction to [state law]."[19]

**3. *Materiality*:** The Rule forbids material misrepresentations (§ 425.3) and requires disclosure of material information (§ 425.4). App.399-407, 446 (Add.16-24, 63). Petitioners repeat their claims that the materiality standard is vague. Br.65. As discussed at 41-42 above, such claims fail because the materiality standard provides concrete guidance grounded in longstanding precedent.

Nor was it arbitrary for the Commission to forbid material misrepresentations and omissions beyond the "recurring subscription feature" itself. *See* Br.66. Negative option programs pose an especially grave risk of deception and fraud, since the charges multiply over time

---

[19] *See* Comment from National Federation of Independent Business, Inc. (Jun. 21, 2023), at 7, https://www.regulations.gov/comment/FTC-2023-0033-0789.

and can accrue for months before the consumer discovers them. App.401-06 (Add.18-23). When a consumer makes individual purchases, "each purchase requires the consumer to … re-evaluate the transaction and affirmatively consent." App.403 (Add.20). But when a wrongdoer "induce[s] consumers into recurring transactions," the consumer lacks the same "built-in interruptions for re-evaluation and renewed consent." *Id.* Subscriptions with recurring charges thus leave consumers uniquely vulnerable to deception, which requires "additional protection" by rule. *Id.*

## IV. The Commission Complied with Procedural Requirements, and Any Alleged Errors Were Harmless.

### A. The Commission complied with Section 22.

Petitioners assert that the Commission skipped a "key procedural requirement" by failing to conduct a preliminary regulatory analysis, Br.54 (title case removed), but the statute did not require a preliminary regulatory analysis because the Commission estimated at the NPRM stage that the Rule's economic effects were below the statutory threshold.

Section 22 of the FTC Act provides that an NPRM for a proposed "rule" must include a preliminary regulatory analysis containing,

63

among other things, a preliminary cost-benefit analysis. 15 U.S.C.

§ 57b-3(b)(1). But that requirement does not apply to an "amendment to

a rule" unless, among other things, the Commission "estimates that the

amendment will have an annual effect on the national economy of $100

million or more." *Id.* § 57b-3(a)(1)(A). This rulemaking involved an

amendment, and the Commission "preliminarily determined" in the

NPRM that the proposal would not have a $100 million "effect[] on the

national economy," because it largely restated preexisting obligations.

App.41. Accordingly, Section 22 did not require the Commission to

prepare a preliminary regulatory analysis. Still, the Commission

requested comment on the economic effects of the proposal. App.42.

In response to the NPRM, some comments urged that the

proposed amendments would have an annual effect exceeding $100

million. Several parties, including petitioners NCTA and IAB, requested

an informal hearing, and the presiding officer agreed with their position

after considering written submissions, expert reports, and oral

testimony. App.381-83. Given that conclusion, the Commission included

a final regulatory analysis with the final Rule. App.425-42. (Add.42-59);

*see also* 15 U.S.C. § 57b-3(b)(2). The process worked as designed—the

Commission accepted the results of an adversarial process before a neutral officer and prepared a final regulatory analysis.

Petitioners urge that Section 18 required the Commission to issue a preliminary regulatory analysis long after the NPRM, once the presiding officer had issued a recommended decision finding that the Rule would have a $100 million annual economic effect. Br.57. But nothing in the statute requires the Commission to supply a preliminary regulatory analysis at a later stage based on second-guessing the Commission's initial "estimate[]." 15 U.S.C. § 57b-3(a)(1)(A). Nor would that make sense: It would not be "preliminary" at that stage.[20] The informal hearing, where parties present evidence and expert testimony about the Rule's economic effects, had already occurred. Conducting a preliminary regulatory analysis after that point—when a final regulatory analysis was already underway—would be wasteful makework.

Congress did not envision a preliminary regulatory analysis at that late stage. The statute refers to "the public comment period in

---

[20] The presiding officer issued her decision a year after the NPRM, and the Commission promulgated the final rule six months later. App.376.

Appellate Case: 24-3137     Page: 75     Date Filed: 03/17/2025 Entry ID: 5496705

response to the preliminary regulatory analysis," 15 U.S.C. § 57b-3(b)(2)(E), but the only statutorily required public comment periods follow the ANPRM and NPRM. And the Senate Report that petitioners frequently cite confirms that Congress was requiring "an analysis of the benefits and the adverse effects of a rule *at the initial notice stage*." S. Rep. 96-500 at 6 (emphasis added); *see also id.* at 29 (same). Congress neither required nor anticipated a preliminary regulatory analysis if evidence collected during the rulemaking process showed that the Commission's initial estimate was off.[21]

## B. Petitioners have not demonstrated prejudice.

Even if petitioners were correct that the Commission should have prepared a preliminary regulatory analysis after the informal hearing, any error was harmless.

The FTC Act, like the APA, instructs reviewing courts to "tak[e] due account of the rule of prejudicial error." 15 U.S.C. § 57a(e)(3);

---

[21] Petitioners complain about the ANPRM, Br.58, but have not challenged its adequacy. App.400-01 (Add.17-18). Similarly, petitioners have forfeited their footnoted argument that the Commission "skipped a mandatory step" by precluding disclosure of material facts during the rulemaking proceeding, Br.58 n.8. *See Falco Lime,* 29 F.3d 362 at 367 n.7. In any event, petitioners identify no relevant disputed facts beyond those designated by the neutral presiding officer. App.389 (Add.6).

Appellate Case: 24-3137    Page: 76    Date Filed: 03/17/2025 Entry ID: 5496705

*accord* 5 U.S.C. § 706. This provision created "the same kind of 'harmless-error' rule that courts ordinarily apply in civil cases" and serves "to prevent appellate courts from becoming impregnable citadels of technicality." *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (cleaned up). As the "party attacking the agency's determination," petitioners bear "the burden of showing that an error is harmful." *Id.* at 409. *Shinseki* held that the Veterans' Administration's failure to provide a disability claimant with a required notice was harmless because the claimant had not explained "how the notice error … could have made any difference." *Id.* at 413.

Petitioners here do not acknowledge the standard under *Shinseki* for assessing prejudicial error, much less claim to satisfy it. The most they say is that "the public never got the chance to point out that the Commission's cost-benefit analysis missed several significant costs" and "overstat[ed]" the "benefits," of the Rule, and that "the public" could not "engage with the Commission's cost-benefit analyses on potential alternatives that may have achieved the same goals in a less costly manner." Br.56. These generalities do not carry petitioners' burden to explain "how the … error … could have made any difference," *Shinseki*,

67

556 U.S. at 413. Tweaks to the cost-benefit analysis would not have made any difference when the low-end assessment of the Rule's benefits is seven times greater than the high-end assessment of its costs. App.427 (Add.44).

Petitioners' argument also ignores the opportunities they did have. After all, the NPRM included discussion of "significant alternatives to the proposed amendments" and analysis of the proposal's recordkeeping and compliance costs. App.42-44. Most significantly, the Commission held the informal hearing at the request of petitioners NCTA and IAB (among others). As part of that process, parties submitted briefs arguing that the Commission had underestimated the costs and overestimated the benefits of the Rule. App.315-16; App.354-58. That process allowed them to submit expert reports with their own estimated costs and benefits, which the Commission considered when promulgating the Rule. *See* App.354-56 (describing such evidence); *see also, e.g.*, App.436 n.597 (Add.53), App.439 (Add.56) (discussing expert reports). This is thus not a case where a procedural error causes harm because "[l]osing the opportunity to dissuade an agency from adopting a particular rule is prejudicial."

68

*Citizens Telecomms. Co. of Minn., LLC v. FCC,* 901 F.3d 991, 1006 (8th Cir. 2018). Petitioners had those opportunities in spades. They do not explain what would have been different had the Commission issued a preliminary regulatory analysis after the NPRM and informal hearing, when the public comment period was already closed. They thus fail to carry their burden of demonstrating prejudicial error.

## V. Any Remedies Should Be Limited in Scope.

Should this Court determine that any part of the Rule violates the APA, the Court should limit any remedy to the offending provisions, and leave "the remaining provisions … in effect." 16 C.F.R. § 425.9 (severability provision). Moreover, the Court should tailor its judgment to limit relief to only the prevailing parties that have demonstrated standing.

The FTC Act incorporates the APA's standard of review. *See* 15 U.S.C. § 57a(e)(3). The APA says nothing about vacatur, however, and "vacatur of rules was not a known administrative-law remedy … when the APA was adopted." John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. Reg. 119, 121 (2023). There is little indication that Congress intended to create a new and radically

69

different remedy when it provided that courts should "set aside" agency action. *See Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, J., concurring) ("Use of the 'setting aside' language does not seem to tell us one way or another whether to nullify illegal administrative action or not to enforce it in the case with the named litigants.").

This Court has vacated rules under the APA in the past, *see North Dakota v. EPA*, 730 F.3d 750, 773 (8th Cir. 2013), but that does not mean that universal vacatur is required. Under Article III, a plaintiff's remedy must "be limited to the inadequacy that produced the injury." *Gill v. Whitford*, 585 U.S. 48, 68 (2018). That approach accords with traditional practice by equity courts, which typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring); *see United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring in the judgment) ("[t]raditionally, when a federal court finds a remedy merited, it provides party-specific relief"). Thus, the Court should limit any relief to parties that have established standing. *See Labrador v. Poe,* 144 S. Ct. 921, 923, 925-28 (2024) (Gorsuch, J., concurring) (discussing the significant legal and practical problems with nonparty relief).

70

Petitioners do not explain why universal vacatur is necessary, Br.66-67, nor how party-specific vacatur would fail to completely redress any cognizable injury to the parties.

Custom Communications appears to have standing, but the other petitioners "lack[] associational standing to sue on behalf of unnamed members." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). The associational petitioners have submitted declarations from some businesses subject to the Rule, *see* Stay App.193-215, 344-364, 401-419, 437-456, 474-496, but have not identified their full membership, demonstrated their authority to litigate on behalf of unnamed members, or established that all their members agree to be bound by any judgment. Indeed, some of petitioners' members likely support the Rule, as they would prefer a fairer playing field. For these reasons, any relief should be limited—at most—to Custom Communications and the members of associational petitioners whose declarations establish standing.

## CONCLUSION

The petitions should be denied.

71

Respectfully submitted,

March 14, 2025

LUCAS CROSLOW
    *General Counsel*

H. THOMAS BYRON III
    *Deputy General Counsel*

BENJAMIN F. AIKEN

*/s/ Bradley Grossman*
BRADLEY DAX GROSSMAN
MATTHEW M. HOFFMAN
    *Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
bgrossman@ftc.gov
202-326-2994

Of Counsel:

JAMES A. KOHM
    *Associate Director*

LAURA KOSS
    *Assistant Director*

KATHERINE JOHNSON
HARRIS A. SENTURIA
JONATHAN W. WARE
    *Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

72

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B) because, excluding the parts of the document exempted by

Fed. R. App. P. 32(f), it contains 12,896 words. It complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style

requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in

a proportionally spaced typeface using Microsoft Word in 14-point

Century Schoolbook type. I further certify that the brief has been

scanned for viruses and that the brief is virus-free.


March 14, 2025                       /s/ Bradley Grossman
                                     Bradley Dax Grossman
                                     Attorney
                                     Federal Trade Commission
                                     600 Pennsylvania Avenue, N.W.
                                     Washington, D.C. 20580

**CERTIFICATE OF SERVICE**

I certify that on March 14, 2025, I served the foregoing brief on counsel of record using the Court's electronic case filing system. All counsel of record are registered ECF filers.

Dated: March 14, 2025   /s/ Bradley Grossman
             Bradley Dax Grossman
             Attorney
             Federal Trade Commission
             600 Pennsylvania Ave., NW
             Washington, DC 20580