IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

| | |
|---|---|
| CUSTOM COMMUNICATIONS, INC. et al,<br><br>          Petitioners,<br><br>vs.<br><br>FEDERAL TRADE COMMISSION,<br><br>          Respondent. | Case Nos. 24-3137 (lead case), 24-3388, 24-3415, 24-3442, 24-3469<br><br>On Petitions for Review of an Order of the Federal Trade Commission |

## *AMICUS CURIAE* BRIEF IN SUPPORT OF THE PETITION BY THE INTERNATIONAL FRANCHISE ASSOCIATION, THE NATIONAL ASSOCIATION OF SPA FRANCHISES AND THE HEALTH AND FITNESS ASSOCIATION

Aaron Van Nostrand, Esq.
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932-0677
Tel: (973) 443-3557
Aaron.vannostrand@gtlaw.com

*Counsel for Amicus Curiae International Franchise Association, National Association of Spa Franchises and Health & Fitness Association*

0

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. Pr. 26.1, the International Franchise Association, National Association of Spa Franchises and Health & Fitness Association each state that they have no parent corporation and no publicly held corporation owns 10% or more of their stock.

# IDENTITY OF *AMICUS CURIAE*

Founded in 1960, the International Franchise Association ("IFA") is the oldest and largest trade association in the world devoted to representing the interests of franchising. The IFA's membership includes franchisors, franchisees, and suppliers. The IFA is the only trade association that acts as a voice for both franchisors and franchisees throughout the United States. The IFA's mission is to safeguard and enhance the business environment for franchising worldwide. In addition to serving as a resource for franchisors and franchisees, the IFA and its members advise public officials across the country about the laws that govern franchising. Through its public-policy programs, it protects, enhances, and promotes franchising on behalf of more than 1,400 brands in more than 300 different industries.

The National Association of Spa Franchises ("NASF") is an association of spa and wellness franchise brands that have aligned as part of their mission to elevate safety standards in the massage and spa industry. Initial discussions concerning the formation of NASF began in Summer 2019 when Hand and Stone Massage and

1

Facial Spas, Massage Heights and Elements Massage met to discuss uniformity in standards for safety and best practices in the massage and spa industry. In particular, the participants were concerned about therapists terminated for violation of safety protocols moving from one entity to another. The three original participants reached out to other industry members to gauge their interest, and the NASF was formally incorporated in December, 2021. The NASF is comprised of the following members: Hand and Stone, Massage Heights, Elements, Woodhouse, Spavia, MassageLuXe, Zen Massage, LaVida, Milk and Honey, The Now, Soothe, Burke Williams and Squeeze. The primary goals of the NASF are to further elevate the professionalism of the industry, to protect customers, and to ensure professional massage therapists are respected for their skills, training, and knowledge. These members are responsible for over 10 million services per year.

The Health & Fitness Association ("HFA") is the leading trade group dedicated to enhancing mental and physical health in the United States by increasing access to physical activity. The HFA represents over 55,000 businesses, which contribute over $22 billion to the economy each year and employ more than 434,000 workers, including many in small communities. From group exercise and yoga studios to gyms, health clubs, and industry suppliers, HFA members are essential to help patrons live healthier lives, strengthen immune systems, increase productivity,

and enhance overall happiness, all of which lead to positive public policy outcomes such as the reduction of overall healthcare costs.

## INTRODUCTION

The final Negative Option Rule promulgated by the Federal Trade Commission ("FTC") should be vacated for the reasons set forth in the Petition. In particular, as set forth in the Petition and below, the Negative Option Rule was expedited without a Preliminary Regulatory Analysis that would have considered the significant financial and administrative impacts of the rule on Amici and other affected businesses, many of which are small businesses. The FTC glossed over these compliance burdens—and a genuine consideration of reasonable alternatives—in rushing through the Negative Option Rule

The haste also resulted in the inclusion of vague, ambiguous and undefined terms and internal inconsistencies and tensions within the rule itself that make compliance challenging. These issues render the rule void for vagueness and present an additional reason why the Negative Option Rule should be vacated.

## ARGUMENT

**I.　The FTC Failed to Analyze the Burden Imposed by the Negative Option Rule Because it Refused to Conduct a Preliminary Regulatory Analysis**

The FTC is required to prepare "a preliminary regulatory analysis" if the agency determines that its rule updating a previous rule meets at least one of three criteria, namely that the amendment will (1) have at least a $100 million annual

3

effect on the economy; (2) result in a "substantial change" in prices or costs of certain goods or services; or (3) significantly affect "persons subject to regulation under such amendment and upon consumers." 15 U.S.C. § 57b-3(a). The purpose of the preliminary regulatory analysis is to "curtail serious adverse effects" of potential rules. S. Rep. 96-500, at 29.

> The preliminary regulatory analysis must include the following:
>
> (A) a concise statement of the need for, and the objectives of, the proposed rule;
>
> (B) a description of any reasonable alternatives to the proposed rule which may accomplish the stated objective of the rule in a manner consistent with applicable law; and
>
> (C) for the proposed rule, and for each of the alternatives described in the analysis, a preliminary analysis of the projected benefits and any adverse economic effects and any other effects, and of the effectiveness of the proposed rule and each alternative in meeting the stated objectives of the proposed rule.

15 U.S.C. § 57b-3(b)(1). The FTC must then give the public the opportunity to comment on the preliminary regulatory analysis before it issues a "final regulatory analysis." 15 U.S.C. § 3(b)(2)(E). Congress created this required procedure to "aid the Commission in shaping its rules in a manner that will reduce the burdens of regulation on business." S. Rep. 96-500, at 9.

Here, the FTC initially took the position that it was not required to conduct a preliminary regulatory analysis because the costs of compliance would not exceed

4

$100 million. In doing so, the FTC estimated that it would cost companies merely three hours annually at $22.15 to comply. As discussed below, that estimate grossly underestimated the costs of compliance. The FTC's failure to conduct a preliminary regulatory analysis negated the ability of affected companies to comment on the burdens imposed by the proposed rule as well as potential reasonable alternatives available to the FTC to accomplish its objectives with less adverse effect.

It was only when the final Negative Option Rule was issued that the FTC admitted that the Negative Option Rule will affect the economy by $100 million or more annually. App.425 (Add.42). In doing so, the FTC attempted to justify its failure to conduct a preliminary analysis on the basis that it conducted a *final* regulatory analysis. But this position gets it backwards: It's called a "preliminary" regulatory analysis for a reason, and that is to afford members of the public, including the Amici and the businesses they represent, a genuine opportunity to consider and comment on the burdens associated with the proposed rule *before* it is finally promulgated. By skipping the required preliminary regulatory analysis, the FTC denied the public—including large and small business alike, like those represented by Amici here—the opportunity to fully assess the regulatory impact of the proposed rule on their businesses and then provide the FTC evidence of the financial burdens and operational complexities that they would face in complying with the proposed rule. The FTC's failure to conduct a preliminary regulatory

5

analysis foreclosed the agency's consideration of the true impact of the rule, and as such the final Negative Option Rule must be "set aside" (15 U.S.C. § 57b-3(c)(1)).

Had Amici been given the opportunity to communicate to the FTC the full economic and administrative burdens imposed by the rule, they would have advised the FTC that the real costs of compliance would reach well into the six figures for many of their members because the rule requires substantial changes to their business practices. To comply with the rule, Amici's members will have to undertake whole-cloth technological development, including building new technology to disclose "material" terms "immediately adjacent" to a new consent to *the negative option feature itself* that is separate from the consumer's consent to *the contract itself* and developing an online or phone cancellation process *even for consumers who buy recurring services in person*. Amici will also need to substantially reconfigure existing technological systems and human processes, such as changing a business' consent/contract retention practices and technology in order to retain consumer consents for three years and changing standard contract terms, customer support processes, and billing technology to comply with new requirements, such as providing a cancellation mechanism that "immediately stop[s]" recurring charges.

### A. Implementation Challenges and Costs

With respect to these significant changes, Amici have reasonably estimated thousands of work hours necessary to comply with the final rule, costing not only hundreds of thousands of dollars but also potentially disrupting business:

- A window covering franchise system estimates that it will cost close to $400,000 to reconfigure its customer relationship and data maintenance platforms to comply with the rule.

- A preventative healthcare franchise system estimates that it will take thousands of hours to assess if modifications are necessary to existing contracts, marketing, and operational processes and implement any requirements, costing hundreds of thousands of dollars in legal fees, technology modifications, creating and producing marketing collateral, and developing and training franchisees who must in turn train employees.

- HFA and NASF members estimate that compliance will be a significant systemwide undertaking that will delay or disrupt operations for months. Member consents and membership agreements used in fitness centers and spas will need to be revised with assistance of counsel, and the online or in-club membership management systems used to support these contracts will need technological development. Some systems even require manual uploading of the membership agreement form for each fitness center or spa,

7

which constitutes a significant manual effort. NASF and HFA members will also need to modify their systems to permit online cancellation mechanisms, which may not be in place for all members. The estimated costs to modify or develop member consents, membership agreements and a new online infrastructure will exceed tens of thousands of hours and hundreds of thousands of dollars.

- One NASF member estimates that compliance costs will be between $250,000 to $500,000 to (a) update the membership management system to include a compliant cancellation option redesign of Point of Sale and Customer Relationship Management software to track and process one-click cancellations, (b) update websites to integrate cancellation workflows with automated email confirmations, (c) train front-line staff and franchisees on new cancellation policies, and (d) develop scripts and protocols for customer service teams for retention efforts before cancellation.

- One HFA member estimates that it would cost over $100,000 to complete technology upgrades to multiple systems (some managed through third party software providers) in order to update online and in-club disclosures of material terms, build additional consents (separate from a signature or other authorization of the contract itself) before

8

accepting payment, and automate cancellation of certain recurring services contracts, including recurring personal training sessions serviced within health clubs.

Moreover, certain of Amici's members, particularly those in the fitness and spa industries, may be disproportionately impacted by the economic costs of compliance because, unlike exclusively online businesses, many of them sell recurring services contracts to health club or spa services to consumers *in person*. First, in the case where a consumer has purchased a service in person, the rule requires businesses to not only offer cancellation in person (ironically, only "where practical," even though a physical club, studio or spa is where the services are rendered) but also cancellation through an "easy to find" interactive electronic medium or by a telephone line that is "answered or records messages, made available during business hours." 16 CFR 425.6(c). Many members of Amici will now be forced to create a system for consumers to cancel their contracts either online or by phone, and a related system for stopping credit card charges "immediately." 16 CFR 425.6(a). This will be a huge burden on small businesses that rely on face-to-face interaction with customers in their day-to-day spa or club operations, from touring prospective members, to providing membership agreements, to facilitating changes to the consumer's services throughout a membership (e.g., changing access or services based on a family change or new offerings), to processing cancellation

9

requests with a third party billing platform after verification of identify. These small proprietors will not only incur potentially significant expense develop new online or telephonic cancellation systems, but then incur additional labor expense to monitor multiple avenues for consumers to cancel.

Second, the rule adds significant expense by requiring operators who receive cancellation requests to "immediately stop" any recurring charges. Many members of Amici charge their customers' credit cards on a monthly or semi-monthly basis using a third-party membership management platform that communicates with both the members' business locations and their respective customers' financial institutions. Many members require a notice period prior to cancellation (typically 30 days) to allow for communication across the business locations' membership database, the third-party membership management platform and the customers' financial institution to effectuate cancellation. And, while existing cancellation methods allow customers to cancel upon a notice period (or, alternatively, "freeze" or suspend their memberships), the technology does not exist to allow synchronous coordination across a local membership database, a third-party membership management platform, and a myriad of customers' financial institutions despite the FTC's conclusory statements in the preamble of the rule that suggest otherwise. The requirement that the customer be given an "immediate" right to cancel creates not only creates an administrative nightmare for small businesses, compliance with the

10

immediate right to cancel currently is infeasible. If a consumer who pays for services on a monthly basis is scheduled to have their payment account charged at 11:00 p.m. for the next month of service, and leaves a cancellation "message" on a phone line, sends an email, or submits an online cancellation request at 10:55 p.m., how is a business—especially a small single-location spa or health club—expected to process that cancellation request to stop the recurring charge in 5 minutes? The matter gets even more challenging if a club's "normal business hours" are 24/7 with access by a key fob, such that the operator is not present to pick up the voicemail or read the email until the next day. With substantial civil penalties in the offing, a small operator will be forced to invest significant sums to develop a system and hire workers that can meet this high bar, so they don't have to drop everything in their business each time a cancellation request comes to determine how close it is to the next charge.

**B.      Relation to State Law**

The rule purports not to preempt state statutes "relating to negative option requirements" that "afford consumers greater protection" (16 CFR 425.7). But, for HFA members, the rule itself—which applies to negative option feature cancellation across all industries—creates confusion over whether its requirements apply, or those at the state level that specifically regulate health clubs and spas.

11

For instance, nearly every state requires that health club contracts allow members to cancel their membership contract for various statutory reasons or causes, typically including death, disability, club closure or member r member relocation (a "for cause" cancellation). The Negative Option Rule obligates sellers to provide a simple mechanism to consumers for cancellation *for convenience* which would "immediately stop any recurring charges." Are cancellations *for a statutory cause*, as required by various state laws, subject to the FTC's "simple mechanism" protocol for cancellation for convenience? The Rule is impermissibly vague and silent, leaving whole industries and their consumer bases wondering if there are two parallel and contradictory paths for cancellation depending on their choice or their circumstances.

C. **Failure to Consider Reasonable Alternatives**

As mentioned, the economic impact from this rule on members of IFA, NASF and HFA is substantial, especially for smaller businesses and franchisees. In the context of a preliminary regulatory analysis—had it engaged in one—the FTC could have substantially reduced compliance expense while still meeting its objectives had it posited and considered comments on reasonable alternatives.

Might the FTC's objectives have been met by a reasonable alternative that required disclosure of material terms clearly and conspicuously *in the contract itself*, thereby obviating a separate standalone consent to the recurring services feature?

Might its objective have been met by a reasonable alternative that the seller retain and also provide a copy of the contract to the consumer, with its material terms disclosed clearly and conspicuously, thereby obviating a separate 3-year retention requirement? Might its objective have been met if it had provided an unambiguous reasonable window for sellers to process cancellation requests, including verifying identity, providing a retention offer, and explaining the consequences of cancelling—rather than requiring an "immediate stop" to recurring charges? All of these concepts are found in state law. *See, e.g.,* Minn. Stat 325G.25 (required contractual disclosure, copy to consumer when signed); Minn. Stat. 325G.59, subd. 2 (window to effectuate cancellation no longer than 31 days). And yet, by short circuiting the preliminary regulatory analysis, the FTC did not properly account for these "adverse economic effects" or "any other effects" in the context of alternatives that other states have found to be reasonable.

The FTC's failure to conduct a preliminary regulatory analysis to evaluate these effects in the context of less costly yet reasonable alternatives is ample grounds to set aside the rule.

## II. The Negative Option Rule Should Be Vacated Because it is Impermissibly Vague

Under the void for vagueness doctrine, a federal regulation "must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement." *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009)

13

(discussing vagueness in the context of a criminal statute). "[F]lexibility and reasonable breadth" are acceptable as long as it is "clear what the [regulation] as a whole prohibits." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (citation omitted).

Here, there are multiple provisions of the Negative Option Rule that are either undefined, impermissibly vague, or internally inconsistent. These infirmities render the rule void for vagueness. Certain of these impermissibly vague provisions are below:

- The rule does not define what an "easy" or "simple" cancellation "mechanism" entails.

- The rule does not define "normal business hours," which varies by business and location.

- The rule does not define what is an "unreasonable or unnecessary" cost for a cancellation call.

- The rule requires that a cancellation by telephone must be effectuated "promptly" but does not define that term. Nor does the rule explain how a seller is not liable for "promptly" effectuating cancellation (which implies that the seller has some reasonable time to effectuate it) but is liable for failing to "immediately" stop any recurring charges after the consumer's cancellation request (which implies that the seller has no time to effectuate

14

it). What happens if the consumer is charged on their scheduled recurring-charge date as the seller is working promptly to effectuate a cancellation request?

- The rule seems to permit a business to identify and disclose a "deadline (by date or frequency) by which the consumer must act to stop the Charges," which suggests that a business could identify some time period *in advance* of a recurring charge by which a consumer must provide notice of cancellation. And yet, as noted, the rule also requires a simple mechanism for the consumer to cancel that will "immediately stop" any recurring charges, calling into question whether a seller can set a reasonable advance notice window.

These ambiguities go to the heart of the Negative Option Rule. On grounds of vagueness, the Rule should not be permitted to stand. If the Court upholds the Negative Option Rule as written, businesses will be left to guess what behavior falls outside of the mandates of the rule. That guess could lead to significant administrative or civil actions being instituted against businesses who, in good faith, attempted to comply with a rule that does not define what behavior is proscribed.

# CONCLUSION

For the foregoing reasons, the Petition should be granted, and the Negative Option Rule should be vacated.

GREENBERG TRAURIG, LLP

By: */s/ Aaron Van Nostrand*
Aaron Van Nostrand
500 Campus Drive, Suite 400
Florham Park, NJ 07932-0677
Tel: (973) 443-3557
Aaron.vannostrand@gtlaw.com

*Counsel for Amicus Curiae
International Franchise Association,
National Association of Spa
Franchises and Health & Fitness
Association*

Dated: February 26, 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because this brief contains 3,256 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

By: */s/ Aaron Van Nostrand*
Aaron Van Nostrand

Dated: February 26, 2025

# CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2025, the foregoing brief was served on all parties or their counsel of record through the Court's electronic filing system.

By: */s/ Aaron Van Nostrand*
Aaron Van Nostrand

Dated: February 26, 2025