# United States Court of Appeals
# for the Eighth Circuit

————

CUSTOM COMMUNICATIONS, INC.,
d/b/a CUSTOM ALARM, *et al.*,

*Petitioners,*

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

————

On Petitions for Review from an
Order of the Federal Trade Commission

————

**BRIEF FOR INTERNET AND CONSUMER LAW PROFESSORS
AS *AMICI CURIAE* SUPPORTING RESPONDENTS**

————

DENNIS FAN, *Director*
GABRIEL N. CASTRO, *Student*
MELANIE MIGNUCCI, *Student*
APPELLATE LITIGATION CLINIC,
  COLUMBIA LAW SCHOOL
MORNINGSIDE HEIGHTS
  LEGAL SERVICES, INC.
435 West 116th St.
New York, NY 10027
(212) 854-4291
dfan@columbialawclinics.org

## TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ........................................................1

INTRODUCTION AND
SUMMARY OF ARGUMENT....................................................................3

ARGUMENT ...............................................................................................5

I.      UNWANTED AUTO-RENEWING SUBSCRIPTIONS THREATEN
        FREE CHOICE, HARM CONSUMERS, AND STIFLE INNOVATION.....................5

        A.      Exploitative Subscription Models Prevent Consumers
                from Freely Navigating the Marketplace ................................5

        B.      Abusive Subscription Models Hurt Ordinary Consumers,  Including
                the Elderly and Parents of Young Children.........................................7

        C.      Enhancing Consumer Choice Also Promotes Innovation
                and the Development of Subscription Markets .................................11

II.     IN REGULATING SUBSCRIPTION MODELS ACROSS MULTIPLE DECADES,
        CONGRESS AND THE FEDERAL TRADE COMMISSION HAVE ENGAGED IN
        AN INTERBRANCH DIALOGUE ON THE PROPER SCOPE OF REGULATION .....14

        A.      Congress Has Repeatedly Pushed Back on Harmful
                Subscription Practices Through Bipartisan Legislation.....................15

        B.      The Federal Trade Commission Has Been Authorized to
                Pursue New Subscription Problems That Arise..................................19

III.    FAR FROM BEING A "POWER GRAB," THE RECENT NEGATIVE OPTION
        RULE IS A PROPER CONTINUATION OF THAT INTERBRANCH DIALOGUE ...25

CONCLUSION.................................................................................29

i

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Atlantic Refin. Co. v. Federal Trade Comm'n*,
381 U.S. 357 (1965)..................................................20, 27

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983)..............................................22, 23, 28

*In re Apple In-App Purchase Litigation*,
855 F. Supp. 2d 1030 (N.D. Cal. 2012)..........................10

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...................................................27

*Michigan v. Environmental Prot. Agency*,
576 U.S. 743 (2015)...................................................27

*Moog Indus. v. FederalTrade Comm'n*,
355 U.S. 411 (1958)...................................................19

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015)...................................................23

*Udall v. Tallman*,
380 U.S. 1 (1965)......................................................23

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)...................................................22

**Statutes**                                                      **Page(s)**

15 U.S.C. § 45 ..........................................................4, 20

15 U.S.C. § 57a ........................................................4, 20

15 U.S.C. § 1693c ...................................................16, 21

15 U.S.C. § 1693e ...................................................16, 21

Appellate Case: 24-3137     Page: 3     Date Filed: 03/21/2025 Entry ID: 5498794

**Statutes**                                                            **Page(s)**

15 U.S.C. § 1693o ..................................................................................19

15 U.S.C. § 6102 ..............................................................................17, 21

15 U.S.C. § 6107 ..................................................................................19

15 U.S.C. § 8403 ................................................................18, 19, 21, 25

15 U.S.C. § 8404 ..................................................................................19

47 U.S.C. § 562 ....................................................................................21

47 U.S.C. § 1753 ..................................................................................21

Electronic Fund Transfer Act,
    Pub. L. No. 95-630, 92 Stat. 3728 (1978).......................16, 19, 21, 22

Further Consolidated Appropriations Act,
    Pub. L. No. 116-94, 133 Stat. 3200 (2019)........................................19

Infrastructure Investment and Jobs Act,
    Pub. L. No. 117-58, 135 Stat. 1244 (2021)........................................19

Restore Online Shoppers' Confidence Act of 2010,
    Pub. L. No. 111-345, 124 Stat. 3620 (2010)................................ *passim*

Telemarketing and Consumer Fraud and Abuse Prevention Act,
    Pub. L. No. 103-297, 108 Stat. 1545 (1994)................................ *passim*


**Legislative Materials**                                               **Page(s)**

95 Cong. Rec. 25,731 (daily ed. Aug. 11, 1978).......................................16

138 Cong. Rec. 28,457 (daily ed. Sept. 29, 1992) ..................................17

156 Cong. Rec. E2165 (daily ed. Dec. 16, 2010) ...................................18

H.R. Conf. Res. 80, 105th Cong. (1997).................................................28

Appellate Case: 24-3137    Page: 4    Date Filed: 03/21/2025 Entry ID: 5498794

**Legislative Materials**                                               **Page(s)**

*Oversight of the Federal Trade Commission: Hearing Before the H. Comm. on the Judiciary*, 118th Cong. (2023) ..........................................................26, 27

*Oversight of Telemarketing Practices and the Credit Repair Act: Hearing before the S. Comm. on Com., Sci.fSci & Transp.* 110th Cong., 1st Sess. (July 31, 2007)..........24

S. Rep. No. 111-240 (2010) .............................................................................18

*Telemarketing Fraud: Hearing on S. 2213, H.R. 4101, and S. 2326 Before the Subcomm. on the Consumer of the Senate Comm. on Com., Sci. & Transp.*, 100th Cong., 2d Sess. (1988) ............................................................................17

Unsubscribe Act of 2021, H.R. 3953, 117th Cong. (2021) ...................................6

Unsubscribe Act of 2021, S. 2072, 117th Cong. (2021) .......................................6


**Rules & Regulatory Materials**                                **Page(s)**

Comment from 23 Attorneys General, Negative Option Rule (16 C.F.R. Part 425), FTC-2019-0082-0012 (Dec. 2, 2019) ...............................7

Comment from 26 Attorneys General, Negative Option Rule, FTC-2023-0033-0886 (June 23, 2023) ...............................................................7

Kaitlin A. Caruso *et al.*, Joint Comment on Negative Option Rule (16 C.F.R. Part 425), FTC-2023-0033-0861 (June 23, 2023) ...........................1

Chris Jay Hoofnagle, Comment on Negative Option Rule, FTC-2023-0033-1137 (June 20, 2023) ..............................................................1

*Use of Negative Option Plans by Sellers in Commerce*, 38 Fed. Reg. 4896 (Feb. 22, 1973) ..................................................................................20, 21, 27

*Regulatory Flexibility Act Review of the Trade Regulation Rule for Use of Negative Option Plan by Sellers in Commerce*, 51 Fed. Reg. 42,087 (Nov. 21, 1986)................................................................22

Appellate Case: 24-3137    Page: 5    Date Filed: 03/21/2025    Entry ID: 5498794

## Rules & Regulatory Materials

*Telemarketing Sales Rule*,
60 Fed. Reg. 43,841(Aug. 23, 1995)................................................23

*"Made in USA" and Other U.S. Origin Claims*,
62 Fed. Reg. 63,756 (Dec. 2, 1997)................................................28

*Trade Regulation Rule Regarding Use of Negative Option Plans by Sellers in Commerce*,
63 Fed. Reg. 44,555 (Aug. 20, 1998)..............................................22

*Telemarketing Sales Rule*,
68 Fed. Reg. 4,580 (Jan. 29, 2003)................................................24

*Rule Concerning the Use of Prenotification Negative Option Plans*,
79 Fed. Reg. 44,271 (July 31, 2014)..............................................22

*Negative Option Rule*,
89 Fed. Reg. 90,476 (Nov. 15, 2024)........................................ *passim*

## Other Authorities

J. Howard Beales III, *The Federal Trade Commission's Use of Unfairness Authority: Its Rise, Fall, and Resurrection*, 22 J. PUB. POL'Y & MKTG. 192 (2003)...................28

BECKER FRIEDMAN INST., *Sophisticated Consumers with Inertia: Long-Term Implications from a Large-Scale Field Experiment* (Mar. 2022), https://perma.cc/A86B-V2KY ....................................................14

Jon Brodkin, *Amazon Named Its "Labyrinthine" Prime Cancellation After Homer's* Iliad, ARS TECHNICA (June 21, 2023), https://arstechnica.com/tech-policy/2023/06/ftc-sues-amazon-over-4-page-6-click-15-option-prime-cancellation-process/ ............................................................6

Warren Buckleitner, CONSUMER REPORTS, *Like Taking Candy from a Baby: How Young Children Interact with Online Environments* (2008), https://perma.cc/UL4U-C548 ......................................................11

Kaitlin Caruso & Prentiss Cox, *Silence as Consumer Consent: Global Regulation of Negative Option Contracts*, 73 AM. U. L. REV. 1611 (2024) ............................................5, 10

Diana Castilla *et al.*, *Teaching Digital Literacy Skills to the Elderly Using a Social Network with Linear Navigation: A Case Study in a Rural Area*, 118 INT'L J. HUM.-COMPUT. STUD. 24 (2018).....................................................9

Jaime Catmull, *4 Ways Your Child's Unlimited App Usage May Be Costing You*, FORBES (Feb. 26, 2025), https://perma.cc/5X85-AH3X ................................11

Marshini Chetty *et al.*, *Dark Patterns at Scale: Findings from a Crawl of 11k Shopping Websites*, PROC. ACM HUM.–COMPUT. INTERACTION 1 (2019) .........12

Ben Cohen, *The Real Reason You're Paying for So Many Subscriptions*, WALL ST. J. (Jan. 19, 2024), https://www.wsj.com/business/cancel-subscriptions-save-money-streaming-peacock-da7e6123....................................................................7

Prentiss Cox, *The Invisible Hand of Preacquired Account Marketing*, 47 HARV. J. ON LEGIS. 425 (2010)......................................................................24

Liran Einav *et al.*, *Selling Subscriptions* (NBER, Working Paper No. 31547, 2023), https://perma.cc/2THZ-8AB7 ......................................................................8, 9

Amelia Fletcher *et al.*, *Consumer Protection for Online Markets and Large Digital Platforms*, 40 YALE J. ON REGUL. 875 (2023) ......................................12, 13

Jonathan Greig, *State Lawmakers Find Bipartisan Support for Stronger Privacy Protections*, THE RECORD (May 28, 2023), https://perma.cc/G6AZ-AR8F.........................7

Koren Grinshpoon, *License to Bill: The Validity of Coupling Automatic Subscription Renewals with Free Trial Offers by Online Services*, 28 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 301 (2018)...........................5, 6

Kevin Hurler, *Three Amazon Execs Added to Lawsuit, FTC Say Top Brass 'Okay' With Dark Pattern Trickery*, GIZMODO (Sept. 21, 2023), https://perma.cc/D27D-GG7L .......................................................................12

J.P. Morgan Chase, *Survey from Chase Reveals That Two-Thirds of Consumers Have Forgotten About at Least One Recurring Payment in the Last Year* (Apr. 1, 2021), https://perma.cc/GAM3-U4SH....................................................................8

Appellate Case: 24-3137     Page: 7     Date Filed: 03/21/2025     Entry ID: 5498794

| Other Authorities | Page(s) |
| --- | --- |

Allie Johnson, *Poll: Majority of Subscribers Experience Unwanted Charges*, BANKRATE (Feb. 6, 2022), https://perma.cc/2JXE-ZAGR ................................................... 8

Mitja Kovač & Ann-Sophie Vandenherghe, *Regulation of Automatic Renewal Clauses: A Behavioral Law and Economics Approach*, 38 J. CONSUMER POL'Y 287 (2015) ................................................................. 13

Tara Lajumoke, *3 Strategies for Making the Most of the Subscription Economy*, HARV. BUS. REV. (Mar. 31, 2022), https://perma.cc/5V69-XJ4Z ................... 14

Randy Lilleston, *Watch Out for Surprise Auto-Renewal Payments*, AARP (Sept. 5, 2017), https://perma.cc/P7DX-LLF9 .............................................. 8, 9

Letter from Malini Mathal, Associate Dir., Div. of Fin. Practices, Fed. Trade Comm'n (May 23, 2023), https://perma.cc/7CFC-454Y ............. 24

Patrick E. Michela, *Comment, You May Have Already Won: Telemarketing Fraud and the Need for a Federal Legislative Solution*, 21 PEPP. L. REV. 553 (1994) ............. 17

Nat'l Inst. on Aging, *Memory Problems, Forgetfulness, and Aging*, NAT'L INSTS. OF HEALTH (Nov. 22, 2023), https://perma.cc/K96B-KYVY ......................... 9

Marilyn E. Schneck *et al.*, *Comparison of Panel D-15 Tests in a Large Older Population*, 91 OPTOMETRY & VISION SCI. 284 (2014) ....................................... 10

Stigler Center for the Study of the Economy and the State, THE UNIVERSITY OF CHICAGO BOOTH SCHOOL OF BUSINESS, Stigler Committee on Digital Platforms: Final Report (2019), https://perma.cc/6RDX-RW34 ................... 13

True Tamplin, *New Subscription Laws Help Put Money Back Into Consumers' Pockets*, FORBES (Aug. 8, 2024), https://perma.cc/9KMG-847L ................................. 14

West Monroe, *The State of Subscription Services Spending* (Aug. 2021), https://perma.cc/528M-K8YK ......................................................................... 8

Alexandria White, *Who's Responsible for Your Kids' Unauthorized Credit Card Charges?*, CNBC (June 27, 2024), https://perma.cc/6833-LCPQ ..................... 10

Appellate Case: 24-3137    Page: 8    Date Filed: 03/21/2025 Entry ID: 5498794

**Other Authorities** **Page(s)**

Tim Wu, THE ATTENTION MERCHANTS: THE EPIC SCRAMBLE TO GET
    INSIDE OUR HEADS (2016) ..................................................................6

Amit Zac *et al.*, *Dark Patterns and Consumer Vulnerability*,
    BEHAV. PUB. POL'Y 1 (2025) ...........................................................6

viii

# INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are eleven law professors who research and write about how the development of the internet and technology intersects with issues around consumer protection and business competition. *Amici* internet and consumer law professors have a deep interest in the proper exercise of the Federal Trade Commission's statutory authorities, as Congress has historically entrusted the Commission with addressing deceptive practices around technological advancements. *Amici* further have a particular interest in the Commission's *Negative Option Rule*, 89 Fed. Reg. 90,476 (Nov. 15, 2024) (codified at 16 C.F.R. § 425), which is challenged in this case. The Negative Option Rule addresses unfair and abusive practices around auto-renewing subscription models, a topic of *amici*'s scholarship.

A number of *amici*, moreover, submitted comments in connection with the rulemaking at issue. *See* Kaitlin A. Caruso *et al.*, *Joint Comment On Negative Option Rule (16 C.F.R. Part 425)*, FTC-2023-0033-0861 (June 23, 2023); Chris Jay Hoofnagle, *Comment on Negative Option Rule*, FTC-2023-0033-1137 (June 20, 2023). The Commission explicitly relied on these comments in no fewer than two dozen occasions in issuing the final Negative Option Rule.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this *amicus* brief. *Amici* further represent that no part or its counsel authored this brief in whole or in part, or contributed money intended to fund the preparation or submission of this brief, and no person contributed to this brief other than *amici* and their counsel.

Appellate Case: 24-3137     Page: 10     Date Filed: 03/21/2025 Entry ID: 5498794

*Amici* internet and consumer law professors are (with institutional affiliations listed for identification purposes only):

- **Nikita Aggarwal**, Associate Professor of Law, University of Miami School of Law;

- **Susan Block-Lieb**, Professor of Law, Fordham Law School;

- **Kaitlin A. Caruso**, Associate Professor of Law, University of Maine School of Law;

- **Prentiss Cox**, Professor of Law, University of Minnesota Law School;

- **Chris Jay Hoofnagle**, Professor of Law in Residence, UC Berkeley School of Law;

- **Edward J. Janger**, David M. Barse Professor of Law, Brooklyn Law School;

- **Dee Pridgen**, Emeritus Professor of Law, University of Wyoming College of Law;

- **Vijay Raghavan**, Associate Professor of Law, Brooklyn Law School;

- **Jeff Sovern**, Michael Millemann Professor of Consumer Law, University of Maryland Francis King Carey School of Law;

- **David C. Vladeck**, A.B. Chettle, Jr., Professor of Law, Georgetown University Law Center; and

- **Tim Wu**, Julius Silver Professor of Law, Science and Technology, Columbia Law School.

Appellate Case: 24-3137    Page: 11    Date Filed: 03/21/2025 Entry ID: 5498794

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

For the past half century, Congress and the Federal Trade Commission have together made clear their ongoing concern with auto-renewing subscriptions, known as negative-option contracts. Problems around exploitative subscription models have spanned the eras, starting from book-of-the-month clubs to telemarketing sales calls to online streaming services. Subscriptions are easy to enter into. They are often much harder to cancel.

Congress has thus enacted statutes to safeguard consumer choice and protect consumers from unfair and abusive business practices in almost every decade since the 1970s, working hand in hand with the Commission along the way. Congress's statutes, which delegate rulemaking authority to the Commission, can be distilled to four key principles: Businesses should refrain from deceptive marketing practices, disclose subscription terms, check that customers consent to recurring charges, and make it simple to cancel. Keeping subscription models within those bounds protects everyone—from older adults who may not be as internet-savvy to parents who are on the hook for their kids' in-app purchases—and enables small businesses to compete with subscription-based national firms, as well.

In this ever-evolving area, Congress's cooperation with the Commission is best viewed as an interbranch dialogue about how to address new subscription problems

3

as they arise. At times it has meant the Commission implementing Congress's explicit direction to flesh out its regulation of an industry. At other times it has meant Congress drawing on the Commission's broad expertise and earlier regulatory steps to formulate its statutes.

The Federal Trade Commission's *Negative Option Rule*, 89 Fed. Reg. 90,476 (Nov. 15, 2024), continues that interbranch dialogue by echoing Congress's historical priorities around subscription models. Indeed, prior negative-option rules have been on the books for half a century, and Congress has regulated in this area without ever casting doubt on those regulations. To the contrary, in the Restore Online Shoppers' Confidence Act of 2010, Congress specifically ratified the Commission's regulation of negative-option contracts as to telemarketing.

*Amici curiae* therefore agree with the Commission's argument (Br. at 24–47) that it properly acted within its statutory authority under Sections 5 and 18 of the Federal Trade Commission Act of 1914 (FTC Act), 15 U.S.C. §§ 45, 57a, to issue the Negative Option Rule. *Amici* write to offer further background on the harms from deceptive subscription practices and a historical perspective on the Commission's established role in regulating subscription models. Though petitioners contend at length (Br. at 31–54) that the Commission engaged in a supposed power grab, that contention fails to grapple with how Congress has repeatedly affirmed the agency's authority here.

4

The Court should deny the petitions for review.

## ARGUMENT

**I. UNWANTED AUTO-RENEWING SUBSCRIPTIONS THREATEN FREE CHOICE, HARM CONSUMERS, AND STIFLE INNOVATION**

### A. Exploitative Subscription Models Prevent Consumers from Freely Navigating the Marketplace

In an increasingly digital era, the rise of subscription models that intentionally ensnare consumers has meant that ordinary Americans have fewer and fewer choices, and less and less cash in their pockets. Not all subscriptions are unwanted, and those models can enable consumers to support the content, services, and products that they find valuable. But the point of an auto-renewing subscription is that, *regardless* of what a consumer would prefer if asked, "the contract continues or renews until the consumer affirmatively cancels it." Kaitlin Caruso & Prentiss Cox, *Silence as Consumer Consent: Global Regulation of Negative Option Contracts*, 73 AM. U. L. REV. 1611, 1615 (2024).

All sorts of businesses practices have eroded that choice further. Consumers face free trials that lock them into a paid subscription after the trial period ends. *See* Koren Grinshpoon, *License to Bill: The Validity of Coupling Automatic Subscription Renewals with Free Trial Offers by Online Services*, 28 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 301, 309–10 (2018). Once subscribers are secured, companies can surreptitiously market unwanted "sponsored content and services" to that captive audience. *See* Tim

5

Wu, THE ATTENTION MERCHANTS: THE EPIC SCRAMBLE TO GET INSIDE OUR HEADS 210 (2016).

When trying to cancel an unwanted subscription product, the process can be byzantine. Indeed, Amazon at one point named its cancellation system for Prime memberships "Iliad," evoking Homer's epic poem set over 24 books and 16,000 lines about the decadelong Trojan War. *See* Jon Brodkin, *Amazon Named Its "Labyrinthine" Prime Cancellation After Homer's* Iliad, ARS TECHNICA (June 21, 2023), https://arstechnica.com/tech-policy/2023/06/ftc-sues-amazon-over-4-page-6-click-15-option-prime-cancellation-process/. And at the end of that cancellation process, consumers can be the target of pressure tactics—"Only 1 Left!" or other exploding offers—that push them into holding onto a subscription they do not want. *See* Amit Zac *et al.*, *Dark Patterns and Consumer Vulnerability*, BEHAV. PUB. POL'Y 1, 2 (2025).

In this environment, the need to scrutinize subscription practices that dampen consumer choice has only grown. Members of Congress have introduced bipartisan bills to tackle problems around subscription models. *See, e.g.*, Unsubscribe Act of 2021, S. 2072, 117th Cong. (2021); Unsubscribe Act of 2021, H.R. 3953, 117th Cong. (2021). More than half of the States have recently enacted statutes governing free-trial, negative-option, or auto-renewing contracts. Those States range from Cal-

Appellate Case: 24-3137    Page: 15    Date Filed: 03/21/2025 Entry ID: 5498794

ifornia to Nebraska to Texas.[2] *See* Jonathan Greig, *State Lawmakers Find Bipartisan Support for Stronger Privacy Protections*, THE RECORD (May 28, 2023), https://perma.cc/G6AZ-AR8F. And it is equally the case that States from Iowa to Minnesota to North Dakota have called for greater attention to subscription practices. *See* Comment from 26 Attorneys General, *Negative Option Rule*, FTC-2023-0033-0886 (June 23, 2023); Comment from 23 Attorneys General, *Negative Option Rule (16 C.F.R. Part 425)*, FTC-2019-0082-0012 (Dec. 2, 2019).

### B. Abusive Subscription Models Hurt Ordinary Consumers, Including the Elderly and Parents of Young Children

**1.** Unwanted subscriptions come at a deep cost. "Americans spend billions of dollars on stuff they have forgotten about." Ben Cohen, *The Real Reason You're Paying for So Many Subscriptions*, WALL ST. J. (Jan. 19, 2024), https://www.wsj.com/business/cancel-subscriptions-save-money-streaming-peacock-da7e6123. At this point, at least half the Nation spends hundreds of dollars every year on subscription services and

---

[2] Alaska Stat. §§ 45.45.920, .930; Cal. Bus. & Prof. Code §§ 17600–17606; Colo. Rev. Stat. § 6-1-732; Conn. Gen. Stat. § 42-126b; Del. Code tit. 6, §§ 2731–2737; D.C. Code §§ 28A-201, 28A-204; Fla. Stat. § 501.165; Ga. Code §§ 13-12-2, 13-12-3, 13-12-5; Haw. Rev. Stat. § 481-9.5(h); Idaho Code § 48-603G; 815 Ill. Comp. Stat. §§ 601/1, 601/20; Ky. Rev. Stat. § 367.580; La. Stat. § 9:2716; Me. Rev. Stat. tit. 10, § 1210 ; Mich. Comp. Laws § 445.903; N.J. Stat. § 56:12-95.5 ; N.M. Code. R. § 12.2.11; N.Y. Gen. Oblig. Law § 5-903(2); N.C. Gen. Stat. § 75-41; N.D. Cent. Code § 51-37-01; Ohio Admin. Code § 109:4-3-04; Or. Rev. Stat. § 646A.292; Tenn. Code § 47-18-133; Utah Code § 15-10-201; Vt. Stat. tit. 9, § 2454a; Va. Code §§ 59.1-207.45, -207.49.

products that they do not want. *See* Allie Johnson, *Poll: Majority of Subscribers Experience Unwanted Charges*, BANKRATE (Feb. 6, 2022), https://perma.cc/2JXE-ZAGR; J.P. Morgan Chase, *Survey from Chase Reveals That Two-Thirds of Consumers Have Forgotten About at Least One Recurring Payment in the Last Year* (Apr. 1, 2021), https://perma.cc/GAM3-U4SH.

Part of the problem is that consumers routinely underestimate just how much money they lose on unwanted subscriptions. In 2021, the average person spent about $275 on subscriptions each month, yet believed that they spent only $60. *See* West Monroe, *The State of Subscription Services Spending* 8 (Aug. 2021), https://perma.cc/528M-K8YKK. There is even a cottage industry of companies—which, ironically, often themselves operate on a subscription model—that "help subscribers find and cancel unwanted subscription services." Liran Einav *et al.*, *Selling Subscriptions* 1 n.2 (NBER, Working Paper No. 31547, 2023), https://perma.cc/2THZ-8AB7.

The monetary harms from unwanted subscriptions, moreover, are not felt by consumers uniformly.

**2.** Elderly consumers are particularly vulnerable to unwanted auto-renewing subscriptions. "Fifty-seven percent of adults ages 53 to 62 said they had made an unexpected automatic payment after starting a free trial." Randy Lilleston, *Watch Out for Surprise Auto-Renewal Payments*, AARP (Sept. 5, 2017), https://perma.cc/P7DX-LLF9.

8

It is easy to see how unfair subscription practices hit the elderly harder. Auto-renewing subscriptions rely on lapses in consumer memory and on a lack of fluency with technology to ensure their continued profit. *See* Einav, *Selling Subscriptions*, *supra*, at 3. Not only are older consumers among those most susceptible to memory loss, *see* Nat'l Inst. on Aging, *Memory Problems, Forgetfulness, and Aging*, NAT'L INSTS. OF HEALTH (Nov. 22, 2023), https://perma.cc/K96B-KYVY, but those individuals also have "less familiarity" and "greater interaction difficulties" with online platforms, Diana Castilla *et al.*, *Teaching Digital Literacy Skills to the Elderly Using a Social Network with Linear Navigation: A Case Study in a Rural Area*, 118 INT'L J. HUM.-COMPUT. STUD. 24, 25 (2018). Businesses have ready ways to take advantage of these unique vulnerabilities: companies may precheck a subscription-enrollment box when someone purchases a product, offer the option to decline a subscription only at the very bottom of a webpage, or otherwise obscure the text of a subscription's terms and conditions. *See* Lilleston, *Watch Out*, *supra*.

Those elderly consumers who develop visual impairments or hearing loss can also find cancellation requirements insurmountable. As one customer related, she was paying for satellite television that she no longer wanted solely because she was hearing impaired and the company did not offer teletypewriter (TTY) or text-based supports in its cancellation process. *See* Caruso & Cox, *Silence as Consumer Consent*, *supra*, at 1636. Even basic aging can make it difficult to see webpages. For example,

9

when we grow older, it becomes harder to see the color blue, the standard shade for internet hyperlinks. *See* Marilyn E. Schneck *et al.*, *Comparison of Panel D-15 Tests in a Large Older Population*, 91 OPTOMETRY & VISION SCI. 284, 287 (2014).

**3.** Parents with young children are also especially vulnerable to the risks of negative-option contracts. Nearly all parents are familiar with their children signing up for a subscription or free trial without their consent, only to be hit later with a surprise fee. *See, e.g.*, *In re Apple In-App Purchase Litigation*, 855 F. Supp. 2d 1030, 1034 (N.D. Cal. 2012) (describing how children make in-app purchases through the Apple App store); Compl. ¶¶ 3−4, *Imber-Gluck v. Google, Inc.*, No. 14-cv-1070 (N.D. Cal. filed Mar. 7, 2014) (similar as to Google Play store). Apple alone has refunded over $32.5 million to customers who were charged for in-app purchases made by children without their parents' approval. *See* Alexandria White, *Who's Responsible for Your Kids' Unauthorized Credit Card Charges?*, CNBC (June 27, 2024), https://perma.cc/6833-LCPQ.

As children use smartphones, tablets, and computers at earlier and earlier ages, manipulative subscription models pose a greater and greater threat. Kids, of course, do not understand the economic models that businesses deploy. In playing games and using applications on their (or their parents') devices, children can be drawn into paying for virtual tokens that their parents would not approve of as a one-off purchase, let alone on a recurring basis. *See* Warren Buckleitner, CONSUMER

REPORTS, *Like Taking Candy from a Baby: How Young Children Interact with Online Environments* 2–3, 10 (2008), https://perma.cc/UL4U-C548. With less caution than adults, kids will sign up for free trials that roll over into paid plans or agree to other recurring purchases, "rack[ing] up unwanted subscriptions." Jaime Catmull, *4 Ways Your Child's Unlimited App Usage May Be Costing You*, FORBES (Feb. 26, 2025), https://perma.cc/5X85-AH3X.

### C. Enhancing Consumer Choice Also Promotes Innovation and the Development of Subscription Markets

**1.** Auto-renewing subscriptions models, particularly from online companies, can also end up cannibalizing smaller businesses and stifling competition. As a result, increasing consumer choice can (unsurprisingly) enhance the free market and promote innovation.

Part of the problem is that subscription models are costly to start up and thus favor more well-resourced businesses. Any subscription model—while profitable—requires substantial resources and labor: that might include a user-interface design team that works to attract initial consumers to the product, customer-service agents trained to minimize any cancellations, and a legal team to navigate liabilities. Those resources are needed for larger firms to see the payoff. For instance, when Amazon added steps to the cancellation process for its Prime members, they were able to cut cancellations by fourteen percent. *See* Kevin Hurler, *Three Amazon Execs Added to Law-*

11

*suit, FTC Say Top Brass 'Okay' With Dark Pattern Trickery*, GIZMODO (Sept. 21, 2023), https://perma.cc/D27D-GG7L.

But these same practices work to the disadvantage of smaller competitors. The average small business does not have the resources to compete with subscription-minded bigger firms. *See* Marshini Chetty *et al.*, *Dark Patterns at Scale: Findings from a Crawl of 11k Shopping Websites*, PROC. ACM HUM.–COMPUT. INTERACTION 1, 2 (2019). And in the extreme, when larger online companies are able to exploit economies of scale to ensnare consumers into unwanted negative-option contracts, smaller firms can find it even more difficult to compete. Conversely, with a check on exploitative subscription practices, it becomes more probable that "consumers will switch their purchases from the large to the small firms." Amelia Fletcher *et al.*, *Consumer Protection for Online Markets and Large Digital Platforms*, 40 YALE J. ON REGUL. 875, 889 n.36 (2023).

Making subscription processes more transparent—with clear terms and easy cancellation options—can thus drive innovation. Companies that lack competitors have few incentives to improve. And companies that can keep customers trapped in a subscription may perversely focus resources on doing so rather than on augmenting their services or products. *See* Mitja Kovač & Ann-Sophie Vandenherghe, *Regulation of Automatic Renewal Clauses: A Behavioral Law and Economics Approach*, 38 J. CONSUMER

Appellate Case: 24-3137     Page: 21     Date Filed: 03/21/2025 Entry ID: 5498794

POL'Y 287, 299 (2015). When consumers understand what they are signing up for and can opt out, companies must in fact compete to earn a consumer's purchase.

Clear rules of the road around permissible subscription practices only enhance that competition by also decreasing entry costs into a given market. Regulation, for instance, can help small businesses expand into other States. Unlike larger firms, small businesses are often deterred from branching out to other States because of the disuniformity in the regulatory environment around subscriptions. *See* Stigler Center for the Study of the Economy and the State, THE UNIVERSITY OF CHICAGO BOOTH SCHOOL OF BUSINESS, *Stigler Committee on Digital Platforms: Final Report* 23, 37 (2019), https://perma.cc/6RDX-RW34. Nationwide subscription regulations can create a "level playing field," saving small businesses from needing to study and adopt different practices in each State. Fletcher *et al.*, *Consumer Protection*, *supra*, at 882.

**2.** Consumer-friendly practices that make sure Americans do not feel tricked also can *increase* subscriptions and benefit the subscription economy. As mentioned, the upshot of subscription models is that they can enable consumers to demonstrate commitment to a brand, empowering them to knowingly sustain those newspapers, podcasts, coffee roasters, or other businesses that they support.

From that perspective, disclosing information to a customer in clear terms and checking that a subscription is in fact wanted can increase confidence in and affinity toward a given service or product. This is why executives are starting to realize that

13

"companies can actually increase subscriptions if they make the cancellation process more transparent." True Tamplin, *New Subscription Laws Help Put Money Back Into Consumers' Pockets*, FORBES (Aug. 8, 2024), https://perma.cc/9KMG-847L.

For the subscription-wary public, clear information and cancellation processes can help consumers feel more willing to try subscription services, to the benefit of businesses. *See* BECKER FRIEDMAN INST., *Sophisticated Consumers with Inertia: Long-Term Implications from a Large-Scale Field Experiment* (Mar. 2022), https://perma.cc/A86B-V2KY. Even though an unwanted subscription can lead to a short-term win for a company, the long-term success of a business can depend on its consumers feeling a positive kinship to its product. *See* Tara Lajumoke, *3 Strategies for Making the Most of the Subscription Economy*, HARV. BUS. REV. (Mar. 31, 2022), https://perma.cc/5V69-XJ4Z. In other words, consumer-friendly practices around subscriptions can bring more customers into the subscription economy.

## II. IN REGULATING SUBSCRIPTION MODELS ACROSS MULTIPLE DECADES, CONGRESS AND THE FEDERAL TRADE COMMISSION HAVE ENGAGED IN AN INTERBRANCH DIALOGUE ON THE PROPER SCOPE OF REGULATION

The problem of unwanted subscriptions is not a new one. Instead, Congress has addressed those products in legislation over the past five decades, enlisting the Federal Trade Commission along the way. That historical relationship is best viewed as an interbranch dialogue—the Commission has carried out Congress's instructions to regulate subscription practices, and Congress has built on the Commission's on-

14

the-ground experience in formulating rules for industry. These whole-of-government efforts have sought to pull back on unfair, deceptive, and otherwise abusive practices that not only inconvenience consumers, but also drain their pocketbooks.

### A. Congress Has Repeatedly Pushed Back on Harmful Subscription Practices Through Bipartisan Legislation

Congress has historically made a series of legislative judgments about the areas most in need of regulation to protect consumer choice and the economy. As relevant here, Congress has focused on four in particular: (1) deceptive practices in how businesses market subscription products; (2) clear disclosures before consumers enter into subscriptions; (3) the need for affirmative consumer consent; and (4) cancellation procedures that are easy to use. As Congress has recognized, the solution has never been to end subscription models, but to ensure meaningful consumer choice in a way that bolsters a free, fair, and competitive market.

*Electronic Fund Transfer Act.* Among Congress's first forays into disclosure rules, consumer consent, and cancellation procedures was the bipartisan Electronic Fund Transfer Act of 1978, which sought to make sure that then-novel electronic fund transfers—*i.e.*, debit-card and ATM transactions—were secure. *See* Pub. L. No. 95-630, 92 Stat. 3728 (1978). In that bygone era of mail-order catalogs and door-to-door salespeople, Congress worried that the lack of security around fund transfers would lead to unwanted or incorrect recurring transactions once a business got ahold

15

of a consumer's financial information. Congress did not seek to end these products outright, but instead recognized that "protect[ing] consumers" would spur "merchants and financial institutions to want to continue developing this new technology." 95 Cong. Rec. 25,731 (daily ed. Aug. 11, 1978) (statement of Rep. Chalmers P. Wylie); *see id.* at 25,732 (statement of Rep. Harry S. Reuss).

As enacted, the Electronic Fund Transfer Act made a number of key reforms around disclosures, consent, and cancellation procedures. The Act ensured that companies gave consumers the "terms and conditions" for charges in "readily understandable language." 15 U.S.C. § 1693c(a). The Act further directed that "preauthorized" charges required the customer's affirmative consent "in writing," with "reasonable advance notice" for any changes to the charges. *Id.* § 1693e(a)–(b). And the Act made it possible for consumers to cancel those charges easily, either "orally or in writing" up to three business days before the transaction. *Id.* § 1693e(a).

*Telemarketing and Consumer Fraud and Abuse Prevention Act.* Fast forward to 1994, when telemarketing gave rise to a new era of deceptive practices, disclosure issues, and consumer harassment around over-the-phone purchases. *See* Patrick E. Michela, Comment, *You May Have Already Won: Telemarketing Fraud and the Need for a Federal Legislative Solution*, 21 PEPP. L. REV. 553, 556–57 (1994). Congress responded with the bipartisan Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), Pub. L. No. 103-297, 108 Stat. 1545 (1994), based on a real concern

16

that ordinary Americans were losing up to $40 billion on telemarketing scams every year. *See Telemarketing Fraud: Hearing on S. 2213, H.R. 4101, & S. 2326 Before the Subcomm. on the Consumer of the S. Comm. on Com., Sci. & Transp.*, 100th Cong., 2d Sess. 1–2 (1988) (statement of Sen. Albert Gore); 138 Cong. Rec. 28,457, 28,459 (daily ed. Sept. 29, 1992) (statement of Rep. Allan Swift).

The Telemarketing Act addressed deceptive practices and disclosures. The Act sought (with the Federal Trade Commission's help, *see infra* at 23–24) to outlaw "deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a). Beyond that, Congress realized how easy it was to rope consumers into a telemarketing scam or recurring charges. The Telemarketing Act thus specifies that businesses must "promptly and clearly disclose" that the purpose of a call is to sell a product or solicit a donation. *Id.* § 6102(b)(3)(C)–(D).

*Restore Online Shoppers' Confidence Act*. The coming of the internet reprised age-old problems around disclosures, consent, and cancellation. In the 2000s, even "reputable" online retailers had begun to sell customer data to facilitate offers for "membership clubs" that would then charge recurring fees. S. Rep. No. 111-240, at 2 (2010). With veto-proof majorities in both chambers, Congress thus adopted the Restore Online Shoppers' Confidence Act of 2010 (ROSCA) to tackle that problem. *See* Pub. L. No. 111-345, 124 Stat. 3620 (2010). In particular, Congress realized that the communities that could benefit most from the advent of online shopping—such

17

as rural and senior consumers—were often the ones who were hurt most by unscrupulous subscription practices. *See* 156 Cong. Rec. E2165 (daily ed. Dec. 16, 2010) (statement of Rep. Zachary T. Space).

ROSCA follows a familiar legislative pattern regarding disclosure, consent, and cancellation. The Act requires "text that clearly and conspicuously discloses" the terms of an online subscription. 15 U.S.C. § 8403(1). For any subscription charges, the Act also requires "a consumer's express informed consent." *Id.* § 8403(2). And the Act regulates cancellation, by requiring "simple mechanisms for a consumer to stop recurring charges." *Id.* § 8403(3).

*Additional Statutes.* As subscription problems recur with technological progress, Congress has been called on to respond time and again. Congress has thus required cable companies to disclose the customer's actual costs and provide a right to cancel. *See* Further Consolidated Appropriations Act, Pub. L. No. 116-94, 133 Stat. 3200 (2019) (codified at 47 U.S.C. § 562). And Congress has made sure that broadband-internet providers also disclose the costs of a subscription product after any introductory rate expires. Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 1244 (2021) (codified at 47 U.S.C. § 1753).

## B. The Federal Trade Commission Has Been Authorized to Pursue New Subscription Problems That Arise

Throughout these decades of regulatory efforts, Congress has also protected consumers from coercive subscription models through an iterative back-and-forth interbranch dialogue with the Federal Trade Commission. Congress has directly leaned on the Commission to do much of the lifting when it comes to regulating subscription models. The various statutes—the Electronic Fund Transfer Act, the Telemarketing Act, and ROSCA—thus all tell the Commission to use its authority to enforce its provisions. *See* 15 U.S.C. §§ 1693o(c), 6107, 8404.

But in a host of other ways, Congress has "called upon [the Commission] to exercise its specialized, experienced judgment" in areas around unfair trade practices and competition issues. *Moog Indus. v. Federal Trade Comm'n*, 355 U.S. 411, 413 (1958). When the Commission has exercised that judgment, Congress has voiced its approval. The interbranch dialogue between Congress and the Commission thus confirms the agency's authority as to the Negative Option Rule.

**1.** Notably, while Congress had been legislating in the subscription space, the Federal Trade Commission engaged in parallel efforts to target harmful subscription practices. The Commission acted *five years before* Congress to address the problems around subscription models, and Congress's repeated statutory enactments only underscore that the Commission has been on the right track.

19

The earliest iteration of a negative-option rule was first promulgated in 1973 pursuant to Sections 5 and 18 of the FTC Act (15 U.S.C. §§ 45, 57a), the Commission's enabling act. *See Use of Negative Option Plans by Sellers in Commerce*, 38 Fed. Reg. 4896 (Feb. 22, 1973) (originally codified at 16 C.F.R. § 425 *et seq.*). Those provisions of the Act, in general, broadly authorize the Commission to address "unfair" practices in the consumer marketplace. *See Atlantic Refin. Co. v. Federal Trade Comm'n*, 381 U.S. 357, 367 (1965). The original rule thus targeted book-of-the-month clubs and other services that charged consumers who took no action to cancel their subscriptions. 38 Fed. Reg. at 4897.

The original negative-option rule was a historical predecessor of the current Negative Option Rule, as well as a number of Congress's enactments. The rule required sellers to "conspicuously disclose" their subscription terms, 38 Fed. Reg. at 4896, much as ROSCA later did almost verbatim (*see* 15 U.S.C. § 8403(1)) and the Electronic Fund Transfer Act and Telemarketing Act did, as well (*see* 15 U.S.C. §§ 1693c(a), 6102(b)(3)(C)–(D)). The rule also addressed "introductory" offers, 38 Fed. Reg. at 4896, much as Congress recently has done with respect to broadband internet, *see* 47 U.S.C. § 1753. And the rule required businesses to "terminate promptly" a customer's membership upon request, 38 Fed. Reg. at 4896, just as Congress has done throughout the decades, *see* 15 U.S.C. §§ 1693e(a), 8403(3); 47 U.S.C. § 562.

This interbranch dialogue between Congress and the Commission confirms the agency's statutory authority to carry out the legislative concern with subscription models. For now half a century, Congress tellingly *never* touched the precursors to the current Negative Option Rule nor cast their legitimacy into doubt. This has been in spite of related congressional statutes in almost every decade since 1973, from the Electronic Fund Transfer Act, the Telemarketing Act, ROSCA, and more recent enactments around cable and broadband.

Rather, each time the Commission took a step forward in regulating a novel area of concern in the subscription industry, it has been to the beat of Congress's drum. Congress has thus repeatedly enacted statutes that mirror key provisions of the Commission's negative-option regulations. And while Congress voiced its judgment that regulation in this area is proper, the Commission has itself revisited the rule on a number of occasions, each time affirming that its choices uphold Congress's view. *See Regulatory Flexibility Act Review of the Trade Regulation Rule for Use of Negative Option Plan by Sellers in Commerce*, 51 Fed. Reg. 42,087 (Nov. 21, 1986); *Trade Regulation Rule Regarding Use of Negative Option Plans by Sellers in Commerce*, 63 Fed. Reg. 44,555 (Aug. 20, 1998); *Rule Concerning the Use of Prenotification Negative Option Plans*, 79 Fed. Reg. 44,271 (July 31, 2014).

Contrary to petitioners' narrow view of the Commission's statutory authority (Br. at 31–52), Congress's actions "affirmatively manifested acquiescence" to the

Appellate Case: 24-3137     Page: 30     Date Filed: 03/21/2025 Entry ID: 5498794

agency's assertion of authority in this area. *Bob Jones Univ. v. United States*, 461 U.S. 574, 601 (1983). Given the fundamental protections that the Commission put into place as to subscription models half a century ago, it "is hardly conceivable that Congress—and in this setting, any Member of Congress—was not abundantly aware of what was going on" in enacting multiple subscription-related statutes. *Id.* at 600–01. Where that "congressional interest has been frequent and intense," it is significant that "at no point did Congress choose" to pull back on the Commission's actions. *Ziglar v. Abbasi*, 582 U.S. 120, 144 (2017).

The past five decades of negative-option regulation could not have been an overstep because "unauthorized acts would not have been allowed to be so often repeated as to crystalize into a regular practice." *Udall v. Tallman*, 380 U.S. 1, 17–18 (1965); *see Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 535–37 (2015) (determining that Congress's repeated amendments to a statute indicate an implicit endorsement of established interpretations). Nor have petitioners pointed to other instances where Congress wielded tools to influence agency action, including through the Congressional Review Act, appropriations, oversight hearings, or other legislative inquiries. Congress's gradual adoption of many of the same sorts of protections as the Commission instead represents a decadeslong tête-à-tête that manifests its approval of the agency's statutory authority.

22

**2.** Indeed, Congress's enactments around telemarketing make it doubly clear that it has assented to the Commission's authority to enact negative-option regulations, and approved of the interbranch dialogue from which that assent arises. Implementing the Telemarketing Act, the Commission issued a telemarketing-sales rule in 1995 that required "affirmative disclosure" of the "total costs … and the quantity of, any goods or services that are the subject of the sales offer"—*i.e.*, any recurring charges. *Telemarketing Sales Rule*, 60 Fed. Reg. 43,841, 43,846 (Aug. 23, 1995) (codified at 16 C.F.R. § 310.3). The rule also required "clear and conspicuous disclosures" of those products, including when part of subscription plans. *Id.* at 43,846–47. The Commission's telemarketing-sales rule was explicit that it built on the protections of the prior negative-option regulations. *Id.* at 43,846 n.48.

The Commission's 2003 amendments to the rule reinforced these guardrails. *See Telemarketing Sales Rule*, 68 Fed. Reg. 4,580, 4,671–72 (Jan. 29, 2003) (codified at 16 C.F.R. § 310.4). That rulemaking directed telemarketers using a customer's "pre-acquired account information" to obtain the customer's last four digits of their credit-card number before converting their free trial into a paid subscription. *Id.* This measure of friction—forcing the consumer to pull their card out of their wallet—made sure that the consumer gave "express informed consent." *Id.*; *see* Prentiss Cox, *The Invisible Hand of Preacquired Account Marketing*, 47 HARV. J. ON LEGIS. 425, 466–67 (2010).

These protections were then rigorously enforced. In the first decade, between 1996 and 2007, the Commission brought over 240 enforcement actions under the rule. *Oversight of Telemarketing Practices and the Credit Repair Act*: *Hearing before the S. Comm. on Com., Sci. & Transp.,* 110th Cong., 1st Sess. (July 31, 2007) (statement of Lydia B. Parnes, Director, Bureau of Consumer Prot., Fed. Trade. Comm'n). And the Commission made clear through its enforcement that the rule applied to instances when businesses "enrolled consumers in auto-ship continuity plans without their consent." Letter from Malini Mathal, Associate Dir., Div. of Fin. Practices, Fed. Trade Comm'n (May 23, 2023), https://perma.cc/7CFC-454Y; *see* Final Judgment, *Federal Trade Comm'n v. Cardiff*, No. 18-cv-2104 (C.D. Cal. Mar. 1, 2022), ECF No. 702.

Congress has since specifically and affirmatively adopted the negative-option aspects of the Commission's telemarketing regulations. In enacting ROSCA in 2010, Congress stated that it had in fact reviewed and approved of the Commission's actions around subscription models—it regulated "negative option features" as those products were "defined in the Federal Trade Commission's Telemarketing Sales Rule," but now as to the internet. 15 U.S.C. § 8403. Though petitioners repeatedly mention ROSCA (Br. at 18, 48, 50–52, 63), they nowhere bring up the fact that Congress in that statute adopted the Commission's regulatory scheme. Rather than being evidence of an agency run amok, the continuing conversation between the branches here only shows Congress's approval of the Commission's work.

### III. FAR FROM BEING A "POWER GRAB," THE RECENT NEGATIVE OPTION RULE IS A PROPER CONTINUATION OF THAT INTERBRANCH DIALOGUE

The Federal Trade Commission's instant Negative Option Rule is part of this regulatory history, and continues a historical interbranch dialogue with Congress. That rule is thus an amendment to the existing negative-option regulations that Congress never touched. *See* 89 Fed. Reg. 90, 476. Mirroring what Congress has done throughout the decades (*supra* at 15–18), the Commission's rule (1) "prohibits misrepresentations of any material fact" in marketing subscriptions, (2) mandates disclosures prior to charging customers for any subscriptions, (3) requires "affirmative consent" from consumers, and (4) imposes "simple cancellation mechanisms." 89 Fed. Reg. at 90,476. That is, it prioritizes the same things that Congress has prioritized.

Petitioners' understanding (Br. at 50, 52) that the Commission has engaged in a "power-grab" that turned the agency into a "super-legislature" is as ahistorical as it is wrong. It was the Commission that first regulated subscription models in 1973 and Congress that let the original negative-option rule stand for five decades without questioning its statutory grounding, all while continuing to regulate in this area. If anyone had a reason to correct a power grab, it would have been Congress, which instead explicitly adopted various features of the Commission's negative-option rules in ROSCA.

Congress, moreover, has been well aware of the Commission's current rule, addressing the instant rulemaking (with approval) in its oversight capacity. *See Oversight of the Federal Trade Commission: Hearing Before the H. Comm. on the Judiciary*, 118th Cong. 51–52 (2023) (statement of Rep. Steve Cohen) ("I had a bundle with Disney, Hulu, and ESPN 26, or something. I tried to get out of that bundle and just do Hulu. Whatever it is, I'm being charged for both of them. I've given up. I've just tried to cancel and it's just too much. It needs to be easy."). As congressmembers have made clear, the "digital tricks" to "enroll people in [a product] without their consent or to prevent people from canceling their subscription" are issues that members "hear a lot from [their] constituents about." *Id.* at 97. Never, however, has Congress questioned the current rulemaking throughout that process.

By equal measure, petitioners' complaint (Br. at 31–42) that the Commission's rule lacks "specificity" ignores that it addresses the precise issue areas that Congress specified. And petitioners' contention (Br. at 42–49) that there is no reason to find a "prevalence" of deceptive subscription practices only underscores their failure to grapple with history. When the Commission first regulated subscription models in 1973, its rule identified a paltry "72 book clubs and four major record clubs"—a far cry from present circumstances. 38 Fed. Reg. at 4898.

Petitioners' arguments boil down to an assumption (Br. at 49–52) that the Commission had no license to go one inch farther than Congress. But in empowering

26

the Commission through the FTC Act, "Congress intentionally left development" of the rules governing unfair practices to the Commission "rather than attempting to define the many and variable unfair practices which prevail in commerce." *Atlantic Refin.*, 381 U.S. at 367 (quotation omitted). Congress's grant of rulemaking authority to the Commission necessarily "leaves [it] with flexibility" to tackle new forms of the age-old subscription problem, consistent with legislative priorities. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Michigan v. Environmental Prot. Agency*, 576 U.S. 743, 752 (2015)).

Nor do petitioners have a serious nondelegation argument (Br. at 52) about the Commission wielding vague statutory language to "overrid[e] Congress's own judgments." Congress has been rather clear about when the Commission has over-stepped. For example, when the Commission in the 1970s tried "to ban all advertising directed to children on the grounds that it was 'immoral, unscrupulous, and unethical' and based on generalized public policies to protect children," Congress withheld funding to the Commission and shut it down for days. J. Howard Beales III, *The Federal Trade Commission's Use of Unfairness Authority: Its Rise, Fall, and Resurrection*, 22 J. PUB. POL'Y & MKTG. 192, 193 (2003). Similarly, when the Commission proposed changes to the "Made in USA" labeling requirements in the 1990s, over 200 members of the House cosponsored a resolution opposing the effort, leading the Commission to abandon the changes. *See* H.R. Conf. Res. 80, 105th Cong. (1997);

*see also "Made in USA" and Other U.S. Origin Claims*, 62 Fed. Reg. 63,756, 63,756, 63,758 (Dec. 2, 1997) (discussing House resolution).

But when the Commission puts forward a rule that mirrors the themes that are central to Congress's efforts, it is difficult for the Court to fault the agency for applying its expertise in aid of the legislature's mission. If the Commission has at all "misconstrued" its authority, it is instead "Congress [that] can and often does correct such misconceptions." *Bob Jones Univ.*, 461 U.S. at 599. It has never done so as to subscription models, and this Court should not be the first to countermand the agency.

Appellate Case: 24-3137     Page: 37     Date Filed: 03/21/2025 Entry ID: 5498794

## CONCLUSION

For the foregoing reasons, this Court should deny the petitions for review.

Dated:      New York, NY
            March 21, 2025

                            Respectfully submitted,

                            /s/ *Dennis Fan*

                            DENNIS FAN, *Director*
                            GABRIEL N. CASTRO, *Student*
                            MELANIE MIGNUCCI, *Student*
                            APPELLATE LITIGATION CLINIC,
                              COLUMBIA LAW SCHOOL
                            MORNINGSIDE HEIGHTS
                              LEGAL SERVICES, INC.
                            435 West 116th St.
                            New York, NY 10027
                            (212) 854-4291
                            dfan@columbialawclinics.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), this document complies with the type-volume limits of Rules 29(a)(5) and 32(a)(7)(B) because, excluding the parts exempted by Rule 32(f), it contains 6,276 words. This document complies with the typeface requirements of Rule 32(a)(5) and type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface, Baskerville, 14-point font.

Pursuant to this Eighth Circuit Rule 28A(h), this brief has been scanned for viruses and is virus-free

Dated:        March 21, 2025                    /s/ *Dennis Fan*
                                                DENNIS FAN
                                                Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the Court's CM/ECF system on March 21, 2025, which will send notice of such filing to all counsel who are CM/ECF registered users.

Dated:        March 21, 2025                    /s/ *Dennis Fan*
                                                DENNIS FAN
                                                Counsel for *Amici Curiae*