Nos. 24-3137 (L), 24-3388, 24-3415, 24-3442, 24-3469

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, *et al.*,

*Petitioners*,

*v.*

FEDERAL TRADE COMMISSION,

*Respondent*.

_____

On Petition for Review of a Rule
of the Federal Trade Commission
(Negative Option Rule, RIN 3084-AB60)

_____

# BRIEF OF MAIN STREET ALLIANCE
# AS AMICUS CURIAE
# IN SUPPORT OF RESPONDENT

_____

Kevin E. Friedl
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 894-6035
kfriedl@democracyforward.org

*Counsel for Main Street Alliance*

## CORPORATE DISCLOSURE STATEMENT

Main Street Alliance is not a nongovernmental corporation, so does not trigger the requirements of Federal Rule of Appellate Procedure 26.1(a).

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..........................................................................1

SUMMARY OF ARGUMENT...........................................................................2

ARGUMENT ...................................................................................................3

I.   The FTC Act Authorizes Issuance of the Click to Cancel Rule.........................3

  A.   The plain text of the statute authorizes the rule. .........................................3

  B.   Petitioners' statutory arguments are unsupported by text and incorrect
       on their own terms. .......................................................................................4

    1.   Nothing in the statute provides that trade regulations must apply to
         only one industry. .................................................................................4

    2.   Petitioners' claimed confusion about parts of the rule does not show
         that the unfair and deceptive practices lack "specificity." ....................7

    3.   The FTC Act does not bar identifying unfair or deceptive practices
         in any field subject to other federal regulation....................................11

    4.   The FTC clearly satisfied all statutory requirements concerning
         "prevalence." ........................................................................................15

II.  No Preliminary Economic Analysis Was Required, and the Absence of
     Such an Analysis Did Not Prejudice Petitioners............................................18

III. The Rule Is Reasonable and Reasonably Explained........................................25

CONCLUSION ...............................................................................................28

Appellate Case: 24-3137   Page: 3   Date Filed: 03/21/2025 Entry ID: 5498842

# TABLE OF AUTHORITIES

## Cases

*Aguilar-Sanchez v. Garland*,
    87 F.4th 878 (8th Cir. 2023) ....................................................... 21, 22

*American Financial Services Ass'n v. FTC*,
    767 F.2d 957 (D.C. Cir. 1985) ...........................................................4, 7

*Azar v. Allina Health Servs.*,
    587 U.S. 566 (2019)...............................................................................6

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)................................................................ 18, 25, 27

*FTC v. Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972).............................................................................11

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015) ..............................................................14

*Krekelberg v. City of Minneapolis*,
    991 F.3d 949 (8th Cir. 2021).............................................................23

*Nat'l Auto. Dealers Ass'n v. FTC*,
    127 F.4th 549 (5th Cir. 2025).............................................................24

*Northport Health Services of Arkansas, LLC v. HHS*,
    14 F.4th 856 (8th Cir. 2021) ...................................................... 23, 24

*Penn. Funeral Directors Ass'n, Inc. v. FTC*,
    41 F.3d 81 (3d Cir. 1994) ..................................................................17

*Shinseki v. Sanders*,
    556 U.S. 396 (2009)...................................................... 21, 22, 23, 25

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
    566 U.S. 560 (2012).............................................................................3

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).............................................................................23

*Union Pac. R.R. Co. v. United States*,
    865 F.3d 1045 (8th Cir. 2017).............................................................14

*United States v. Hughes*,
795 F.3d 800 (8th Cir. 2015)..................................................................3

*USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment of the City of Des Moines*, 465 F.3d 817 (8th Cir. 2006).................................... 17, 18


**Statutes**

15 U.S.C. § 57a ....................................................................... *passim*

15 U.S.C. § 57b-3 ........................................................................ 20, 21

15 U.S.C. § 1693 .......................................................................... 12, 13

15 U.S.C. § 6102 ...............................................................................13

15 U.S.C. § 8403 ...............................................................................12

47 U.S.C. § 562 ........................................................................... 12, 13

47 U.S.C. § 1753 .......................................................................... 12, 13

Pub. L. 116-94, 133 Stat. 2534 (2010)..............................................13

Pub. L. 117-58, 133 Stat. 429 (2021)................................................13


**Other Authorities**

H.R. Rep. No. 93-1107 (1974)............................................................6

S. Rep. No. 95-915 (1978)................................................................13

S. Rep. No. 96-500 (1980)..............................................................6, 7

S. Rep. No. 103-130 (1993)..............................................................15


**Rules and Regulations**

Fed. R. App. P. 29.............................................................................1

16 C.F.R. § 425 .......................................................... 3, 8, 9, 10, 12

16 C.F.R. § 444 ..............................................................................4, 7

17 C.F.R. § 240.10b-5 ......................................................................9

iii

## INTEREST OF AMICUS CURIAE

Main Street Alliance (MSA) is a membership association representing approximately 30,000 small businesses across the country. It seeks to organize, empower, and advocate for small business owners in order to create a thriving and inclusive economy.

MSA's small business members have a significant interest in the outcome of this litigation. They are uniquely situated vis-à-vis the rule because they are both directly regulated by it and direct beneficiaries of its protections. MSA's members routinely purchase goods and services for their small businesses and for themselves using negative-option agreements. They therefore doubly benefit from the rule's protections and would be harmed if the rule were invalidated. Members would suffer other injuries, too, if the rule were struck down, including competitive disadvantage—namely, lost sales due to huge competitors using unfair and deceptive negative-option contracts to rig consumer choices in their favor.

MSA files this brief with leave of the Court. *See* Order, *Custom Commc'ns, Inc. v. FTC*, No. 24-3137 (8th Cir. Mar. 13, 2024).[1]

---

[1] No party's counsel authored this brief in whole or in part, and no person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

1

## SUMMARY OF ARGUMENT

The Click to Cancel Rule provides necessary and commonsense consumer protections in an area where unfair and deceptive practices have become rampant. Rather than competing on price or quality, too many companies have sought to trap buyers—both individual consumers and business consumers, including the small businesses Main Street Alliance represents—in automatic recurring deals they no longer want and may never have asked for in the first place. The result is widespread harm not just to individual consumers but to honest small businesses. Small businesses can become trapped in unwanted subscriptions and similar deals and they also suffer competitive disadvantage when large companies use unfair and deceptive negative-option features to lock in their dominant positions.

Petitioners do not dispute that the practices identified in the rule occur, that they seriously harm consumers and small businesses, and that they qualify as unfair and deceptive. Petitioners nonetheless seek to invalidate the rule based on a series of tendentious statutory and procedural arguments. Those arguments fail. The rule is squarely within the Federal Trade Commission's statutory authority, Petitioners do not identify any procedural failings or show that any alleged failings prejudiced them, and the rule's requirements are reasonable and reasonably explained. The Court should deny the petitions and allow that rule to take effect as scheduled for the protection of the market, individual consumers, and businesses.

2

## ARGUMENT

## I.    The FTC Act Authorizes Issuance of the Click to Cancel Rule.

Petitioners challenge the FTC's statutory authority to issue the rule. Yet the text of the statute makes clear the FTC's authority to do so, and that conclusion is only confirmed by precedent, legislative history, and common sense.

### A. The plain text of the statute authorizes the rule.

Section 18 of the FTC Act authorizes the FTC to "prescribe … rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57a(a)(1). The Click to Cancel Rule does just that, defining four specified unfair and deceptive practices in or affecting commerce. 16 C.F.R. §§ 425.3-425.6.

Those provisions define the unfair and deceptive practices with "specificity" under any reasonable understanding of that term. "When a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *accord United States v. Hughes*, 795 F.3d 800, 804 (8th Cir. 2015). In ordinary usage, "specific" means "constituting or falling into a specifiable category," "sharing … those properties of something that allow it to be referred to a particular category," or "restricted to a particular individual, situation, relation, or effect," *Specific*, Merriam-Webster.com. The Click to Cancel Rule defines the unfair and deceptive practices with "specificity"

because it describes those practices such that they are "restricted to a particular …
situation" and by way of "properties … that allow [those practices] to be referred
to a particular category." *See id.*

The D.C. Circuit's decision in *American Financial Services Ass'n v. FTC*,
767 F.2d 957 (D.C. Cir. 1985) ("*AFSA*"), is instructive. That case considered a
challenge to the Credit Practices Rule, which the FTC issued under Section 18 and
which defines certain unfair and deceptive practices by lenders and retail sellers.
16 C.F.R. pt. 444. The practices addressed in that rule—such as "the taking of
[household goods] security interests and wage assignments as collateral" when
extending consumer credit, *AFSA*, 767 F.2d at 984—were not materially different
from those in the Click to Cancel Rule in terms of their particularity. Yet the D.C.
Circuit had no difficulty concluding that the agency had "defined with specificity
the acts or practices deemed unfair" and thus had "fully complied with the
statutory requirements of section 18(a)(1)(B)." *Id.* So too here.

## B. Petitioners' statutory arguments are unsupported by text and incorrect on their own terms.

### 1. Nothing in the statute provides that trade regulations must apply to only one industry.

Petitioners' lead argument is that the Act's reference to "specificity" in 15
U.S.C. § 57a(a)(1) means "specific to one industry." That is not a plausible reading
of the statutory text. It is also contradicted by legislative context and precedent.

4

To begin, not even Petitioners claim that anything in the statute expressly states that rules issued under Section 18 must be limited to one industry. That is a telling omission. If Congress had intended Petitioners' one-industry-only rule, it could easily have made that very significant limitation clear by including it in the statute on any of the several occasions that it amended Section 18. Congress did not.

Petitioners focus then on the word "specificity" in 15 U.S.C. § 57a(a)(1). But that does not help them. As noted, undefined statutory terms such as "specificity" take their ordinary meaning. In ordinary usage, the term "specificity" does not mean "specific to one industry"—at least not without some clear contextual indication to the contrary.

Here, context not only fails to support but is actually inconsistent with that interpretation. The relevant provision does not require that *the regulated industry* be defined with specificity but that the "acts or practices which are unfair or deceptive" be so defined. Nor does "specificity" depend on how often the specifically defined practice occurs. *Contra* Pet'rs' Br. at 32-33 (focusing on the number of contracts containing negative-option features). That argument confuses specificity with prevalence.

Finding no support in the text, Petitioners shift to their real focus: legislative history. There are several problems with this approach. For one, "legislative history

5

is not the law," and "ambiguous legislative history" cannot be used "to muddy clear statutory language." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019).

Moreover, Petitioners paint an inaccurate picture of the legislative materials. They seek (at 33), for example, to portray the Magnuson-Moss amendments of 1975 as a disapproving reaction to FTC rulemaking. The opposite is true. Those amendments were passed specifically to expand the FTC's jurisdiction and to confirm its rulemaking authority. H.R. Rep. No. 93-1107 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7702, 7714-15, 7727. And when Congress added the "specificity" requirement as part of those amendments, it explained that its purpose was to make sure regulated entities knew what was required of them (*not* to limit rules to one industry). *See id.* at 7727 ("Such specificity would require that any [Section 18] rule reasonably and fairly inform those within its ambit of the obligation to be met and the activity to be avoided.").

Petitioners also point (at 34-35) to Congress's disapproval, in 1980, of ongoing FTC rulemakings to address children's advertising and the use of product standards and certifications. Petitioners imply (at 34) that Congress' disapproval of those rules was because "neither … w[as] tethered to any industry." Not so. Congress disapproved the advertising rule because "the Commission never proposed a specific rule to be considered during the hearing phase" but instead "simply noted the staff proposals which included a total ban on all children's

6

advertising." S. Rep. No. 96-500, at 2 (1979). And it disapproved the standards rule because the FTC had not identified "a 'pattern' of violations" and "there are adequate remedies available through the antitrust laws" to address the problems the FTC had found. *Id.* at 3.

Judicial precedent also cuts against Petitioners. As discussed, *supra* at 4, the D.C. Circuit's decision in *AFSA* squarely held that the Credit Practices Rule "fully complied with the statutory requirements" of Section 18 because it "defined with specificity the acts or practices deemed unfair." 767 F.2d at 984. But that rule is not limited to a single industry. Instead, it applies to persons "engage[d] in the business of lending money to consumers" and persons "who sell[] goods or services to consumers on a deferred payment basis or pursuant to a lease-purchase arrangement." 16 C.F.R. § 444.1(a)-(b). Many different industries may lend money to consumers or sell goods or services on a deferred-payment basis or under a lease-purchase agreement. Petitioners not only fail to address *AFSA*, they fail to identify any precedent that would support their one-industry-only rule.

### 2. Petitioners' claimed confusion about parts of the rule does not show that the unfair and deceptive practices lack "specificity."

Petitioners next allege (at 39) that the rule does not define the unfair and deceptive practices "with specificity" because three aspects of the rule are "vague and ambiguous." Petitioners are wrong on each count.

7

First, they challenge (at 40-41) the use of the term "simple mechanism" in Section 425.6. That section requires sellers to provide a simple mechanism for the buyer to cancel the negative option, avoid being charged, and stop any recurring charges. The mechanism "must be at least as easy to use as the mechanism the consumers used to consent to the Negative Option Feature." 16 C.F.R. § 425.6(b). And the rule provides certain minimum requirements for the mechanism, such as that when it is offered over the phone, it must be made available during normal business hours. *Id.* § 425.6(c)(2). These detailed provisions are further discussed at length in the rule's statement of basis and purpose. App.412-19.

Petitioners' claim that this requirement is not defined "with specificity" rings hollow. Their argument boils down to the observation (at 40) that "[w]hat is 'easy' may differ from context to context, and company to company." But that elides the fact that Section 425.6 directs a straightforward comparative inquiry: the mechanism to cancel must be at least as easy to use as the mechanism to enroll. 16 C.F.R. § 425.6(b). That inquiry necessarily takes into account differences between companies and market sectors.[2]

---

[2] The statement of basis and purpose confirms that Section 425.6 requires just what it sounds like: providing buyers with "similar cancellation and consent experiences in terms of time, burden, expense, and ease of use, among other things." App.414. The FTC acknowledged that "these experiences may not always be perfectly symmetrical," including because of the need to "verify or authenticate [a buyer's] identify." *Id.*

Second, Petitioners take issue (at 41-42) with the use of the term "material" in Sections 425.5 and 425.6. Section 425.5 prohibits sellers from misrepresenting a "material fact" in connection with a sale of goods or services with a negative-option feature. Section 425.6 requires sellers to disclose all "material terms" before obtaining the buyer's billing information.

Petitioners' objection to the word "material" in this context is an odd one. "Materiality" is a familiar concept. For many decades, it has been a touchstone of identifying deceptive practices under the FTC Act. *See, e.g.*, App.403. It is used in other well-known regulations such as SEC Rule 10b-5, which concerns material misstatements in the securities context. *See* 17 C.F.R. § 240.10b-5. In response to comments, the FTC specifically defined the term in the rule's text, giving it its longstanding and well-established meaning of "likely to affect a person's choice of, or conduct regarding, goods or services." 16 C.F.R. § 425.2; *see also* App.403. And "[t]o further promote clarity," the rule "includes a list of non-exclusive examples" of material facts drawn from decades of FTC precedent, App.401-02, such as cost and the efficacy of the underlying good or service, 16 C.F.R. § 425.3(a)-(d); *see also id.* § 425.4(a)(1)-(4) (providing examples of "material" terms).

Third, Petitioners claim confusion (at 42) about the rule's prohibition on putting information into disclosures that "interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or

9

otherwise understand the disclosures," 16 C.F.R. § 425.4(b)(3), or similarly interfering with "the ability of consumers to provide their express informed consent to the Negative Option Feature," *id.* § 425.5(a)(2).

As an initial matter, these provisions appear to have been issued under the FTC's authority to prescribe requirements "for the purpose of preventing [the identified unfair or deceptive] acts or practices" and thus are distinct from the rule's identification of unfair or deceptive practices, which is what Section 18 requires be done "with specificity." *See* 15 U.S.C. § 57a(a)(1)(B); App.384. But even if it were otherwise, the detailed provisions Petitioners challenge are certainly described "with specificity," especially when read in context. Contrary to Petitioners' suggestion (at 42), the FTC was not required to list every statement that would interfere with "the ability of consumers to … understand the disclosures" of material terms required by Section 425.4, nor should it be difficult for sellers to identify such a statement ex ante.

Because Petitioners have not shown that the rule fails to identify unfair and deceptive practices "with specificity," their claim (at 42-44) that the rule "constitutes an end-run" around the FTC Act's adjudication procedures necessarily fizzles. So too their suggestion (at 43) that the FTC has not "give[n] notice to companies" about the prohibited conduct. That is exactly what the rule does—to the benefit of sellers who now need not wait to become the subject of "an

10

administrative and judicial review process" (which MSA's members, at least, would rather avoid) in order to know specifically what conduct constitutes unfair and deceptive practices.

### 3. The FTC Act does not bar identifying unfair or deceptive practices in any field subject to other federal regulation.

Petitioners next claim (at 49-52) that the rule exceeds the FTC's authority because it "second-guesses Congress's judgment[s]" as expressed in some existing laws addressing aspects of negative-option deals in certain contexts. Although Petitioners' claim is one about statutory authority, they do not identify any statutory provision that would limit the FTC's rulemaking in the way they suggest.

Petitioners' argument fails for other reasons as well. The FTC is not limited to identifying as unfair or deceptive only conduct that is already prohibited by other statutes. *Cf. FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239 (1972) (holding that Section 5 of the FTC Act "empower[s] the Commission to define and proscribe an unfair competitive practice, even though the practice does not infringe either the letter or the spirit of the antitrust laws"). That would render the authority largely pointless and be inconsistent with Congress's expressly stated goal of empowering the FTC to identify new unfair and deceptive practices as they emerge. *See, e.g., id.* at 240-41 (explaining this point and quoting Congress's view that "[i]t is impossible to frame definitions which embrace all unfair practices" because "[t]here is no limit to human inventiveness in this field").

11

Nor does the rule conflict or interfere with any of the statutes Petitioners cite. Petitioners point (at 50-51) to provisions governing required notices for "broadband internet access service plans," 47 U.S.C. § 1753, and for "electronic fund transfers," 15 U.S.C. § 1693c. But there is no reason—and Petitioners offer none—why a company could not simultaneously comply with both these requirements and the rule, in instances where both apply.

Petitioners get no further (at 51) with a provision giving consumers the right to stop payment of a preauthorized electronic fund transfer by contacting their financial institution up to three days in advance, 15 U.S.C. § 1693e(a), or another prohibiting cable and satellite TV companies from charging consumers a fee if they cancel within 24 hours of signing a contract for services, 47 U.S.C. § 562(a)(3). Petitioners, again, identify no reason a company cannot comply both with these provisions and with the rule.[3] There is no conflict with the Restoring Online Shoppers' Confidence Act either. Petitioners claim (at 51) that the rule's cancellation requirement is "more restrictive" than the one in ROSCA, 15 U.S.C. § 8403, but both ROSCA and rule require a "simple" cancellation mechanism.

The fact that a handful of statutes enacted over several decades touch in some way on negative options does not demonstrate an intention by Congress to

---

[3] To avoid any potential conflict with Section 1693e, the Commission limited application of the rule's affirmative-consent requirements with respect to transactions covered by that section. *See* 16 C.F.R. § 425.5(c); App.408 n.312.

Appellate Case: 24-3137      Page: 17      Date Filed: 03/21/2025 Entry ID: 5498842

occupy the field such that the FTC lacks statutory authority to address ongoing unfair or deceptive practices in those areas. With the exception of ROSCA, none of the laws Petitioners cite were even primarily directed at problems with negative-option features themselves.

The Electronic Fund Transfer Act was enacted in 1978 in order to clarify legal rights and responsibilities in the then-emerging area of electronic payment systems. 15 U.S.C. § 1693; S. Rep. No. 95-915, at 1 (1978). The Telemarketing Act tasked the FTC with "prescrib[ing] rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices," 15 U.S.C. § 6102—but does not itself regulate companies' conduct or once mention negative options.

The Television Viewer Protection Act of 2019, which added the provision codified at 47 U.S.C. § 562, dealt more generally with concerns about cable and satellite TV services, such as companies failing to provide consumers with cable boxes and other necessary equipment, and also does not expressly address negative options. *See* Pub. L. 116-94, §§ 1001-04, 133 Stat. 2534, 3198-201 (2010). And Congress gave no indication when it required the FCC to issue rules governing notices about broadband service plans, 47 U.S.C. § 1753, that it was primarily concerned with the fact that many such plans are sold via negative-option deals. *See* Pub. L. 117-58, § 60504, 133 Stat. 429, 1244 (2021).

13

There is nothing unusual about different aspects of a transaction being governed by different laws, and no reason to understand Petitioners' cited statutes as having implicitly altered the authority to identify unfair or deceptive practices that Congress conferred on the FTC when it enacted Section 18 in 1975 (before any of the other statutes became law). Indeed, the Third Circuit rejected a similar argument in *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 247-48 (3d Cir. 2015), concluding that the FTC's authority to define unfair practices was not "reshaped" by subsequent congressional enactments in other areas.

Petitioners' argument also runs contrary to the well-established rule that courts will not find that "later-enacted statutes impliedly repeal an earlier one unless the intention of Congress to repeal is clear and manifest"—i.e., that "[t]he later statute … expressly contradict[s] the earlier one" or "such a construction is absolutely necessary to give the words of the later statute any meaning." *Union Pac. R.R. Co. v. United States*, 865 F.3d 1045, 1052 (8th Cir. 2017). Because that is clearly not the case here, there is no reason to understand the later-enacted laws Petitioners cite as impliedly repealing Section 18 in whole or in part.

Grasping at straws, Petitioners turn (at 52-54) to the nondelegation doctrine. But that doctrine is irrelevant here. Whether one reads the statute (correctly) to authorize the Click to Cancel Rule or (incorrectly) to prohibit Section 18 rules from touching any area that Congress has regulated in any other way, the statute

14

would provide the required "intelligible principle" to guide the agency's discretion. So this argument is entirely a red herring.

### 4. The FTC clearly satisfied all statutory requirements concerning "prevalence."

Petitioners fare no better arguing (at 44-49) that the rule "exceeds Section 18's 'prevalence' requirement."

As Petitioners acknowledge (at 45), the FTC may issue a *notice of proposed rulemaking* only if the Commission at the time "has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." 15 U.S.C. § 57a(b)(3). That standard—that "[t]he Commission … has reason to believe"—makes clear the agency's significant discretion. *See also* S. Rep. No. 103-130, at 10 (1993) ("The 'reason to believe' standard is intended to bar any judicial review."). Section 18 defines "prevalent" to mean either that the FTC "has issued cease and desist orders regarding such acts or practices" or has other information "indicat[ing] a widespread pattern of unfair or deceptive acts or practices." 15 U.S.C. § 57a(b)(3).

Petitioners do not directly dispute that the Commission had reason to believe in the prevalence of the identified unfair and deceptive practices at the time it issued the notice of proposed rulemaking. Nor could they. In its proposed rule, the FTC explained that substantial information—including thousands of consumer complaints, "many recent federal and state enforcement actions related to negative

15

options," nearly 100 private actions, studies and survey results submitted by commenters, and the FTC's own enforcement actions—showed a widespread pattern of unfair and deceptive practices in this area. App.26, 35-36 & nn.60, 62; *see also* App.33-35. Because the FTC had "reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent," 15 U.S.C. § 57a(b)(3), it did not exceed its statutory authority when it issued the proposed rule.

Section 18 next requires that the FTC's statement of basis and purpose "shall include a statement as to the prevalence of the acts or practices treated by the rule." 15 U.S.C. § 57a(d)(1). While this requirement is not judicially reviewable, *id.* § 57a(e)(5)(C), it is clear that the statement of basis and purpose includes the required statement. *See* App.389-92. Because that is so, the FTC did not exceed its statutory authority when it issued the final rule.

Petitioners' contrary argument begins (at 45) in the right place—with the actual language of Section 57a(b)(3) and 57a(d)(1)—but goes quickly astray, transmogrifying those provisions into an imagined requirement that the FTC not issue a final rule unless it confirms in the statement of basis and purpose that the practices are in fact "prevalent."[4] That requirement, however, appears nowhere in

---

[4] Petitioners likewise err in quickly discarding (at 44) the statute's actual standard for "prevalence," *see* 15 U.S.C. § 57a(b)(3)(A)-(C), for the dictionary definitions that best suit their needs (e.g., "dominant").

the statute. And even if it did, that still would not help Petitioners, because the FTC confirmed in the statement of basis and purpose that the practices are in fact "prevalent." *See* App.389-92.

At bottom, Petitioners are not making an argument about statutory authority at all; they simply disagree with the FTC's substantive conclusion that the practices the rule addresses are widespread. That, however, is a claim that "that the Commission's action is not supported by substantial evidence in the rulemaking record," 15 U.S.C. § 57a(e)(3)(A)—not a claim about what authority is conferred on the agency by statute. *See Penn. Funeral Directors Ass'n, Inc. v. FTC*, 41 F.3d 81, 86-89 (3d Cir. 1994) (reviewing—and rejecting—"prevalence" challenge to FTC regulation under "substantial evidence" standard).

Under the substantial evidence standard, as the Court has explained, so long as "the [agency's] findings are supported by some substantial level of evidence (but less than a preponderance) on the record as a whole … so that a reasonable fact-finder could reach the same conclusion as did the [agency], the [agency's] decision must be affirmed." *USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment of the City of Des Moines*, 465 F.3d 817, 821-22 (8th Cir. 2006).

Petitioners could not hope to succeed under that standard. The rule describes at length the information before the Commission showing a widespread practice of unfair and deceptive practices in connection with negative-option features,

including numerous state, federal, and private actions, survey evidence, and tens of thousands of consumer complaints. App.389-92. This information easily exceeds the requirement to identify "some substantial level of evidence (but less than a preponderance) on the record as a whole," *USCOC*, 465 F.3d at 821, "indicat[ing] a widespread pattern of unfair or deceptive acts or practices," 15 U.S.C. § 57a(b)(3)(B).

Petitioners cavil (at 47) at the FTC's consideration of consumer complaints and of private and public suits that ended in settlement, suggesting that the only evidence that counts are lawsuits resolved on the merits. But the statute specifically allows the FTC to determine prevalence based on "*any* other information available to the Commission." 15 U.S.C. § 57a(b)(3)(B). And Petitioners provide no reason to doubt that the FTC understood both the probative value and limitations of the different types of information before it. *Cf. FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (holding that the Administrative Procedure Act does not require agencies to act only on the basis of "perfect empirical or statistical data").

## II. No Preliminary Economic Analysis Was Required, and the Absence of Such an Analysis Did Not Prejudice Petitioners

Petitioners next contend that the rule should be thrown out because the FTC did not include a "preliminary regulatory analysis" with its proposed rule. But the FTC was not required to conduct a preliminary regulatory analysis in the first place, and the lack of such a statement did not prejudice Petitioners.

18

The FTC did not include a designated "preliminary regulatory analysis" in its notice of proposed rulemaking because it preliminarily determined that the rule would not have annual effects of the national economy of $100 million or more. App.41; *see also* 15 U.S.C. § 57b-3(a)(A), (b)(1). (That conclusion was reasonably based on the FTC's preliminary view that the rule would largely "consolidat[e]" existing legal requirements. App.36.) The notice of proposed rulemaking nonetheless provided a concise statement of the need for and objectives of the proposed rule and a description of alternatives. App.42-43; *see also* App.38 (describing alternative to require additional consent for free trials), App.39 (seeking comment on alternative approaches to requiring periodic reminders).

Following publication of the proposed rule, the FTC's conclusion as to the overall economic impact of the proposal was challenged at the informal hearing provided for under 15 U.S.C. § 57a(c). Petitioners Interactive Advertising Bureau (IAB) and NCTA – The Internet and Television Association, as well as amicus International Franchise Association, took part in that proceeding. App.388. The proceeding spanned three hearings across January and February 2024. App.388-89. The participating parties submitted briefing and evidence, including an expert report from IAB, *Economic Analysis of the Federal Trade Commission's Proposed*

*Negative Option Rule*.[5] App.378. They also provided oral testimony under cross-examination. *Id.* (Of potential anecdotal relevance to Petitioners' claims about prevalence, both authors of the IAB's expert report—highly credentialled economic specialists—testified to having themselves personally run into difficulties with unwanted negative-option programs before. *Id.*)

Following those proceedings, the hearing officer issued a recommended decision finding that the proposed rule would have an overall impact of over $100 million in benefits and costs. App.381-83. The FTC therefore provided a final regulatory analysis when it issued the final rule. App.425-42.

Petitioners say (at 54) that not including a preliminary regulatory analysis in the notice of proposed rulemaking, at a time when the FTC understood the proposed rule's impact to be below $100 million, is "fatal" to the rule. But that view misreads the statute's requirement that a preliminary regulatory analysis is required only when the FTC, when it "publishes notice of a proposed rulemaking," 15 U.S.C. § 57b-3(b)(1), "estimates that such amendment will have an annual effect on the national economy of $100,000,000 or more," *id.* § 57b-3(a)(A). Because the FTC "preliminarily determined" at that time that the amendment

---

[5] Interactive Advertising Bureau, FTC-2024-0001-0026, Economic Analysis Submission (Feb. 5, 2024), https://www.regulations.gov/comment/FTC-2024-0001-0026.

would *not* have such an effect, App.425, the statutory requirement for a preliminary regulatory analysis was not triggered.

But even if a preliminary regulatory analysis were required, Petitioners would not be entitled to the remedy they seek: vacatur of the rule and the elimination of its important protections for individual consumers and small businesses. That is because Section 18 provides that judicial review shall "tak[e] due account of the rule of prejudicial error," 15 U.S.C. § 57a(e)(3), and Petitioners have failed to meet their burden to show, in the circumstances here, that they were prejudiced by the lack of a preliminary regulatory analysis.

To begin, Petitioners are wrong that the lack of a regulatory analysis requires reversal. They repeatedly mischaracterize (at 29, 30, 55) a part of the statute providing that a reviewing court "may" set aside a rule if the FTC has "failed entirely to prepare a regulatory analysis," 15 U.S.C. § 57b-3(c)(1), as *requiring* the court to do so. And they overlook that the same subsection emphasizes that it "do[es] not alter" the otherwise applicable standards of review, *id.* § 57b-3(c)(3), standards that require considering the rule of prejudicial error, *id.* § 57a(e)(3).

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (interpreting nearly identical statutory language); *accord Aguilar-Sanchez v. Garland*, 87 F.4th 878, 883 (8th Cir. 2023). Meeting that burden requires showing

21

"why the [challenged action] caused harm." *Sanders*, 556 U.S. at 410. The Supreme Court has warned against assessing claims of harm "through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record." *Id.* at 407.

Petitioners make little effort to meet their burden. They allege (at 56) only that they were unable to point out "significant costs" of the rule (costs they do not identify or otherwise explain) and to "engage with the Commission's cost-benefit analysis on potential alternatives." Those bare allegations fall short. Nothing prevented Petitioners from submitting comments about the expected costs of the rule—and they in fact did so. Nor were Petitioners prevented from providing feedback on the potential alternatives noted in the proposed rule or suggesting any other lower-cost alternatives that could achieve the objectives that the FTC identified in the proposal. App.42. Two Petitioners, and one of their supporting amici, even participated in an extended proceeding specifically dedicated to exploring the economic effects of the rule. App.388-89. As Petitioners themselves acknowledge (at 21), hearing participants were able to "offer[] detailed submissions and expert reports on the proposed rule's costs."

Examination of the record as a whole casts further doubt on Petitioners' suggestion that the unspecified additional submissions they say they would have offered would have lead to a different rule. *See Aguilar-Sanchez*, 87 F.4th at 883

22

(finding no prejudice where alleged error created no "uncertainty as to the outcome"); *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 959 (8th Cir. 2021) (explaining that "whether there is harmless error … turns on whether the 'error affected the judgment'" (quoting *Sanders*, 556 U.S. at 408)). That is because the FTC found that the rule would generate significant net benefits for consumers and the economy: between roughly $600 million and $5.5 billion in quantified benefits in excess of costs each year over 10 years. App.427. Thus, it found, "there is considerable scope for the net benefits to remain positive and large even if compliance costs have been substantially underestimated." App.426.

Petitioners may respond by claiming to have been harmed by the FTC's alleged procedural failure itself. That claim, however, would be inconsistent with the Supreme Court's repeated holdings in the context of Article III standing that "bare procedural violations, divorced from any concrete harm" are not enough. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021) (bracket omitted). And it is directly contrary to this Circuit's decision in *Northport Health Services of Arkansas, LLC v. HHS*, 14 F.4th 856 (8th Cir. 2021). That case considered an agency's failure to comply with a procedural requirement of the Regulatory Flexibility Act—specifically, the requirement that the agency explain the basis for its conclusion that its regulation will not have a significant economic impact on a substantial number of small entities. *Id.* at 876-77. The Court concluded that the

23

agency "failed to comply with the procedural requirements of the RFA" but also "that such an error is harmless." *Id.* at 878.

Petitioners cite (at 58-59) the Fifth Circuit's ruling in *National Automobile Dealers Ass'n v. FTC*, 127 F.4th 549 (5th Cir. 2025), but that case is distinguishable. It set aside a far-reaching FTC regulation of auto dealers after finding that the petitioners were prejudiced by the agency having not issued an advance notice of proposed rulemaking. *Id.* at 560-61. But the petitioners there were deprived of an entire round of public comment by the lack of ANPRM; Petitioners here were not. Although Petitioners complain that they wanted more analysis to respond to in the notice of proposed rulemaking, they were in fact able to submit comments and evidence in response to that notice, including by opining on the benefits and costs of the rule and of the alternatives that the FTC described in its proposal. They then had an additional opportunity to address the economic impact of the rule at the informal hearing that followed the proposal.

And to the extent the Fifth Circuit based its holding on a bare procedural failing, or shifted the burden to agency to disprove the existence of harm, *see id.* at 561 (stating that "it is far from clear that the failure to issue an ANPRM had no bearing on the procedure used" (quotation marks omitted)), that would be contrary to this Circuit's precedent and the Supreme Court's, respectively, *see Northport Health Servs.*, 14 F.4th at 878 (holding that procedural failing alone is not enough);

24

*Sanders*, 556 U.S. at 409 ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

## III. The Rule Is Reasonable and Reasonably Explained.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Prometheus Radio*, 592 U.S. at 423. "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

None of Petitioners' arguments overcome that high bar. First, Petitioners argue (at 61-62) that the rule unreasonably bars companies from verifying that a cancellation request actually came from the consumer. The rule does no such thing. The FTC considered this aspect of the problem—that the need to verify a request for cancellation could making cancellation more time-consuming or difficult than enrollment—addressed it at length, and specifically recognized that companies may reasonably require consumers "to verify or authenticate their identity" or "to confirm their intent to cancel." App.414; *see also* App.418. Petitioners gripe (at 62) that this statement is not in the text of the rule itself, but that is refusing to take yes for an answer. The FTC's statement that sellers may take steps to verify a consumer's identity was unambiguous, and the agency has now reiterated it here.

Petitioners get no further with their effort (at 62) to present a single line from the FTC's cost-benefit analysis as imposing a time limit on cancellation that

appears nowhere in the rule. In that analysis, the FTC explained that, in order "[t]o estimate the average time savings to consumers" from the online "click to cancel" mechanism, it would "assume[] a final Rule-compliant cancellation should take no more than 30 seconds to one minute." App.428. Petitioners cannot hope to portray that economic assumption as a legal requirement. And their claim (at 62) that the rule "would … prevent" a company that enrolls consumers over email "from having the customer talk to a representative" is just wrong. *See* App. 416 (explaining that "[t]he 'same medium' requirement ... only requires businesses to offer consumers the ability to cancel in the manner they were able to sign up" and that "[s]ellers are free to provide additional cancellation mechanisms, giving consumers choices").

Second, Petitioners challenge (at 62-64) the rule's application to bundled services. But, again, this is an issue the FTC considered and reasonably addressed. App.415, 418. It explained that it was "declin[ing] to exclude industries providing bundled services from the same medium requirement," including because the simple cancellation mechanism need only be as easy as the mechanism to enroll, so products requiring more complex enrollments would automatically justify somewhat more complex cancellation processes. App.418.

At times, Petitioners seem to simply be arguing that, as a policy matter, cable companies and similar providers should be allowed to subject consumers to

upsells and other sales pitches when they are trying to cancel services. *See* Pet'rs'
Br. at 63 (fretting that consumers may cancel "without knowing what they are
missing"). But policy disagreements are not a valid basis for an arbitrary and
capricious challenge. *E.g.*, *Prometheus Radio*, 592 U.S. at 423. And the kinds of
obstacles to cancellation, however well intentioned, that Petitioners describe only
demonstrate the need for the rule—they are not signs that it is unreasonable.

Third, Petitioners contend (at 64-65) that the FTC contradicted itself by
requiring buyers to expressly consent to a negative option feature while supposedly
stating that requiring two consents—one for the negative option feature and one for
the underlying products or services—would be "unnecessary" and "potentially
confusing." But that is not what the FTC said. Instead, it explained that it was not
adopting a proposed requirement that consumers must unambiguously consent to
the underlying purchase of goods or services (separate from the negative option
feature itself) beyond what was already in the contract. App.410. The FTC
concluded that such requirement would be "unnecessary." *Id.* That conclusion was
reasonable and casts no doubt on the requirement the FTC did adopt that a buyer
must expressly agree to the negative option feature.

Petitioners' related claim (at 64) that it will be "near-impossible" for lawn
care companies to confirm that buyers have expressly consented to recurring
services is baseless and incorrect. The experience of MSA and its own members

27

confirms the obvious fact that even companies that operate "on an informal basis" can quite readily handle the concepts of offer and (express, informed) acceptance.

Fourth, and finally, Petitioners object (at 65-66) to the rule's definition of "material." For the reasons previously given, the decision to adopt and expressly incorporate into the rule that well-established legal concept was reasonable and reasonably explained. And Petitioners are wrong again (at 66) when they say the FTC never explained why the material misrepresentation requirement applied to statements about the underlying good or service and not only about the negative option feature. The FTC did exactly that. App.401.

## CONCLUSION

The Court should deny the petitions for review.

Dated: March 21, 2025

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 894-6035
kfriedl@democracyforward.org

*Counsel for Main Street Alliance*

## CERTIFICATE OF COMPLIANCE

This motion complies with the length limit in Federal Rule of Appellate Procedure 29(a)(5). It contains 6,478 words, excluding the portions exempted by Rule 32(f). It is written in 14-point Times New Roman using Microsoft Office 365. This brief has been scanned for viruses and is virus-free.

*/s/ Kevin E. Friedl*
Kevin E. Friedl

# CERTIFICATE OF SERVICE

On March 21, 2025, a true and accurate copy of this document was filed

electronically via CM/ECF and served on all counsel of record.

*/s/ Kevin E. Friedl*
Kevin E. Friedl
