# United States Court of Appeals

*for the*

# Eighth Circuit

---

Case Nos. 24-3137, 24-3388,
24-3415, 24-3442, 24-3469

CUSTOM COMMUNICATIONS, INC., doing business as Custom Alarm,

*Petitioner,*

– v. –

FEDERAL TRADE COMMISSION,

*Respondent,*

---

SERVICE CONTRACT INDUSTRY COUNCIL; AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION; CONSUMER CREDIT INDUSTRY ASSOCIATION; HEALTH & FITNESS ASSOCIATION; INTERNATIONAL FRANCHISE ASSOCIATION; NATIONAL ASSOCIATION OF SPA FRANCHISES,

*Amici on Behalf of Petitioner.*

---

ON PETITION FOR REVIEW OF A FINAL TRADE REGULATION RULE OF THE FEDERAL TRADE COMMISSION

## BRIEF FOR *AMICUS CURIAE* TRUTH IN ADVERTISING, INC. IN SUPPORT OF RESPONDENT

LAURA SMITH
  LEGAL DIRECTOR
TRUTH IN ADVERTISING, INC.
PO Box 927
Madison, Connecticut 06443
(203) 421-6210

P. RENÉE WICKLUND
RICHMAN LAW & POLICY
535 Mission Street
San Francisco, California 94105
(415) 259-5688

*Attorneys for Amicus Curiae Truth in Advertising, Inc.*

CP COUNSEL PRESS   (800) 4-APPEAL • (379657)

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A) and Eighth Circuit Rule of Appellate Procedure 26.1A, the undersigned counsel certifies that amicus curiae Truth in Advertising, Inc. is a 501(c)(3) nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

Respectfully submitted,

*/s/ P. Renée Wicklund*
P. Renée Wicklund
**RICHMAN LAW & POLICY**
535 Mission St.
San Francisco, CA 94105
T: (415) 259-5688
rwicklund@richmanlawpolicy.com

*Counsel for Truth in Advertising, Inc.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF AMICUS CURIAE .....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ....................................................................................5

    I.    The FTC's Final Rule Is Needed to Curb Widespread and Harmful Abuses of Negative Option Offers ..........................................5

        A.    Deceptive Subscriptions Are Pervasive ................................5

        B.    Unwanted Subscriptions Cause Significant Harm to Consumers and Create Economic Inefficiencies ........................9

    II.    The Final Rule Provides Much-Needed Protection for All Consumers .............................................................................17

CONCLUSION ..................................................................................21

Appellate Case: 24-3137    Page: 3    Date Filed: 03/21/2025 Entry ID: 5498856

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*AMG Capital Mgmt., LLC v. Fed. Trade Comm'n,*
  593 U.S. 67 (2020)..................................................................... 2, 17

*Donaldson v. Read Magazine, Inc.,*
  333 U.S. 178 (1948)................................................................9

*FTC v. Algoma Co.,*
  291 U.S. 67 (1934)................................................................17

*FTC v. Am. Screening, Ltd. Liab. Co.,*
  105 F.4th 1098 (8th Cir. 2024)................................................9

*Spiegel, Inc. v. FTC,*
  494 F.2d 59 (7th Cir. 1974) ................................................ 9, 16

**Statutes & Other Authorities:**

5 U.S.C. § 706..................................................................4

15 U.S.C. § 57a(a)..................................................................4

15 U.S.C. § 57a(e)(3)(A)..................................................................4

15 U.S.C. § 8403..................................................................18

16 C.F.R. 310..................................................................18

16 C.F.R. pt. 425.......................................................... 4, 5, 17

Fed. R. App. P. 29(4)(E)..................................................................1

Fed. R. App. P. 29(a)(2)..................................................................1

6 R.I. GEN. LAWS § 6-13-14 (2024) ...............................................19

815 ILL. COMP. STAT. § 601/1-601/20 ......................................19

940 CODE MASS. REGS 38.00 .....................................................19

ALASKA STAT. §§ 45.45.920, 930 (2024) .....................................19

CAL. BUS. & PROF. CODE §§ 17600-17606..............................19

CONN. GEN. STAT. § 42-126b ................................................................19

D.C. CODE §§ 28A-201-204 (2025) ....................................................19

DEL. CODE ANN. TIT. 6, §§ 2731-2737 ..............................................19

FLA. STAT. § 501.165 .........................................................................19

GA. CODE ANN. §§ 13-12-1-13-12-5 ..................................................19

HAW. REV. STAT. § 481-9.5 ...............................................................19

IDAHO CODE § 48-603G (2024) ..........................................................19

LA. STAT. ANN. § 9:2716 ...................................................................19

ME. STAT. TIT. 10, § 1210-C (2024) ..................................................19

N.C. GEN. STAT. § 75-41 (2025) ........................................................19

N.D. CENT. CODE § 51-37-01 ............................................................19

N.J. STAT. ANN. § 56:12-95.5 (2024) .................................................19

N.M. CODE R. § 12.2.11 .....................................................................19

N.Y. GEN. BUS. LAW § 527, 527-a .....................................................19

OR. REV. STAT. §§ 646A.292 - 646A.295 ...........................................19

S.D. CODIFIED LAWS § 49-31-116 (2025) ..........................................19

TENN. CODE ANN. § 47-18-133 ..........................................................19

VA. CODE ANN. §§ 59.1-207.45 - 59.1-207.49 (2024) ........................19

VT. STAT. ANN. TIT. 9, § 2454a ..........................................................19

Ad Alert: AARP Membership, TINA.ORG (Feb. 25, 2025) ....................12

Ad Alert: Xfinity Home Internet and Mobile Promotion, TINA.ORG (Mar.
   3, 2025) ............................................................................................12

Allie Johnson, Poll: Majority of Subscribers Experience Unwanted
   Charges, BANKRATE (Feb. 6, 2022) ...........................................8, 14

Andrew Faridani, How To Market To Skeptical Consumers, FORBES (May
   22, 2024) ..........................................................................................16

Angela Campbell, Rethinking Children's Advertising Policies for the
   Digital Age, 29 LOY. CONSUMER L. REV. 1 (2017) .........................15

iv

Ben Cohen, *The Real Reason You're Paying for So Many Subscriptions*, WALL ST. J. (Jan. 19, 2024) ............................................................8

Brief for Truth In Advertising, Inc. et al. as Amici Curiae Supporting Appellants, *Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.*, 753 Fed. Appx. 87 (2d Cir. 2019) ...........................................2

*Business Profile: Dossier*, *Complaint Details*, BETTER BUS. BUREAU...................12

Caruso & Cox, *Silence as Consumer Consent: Global Regulation of Negative Option Contracts*, 73 AM. U. L. REV. 1611 (2024) .................. 9, 14

Confirmation of Rule, FTC Rule Concerning the Use of Prenotification Negative Option Plans, 79 Fed. Reg. 44271 (July 31, 2014).......................18

*Federal Trade Commission: Protecting Consumers and Fostering Competition in the 21st Century, Before the H. Comm. on Appropriations*, 116th Cong. 16-17 (2019)............................................ 20-21

Fran Blumberg et al., *Linkages Between Media Literacy and Children's and Adolescents' Susceptibility to Advertising*, ADVERTISING TO CHILDREN: NEW DIRECTIONS, NEW MEDIA 158 (Mark Blades et al. eds., 2014)...............................................................................15

FTC Rule Concerning the Use of Prenotification Negative Option Plans, 74 Fed. Reg. 22720 (May 14, 2009)................................................17

Iulia Grad, *Ethical Considerations on Advertising to Children*, 6 POSTMODERN OPENINGS 43 (2015).................................................15

Jaime Catmull, *4 Ways Your Child's Unlimited App Usage May Be Costing You*, FORBES (Feb. 26, 2025) ...........................................15

Kamaron McNair, *Nearly Half of Americans Say They Live Paycheck to Paycheck*, CNBC (Nov. 19, 2024) ................................................14

*Keynote Remarks of FTC Acting Chairwoman Rebecca Kelly Slaughter*, FED. TRADE COMM'N (May 4, 2021) .............................................21

Nadya Ali et al., Citizens Advice, TRICKS OF THE TRADE (Dec. 2022)...................14

Natasha Frost, *Why Call-to-Cancel Policies Are an Accessibility Nightmare*, MODERNRETAIL (July 22, 2020)..................................14

Negative Option Rule, 89 Fed. Reg. 90476 (Nov. 15, 2024) ...................... 4, 5, 17

v

Nick Wolny, *'Subscription Creep' Is Real. Consumers Are Paying Over $1,000 Each Year, CNET Survey Finds*, CNET (Oct. 17, 2024) ...................8

Peter S. Menell, *Symposium—Brand New World: Distinguishing Oneself in the Global Flow, Part II 2014: Brand Totalitarianism*, 47 U.C. DAVIS L. REV. 787 (2014) ......................................................... 15-16

Prentiss Cox, *The Invisible Hand of Preacquired Account Marketing*, 47 HARV. J. LEGIS. 425 (2010) .....................................................14

Press Release, Fed. Trade Comm'n, *Federal Trade Commission Announces Final "Click-to-Cancel" Rule Making It Easier for Consumers to End Recurring Subscriptions and Memberships* (Oct. 16, 2024) ......................................................................................8

Press Release, Wash. State Off. Att'y Gen., *Consumer Alert: Attorney General's Consumer Survey Reveals that Millions of Washingtonians May Have Been Unintentionally Enrolled in a Subscription Service* (Oct. 10, 2022)..............................................7

Press Release: *Visa Brings Convenience and Control to Booming Subscription Economy*, VISA (Apr. 4, 2024) .................................19

Rebecca Lake, *Report: Hidden Fees Are #1 Consumer Complaint*, MY BANK TRACKER (updated Nov. 29, 2021) .....................................11

Request for Public Comment, 84 Fed. Reg. 52393-01 (Dec. 2, 2019)....................17

Revised Standards for Subscription/Recurring Payments and Negative Option Billing Merchants, MASTERCARD (Nov. 2022) ................................19

Sally Greenberg, *Capital One Eliminates Predatory Overdraft Charges*, NCL (Jan. 6, 2022) .....................................................14

Sophia Wang, *One Size Does Not Fit All: The Shortcomings of Current Negative Option Legislation*, 26 CORNELL J. L. & PUB. POL'Y 197 (2016)................................................5-6

*Subscription Service Statistics and Costs*, C+R RESEARCH (May 18, 2022) ..........10

*Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements*, BETTER BUS. BUREAU (Dec. 12, 2018)................................................10

vi

*Survey from Chase Reveals That Two-Thirds of Consumers Have Forgotten About At Least One Recurring Payment In The Last Year*, CHASE (Apr. 1, 2021) ..................................................................... 10

TINA.org, Comment Letter on Proposed Amendments to the FTC Negative Option Rule (Dec. 2, 2019) ............................................ 11

TINA.org, Comment Letter on Proposed Amendments to the FTC Negative Option Rule (June 20, 2023) ......................................... 13

TINA.org, Complaint Letter to FTC re: FabKids' Deceptive Advertising and Illegal Business Practices (Aug. 30, 2021) ............................ 12

Updated Policy for Subscription Merchants Offering Free Trials or Introductory Promotions, VISA (June 20, 2019) ........................... 19

*What You Should Know about Nerium*, TINA.ORG (updated Sept. 28, 2023) ....................................................................................... 13

Appellate Case: 24-3137    Page: 8    Date Filed: 03/21/2025 Entry ID: 5498856

## STATEMENT OF AMICUS CURIAE

*Amicus curiae* Truth in Advertising, Inc. (TINA.org)[1] is a nonpartisan, nonprofit consumer advocacy organization whose mission is to combat deceptive advertising and consumer fraud; promote understanding of the serious harms commercial dishonesty inflicts; and work with consumers, businesses, self-regulatory bodies and government agencies to advance countermeasures that effectively prevent and stop deception in the economy. At the center of TINA.org's efforts is its website, www.tina.org, which provides information about common deceptive advertising techniques, consumer protection laws, and alerts about specific deceptive marketing campaigns—such as nationally advertised "Built in the USA" vans manufactured abroad, pillows and essential oils falsely marketed as being able to treat chronic diseases, and a tax preparation service deceptively advertised as free. The website functions as a clearinghouse, receiving consumer complaints about suspicious practices, which TINA.org investigates and, when appropriate, pursues with businesses and regulatory authorities. The website is also

---

[1] All parties consent to amicus filing this brief. Fed. R. App. P. 29(a)(2). Pursuant to Fed. R. App. P. 29(4)(E), amicus affirms that no counsel for a party authored this brief in whole or in part, nor did any person or entity, other than amicus or their counsel, make a monetary contribution to fund the preparation or submission of this brief.

a repository of information relating to consumer protection lawsuits and regulatory actions.

Through its collaborative approach and attention to emerging issues and complexities, TINA.org has become a trusted source of expertise on matters relating to consumer fraud, and its representatives have testified before Congress on issues related to consumer protection, deceptive marketing and economic justice. TINA.org regularly draws on its expertise to advocate for consumer interests before the Federal Trade Commission ("FTC") and other governmental bodies and appears as amicus curiae in cases raising important questions of consumer protection law. *See, e.g.*, Brief for Truth In Advertising, Inc. as Amicus Curiae Supporting Respondent, *AMG Capital Mgmt., LLC v. Fed. Trade Comm'n*, 593 U.S. 67 (2020) (No. 19-508); Brief for Truth In Advertising, Inc. as Amicus Curiae Supporting Respondent, *Intuit, Inc. v. Fed. Trade Comm'n* (5th Cir. June 21, 2024) (No. 24-60040); Brief for Truth In Advertising, Inc. et al. as Amici Curiae Supporting Appellants, *Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.*, 753 Fed. Appx. 87 (2d Cir. 2019) (No. 17-3745).

Since its inception, TINA.org has filed legal actions with regulatory agencies against hundreds of companies and entities, published more than 1,400 ad alerts and more than 1,000 news articles, and tracked more than 4,000 federal class actions alleging deceptive marketing. Notably, since 2015, state and federal

2

agencies have obtained more than $250 million from wrongdoers based on TINA.org's legal actions and evidence, and returned millions in ill-gotten gains to consumers.

With respect to negative option marketing specifically, TINA.org has investigated and reported on dozens of companies using deceptive negative option offers, and has filed complaints with state and federal regulators against five brands for engaging in such tactics. As a result of these investigations and complaints, six regulatory enforcement actions have been taken (including one by the FTC), cumulatively resulting in more than $6 million in civil penalties and consumer redress. TINA.org has also published more than 100 ad alerts and tracked more than 175 class-action lawsuits challenging alleged misleading negative option marketing used by a multitude of companies in diverse industries.

In short, the tools the FTC has at its disposal to stop deceptive negative option offers and subscriptions—including, in particular, the rule at issue in this case—are of central importance to TINA.org's work and mission.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Deceptive marketing and similar forms of commercial dishonesty wreak havoc on the U.S. economy, cheating consumers out of billions of dollars and distorting the fair allocation of resources as those who hone fraudulent schemes are rewarded, and honest competitors suffer. Consumer fraud and deceptive marketing

3

are classic market failures. And as consumers continue to gravitate to the internet for their purchases, savvy scammers are able to further exploit consumers while making it increasingly difficult for shoppers to protect themselves against such deception.

Exemplifying this troubling problem are deceptive negative option contracts, which have become a multibillion-dollar disaster for consumers and legitimate businesses alike. And despite the best efforts of the FTC and state attorneys general, among others, deceptive negative option offers continue to proliferate. Recognizing these realities, and understanding that consumer protection laws are vital to maintaining a functional market economy that benefits both consumers and businesses, the FTC issued the Negative Option Rule ("the Final Rule") in October 2024, which amended the Commission's original 1973 Negative Option Rule. *See* Negative Option Rule, 89 Fed. Reg. 90476 (Nov. 15, 2024) (to be codified at 16 C.F.R. pt. 425). This Final Rule is a logical, appropriate, and necessary response to the deluge of unwanted subscriptions that plague consumers all across the marketplace. It is neither arbitrary nor capricious (5 U.S.C. § 706); quite to the contrary, it is supported by substantial evidence (15 U.S.C. § 57a(e)(3)(A)) and falls squarely within the FTC's mandate to prevent deceptive acts and practices (15 U.S.C. § 57a(a)). As such, this Court should deny the petition for review of the

4

Final Rule and allow the FTC to fulfill its duty to protect American consumers and honest businesses from deceptive and unfair conduct in the marketplace.

## ARGUMENT

### I. The FTC's Final Rule Is Needed to Curb Widespread and Harmful Abuses of Negative Option Offers.

All too often, misleading negative option offers trap consumers into unwanted subscriptions and memberships that they cannot get out of—no matter how hard they may try. And despite a multitude of applicable laws currently in place, consumers continue to be tricked into signing up for these subscriptions by companies that employ an assortment of deceptive marketing tactics. Adding insult to injury, these companies make it difficult (if not impossible) for consumers to cancel the unwanted recurring charges. These problems are widespread, inflict billions of dollars in losses to cheated consumers, distort the efficient allocation of resources in our economy, and punish honest competitors focused on bringing superior products and services to market.

### A. Deceptive Subscriptions Are Pervasive.

While not all subscription services involve dishonesty or are unwanted, deceptive conduct perpetuated by companies engaging in negative option offers has persisted for decades. *See* Negative Option Rule, 89 Fed. Reg. 90476 (Nov. 15, 2024) (to be codified at 16 C.F.R. pt. 425); *see also* Sophia Wang, *One Size Does Not Fit All: The Shortcomings of Current Negative Option Legislation*, 26

5

CORNELL J. L. & PUB. POL'Y 197, 201-03 (2016) (describing deceptive practices in early negative option marketing starting in the 1970s). Indeed, for those industries that employ negative option contracts, it is difficult to identify one that does *not* have members engaged in deceptive recurring subscriptions. TINA.org's investigations of more than 100 products and services sold through problematic subscription programs span a multitude of industries, including home internet and mobile services, vitamins and supplements, hunting supplies and outdoor gear, food delivery services, legal services, home cleaning services, printers, skin care products, books and magazines, movie tickets, perfumes, fitness memberships, clothing and lingerie, contact lenses, e-cigarettes, multilevel marketing opportunities, and weight-loss products, among others. *See Ad Alerts*, TINA.ORG, https://truthinadvertising.org/ad-alerts/ (select "Subscriptions" filter); *Legal Actions: Brands & Industries,* TINA.ORG, https://truthinadvertising.org/legal-action/brands-industries/ (select "Subscriptions" filter). Moreover, deceptive auto-renewing models are not used just by small, fly-by-night operations, but also by large, sophisticated entities, including Amazon, AARP, Unilever, and Xfinity. *See id*. TINA.org has also tracked class-action lawsuits alleging misleading subscription practices by such well known companies as The New York Times, Walmart, Apple, Google, NFL Enterprises, Staples and Zoom. *See Class-Action*

6

*Tracker*, TINA.ORG, https://truthinadvertising.org/legal-action/class-action-tracker/ (select "Subscriptions" filter).

While subscription plans span a diverse number of industries, the manipulative tactics used to trap consumers in negative option offers remain remarkably uniform: (1) use deceptive marketing to lure consumers in, (2) conceal subscription terms so that consumers remain ignorant of the recurring costs, and (3) implement burdensome cancellation policies so consumers have difficulty terminating the subscriptions. These tactics are incredibly effective. By way of example, in 2022, the Washington Attorney General's office conducted a consumer survey that revealed that 59% of Washingtonians (or 3.5 million residents) may have been enrolled in a subscription plan or service when they thought they were making a one-time purchase. Press Release, Wash. State Off. Att'y Gen., *Consumer Alert: Attorney General's Consumer Survey Reveals that Millions of Washingtonians May Have Been Unintentionally Enrolled in a Subscription Service* (Oct. 10, 2022), https://www.atg.wa.gov/news/news-releases/consumer-alert-attorney-general-s-consumer-survey-reveals-millions-washingtonians. Further, the FTC has reported that it receives thousands of complaints regarding negative option offers and recurring subscriptions each year, that the number of such complaints has been "steadily increasing over the past five years," and that in 2024, "the Commission received nearly 70 consumer complaints

7

per day on average, up from 42 per day in 2021." Press Release, Fed. Trade Comm'n, *Federal Trade Commission Announces Final "Click-to-Cancel" Rule Making It Easier for Consumers to End Recurring Subscriptions and Memberships* (Oct. 16, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/10/federal-trade-commission-announces-final-click-cancel-rule-making-it-easier-consumers-end-recurring.[2]

The data make clear that far too many companies are manipulating consumers with deceptive and misleading subscription offers and, as a result, Americans are spending "billions of dollars on stuff they have forgotten about." Ben Cohen, *The Real Reason You're Paying for So Many Subscriptions*, WALL ST. J. (Jan. 19, 2024), https://www.wsj.com/business/cancel-subscriptions-save-money-streaming-peacock-da7e6123.

---

[2] In addition, a 2024 survey conducted by CNET found that "48% of respondents said they had signed up for a free trial of a paid subscription and then forgot to cancel it." Nick Wolny, *'Subscription Creep' Is Real. Consumers Are Paying Over $1,000 Each Year, CNET Survey Finds*, CNET (Oct. 17, 2024), https://www.cnet.com/personal-finance/subscription-creep-is-real-consumers-are-paying-over-1000-each-year-cnet-survey-finds/. And a 2022 Bankrate survey found that more than half of U.S. adults end up with unwanted charges from a subscription or membership. Allie Johnson, *Poll: Majority of Subscribers Experience Unwanted Charges*, BANKRATE (Feb. 6, 2022), https://www.bankrate.com/credit-cards/news/subscription-service-charges-survey/.

8

**B. Unwanted Subscriptions Cause Significant Harm to Consumers and Create Economic Inefficiencies.**

The goal of companies deceptively employing recurring subscription models is to charge consumers indefinitely—luring and locking consumers in, driving out competitors, and all but ensuring consumers can never leave. *See, e.g.*, Caruso & Cox, *Silence as Consumer Consent: Global Regulation of Negative Option Contracts*, 73 AM. U. L. REV. 1611, 1624 (2024) ("Negative option contracts fundamentally differ from most other contracts. Absent regulation, a consumer can sign up once and, via negative option, essentially obligate themselves to pay for some good or service indefinitely. While they may offer some efficiencies and benefits [ . . . ], these contracts also present real consumer risks and are highly susceptible to abuse.").

This type of deceptive conduct deprives consumers of free choice in their purchasing decisions. *See FTC v. Am. Screening, Ltd. Liab. Co.*, 105 F.4th 1098, 1104 (8th Cir. 2024) (noting that "because the seller's misrepresentation tainted the purchasing decision . . . the consumer has lost the chance to avoid the purchase entirely, and is stuck with one that he did not intend to make"); *see also Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 189 (1948) ("People have a right to assume that fraudulent advertising traps will not be laid to ensnare them."); *Spiegel, Inc. v. FTC*, 494 F.2d 59, 62 (7th Cir. 1974) ("[I]ndividuals in society have a right to be told the truth so that their choices among products, or, as in this case, among

9

offers, can be understandingly made."). And when consumers are deprived of free choice, they suffer financially. *See Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements*, BETTER BUS. BUREAU (Dec. 12, 2018), https://www.bbb.org/article/investigations/18929-subscription-traps-and-deceptive-free-trials-scam-millions-with-misleading-ads-and-fake-celebrity-endorsements [hereinafter *Subscription Traps*].

Victims in just fourteen FTC deceptive subscription cases brought between 2008 and 2018 collectively lost $1.3 billion. *Subscription Traps*, *supra*. And a 2021 study by Chase Bank found that nearly three-quarters of Americans waste more than $50 a month on unwanted subscription fees. *Survey from Chase Reveals That Two-Thirds of Consumers Have Forgotten About At Least One Recurring Payment In The Last Year*, CHASE (Apr. 1, 2021), https://media.chase.com/news/survey-from-chase-reveals. In a 2022 survey, consumers reported underestimating their actual monthly spend on subscriptions by $133 (or two-and-a-half times more than what they thought they were paying). *Subscription Service Statistics and Costs*, C+R RESEARCH (May 18, 2022), https://www.crresearch.com/blog/subscription-service-statistics-and-costs/. From 2015 to 2017, approximately 37,000 complaints filed with the Better Business Bureau reported an average loss of $186 as a result of deceptive subscriptions. *Subscription Traps*, *supra*.

10

Indeed, the scope and reach of deceptive subscription plans is so extensive that consumer complaints about them are ubiquitous.[3] In fact, issues with deceptive negative option offers are one of the most common types of complaints that TINA.org receives.[4] Consumers generally report unwittingly being enrolled in a negative option plan, and then finding it impossible to cancel the subscription. The following examples are illustrative:

- "[S]ent for the free bottle of . . . oil plus an extra one bottle they charged me $98/93 . . . THAT IS FRAUD . . . i realize I have been scammed and as I am a pentioner [*sic*] they have taken my xmas money for my kids. i want to cancel the order and get my money back can you help me please as that amount for 1 bottle is outrageous there is no phone number to ring" (weight-loss company, 2016 complaint).[5]

- "They charge your card $39 every single month even if you do not shop that month. I would have never even shopped on their website if I known that. No where did I see I would be charged $39. I think it's sneaky and not good business. And I also see I'm not the only one who had this problem. I would have never known they were taking money out if it wasn't for me checking my bank statement because

---

[3] Unsurprisingly, a 2016 consumer survey found that hidden fees associated with, among other things, trial offers and automatically renewing subscriptions was the biggest financial complaint of consumers. *See* Rebecca Lake, *Report: Hidden Fees Are #1 Consumer Complaint*, MY BANK TRACKER (updated Nov. 29, 2021), https://www.mybanktracker.com/money-tips/money/hidden-fees-consumer-complaint-253387.

[4] Other outlets for consumer complaints, including the FTC, BBB, and TrustPilot, also receive complaints concerning negative option offers on a frequent and continual basis.

[5] TINA.org, Comment Letter on Proposed Amendments to the FTC Negative Option Rule (Dec. 2, 2019), https://truthinadvertising.org/wp-content/uploads/2019/12/12_2_19-comment-to-FTC-re-NOO-Rule.pdf.

11

they don't send you a receipt to your email like they do when you order something" (children's clothing company, 2021 complaint).[6]

- "In December 2024 I ordered perfume from this company as a Christmas gift for my daughter. At the beginning of January 2025, I noticed that the company charged my credit card over $42. When I disputed the charge they said it was for my monthly subscription. I asked that they refund the money & cancel the subscription since I had never agreed or subscribed to anything! They reversed the charges in short order. However—it is now February and I now see another $42+ charge on my credit card from this company" (perfume company, 2025 complaint).[7]

- "If you try to cancel your service, they will make it so difficult that you will cry. I had to talk to 5 different people who all gave me different information, was assured that my service was canceled multiple times, only to continue receiving bills, it was a nightmare . . ." (internet and cable company, 2024 complaint).[8]

- "Once you sign up for auto-renew, they make it near impossible to cancel. Thus they are participating in the kind of financial abuse of elders that they should be protecting us from. Avoid at all costs" (national senior service organization, 2023 complaint).[9]

- "I have been trying to cancel my monthly subscription/membership for MONTHS. No response on live chats, no response through

---

[6] TINA.org, Complaint Letter to FTC re: FabKids' Deceptive Advertising and Illegal Business Practices (Aug. 30, 2021), https://truthinadvertising.org/wp-content/uploads/2021/08/8_30_21-FabKids-complaint-to-FTC_Redacted.pdf.

[7] *Business Profile: Dossier*, *Complaint Details*, BETTER BUS. BUREAU, https://www.bbb.org/us/ny/new-york/profile/dossier-0121-87146464/complaints (last visited Mar. 19, 2025).

[8] *Ad Alert: Xfinity Home Internet and Mobile Promotion*, TINA.ORG (Mar. 3, 2025), https://truthinadvertising.org/articles/xfinity-home-internet-and-mobile-promotion/.

[9] *Ad Alert: AARP Membership*, TINA.ORG (Feb. 25, 2025), https://truthinadvertising.org/articles/aarp-membership/.

customer service. They keep charging me 50 dollars . . ." (lingerie company, 2020 complaint).[10]

- "I tried to call and cancel, they told me it was canceled, but it was not. I received packages from them filled with . . . things I don't eat. I called the bank to file a dispute and set up a stop payment, but that didn't stop, they just kept changing the amount they were charging, so the stop payment didn't do anything. Now left with no options, I have to close my card!" (meal-kit company, 2022 complaint).[11]

- "In August, they took my money but never sent me the product. I contacted them via email to inform them of this and asked them to cancel my subscription since they did that. In September, they again took my money and never sent my product. Again, I contacted them for a refund and cancellation. It happened again this week. I emailed them on Wednesday and today. I called today and they stated that they have not received any communication from me. They also said they would not refund my money unless I send them the bottles. But, being I am not receiving the product, how am I suppose to mail the bottles to them?" (multilevel marketing company, 2013 complaint).[12]

The tactics employed to trick consumers into subscriptions that are difficult to

cancel also have an especially burdensome impact on susceptible populations,

---

[10] TINA.org, Comment Letter on Proposed Amendments to the FTC Negative Option Rule (June 20, 2023), https://truthinadvertising.org/wp-content/uploads/2023/06/6_20_23-Negative-Option-Rule-Comment-to-FTC.pdf.
[11] *Id.*
[12] *What You Should Know about Nerium*, TINA.ORG (updated Sept. 28, 2023), https://truthinadvertising.org/articles/what-you-should-know-about-nerium/; *see also* Nerium Complaints on File with FTC 2012-July 2016, https://truthinadvertising.org/wp-content/uploads/2017/04/Nerium-Complaints.pdf (sent to TINA.org in response to FOIA Request).

including those with limited financial resources,[13] seniors,[14] the disabled,[15] and

---

[13] Consumers with limited disposable income do not have the means to absorb unexpected or unauthorized negative option payments, and as a result, when they are tricked into recurring subscription charges, they may find themselves unable to pay for necessary expenses or may incur costly overdraft charges. *See* Kamaron McNair, *Nearly Half of Americans Say They Live Paycheck to Paycheck*, CNBC (Nov. 19, 2024), https://www.cnbc.com/2024/11/19/bank-of-america-nearly-half-of-americans-live-paycheck-to-paycheck.html (noting that 26% of households spend 95% or more of their income on necessities); Sally Greenberg, *Capital One Eliminates Predatory Overdraft Charges*, NCL (Jan. 6, 2022), https://nclnet.org/overdraft_fees/ (explaining that a $5 charge can result in a $40 cost, when including a $35 overdraft fee).

[14] Older adults are particularly vulnerable to deceptive subscription services. One study by the Iowa Attorney General's office found that consumers older than 65 were disproportionately represented among those who were billed for a subscription but never used any of its purported benefits. *See* Prentiss Cox, *The Invisible Hand of Preacquired Account Marketing*, 47 HARV. J. LEGIS. 425, 452 (2010). Additionally, a 2022 survey found that 41% of adults ages 58 to 76 reported difficulty canceling a subscription. *See* Allie Johnson, *Poll: Majority of Subscribers Experience Unwanted Charges*, BANKRATE (Feb. 6, 2022), https://www.bankrate.com/credit-cards/news/subscription-service-charges-survey/.

[15] Deceptive negative option offers are problematic for those with disabilities, especially those with vision and hearing impairments. For example, cancellation policies that require a phone call can be particularly difficult for consumers who have hearing problems, and a website that disguises or hides material terms of an offer is a notable challenge for those with vision issues. *See* Natasha Frost, *Why Call-to-Cancel Policies Are an Accessibility Nightmare*, MODERNRETAIL (July 22, 2020), https://www.modernretail.co/retailers/why-call-to-cancel-policies-are-an-accessibility-nightmare/; Caruso & Cox, *supra*, at 1636. Further, those with mental health challenges or disabilities are especially susceptible to deceptive negative option schemes. *See, e.g.*, Nadya Ali et al., Citizens Advice, TRICKS OF THE TRADE (Dec. 2022), https://assets.ctfassets.net/mfz4nbgura3g/4UtD4GkI7cmdVrps2Uy2ZG/378374c06e75496974571cfd6a9237bf/OCA_20report_20-_20version_202_20_5_.pdf ("[W]hen looking at subscription traps we found 26% of people have signed up accidentally, but this rises to 46% of people with a mental disability or mental health problem.").

14

children (and their parents).[16]

Of course, the harm of deceptive negative option contracts is not limited to consumers—such dishonest practices inflict systemic damage on the American economy. Bad advertising can drive out good: when consumers become suspicious of advertising claims, persuading them that an honest representation is true becomes more costly—a special obstacle for new market entrants, who account for a disproportionate share of innovative products and must rely on advertising to overcome consumer wariness. *See* Peter S. Menell, *Symposium—Brand New World: Distinguishing Oneself in the Global Flow, Part II 2014: Brand*

---

[16] Children are vulnerable to deceptive subscription traps. Although children are adept at handling technology, when it comes to advertising, they do not interpret or understand marketing material in the same ways that adults do—a smaller proportion of children than adults have the ability to recognize advertising messages, and even those that do may not be able to critically evaluate the underlying marketing message. *See* Angela Campbell, *Rethinking Children's Advertising Policies for the Digital Age*, 29 LOY. CONSUMER L. REV. 1, 38 (2017); Iulia Grad, *Ethical Considerations on Advertising to Children*, 6 POSTMODERN OPENINGS 43, 51 (2015); Fran Blumberg et al., *Linkages Between Media Literacy and Children's and Adolescents' Susceptibility to Advertising*, ADVERTISING TO CHILDREN: NEW DIRECTIONS, NEW MEDIA 158, 163 (Mark Blades et al. eds., 2014). Thus, children (and by extension their parents) are also unwitting consumers of subscription products and services. *See* Jaime Catmull, *4 Ways Your Child's Unlimited App Usage May Be Costing You*, FORBES (Feb. 26, 2025), https://www.forbes.com/sites/jaimecatmull/2025/02/26/four-ways-your-childs-unlimited-app-usage-may-be-costing-you/ ("Whether a child signed up for the app under the pretense that it was entirely free, or if they meant to come back and cancel it before the first charge, it's possible for busy parents to go months paying for a rogue app subscription without even realizing it.").

15

*Totalitarianism*, 47 U.C. DAVIS L. REV. 787, 790 n.17 (2014) ("[I]nformative advertising plays a role in the introduction of new products to the market and in allowing consumers to differentiate among similar products."); *see also, e.g.*, Andrew Faridani, *How To Market To Skeptical Consumers*, FORBES (May 22, 2024), https://www.forbes.com/councils/forbesbusinessdevelopmentcouncil/2024/05/22/how-to-market-to-skeptical-consumers/ ("Clearing that air of mistrust requires a robust marketing strategy that is both novel and authentic."). Capital is likewise being misdirected to fraudulently successful subscription businesses and toward efforts to keep consumers locked in negative option contracts. In significant ways, such issues have worsened over time as more and more companies have adopted the subscription model. *See Spiegel*, 494 F.2d at 63 ("If sellers in our society are free to compete for consumers' patronage with others by unfair advertising, not only is the consumers' right violated, but our commitment to fair competition becomes a pretense.").

If Petitioners have their way, the FTC will be prevented from effectively and efficiently regulating deceptive negative option contracts and, as such, many companies that utilize subscription models will continue to ignore the fundamentals of truth-in-advertising requirements and persist in their manipulation of consumers. As the Supreme Court stated nearly a century ago, "[t]he careless

16

and the unscrupulous must rise to the standards of the scrupulous and diligent. The Commission was not organized to drag the standards down." *FTC v. Algoma Co.*, 291 U.S. 67, 79 (1934) (citations omitted).

## II.   The Final Rule Provides Much-Needed Protection for All Consumers.

It has become clear that modern and more specific regulations are necessary to address deceptive subscription offers as the FTC has struggled to ensure that this dishonest business model does not continue as a winning strategy.[17] The FTC first promulgated the Negative Option Rule in 1973 to curb abuses of pre-notification negative option plans (such as product-of-the-month clubs). 16 C.F.R. § 425 (1973). Though the Commission initiated reviews of the Rule several times,[18] the last report, issued in 2014, concluded that amending the rule was not warranted at

---

[17] This does not result from any want of trying. The FTC, the Consumer Financial Protection Bureau, and multiple state attorneys general have all brought civil actions to enforce the current laws against companies allegedly engaged in deceptive negative option marketing.  *See* Negative Option Rule, 89 Fed. Reg. 90476 (Nov. 15, 2024) (to be codified at 16 C.F.R. pt. 425); Comment Letter from Attorneys General to FTC re: Negative Option Rule (16 C.F.R. pt. 425) (Project No. P064202); Request for Public Comment, 84 Fed. Reg. 52393-01 (Dec. 2, 2019) (ANPRM). Further, the FTC's ability to rely on the FTC Act to protect consumers and deter deception has been limited since the Supreme Court's decision in *AMG Capital Management*. *See AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) (holding that the FTC does not have the authority to obtain consumer redress under Section 13(b) of the FTC Act).
[18] *See* FTC Rule Concerning the Use of Prenotification Negative Option Plans, 74 Fed. Reg. 22720 (May 14, 2009) (ANPRM).

that time. *See* Confirmation of Rule, FTC Rule Concerning the Use of Prenotification Negative Option Plans, 79 Fed. Reg. 44271 (July 31, 2014). The Agency reasoned that although negative option marketing was the cause of substantial consumer injury, the then-recently enacted Restore Online Shoppers' Confidence Act ("ROSCA")[19] and the Telemarketing Sales Rule ("TSR")[20] might prove adequate to address the issue. *Id.* The past decade, however, has shown that the tools available to the FTC are not adequate to address deceptive negative option contracts.

Recognizing the ever-present harms associated with deceptive subscriptions and automatic renewal provisions that continue to plague consumers, a multitude

_____

[19] ROSCA contains provisions related to disclosures, express consent, and provision of simple cancellation of negative option offers; however, it only applies to online transactions and does not provide the level of detail prescribed in the Final Rule. *See* 15 U.S.C. § 8403.

[20] The TSR prohibits telemarketers from making misrepresentations regarding negative option offers—but it applies only to offers made over the phone. *See* 16 C.F.R. 310.

of states[21] and even some credit card companies[22] have issued laws and rules in an

attempt to fill the gap in federal oversight. However, much like the federal

---

[21] *See, e.g.*, ALASKA STAT. §§ 45.45.920, 930 (2024); CAL. BUS. & PROF. CODE §§ 17600-17606 (Deering 2024); CONN. GEN. STAT. § 42-126b (2024); DEL. CODE ANN. TIT. 6, §§ 2731-2737 (2024); FLA. STAT. § 501.165 (LexisNexis 2025); GA. CODE ANN. §§ 13-12-1-13-12-5 (2024); HAW. REV. STAT. § 481-9.5 (LexisNexis 2024); IDAHO CODE § 48-603G (2024); 815 ILL. COMP. STAT. § 601/1-601/20 (LexisNexis 2024); LA. STAT. ANN. § 9:2716 (2024); 940 CODE MASS. REGS 38.00 (LexisNexis 2024); ME. STAT. TIT. 10, § 1210-C (2024); N.J. STAT. ANN. § 56:12-95.5 (2024); N.M. CODE R. § 12.2.11 (LexisNexis 2025); N.Y. GEN. BUS. LAW § 527, 527-a (Consol. 2025); N.C. GEN. STAT. § 75-41 (2025); N.D. CENT. CODE § 51-37-01 (2025); OR. REV. STAT. §§ 646A.292 - 646A.295 (2025); 6 R.I. GEN. LAWS § 6-13-14 (2024); S.D. CODIFIED LAWS § 49-31-116 (2025); TENN. CODE ANN. § 47-18-133 (2024); VT. STAT. ANN. TIT. 9, § 2454a (2025-26); VA. CODE ANN. §§ 59.1-207.45 - 59.1-207.49 (2024). *See also* D.C. CODE §§ 28A-201-204 (2025).

[22] MasterCard and Visa, for example, have established their own rules to govern negative option offers. Updated Policy for Subscription Merchants Offering Free Trials or Introductory Promotions, VISA (June 20, 2019), https://usa.visa.com/dam/VCOM/global/support-legal/documents/subscription-merchants-visa-public.pdf (requiring merchants to get express consent for recurring payments, send copies of terms and conditions of subscriptions, make upfront disclosures, and create easier cancellation, among other requirements); *Press Release: Visa Brings Convenience and Control to Booming Subscription Economy*, VISA (Apr. 4, 2024), https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.20541.html (announcing Visa's subscription manager tool for Visa cardholders to more easily track and stop their subscriptions); Revised Standards for Subscription/Recurring Payments and Negative Option Billing Merchants, MASTERCARD (Nov. 2022), https://www.mastercard.us/content/dam/public/mastercardcom/na/global-site/documents/subscription_recurring-payments-and-negative-option-billing-merchants.pdf (requiring, among other things, merchants to provide cardholders with an email or other electronic communication every time there is an approved authorization request for a subscription, including instructions for canceling subscriptions).

19

landscape, these rules and regulations have not been able to effectively eradicate the negative option offer problem. Moreover, these efforts differ significantly in scope, requirements, and category of products to which they apply. As a result, consumers receive different levels of protection depending on where they live geographically, what goods or services they are purchasing, or what credit card they use; and so far, these provisions have been inadequate to stem the tide of unwanted subscriptions that continue to bedevil American consumers. As such, the uniform protection of the Final Rule is much needed.

To be sure, lying to consumers can be a lucrative business strategy, which is a reason why the Final Rule is specific in targeting deceptive negative option practices that remain pervasive despite the current regulatory landscape. In the absence of an updated FTC rule, deceptive negative option practices will continue to harm consumers and honest businesses. As former Chair of the FTC Joseph Simons aptly stated, "Truthful advertising allows consumers to make well-informed decisions about how to best use their resources and promotes the efficient functioning of market forces by encouraging the dissemination of accurate information." *Federal Trade Commission: Protecting Consumers and Fostering Competition in the 21st Century, Before the H. Comm. on Appropriations*, 116th

Cong. 16-17 (2019) (Statement of Joseph Simons, Chair of the Fed. Trade

Comm'n). That is precisely what the Final Rule will help achieve.[23]

## CONCLUSION

For the reasons articulated above, this Court should deny the petition to

review the Final Rule.

Dated: March 21, 2025

Respectfully submitted,

_____
P. Renée Wicklund
**RICHMAN LAW & POLICY**
535 Mission St.
San Francisco, CA 94105
T: (415) 259-5688
rwicklund@richmanlawpolicy.com

*On Behalf of Amicus Curiae,*
*Truth in Advertising, Inc.*

---

[23] When there is a specific FTC rule in place delineating certain conduct as prohibited, companies have clear parameters to stay within the boundaries of acceptable behavior and regulators have a clear path for enforcement. *See Keynote Remarks of FTC Acting Chairwoman Rebecca Kelly Slaughter*, FED. TRADE COMM'N, (May 4, 2021), https://www.ftc.gov/system/files/documents/public_statements/1589607/keynote-remarks-acting-chairwoman-rebecca-kelly-slaughte-cfa-virtual-consumer-assembly.pdf ("Once developed and published, rules provide clarity about the boundaries of illegal behavior, and in exchange for that clarity companies can face penalties even for first-time rule violations. As a result, rules create strong incentives to comply with the law. Powerful deterrence makes for lawful markets that are good for consumers and businesses alike.").

21

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a). This brief contains 4,953 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen (14) point Times New Roman font.

Dated: March 21, 2025

/s/ P. Renée Wicklund
P. Renée Wicklund
Attorney for *Amicus Curiae*
Truth in Advertising, Inc.

## CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to

Circuit Rule 28A(h), a version of the brief in non-scanned PDF format.  I hereby

certify that the file has been scanned for viruses and that it is virus-free.

*/s/ P. Renée Wicklund*

P. Renée Wicklund
Attorney for *Amicus Curiae*
Truth in Advertising, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 21, 2025, an electronic copy of the Brief for *Amicus Curiae* Truth in Advertising, Inc. in Support of Respondent was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. The undersigned also certifies that the following participant in this case is a registered CM/ECF user and that service of the Brief will be accomplished by the CM/ECF system:

*/s/ P. Renée Wicklund*
P. Renée Wicklund
Attorney for *Amicus Curiae*
Truth in Advertising, Inc.