# United States Court of Appeals for the Eighth Circuit

———————

CUSTOM COMMUNICATIONS, INC.,
d/b/a CUSTOM ALARM, et al.,

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent*.

————————————

On Petitions for Review from an
Order of the Federal Trade Commission

———————

**BRIEF OF CENTER FOR CONSUMER LAW AND ECONOMIC JUSTICE, CONSUMER FEDERATION OF AMERICA, CONSUMER ACTION, NATIONAL CONSUMERS LEAGUE, NATIONAL CONSUMER LAW CENTER, AND NATIONAL ASSOCIATION OF CONSUMER ADVOCATES AS *AMICI CURIAE* IN SUPPORT OF RESPONDENT**

———————

SETH E. MERMIN
DAVID S. NAHMIAS
JOHN KAUFFMAN
CENTER FOR CONSUMER LAW AND
ECONOMIC JUSTICE,
  UC BERKELEY SCHOOL OF LAW
305 Law Building
Berkeley, CA 94720
(510) 643-3519
tmermin@law.berkeley.edu

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1(a), the undersigned counsel states that the following amici curiae have no parent corporations, and no publicly held corporation owns 10% or more of its stock:

- U.C. Berkeley Center for Consumer Law & Economic Justice

- Consumer Federation of America

- Consumer Action

- National Consumers League

- National Consumer Law Center

- National Association of Consumer Advocates

Dated: March 27, 2025

/s/ Seth E. Mermin
_____
SETH E. MERMIN
CENTER FOR CONSUMER LAW AND
ECONOMIC JUSTICE,
    UC BERKELEY SCHOOL OF LAW
305 Law Building
Berkeley, CA 94720

i

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT..........................................................i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .................................................................iv

INTERESTS OF AMICI CURIAE ..........................................................1

INTRODUCTION ...................................................................................2

SUMMARY OF ARGUMENT ...............................................................8

ARGUMENT ...........................................................................................9

I. The Rule Falls Squarely Within the Authority Granted by Section 18 of the FTC Act. ........................................................................................9

    A. The Rule Defines Unfair or Deceptive Practices With the Specificity Required by Section 18 of the FTC Act....................................................10

    B. The FTC Amply Demonstrated the Prevalence of Unfair Practices in Negative Option Marketing. ....................................................12

    C. Petitioners Mischaracterize the Rule as Overbroad. ...............................16

II. The FTC Fully Complied With the Procedural Requirements of Magnuson-Moss Rulemaking. ...........................................................19

    A. Magnuson-Moss Rulemaking Does Not Mandate Preliminary Analysis When Reasonable Initial Estimates Show an Economic Impact Below the Statutory Threshold............................................20

    B. The FTC's Comprehensive Final Regulatory Analysis Fully Satisfied the Magnuson-Moss Act's Requirements.................................................22

    C. Petitioners' Interpretation Would Undermine the Magnuson-Moss Act's Core Purpose of Flexibility and Public Participation.....................23

III. The Rule is Reasonable, Carefully Considered, and Fully Compliant With the Requirements of the Administrative Procedure Act.................................25

A.  The Commission Amply Considered Industry-Specific Concerns, Including Security and Verification Issues. ...............................................26

B.  The Rule Reasonably and Clearly Defines "Material" Terms. ................29

C.  The Rule Complements and Reinforces, and Does Not Conflict With, Existing Federal Consumer Protection Statutes. ......................................31

CONCLUSION ................................................................................................33

iii

# TABLE OF AUTHORITIES

## CASES

*Am. Fin. Servs. Ass'n v. FTC*,
767 F.2d 957 (D.C. Cir. 1985) ........................................................................31

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,
110 F. Supp. 3d 176 (D.D.C. 2015) ...............................................................27

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ........................................................................................25

*Compassion Over Killing v. FDA*,
849 F.3d 849 (9th Cir. 2017)...........................................................................13

*Entergy Corp. v. Riverkeeper, Inc.*,
556 U.S. 208 (2009) ........................................................................................28

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...................................................................................25, 32

*FTC v. AAFE Prods. Corp.*,
No. 3:17-cv-00575 (S.D. Cal. 2017) .................................................................6

*FTC v. Adobe Inc.*,
No. 5:24-cv-03630 (N.D. Cal. 2024) .................................................................7

*FTC v. AdoreMe, Inc.*,
No. 1:17-cv-09083 (S.D.N.Y. 2017)............................................................5, 14

*FTC v. Age of Learning, Inc. (ABCmouse)*,
No. 2:20-cv-07996 (C.D. Cal. 2020).......................................................5, 13, 14

*FTC v. Amazon.com, Inc.*,
No. 2:23-cv-00923 (W.D. Wash. 2023) .............................................................6

*FTC v. Cardiff*,
2020 WL 6540509 (C.D. Cal. Oct. 9, 2020) ....................................................17

iv

*FTC v. Credit Bureau Ctr., LLC,*
  81 F.4th 710 (7th Cir. 2023)..................................................................17

*FTC v. Credit Bureau Ctr., LLC,*
  No. 1:17-cv-00194 (N.D. Ill. 2017) ......................................................14

*FTC v. Direct Mktg. Concepts, Inc.,*
  569 F. Supp. 2d 285 (D. Mass. 2008) ....................................................30

*FTC v. Johnson,*
  96 F. Supp. 3d 1110 (D. Nev. 2015) ......................................................29

*FTC v. Lifewatch Inc.,*
  176 F. Supp. 3d 757 (N.D. Ill. 2016) ......................................................4

*Katharine Gibbs Sch. (Inc.) v. FTC,*
  612 F.2d 658 (2d Cir. 1979)..................................................................10

*Kraft, Inc. v. FTC,*
  970 F.2d 311 (7th Cir. 1992)..................................................................30

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ..............................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29, 43 (1983) ..........................................................................25

*Nat. Res. Def. Council, Inc. v. EPA,*
  824 F.2d 1258 (1st Cir. 1987) ...............................................................24

*People v. Lavender Lingerie, LLC,*
  No. 22CV402737 (Cal. Super. Ct. 2022) ..............................................15

*People v. Sirius XM Radio Inc.,*
  No. 453325/2023 (N.Y. 2024) ...............................................................15

*S. Terminal Corp. v. EPA,*
  504 F.2d 646 (1st Cir. 1974) .................................................................24

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947) ..............................................................................28

Appellate Case: 24-3137    Page: 6    Date Filed: 03/27/2025 Entry ID: 5500774

*State of Wash. v. Internet Ord. LLC*,
  No. 2:14-cv-01451 (W.D. Wash. 2015) ................................................16

*State v. Bureau of Land Mgmt.*,
  612 F. Supp. 3d 925 (N.D. Cal. 2020) ................................................27

*U.S. v. Cerebral, Inc.*,
  No. 1:24-cv-21376 (S.D. Fla. 2024).......................................................4

## STATUTES

15 U.S.C. § 1693a ...............................................................................18

15 U.S.C. § 57a (Section 18 of the FTC Act) .................................passim

15 U.S.C. § 57b-3 (Magnuson-Moss Act) ......................................passim

15 U.S.C. § 8403 ...............................................................17, 18, 31

Administrative Procedure Act (APA),
  5 U.S.C. §§ 551–559 ...............................................................25, 27, 32

CAL. BUS. & PROF. CODE § 17602 .......................................................18

N.Y. GEN. BUS. LAW § 527-a ............................................................19

Restore Online Shoppers' Confidence Act (ROSCA),
  15 U.S.C. §§ 8401–8405 ...............................................17, 18, 28, 31

## OTHER AUTHORITIES

*Am. Heritage Dictionary of the English Language* (1969) .....................12

AMAZON, *RxPass* ................................................................................4

BETTER BUS. BUREAU, *BBB Investigation Update: Free Trial Offer Scams*
  (Apr. 21, 2020) ....................................................................................6

vi

BETTER BUS. BUREAU, *Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements* (Dec. 12, 2018).................................................................5

C+R RSCH., *Subscription Service Statistics and Costs* (July 26, 2024) ...................3

EXPRESS SCRIPTS, *How it Works* ................................................................4

FED. TRADE COMM'N, *Bringing Dark Patterns to Light* (Sept. 2022) .....................6

Jennifer Abel, *ADT Security Loves Customers Too Much to Let Them Leave*, CONSUMER AFFS. (Sept. 13, 2013) ...................................................5

JUNIPER RSCH., *Global Subscription Economy Market 2024–2028* (Apr. 2024) ............................................................................3

Nick Wolny, *'Subscription Creep' is Real. Consumers Are Paying Over $1,000 Each Year, CNET Survey Finds*, CNET (Oct. 17, 2024) ..........................6

*Random House Dictionary of the English Language* (1968) ..................................12

Tony Chen et al., *Thinking Inside the Subscription Box: New Research on E-Commerce Consumers*, MCKINSEY (Feb. 9, 2018) ...........................................3

*Webster's Third New Int'l Dictionary* (1976) ....................................11, 12

## RULES

FTC Policy Statement on Deception, appended to *Cliffdale Assocs.*, 103 F.T.C. 110, at 45–50 (1984).........................29

*Negative Option Rule*, 88 Fed. Reg. 24716 (Apr. 24, 2023)..............................................19, 21

*Negative Option Rule*, 89 Fed. Reg. 90476 (Nov. 15, 2024).............................................passim

Recommended Decision by the Presiding Officer, *Negative Option Rule*, Project No. P064202 (Apr. 12, 2024)....................................................20

Appellate Case: 24-3137    Page: 8    Date Filed: 03/27/2025 Entry ID: 5500774

**REGULATIONS**

16 C.F.R. § 310.3 ........................................................................18

16 C.F.R. § 425.2 ........................................................................29

16 C.F.R. § 425.3 ........................................................................17

16 C.F.R. § 425.4 ...................................................................10, 17

16 C.F.R. § 425.5 ...................................................................10, 17

16 C.F.R. § 425.6 .............................................................10, 17, 27

**LEGISLATIVE MATERIALS**

S. Conf. Rep. No. 93-1408 (1974) ..............................................11

S. Rep. No. 103-130 (1993) ........................................................16

S. Rep. No. 96-500 (1979) ...............................................11, 21, 24

Appellate Case: 24-3137    Page: 9    Date Filed: 03/27/2025 Entry ID: 5500774

## INTERESTS OF AMICI CURIAE

Amici curiae[1] are nonprofit organizations dedicated to protecting consumers from unfair and deceptive business practices. Each has a strong interest in defending the FTC's authority to combat manipulative retention tactics and ensure consumers can easily cancel unwanted subscriptions.

The **Center for Consumer Law and Economic Justice** at the UC Berkeley School of Law promotes economic fairness through litigation support, policy advocacy, and legal education. The Center regularly provides expertise on consumer protection matters to courts and regulatory bodies.

**Consumer Federation of America (CFA)** is a national association of consumer organizations committed to ensuring a fair and safe marketplace. CFA supports the Rule as a necessary safeguard against predatory subscription tactics.

**Consumer Action** empowers low- and moderate-income consumers through education and advocacy. It supports the Rule as a reflection of the government's duty to prevent deceptive practices that harm vulnerable communities.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this amicus brief. Amici further represent that no party or its counsel authored this brief in whole or in part, or contributed money intended to fund the preparation or submission of this brief, and no person contributed to this brief other than amici and their counsel.

Appellate Case: 24-3137    Page: 10    Date Filed: 03/27/2025 Entry ID: 5500774

**National Consumers League (NCL)** advocates for consumers and workers on issues from fraud protection to healthcare access. NCL has long supported reforms to curb negative-option marketing tactics that undermine consumer choice.

**National Consumer Law Center (NCLC)** advances consumer justice for disadvantaged communities. NCLC collaborates with advocates and government agencies nationwide to stop exploitative practices and promote economic security.

The **National Association of Consumer Advocates (NACA)** is a nationwide membership organization of attorneys and advocates focused on protecting consumers from unfair business practices. NACA promotes justice through education, litigation, and public policy.

## INTRODUCTION

At issue in this case is the FTC's commonsense effort to protect American consumers from widespread, well-documented abuses involving negative option contracts—subscription models under which consumers continue to be charged until they affirmatively cancel. Petitioners do not substantively question the need for the "Click-to-Cancel" Rule, or argue that it somehow violates constitutional norms. Instead, they base their challenge on technical grounds, arguing that the Rule exceeds the FTC's statutory authority, violates procedural requirements, and is arbitrary and capricious. But not even these technical claims withstand scrutiny. The Rule falls comfortably within the FTC's authority to regulate across industries;

2

scrupulously follows the procedural provisions of the relevant statutes; and is a thoughtful, reasonable, and carefully designed response to an urgent and growing problem.

What drives the Rule is the reality that consumers are being harmed every day by predatory subscription practices that impose billions of dollars in unwanted and unauthorized charges, create needless frustration, and erode trust in the marketplace.

Negative option contracts remain pervasive in the consumer market. The subscription economy grew to $593 billion in 2024,[2] and nearly half of consumers have reported enrolling in at least one negative option subscription.[3] While subscription services may offer convenience, too many businesses exploit these models by deliberately complicating cancellations. And that leads to ongoing unwanted charges. On average, consumers spend about $133 more per month on subscription services than they realize—a staggering 2.5 times what they believe they are spending.[4]

---

[2] JUNIPER RSCH., *Global Subscription Economy Market 2024–2028* (Apr. 2024), available at https://www.juniperresearch.com/research/fintech-payments/ecommerce/subscription-economy-market-report/.

[3] Tony Chen et al., *Thinking Inside the Subscription Box: New Research on E-Commerce Consumers*, MCKINSEY (Feb. 9, 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers.

[4] C+R RSCH., *Subscription Service Statistics and Costs* (updated July 26, 2024), https://www.crresearch.com/blog/subscription-service-statistics-and-costs.

These abuses are not hypothetical. They inflict substantial real-world harm, particularly on seniors and other vulnerable consumers. For example, pharmaceutical and medical monitoring subscription services, which are often marketed to older consumers, frequently employ cancellation procedures requiring digital literacy or online interactions that many seniors may find challenging.[5] As the FTC's enforcement record shows, seniors all too often find themselves trapped in costly subscriptions for healthcare or medical monitoring services they no longer want or need.[6]

More generally, companies may make cancellations needlessly difficult through aggressive sales tactics, restrictive cancellation windows, and cumbersome

---

[5] *See, e.g.*, AMAZON, *RxPass* (last visited Mar. 16, 2025), https://pharmacy.amazon.com/rxpass ) (monthly prescription service where users must enroll, manage prescriptions, and cancel through their Amazon account online, posing barriers for seniors with limited digital literacy; EXPRESS SCRIPTS, *How it Works* (last visited Mar. 16, 2025), https://www.express-scripts.com/pharmacy/how-it-works (online pharmacy service that encourages customers to set up automatic refills and autopay).

[6] *See, e.g.*, First Amended Complaint, *U.S. v. Cerebral, Inc.*, No. 1:24-cv-21376 (S.D. Fla. filed May 31, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2223087cerebralfirstamendedcmplt.pdf (alleging telehealth firm required customers to navigate a complex cancellation process that could take several days); *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757 (N.D. Ill. 2016) (alleging telemarketing scheme tricked seniors into signing up for medical alert systems with monthly monitoring fees and steep penalties for cancellation).

paperwork.[7] Consumers trying to cancel subscriptions often face deliberate delays,

leading to months of unwanted charges. The FTC's enforcement actions demonstrate

how rampant these abuses are across industries.[8]

Deceptive "free trial" schemes also trap consumers in unwanted

subscriptions,[9] with resolved FTC cases reporting nearly $1.4 billion in documented

---

[7] *See, e.g.*, Jennifer Abel, *ADT Security Loves Customers Too Much to Let Them Leave*, CONSUMER AFFS. (Sept. 13, 2013), https://www.consumer affairs.com/news/adt-security-loves-cutomers-too-much-to-let-them-leave-091313 .html (describing ADT Security Systems' onerous and often inconsistent cancellation procedures).

[8] *See, e.g.*, Complaint, *FTC v. Age of Learning, Inc. (ABCmouse)*, No. 2:20-cv-07996 (C.D. Cal. filed Sept. 1, 2020), https://www.ftc.gov/system/files/ documents/cases/1723086abcmousecomplaint.pdf (accusing online children's education company of billing users without authorization due to obscure membership cancellation process); Complaint, *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. filed Nov. 20, 2017), https://www.ftc.gov/system/files/ documents/cases/adoreme_complaint.pdf (suing online lingerie retailer for obstructing subscription cancellations with long customer service wait times and restrictive cancellation conditions).

[9] *See* BETTER BUS. BUREAU, *Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements* (Dec. 12, 2018), https://www.bbb.org/article/investigations/18929-subscription-traps-and-deceptive-free-trials-scam-millions-with-misleading-ads-and-fake-celebrity-endorsements.

Appellate Case: 24-3137    Page: 14    Date Filed: 03/27/2025 Entry ID: 5500774

consumer losses as of 2020.[10] Nearly half of consumers forget to cancel,[11] and some companies actively conceal automatic charges.[12]

Compounding these harms are manipulative "dark patterns"—deceptive online design strategies intended to confuse or mislead consumers into continuing payments.[13] Recent FTC cases against major companies underscore how widespread these tactics are, with many deliberately complicating cancellation processes to retain unwilling subscribers.[14]

---

[10] BETTER BUS. BUREAU, *BBB Investigation Update: Free Trial Offer Scams* (Apr. 21, 2020), https://www.bbb.org/article/news-releases/22040-bbb-update-free-trial-offer-scams.

[11] Nick Wolny, *'Subscription Creep' is Real. Consumers Are Paying Over $1,000 Each Year, CNET Survey Finds*, CNET (Oct. 17, 2024), https://www.cnet.com/personal-finance/subscription-creep-is-real-consumers-are-paying-over-1000-each-year-cnet-survey-finds.

[12] *See* Complaint, *FTC v. AAFE Prods. Corp.*, No. 3:17-cv-00575 (S.D. Cal. filed Mar. 23, 2017), https://www.ftc.gov/system/files/documents/cases/bnri_complaint.pdf (alleging online marketers lured consumers with "free" and "risk-free" trials without clearly disclosing that customers would be charged fees if they did not affirmatively cancel).

[13] *See generally* FED. TRADE COMM'N, *Bringing Dark Patterns to Light* (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

[14] *See, e.g.*, Amended Complaint, *FTC v. Amazon.com, Inc.*, No. 2:23-cv-00923 (W.D. Wash. filed Sept. 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2023-09-20-067-AmendedComplaint%28redacted%29.pdf (alleging Amazon Prime's cancellation process was designed to be complex and discouraging); Complaint, *FTC v. Adobe Inc.*, No. 5:24-cv-03630 (N.D. Cal. filed July 23, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/040-Unredacted

Congress empowered the FTC to respond to these types of widespread consumer harms through Magnuson-Moss rulemaking. *See* 15 U.S.C. §§ 57a, 57b-3. The Rule directly addresses deceptive cancellation practices by requiring that subscription services make cancellation as easy as signing up. The Rule does not impose sweeping new obligations but instead aligns with existing federal consumer protection laws. It is carefully calibrated to minimize burdens on legitimate commerce while providing substantial consumer safeguards.

Petitioners attempt to distract from the reality of documented consumer harm by conjuring exaggerated hypotheticals about industry disruption, procedural oversights, and regulatory overreach. Yet the Rule is precisely the kind of measured and well-supported regulatory action that Congress empowered the FTC to promulgate, one that eliminates deceptive and unfair practices without impeding legitimate commerce.

Amici respectfully urge this Court to uphold the Rule as a thoughtful, lawful, and necessary exercise of the FTC's authority that protects hundreds of millions of consumers across the United States.

---

Complaint.pdf (alleging Adobe purposefully designed its online cancellation process to be convoluted and retention-focused).

## SUMMARY OF ARGUMENT

Petitioners' challenges fundamentally misinterpret both the text and the purpose of Section 18 of the FTC Act. Contrary to their claims, the FTC's "Click-to-Cancel" Rule is entirely within the Commission's statutory authority. The Rule precisely defines prohibited unfair practices, thoroughly documents their widespread prevalence, and aligns with existing federal consumer protection statutes addressing similar harms. Petitioners wrongly assert that FTC rules must be tailored to specific industries, disregarding both clear congressional intent and decades of judicial precedent.

Petitioners' procedural arguments fare no better. Their claim that the FTC failed to issue a preliminary regulatory analysis misconstrues the Magnuson-Moss Act, which requires such analyses only when the Commission reasonably anticipates significant economic impacts at the outset of rulemaking. Here, the FTC properly responded with a detailed final regulatory analysis once the extent of the economic impacts became clearer, fully satisfying statutory requirements and ensuring meaningful public participation.

Nor is the Rule arbitrary or capricious. Petitioners selectively highlight industry-specific hypotheticals, exaggerating supposed burdens while ignoring the Rule's carefully articulated flexibility. The FTC explicitly considered and addressed legitimate concerns about verification processes and bundled services, adopting

8

reasonable standards that balance consumer protection with practical business needs. The final Rule aligns fully with existing federal statutes, complements industry-specific regulations, and sensibly targets pervasive and well-documented consumer harm.

The Rule is lawful, reasonable, and necessary. It should be upheld.

## <u>ARGUMENT</u>

### I. The Rule Falls Squarely Within the Authority Granted by Section 18 of the FTC Act.

Petitioners' central argument rests on a fundamental misinterpretation of the Federal Trade Commission's statutory authority under Section 18 of the FTC Act, 15 U.S.C. § 57a. Contrary to Petitioners' assertions, the FTC's "Click-to-Cancel" Rule comfortably satisfies Section 18's requirements by precisely defining unfair and deceptive practices, substantiating their pervasiveness, and addressing the very consumer harms that Congress sought to curtail. Petitioners' claims of statutory overreach misconstrue both the plain meaning and purpose of Section 18, disregard ample evidence of widespread misconduct, and mischaracterize the Rule's carefully tailored prohibitions.

9

## A. The Rule Defines Unfair or Deceptive Practices With the Specificity Required by Section 18 of the FTC Act.

Petitioners wrongly conflate the specificity required by Section 18 of the FTC Act—clarity in defining prohibited conduct—with a nonexistent requirement that FTC rules be confined to particular industries. Section 18 explicitly authorizes the FTC to promulgate rules that "define with specificity acts or practices which are unfair or deceptive." 15 U.S.C. § 57a(a)(1)(B). This statutory language directs the Commission to delineate the regulated conduct with clarity, not to limit regulation to narrowly defined industries. The Rule satisfies this requirement by identifying specific, well-documented unfair practices prevalent in subscription markets: deceptive or obscure cancellation mechanisms, misleading subscription terms, and unnecessary barriers to terminating subscriptions. *See* 16 C.F.R. §§ 425.4–425.6.

Specificity under Section 18 requires the FTC to clearly articulate the unfair or deceptive acts that justify regulation, rather than merely establishing preventive measures without first defining the underlying misconduct. *See Katharine Gibbs Sch. (Inc.) v. FTC*, 612 F.2d 658, 662 (2d Cir. 1979). Consistent with this standard, the Rule identifies and prohibits specific abusive practices, such as failing to provide cancellation methods that are "at least as easy to use" as the sign-up process, imposing unnecessary verification hurdles, or employing deliberate retention tactics to discourage cancellation. *See* 16 C.F.R. § 425.6(b)-(c). The Rule provides

10

regulated entities with clear guidance on compliance, ensuring businesses can adapt their practices without uncertainty or undue burden.

Petitioners' assertion that "specificity" requires narrow, industry-by-industry rules is contradicted by both the FTC's longstanding regulatory practice and congressional intent. Congress has unequivocally affirmed the FTC's authority to promulgate broadly applicable rules addressing common unfair practices across multiple sectors. *See* S. Rep. No. 96-500, at 3 (1979) (confirming the FTC's authority to issue rules that apply across industries where unfair practices are clearly and specifically defined). In fact, Congress designed the rulemaking process to ensure clarity and predictability—not to artificially restrict the agency's authority to isolated industries. *See* S. Conf. Rep. No. 93-1408, at 7763-64 (1974) ("Because the prohibitions of section 5 of the Act are quite broad, trade regulation rules are needed to define with specificity conduct that violates the statute and to establish requirements to prevent unlawful conduct.").

Petitioners' selective reliance on dictionary definitions does nothing to undermine the Rule's compliance with statutory specificity. The plain statutory text does not equate "specificity" with industry segmentation. *See* 15 U.S.C. § 57a(a)(1)(B). Petitioners cite the *Webster's Third New International Dictionary* (1976) definition of "specificity" as "the condition of being peculiar to a particular individual or group." Pet. Br. at 32–33. But they fail to disclose that this definition

11

is explicitly tied to the biological context and selectively omit the phrase "of organisms" from the end. *See Webster's Third New Int'l Dictionary* 2187 (1976). That omission is telling, and it renders the definition irrelevant to the Rule. By contrast, Webster's definition of "specific" is directly applicable: "characterized by precise formulation or accurate restriction (as in stating, describing, defining, reserving); free from such ambiguity as results from careless lack of precision or from omission of pertinent matter." *Id.* Other contemporaneous dictionaries confirm this understanding.[15]

Thus, the Rule aligns precisely with Congress's mandate. It clearly and unambiguously defines prohibited unfair practices, ensuring both adequate notice and predictability in compliance. The specificity requirement exists to promote clarity in regulated conduct, not to impose an artificial limitation on the Commission's ability to address widespread consumer harm.

## B. The FTC Amply Demonstrated the Prevalence of Unfair Practices in Negative Option Marketing.

The FTC more than satisfied Section 18's prevalence requirement by providing substantial evidence of widespread unfair and deceptive practices in negative-option subscriptions across multiple consumer-facing sectors. Under

---

[15] *See, e.g.*, *Am. Heritage Dictionary of the English Language* 1240 (1969) (defining "specific" as "[e]xplicitly set forth; particular; definite"); *Random House Dictionary of the English Language* 1262 (1968) (defining "specific" as "having special application, bearing, or reference; specifying, explicit, or definite").

12

Section 18, prevalence simply means that practices must be shown to be "widespread." 15 U.S.C. § 57a(b)(3)(B); *see also Compassion Over Killing v. FDA*, 849 F.3d 849, 855 (9th Cir. 2017) (explaining that prevalence requires unfair or deceptive practices to be "sufficiently widespread to justify promulgating . . . regulations"). The FTC extensively documented such prevalence during the rulemaking process. *See* 89 Fed. Reg. 90481–90484.

Petitioners minimize this record by cherry-picking isolated examples and dismissing well-documented consumer harm. But the full administrative record reveals a far more robust foundation. The Commission cited more than thirty-five FTC cases specifically targeting deceptive subscription practices involving cancellation barriers, misleading disclosures, and unauthorized renewals—each demonstrating how businesses across industries deploy similar unfair tactics to trap consumers in ongoing charges. *See* 89 Fed. Reg. 90481 n. 60.

For instance, in *FTC v. ABCmouse*, the FTC alleged that an online educational service deceptively enrolled hundreds of thousands of consumers in automatically renewing negative-option subscriptions while deliberately making cancellation difficult.[16] The company failed to adequately disclose renewal terms and designed its online cancellation process to be convoluted, a set of practices that ultimately led

---

[16] *See* Complaint, *FTC v. ABCmouse*, *supra* note 8.

to a $10 million settlement with the FTC.[17] Similarly, in *FTC v. AdoreMe, Inc.*, the FTC found that an online lingerie retailer deceptively withheld store credit refunds from consumers who attempted to cancel their memberships, effectively coercing them into continued participation.[18] AdoreMe was ultimately ordered to pay nearly $1.38 million in refunds and to overhaul its cancellation practices.[19]

The FTC documented that negative option abuses extended into the financial services sector as well. In *FTC v. Credit Bureau Center, LLC*, the Commission sued a credit monitoring company that deceptively enrolled consumers in $29.94/month negative-option subscriptions through misleading "free" credit score offers.[20] The court found that these practices harmed tens of thousands of consumers, ultimately granting more than $5 million in monetary relief.[21]

---

[17] *See* Stipulated Order for Permanent Injunction and Monetary Judgment, *FTC v. ABCmouse*, No. 2:20-cv-07996 (C.D. Cal. filed Sept. 8, 2020), https://www.ftc.gov/system/files/documents/cases/1723186abcmouseorder.pdf.

[18] *See* Complaint, *FTC v. AdoreMe, Inc.*, *supra* note 8.

[19] *See* Stipulated Order for Permanent Injunction and Monetary Judgment, *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. filed Nov. 30, 2017), https://www.ftc.gov/system/files/documents/cases/adore_me_stipulated_ord.pdf.

[20] *See* Complaint, *FTC v. Credit Bureau Ctr., LLC*, No. 1:17-cv-00194 (N.D. Ill. filed Jan. 10, 2017), https://www.ftc.gov/system/files/documents/cases/170118myscore_complaint_filed.pdf.

[21] *See* Memorandum Opinion and Order, *FTC v. Credit Bureau Ctr., LLC*, No. 1:17-cv-00194 (N.D. Ill. filed Sept. 13, 2021), https://www.ftc.gov/system/files/ftc_gov/pdf/crc_memorandum_opinion_and_order.pdf.

Furthermore, the FTC relied on thousands of verified consumer complaints, numerous state attorney general investigations, and several comprehensive empirical studies to demonstrate prevalence. *See* 89 Fed. Reg. 90482–84. Consumer complaints consistently highlighted frustration with cancellation obstacles deliberately embedded to retain subscribers involuntarily, with many detailing how businesses require excessive steps, impose retention-focused sales pitches, or bury cancellation options within complex account settings. *See id.* at 90483–84.

State enforcement actions reinforce those complaints. For example, in *People v. Lavender Lingerie, LLC*, several California district attorneys sued an online lingerie business for failing to clearly disclose automatic charges resulting from VIP membership subscriptions.[22] The company was ultimately ordered to pay $1.2 million in civil penalties and restitution.[23] Similar lawsuits brought by other state attorneys general confirm that these deceptive practices are pervasive across industries and jurisdictions.[24]

---

[22] *See* Final Judgment and Injunction Pursuant to Stipulation, *People v. Lavender Lingerie, LLC*, No. 22CV402737 (Cal. Super. Ct. filed Nov. 23, 2022), https://truthinadvertising.org/wp-content/uploads/2021/12/CA-v-Savage-x-Fenty-order.pdf.

[23] *See id.*

[24] *See, e.g.*, Decision & Order on Motion, *People v. Sirius XM Radio Inc.*, No. 453325/2023 (N.Y. filed Nov. 21, 2024), https://cases.justia.com/new-york/other-courts/2024-2024-ny-slip-op-34113-u.pdf?ts=1732662758 (holding business liable for training agents to draw out conversations with customers to make cancellation

Petitioners attempt to dismiss this overwhelming evidence by artificially narrowing the prevalence inquiry. But Section 18's legislative history makes clear that prevalence does not require proof that a deceptive practice dominates every subscription type or sector individually—only that the practice occurs broadly enough to cause significant consumer harm. *See* S. Rep. No. 103-130, at 10 (1993) (stating prevalence exists "if the FTC has issued cease and desist orders regarding acts and practices that are addressed by the rule, or if other information available to the FTC indicates a pattern of unlawful conduct").

The FTC's extensive documentation easily meets the prevalence standard. *See* 89 Fed. Reg. 90481–90484. The Rule is not based on speculation or isolated anecdotes. It is grounded in a comprehensive evidentiary record that establishes the prevalence of deceptive negative-option practices and underscores the pressing need for a regulatory response.

**C. Petitioners Mischaracterize the Rule as Overbroad.**

Petitioners misrepresent the Rule's actual scope, incorrectly portraying it as an indiscriminate ban on all negative-option subscription models. In truth, the Rule

---

difficult); Consent Decree, *State of Wash. v. Internet Ord. LLC*, No. 2:14-cv-01451 (W.D. Wash. filed Aug. 31, 2015), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/2015/Internet%20Order%20CD%20083115.pdf (mandating payment of $1 million from company using negative-option marketing to trap consumers in recurring billing with unclear cancellation procedures).

does not outlaw or even discourage negative-option marketing as a practice. Instead, it imposes carefully tailored safeguards: transparent disclosures of subscription terms, informed consumer consent mechanisms, and accessible cancellation procedures. *See* 16 C.F.R. §§ 425.3–425.6. These requirements align with longstanding consumer protection principles and mirror safeguards that Congress has repeatedly endorsed.

Indeed, Congress has explicitly recognized the importance of clear disclosures and straightforward cancellation mechanisms in multiple legislative contexts. Most notably, the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. §§ 8401–8405, codified many of the same principles embodied in the Rule, such as requiring businesses to "clearly and conspicuously disclose[]" subscription terms and mandating that cancellation processes be "simple." 15 U.S.C. § 8403. Courts have also recognized the broad remedial purpose of ROSCA in preventing subscription-related deception. *See FTC v. Cardiff*, 2020 WL 6540509, at *17 (C.D. Cal. Oct. 9, 2020) (explaining that "Congress passed [ROSCA] to promote consumer confidence in online commerce" and that ROSCA "generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature" without the customer's consent); *FTC v. Credit Bureau Ctr., LLC*, 81 F.4th 710, 715 (7th Cir. 2023) ("[ROSCA] makes it unlawful for any person to use a negative-option marketing device unless he 'clearly and

conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information.'" (quoting 15 U.S.C. § 8403(1))).

Congress has similarly imposed clear cancellation rights and disclosure requirements in other subscription-dependent industries, further demonstrating that the Rule is not an outlier but a continuation of well-established regulatory norms. For example, the Telemarketing Sales Rule (TSR) mandates that telemarketers gain consumers' explicit, affirmative consent before charging for negative-option plans. *See* 16 C.F.R. § 310.3(a)(1)(vii). Likewise, the Electronic Fund Transfer Act requires servicers to obtain express authorization from customers before initiating recurring charges and provides means for consumers to stop any such payments. *See* 15 U.S.C. § 1693a. These existing statutory frameworks contradict Petitioners' assertion that requiring simple cancellation is an excessive or unprecedented regulatory burden.

Petitioners' alarmist claims of economic disruption also ring hollow in the face of state laws and industry-specific regulations that already impose similar requirements and have not caused disruption to legitimate commerce. California's Automatic Renewal Law (ARL) requires clear disclosures of automatic renewal terms and mandates that businesses using online systems "display[] a prominently located and continuously and proximately displayed direct link or button entitled 'click to cancel,' or words to that effect." CAL. BUS. & PROF. CODE § 17602. New

18

York's ARL requires that businesses provide customers with a "cost-effective, timely, and easy-to-use mechanism for cancellation" of subscriptions in the same medium the customer used to sign-up. N.Y. GEN. BUS. LAW § 527-a(2), (3). These successful policy regimes further undermine Petitioners' claims that the Rule imposes unworkable burdens or disruptive costs.

In sum, Petitioners fundamentally misconstrue both the scope of the Rule and the meaning of Section 18's specificity and prevalence requirements. The Rule properly defines specific unfair practices, substantiates their widespread prevalence, and mirrors longstanding legislative precedents safeguarding consumers. It falls squarely within the FTC's statutory mandate under Section 18 and is a lawful exercise of the Commission's rulemaking authority.

## II. The FTC Fully Complied With the Procedural Requirements of Magnuson-Moss Rulemaking.

The FTC's rulemaking process adhered fully to the Magnuson-Moss Act's procedural requirements, codified in relevant part at 15 U.S.C. § 57b-3, including the statutory framework governing economic impact analyses. The statute mandates a preliminary regulatory analysis only when the Commission reasonably anticipates at the outset that a rule will exceed $100 million in annual economic impact. 15 U.S.C. § 57b-3. Here, the FTC reasonably concluded—based on available data at the ANPRM stage—that the Rule's economic impact would not reach that threshold. *See* 88 Fed. Reg. 24731. Only later, as additional information became available

19

during public comment, did the Commission determine that the threshold would be exceeded,[25] at which point it properly issued a comprehensive final regulatory analysis to ensure transparency and public participation. 89 Fed. Reg. 90517.

Petitioners wrongly contend that the FTC's decision violated procedural requirements. Their argument that a preliminary regulatory analysis under 15 U.S.C. § 57b-3(b)(1) was mandatory simply because the *final* impact exceeded $100 million, Pet. Br. at 54–60, misconstrues the statutory text and contradicts both legislative intent and standard administrative practice.

### A. Magnuson-Moss Rulemaking Does Not Mandate Preliminary Analysis When Reasonable Initial Estimates Show an Economic Impact Below the Statutory Threshold.

The Magnuson-Moss Act requires the FTC to prepare a preliminary regulatory analysis if the Commission reasonably anticipates that a proposed rule will "have an annual effect on the national economy of $100,000,000 or more." 15 U.S.C. § 57b-3(a)(1)(A). Petitioners' reading of this requirement wrongly asserts that a preliminary analysis is automatically triggered whenever the *final* determination ultimately surpasses the $100 million threshold. *See* Pet. Br. at 54–55. That reading defies logic and disregards both the statutory text and fundamental principles of agency decision making.

---

[25] *See generally* Recommended Decision by the Presiding Officer, *Negative Option Rule*, Project No. P064202 (Apr. 12, 2024), https://www.regulations.gov/comment/FTC-2024-0001-0042.

The statute's plain language makes clear that the key inquiry is what the FTC "estimates" at the time of proposed rulemaking, not what economic effects later emerge as additional data becomes available. *See* 15 U.S.C. § 57b-3(a)(1)(A). Nothing in the Magnuson-Moss Act suggests that an agency must retroactively conduct a preliminary analysis simply because subsequent proceedings refine or expand the original estimated economic impact.

Here, the FTC's initial determination that the Rule would not surpass the $100 million threshold was reasonable based on the evidence available at the notice stage. The agency relied on available data and industry practices indicating that many affected businesses already complied with the Rule's objectives to some degree, suggesting limited incremental compliance costs. *See* 88 Fed. Reg. 24731. Petitioners' reliance on hindsight fails to account for the reality that agencies necessarily refine their economic assessments as additional data emerges over the course of the rulemaking process.

Indeed, the purpose of the preliminary regulatory analysis requirement is not to lock agencies into early-stage estimates but to ensure informed decision-making and meaningful public input. *See* S. Rep. No. 96-500, at 28–29 (1979) ("The Committee recognizes that precise projections of adverse effects are often beyond the reach of existing measurement techniques. . . . The Commission cannot be expected to achieve an unrealistic level of precision."). That purpose was fully

Appellate Case: 24-3137    Page: 30    Date Filed: 03/27/2025 Entry ID: 5500774

achieved here: when the FTC determined that the Rule's economic impact warranted further analysis, it provided a detailed final regulatory analysis that afforded ample opportunity for public comment. 89 Fed. Reg. 90517–34.

### B. The FTC's Comprehensive Final Regulatory Analysis Fully Satisfied the Magnuson-Moss Act's Requirements.

When the FTC determined, based on public comments and additional evidence, that the Rule's economic impact would exceed the $100 million threshold, it responded appropriately by issuing a comprehensive final regulatory analysis, as the Magnuson-Moss Act requires. *See id.*; 15 U.S.C. § 57b-3(b)(2). Petitioners attempt to downplay the significance of this analysis by characterizing it as insufficient or cursory. *See* Pet. Br. at 56–57. That claim, however, misinterprets both the administrative record and the statutory framework of the Magnuson-Moss Act.

The Magnuson-Moss Act recognizes that agencies refine their economic analyses throughout the rulemaking process, incorporating public comments and updated information before culminating in a final regulatory analysis. *See* 15 U.S.C. § 57b-3(b)(2). The Commission actively solicited comments on regulatory alternatives and made substantive changes based on public input, including eliminating certain disclosure requirements, modifying recordkeeping provisions, and reducing compliance burdens on small businesses. *See* 89 Fed. Reg. 90517–19.

Petitioners' claim that the final analysis offered only "three paltry paragraphs" on alternative regulatory options, Pet. Br. at 57, is both misleading and incomplete. The FTC explicitly considered multiple alternatives, including (1) terminating the rulemaking process entirely and relying on existing legal frameworks, and (2) limiting the Rule's scope to apply only to negative-option plans marketed in person or by mail. 89 Fed. Reg. 90518. The Commission concluded that these alternatives would "substantially reduce or eliminate the benefits of the Rule" by failing to provide clarity and comprehensive coverage across subscription models. *Id.*

The Magnuson-Moss Act does not impose a rigid page-length or quantitative threshold for analyzing regulatory alternatives. Instead, it requires "a description of any alternatives to the final rule which were considered by the Commission," 15 U.S.C. § 57b-3(b)(2)(B), a standard the FTC clearly met here. The record confirms that the FTC engaged with alternative regulatory approaches, meaningfully adjusted the Rule in response to concerns, and ultimately determined that the adopted framework would best serve the statutory purpose. *See* 89 Fed. Reg. 90486–515 ("Discussion of Specific Rule Provisions, Section-by-Section Analysis"), 90515–18 ("Modification, Alternatives Considered").

### C. Petitioners' Interpretation Would Undermine the Magnuson-Moss Act's Core Purpose of Flexibility and Public Participation.

Petitioners advocate for a rigid interpretation of the Magnuson-Moss Act that would retroactively impose preliminary analysis requirements, even when agencies

initially and reasonably estimate lower economic impacts. But this approach contradicts the statute's fundamental objectives of fostering public input, ensuring agency accountability, and facilitating flexible administrative responses. *See* S. Rep. No. 96-500, at 20 (1979) (procedural requirements meant to encourage public engagement that "produce[s] relevant information not previously gathered during the FTC's non-public investigation, including information bearing on the prevalence of unfair or deceptive acts or practices").

Adopting Petitioners' interpretation would perversely penalize agencies for responsibly revising economic assessments based on updated information. Such rigidity would discourage agencies from updating economic analyses mid-process, instead incentivizing them to either inflate initial estimates unnecessarily or ignore subsequent relevant data—precisely the opposite of the outcome Congress intended.

The statutory text and purpose clearly support the FTC's approach here: timely adjustments to economic analysis, robust public engagement on those revised analyses, and full compliance with the Act through a comprehensive final analysis that incorporates public input. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. EPA*, 824 F.2d 1258, 1283–84 (1st Cir. 1987) (upholding provision of final agency rule that was added in response to public comment and was "a logical outgrowth of the notice and comments received"); *S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974) (upholding "substantial" changes in agency's final rule because "they were in

24

character with the original scheme and were additionally foreshadowed in proposals and comments advanced during the rulemaking").

The FTC appropriately interpreted the regulatory analysis requirements and complied by providing a thorough final analysis when actual economic impacts became apparent. This procedural approach fully adhered to the Act, reflected responsible administrative practice, and fulfilled Congress's intent of meaningful public engagement and regulatory transparency.

## III. The Rule is Reasonable, Carefully Considered, and Fully Compliant With the Requirements of the Administrative Procedure Act.

The FTC's Click-to-Cancel Rule easily meets the reasoned decision-making standard required under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559. Agency actions are presumed valid, and Petitioners bear the burden of showing that the Commission's reasoning was irrational, unsupported by substantial evidence, or a clear departure from the record. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) (agency action is arbitrary only where it "entirely failed to consider an important aspect of the problem" or provided an explanation "so implausible that it could not be ascribed to a difference in view or the product of agency expertise"); *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("Under the 'arbitrary

25

and capricious' standard the scope of review is a narrow one. . . . [W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Petitioners' assertion that the Rule is arbitrary and capricious, Pet. Br. at 60, mischaracterizes the Commission's thorough and careful analysis.

## A. The Commission Amply Considered Industry-Specific Concerns, Including Security and Verification Issues.

The Rule is not arbitrary merely because it applies across multiple industries with different operational needs. Petitioners' claim that the FTC ignored complexities in certain markets, such as security verification for high-risk services, Pet. Br. at 60–62, is inaccurate. The Commission explicitly addressed industry-specific concerns and designed the Rule to balance consumer protection with legitimate business interests.

The FTC carefully evaluated verification concerns during rulemaking, clarifying that the Rule's requirement for a "simple cancellation mechanism" allows businesses to implement reasonable consumer identity verification processes. 89 Fed. Reg. 90506. The Commission clearly explained that the Rule does not prohibit these procedures, so long as the verification methods used do not unreasonably impede cancellation. *See id.* ("[Cancellation and consent] experiences may not always be perfectly symmetrical. . . . However, reasonable verification, authentication, or confirmation procedures should not create distinctly asymmetrical experiences."). The Commission explicitly made clear that businesses retain

26

flexibility to implement security measures that are necessary but not overly burdensome. *See id.* (affirming the Rule's "as easy as" standard is intended to be "a flexible measure").

Petitioners' objections are based on hypothetical concerns rather than actual regulatory burdens. Courts routinely reject this sort of speculative argument as a basis for invalidating agency action. *See, e.g.*, *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 195–96 (D.D.C. 2015) (holding that hypothetical examples of harm were insufficient to render agency rule arbitrary and capricious); *State v. Bureau of Land Mgmt.*, 612 F. Supp. 3d 925, 936–37 (N.D. Cal. 2020) (appeal pending) (same); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that [actively] causes it harm."). Here, Petitioners fail to identify any actual instance where the Rule prevents a company from implementing legitimate security measures.

Moreover, the FTC deliberately adopted a broad "simple mechanism" standard rather than rigid, one-size-fits-all cancellation requirements. 16 C.F.R. § 425.6. The Commission explained that a prescriptive approach would be impractical given the wide variety of subscription services, so it instead chose a "flexible" rule adaptable across industries. *See* 89 Fed. Reg. 90486. Courts have consistently upheld agency discretion to adopt flexible regulatory standards where precise uniformity

27

would be impractical. *See, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947) (acknowledging that agencies must have flexibility to develop regulatory standards either through general rulemaking or case-by-case adjudication, as some issues are too specialized or variable for rigid, uniform rules); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 219–20 (2009) (holding that agencies retain discretion to determine the extent of regulatory requirements based on practical considerations, including feasibility and cost-effectiveness).

Petitioners also mischaracterize the Commission's illustrative guideline that "online cancellation should take no more than 30 seconds to one minute." *See* Pet. Br. at 61; 89 Fed. Reg. 90520. The Commission did not impose this as a rigid time limit that businesses must comply with but instead used it solely as an analytical benchmark for estimating consumer benefits. *See* 89 Fed. Reg. 90520. Moreover, the Commission explicitly disclaimed any intent to set this estimate as an enforcement standard, stating that it was "used only for the express purpose of estimating the incremental benefits to consumers" and "has not been used as a standard for ROSCA enforcement and is not intended to set a standard here." *Id.* at 90520 note 545. This express clarification defeats Petitioners' claim that the FTC imposed an inflexible cancellation timeframe.

The FTC carefully considered security, verification, and industry-specific concerns, adopting a flexible framework that accommodates legitimate business

28

needs while protecting consumers. Petitioners' claim that the Rule is arbitrary and capricious ignores the extensive record demonstrating that the Commission's decision was based on reasoned analysis, broad public input, and well-documented consumer harm.

## B. The Rule Reasonably and Clearly Defines "Material" Terms.

The FTC's definition of "material," 16 C.F.R. § 425.2, is consistent with longstanding agency precedent, well-established judicial interpretations, and clear regulatory guidance. Petitioners' claim that the definition is arbitrary or internally inconsistent, Pet. Br. at 65–66, misrepresents both FTC practice and the record.

The FTC adopted a materiality standard that aligns with decades of judicially affirmed precedent: a fact is "material" if it is "likely to affect a person's choice of, or conduct regarding, goods or services." 16 C.F.R. § 425.2; *see* 89 Fed. Reg. 90492 (adopting the longstanding standard consistent with the TSR and Section 5 of the FTC Act); *see* FTC Policy Statement on Deception, appended to *Cliffdale Assocs.*, 103 F.T.C. 110, at 45–50 (1984) (explaining the Commission's interpretation of "material" in light of longstanding judicial precedent). Courts have repeatedly upheld this definition in FTC enforcement actions. *See, e.g.*, *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1138 (D. Nev. 2015) (finding the deception created by misleading website to be material because "it goes so the central characteristics of the product and induces [consumer] purchase"); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F.

Supp. 2d 285, 299–300 (D. Mass. 2008) (holding misleading representations in infomercial were material under the FTC's definition).

The Rule's materiality standard appropriately reflects the time-honored principle that materiality inherently depends on context. Petitioners allege inconsistency on the grounds that the FTC acknowledged the necessity of context-specific evaluation of material terms. Pet. Br. at 65. However, Petitioners ignore established case law affirming that whether a fact is material to consumers requires evaluating the surrounding circumstances. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (noting that in cases where materiality is not presumed, "the Commission examines the record and makes a finding of materiality or immateriality" based on the evidence before it). Context-based materiality is not a contradiction; it is an essential feature of well-reasoned consumer protection law that balances clear enforcement guidance with the flexibility to account for diverse industries and business practices.

Tellingly, Petitioners fail to identify any instance where a court has found the FTC's materiality standard to be unworkably vague or internally inconsistent. That failure reflects the fact that the Rule's definition of materiality adheres to well-established regulatory principles, providing clear notice to businesses while preserving the latitude needed to address deceptive practices across different contexts.

30

## C. The Rule Complements and Reinforces, and Does Not Conflict With, Existing Federal Consumer Protection Statutes.

The Rule functions as a necessary extension of existing consumer protection statutes, reinforcing rather than conflicting with federal law. The FTC expressly acknowledges that "the legislative history of the FTC Act indicates Congress did not intend the FTC to occupy the consumer protection regulation field." 89. Fed. Reg. 90515 (citing *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 989 (D.C. Cir. 1985)). The Commission repeatedly emphasized that the Rule operates as a consumer protection floor rather than a ceiling, aligning with Congress's intent in statutes like ROSCA, which requires "simple mechanisms" for cancellation. *See* 15 U.S.C. § 8403.

Petitioners' assertion that the Rule disrupts bundled discounts, Pet. Br. at 62–64, is similarly unfounded. The Commission confirmed that businesses remain free to offer bundling arrangements, as long as they provide a cancellation method similar to the sign-up process in terms of time, burden, expense, and ease of use. *See* 89 Fed. Reg. 90510 ("[The Rule] does not require use of the exact same mechanism."). The Rule neither prohibits bundling nor restricts businesses from structuring consumer incentives—it merely ensures consumers are not trapped in subscriptions because of opaque or deliberately obstructive cancellation policies. *See id.*

31

Ultimately, Petitioners conflate policy disagreement with arbitrary decision-making. The APA does not demand perfection, only a reasoned explanation grounded in evidence. *See Prometheus Radio Project*, 592 U.S. at 423. The Commission thoroughly documented the extensive consumer harm caused by manipulative subscription practices, weighed competing considerations, and adopted a rule carefully tailored to the record before it. That record easily satisfies the APA's deferential standard.

The Rule is both lawful and reasonable, and should be upheld.

Appellate Case: 24-3137    Page: 41    Date Filed: 03/27/2025 Entry ID: 5500774

## <u>CONCLUSION</u>

For the foregoing reasons, Amici ask this Court to uphold the FTC's Click-to-Cancel Rule as a lawful, well-supported, and necessary safeguard against deceptive subscription practices.

Dated: March 27, 2025                    Respectfully submitted,


   /s/ Seth E. Mermin
SETH E. MERMIN
DAVID S. NAHMIAS
JOHN KAUFFMAN
CENTER FOR CONSUMER LAW AND
ECONOMIC JUSTICE,
    UC BERKELEY SCHOOL OF LAW
305 Law Building
Berkeley, CA 94720
(510) 643-3519
tmermin@law.berkeley.edu

33

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), this document complies with the type-volume limits of Rules 29(a)(5) and 32(a)(7)(B) because, excluding the parts exempted by Rule 32(f), it contains 6496 words. This document complies with the typeface requirements of Rule 32(a)(5) and type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface, Times New Roman, 14-point font.

Pursuant to this Eighth Circuit Rule 28A(h), this brief has been scanned for viruses and is virus-free.

Dated: March 27, 2025

/s/ Seth E. Mermin
SETH E. MERMIN
CENTER FOR CONSUMER LAW AND
ECONOMIC JUSTICE,
    UC BERKELEY SCHOOL OF LAW
305 Law Building
Berkeley, CA 94720

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the Court's CM/ECF system on March 27, 2025, which will send notice of such filing to all counsel who are CM/ECF registered users.

Dated: March 27, 2025

/s/ Seth E. Mermin

SETH E. MERMIN
CENTER FOR CONSUMER LAW AND
ECONOMIC JUSTICE,
    UC BERKELEY SCHOOL OF LAW
305 Law Building
Berkeley, CA 94720