# In the United States Court of Appeals for the Eighth Circuit

―――――――――――――

CUSTOM COMMUNICATIONS, INC., D/B/A CUSTOM ALARM, ET AL.,

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent*.

**\*\*\*\***

SERVICE CONTRACT INDUSTRY COUNCIL, ET AL.,

*Amici on Behalf of Petitioners*,

INTERNET AND CONSUMER LAW PROFESSORS, ET AL.,

*Amici on Behalf of Respondent*.

―――――――――――――

On Petitions for Review of an Order of the
Federal Trade Commission

## PETITIONERS' REPLY BRIEF

> Helgi C. Walker
>   *Counsel of Record*
> Lucas C. Townsend
> Michael P. Corcoran
> Lael D. Weinberger
> GIBSON, DUNN & CRUTCHER LLP
> 1700 M Street, N.W.
> Washington, D.C.  20036
> (202) 955-8500
> hwalker@gibsondunn.com
>
> *Counsel for Petitioners*
> *Additional counsel listed on next page*

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, D.C. 20006
(202) 783-8400
edavis@shb.com

*Counsel for Custom
Communications, Inc., d/b/a
Custom Alarm*

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE
FLOWERS LLC
P.O. Box 8248
Cincinnati, OH 45249
(513) 201-5775
bflowers@abkf.com

*Counsel for Michigan Press
Association and the National
Federation of Independent
Business, Inc.*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD &
MARTIN, P.C.
777 Gloucester Street
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for the Chamber of
Commerce of the United States of
America and the Georgia
Chamber of Commerce*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062

*Counsel for the Chamber of
Commerce of the United States of
America*

# TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

ARGUMENT ..................................................................... 3

I.   The Rule Exceeds The Commission's Limited Statutory Authority. ................................................................ 3

     A.   The Rule Violates The "Specificity" Requirement ........ 3

          1.   The Commission's Primary "Specificity" Argument Flouts The FTC Act's Text and Structure. ................................................ 4

          2.   The Plain Meaning Of "Specificity" Confirms That The Rule Isn't Specific. ................. 7

               (i)   The Rule's Scope Isn't "Limited," "Restricted," Or Focused On Any "Particular Group." ................................ 7

               (ii)  The Rule's Terms Aren't "Definite" Or "Precise." ........................................ 12

     B.   The Rule Violates The "Prevalence" Requirement ...... 14

          1.   The Prevalence Requirement Is Judicially Reviewable. ............................................. 15

          2.   The Commission Failed To Satisfy The Prevalence Requirement. ..................................... 16

     C.   The Rule Overrides Numerous Federal Statutes That Already Regulate Recurring Subscriptions And Contravenes The Nondelegation Doctrine. .......... 19

II.  The Commission Violated A Key Procedural Requirement By Failing To Issue A Preliminary Regulatory Analysis. ......................................... 22

     A.   The Preliminary Regulatory Analysis Was Required ........................................................ 23

     B.   The Commission's Initial Estimate Was Arbitrary And Capricious. ......................................... 26

     C.   The Commission's Prejudice Argument Fails ............. 26

Appellate Case: 24-3137    Page: 3    Date Filed: 04/04/2025 Entry ID: 5503654

III.    The Rule Is Arbitrary And Capricious.................................... 29

IV.    The Rule Should Be Vacated..................................................... 32

CONCLUSION........................................................................................ 35

Appellate Case: 24-3137    Page: 4    Date Filed: 04/04/2025 Entry ID: 5503654

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Optometric Ass'n v. FTC*,
  626 F.2d 896 (D.C. Cir. 1980) .............................................................. 15

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023) ..................................................... 27, 33

*American Financial Services Association v. FTC*,
  767 F.2d 957 (D.C. Cir. 1985) ................................................................ 6

*Citizens Telecomms. Co. of Minn. v. FCC*,
  901 F.3d 991 (8th Cir. 2018) ................................................................ 28

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .............................................................................. 33

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  603 U.S. 799 (2024) .............................................................................. 33

*FEC v. Nat'l Republican Senatorial Comm.*,
  966 F.2d 1471 (D.C. Cir. 1992) ............................................................ 16

*FTC v. Cyberspace.com LLC*,
  453 F.3d 1196 (9th Cir. 2006) ................................................................ 5

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980) .............................................................................. 16

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980) .............................................................................. 22

*Iowa League of Cities v. EPA*,
  711 F.3d 844 (8th Cir. 2013) ................................................................ 33

*Jesner v. Arab Bank, PLC*,
  584 U.S. 241 (2018) ................................................................................ 8

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................ 8

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*,
  554 U.S. 527 (2008) ................................................................................ 8

iv

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................... 30

*Nat'l Auto. Dealers Ass'n v. FTC*,
   127 F.4th 549 (5th Cir. 2025) .......................................... 27

*Nebraska v. Biden*,
   52 F.4th 1044 (8th Cir. 2022) .......................................... 34

*NFIB v. Dep't of Lab.*,
   595 U.S. 109 (2022) ............................................................. 11

*North Dakota v. EPA*,
   730 F.3d 750 (8th Cir. 2013) ............................................ 33

*Novartis Corp. v. FTC*,
   223 F.3d 783 (D.C. Cir. 2000) ............................................ 5

*Ohio v. EPA*,
   603 U.S. 279 (2024) ............................................................. 17

*Pennsylvania Funeral Directors Association, Inc. v. FTC*,
   41 F.3d 81 (3d Cir. 1994) .......................................... 17, 18

*Religious Sisters of Mercy v. Becerra*,
   55 F.4th 583 (8th Cir. 2022) ............................................ 34

*Thigulla v. Jaddou*,
   94 F.4th 770 (8th Cir. 2024) ............................................ 15

*United States v. Brewer*,
   766 F.3d 884 (8th Cir. 2014) ............................................ 27

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................. 34

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ............................................................. 22

*Worth v. Jacobson*,
   108 F.4th 677 (8th Cir. 2024) .................................... 34, 35

Appellate Case: 24-3137    Page: 6    Date Filed: 04/04/2025   Entry ID: 5503654

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

## Statutes

5 U.S.C. § 553 .................................................................... 24

5 U.S.C. § 706 .................................................................... 33

15 U.S.C. § 57a ............................................ 3, 13, 15, 16, 24, 32, 33

15 U.S.C. § 57b-3 ........................................... 23, 24, 25, 26, 33

15 U.S.C. § 1693a ............................................................... 21

15 U.S.C. § 1693c ............................................................... 21

47 U.S.C. § 562 .................................................................. 21

47 U.S.C. § 1753 ............................................................. 11, 21

Pub. L. No. 103-312 (Aug. 1994) ......................................... 18

88 Stat. 2183 (1975) .............................................................. 9

88 Stat. 2198 (1975) .............................................................. 9

## Regulations

16 C.F.R. § 444.2 ................................................................... 6

38 FR 4896 ........................................................................... 9

39 FR 15387 ......................................................................... 9

47 FR 42260 ......................................................................... 9

49 FR 7740 ...................................................................... 6, 10

49 FR 7745 ...................................................................... 6, 10

49 FR 7752 ...................................................................... 6, 10

76 FR 76816 ........................................................................ 24

Appellate Case: 24-3137    Page: 7    Date Filed: 04/04/2025 Entry ID: 5503654

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

## Other Authorities

*Ask the Commissioner: Federal Trade Commissioner*
*Christine Varney* No. 2 ACCA Docket 36 (1996) .................................. 8

H.R. Rep. 103-138 (1993) .............................................................. 8

*Rulemaking* (last accessed April 4, 2025),
https://www.ftc.gov/enforcement/rulemaking ...................................... 8

S. Conf. Rep. 93-1408 (1974) ........................................................ 8

S. Hrg. 111-647 (Feb. 4, 2010) ...................................................... 8

S. Rep. 96-500 (1979) ................................................................ 8

*Specific*, Black's Law Dictionary (4th ed. 1968) ................................ 3

*Specificity*, Webster's Third New International Dictionary 2187 (1976) 4

Appellate Case: 24-3137    Page: 8    Date Filed: 04/04/2025 Entry ID: 5503654

## INTRODUCTION

To read the Commission's brief, one would think Congress had never enacted the Magnuson-Moss Act and other FTC Act amendments that rein in the agency's power to adopt sweeping rules regarding "unfair and deceptive practices." Section 18 does not give the Commission "broad discretion to issue rules." Resp.2. Quite the opposite.

Under the actual limitations of Section 18, the Rule cannot stand. The Rule is not "specific" because it applies to more than a billion contracts across the entire economy involving everything from newspapers to home warranty services and subjects them to highly generalized, one-size-fits-all terms like "material misrepresentations" or "simple cancellation mechanisms." The Commission has identified no instances of problems—much less "prevalent" problems—commensurate with the Rule's economy-wide scope. And the Commission wasn't permitted to skip the required preliminary regulatory analysis just because, by the time the Commission realized the true costs of its overbroad Rule, the rulemaking was at a "late stage." Resp.22.

The Commission blew past these preconditions to a lawful Section 18 rulemaking. In doing so, the agency promulgated a Rule that it can

1

directly enforce against companies for more than $53,000 per violation without Section 5's administrative guardrails that give notice of the particular conduct prohibited before imposing penalties. Congress prohibited this style of Commission rulemaking decades ago, and the Commission's efforts to read these explicit limitations on its authority out of the FTC Act should be rejected.

On top of these statutory violations, the Commission brushes aside arbitrary and capricious aspects of the Rule. For example, the Rule would require all sellers of recurring subscriptions to restructure their enrollment systems to require two consents—one to the automatic renewal feature and one to the rest of the transaction—despite the Commission failing to grapple with either the costs of this cumbersome overhaul for companies or the resulting confusion for consumers.

As an afterthought, the Commission offers a handful of novel arguments about the scope of relief that contravene settled precedent. The Rule cannot be saved with "severability" because the entire rulemaking was unlawful. It has been settled for decades that vacatur of the Rule is the default remedy, and Custom Alarm concededly has

Appellate Case: 24-3137    Page: 10    Date Filed: 04/04/2025 Entry ID: 5503654

standing to seek vacatur. And the remaining Petitioners have associational standing under settled law anyway.

At every turn, the Commission's arguments fail. Congress's choice to curb the agency's rulemaking power under Section 18 must be respected, and the Rule should be vacated.

## ARGUMENT

### I. The Rule Exceeds The Commission's Limited Statutory Authority.

#### A. The Rule Violates The "Specificity" Requirement.

The Commission's brief confirms that the Rule has a fatal "specificity" problem. Both sides agree that any rules adopted pursuant to Section 18 must define "unfair or deceptive acts or practices" with "*specificity*"—an express limitation on the Commission's authority to prescribe conduct by rules. 15 U.S.C. § 57a(a)(1)(B) (emphasis added); Resp.27-29. The Commission has "no authority" to promulgate Section 18 rules that don't satisfy this requirement. 15 U.S.C. § 57a(a)(2). And both sides agree on the definition of "specificity": Section 18 rules must be "precisely formulated or restricted," "definite," "limited or precise," *Specific*, Black's Law Dictionary (4th ed. 1968), "peculiar to a particular individual or group," and "free from ambiguity as results from careless

3

lack of precision," *Specificity*, Webster's Third New International Dictionary 2187 (1976). Resp.26, 38-39 (citing Petr.32-33).

Yet the Commission never explains how the Rule meets that agreed-upon definition. It can't, and the ordinary meaning of Section 18 proves that the Rule isn't "specific."

1. The Commission's Primary "Specificity" Argument Flouts The FTC Act's Text and Structure.

The Commission starts (at 25-28) by asserting that Section 18 requires only that the agency "identify" (at 26) the relevant acts or practices, repeatedly pointing to four supposedly "specific" unfair and deceptive practices: (i) "misrepresent[ing] material facts," (ii) "omitt[ing] important details," (iii) not getting "informed consent," and (iv) "impos[ing] unreasonable barriers to cancellation." But not once does the Commission fit those practices within the ordinary meaning of "specificity" or explain how they are "limited," "precise," "peculiar to a particular … group," or "free from ambiguity."

Again, it can't. At that level of generality, these statements are just broad truisms. Everyone knows it's unfair to omit important details or not get informed consent. Those things can happen in *any* context, and simply applying these highly generalized labels to a billion-plus different

4

contracts provides no specific guidance to anyone. "Specificity" demands details and limits, yet the Commission all but admits (at 40-42) that the Rule doesn't say how it will apply in any particular situation—say, a certain industry, type of subscription, or sort of consumer. Rather, the Commission says (at 40-42) it will tell companies what the Rule means when it brings enforcement actions against them. Section 18 forbids this "we'll explain later" approach, as the Commission effectively concedes (at 26) by acknowledging that Section 18 rules can't simply restate Section 5's more generalized standards.

Yet the Commission all but admits that the Rule's four basic prohibitions don't add any specificity beyond Section 5 itself. The Commission cites its own 2021 Enforcement Policy Statement (at 40) that discussed the exact same generic practices when discussing "four basic *Section 5* requirements" that sellers of recurring subscriptions "must follow to comply with *Section 5*." App.21 (emphases added). And the Commission reassures the Court (at 40-42) that the Rule will give companies guidance by citing *Section 5* cases that only applied those nonspecific standards to individual companies. Resp.40-42 (citing, *e.g.*, *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000) (Section 5 case);

5

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (same)).
The Rule thus promulgates Section 5-type high-level standards while
permitting the Commission to flesh out later, case-by-case, what precise
conduct is forbidden—but without Section 5's administrative notice
process before seeking penalties. Petr.42-43. That would upend the FTC
Act.

The Commission cites only *American Financial Services
Association v. FTC*, 767 F.2d 957 (D.C. Cir. 1985), to bolster its argument.
But that case doesn't help the agency. *American Financial* held that two
Credit Practices Rule provisions regulating certain practices were
"specific": a ban on taking non-purchase money security interests in
household goods and taking wage assignments when extending credit.
*Id.* at 964. Unlike the Rule here, those two provisions defined the unfair
or deceptive practices with precision for the "consumer finance industry."
49 FR 7740, 7740, 7745, 7752; *see also* 16 C.F.R. § 444.2 (current
codification). The Credit Practices Rule did not, by analogy, broadly ban
"misrepresenting material facts," or "not making it as easy to repay loans
as to obtain them." Nor did that regulation merely incorporate Section 5

Appellate Case: 24-3137    Page: 14    Date Filed: 04/04/2025 Entry ID: 5503654

standards to be later defined case-by-case, much less suffer from the myriad other flaws in this Rule.

The Commission's primary defense of the Rule accordingly fails.

> 2. The Plain Meaning Of "Specificity" Confirms That The Rule Isn't Specific.

The Rule fails to satisfy the ordinary meaning of "specificity" for two basic reasons: (1) the Rule isn't "limited" or "restricted" because it sweeps more broadly than five different statutes combined and covers the entire economy and dozens of disparate industries, contrary to how Congress and the Commission have long understood Section 18; and (2) the Rule isn't "definite" or "precise" because it employs highly generalized standards like "easy to use" or "material" that the Commission admits (at 40-42) will be defined through case-by-case enforcement.

> (i) The Rule's Scope Isn't "Limited," "Restricted," Or Focused On Any "Particular Group."

The Commission can't explain how regulating a billion-plus contracts used for everything from magazines to pet food is "limited," "restricted," or focused on any "particular … group." In asserting that "specificity" doesn't limit the scope of its rules (at 29), the Commission

7

ignores the undisputed definition of "specificity," Resp.26 (citing Petitioners' definitions). Section 18's history, Congress's other statutes, and basic rules of statutory interpretation all confirm that point.

*First*, both Congress and the Commission have made clear for decades that Section 18 rules should be limited to particular industries to be specific. Petr.33-36; S. Conf. Rep. 93-1408, at 7763 (1974); S. Rep. 96-500, at 3, 17 (1979); H.R. Rep. 103-138, at 3 (1993); *Ask the Commissioner: Federal Trade Commissioner Christine Varney*, 14 No. 2 ACCA Docket 36 (1996); S. Hrg. 111-647, at 59 (Feb. 4, 2010); *Rulemaking*, FTC.gov (last accessed Apr. 4, 2025), https://www.ftc.gov/enforcement/rulemaking. The Commission dismisses that mountain of evidence as "[p]ost-enactment" (at 36), but courts often rely on post-enactment references to the "settled understanding" of statutory terms, *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 551 n.6 (2008) (Scalia, J.); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393-94 (2024) (post-APA DOJ opinions and law review articles); *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 255 (2018) (same, Alien Tort Statute).

8

The Commission notes (at 24, 31-36) that it has issued economy-wide rules, such as the old Negative Option Rule, the Mail Order Rule, and its rules for consumer warranties. But as the Commission admits (at 32-33), Congress *exempted* those rules from Section 18. *See* 88 Stat. 2183, 2198 (1975) (these rules were valid as if "[Section 18] had … not been enacted"). This history thus undermines the Commission's position by showing that where Congress authorized economy-wide rules, it carved them out of Section 18's specificity limit.[1]

The Commission also doesn't dispute that Congress *blocked* two economy-wide rules under Section 18: one on children's advertising, and the other on standards for weights and measures. Petr.34-35.[2] Nor does it dispute that almost all the Section 18 rules from the Magnuson-Moss era that *weren't* blocked are industry-specific, such as the Eyeglasses

_____

[1] Contrary to the Commission's suggestion (at 27-28 n.5), its Amplifier, Mail Order, and Funeral Rules specified the prohibited conduct with more precision. 38 FR 4896 (failure to disclose rated power output); 40 FR 49492 (detailed description of shipping delays without consent); 47 FR 42260 (specific misrepresentations regarding embalming or caskets for cremation).

[2] Respondent's amici downplay this as "interbranch dialogue," Professors.Br.14-24, but Congress defunded the Commission and directly terminated these "overly broad" and "far reaching" Section 18 rulemakings, Petr.10-12.

Appellate Case: 24-3137    Page: 17    Date Filed: 04/04/2025 Entry ID: 5503654

Rule and the Funeral Home Rule. Petr.35. And the two Section 18 rules that the Commission claims (at 35) weren't industry-specific are nothing like this whole-economy Rule. The Credit Practices rulemaking explicitly targeted the "consumer finance *industry*," 49 FR at 7740, 7745, 7752 (emphasis added), and the 2011 Business Opportunity Rule was a niche rule targeting ventures like vending machines and rack displays; it went unchallenged and received little attention.

The Commission thus resorts to attacking strawmen. Petitioners aren't asking the Court to "add words" to Section 18, adopt a per-se "single-industry" limit, or rest on "legislative history." Resp.19, 36-38. Petitioners merely ask the Court to enforce the plain meaning of "specificity" as understood by Congress and the Commission for decades. Industry-specific rules have been the norm under Section 18 since Congress enacted it, and the Rule's application to the entire economy is compelling proof that it's far from "limited" or "restricted."

*Second*, the Rule is not "limited," "restricted," or "particular" because it is substantively overbroad. It strings together various catch-all phrases to regulate any and all practices "[i]n connection with promoting or offering for sale any good or service with a negative option

10

feature," including misrepresenting "expressly or by implication, any Material fact" whatsoever about the recurring subscription or the underlying good or service. Rule §§ 425.3, 425.4, 425.5, 425.6. That language is designed to cover maximum ground, and the Commission achieved its intended result: the Rule reaches over a *billion* existing contracts used by 220 million Americans for everything from broadband to diaper services.

Yet Congress has never regulated all recurring subscriptions at once. Rather, Congress enacted five different statutes that regulate different types of recurring subscriptions in different contexts. Petr.39. The Commission never disputes that the Rule is broader than all those statutes combined, or that the Rule's language is more generic than these statutes. *E.g.*, 47 U.S.C. § 1753(a) (detailing disclosures from broadband providers). Nor does the Commission explain how the Rule could be "restricted" or focused on any group when it extends more broadly than multiple congressional statutes.

*Third*, the utter lack of "historical precedent" for the agency's newfound "breadth of authority" is a "'telling indication' that the [Rule] extends beyond the agency's legitimate reach." *NFIB v. Dep't of Lab.*, 595

11

U.S. 109, 119-20 (2022) (per curiam).[3]  The Commission barely grapples with that principle, despite conceding that: (1) it has never enacted a Section 18 rule that's so expansive; (2) it issued only *one* new rule between 1984 and 2020; and (3) Congress, in *all* of its legislation on this topic combined, has never gone so far as this Rule.  This is precisely the sort of "rarely … used," "[e]xtraordinary," and "suddenly discovered" authority that the Supreme Court has cautioned against.  Petr.38 & n.5.

      (ii)    <u>The Rule's Terms Aren't "Definite" Or "Precise."</u>

Beyond the impermissibly sweeping scope of the Rule, the Commission fails to explain how the Rule's capacious terms are "definite" or "precise."  Resp.39-41.  Yet again, it can't; to address over a billion contracts across all industries, the Rule is forced to repeatedly employ malleable and often abstract requirements relating to "easy" cancellation mechanisms or "material" facts.  Petr.40-42.  These high-level generalities necessarily will result in countless case-by-case adjudications on the Rule's meaning in specific contexts.

_____

[3] Contrary to the Commission's suggestion (at 35 n.8), Petitioners didn't forfeit reliance on this basic rule or include it only in a footnote.  *See* Petr.37-38 (discussing the argument).

These questions will be far from easy. For example, cancelling online might be easier than via telephone for some, but Respondent's amici note that "seniors may find [online mechanisms] challenging." Consumer Law Br.4. And the Commission has suggested that a company's "characteristics" could be "material," App.402 (Add.19), leaving companies to guess as to what "characteristics"—from labor practices to political affiliations—might matter to the Commission. Section 18 does not permit this type of specification through adjudication; Section 18 rules must have "specificity" at the outset.

The Commission argues (at 39) that these problems aren't relevant in a "facial attack on a regulation," but that mischaracterizes Petitioners' argument. The Commission had "no authority" to issue a Section 18 rule lacking specificity, 15 U.S.C. § 57a(a)(2), and Petitioners' arguments show that the Rule lacks specificity.

To backfill the "specificity" that the Rule itself lacks, the Commission cites *other* sources, including guidance documents, Section 5 cases, and an SEC rule that supposedly will shed light on the Rule's admittedly amorphous terms. Resp.40-42. That the Commission is forced to rely on such extraneous sources—not one of which is subject to

13

Section 18's "specificity" limit—to gap-fill the Rule only confirms the Rule's lack of precision. And the Commission's reliance on these sources reinforces that this Rule represents exactly the unlawful approach that Petitioners identified: importing Section 5's case-by-case standards into a Section 18 rule. *See supra*, at 5-6.

***

This historically unprecedented Rule that covers the *entire* economy, employing general definitions and standards that lack *any* contextualization for anyone, is the polar opposite of "specific." The Commission fails to rebut that common-sense conclusion.

## B. The Rule Violates The "Prevalence" Requirement.

The Rule also must be set aside because it independently fails to satisfy Section 18's "prevalence" requirement. The Commission tries to erase this statutory limitation by claiming it's not judicially reviewable or, alternatively, reviewable only for substantial evidence. Neither argument has merit. And the Commission failed to show any evidence of prevalent problems commensurate with the Rule's economy-wide scope.

14

1.  <u>The Prevalence Requirement Is Judicially Reviewable.</u>

The Commission insists that the prevalence requirement isn't judicially reviewable (at 50-51), citing Section 18's bar on judicial review of the Rule's "statement of basis and purpose." But Petitioners aren't challenging the "contents and adequacy" of that statement. 15 U.S.C. § 57a(e)(5)(C). Petitioners are challenging *the Rule* as unlawful because the Commission applied the wrong "prevalence" standard. Petr.45 n.6. Section 18 requires both a statement of prevalence *and* judicial review for any Commission action that's contrary to law or lacks substantial evidence in the "rulemaking record." 15 U.S.C. § 57a(d)(1)(A), (e)(3). While courts can't review the "contents and adequacy" of the prevalence statement, they can look at the statement to determine whether the Commission legally erred or lacked evidence. *See id.* § 57a(e)(1)(B) ("rulemaking record" includes the statement of basis and purpose); *Am. Optometric Ass'n v. FTC*, 626 F.2d 896, 906 (D.C. Cir. 1980) ("consulting the statement of basis and purpose" to "understand[] the Commission's reasoning"). If there's doubt, the "presumption" in favor of judicial review resolves it. *Thigulla v. Jaddou*, 94 F.4th 770, 774 (8th Cir. 2024).

15

Regardless, the Commission is wrong (at 51) that the only "relevant" prevalence requirement is contained in the provision regarding the statement of basis and purpose, 15 U.S.C. § 57a(d). Section 18 elsewhere requires the Commission to "make a determination that unfair or deceptive acts or practices are prevalent" as a precondition to any rulemaking, entirely apart from the final statement of basis and purpose. *Id.* § 57a(b)(3). At a minimum, the Court can review that required finding of prevalence.

The Commission posits (at 51) that Section 18's "reason to believe" standard was intended to preclude judicial review, but courts can review agency actions under statutory "reason to believe" standards. *E.g.*, *FEC v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1474 (D.C. Cir. 1992). Moreover, the Commission's only cited case held that an agency's decision to issue a complaint was not a final agency action and is inapposite. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238-46 (1980).

> 2. The Commission Failed To Satisfy The Prevalence Requirement.

On the merits, the Commission failed to show that all of the practices regulated by the Rule were actually prevalent across the entire economy, as required to justify an economy-wide regulation. As with

16

"specificity," the Commission wants to define "prevalent" out of the statute. Petr.47-49. That's not a mere evidentiary issue, as the Commission argues (at 48-49), but a failure to comply with another statutory requirement for Section 18 rules.

Like specificity, the Commission never disputes the ordinary meaning of "prevalent": "widely or commonly occurring" or "dominant." Petr.44. Instead, the Commission asserts (at 52-53) that it need only meet the APA's arbitrary-and-capricious standard of "some basis or evidence" or a "rational basis" for its action. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024). But that isn't what "prevalent" means, and reading "prevalent" to mean "not an APA violation" would render "prevalent" a null term. And what the Commission decries (at 52-54) as "extraordinary" evidence matching the Rule's scope is just the showing needed under the undisputed definition of "prevalent." Petr.44. If the Commission is going to adopt an economy-wide rule, then it must show economy-wide prevalence, plain and simple.

The Commission's own brief confirms the point. The Commission repeatedly cites *Pennsylvania Funeral Directors Association, Inc. v. FTC*, 41 F.3d 81, 87 (3d Cir. 1994), to say that it has "no mandate" to establish

"that a practice be prevalent." But *Pennsylvania Funeral* concerned a Funeral Rule amendment that was issued *before* Congress added the "prevalence" requirements to Section 18. *See id.* at 83 (amendment in January 1994); Pub. L. No. 103-312, § 5, 108 Stat. 1691, 1692 (Aug. 1994). At the time, the Commission was following only its own guidance regarding prevalence. *Pa. Funeral*, 41 F.3d at 87. Even then, the Commission recognized that its prevalence findings would "vary depending on … the characteristics of the *industry involved*." *Id.* at 86 (emphasis added). In *Pennsylvania Funeral*, its determination was sufficient because the Commission relied on a survey of 31 respondents for a rule covering a niche industry of 200 funeral homes. *Id.* at 88. This economy-wide Rule, covering a billion contracts, demands far more.

Here, the prevalence determination is insufficient even if reviewed for substantial evidence. The Commission offers only anecdotes about problems and lawsuits in certain industries and surveys about free trial offers that many covered industries don't offer. There is no evidence—zero—that the acts or practices identified in the Rule are prevalent in business-to-business contracting, home warranties, fire detection services, or myriad other goods-and-services contracts that make up our

18

modern economy. *See* Service Contract Industry Council Br.15-21. The Commission feebly says that these problems "*could* arise" in any industry (at 53 (emphasis added)), but that's true of almost any problem. And the Commission points to a few dozen cease-and-desist orders (at 52), but never says that these are enough to even meet the "prevalence" baseline.

The Commission also claims (at 3) there are "tens of thousands" of consumer complaints per year, but even if that's true, it's a function of the lack of specificity in defining the problem. "If similarity among complaints and cases only at the highest level of generality" suffices, then any regulator could see problems anywhere. App.451 (Add.68). If that level of generality were enough, the Commission could just have said it receives complaints about "contracts" containing misrepresentations or omissions. On the Commission's view, Section 18's "prevalence" requirement would provide "no meaningful guardrail on the Commission's conduct at all." *Id.* That would re-write the statute.

## C. The Rule Overrides Numerous Federal Statutes That Already Regulate Recurring Subscriptions And Contravenes The Nondelegation Doctrine.

The Rule is contrary to law in yet another way: it second-guesses Congress's judgment in numerous federal statutes about what sorts of

practices are lawful or unlawful for these recurring subscriptions, making the Commission a super-legislature. Worse, it overrides those judgments without any principle to guide when it may do so. Petr.49-53. The Commission dances around these problems, trying to distinguish away the issue (at 43-47), but never squarely addresses Petitioners' arguments.

The Commission argues (at 43-46) that multiple statutes and agency regulations can cover the same conduct. But the issue here is that Congress enacted five different statutes with different standards for different recurring subscriptions in different contexts—yet the Rule would obliterate all those differences with a one-size-fits-all code for recurring subscriptions nationwide. Petr.50-51. And the Rule would deem all entities to be engaged in unfair or deceptive practices even if they comply with all of Congress's requirements, making that legislative effort pointless.

For instance, the 2021 Infrastructure Act, the Television Viewer Protection Act, and the Electronic Fund Transfer Act all provide different lists of required disclosures that are respectively tailored for broadband subscriptions, cable and satellite TV subscriptions, and recurring

20

electronic fund transfers. 47 U.S.C. §§ 562, 1753(a); 15 U.S.C. § 1693c(a)(5)-(6).[4] Those varying requirements reflect Congress's judgments on what terms each industry should disclose and how they should be disclosed. Yet the Rule concludes that a requirement to disclose all "material terms" is somehow preferable to Congress's more calibrated judgments, exposing entities to significantly more risk than Congress deemed warranted. It won't matter that companies disclose customized terms in the way that Congress required for their industries; the Rule's requirements will prevail. The Rule thus supersedes these laws by deeming compliance with them insufficient.

The Commission therefore misses the mark by noting (at 45) that some of these statutes, like ROSCA, preserve the Commission's authority elsewhere. The Rule still renders pointless Congress's judgments in multiple statutes by requiring more of companies than each statute does while supplanting their differences. That is precisely the sort of

---

[4] The Commission overlooks (at 46) that the EFTA extends broadly to "any other person who, directly or indirectly, holds an account belonging to a consumer"—not just banks exempted from the Commission's jurisdiction. 15 U.S.C. § 1693a(9).

Appellate Case: 24-3137     Page: 29     Date Filed: 04/04/2025 Entry ID: 5503654

"[e]xtraordinary" claim of authority that warrants additional scrutiny. *West Virginia v. EPA*, 597 U.S. 697, 723-25 (2022).

The Commission suggests (at 46-47) that there's no nondelegation problem because the "unfair or deceptive acts or practices" standard has long existed. But that *Section 5* standard doesn't give an intelligible principle on the limits of a *Section 18* rule and when Section 18 rules may override other statutes. Petr.52-53. For example, could the Commission issue Section 18 rules that regulate when medical contracts obtain "informed consent," when securities make "material misrepresentations," or when environmental practices are "unfair"—all while imposing stricter limits than existing federal law? Congress never clearly delegated such a broad grant of rulemaking authority; rather, it clearly *limited* the Commission's authority in Section 18. The Court should honor those limits and construe Section 18 to "avoid[] this kind of open-ended grant" of authority. *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality op.).

## II. The Commission Violated A Key Procedural Requirement By Failing To Issue A Preliminary Regulatory Analysis.

It is crystal-clear that the Commission failed to conduct Section 22's required preliminary regulatory analysis. That failure alone requires

22

"set[ting] aside" the Rule under Section 22, 15 U.S.C. § 57b-3(c)(1), and the Commission's attempts to excuse this fatal noncompliance fail.

## A.    The Preliminary Regulatory Analysis Was Required.

The Commission concedes that the Rule will affect the economy by $100 million or more annually and that it issued an NPRM for the Rule. 15 U.S.C. § 57b-3(a)(1)(A).  Under Section 22, those concessions trigger the need to issue a preliminary regulatory analysis.  *Id.* § 57b-3(a)(1)(A), (b)(1).  The text is clear: "[i]n *any* case in which the Commission publishes notice of a proposed rulemaking" that the Commission estimates will affect the economy by $100 million or more, "the Commission *shall* issue a preliminary regulatory analysis" for public comment.  *Id.* (emphases added).  The requirement is mandatory.

The Commission argues (at 63-66) that it was excused from complying with this requirement because it didn't estimate that the Rule would have such effects until *after* it issued the NPRM.  But Section 22 doesn't require the preliminary regulatory analysis to appear alongside an initial NPRM.  Rather, Section 22 says only that the Commission "shall issue" a preliminary regulatory analysis if it publishes an NPRM and makes such an estimate.  15 U.S.C. § 57b-3(b)(1).

23

Nor is there anything to suggest that the "public comment period" following the preliminary regulatory analysis must be the same as the comment period following the NPRM, as the Commission asserts (at 65-66). Section 22(b)(2) does not cross-reference Section 18 or the APA or even use the same language as those other provisions. *Compare* 15 U.S.C. § 57b-3(b)(2)(E) ("public comment period"), *with id.* § 57a(b)(1)(B) (parties may "submit written data, views, and arguments"); 5 U.S.C. § 553(c) (same). And the final regulatory analysis must respond to comments on the preliminary one, confirming the Commission can't skip it. 15 U.S.C. § 57b-3(b)(2)(E).

Nor would it matter if the Commission had to re-issue an NPRM to provide the preliminary regulatory analysis. It's not uncommon for agencies to re-issue NPRMs to ensure compliance with procedural requirements or if the scope of a proposed rule changes; the Commission itself has issued revised NPRMs to comply with the law. *See* 76 FR 76816 (revised NPRM for the Business Opportunity Rule). The Commission offers no reason why it couldn't do so here too.

The Commission instead asserts (at 64-65) that a preliminary regulatory analysis would be "wasteful makework" because it already

24

issued an NPRM and held an informal hearing on the Rule's costs. But agencies can't violate statutory requirements and forge ahead with rulemakings because they think the process required by Congress is not worth the effort. There is no "late stage" (at 22) excuse under Section 18. The Commission also ignores that the preliminary regulatory analysis was supposed to contain a cost-benefit analysis of the Rule *and its alternatives*—an analysis the public never got the chance to see or comment upon. 15 U.S.C. § 57b-3(b)(1)(C).

The Commission is thus wrong to say (at 64-65) that the preliminary analysis wouldn't have been "preliminary," or that the "process worked as designed." Congress wanted the public—who would experience the effects of so costly a regulation in their businesses and daily lives—to have the chance to communicate with the agency about whether the rule's burdens were warranted. By refusing to issue a preliminary regulatory analysis, the Commission never provided a cost-benefit analysis of the Rule's alternatives; never gave the public the chance to comment on that analysis; and never addressed comments that may have explained how less burdensome alternatives could provide comparable benefits. For an agency that relied so heavily on consumer

25

complaints to then so quickly dismiss the value of the public's views is remarkable.

## B. The Commission's Initial Estimate Was Arbitrary And Capricious.

The Commission has no response to Petitioners' argument that the Commission's initial estimate of the Rule's effects was arbitrary and capricious because the ANPRM was deficient and because the Commission unreasonably downplayed the Rule's effects. Petr.58-59. The ALJ found that the Commission's initial estimate was "clearly unrealistically low" by saying that the Rule would save consumers hours of time while costing businesses almost nothing because they supposedly already complied with the Rule. App.382. The Commission doesn't dispute this reason to vacate the Rule.

## C. The Commission's Prejudice Argument Fails.

As a fallback, the Commission argues that its noncompliance with the preliminary regulatory analysis requirement wasn't prejudicial, but the Commission misreads the FTC Act. Section 22 contains no prejudice requirement; it simply provides that courts "may set aside [the Rule] if the Commission has failed entirely to prepare a regulatory analysis," period. 15 U.S.C. § 57b-3(c)(1). The Commission misleadingly quotes

26

Section 18, but Section 22 independently authorizes vacatur for this key procedural failure.[5]

Even if the default administrative prejudice rules did apply, the Commission overstates them. When there is an "utter failure to comply with notice and comment," that failure "cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1338 (D.C. Cir. 2023); *see also United States v. Brewer*, 766 F.3d 884, 891-92 (8th Cir. 2014) (similar); *Nat'l Auto. Dealers Ass'n v. FTC*, 127 F.4th 549, 559-61 (5th Cir. 2025) (same). That's what occurred here: the Commission utterly failed to give notice of its preliminary regulatory analysis or allow the public to comment on it.

As a result of this failure, Petitioners and the public *have* suffered prejudice from the Commission's failure. From the start, Petitioners have been trying to show the Commission that their industries don't engage in the unfair or deceptive practices; that the Rule's costs are more

---

[5] Respondent's amicus, Main Street Br.21, notes that Section 22(c)(3) "do[es] not alter the substantive or procedural standards *otherwise* applicable to judicial review of" the Rule, 15 U.S.C. § 57b-3(c)(3). But that provision applies to *other* "substantive or procedural standards"— not to Section 22's requirements.

than the Commission's estimates; and that less restrictive alternatives could achieve the same purported benefits. *E.g.*, App.88, 117-22, 151-52. Had the Commission issued a preliminary regulatory analysis, with cost-benefit analyses of alternatives to the Rule, Petitioners could have commented on those analyses and attempted "to dissuade [the] agency from adopting" so broad a Rule. *Citizens Telecomms. Co. of Minn. v. FCC*, 901 F.3d 991, 1006 (8th Cir. 2018). Losing that "opportunity … is prejudicial." *Id.*

By the same token, the Commission's suggestions (at 65-68) that Petitioners were able to comment on the initial estimate of the Rule's costs or participate in the informal hearing fall flat. No one could comment on the Commission's preliminary cost-benefit analysis of alternatives to the Rule, at any point in the process, because the Commission never conducted or published that analysis. And the informal hearing was limited solely to the Rule's recordkeeping and disclosure costs and whether the Rule would annually affect the economy by $100 million or more—not the costs and benefits of the Rule's alternatives. App.376-77.

28

If the Court were to excuse the Commission's statutory noncompliance here, it would blaze a trail for future Commission noncompliance with Section 22. Future Commissioners would know that they need only provide an "unrealistically low" initial estimate of a rule's effects in the NPRM, App.382, and then entirely avoid issuing any cost-benefit analysis of a rule's alternatives for public comment. The Court should not countenance that result, which contravenes Congress's intent.

## III. The Rule Is Arbitrary And Capricious.

The Commission failed to address multiple problems raised by the Rule, including how the Rule will: (1) apply to business-to-business transactions; (2) affect cancellation of critical and bundled services; (3) require two-step consent for contracts; and (4) employ a vague and overbroad materiality standard.

*First*, the Commission failed to justify the Rule's application to business-to-business transactions. The Commission states (at 55) that subscriptions can harm businesses just like individuals. But the record contains just a handful of examples of problems in business-to-business contracting, and the Commission never adequately considered how businesses tend to negotiate more sophisticated contracts than ordinary

29

consumers. Petr.46. The Commission also fails to consider that there are many contexts where small businesses sell recurring subscriptions to large corporate subscribers. *See id.* Those failures are textbook arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*Second*, the Commission tries to salvage the problems with the Rule's cancellation requirement by saying (at 57-58) that the Rule allows for "reasonable verification" or "appris[ing] consumers" of the consequences of cancellation. But those quotations are from the Commission's nonbinding statement of basis and purpose—*not* the Rule's text. App.414, 420 (Add.31, 37). And the Commission never explains how companies can know what constitutes "*reasonable* verification" beyond its one-minute-to-cancel estimate that does not "set a standard" and some drive-by references to "symmetry" with enrollment. Resp.59.

The Commission questions why companies might need a telephone call for contracts entered online (at 58-59), but Petitioners already explained this, *see* Petr.61-62. Security services might need to speak with consumers to make sure their email accounts aren't hacked, and pre-packaged bundled services might need to explain what cancelling one

30

service will do to the others. *Id.* Even if a telephone call isn't required, protecting customers from malicious or inadvertent cancellation of security services or explaining the consequences of cancelling bundled services might require more electronic steps than sign-up. *Id.*

*Third*, the Commission doesn't deny that the Rule effectively requires two separate consents per transaction, but now says (at 61) that contracts routinely require multiple consents. That's certainly not the case for many recurring subscriptions. Yet the Rule would require *all* companies offering recurring subscriptions to revise their contracts to obtain double-consents. By the Commission's own words, that requirement will be "hard to implement for many sellers" and will "cause consumer confusion." App.410-11 (Add.27-28). The Commission never grappled with how these problems could be avoided.

*Fourth*, the Commission insists (at 62) that its materiality standard provides "concrete guidance grounded in longstanding precedent." But it admits that it will have to continue resolving what is "material" for companies on a case-by-case basis. Resp.40-42 (citing Section 5 cases). Businesses accordingly will have to guess as to what they can and can't say under the Commission's purview. And, as explained above, Section

31

18 lacks Section 5's guardrails to ensure that companies receive notice of what particular facts are "material" before penalties can be imposed.

As to the Commission's decision to regulate the disclosure of *all* material terms—even those unrelated to the recurring subscription—the Commission argues (at 62-63) that charges for subscriptions can "multiply over time." But then why didn't the Commission limit the Rule to charges for subscriptions? The Commission never explains why concerns about recurring subscription agreements warrant its regulation of terms that are wholly unrelated to the charges for subscriptions, such as the "characteristics of the seller," which could mean almost anything from whether a company's products were assembled in the United States to whether the company is woman-owned. App.402 (Add.19).

## IV. The Rule Should Be Vacated.

Finally, the Commission asks (at 69-71) that the Court limit relief to certain parts of the Rule or certain parties. There's no authority for that request.

*First*, Petitioners' challenges go to the lawfulness of the entire Rule. If the Rule is unlawful because it lacks specificity or prevalence, the Commission had "no authority" to promulgate the Rule at all, 15 U.S.C.

32

§ 57a(a)(2), and the Court "shall hold unlawful and set aside *the rule*"—
not just part of it, *id.* § 57a(e)(3) (emphasis added). Similarly, if the Rule
was procedurally flawed, or arbitrary and capricious, "the rule" must be
set aside. *Id.*; *see also id*. § 57b-3(c)(1) ("upon review of *a rule*" a court
"may set aside such rule" for failure to conduct regulatory analysis)
(emphasis added).

*Second*, there is no basis for the FTC's odd suggestion that vacatur
is not a legitimate remedy. The APA provides that a "reviewing court
shall … set aside" unlawful agency action. 5 U.S.C. § 706(2); *see also* 15
U.S.C. § 57a(e)(3) ("set aside"); *id*. § 57b-3(c)(1) (same). Well-settled
precedent across the country and this circuit teaches that this language
means vacatur, and that "vacatur is the normal remedy when a rule is
found unlawful." *Am. Pub. Gas Ass'n*, 72 F.4th at 1342 (cleaned up);
*North Dakota v. EPA*, 730 F.3d 750, 764 (8th Cir. 2013) (vacating rule);
*Iowa League of Cities v. EPA*, 711 F.3d 844, 875-76 (8th Cir. 2013) (same);
*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971)
(rule "must be set aside" "[i]n all cases"); *Corner Post, Inc. v. Bd. of
Governors of Fed. Reserve Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J.,
concurring) ("The text and history of the APA authorize vacatur."). The

33

Commission cites no case that has held otherwise, and this Court should not be the first.

Relatedly, the Commission takes a passing shot at Petitioners' associational standing, but that's a nonstarter. Because the Commission concedes (at 71) that Custom Alarm has standing, and all Petitioners seek the same relief, no further inquiry into associational standing is needed. *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) (per curiam).

Regardless, the Commission misrepresents the law of associational standing. Associations have standing so long as they identify "at least *one* of their members" with standing. *Worth v. Jacobson*, 108 F.4th 677, 686 (8th Cir. 2024) (emphasis added). And if an organization has associational standing, it may obtain relief that "will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975); *Worth*, 108 F.4th at 685-86 (granting relief to an association that identified one member). The Commission misleadingly quotes *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022), but that case involved an association that "failed to

34

identify *any* [injured] members," *Worth*, 108 F.4th at 686 (emphasis added). Here, Petitioners *have* identified injured members. Resp.71.

## CONCLUSION

If the Commission can adopt an economy-wide rule regulating general business practices in high-level terms without showing the abuses are dominant economy-wide, and skipping public comment on potential alternatives, then it can do almost anything under Section 18. But Congress didn't take the time to impose restrictions to stop the Commission's prior freewheeling rulemakings as a pointless exercise. Petitioners respectfully request that the Court vacate the Rule.

Dated: April 4, 2025

Respectfully submitted,

*/s/ Helgi C. Walker*
Helgi C. Walker
 *Counsel of Record*
Lucas C. Townsend
Michael Corcoran
Lael D. Weinberger
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

35

Elliott M. Davis
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, D.C. 20006
(202) 783-8400
edavis@shb.com

*Counsel for Custom Communications, Inc., d/b/a Custom Alarm*

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE FLOWERS LLC
P.O. Box. 8248
Cincinnati, OH 45249
(513) 201-5775
bflowers@ashbrookbk.com

*Counsel for Michigan Press Association and the National Federation of Independent Business, Inc.*

Mark D. Johnson
GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.
777 Gloucester Street
Suite 200
Brunswick, GA 31520
(912) 265-6700
mjohnson@ghsmlaw.com

*Counsel for the Chamber of Commerce of the United States of America and the Georgia Chamber of Commerce*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

*Counsel for the Chamber of Commerce of the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

/s/ Helgi C. Walker
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f), it contains 6,490 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook LT.

I further certify that this brief has been scanned for viruses and is virus-free.

Dated: April 4, 2025

*/s/ Helgi C. Walker*
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioners*